## TABLE OF CONTENTS, BRANDI CHANNON'S 2255 MOTION

GROUNDS UNDER ARTICLE I, AMENDMENT IV, AMENDMENT VIII

**I.  MOVANT'S ARTICLE I SECTION 1 RIGHT AGAINST EXTRACONGRESSIONAL LEGISLATION, ARTICLE I SECTION 9 RIGHT AGAINST EX POST FACTO LAWS, 6TH AMENDMENT RIGHT TO BE INFORMED OF CRIMINAL CHARGES, 5TH AMENDMENT RIGHT TO DUE PROCESS, AND 6TH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL, WERE VIOLATED WHEN HER COUNSEL FAILED TO CHALLENGE THE INDICTMENTS AGAINST HER FOR FAILURE TO STATE A CLAIM** ............................................. 1

    A. NO SCHEME OR ARTIFICE TO DEFRAUD WAS ALLEGED ........................... 1

    B. NO MATERIAL PRETENSES ALLEGED FOR ACCOUNT CREATIONS ..................... 1

    C. NO PRETENSES, MATERIAL OR OTHERWISE, WERE ACCURATELY ALLEGED FOR OTHER ACTS IN FURTHERANCE ...................................................................... 2

    D. THE SUPERSEDING INDICTMENTS FAIL TO ALLEGE IN COUNTS 1SS–5SS THAT DEFENDANTS TRANSMITTED OR CAUSED ANY TRANSMISSION ....................................... 3

    E. THE INDICTMENTS FAILED TO ALLEGE THAT WHAT WAS SENT, OR CAUSED TO BE SENT, INCLUDED WRITINGS, SIGNS, SIGNALS, PICTURES, OR SOUNDS ................... 4

    F. THE SUPERSEDING INDICTMENTS FAILED TO STATE A CONSPIRACY CLAIM DUE TO USE OF DISJUNCTIVE AND/OR PASSIVE VOICE ...................................... 4

    G. AFFIRMATIVE DEFENSES WERE APPLICABLE BUT NEVER RAISED BY COUNSEL .......... 4

        1. GOOD FAITH ....................................................... 4

        2. EXPRESS CONSENT .................................................. 5

        3. NOVATION ......................................................... 6

        4. ENTRAPMENT ....................................................... 6

    H. THE MAXPERKS REWARDS RULES WERE NOT BINDING LAW ....................... 8

    I. THE INDICTMENTS DID NOT ALLEGE THE ACTUAL MAXPERKS REWARDS RULES WERE VIOLATED ......................................................................... 10

        1. "ONE ACCOUNT PER PERSON" ........................................ 10

        2. "FOR TEACHERS ONLY" .............................................. 11

    J. THE GOVERNMENT SUPERSEDED A DEFECTIVE INDICTMENT TO AVOID DISMISSAL BUT ARGUED ITS CASE BASED ON THE DEFECTIVE INDICTMENT ............................ 13

        1. THE SECOND SUPERSEDING INDICTMENT WAS MERELY DISGUISED MOTIONS PRACTICE TO END-RUN AROUND MOVANT'S SIXTH AMENDMENT RIGHTS TO BE INFORMED OF CHARGES 13

        2. WHERE MOVANT'S MERCHANDISE CAME FROM ............................ 15

    K. MULTIPLE OPPORTUNITIES FOR ADEQUATE ASSISTANCE OF COUNSEL WERE OVERLOOKED OR FRUSTRATED, AND A SIMPLE ONE-PAGE MOTION BY DEFENSE COUNSEL COULD HAVE OBVIATED NOT ONLY THE REST OF THESE COUNTS BUT MULTIPLE YEARS OF LITIGATION IN THIS CASE ......................................................... 16

    L. THE SUPERSEDING INDICTMENTS FAILED TO STATE WHICH STATUTE WAS CHARGED UNDER WHICH COUNT ....................................................... 18

**II.  MOVANT'S 4TH AMENDMENT RIGHT FOR NO WARRANTS TO ISSUE BUT UPON PROBABLE CAUSE, AND 6TH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL, WERE VIOLATED WHEN HER COUNSEL FAILED TO CHALLENGE A FALSIFIED SEARCH WARRANT AFFIDAVIT** ................................................. 19

**III.  MOVANT'S ARTICLE I SECTION 9 RIGHT AGAINST EX POST FACTO LAWS, 6TH AMENDMENT RIGHT TO COMPEL WITNESSES TO APPEAR, AND TO ASSISTANCE OF COUNSEL, WERE VIOLATED WHEN COUNSEL FAILED TO COMPREHEND THE RULES AND EVIDENCE** ......................................................... 20

IV.   MOVANT'S 1ST AMENDMENT RIGHT OF THE PRESS AND TO PEACEABLY
ASSEMBLE, 4TH AMENDMENT RIGHT TO BE SECURE IN HER PERSON AND HOUSE, 5TH
AMENDMENT RIGHT NOT TO BE COMPELLED IN A CRIMINAL CASE TO BE WITNESS
AGAINST HERSELF NOR TO BE DEPRIVED OF LIBERTY WITHOUT DUE PROCESS OF
LAW, NOR PRIVATE PROPERTY TAKEN FOR PUBLIC USE, AND 6TH AMENDMENT RIGHT
TO HAVE ASSISTANCE OF COUNSEL FOR HER DEFENSE WERE VIOLATED WHEN HER
HOME WAS INVADED, HER SMARTPHONE SEIZED, HER PERSON ABDUCTED, HER
ASSOCIATION WITH FAMILY ABRIDGED, HER BACKYARD SEIZED TO FORM AN AD HOC
INTERROGATION ROOM, HER WILL OVERBORNE, HER CONFESSION OBTAINED, AND
COUNSEL FAILED TO EFFECTIVELY REPRESENT HER ......................... 25

   A. FBI NOTES INCONSISTENT WITH REALITY ................................. 25
   B. INCONGRUITIES BETWEEN TESTIMONY AND MEMORANDUM OPINION .................. 26
      1. COERCIVE ENVIRONMENT HAD NO TIME TO DISSIPATE ...................... 26
      2. "NERVOUS YET COMFORTABLE" ....................................... 27
      3. PULLED OUT THE FRONT DOOR ....................................... 27
      4. "BRIEF LITTLE PATDOWN" .......................................... 28
      5. PERMISSION NEVER GIVEN .......................................... 28
   C. MOVANT'S LUPUS ...................................................... 29
   D. MOVANT'S CAT WAS IN DANGER AND LEAVING WAS NOT VOLUNTARY ............... 31
   E. MOVANT'S RIGHT TO REPRESENTATION WAS VIOLATED ......................... 33
   F. MOVANT'S SELF-DISCREDITING CONFESSION ................................ 33


GROUNDS UNDER AMENDMENT V

V.   MOVANT'S 5TH AMENDMENT RIGHT NOT TO BE HELD ON AN INFAMOUS CRIME,
UNLESS ON AN INDICTMENT OF A GRAND JURY, WAS VIOLATED WHEN SHE WAS
CHARGED BY WAY OF AN INDICTMENT LACKING ANY SIGNATURE .............. 34


VI.   MOVANT'S 5TH AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS INVOLVING
AN UNBIASED TRIBUNAL, 6TH AMENDMENT RIGHT TO TRIAL BY AN IMPARTIAL
JURY, AND 8TH AMENDMENT RIGHT AGAINST EXCESSIVE FINES WERE VIOLATED
WHEN THE JUDGE PREJUDGED HER GUILT ................................. 35


VII.   MOVANT'S 5TH AMENDMENT RIGHT TO DUE PROCESS AND GRAND JURY
SCREENING OF INDICTMENTS, AND 6TH AMENDMENT RIGHT TO BE INFORMED OF
CRIMINAL CHARGES, CONFRONT WITNESSES, AND COMPEL WITNESSES TO APPEAR IN
COURT WERE VIOLATED WHEN THE AUSA AND FBI MANUFACTURED EVIDENCE USED AT
TRIAL   ............................................................. 37

   A. IP ADDRESS IRREGULARITIES .......................................... 37
   B. THE EVIDENCE ITSELF WAS ARGUMENTATIVE ................................ 40
   C. NO GMAIL SERVERS IN NEW MEXICO ..................................... 40
   D. SYNTHESIZED TRIAL EXHIBITS ......................................... 41
   E. GRAND JURY IRREGULARITIES .......................................... 42


VIII.   MOVANT'S 5TH AMENDMENT RIGHT TO DUE PROCESS OF LAW AND 6TH
AMENDMENT RIGHT TO HAVE THE ASSISTANCE OF COUNSEL FOR HER DEFENSE, WERE
VIOLATED WHEN THE JUDGE FAILED TO PROVIDE AN OPPORTUNITY FOR, AND HER
COUNSEL FAILED TO SEEK, A LAST-MINUTE CONTINUANCE BEFORE JEOPARDY
ATTACHED ........................................................... 43


IX.   MOVANT'S 6TH AMENDMENT RIGHT TO A JURY POOL COMPOSED OF A FAIR
CROSS-SECTION OF THE COMMUNITY, AND 5TH AMENDMENT RIGHTS OF JURORS TO
EQUAL PROTECTION UNDER THE LAW, WERE VIOLATED BECAUSE OF THE DISPARITY
BETWEEN THE PERCENTAGE OF MEN ON THE QUALIFIED JURY VENIRE AND THE
PERCENTAGE OF MEN IN THE POPULATION OF THE DISTRICT OF NEW MEXICO ... 45

**X.  MOVANT'S 5TH AMENDMENT RIGHT NOT TO BE HELD ON AN INFAMOUS CRIME, UNLESS ON AN INDICTMENT OF A GRAND JURY, WAS VIOLATED WHEN SHE WAS CHARGED BY WAY OF GRAND JURY PROCEEDINGS TAINTED BY PROSECUTORIAL MISCONDUCT; AND MOVANT'S 6TH AMENDMENT RIGHTS TO BE CONFRONTED WITH THE WITNESSES AGAINST HER AND TO COMPEL WITNESSES IN HER FAVOR WERE VIOLATED WHEN BRADY EVIDENCE WAS PROVIDED LATE AND JENCKS EVIDENCE WAS WITHHELD** ............................................................. 46

    A.  The First Superseding Indictment's Grand Jury Transcript Was Impermissibly Redacted By AUSA Messec........................................... 46

    B.  The Second Superseding Indictment's Grand Jury Transcript Was And Is Being Impermissibly Withheld By AUSA Kastrin ............................. 46

    C.  Brady Evidence Was Produced Late .................................. 47

**XI.  MOVANT'S 5TH AMENDMENT RIGHT TO DUE PROCESS AND 6TH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL WERE VIOLATED THROUGH GOVERNMENT WITNESS STEVEN GARDNER'S BLACKMAIL AND PERJURY, AND COUNSEL'S WAIVER OF OBJECTION** ........................................................... 47

    A.  Blackmail ....................................................... 47

    B.  Perjury In Preparation And Proffer Of Evidence ........................ 50

**XII.  MOVANT'S 5TH AMENDMENT RIGHT TO DUE PROCESS, HER 6TH AMENDMENT RIGHT TO TRIAL BY AN IMPARTIAL JURY, TO BE INFORMED OF CRIMINAL CHARGES, TO CONFRONT WITNESSES, TO COMPEL WITNESSES TO APPEAR IN COURT, AND TO HAVE ASSISTANCE OF COUNSEL FOR HER DEFENSE, WAS VIOLATED WHEN HER COUNSEL FAILED TO APPEAL THE USE OF UNTRUSTWORTHY HEARSAY EVIDENCE AGAINST HER** ............................................................ 51

    A.  Authenticity.................................................... 52

    B.  Reliability ....................................................... 54

    C.  Authorship ...................................................... 56

    D.  803(6)(E) Objections At Trial .................................... 59

**XIII.  MOVANT'S 5TH AMENDMENT RIGHT TO DUE PROCESS OF LAW AND 6TH AMENDMENT RIGHTS TO A SPEEDY AND PUBLIC TRIAL, AND TO BE INFORMED OF CRIMINAL CHARGES AGAINST HER, AND TO HAVE ASSISTANCE OF COUNSEL FOR HER DEFENSE, WERE VIOLATED WHEN THE GOVERNMENT VINDICTIVELY PROSECUTED HER, AND HER COUNSEL BOTH SUPPORTED THE PLEA OFFER AND DECLINED TO MENTION IT TO THE COURT** ...................................................... 59

**XIV.  MOVANT'S 5TH AMENDMENT RIGHT TO DUE PROCESS AND 6TH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL WERE VIOLATED THROUGH THE COURT'S ADOPTION OF A JURY INSTRUCTION AT ODDS BOTH WITH THE STATUTE AND INDICTMENT, AND COUNSEL'S WAIVER OF OBJECTIONS** ..................... 61

GROUNDS UNDER AMENDMENT VI

**XV.  MOVANT'S 6TH AMENDMENT RIGHT TO A SPEEDY AND PUBLIC TRIAL, AND 6TH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL, WAS VIOLATED WHEN HER COUNSEL FAILED TO RAISE A SPEEDY TRIAL ACT VIOLATION BOTH AT THE TRIAL COURT AND ON APPEAL** ..................................................... 62

    A.  Movant Aggressively Sought The Dismissal Motion........................ 62

    B.  Neither Defendant Contributed Significantly To The Periods Of Delay In This Case, Despite The Arrival Of Their First Child ......................... 63

    C.  The Delay Adversely Impacted Movant's Ability To Present A Defense ....... 64

D. THE GOVERNMENT FILED TWO SUPERSEDING INDICTMENTS TO SUCCESSFULLY DISCOURAGE AND INTIMIDATE MOVANT'S COUNSEL FROM MOVING TO DISMISS UNDER THE SPEEDY TRIAL ACT ........................................................ 65
E. NOWHERE NEAR AS LOW AS 70 NON-EXEMPT DAYS PASSED ..................... 65
F. THE SUPERSEDING INDICTMENTS ALSO EXCEEDED THE SPEEDY TRIAL CLOCK ......... 66
G. THE FINAL INDICTMENT ALONE EXCEEDED THE SPEEDY TRIAL CLOCK .............. 66
H. COUNSEL FAILED TO MOVE TO DISMISS UNDER SPEEDY TRIAL GROUNDS ON THE EVE OF TRIAL ................................................................. 67

XVI.   MOVANT'S 6TH AMENDMENT RIGHT TO COMPEL WITNESSES TO APPEAR AND TO HAVE ASSISTANCE OF COUNSEL FOR HER DEFENSE WAS VIOLATED WHEN HER COUNSEL WITHDREW HIS MOTION TO COMPEL AND WAIVED SUBPOENAS UNTIL TRIAL WAS OVER ............................................................... 67

XVII.   MOVANT'S 6TH AMENDMENT RIGHT TO CONFRONT WITNESSES, AND TO COMPEL WITNESSES TO APPEAR, AND TO ASSISTANCE OF COUNSEL, WERE VIOLATED WHEN COUNSEL FAILED TO CALL ANY WITNESSES, BE THEY EXPERT, FACT, OR LAY ................................................................... 69
A. BESIDES AN ACCOUNTANT WHO DID NOT TESTIFY, COUNSEL INVOLVED ZERO WITNESSES TOTAL AT TRIAL ............................................................ 69
B. DUE TO PROSECUTORIAL MISCONDUCT AND JUDICIAL ERROR, COUNSEL INEFFECTIVELY FAILED TO LAY THE BASIS FOR MCHARD TO TESTIFY ............................... 74
C. NEITHER COUNSEL EVER CALLED MCHARD TO TESTIFY ......................... 75
D. WITHOUT DEFENSE WITNESSES, THE COURT DID NOT UNDERSTAND THE INDICTMENT .... 76

XVIII.   MOVANT'S 6TH AMENDMENT RIGHT TO HAVE COMPULSORY PROCESS FOR OBTAINING WITNESSES IN HER FAVOR, AND TO HAVE THE ASSISTANCE OF COUNSEL FOR HER DEFENSE, WAS VIOLATED WHEN HER COUNSEL FAILED TO INTRODUCE OR DEVELOP EXCULPATORY EVIDENCE ................................................. 77
A. THE GOVERNMENT'S SPREADSHEET EVIDENCE IS INTERNALLY INCONSISTENT, SHOWING MOVANT AND CO-MOVANT TRAVELING BETWEEN STORES AT UNLIKELY SPEEDS ......... 78
B. THE GOVERNMENT'S SPREADSHEET EVIDENCE EXHIBITS OTHER TIME-AND-SPACE ERRORS DUE TO MISKEYS ........................................................... 80
C. THE GOVERNMENT'S SPREADSHEET EVIDENCE SHOWCASES SYSTEMIC CLERICAL ERRORS IN UNLIKELY PLACES AFTER ALL RELEVANT CONDUCT HAD CEASED ................... 81
D. ACCOUNT CREATION TIMES OVERLAPPED WITH STORE CHECKOUT TIMES AND FLIGHT TIMES 82
E. MOST ACCOUNT CREATIONS WERE DONE VIA PAPER SIGN-UP AND COULD NOT HAVE BEEN REASONABLY FORESEEN TO CAUSE WIRE TRANSMISSIONS ........................ 85
F. MOVANT DID NOT USE "ADVANCED COMPUTER SKILLS" OR "SCRIPTS" TO CREATE ACCOUNTS OR PERFORM ADJUSTMENTS ............................................... 86
   1. CONTRARY CONFESSION ................................................. 86
   2. MEANING OF "SCRIPT" ................................................. 86
   3. TYPOS USUALLY INDICATE A COMPUTER *DID NOT* DO THE TYPING ............. 88
   4. MOVANT'S AUTHORSHIP UNQUESTIONED ..................................... 88
   5. THERE WAS NO COMPUTER PROGRAM ....................................... 89
G. MOVANT AND HER CO-DEFENDANT WERE PROVABLY NOT "SNEAKING AROUND" ......... 90
   1. NO ONE WITH KNOWLEDGE TESTIFIED ..................................... 91
   2. NO INNOCUOUS THEORY FOR STAGGERED ENTRANCES ADVANCED ................. 91
   3. NO INNOCUOUS THEORY FOR QUICK BEHAVIOR ADVANCED ..................... 92
   4. NO EMPLOYEES WERE CALLED TO TESTIFY ................................. 92
   5. RIDICULOUS ASSERTIONS ABOUT VIDEO EVIDENCE UNCHECKED ................. 92
   6. INTERSTATE TRAVEL CONCLUSIONS UNCONTESTED ........................... 93
   7. OFFICEMAX SALES ASSOCIATES ARE NOT RUBES ........................... 94
   8. INVALID MAILING ADDRESSES ........................................... 95
   9. TELEPHONE ADMISSIONS ................................................. 95
   10.  PREJUDICE AT SENTENCING ............................................ 96

**XIX.   MOVANT'S 6TH AMENDMENT RIGHT TO CONFRONT WITNESSES, AND TO COMPEL WITNESSES TO APPEAR, TO TRIAL BY AN IMPARTIAL JURY, AND TO ASSISTANCE OF COUNSEL, WERE VIOLATED WHEN THE JUDGE ALLOWED LEADING TESTIMONY AND FORBADE CROSS-EXAMINATION, AND COUNSEL FAILED TO OBJECT ON APPEAL ... 97**

    **A. LEADING WITNESSES** ............................................ **97**
        1. WHOLESALE LEADING ......................................... **97**
        2. AUSA VIERBUCHEN AND THE COURT LEGISLATED THEIR OWN SUBCHAPTER OF 611 FOR "FOUNDATIONAL" TESTIMONY ....................................... **98**
    **B. SANDBAGGING THE DEFENSE** ...................................... **99**

**XX.   MOVANT'S 6TH AMENDMENT RIGHT TO TRIAL BY AN IMPARTIAL JURY, AND TO HAVE ASSISTANCE OF COUNSEL FOR HER DEFENSE, WAS VIOLATED WHEN HER COUNSEL REFUSED TO BRING SLEEPING JURORS TO THE COURT'S ATTENTION .. 100**

**XXI.   MOVANT'S 6TH AMENDMENT RIGHT TO CONFRONT WITNESSES, AND TO HAVE ASSISTANCE OF COUNSEL FOR HER DEFENSE, WAS VIOLATED WHEN GOVERNMENT PROSECUTORS THEMSELVES TESTIFIED AT SUMMATION AND REBUTTAL AND HER COUNSEL REFUSED TO OBJECT, AND MOVANT'S 8TH AMENDMENT RIGHT TO A RELIABLE SENTENCING DETERMINATION WAS DEPRIVED BY GOVERNMENT PROSECUTORS' UNFAIR CLOSING ARGUMENTS. ........................... 101**

    **A. FALSEHOODS IN RULE 29 RESPONSE** ................................ **101**
    **B. MATTERS NOT IN EVIDENCE DURING SUMMATION AND REBUTTAL** ............. **102**
        1. VIERBUCHEN TESTIFIES THE CHANNONS ARE NOT TEACHERS ................. **102**
        2. VIERBUCHEN TESTIFIES E-MAILS CROSSED STATE LINES................. **103**
        3. VIERBUCHEN TESTIFIES MOVANT USED ACCOUNTS THAT WERE THEMSELVES FAKE ... **104**
        4. VIERBUCHEN TESTIFIES THE CHANNONS USED CARDS IN SOMEONE ELSE'S NAMES .. **104**
        5. VIERBUCHEN TESTIFIES AS TO WHAT WORDS THE DEFENDANTS SPOKE .......... **105**
        6. VIERBUCHEN TESTIFIES THE DEFENDANTS PRETENDED NOT TO KNOW EACH OTHER AND TESTIFIES AS TO THEIR STATE OF MIND ........................... **105**
        7. VIERBUCHEN TESTIFIES WHEN A PHOTOGRAPH WAS TAKEN.................. **106**
    **C. UNQUALIFIED STATEMENTS OF LAW** .................................. **107**
    **D. UNQUALIFIED OPINIONS OF GUILT** ................................. **107**
    **E. BURDEN-SHIFTING** .............................................. **108**
    **F. ADMONISHING THE JURY TO IMAGINE MOVANT'S GUILT** ................. **109**
    **G. STOKING PASSION OR PREJUDICE IN THE JURY** ...................... **109**
        1. SYMPATHY FOR "REAL TEACHERS" ................................ **110**
        2. SYMPATHY FOR "HONEST BUSINESS" ............................. **110**
        3. HOSTILITY TOWARD MOVANT'S VERACITY .......................... **111**
        4. FURTHER HOSTILITY TOWARD MOVANT'S VERACITY.................... **112**
        5. HOSTILITY TOWARD THE CHANNONS' PHOTOGRAPH .................... **113**

### BRANDI CHANNON'S 2255 MOTION EXHIBIT LIST

1  Letter from Albuquerque Public Schools
2  7/7/15 Hearing Transcript, at 25-27
3  Dkt. 286, Order to Strike Surplusage
4  Court's Jury Instructions, at 3-4
5  Trial Transcript, at 954-955
6  Trial Transcript, at 958-962
7  Trial Transcript, at 1002-1006
8  Second Superseding Indictment
9  First Superseding Indictment
10 Original Indictment
11 Office Depot Subpoenaed Documents
12 Trial Transcript, at 333-336
13 Search Warrant Affidavit
14 Receipt Adjustment Screen
15 eBay Fraud Record (Gardner)
16 eBay Fraud Record (Sipko)
17 302 Interview Gardner (Boady)
18 Investigative Notes (Gardner)
19 Trial Transcript, at 622
20 10/28/15 Hearing Transcript, at 104-105
21 1/11/16 Hearing Transcript, at 230-231
22 1/11/16 Hearing Transcript, at 243-244
23 E-mail to AUSA Paige Messec (Gardner)
24 Forwarded E-mail from Jim LaFontaine (Gardner)
25 1/6/16 Hearing Transcript, at 117-118
26 E-mail to Gardner (Boady)
27 E-mail to AUSA Paige Messec (Boady)
28 302 Evidence Review Including Gardner (Boady)
29 E-mail to Boady Re: Account Complaint (Gardner)
30 E-mail to Kevin Plante at Staples (Gardner)
31 Affidavit of Matthew Channon
32 Dkt. 130, Order Denying Motion to Sever, at 53
33 Examples of MaxPerks E-mails
34 Example of OfficeMax Mailers
35 302 Interview Gardner & Poucher (Boady)
36 E-mail to Boady Re: Accounts Left Open (Gardner)
37 7/7/15 Hearing Transcript, at 4-11
38 Sentencing Hearing Transcript, at 59
39 Sentencing Hearing Transcript, at 60
40 Sentencing Hearing Transcript, at 66
41 Case Summary (Gardner)
42 Sentencing Hearing Transcript, at 104-109
43 MaxPerks Terms & Conditions, Oct 2010
44 Trial Transcript, at 347
45 Trial Transcript, at 963-983
46 MaxPerks Recycling Web Page
47 1/6/16 Hearing Transcript, at 54-55
48 Trial Transcript, at 1552-1555
49 Trial Transcript, at 1631-1633
50 Trial Transcript, at 1641-1647
51 MaxPerks Web Page
52 MaxPerks Teacher Web Page

53  Trial Transcript, at 939
54  Trial Transcript, at 433-438
55  Trial Transcript, at 219
56  Dkt. 177, Motion to Dismiss Superseding Indictment
57  Dkt. 179, Motion to Extend Deadline for Response, at 1-2
58  Dkt. 239, Order Dismissing Motion to Dismiss Indictment
59  E-mail to Boady Re: Prepaid Cards, Match Inv. (Gardner)
60  Trial Transcript, at 918-922
61  Sentencing Hearing Transcript, at 107-108
62  Dkt. 332, US Response to PSR Objections, at 13
63  302 Re: Straw Purchase (Boady)
64  Mailing Label for Straw Purchase
65  Dkt. 50, Motion for Bill of Particulars
66  Dkt. 56, Motion to Dismiss
67  Dkt. 62, Government Response to Dkt. 56, at 3
68  Dkt. 76, Defendants' Reply to Dkt. 56, at 1-6
69  7/7/15 Hearing Transcript, at 36-37
70  Dkt. 274, Motion to Strike Surplusage, at 5
71  Dkt. 130, Order Denying Bill of Particulars, at 6
72  Dkt. 274, Motion to Strike Surplusage, at 1
73  Dkt. 375, Order of Forfeiture, at 1
74  Trial Transcript, at 1532-1534
75  Notes To/From Jury
76  Dkt. 379, Judicial Certification of Judgment, M.C.
77  Dkt. 380, Judicial Certification of Judgment, B.C.
78  Verdict Form, M.C.
79  Verdict Form, B.C.
80  Search Warrant Affidavit, Original, at 33-36
81  E-mail to hydrazok (Gardner)
82  E-mail to Gardner (Atty. Kochersberger)
83  Search Warrant Affidavit, Forged, at 33-38
84  Line of questioning provided to Counsel
85  Trial Transcript, at 1113-1124
86  Trial Transcript, at 1131-1132
87  Dkt. 277, Defendant's Exhibit List
88  Trial Transcript, at 340-345
89  MaxPerks Terms & Conditions, 2009
90  MaxPerks Terms & Conditions, 2009 (Legible)
91  Trial Transcript, at 352
92  Trial Transcript, at 509-512
93  MaxPerks Signup Screen, Screen Perspective
94  MaxPerks Signup Screen, Print Perspective
95  Trial Transcript, at 1015-1016
96  MaxPerks Terms & Conditions, 2009
97  Trial Transcript, at 1634-1638
98  3/26/13 Grand Jury Transcript
99  "Accounts Linked to Channon", Bates 1617-1618
100 Loyalty Transactions in Both NM & MO
101 Photograph, Backyard, Bates 2459
102 6/11/14 Hearing Transcript
103 Dkt. 123, Order Denying Motion to Suppress
104 302 Interview Brandi (Boady & Berry)
105 "Additional Accounts by FBI", Bates 1390
106 Affidavit of Brandi Channon

107   FBI Legal Handbook for Special Agents, at 9-10
108   Photograph, Door Propped Open
109   Trial Transcript, at 306
110   Trial Transcript, at 1105
111   Trial Transcript, at 1619-1620
112   Engagement Letter, Don Kochersberger
113   Arraignment Minute Sheet, M.C.
114   Arraignment Minute Sheet, B.C.
115   Affidavit of Matthew Channon Re: Grand Jury
116   Trial Transcript, at 5
117   E-mail to Counsel Re: G.J. Signature (Matthew)
118   1/6/16 Hearing Transcript, at 152-158
119   7/7/15 Hearing Transcript, at 42
120   Form, Receipt of Plea Offer
121   Trial Transcript, at 1214-1231
122   Coordinates of the 98.230.199.128 IP Address
123   Government Exhibit 85, Comcast Subpoena Return
124   E-mail to Messec Re: IP Addresses (Gardner)
125   Trial Transcript, at 903
126   Comcast Exhibit from Casey Anthony Case
127   Government Exhibit 86, Google Subscriber Info
128   Google Subscriber Info: Teechur
129   Google Subscriber Info: Bargle
130   Google Subscriber Info: Garble
131   Trial Transcript, at 451-462
132   Teechur-associated IP Info: Lawton, Oklahoma
133   Teechur-associated IP Info: Milton Keynes, UK
134   Teechur-associated IP Info: Washington, DC
135   Bargle-associated IP Info: Lawton, Oklahoma
136   Bargle-associated IP Info: Germany
137   Bargle-associated IP Info: Stockholm
138   Bargle-associated IP Info: Moscow
139   Garble-associated IP Info: Brighton, MA
140   Coach-associated IP Info: Germany
141   Coach-associated IP Info: San Francisco
142   Coach-associated IP Info: Las Vegas
143   Coach-associated IP Info: Dallas
144   Trial Transcript, at 1254-1258
145   Government Exhibit 55, Conclusions Included
146   Government Exhibit 56, Conclusions Included
147   Government Exhibit 161, Google Certification
148   SW Airlines Travel Info: St. Louis
149   SW Airlines Travel Info: Chicago
150   Google Subscriber Info: Furnitu
151   Furnitu-associated IP Info: Oxnard, CA
152   E-mail to Messec Re: Data Correctness (Gardner)
153   E-mail to Messec Re: Data Generation (Gardner)
154   E-mail to Messec Re: Data Generation (Gardner)
155   Government Exhibit 14, Graphic Evidence
156   Government Exhibit 104, eBay Logo Evidence
157   Government Exhibit 88, AUSA-Authored Evidence
158   Government Exhibit 89, AUSA-Authored Evidence
159   RCFL Notes, Incompetently Redacted
160   RCFL Notes, Unredacted

161  1/21/15 Grand Jury Transcript, Heavily Redacted
162  Dkt. 252, Amended Notice of Trial
163  Dkt. 287, Order Denying Motions
164  Trial Transcript, at 52-54
165  7/13/15 Jury List
166  Modified Jury Plan
167  Second Jury List
168  E-mail to Counsel Re: Mechanical Turk (Mathew)
169  Excerpt of Mechanical Turk Results
170  E-mail to Gardner Re: Account of Phone Call (Sipko)
171  Letter to Matthew Channon (Gardner)
172  E-mail to Matthew Channon (Gardner)
173  Photograph, Evidence including Letter, Redacted
174  E-mail to Robert & Robbenhaar (Matthew)
175  Line of questioning provided to Counsel
176  Line of questioning provided to Counsel
177  Line of questioning provided to Counsel
178  Line of questioning provided to Counsel
179  Trial Transcript, at 935-937
180  Trial Transcript, at 994-1000
181  Bates 1963, with "sgardner" authorship detail
182  1/11/16 Hearing Transcript, at 235-237
183  1/11/16 Hearing Transcript, at 37-73
184  1/11/16 Hearing Transcript, at 14
185  10/28/15 Hearing Transcript, at 34
186  10/28/15 Hearing Transcript, at 53
187  1/11/16 Hearing Transcript, at 210-211
188  Trial Transcript, at 44-47
189  1/11/16 Hearing Transcript, at 289-290
190  Trial Transcript, at 1464-1485
191  "Original Spreadsheet", with "sgardner" authorship
192  1/11/16 Hearing Transcript, at 248-251
193  Bates 1963, with "maguirre" modification detail
194  Trial Transcript, at 417-424
195  Chained Plea Offer, 9/24/2013
196  Chained Plea Offer, 3/28/2014
197  Speedy Trial Days Chart
198  E-mail to Counsel Re: STA Motion (Matthew)
199  Draft STA Motion (Matthew)
200  Draft STA Chart (Matthew)
201  E-mail to Matthew Channon (Counsel)
202  Dkt. 358, Office Depot Subpoena Resp. at 3-4
203  Dkt. 41, 8/28/13 Scheduling Order
204  Dkt. 231, Govt's Motion for Firm Trial Setting
205  Dkt. 57, Motion to Compel Discovery
206  Dkt. 102, Motion to Withdraw as Counsel (Sirignano)
207  Dkt. 133, Minutes of Evidentiary Hearing
208  Letter to Judge Khalsa (Robert)
209  Dkt. 140, Withdrawal of Motion to Compel
210  Dkt. 333, Motion for Subpoena to Officemax at 1-2
211  Sentencing Hearing Transcript, at 44-45
212  Trial Transcript, at 285
213  Ink Cartridge Buyback List
214  Trial Transcript, at 332

215 Trial Transcript, at 1062
216 Government Exhibit 98, E-mails w/ Warren Tsang
217 10/28/15 Hearing Transcript, at 4-5
218 Trial Transcript, at 262-63
219 Trial Transcript, at 1040
220 Witnesses Chart
221 Trial Transcript, at 645-646
222 Trial Transcript, at 950
223 Trial Transcript, at 499-501
224 MaxPerks Transactions, 3/3/10 in UT, NV
225 MaxPerks Transactions, 3/8/10 in NM, UT
226 Paypal Shipping Label, 3/8/10
227 Paypal Shipping Label, 3/8/10
228 MaxPerks Transactions, 3/9/10 in NV, UT, AZ, NM
229 MaxPerks Transactions, 3/13/10 in NV, NM
230 MaxPerks Transactions, 3/26/10 in AZ, NV
231 MaxPerks Transactions, 4/26/10 in NM, CO
232 MaxPerks Transactions, 4/30/10 in NM, NV
233 MaxPerks Transactions, 5/11/10 in NM, NV
234 MaxPerks Transactions, 6/17/10 in NM, CO
235 MaxPerks Transactions, 7/6/10 in NM, UT
236 MaxPerks Transactions, 1/24/11 in AZ, NM
237 E-mail to Boady Re: Miskeys (Gardner)
238 Trial Transcript, at 756
239 Table of Improperly Assigned Transactions
240 Dkt. 82, US' Response to Discovery, at 14
241 In-flight Account Creation Record, 7/7/10
242 In-flight Account Creation Record, 8/25/10
243 In-flight Account Creation Records, 9/4/10
244 In-store Account Creation Records, 6/4/10
245 E-mail to Matthew Channon (Sean Scott)
246 Superhuman Account Creation Records, 6/17/10
247 Account Creation While Driving Records, 7/13/10
248 Table of Account Creation Methods
249 E-mail to Moon Re: "ACT" (Gardner)
250 Sentencing Hearing Transcript, at 35-37
251 Trial Transcript, at 722-728
252 Government Exhibit 156, Anonymous Post-it Notes
253 Trial Transcript, at 401-403
254 Trial Transcript, at 990-991
255 Enrollment Information for Group 2 Accounts
256 Enrollment Information for Group 2 Accounts
257 Enrollment Information for Group 2 Accounts
258 Enrollment Information for Group 2 Accounts
259 Trial Transcript, at 1436-1437
260 Trial Transcript, at 289-293
261 Trial Transcript, at 1444
262 Sentencing Hearing Transcript, at 98
263 Sentencing Hearing Transcript, at 71-72
264 Trial Transcript, at 1615
265 Trial Transcript, at 1454
266 Trial Transcript, at 1603
267 List of two-consecutive Recycling Transactions
268 List of two-consecutive Recycling Accounts

x

269   List of Accounts with Address Status
270   Trial Transcript, at 1449-1450
271   Trial Transcript, at 355
272   Trial Transcript, at 503-504
273   Trial Transcript, at 654
274   Trial Transcript, at 765-766
275   Trial Transcript, at 1019
276   Trial Transcript, at 1384
277   Trial Transcript, at 514-515
278   Trial Transcript, at 1655-1656
279   Trial Transcript, at 1488
280   Trial Transcript, at 1564-1565
281   Trial Transcript, at 1572-1580
282   Photo, MaxPerks Signup Kit
283   Trial Transcript, at 898
284   E-mail to Messec Re: Tapering Off (Gardner)
285   Trial Transcript, at 120-121
286   Photograph, Front yard, Bates 2178
287   Photograph, Zoomed in with Face Blurred
288   Photograph, Foyer, Bates 2364
289   Trial Transcript, at 702-708
290   Photograph, Zoomed in
291   Dkt. 28, Order Designating Case Complex
292   Dkt. 45, Order Granting Motion to Continue
293   Dkt. 190, Req. Jury Instructions (Brandi) at 6-8
294   Dkt. 298, Court's Jury Instructions, at 6-7
295   E-mail to Counsel Re: Chained Plea (Matthew)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

v.

MATTHEW CHANNON and
BRANDI CHANNON

Civil No. *1:19-CV-00201-JCH*

Criminal No. 1:13-cr-00966-JCH-KK

---

**BRANDI CHANNON'S GROUNDS FOR RELIEF IN SUPPORT OF MOTION FILED UNDER 28 U.S.C. §2255**

I. <u>Movant's Article I Section 1 Right Against Extracongressional Legislation, Article I Section 9 Right Against Ex Post Facto Laws, 6th Amendment Right To Be Informed Of Criminal Charges, 5th Amendment Right To Due Process, And 6th Amendment Right To Assistance Of Counsel, Were Violated When Her Counsel Failed To Challenge The Indictments Against Her For Failure To State A Claim</u>

An effective attorney would have moved, first and foremost, to dismiss the first indictment for failure to state a claim. The first and second superseding indictments likewise failed to state claims and with one minor exception, Counsel failed to move and should have moved to dismiss each indictment.

The indictments' most dispositive flaws, not timely confronted, were:

**A. No Scheme Or Artifice To Defraud Was Alleged**

All three indictments fail to allege that a scheme or artifice to defraud, with actual losses as its object, existed. AUSA Messec stated overtly:

> "The law is very clear that the Court should not look to facts outside the indictment to determine whether the allegations in the indictment are sufficient. And you can't determine whether MaxPerks rewards are property without looking outside of the indictment." (Ex. 2, Hearing, 7/7/15, at 26).

**B. No Material Pretenses Alleged For Account Creations**

The only pretenses alleged throughout the rambling conspiracy count were statements of personal identifying information belonging to

1

the accountholder(s), "using fictitious names, mailing addresses, and phone numbers" and "fictitious schools".

At no point in any indictment was it alleged that this identifying information was ever accessed by Officemax for use in consideration as to whether or not to complete a transaction.

Even this material was stricken as surplusage (Ex. 3, Dkt. 286).


### C. No Pretenses, Material Or Otherwise, Were Accurately Alleged For Other Acts In Furtherance

Even taken as true, for counts 2-5 (Ex. 4) in the superseding indictments, Movant and her Co-Defendant made no pretenses at all, other than they were submitting actual ink cartridges for credit, which was never in dispute. It was never alleged that identification was sought or offered. The interaction was as simple as an anonymous cash transaction to a store account.

Movant is deceptively alleged to have made pretenses (teacher name, school, etc.) during the transmissions as charged, but a fatal variance existed: the information only accompanied the accounts' creation, months prior to the dates alleged, and the pretenses never took place during either defendant's time at the register (Exs. 5, Tr. at 954-955; 6, Tr. at 958-959; 7, Tr. at 1002-06).

When the Government tried to conflate Movant's presenting an Officemax-issued account number at the register with presenting an entire fictitious identity (Ex. 7, Tr. at 1002-06), Counsel waived objection and waived recross on the subject.

Counsel never introduced testimony that dropping off ink cartridges was placing faith in the store to pay as agreed within the next 30-120 days, at a price the store set and a schedule the store and the store alone controlled, where the store could change its mind after

the fact (and on occasion did), using an account number the store created for this exact purpose and for no one else.

It was never alleged nor proven at trial that the point-of-sale transmissions even included business or teacher names, so the pretenses could not have existed as alleged.

### D. The Superseding Indictments Fail To Allege In Counts 1ss–5ss That Defendants Transmitted Or Caused Any Transmission

First and foremost, in each retail transaction where Movants dropped off ink cartridges and supplied an account number, Movants themselves were not alleged to have performed any wire transmissions.

Through sloppy use of passive voice, the superseding indictments claimed, "Details of the purchase would then be routed by wire to MaxPerks Rewards computer servers in Illinois, and the purchase would be eventually credited to the customer's MaxPerks account" [Ex. 9, ¶7 at 2]. Routed by whom? Who was the customer? The indictments never state who or what performs or performed the routing or the crediting. If the defendants caused wire transmissions, the indictments did not claim so here. They did not claim so elsewhere as to counts 1ss–5ss. This was prior to the aforementioned being stricken as surplusage without being replaced.

Specifically looking at the table of charged counts in the superseding indictments, and contrasting counts 2ss–5ss with 6ss–7ss, the latter counts against Co-Movant Matthew Channon allege the phrase "via e-mail" (itself potentially a wire use), but the earlier counts make no mention about what manner and means was caused to be used. If Officemax did not use carrier pigeons to transmit data, and instead used a wire means, the indictments never alleged so.

**E. The Indictments Failed To Allege That What Was Sent, Or Caused To Be Sent, Included Writings, Signs, Signals, Pictures, Or Sounds**

No writings were alleged in these indictments.

No signs, pictures, or sounds were alleged in these indictments.

No signals or alternative means of communication were alleged to have been sent or caused to be sent in the indictment.

The indictments failed to specify which of the five was actually used, or that any was used.

**F. The Superseding Indictments Failed To State A Conspiracy Claim Due To Use Of Disjunctive And/Or Passive Voice**

Ex. 9, ¶11a. "One or both Defendants signed up…"
Ex. 9, ¶11b. "The name…was used to create…"
Ex. 9, ¶11c. "…Rewards accounts were registered to…"
Ex. 9, ¶11d. "One or both Defendants would obtain…One or both Defendants would access…"
Ex. 9, ¶111. "Defendants themselves redeemed, or sold to other individuals who redeemed…"

The superseding indictments, prior to being stricken, failed to allege that any misrepresentations in the MaxPerks account signups were made with the Movant's permission or at her direction.

The superseding indictments did not allege any basis whatsoever that Movant and her Co-Movant relied on, or were even involved in, any of each other's acts in furtherance of a conspiracy.

**G. Affirmative Defenses Were Applicable But Never Raised By Counsel**

**1.    Good Faith**

Movant's Counsel failed to raise a "good faith" affirmative defense against the indictment, namely, that OfficeMax made money on recycled ink cartridges, and Movant believed OfficeMax made money on recycled ink cartridges. It was proven at sentencing, but too late for trial, that Movant's good faith belief that OfficeMax was profiting from Movant's conduct was well-justified by the facts (Ex. 11, at 13).

Had Movant not submitted any ink cartridges, Officemax would not have profited. Thus, no scheme or artifice to defraud could have existed. AUSA Vierbuchen led the witness to her casuistry that OfficeMax was environmentally-minded first and foremost (Ex. 12, Tr. at 336, lines 21-24).

Counsel never requested a good faith jury instruction or dismissal of the indictment, nor brought up good faith during trial or appeal, and thus failed to effectively assist.


### 2.    Express Consent

Officemax expressly authorized Movant to adjust receipts from purchases she did not make. In the affidavit for search warrant [Ex. 13, pg. 10], the alleged receipt adjustment page (Ex. 14) explicitly authorizes Movant to adjust a purchase she did not make by saying "Enter a receipt to receive credit for a purchase made in a store without your MaxPerks ID Card."

The original indictment inaccurately states the Government's argument "The defendant[] falsely claim[ed] purchases made by other customers as his own…" (Ex. 10, ¶9) through its use of the word "falsely". Given the express consent as described above, it is impossible for anyone claiming others' purchases as her own, exactly as instructed, to do so falsely.

Prior to being stricken, the superseding indictments even admitted the express consent: "[O]nly those four pieces of information were required to claim a transaction through an online adjustment" (Ex. 9, ¶11(d)); "They could then use those prepaid cards wherever they were accepted." (Ex. 9, ¶11(i)).

Counsel never requested an express consent jury instruction or dismissal of the indictment on that basis, nor brought up express consent during trial or appeal, and thus failed to effectively assist.

### 3.   Novation

A novation took place involving OfficeMax as the obligor, the original purchaser as the original obligee, and Movant as the new obligee. OfficeMax specifically wrote to Movant, "enter a receipt for a purchase you did not make." (Ex. 14).

Counsel never requested a novation jury instruction or dismissal of the indictment, nor brought up novation during trial or appeal, and thus failed to effectively assist.

### 4.   Entrapment

Officemax and Steven Gardner in particular were demonstrably government actors, agents of law enforcement, in this proceeding.

Gardner and other Officemax employees represented themselves as law enforcement officials to eBay (Exs. 15, 16, 17, 18) in order to procure Movant's account data under color of federal law, to share it with SA Boady, and to convince him to deputize them.

At trial, government-paid witness Jason McDevitt, an eBay employee, illuminated the relationship:

> MR. ROBBENHAAR: Is that a document that was produced through your
>     office to the government in this case?
> MR. MCDEVITT: It appears so, yes.
> MR. ROBBENHAAR: And the individual list as law enforcement
>     officer, what's his name?
> MR. MCDEVITT: Charles Sipko.
> MR. ROBBENHAAR: Okay. And is he a law enforcement officer?
> MR. MCDEVITT: The law enforcement agency was Officemax. (Ex. 19,
>     Tr. at 622).

Officemax personnel spent, from 2010-2014, over 100 hours with SA Moon (Ex. 20, 10/20/15 Hrg.), Gardner working "directly" (Ex. 21,

1/11/16 Hrg.) with FBI agents Boady and Moon, and spent two months on two-hour phone conferences "almost every day" with AUSA Messec (1/11/16 Hrg., Exs. 22, 23). Gardner referred to the combined group as "us" (Ex. 24). AUSA Vierbuchen referred to the combined group as "we" (Ex. 25).

SA Boady pushed for collaboration (Ex. 26), and complained the coordination was not closer, even delaying his seizure to accommodate and leverage Gardner's acts, both investigatory and illegal (Ex. 27). SA Boady shared Movant's unredacted personal financial records from his search and seizure of Movant's residence with Gardner (Ex. 28). SA Boady gave Gardner access to the FBI evidence room (Ex. 29). Gardner then shared his spoils of the FBI seizure with Kevin Plante, his contact at Staples, in an effort to widen the investigation under color of law (Ex. 30).

At trial, Gardner, ostensibly a fact witness only, required access to his laptop in the courtroom, and on at least one occasion required the prosecution team to intervene on his behalf at courthouse security to allow him to enter with it (Ex. 31). Gardner is not, and has never been, deputized by any court to perform law enforcement functions, nor sworn to protect the public or uphold the law. Nonetheless, the Court held Gardner on an equal footing with Boady (Ex. 32, Dkt. 130, at 53).

Officemax, as a government actor, continually enticed Movant to turn in more and more ink cartridges, not only through continued generation of rewards it was under no obligation to provide, honoring those rewards at its retail locations it was under no obligation to honor, accepting qualifying ink cartridges without exception or complaint, and sending each of the thousands of accounts a minimum of one e-mail per week exhorting it to participate further in the MaxPerks rewards program and to recycle more ink cartridges (Ex. 33). Even after

the indictment, Officemax and later Office Depot continued to send, (and continue to send to this day (Ex. 34), countless mailers and e-mails to the allegedly fraudulent accounts.

The provision of tens of thousands of dollars' worth of inducements, which Officemax was under no obligation to provide, continued without interruption. Even after fraud was privately alleged and Movant was identified, Steven Gardner opted to leave the ink recycling accounts open (Ex. 35) in order to claim higher losses and target more defendants (Ex. 36), while his company's cashiers took Movant's ink cartridges with a smile and encouraged her return.

> Gardner advised that approximately 30-40 of those accounts are about to receive rewards totaling over $3,000 USD, which OfficeMax does not want to payout. (Ex. 35, SA Boady's 302).

Even while Officemax provided inducements by choice, the Government insisted otherwise:

> MS. MESSEC: Officemax, in its own terms and conditions for the MaxPerks program, retains the right to cancel MaxPerks rewards at any time if they have been obtained by fraud, or in violation of the terms of the program, even. And so if Officemax knew that these certificates had been obtained by fraud, that they certainly would not have accepted them as a form of payment for the merchandise that the defendants had obtained using these certificates that they were not entitled to. (Ex. 37, 7/7/15 Hrg. at 5).

It is amply supported by the record (Sentencing Hearing 10/20/16, Exs. 38; 39; 40) that it was universally believed that Movant, absent the inducement, would not have engaged in fraudulent conduct.

Counsel never requested an entrapment jury instruction or dismissal of the indictment, nor brought up entrapment during trial or appeal, and thus failed to effectively assist.

**H. The Maxperks Rewards Rules Were Not Binding Law**

Each indictment implies acts against the Officemax rules, rules that are not enacted by Congress as law. The entirety of the indictments are rote boilerplate language cribbed from examples, interspersed with inaccurate restatements of corporate terms and conditions asserted as law: "could earn"; "limited"; "was required to provide"; "had to spend"; "to which they were not entitled" (Ex. 9), and devoid of any coherent theory as to how the acts alleged, even taken as true, constituted a scheme or artifice to defraud. "The defendants would…evade the limits of the…program" (Ex. 10, At ¶3.)

The second superseding indictment (Ex. 8) did not allege that Movant or Co-Movant ever read or became familiar with the MaxPerks terms and conditions, which would be a necessary condition for their conspiracy to devise an artifice or scheme to violate those terms and conditions, assuming such a violation was at all unlawful in the first place.

In Steven Gardner's case summary presented to SA Boady (Ex. 41), Co-Movant's alleged acts were not described as violations of federal law or a financial loss but rather "a severe violation of our terms and conditions".

By failing to raise through proper channels the propriety of a private corporation deciding ex post facto what was and was not wire fraud, Counsel was ineffective, and by likewise treating Officemax as a lawmaking branch of the government, the Court violated the U.S. Constitution. To illustrate, the Hon. Judge Herrera said to Co-Movant:

> I am aware of OfficeMax saying that because of your conduct and the way you manipulated their rules you ended up with over $100,000 of value that they would never have sent your way if they had known the true state of the situation.
> (Ex. 42, 10/20/16 Sentencing Hearing, at 108).

## I. The Indictments Did Not Allege The Actual Maxperks Rewards Rules Were Violated

This indictment failed to allege that Movant and/or Co-Movant even violated the terms and conditions.

### 1. "One account per person"

Movant's counsel never questioned the flawed narrative that MaxPerks Rewards rules "limited each customer to one MaxPerks account" (Ex. 9, §4) and that by creating multiple accounts, Movant violated the MaxPerks Rewards rules.

The actual text of the rules explicitly permitted "[o]nly one MaxPerks account and member ID per person [] *at any given time*" (Ex. 43, at 1, "How to Enroll", emphasis added). The context of the rule was in explaining the technical limitations of the point-of-sale systems in the rewards program (under "How to Enroll", not "Eligibility"), and not in admonishing members that possession of multiple accounts would render themselves criminally liable. At no point did the indictment allege that Movant used more than one account per person at any given time. The point-of-sale systems Officemax used were and still are incapable of splitting purchases or transactions across multiple rewards accounts, and it would be reasonable for Officemax to notify members of this limitation, and to do so where they did.

Counsel adopted the Government's mistaken notion that the phrasing could be truncated even though doing so substantially altered its meaning to Movant's detriment.

Counsel ineffectively supported the Government's position during Co-Counsel's cross-examination, leading the witness with the truncated "one account per person" version, even though the witness's own testimony (Ex. 44, Tr. at 347) had not truncated it:

MR. ROBBENHAAR: Sure. In your testimony earlier in the case you
    testified about, basically, the terms and conditions limited
    one account per person?
MR. GARDNER: Yes.
MR. ROBBENHAAR: All right. And would one person be able to have
    two accounts?
MR. GARDNER: According to the terms and conditions, no, we
    wouldn't want somebody to have two accounts.
(Ex. 45, Tr. at 982-983).

Officemax marketing materials, from the same time period, were
inconsistent with the Government's narrative: "You can earn up to $60
in rewards per calendar month per member…there is no limit to the
number or brand of ink/toner cartridges you may recycle" (Ex. 46).


2.    "For teachers only"

Movant's Counsel likewise failed to question the legal
proposition that "MaxPerks for Teachers" was a legally-enforceable
limitation that barred all nonteachers or individuals who did not meet
Officemax's whim-based standards for teachers from membership. In
contrast to SA Boady's doctored affidavit for search warrant ("The
Teacher accounts are more lucrative and only available to teachers",
Ex. 13, at ¶5), the indictments ("available only to teachers", Ex. 10
at ¶3, Ex. 9 at ¶3, Ex. 8 at ¶3), and AUSA Vierbuchen's histrionics and
opinion offered as testimony ("[I]n fact, we know they're not teachers"
Ex. 47, Tr. 1/6/16 Hrg. at 54; "The evidence is undisputed that neither
of the defendants are teachers." Ex. 48, Tr., at 1552; "if they didn't
lie about being teachers over 5,000 times…" Ex. 49, Tr., at 1631;
"[Movant would not need to] falsely claim to be a teacher." Ex. 50,
Tr., at 1645), the actual webpages OfficeMax put out (Exs. 51, 52, 46)
framed the choice between "MaxPerks for Teachers" and "MaxPerks for
Business" as being a welcoming, confusing and financials-driven matter
of consumer preference, with zero guidance away from the teacher
accounts.

The only alternative option to signing up as a teacher offered was "MaxPerks for Business", and yet many members under the latter program did not work for, own, or operate businesses.

> MR. ROBBENHAAR: Okay. But the signup screen says to select which one [business or teacher] is most appropriate, correct?
> MR. GARDNER: Correct. (Ex. 53, Tr. at 939).

OfficeMax did no vetting of teachers, and no one defined what a teacher was and was not:

> MR. ROBBENHAAR: So individuals were asked to self-place themselves within the business or the teacher columns, if you will?
> MR. GARDNER: Yes.
> MR. ROBBENHAAR: All right. Now if someone selected teacher, would OfficeMax — would the system require some sort of credentials?
> MR. GARDNER: No, they wouldn't.
> MR. ROBBENHAAR: All right. And that's -- I think that's to your point earlier that this was an honor system, if you will?
> MR. GARDNER: Yes. (Ex. 53, Tr. At 939).

Counsel further waived objection on the subject to AUSA Kastrin's direct, irrelevant and unqualified opinions from witness Nandukumar, whose sum character knowledge of Co-Movant was that he had met him once, two years prior, during a job interview:

> MS. KASTRIN: With the Court's indulgence, one second.
> MS. KASTRIN: And as part of the interview process and with the resume itself, did he ever represent himself to be a teacher?
> MR. NANDUKUMAR: Not to my recollection. (Ex. 54, Tr. At 433).

Further, Counsel ineffectively missed bringing up the point that Co-Movant guest taught classes at UNM in architecture and entrepreneurship (during the applicable period), and had since taught classes at New Mexico Tech in physics, to say nothing of his 2-year graduate assistantship during his masters' program at Georgia Tech.

Even further, Co-Counsel had been made aware of, and later given, a letter (Ex. 1) Co-Movant had received from the principal at Comanche Elementary School, dated months before any inkling of trouble with Officemax, thanking Co-Movant for the multiple cases of copy paper and

other office supplies Co-Movant had donated to the school. Counsel could have used the letter to demonstrate that if Movant's activities resulted in school supplies being used by teachers, Movant was at least complying with the spirit of the MaxPerks for Teachers program, and not guilty *malum in se* of the uncharged offense of impersonating a teacher. Counsel never brought the letter to the Court's attention, during trial, during sentencing, or during appeal.

Counsel failed to effectively argue the notion that claiming oneself is a teacher is not a material claim toward fraud, and also piling on the notion during voir dire, doing the Government's job for them by advancing to the Jury Venire that Movant and Co-Movant were both not teachers (Ex. 55, Tr. At 219.)

### J. The Government Superseded a Defective Indictment To Avoid Dismissal But Argued Its Case Based on The Defective Indictment

### 1. The Second Superseding Indictment Was Merely Disguised Motions Practice to End-Run Around Movant's Sixth Amendment Rights to Be Informed of Charges

On 1/21/15, the Government filed a superseding indictment (Ex. 9, Dkt. 155). After Counsel moved to dismiss the superseding indictment under *Cleveland v. U.S.* (Ex. 58, Dkt. 177), the Government faced the possibility the Court would dismiss the indictment.

In the Government's response to the motion, AUSA Messec stated, "…Defendants used the MaxPerks Rewards certificates that they had been issued to obtain prepaid debit cards and other merchandise." (Ex. 57, Dkt. 179, at 1-2, emphasis added).

In order to moot a dismissal, the Government changed a few words on the first superseding indictment, primarily to convert "MaxPerks Rewards" (Ex. 9, ¶10), as the object of the conspiracy to "OfficeMax merchandise", in the form of a second superseding indictment (Ex. 8,

Dkt. 197), filed 6/24/15. To satisfy the Court that these changes were in earnest, AUSA Messec stated and the Court responded:

> MS. MESSEC: So I just think it's very clear, under the law, merchandise would be considered property. We're not talking about the scheme being — the purpose is not just to obtain MaxPerks rewards, because obtaining MaxPerks rewards, if not being able to use the MaxPerks rewards, is useless.
>
> THE COURT: And I guess part of where I get maybe caught up, because — because the rewards themselves are not of value to the company…What's of importance is whether or not whatever was taken from the victim is property. (Ex. 37, 7/7/15 Hrg. at 5-6).

The Court was satisfied the changes were in earnest:

> THE COURT: Since the alleged objective of Defendants' scheme was to obtain merchandise—undisputedly "property"—*Cleveland* does not support Defendants' motion. The Government alternatively argues that the MaxPerks Rewards constitute "property" in the hands of OfficeMax. Given the Court's ruling above, the Court need not reach this alternative argument. (Ex. 58, Dkt. 239, at 3).

The Government's case-in-chief, however, was already set up to prove the acquisition of rewards, not merchandise. At trial, the Government spent the entirety of its case proving the acquisition and use of rewards, not merchandise. The term "merchandise" appears in the trial record sparingly, and typically in rote recitation of the second superseding indictment, in the abstract, or in error.

Unfortunately for the Government, its revision to the superseding indictment, that the rewards were used to acquire merchandise, was inaccurate: the trial record shows the rewards were instead used to acquire prepaid gift cards.

Steven Gardner informed SA Boady that Co-Movant was "only using his rewards to buy prepaid credit cards" (Ex. 59).

At trial, Steven Gardner reported what Co-Movant had told him, and it had nothing to do with actual merchandise:

> MS. VIERBUCHEN: Did you ask Mr. Channon what he would do with the reward cards he received pursuant to the ink recycling?
>
> MR. GARDNER: Yes, I did.

> MS. VIERBUCHEN: What did he say?
> MR. GARDNER: He was purchasing the prepaid gift cards and credit cards.
> MS. VIERBUCHEN: And is this purchase activity that Mr. Channon admitted to, is that consistent with the purchase activity you saw in these accounts?
> MR. GARDNER: Yes. (Ex. 60, Tr. at 918-19).

Unfortunately for Movant, Counsel waived any objection at trial or appeal to the object of the fraud and conspiracy being reverted from merchandise to MaxPerks Rewards and the indictment being prosecuted backsliding from the second to the first superseding indictment.

At sentencing, the Court, despite having stated "what's of importance is whether or not whatever was taken from the victim is property" earlier, stated to Co-Movant:

> THE COURT: The fact of the matter is, you defrauded OfficeMax and you defrauded them of $105,191 worth of money, merchandise, whatever the case may be. (Ex. 61, 7/7/15 Hrg. at 107-108).

Finally, the Court erred as to which indictment (Ex. 9, Dkt. 155 or Ex. 8, Dkt. 197) the Motion to Dismiss (Ex. 56, Dkt. 177) applied to. "The Court denies Defendants' motion to dismiss the Second Superseding Indictment." (Ex. 58, Dkt. 239, at 4).

## 2.    Where Movant's Merchandise Came From

As discussed in Ground XVII(A), the ink recycling programs were different between Officemax and Staples/Office Depot. In short, Officemax demanded a higher quality of cartridge, but was the only store that allowed the credit to be used toward prepaid gift cards at the time.

Prepaid gift cards are nearly fungible with cash, but merchandise would have to be offered for sale, sold, and shipped, in order to derive a financial benefit. The Government strongly suspected Co-Movant was enrolled in large-scale activity at both Staples and Office Depot,

(Ex. 62) and activities at these stores accounted for nearly the entirety of the merchandise seized and suspected. They also explain the paucity of merchandise from Officemax seized and suspected.

In the FBI's straw purchase (Ex. 13, ¶67-68), in which the Government bought a two-pack of Canon ink cartridges plus bonus paper (Ex. 63), and Co-Movant had shipped the same from Phoenix, AZ 85008 (Ex. 64), the Government assumed that the products originated at Officemax, but could not prove it. (Ex. 59).

In fact, although Officemax sold the 210XL and 211XL cartridges individually and/or as a "twin pack", only Staples offered the package including bonus 20 sheets of photo paper. Not only did the FBI fumble the straw purchase by picking a product that Officemax might not have sold, they picked a product that Officemax could not have sold.

Counsel never objected to the Government's baseless allegations of merchandise, at trial or on appeal.

### K. Multiple Opportunities For Adequate Assistance Of Counsel Were Overlooked Or Frustrated, And A Simple One-Page Motion By Defense Counsel Could Have Obviated Not Only The Rest Of These Counts But Multiple Years Of Litigation In This Case

Counsel made a few feeble attempts to raise issues with the indictment, starting with Dkt. 50 (Ex. 65), Motion for a Bill of Particulars, which was filed late without seeking leave by Ms. Sirignano and Mr. Hotchkiss. The motion was ineffective assistance for failing to bring up Rule 12(b)(3) and Rule 7(c)(1).

In Dkt. 56 (Ex. 66), Motion to Dismiss, Counsel similarly went out of their way to sidestep meritorious claims against the sufficiency of the indictment (brought up by the Government in Dkt. 62, at 3 (Ex. 67), and explicitly waived by Counsel in Dkt. 76 at 2 (Ex. 68), and was ineffective.

In fact, after his Motion to Dismiss Superseding Indictment (Ex. 56, Dkt. 177), Co-Movant's Counsel explicitly waived filing under Rule 12 at the hearing:

> MR. ROBERT: It wasn't clear to us at all whether this was a motion that was required to be filed under Rule 12. We thought that we would do what we did -- it's kind of ironic to me, because the government accuses me of bad faith and seeking a tactical advantage in doing this. What I've obviously done is exactly the opposite of that…We have again forfeited what would arguably be a tactical advantage… (Ex. 69, 7/7/15 Hrg., at 36-37).

Counsel waived Rule 12 but also failed to raise Rule 7(c)(1), relying ineffectively on the decision in *Cleveland v. United States*.

Counsel even took the ridiculous position that "The Second Superseding Indictment goes well beyond what is required to set forth the elements of the offenses alleged therein." (Ex. 70, Dkt. 274, ¶5) in a Motion to Strike Surplusage. In granting the Motion (Ex. 3, Dkt. 286), the Judge stripped the indictment to a few recitations of statutes and a list of innocuous acts, bereft of a word of theory of the offense.

In addition, without writing anything about the necessary elements of the indictment that were missing, other than obtaining "$180,000 in MaxPerks rewards" and/or "$74,800 in MaxPerks rewards", the Judge first wrote:

> "[T]he Indictment gives sufficient notice of the theory of the Government's case…the Court concludes that the Indictment (together with voluminous discovery) gives Defendants sufficient notice of the charges to allow them to prepare a defense." (Ex. 71, Dkt 130, Denial of Motion for Bill of Particulars, at 6).

In contrast, the Judge later said:

> "{W]ell, I guess I need clarification on exactly what the scheme is, what the objective of the scheme is, and whether or not what the defendants obtained from OfficeMax was property. And I will confess to you that the issue is a lot more complicated than I thought it would be when I first started looking at it." (Ex. 37, 7/7/15 Hrg., at 4.)

Counsel failed yet again to respond with a motion to reconsider any of the denied motions with regard to a deficient indictment, given the Judge's admission of its defects, and waived appeal on the matter, providing ineffective assistance.

### L. The Superseding Indictments Failed To State Which Statute Was Charged Under Which Count

On count 1, ¶10 of the second superseding indictment (Ex. 8) claimed 18 USC §1343 was violated, and later in ¶11(1), the same count claimed 18 USC §1349 was violated. So which one was it? Counsel, the Government, and the Judge each changed their minds several times.

Counsel neither objected to nor noticed the duality, perhaps assuming the Government had meant 18 USC §1349 for count 1 (Ex. 72, Dkt. 274, ¶1), or, in leaving out a §1349 instruction in proposed jury instructions (Dkt. 192), perhaps assumed the Government had meant 18 USC §1343 for count 1.

In Dkt. 286, the Hon. Judge Herrera specifically required the stricken second superseding indictment "thus retain[]: 'In violation of 18 U.S.C. § 1349.'" (Ex. 3, at 2). Then, the Judge did the opposite: In Dkt. 298 (Ex. 4), the jury was told only §1343. In Ex. 73 (Dkt. 375 at 1), and Ex. 74 (Tr., at 1532), the Judge called it §1349 and conspiracy again. As one might have predicted, the jury was confused and wrote a note to the Judge (Ex. 75, at 1), following it up with the jury's own reverse "Allen charge" (Ex. 75, at 2).

Over Co-Movant's Counsel's objections (Tr. at 1651-53), the Hon. Judge Herrera handwrote a note revising the indictment, adding new language telling the jury to find under §1349 (Ex. 75, at 3). The Judge flip-flopped again, with a Judicial Certification of Judgment (Ex. 77,

Dkt. 380) that convicted Movant under §1343 and relabeled Count 1 from conspiracy to wire fraud.

While Counsel timely joined the objection to the Hon. Judge Herrera's decision to singlehandedly revise the indictment to obtain a quick verdict, Counsel ineffectively waived the objection on appeal, and in fact never advised Movant that it had occurred.

For counts 2-7, the superseding indictments list a lengthy table of transactions without context, each failing to claim any basis for scheme or artifice, or wire use, culminating in the highly unspecific "In violation of 18 USC §1343 *and* 18 USC §2." (emphasis added), which made it into the jury instructions exactly thus (Ex. 4).

In authoring the Judicial Certifications (Exs. 76, 77) in this case, the Hon. Judge Herrera put forward a haphazard accounting of when the different counts were violated (Dkts. 377 and 378), then amended a different error (Exs. 76, 77, Dkts. 379 and 380). The "Offense ended" dates within the above judgments bore no resemblance to the counts charged, or reality, and went beyond even the Government's final argued choice of charges (18 USC §1343 for *all counts*, with 18 USC §1349 and 18 USC §2 listed in the Government's indictments but not resulting in a conviction). The verdict form (Ex. 79) did not allow the jurors to choose the statute under which they found Movant guilty.

II. **Movant's 4th Amendment Right For No Warrants To Issue But Upon Probable Cause, And 6th Amendment Right To Assistance Of Counsel, Were Violated When Her Counsel Failed To Challenge A Falsified Search Warrant Affidavit**

FBI Special Agent Michael Boady prepared an affidavit for search warrant for Movant's home premises (Ex. 80), never got it signed by Magistrate Judge W. Daniel Schneider, modified the affidavit due to an unexpected delay (in order to abet felony blackmail, Exs. 81, 82, 27), and instead of getting the modified version signed, substituted the

signed page from a different affidavit himself, thus forging the
Magistrate Judge's signature (Ex. 83).

During cross-examination of FBI agent Boady at trial, Counsel
failed to follow through with a line of questioning he was provided
(Exs. 84; 85 (Tr. at 1122-1124)), designed to implicate Boady in
falsifying his affidavit for the search warrant.

The doctored affidavit for search warrant ended with pages 34,
35, and 38, where 38 bore the signature of Magistrate Judge Schneider.
Further, content at the bottom of page 35 was partially repeated as
content at the top of page 38. Counsel was expected to ask Boady if he
had switched signature pages, but he instead stopped short without any
objections or prompting from the Government. This allowed AUSA Kastrin,
on redirect, to misdirect the jury with a clever series of questions
(Ex. 86) designed to make the switched signature page look like a
harmless formatting error without explicitly mentioning or asking about
the Magistrate's signature and risking agent Boady perjure himself.

### III. <u>Movant's Article I Section 9 Right Against Ex Post Facto Laws, 6th Amendment Right To Compel Witnesses To Appear, And To Assistance Of Counsel, Were Violated When Counsel Failed To Comprehend The Rules And Evidence</u>

Buried within the week of testimony and evidence that the
Government presented, but still present, was the tiny yet thick
boilerplate text of the MaxPerks Rewards program rules (Ex. 43).
Although two rules versions were brought as evidence at trial by the
Government (for years 2009 and 2010), the defense had located and
prepared to introduce a dozen versions (Ex. 87), complete with time
stamps and detailed differences between each revision.

Co-Movant's Counsel blundered by objecting (Tr. at 341-343, Ex.
88) to Trial Exhibit 1 (Ex. 89), which contained a 2009 version of the
MaxPerks terms and conditions. Although the exhibit was a barely

legible and incomplete copy, it included language to support that no
additional purchases were necessary to recycle ink for credit,
information that was crucial to present.

AUSA Vierbuchen then misrepresented her position to the Court:

THE COURT: And you don't have any better version of this?
MS. VIERBUCHEN: We do not, Your Honor. We actually looked prior
        to court. (Ex. 88, Tr. at 342)

In fact, the original Defense Exhibit J (resembling Ex. 90) was a
better version of the same document, and AUSA Vierbuchen must have had
it in her possession given her reference to it two trial days later, or
in the alternative, Counsel had it available and failed in its
obligation to make the best evidence available to the Government.

The Government got Trial Exhibit 1 admitted (Ex. 91, Tr. at 352)
over Mr. Robbenhaar's objections, joined by Counsel, and despite
opportunities to bring up the 2009 Terms and Conditions when he Voir
Dire'd Mr. Gardner (Ex. 92, Tr. at 510-512), and cross-examined him two
trial days later, Mr. Robbenhaar did not bring them up, nor did
Counsel.

Instead of using the Government's evidence already admitted,
Counsel relied on Mr. Robbenhaar's ineffective attempts to introduce
the Defense's myriad copies of rules into evidence not through
Defense's own witnesses, but through cross-examining the prosecution's
star witness, Steven Gardner, an attempt that failed (Ex. 45, Tr. at
970-982).

Presenting Defense Exhibit R (Ex. 93), a signup screen including
a 2010 version of the rules, to the witness but not introducing it as
evidence, Mr. Robbenhaar was then blocked from introducing it as
evidence when AUSA Vierbuchen protested that her version of Defense
Exhibit R (resembling Ex. 94) did not match what Robbenhaar had
provided the Government (Ex. 45, Tr. at 974-975). The difference

between the documents was that Ex. 93 was how the MaxPerks signup web page looked on a computer screen, and Ex. 94 was how the same page looked when printed from a web browser, even though both originated from the same archive on the Internet Archive's "Wayback Machine". The more accurate version, Ex. 93, was prepared by Co-Movant and Ms. Porter the morning of January 14th, but Counsel either failed to update the Government as to the change by January 19th, or failed to refute AUSA Vierbuchen's claimed lack of receipt of a newer version, leaving her with an opportunity to stymie Counsel.

Adding a dash of prosecutorial misconduct, AUSA Vierbuchen objected to her copy of Exhibit R's origins from the Wayback Machine, stating as part of her objection, "I think the question just needs to be asked if he can say that this is a true and accurate reflection of the business records of OfficeMax, because I don't know what that is, Wayback Machine." (Ex. 45, Tr. at 975), going on to say:

> MS. VIERBUCHEN: And if the information was obtained off of Wayback Machine, then I think it would be improper to offer this through that witness. And I think it's a little misleading to put that one up if, in fact, the source of the document is really this Wayback Machine. (Ex. 45, Tr. at 980).

In fact, Trial Exhibit 2 (Ex. 43) itself plainly states in its footer that it originated from the Wayback Machine (web.archive.org). Vierbuchen had no compunctions about using Wayback Machine-derived Government Exhibit 2 herself with the same witness at its introduction (Ex. 88, Tr. at 340-44), then going on to redirect the same witness again using 2 after lodging her objections to the Wayback Machine (Ex. 95, Tr. at 1015-16). Counsel was silent as to the Government's double standard.

What neither Mr. Robbenhaar nor the Government seemed to realize was that Robbenhaar's propounded Exhibit R was essentially a wrapper around already-introduced Trial Exhibit 2 (Ex. 43), and cumulative.

Mr. Robbenhaar and Counsel were more concerned about selling the jury on the possibility that account signups could occur without Movant or Co-Movant ever reading the rules, in order to plead ignorance, when in fact the stronger argument, that Movant and Co-Movant were actually innocent because the rules originally allowed ink recycling without qualified purchases, went completely unnoticed and unpresented.

No one pointed out that by subtly changing the rules, Officemax criminalized conduct with the change (conduct that had ceased long before the change), and withheld this information.

Defense Exhibit J (Ex. 96), or any of Defense Exhibits A-J, whether original or revised, would have adequately substituted for Trial Exhibit 1 (Ex. 89), but Counsel did not try to introduce any of them, leaving the knowledge that the pre-2010 rules allowed for ink recycling without "qualified spend" out of the hands of the jury.

If Counsel had not failed to apprehend and communicate the impact of changes to Officemax's rules, Counsel could have demonstrated, even just with the two versions the Government had attempted to introduce, that the portions of the conspiracy count, which listed the creation of numerous accounts for the purposes of taking credit for other people's purchases in order to redeem ink cartridges, could not have existed.

When all "Group 1" accounts (business accounts used primarily to recycle ink) were created, the 2009 version of the rules (Trial Exhibit 1, Ex. 89) did not require any purchases in order to gain credit. These accounts could be used, and were used, legally, to convert ink cartridges to store credit, without any purchases or receipt adjustments, until some point in 2010, perhaps September (Ex. 97 (Tr. at 1634); Ex. 98 (3/26/13 Grand Jury Transcript at 19)). Once they were created, it would only have been necessary or possible under the 2010 version of the rules (Trial Exhibit 2, Ex. 43) for them to be used to

claim purchases to enable a financial return from ink cartridge recycling.

The Government argued Movant's false pretenses occurred at the beginning of the scheme: submitting the fictitious identity of the accountholder. However, the identity of the accountholder could not have been fraudulently presented for the purpose of taking credit for others' purchases in order to enable store credit from ink cartridge recycling, as argued, because at the time the accounts were created (2009), the rules did not require, or even mention, qualifying credit for ink recycling (Ex. 96).

Contrary to the Government's unquestioned assertions, all 123 Group 1 accounts charged under violating September 2010's rules in count 1 through their creation were in fact created *prior* to September 2010 (Bates 1617-8, Ex. 99). The accounts in counts 2, 4, and 5 were created in 2009 (Ex. 99), with count 3's created in similar fashion in February 2010, months before the 2010 rule changes were announced. Of the $61,288 the Government argued was lost to ink recycling under the 2010 rules ("Original Spreadsheet", Bates 3269), all $61,288 came from accounts established in 2007-February 2010. The last "group 1" accounts were created in February 2010, and as discussed in Ground XVIII, the 2010 Group 1 accounts (hereinafter "2010's") routinely appeared in out-of-state transactions when Movant and Co-Movant were in New Mexico (Ex. 100), raising reasonable doubt that Movant and Co-Movant were even the ones who created the 2010's.

Co-Defendant, Matthew Channon, met with both Counsel and his counsel dozens if not hundreds of times over the course of this prosecution, and Counsel absorbed some portions of his explanations but never quite "got" why the prosecution was wrong. By failing to apprehend the nature of the case, Counsel could not explain it to the

judge or the jury, nor justify Movant's actions or distinguish them from illegal acts. For this reason, Counsel was ineffective, trial was unfair and haphazard, and Movant was prejudiced.

IV. **Movant's 1st Amendment Right Of The Press And To Peaceably Assemble, 4th Amendment Right To Be Secure In Her Person And House, 5th Amendment Right Not To Be Compelled In A Criminal Case To Be Witness Against Herself Nor To Be Deprived Of Liberty Without Due Process Of Law, Nor Private Property Taken For Public Use, And 6th Amendment Right To Have Assistance Of Counsel For Her Defense Were Violated When Her Home Was Invaded, Her Smartphone Seized, Her Person Abducted, Her Association With Family Abridged, Her Backyard Seized To Form An Ad Hoc Interrogation Room, Her Will Overborne, Her Confession Obtained, And Counsel Failed To Effectively Represent Her**

A. **FBI Notes Inconsistent With Reality**

Although Counsel filed a motion to suppress on 1/28/14 with the Court, numerous known falsehoods were present within the agent's 302, and were never brought up by Counsel.

First and foremost among these falsehoods was the cross-talk between the simultaneous interviews in the backyard where agents Boady and Berry (interviewing Movant within earshot of Roberta Duran); and Adkins and Hale (interviewing Roberta Duran within earshot of Movant) took place quite close to each other (Ex. 101), and not, as SA Boady claimed (Ex. 102, at 35), far enough apart that Duran and Movant "couldn't overhear each other or anything".

In the resulting opinion and order, additional flawed testimony was produced:

> "The backyard was pretty good-sized, so that they were able to have two interviews there at the same time without being able to overhear one another. [Tr. 35]" (Ex. 103, Dkt. 123 at 3-4).

> "They spoke quietly enough so that they were not be heard [sic] by the others engaged in the other interview. [Tr. 36]" (Ex. 103, Dkt. 123 at 4).

Further, agents continually used their Blackberry phones to communicate facts of one interview to another, all the while taking

notes on the same Blackberry phones. The notes were never produced in discovery.

The FBI's flawed approach to interrogation created a parade of stream-of-consciousness-style note taking, reminiscent of a game of "telephone", whereby agents would bring up, inaccurately, the contents of one interview as subject matter for the other while both were still going on, and ascribing the information from one interview to the other. Movant could hear what was going on in the other conversation, then hear the message come in on the agent's Blackberry, then hear the nearby agent repeat a butchered version of the remark, with the agents propounding the information with a straight face.

The "funkygems" account Boady claimed Movant confessed to (Ex. 104, at 3) simply did not exist, though "gfuinkreturn@gmail.com" was one of Roberta Duran's accounts (Ex. 105), overheard and relayed via Blackberry from Agent Adkins to Agent Berry.

Counsel never addressed either discrepancy in cross-examination of SA Boady. Counsel never moved to compel production of the notes. Counsel never sought the testimony or notes of SA's Berry, Adkins, or Hale to foil Boady's inconsistent statements.


**B. Incongruities Between Testimony and Memorandum Opinion**


**1. Coercive Environment Had No Time To Dissipate**

SA Boady described the fast transition from Movant's first time in the front yard to interviewing her:

> MR. HOTCHKISS: All right. Do you have any recollection of how
>     long Ms. Channon would have been in the front yard before you
>     approached her and took her into the backyard?
> MR. BOADY: I recall it being pretty quick, once they finished
>     clearing the house…so I wouldn't say more than five minutes
>     that it took for them to clear the house, or maybe ten
>     minutes, at most. (Ex. 102, 6/11/14 Hrg. at 25-26).

Movant's affidavit (Ex. 106) confirms no more than five minutes, because Movant was no longer in the front yard when her cousin Patrick Vigil entered it.

> The Court confirmed the briefness of the period:

> THE COURT: Now, my last question is: How much time would you say
>    elapsed from when you knocked on the door to when you asked
>    Ms. Channon if you could interview her?
> AGENT BOADY: Less than 10 minutes. (Ex. 102, 6/11/14 Hrg. at 48).

However, the Court came up with a different version of events in its memorandum opinion and order:

> After the pointing of weapons and patdown, Brandi stood in her
> front yard for about ten minutes while the house was cleared.
> (Ex. 103, Dkt. 123, at 19).

> At least ten minutes had passed before the interview actually
> began. (Ex. 103, Dkt. 123, at 20).

### 2. "Nervous yet comfortable"

SA Boady referred to Movant's demeanor as nervous yet comfortable:

> MS. MESSEC: How did Ms. Channon seem to you when you were
>    speaking with her?
> MR. BOADY: She seemed comfortable. I mean nervous, obviously,
>    from us, but not — you know, she seemed comfortable talking
>    with us. (Ex. 102, 6/11/14 Hrg., at 15).

In The Hon. Judge Herrera's 27-page memorandum opinion and order's findings of fact, "During the interview Brandi was nervous but otherwise comfortable talking with Boady and Berry. [Tr. 15]". (Ex. 103, Dkt. 123, at 4).

### 3. Pulled Out The Front Door

On page 2 of the memorandum opinion and order (Ex. 103, Dkt. 123), the Court writes, "As Brandi walked out the front door, a female agent pulled her and moved her more quickly away from the door". This is unsupported by the record. At no point did either witness claim

Movant walked out the front door. Both testified she was pulled (Ex. 102, 6/11/14 Hrg. at 22, 51, and 53).

The Court did not opine on whether clearing the house itself was reasonable, though the Court found the use of handcuffs incident to clearing the house, Ex. 103, Dkt. 123, at 14, 19) noncoercive. Although Agent Boady testified it was standard procedure to clear a house (Ex. 102, 6/11/14 Hrg., at 7-8), the FBI Legal Handbook for Special Agents does not authorize agents to clear houses before executing search warrants (Ex. 107).

### 4. "Brief little patdown"

"The Court finds that the patdowns were brief and minimally intrusive; Brandi herself did not characterize this as a significant event, testifying that it was only a "brief little patdown. [Tr. 53]" (Ex. 103, Dkt. 123, at 19).

The Court erred, because the "brief little patdown" was followed by Movant stating, "And then I was escorted to the tree and they did a further search. Everything — you could see what I was wearing. There was nothing underneath it." (Ex. 102, 6/11/14 Hrg. at 53).

### 5. Permission Never Given

The Court opined, without a citation in the record this time, "Agents requested permission to interview Brandi, and she gave permission." (no cite) (Ex. 103, Dkt. 123, at 19).

Movant made clear she did not think it was a request: "I said I did not want to go into the backyard, because I wanted to be in the front yard with Patrick" (Ex. 102, 6/11/14 Hrg. at 56), and:

> MR. HOTCHKISS: Now at a particular point in time, Agent Boady approached you regarding going into the backyard for questioning.
> MS. CHANNON: Yes.

MR. HOTCHKISS: What do you remember he told you?

MS. CHANNON: We're going to go into the backyard so I can — we can have a conversation and I can ask you some questions.

MR. HOTCHKISS: Now, do you — did you believe you were asked to go into the backyard?

MS. CHANNON: No. I was told we were going into the backyard. And when we went into the backyard, there were already designated chairs for us to sit in that had been taken from underneath my porch.

MR. HOTCHKISS: Did you believe you had a choice to go into the backyard?

MS. CHANNON: No.

MR. HOTCHKISS: Why not?

MS. CHANNON: I didn't have a choice to not open my front door. You do what the men with guns tell you to do. I didn't feel like I had a lot of choices that day. (Ex. 102, 6/11/14 Hrg. at 59-60).

At no point did Movant claim agents sought her permission.

### C. Movant's Lupus

As Movant's presentence report showed, and the court later adopted, Movant suffers from Lupus, an autoimmune disorder where various triggers cause the onset of debilitating pain, skin reactions, lethargy, and digestive issues.

Unlike many autoimmune conditions, the debilitating pain, skin reactions, and digestive issues associated with Lupus often take hours or days to manifest after a triggering event. In Movant's case, triggering events include stressful situations, exposure to outdoor allergens (pollen, particularly in early morning or late evening), and especially exposure to direct sunlight.

Movant's relationship with her house was thus more medically necessary than a typical suspect's relationship. Instead of merely a place of solitude and privacy, Movant's home provided her medicinal protection from the poisonous light outside, and when she was barred from entering it, she could at least use the ample shade in the front yard.

Boady had described his focus as follows:

MR. HOTCHKISS: Did [men with rifles who are in the stack] stay at the scene?

MR. BOADY: I don't remember exactly what every person that was there did, because I kind of had some focus on the interviews that I was going to, you know, request to do with Ms. Channon. (Ex. 102, 6/11/14 Hrg. at 25).

Counsel raised Brandi's condition with Boady during cross-examination:

MR. HOTCHKISS: Okay. Do you remember Ms. Channon saying anything to you about any physical condition she may have pertaining to sunlight?

MR. BOADY: No. (Ex. 102, 6/11/14 Hrg. at 41).

Movant testified on direct:

MR. HOTCHKISS: Were you seated under the porch?

MS. CHANNON: No, but I asked if we could move from where they had us. They had taken the chairs from underneath the porch where it was shady and moved them to the left side, or the north side of the property, and it was in full sun.

MR. HOTCHKISS: Why did you ask?

MS. CHANNON: I had explained to Agent Boady that I have a condition to where my body does not metabolize sunrays. Even through clothes I get sunburned. And I have a flare-up when I am in the sun, exposed to the sun.

MR. HOTCHKISS: What did Agent Boady tell you?

MS. CHANNON: He said we were not allowed to move underneath the porch because it was too close to the house, and they were still executing the search warrant. And if I started to have a flare-up, then they would take that into consideration. (Ex. 102, 6/11/14 Hrg. at 63-64).

Messec asked Movant:

MS. MESSEC: Did you suffer any effects from your sun condition while you were in the backyard with the agents?

MS. CHANNON: Not while I was in the backyard. (Ex. 102, 6/11/14 Hrg. at 70).

Then Messec redirected Boady:

MS. MESSEC: You heard the defendant testify that she told you that she had a special condition that she couldn't be out in the sun or she would have some kind of reaction. Did that conversation occur?

MR. BOADY: No.

MS. MESSEC: And if she had told you that she had some kind of special sun condition, what would you have done?

MR. BOADY: Interviewed her in the shade or in the house.

MS. MESSEC: Why is that?

MR. BOADY: Well, we weren't — we weren't angry at her or — we were being as accommodating as we could.

> MS. MESSEC: And would you be afraid that you could get in trouble
>     with your agency if you had disregarded a witness' medical
>     condition?
> MR. BOADY: Absolutely.
> MS. MESSEC: Did you notice her having any ill effects from any
>     type of sun condition during your interview?
> MR. BOADY: No. (Ex. 102, 6/11/14 Hrg. at 71-72).

Then Hotchkiss recrossed Boady:

> MR. HOTCHKISS: So, Agent Boady, you don't recall her telling you
>     that at all?
> MR. BOADY: No.
> MR. HOTCHKISS: You do admit that you have problems remembering
>     some things of what happened that day?
> MR. BOADY: I — there are some things that are not as clear as
>     others, sure.
> MR. HOTCHKISS: And I mean, you didn't even remember what she was
>     wearing, for instance?
> MR. BOADY: Yes.
> MR. HOTCHKISS: Is it possible you didn't remember this?
> MR. BOADY: If she would have asked me to not be in the sun for
>     some physical condition, I would not have had her in the sun.
>     It's just plain and simple. I'm not a spiteful person. (Ex.
>     102, 6/11/14 Hrg. at 73).

After the agents left, Movant suffered one of the worst Lupus flare-ups

in her life, bedridden shortly thereafter, in agonizing pain, and

unable to get out of bed for three days.

### D. Movant's Cat Was In Danger and Leaving Was Not Voluntary

Boady testified on Messec's direct examination:

> MS. MESSEC: Did you — or are you aware of anyone telling her that
>     when agents left the house they would leave the door wide
>     open?
> MR. BOADY: I never heard anybody say that to anybody.
> (Ex. 102, 6/11/14 Hrg, at 11).

Boady had, however, admitted that he was not in Movant's presence

the entire time and that other agents were talking with Movant.

Therefore, whether he had not heard something he was not present to

hear meant he simply lacked awareness of it, not that it did not occur.

The FBI Evidence Response Team's photo proves the door was propped wide

open (Ex. 108).

After Movant testified, The Hon. Judge Herrera ruled that Movant's confession was voluntarily given because her escorted confinement in the backyard was not coercive nor custodial.

The judge's basis was that Movant was allegedly told she was free to leave, and that by standing in the front yard for ten minutes prior to the interview, she made the interview voluntary.

To the contrary of the Judge's conclusions, Movant did not stand in the front yard for ten minutes. Instead, she was told to go to the backyard almost immediately after getting pulled into the front yard, and she said she "didn't want to leave" the front yard, twice, because of her cat (Ex. 106).

At trial, Movant's cat got substantial mention. During opening, Counsel stated:

> The evidence will show, or is expected to show, that Ms. Channon, while outside on her front lawn, was concerned about her cat, that in the surprising emptying of the residence, amidst the tumult of federal agents attempting to clear the residence, Ms. Channon's cat had disappeared. Ms. Channon, concerned about her cat, did not leave. (Ex. 109, Tr. at 306).

On the fifth day of trial, during Counsel's cross-examination of SA Boady:

> MR. HOTCHKISS: And did she tell you that she didn't want to
>     leave?
> MR. BOADY: She did.
> MR. HOTCHKISS: And did she tell you she didn't want to leave
>     because of her cat?
> MR. BOADY: She did. (Ex. 110, Tr. at 1105).

Counsel stated during summation, "She was told she was free to leave, but did not leave because of her beloved cat." (Ex. 111, Tr. at 1619). Even AUSA Vierbuchen opined to the jury at closing, "Now, I'm going to call this the beloved cat argument here. So I'm a little unclear what the cat has to do with anything." (Ex. 97, Tr. at 1636); "Defense counsel seems to argue that somehow she was, I don't know, distracted because her cat had got away. It really doesn't make a lot

of sense to me." (Ex. 97, Tr. at 1637), and "so this is after she's been told she's free to leave and that she wanted to stay because of her cat." (Ex. 97, Tr. at 1637-38).

### E. Movant's Right to Representation Was Violated

In the time following Steven Gardner's phone call to Matthew Channon on 6/8/2011, Matthew retained the services of Donald Kochersberger, attorney at law, to represent the family in the Officemax matter (Ex. 112). Mr. Kochersberger also represented Movant and Mr. Channon from indictment to arraignment (Exs. 113, 114), helping the Channons to put together paperwork to qualify for public defenders.

When being brought back to the backyard, agents told Movant, "if Matt had paid the restitution to Officemax, that they would not have had to search the residence" (Ex. 106). When brought to the chairs, Agent Boady told Movant, "Even if Matt was here, we couldn't talk to him, because he has a lawyer. You don't have a lawyer. Sit down." (Ex. 106). Counsel never brought these matters up.

### F. Movant's Self-Discrediting Confession

After SA Boady's "Brutonized" testimony was given on direct examination, Counsel inexcusably brought forth testimony that served to incriminate Movant in the minds of the jury:

> MR. HOTCHKISS: Isn't it true that at the beginning of the interview Ms. Channon told you that whatever it is that the FBI was at her house for she wants to be blamed for it and it was she who did it?
> MR. BOADY: She did say that.
> …
> MR. HOTCHKISS: Now, Agent, when the bulk of what Ms. Channon told you in answers to your questions, by admitting certain things, those — those admissions were new to you. Isn't that correct?
> MR. BOADY: I believed that she was involved from the beginning, but I didn't — it was new to me the extent.
> MR. HOTCHKISS: And with each of these admissions did it cause you any concern, given her statement that she wanted to take the blame for everything?
> MR. BOADY: No, sir.

```
    MR. HOTCHKISS: It didn't cause you any concern?
    MR. BOADY: I understood why she was saying it. (Ex. 85, Tr. at
       1113, 1120).
```

Counsel abandoned the line of questioning, stopping short of asking SA Boady to explain his understanding of what appeared to be false statements, and how he could tell which statements were to be believed.

**V.  Movant's 5th Amendment Right Not To Be Held On An Infamous Crime, Unless On An Indictment Of A Grand Jury, Was Violated When She Was Charged By Way Of An Indictment Lacking Any Signature**

In the signature block for the copies provided to the defense of the original indictment, superseding indictment, and second superseding indictment (Exs. 10, 9, 8), the Jury Foreperson's signature is simply denoted "/s", rather than an indication that the jury foreperson signed the form by hand and the signature was redacted to protect the Grand Juror's identity.

Distinguishing the instant case, the Grand Jury forepersons in each of these indictments, if they ever existed, never so much as saw the clerk or a Magistrate Judge, or performed an actual signature. The AUSA prepared the indictments herself and then filed them herself (Messec for the first two; Kastrin for the third). The Government's failure to disclose Grand Jury minutes as part of *Brady* and *Jencks* evidence means it is likely some or all of the indictments skipped a proper Grand Jury altogether.

Co-Movant interviewed an employee in the U.S. District Court Clerk's Albuquerque office on March 4, 2019, and verified that the Clerk was not aware of any instances where grand jurors meet magistrate judges in open court or grand jurors file anything with the clerk directly (Ex. 115).

AUSA's Messec and Kastrin both committed misconduct by short-circuiting the Grand Jury signature process, by skipping the foreperson's submission to a Magistrate Judge in open court, skipping the foreperson's signature, and skipping the foreperson's filing with the clerk.

The case was close to getting dismissed at the outset:

> [I]f these summary charts are not admissible at trial, Judge, the government would not be able to go forward at this time. (Ex. 116, Tr. at 5).

Even though Co-Movant raised it (Ex. 117), Counsel failed to call the irregularity to the Court's attention, failed to request an *in camera* review to verify the Grand Jury had actually endorsed the indictment, and failed to otherwise object to each invalid indictment.

### VI. **Movant's 5th Amendment Right To Procedural Due Process Involving An Unbiased Tribunal, 6th Amendment Right To Trial By An Impartial Jury, And 8th Amendment Right Against Excessive Fines Were Violated When The Judge Prejudged Her Guilt**

The Hon. Judge Herrera took many opportunities to make it clear to Movant that she was not going to receive a fair trial, including a number of them on the record:

> THE COURT: "But, to me, asking for a native database…is way beyond what is — what this case is about. This case is about the Channons." (Ex. 118, 1/6/16 Hrg. at 152-53).

> THE COURT: "But they obtained these rewards…The rewards are of value to the defendant who may or may not use them — or I said the defendant — the customer who may or may not use them." (Ex. 37, 7/7/15 Hrg. at 5-6).

> THE COURT: "[Y]ou know I don't dispute the facts here. I mean, the facts are that the defendants were, you know, creating a way to get many, many, many, many, many more rewards than they would have been entitled to based on their own purchases." (Ex. 37, 7/7/15 Hrg. at 11).

> THE COURT: "My concern is I don't — I don't dispute that the Channons did something here." (Ex. 2, 7/7/15 Hrg. at 25).

Off the record but in open court, The Hon. Judge Herrera routinely opened or closed proceedings pressuring Defendants to settle with the prosecution, both directly, and at least three times indirectly, through Court Reporter, Paul Baca.

Pressure also took place on the record. The Hon. Judge Herrera asked Counsel:

> THE COURT: "Don't take this personally. I ask everybody this in every case. Is there any chance you-all are going to resolve this?" (Ex. 119, 7/7/15 Hrg. at 42).

Despite Movant's and Co-Movant's repeated complaints to Counsel how upsetting it was to be pressured by courtroom staff who were supposed to be disinterested and unbiased, Counsel did not bring it to the Court's attention, nor raise it on appeal. Movant was thus made powerless to make it clear to the Court that the pressure should not continue.

The Government also applied inappropriate pressure, sending Movant and Co-Movant forms (Ex. 120) it expected them to sign in spite of representation.

The Hon. Judge Herrera sent another clear signal to Defendants in open court off the record: opening or closing a number of court proceedings by gushing about AUSA Messec's pregnancy (not her first), offering congratulations, and offering motherly advice, when the Court never expressed even the slightest personal interest in Movant's (first) pregnancy at any point off the record.

The bias had a resonating effect on the attorneys in the case: Counsel became subdued, cowed into quiescence, waived arguments, and impotently raised objections as one would raise sour grapes. Government attorneys, on the other hand were emboldened, became boisterous, domineering, and long-winded, and were so indulged by the Court that they committed acts of misconduct they knew the Court would tolerate.

Neither Movant nor Co-Movant testified in their own defense.

VII. **Movant's 5th Amendment Right To Due Process And Grand Jury Screening Of Indictments, And 6th Amendment Right To Be Informed Of Criminal Charges, Confront Witnesses, And Compel Witnesses To Appear In Court Were Violated When The AUSA And FBI Manufactured Evidence Used At Trial**

   A. **IP Address Irregularities**

During his direct testimony at trial, SA Moon mischaracterized how many computers could come from a single IP address, even contradicting himself in the same thought:

> MS. VIERBUCHEN: And I think you've mentioned that the IP address was unique. And what does that mean, it's unique?
> MR. MOON: Yeah. So an external IP address is unique in the fact that no two devices, be it an iPad or a computer, can access the internet using the same IP address at the exact same time. (Ex. 121, Tr. at 1213).
>
> MS. VIERBUCHEN: Now, you've testified that two people -- devices cannot have the same IP address, or external IP address. Do I have that correct?
> MR. MOON: That's correct.
> MS. VIERBUCHEN: What happens when you have multiple computers, say an iPad and a MacMini, corresponding from the same residence?
> MR. MOON: Without going into too many details, you're -- all of those devices would have the same external IP address. So if I access PayPal from my computer or my iPad on my same home network, PayPal wouldn't notice a difference. It's the same external IP address. (Ex. 121, Tr. at 1214)
>
> MS. VIERBUCHEN: Now let's say you're traveling and you take your own laptop with you on the travel, and you connect to the hotel Wi-Fi. Would you get your home IP address?
> MR. MOON: You would get the IP address of the hotel, the internet service provided to the hotel. You would get their IP address, so it does not follow the computer.
> MS. VIERBUCHEN: So the same concept of logging on with my laptop at a Starbucks?
> MR. MOON: Right. So every user at Starbucks is going to have the same external IP. If they, again, hit PayPal, they would see only one IP address. (Ex. 121, Tr. at 1215).

Counsel did not object. Moon's testimony included additional debunked statements about the IP addresses as to merit numerous objections, which Counsel never made:

So any time you see the same IP address logging into multiple accounts it links them, meaning the owner of that IP address controlled both of those accounts. (Ex. 121, Tr. at 1230).

So the likelihood of a different person having the exact same IP address — or excuse me — the same IP address and logging into those accounts is almost impossible. (Ex. 121, Tr. at 1230-31).

Counsel never confronted Moon about, nor had his own witness explain, how Starbucks does not control the accounts its customers use its Wi-Fi to access, or how the hundreds of devices using the same Wi-Fi would have the same IP address yet not belong to a single person.

Counsel also never introduced that IP addresses corresponding to one residence may be reassigned to another residence. For example, the Comcast 98.230 address is still in use in 2019, but about 4 miles away, near Juan Tabo and Indian School NE in Albuquerque (Ex. 122).

Moon testified (Ex. 121, Tr. at 1217-18; Ex. 121, Tr. at 1221-22) facts not in evidence: that the 98.230.199.128 IP address resolved to Comcast and had been linked to 7100 Gladden. Counsel failed to object. Government Ex. 85 (Ex. 123), a Comcast-authored document linking the IP to the residence, was in fact never admitted or authenticated.

Comcast's subpoena response only linked the 98.230.199.128 IP address to Movant's residence (and not to a specific computer or person) from 9/14/10 to 9/22/10 (Ex. 123). No gmail accounts or MaxPerks accounts were created during this span, nor were any Southwest Flights booked. Although Co-Movant made his counsel aware of this discrepancy, Counsel refused to raise it. Officemax itself did not log any IP traffic of any kind (Exs. 124; 125 (Tr. at 903)).

The Comcast exhibit proffered in discovery (Ex. 123 without the sticker) was illegally redacted by AUSA Messec to conceal the existence of a grand jury subpoena, which was never disclosed to the defense. Because of the redactions, the document indicates such a subpoena may have been, similar to the affidavit for search warrant in Ground II or

the grand jury indictments in Ground VII, forged or illegally generated by SA Boady and/or AUSA Messec. A similar responsive document from Comcast, from the Casey Anthony case with the corresponding areas highlighted (Ex. 126) helps make clear what was being redacted: not anything sensitive and properly redacted, but rather the existence of a grand jury subpoena.

A substantial number of IP addresses associated with the accounts in this case were outside the United States. The Government withheld this information from the jury, and in fact built summary exhibits in order to conceal this information. At trial, Counsel failed to object or point out the ties, furnished in the Government's discovery, between dozens of other IP addresses and the accounts pinned on Movant.

For example, Government exhibit 86 (Ex. 127) shows the "coach" gmail account, which is the second of four "Group 2" gmail accounts purportedly used, and links it to the 98.230 address. However, the Government quickly fast-talked and shuffled through the first, third, and fourth gmail account records (Exs. 128, 129, 130), which each show a wide variety of IP addresses in their creation and use (Ex. 131, Tr. at 451-54). "Teechur" was created in Lawton, Oklahoma (Ex. 132), and accessed from Milton Keynes, England (Ex. 133) and Washington, DC (Ex. 134). "Bargle" was also created in Lawton, Oklahoma (Ex. 135), and accessed from Germany (Ex. 136), Stockholm, Sweden (Ex. 137), and Moscow, Russia (Ex. 138). "Garble" was created from Brighton, Massachusetts at Boston University (Ex. 139).

A closer look at Ex. 127 reveals that even if "Coach" was created from the 98.230 address, it was not being used from it, but rather Germany (Ex. 140), San Francisco (Ex. 141), Las Vegas (Ex. 142), and Dallas (Ex. 143), the latter three of which were accessed in a span of 6 minutes.

At a later point, Moon asserted the IP address 76.113.79.124, was also a Comcast address (Ex. 144, Tr. at 1258), but this was similarly a fact not in evidence, but this time with no exhibit to propound. Counsel did not object or revisit the issue on cross-examination.

## B. The Evidence Itself Was Argumentative

The end result of this selective presentation of information was a number of colorful Government exhibits admitted at trial. By doing the thinking for the jury, so that rather than the jury seeing summaries and reaching the conclusions themselves, the Government prepackaged those conclusions by decorating their summary exhibits with the conclusions already in place (Exs. 145, 146). Counsel joined objections to each one under hearsay grounds, but never objected for assuming facts not in evidence or being incomplete.

To their credit, Counsel did bring similar matters up in regard to the original indictment in their Motion to Dismiss (Ex. 66, Dkt. 56 at 12), but never raised them when the counts were superseded, at trial, or on appeal. Instead of raising sufficiency objections at the pretrial stage, or trial fact evidence at trial, Counsel only raised trial fact evidence at the pretrial stage (Ex. 66, Dkt. 56).

## C. No Gmail Servers in New Mexico

In order to establish that a wire was used for superseding indictment Counts 6-7 against Co-Movant, AUSA Vierbuchen attempted to establish that Co-Movant must have sent wires across state lines to gmail, asking Despina Papageorge, paid witness from Google, to certify that gmail had no servers in New Mexico from 7/15/10-7/28/10 (Ex. 147), which she did:

Q: And can you — were you able to conduct research to determine whether or not that Google — whether or not Google had servers in New Mexico on the dates of July 15, 2010, and July 28, 2010?

A: On those two dates, Google did not maintain servers in New Mexico. (Ex. 54, Tr. at 437).

AUSA Vierbuchen made a large assumption without making any proof: that Movant or Co-Movant sent transmissions from New Mexico. According to the Government's own records, Co-Movant was outside of New Mexico during most of that time, arriving in St. Louis on 7/22/10 (Ex. 148) and leaving Chicago on 7/27/10 (Ex. 149). Co-Movant had traveled to Texas for multiple days earlier in the month, and routinely drove to Colorado and Arizona to recycle ink at other stores, often without visiting a single Officemax store.

Google's records for furnituu@gmail.com, subpoenaed in 2011 (Ex. 150), the account in Counts 6-7, showed no access from New Mexico IP addresses during the time periods in question. In fact, this account was created in Oxnard, California (Ex. 151), the same state as Google's servers. Counsel never questioned the Government's "near" half of the supposedly interstate wire transmissions, which were essential to the Government's conspiracy count against Movant.

Counsel never brought up any of these discrepancies with Google witness Papageorge.


### D. Synthesized Trial Exhibits

As seen in Ex. 152, Messec was having Gardner manufacture evidence, subject to her approval ("Let me know if they are correct.") In Exs. 153 and 154, Messec redacted what she asked Gardner to manufacture.

With particular regard to the receipts the Government put forward as evidence, adding color, writing in arrows, and using the VISA,

MasterCard, and AmEx logos went beyond mere summary (For example, Government's Exhibit 14, Ex. 155). The Government, and not witnesses for the Government, was testifying about linkages between the receipts and other documents, without providing the originals. Counsel similarly objected to these under hearsay grounds, but again, not as assuming facts not in evidence or being incomplete, or calling out the synthesis errors through its own witnesses.

Government's Exhibit 10d was purported to be eBay-generated and bore the eBay logo but instead the author of the document was AUSA Messec (Ex. 156).

Government's Exhibit 88 was purported to come from Officemax but again, Messec manufactured it (Ex. 157).

Government's Exhibit 89 was purported to come from Google and Officemax (Ex. 144, Tr. 1254-55), but Messec manufactured it (Ex. 158).

### E. Grand Jury Irregularities

At the first known grand jury in this case, SA Boady fabricated information with no evidentiary basis, to wit:

> MR. BOADY: So when we did a search warrant on the subject's house, Matthew Channon and Brandi Channon's house, we found on one of their computers that they had had some e-mails and stuff like that related to something called fake name generator, I believe. (Ex. 98, 3/26/13 Grand Jury Transcript at 11-12).

> MR. BOADY: And when we did a search warrant on their residence, we found some evidence of like receipts and other stuff. Like there was one Excel file that showed like the trip that they had planned to take where it like goes from one Officemax to another around the country, and they like had it all mapped out, "We'll go from here to here to here to here." (Ex. 98, 3/26/13 Grand Jury Transcript at 21).

The evidence was fabricated because FBI employee Jane Bales deleted Boady's entire case file before the grand jury heard his evidence, without redoing the extraction. Bales then incompetently

redacted her notes in order to conceal this potentially exculpatory information (Ex. 159). Movant recovered the concealed information in Ex. 160, which divulged that Bales had "Spoke with SA Boady -- do not redo case; plea deal in works", a curious sentiment, since the notes were placed under "03/05/2012", almost a year before the first known grand jury met and long before any charges were filed.

> Boady testified before the first known grand jury:

> MR. BOADY: Yeah. For the most part, basically, we'd look at IP logs, for instance, and we'd see that he was logging in from his house or from a common IP that he would use to log into his Facebook account or something else like that" (Ex. 98, at 23-24).

Co-Movant has never had a Facebook account, and the IP logs showed numerous IP's that did not correspond to Co-Movant.

For the first known grand jury transcript in this case (Ex. 98), little was redacted. For the second known grand jury transcript in this case (Ex. 161), AUSA Messec redacted ten consecutive pages in an effort to conceal far more than the personally identifying information of the grand jurors. For the third known grand jury transcript, AUSA Kastrin refused to furnish a single page, despite multiple requests by Counsel.

Movant believes and therefore states that fabricated evidence was presented to the grand juries in the latter two proceedings, prejudicing, among others, her Fifth Amendment Right to Due Process, and Sixth Amendment Rights to Confront Witnesses and to Be Informed of Charges.

VIII. **Movant's 5th Amendment Right To Due Process Of Law And 6th Amendment Right To Have The Assistance Of Counsel For Her Defense, Were Violated When The Judge Failed To Provide An Opportunity For, And Her Counsel Failed To Seek, A Last-Minute Continuance Before Jeopardy Attached**

Despite an impending trial date determined two months in advance (Dkt. 252, Ex. 162), the Hon. Judge Herrera had substantial trouble

arriving to decisions on timely filed motions that, had they been decided differently, could have obviated the trial entirely.

With trial scheduled for Monday, 1/11, the Court waited until Friday, 1/8, to push trial (Dkt. 282, no brief) to Wednesday, 1/13, to deal with evidentiary issues on 1/11 that had been largely in the Court's docket for months.

Then, on 1/11, with an eerie feeling in the courtroom as if the day had been stolen from the trial and the jury, the Court and Counsel let the Government present their case-in-chief uninterrupted for over two hours.

The Defense had three motions in limine pending (Dkt. 182, from 6/17/15; Dkt. 259, from 11/25/15; and Dkt. 271, from 12/24/15), none of which were ruled upon during the hearing. Government motion in limine (Dkt. 169) was never ruled upon at all.

Despite the Court's strong hinting that the Government's evidence-in-chief would not be allowed, the Hon. Judge Herrera slipped in a denial of "motions to exclude Daubert exhibits 1 and 2" (Ex. 163, Dkt. 287) on 1/12, catching Counsel completely unprepared to proceed to a trial where they would have to rebut that evidence through testimony.

The morning of trial, due to the presence of the jury venire in the next room, the Court never asked Counsel if they were ready to begin trial, or if Counsel was ready for the jury to come in, but ruled on evidence, declared a recess and called in the venire (Ex. 164, Tr. at 53-54). Counsel, even provided with a 15-minute recess to do so, made zero effort to seek a continuance to adequately prepare for trial, despite feeling near-certainty the week of trial that there would be no trial, and the Court having made a pivotal evidentiary ruling immediately prior.

This unexpected trial development made also added difficulty for either Counsel to call Janet McHard, the sole defense witness, who was advertised to the jury during opening arguments but never called potentially due to schedule conflict.

Numerous veniremen were no-shows, bringing the number of jurors available after for-cause and peremptory challenges perilously close to insufficient, but Counsel raised no according objection.

IX. **Movant's 6th Amendment Right To A Jury Pool Composed Of A Fair Cross-Section Of The Community, And 5th Amendment Rights Of Jurors To Equal Protection Under The Law, Were Violated Because Of The Disparity Between The Percentage Of Men On The Qualified Jury Venire And The Percentage Of Men In The Population Of The District Of New Mexico**

This case's original jury pool, for trial set on 7/13/15, consisted of 71 veniremen, of which 38 (54 percent) were men (Ex. 165).

On 10/27/15, the Court enacted a modified jury plan effective 11/1/15 (Ex. 166). The timing of this case suggests that it was one of the first jury trials, if not the first, in the new consolidated wheel for Northern New Mexico to utilize the new venire system, called "eJuror".

The second jury pool, and the one used at trial, consisted of 70 veniremen, of which 23 (32.8 percent) were men (Ex. 167). The eJuror system for this pool was flawed, causing errors in the earliest three questionnaires submitted, on 11/16, and four from 11/17-11/19. Seven jurors (Apodaca, D. Gonzales, Kingston, Kosilla, Makil-Medina, Salazar-Mackenzie, and Saldana) had submitted surveys that were almost completely blank, indicating a system that was prone to computer error.

After Government's, Counsel's, and Co-counsel's for-cause challenges, the Government peremptorily struck six women, and the defense peremptorily struck nine women and one man, and the jury was still half women.

Co-Movant's self-conducted defense research using Amazon Mechanical Turk, featuring a custom vignette for mock jury testing (Exs. 168, 169), had indicated that men were far less likely to convict the defendants under the Court's evidentiary rulings than women were. Survey respondents identifying as divorced women, in particular, were shown as six times as likely to mock convict.

Despite Co-Movant's requests, neither Counsel made any objection to the makeup of the jury or jury pool.

X. **Movant's 5th Amendment Right Not To Be Held On An Infamous Crime, Unless On An Indictment Of A Grand Jury, Was Violated When She Was Charged By Way Of Grand Jury Proceedings Tainted By Prosecutorial Misconduct; And Movant's 6th Amendment Rights To Be Confronted With The Witnesses Against Her And To Compel Witnesses In Her Favor Were Violated When Brady Evidence Was Provided Late And Jencks Evidence Was Withheld**

A. **The First Superseding Indictment's Grand Jury Transcript Was Impermissibly Redacted By AUSA Messec**

On or about 1/18/16, the Government turned over the first two known grand jury transcripts: the original indictment's, largely unredacted (Ex. 98); and the first superseding indictment's, heavily redacted (Ex. 161). Within the second transcript, as soon as a grand juror starts inquiring about the legality of the charges, AUSA Messec, not the prosecutor at trial, redacted six entire pages of discussions. Counsel never raised the issue at trial or on appeal.

B. **The Second Superseding Indictment's Grand Jury Transcript Was And Is Being Impermissibly Withheld By AUSA Kastrin**

On 6/23/15, AUSA Kastrin brought various matters before a Federal Grand Jury. On 6/24/15, AUSA Kastrin filed the second superseding indictment in CM/ECF. Even though such a grand jury would necessarily have heard from witnesses who later testified at trial (most likely FBI SA Jeffrey Moon), the US Attorney's Office has refused to turn over

even a redacted version of this Grand Jury transcript to this day.
Counsel has made no requests to have one turned over. Counsel never
requested an *in camera* review of this grand jury transcript or the
corresponding minutes.

### C. *Brady* Evidence Was Produced Late

Among the *Jencks* evidence divulged following SA Boady's trial
testimony, on or around 1/18/15, was proof that agent Boady and AUSA
Messec were made contemporaneously aware (Ex. 27) of their star
witness's attempt to blackmail Matthew Channon (Ex. 81), without prior
authorization. Despite being furnished at a time inconvenient to the
defense, the bulk of the *Jencks* disclosure was not massive in
comparison to the thousands of documents previously turned over.
Counsel had the capability to raise, but waived raising, this
information during his Rule 29 motion, his case-in-chief, and
sentencing and appeal.

### XI. Movant's 5th Amendment Right To Due Process And 6th Amendment Right To Assistance Of Counsel Were Violated Through Government Witness Steven Gardner's Blackmail And Perjury, And Counsel's Waiver Of Objection

#### A. Blackmail

On June 8th, 2011, ostensibly without prior consultation with the
FBI and US Attorney's Office, Government witness Steven Gardner placed
a phone call directly to Movant's landline.

Co-Movant answered, and a brief conversation took place. By all
accounts, Gardner made clear that he believed Co-Movant had ill-gotten
gains from Officemax and that he wanted Co-Movant to pay Officemax a
sum of money. Co-Movant offered an e-mail address for Gardner to send
information to. Missing from both Gardner's official account (Ex. 18)

and Chuck Sipko's account (Ex. 170), but present within Co-Movant's affidavit (Ex. 31), was the way the call ended: Gardner started to sound frustrated, then his tone of voice changed and became belligerent, stating that the call had been recorded and he had a witness to the call.

Gardner attempted to call Co-Movant again but did not have a second conversation.

On June 10th, Gardner sent Co-Movant an attachment via e-mail: a letter, dated June 9th (Ex. 171), demanding payment of $81,231.75, with no mention of returning Movant's or Co-Movant's ink cartridges:

> "So to recap you owe OfficeMax $81,231.75 for these fraudulent MaxPerks accounts and you would like to resolve this issue by paying restitution. Please send a money order made out to OfficeMax in the amount of $81,231.75 to the address below by June 23, 2011." (Ex. 171).

Although the attached letter allowed two weeks for payment, in the same e-mail received June 10th, the body of the document (Ex. 172) took a more aggressive and sinister tone:

> I have not been able to get a hold of you lately but expect that you will call me back so we can discuss how resolve [sic] this issue. If I do not hear back by Monday June 13, 2011 I will be forced to present my findings to the FBI in Albuquerque.

On June 28th, 2011, SA Boady and at least 16 other FBI agents and officials executed a search warrant at Movant's residence. SA Boady had originally planned on executing the warrant two weeks prior on June 14th, 2011, but called the search and seizure off for undisclosed reasons, delaying the warrant's execution by two weeks.

In an emailed memorandum (Ex. 27), disclosed by the Government days into the trial when it was too late for Counsel to react to it, FBI SA Boady stated to AUSA Messec and his supervisors at the FBI that he was aware that Gardner had contacted Movant's co-defendant Matthew

Channon and blackmailed him, stating, "I can't believe they did this without informing me of it in advance."

During the search and seizure, Movant talked to various agents including SA Boady. According to Movant's affidavit (Ex. 106), the agents told her, "If Matt had paid the money, they would not have needed to come."

Agents photographed a printed copy of Gardner's e-mail attachment ostensibly found in the premises (Ex. 173, bank account information redacted by Movant but fully disclosed to the jury) and the Government used the photograph as evidence at Movant's trial.

Counsel waived any pretrial motions on the subject and refused to cross-examine Gardner or Boady as to the subject of blackmail, in spite of Co-Movant's e-mail to his Counsel dated June 4, 2015 (Ex. 174), detailing exactly which law was violated.

In addition, Co-Movant had prepared lines of questioning specifically for Counsel to use against Gardner, which were emailed with Movant's approval to Counsel on January 15-18 (Exs. 175, 176, 177, 178). Numerous questions within Gardner's cross-examination in the trial record originated with these e-mails. Unfortunately, as seen numerous times, Counsel frequently skipped around and missed the "punchline" portion of these lines of questioning. For example, the line of questioning in Ex. 176, page 2, beginning with the "CEFI" certification, ties in closely with the trial transcript at 935-37 (Ex. 179), but Counsel avoided the topic of blackmail entirely.

Similarly, Ex. 180 (Tr. at 995-996) shows Counsel abandoning the line of examination just as it starts getting worthwhile, instead of the suggested examination from Ex. 175 at 12-13, again sidestepping the topic of blackmail.

Despite Movant's multiple pleas to Counsel and Co-counsel, blackmail was never brought up during hearings before or after trial, or trial itself. Gardner testified during all three. In fact, the word "blackmail" never appears once in the trial record.

### B. Perjury In Preparation And Proffer Of Evidence

The infamous spreadsheets in this case betray a tangled chain of custody, where multiple witnesses both claimed credit for, and disavowed, creation of the same documents.

While Excel spreadsheets notoriously fail to log modifications, they do retain metadata, including the username of the person who created them. As shown in Ex. 181, the creator of most of these spreadsheets was "sgardner". Mr. Robert told the Court during the 1/6/16 evidentiary hearing:

> Mr. Gardner is going to say that he created the spreadsheet. If he doesn't say that, I think we have a problem.
>
> I don't think that this is going to take 30 minutes. Today's experience suggests otherwise.
>
> I — it seems to me that the Court has the information necessary to decide the issue.
>
> I guess Mr. Gardner can talk about the circumstances under which he created this spreadsheet, but there's no question that he did so, and that is really the germ of the issue. (Ex. 118, 1/6/16 Hrg. at 157-58).

Yet during his cross-examination in evidentiary hearing held 1/11/2016, Gardner disavowed his authorship, contradicting the Government's own evidence he was there to vouch for:

> MR. ROBBENHAAR: And this looks to be the Daubert Exhibit 1 that's on the screen — 2? Pardon me. The enhanced. And if we right click on the tab, you see the tool bar that just popped up?
> MR. GARDNER: I sure do.
> …
> MR. ROBBENHAAR: So I thought — are you not the author of this particular spreadsheet?
> MR. GARDNER: I — I wouldn't call myself the author, because it's — the information on that spreadsheet is supplied by SHC.

MR. ROBBENHAAR: Information that you didn't have direct access to?

MR. GARDNER: Correct.

MR. ROBBENHAAR: And can you pull up the properties of the — So here, if we look at the properties of this particular spreadsheet, it looks like the author is S. Gardner?

MR. GARDNER: Okay.

MR. ROBBENHAAR: Is that you?

MR. GARDNER: That is me. But I can tell you I didn't create the spreadsheet. They could have taken an older spreadsheet that I modified at one time and gave back to them. I don't know. But I know that I didn't create that spreadsheet.

…

MR. ROBBENHAAR: So can you answer this question? Who created this spreadsheet?

MR. GARDNER: I would assume SHC created this —

MR. ROBBENHAAR: No, without assuming.

MR. GARDNER: I wouldn't know. (Ex. 182, 1/11/16 Hrg. at 236-37).

In contrast to this disavowal, immediately prior in the transcript Gardner says the opposite:

MR. ROBBENHAAR: All right. How many spreadsheets did you create in this — in the course of this investigation?

MR. GARDNER: I don't know, to be honest with you. There were quite a few. There was a lot.

MR. ROBBENHAAR: Dozens?

MR. GARDNER: It could be. I — like I said, I don't know, but there were a lot of different spreadsheets.

MR. ROBBENHAAR: Okay.

MR. GARDNER: And they are capturing different date ranges and different information. (Ex. 182, 1/11/16 Hrg. at 235-36).

In the Court's Memorandum and Order, "[t]he court observes that the Government recognizes that its statements about the content and preparation of Daubert Exhibits 1 and 2 have at times been inconsistent and inaccurate" (Ex. 163, Dkt. 287, at 3).

After Gardner's testimony, Counsel never again raised the fact that either Gardner was lying under oath or the documents he created were fraudulent.

XII. **Movant's 5th Amendment Right To Due Process, Her 6th Amendment Right To Trial By An Impartial Jury, To Be Informed Of Criminal Charges, To Confront Witnesses, To Compel Witnesses To Appear In Court, And To Have Assistance Of Counsel For Her Defense, Was Violated When Her Counsel Failed To Appeal The Use Of Untrustworthy Hearsay Evidence Against Her**

Well into the Wednesday of a trial that was supposed to start the prior Monday, the Court found:

> THE COURT: I do think that the evidentiary foundation was laid at the hearing on Monday.
> THE COURT: Defense had an opportunity to cross-examine the witnesses, and so the Court does recognize that the original and 1963 Bates-stamped documents, the two spreadsheets, do appear to be business records of regularly conducted activity.
> THE COURT: So the Court does find that they are admissible on that basis.
> THE COURT: The original and 1983 [sic], I would say most — I would say are machine generated. As well, the enhanced spreadsheet.
> THE COURT: I know that there was some cut and paste, and so it's hard for me to — to be satisfied that it's machine generated. (Ex. 164, Tr. at 53).

The Hon. Judge Herrera did not reach a consistent opinion on whether the documents were machine generated or not, but admitted that there was "some cut and paste", which any reasonable jurist would conclude meant they were not machine generated. The Court continued:

> THE COURT: But the government, nevertheless, has basically said to us today that the summaries that they seek to admit are — come from both Daubert Exhibit 1, the original, and Bates-stamped Document 1963.
> THE COURT: So to the extent there are summaries that come from those records, it appears that both of those documents are what is necessary. (Ex. 164, Tr. at 53).

After the Hon. Judge Herrera ruled that even though the proffered exhibits were clearly not machine generated, since the Government said otherwise, they must be machine generated, Counsel waived objection.

## A. Authenticity

There is zero mention of "SHC" or related companies anywhere in the Excel spreadsheets the Government provided. The authentication testimony of SHC employee Victoria Mills alleged:

> MS. VIERBUCHEN: Now, on your — on the end — when SHC got the request, did you actually physically run the request?
> MS. MILLS: I did not. I would send it over to our analytical team and ask them for whatever information OfficeMax was inquiring about.

> MS. VIERBUCHEN: Okay. And then you worked with the analytical
> team to get the product back and forwarded it to Steve?
> MS. MILLS: Correct. (Ex. 183, 1/11/16 Hrg. at 37).

> MR. ROBERT: You described a little bit ago that you're not the
> one that actually extracts the data from the databases.
> MS. MILLS: That is true.
> MR. ROBERT: The analytics team does that?
> MS. MILLS: Correct. (Ex. 183, 1/11/16 Hrg. at 56).

"The analytical team" or "the analytics team" was never named, and Counsel never asked Ms. Mills to identify them. No one called them to testify or declared them unavailable. As to Victoria Mills herself as the authenticating proponent, her testimony on direct during the 1/11/16 evidentiary hearing was as follows:

> MS. VIERBUCHEN: I want to ask you a question about the hardware
> and software that's used by your company.
> MS. MILLS: Okay.
> MS. VIERBUCHEN: Are you — do you understand the details of how
> the hardware works and how the software is programmed to
> extract the data from the database and populate it into an
> Excel? [sic]
> MS. MILLS: I have limited knowledge — technical knowledge. But I
> do know that we are a PCI compliant company, which means that
> we're at a level of testing that we can store credit card
> date. And it's, you know, at the high level of security. (Ex.
> 183, 1/11/16 Hrg. at 50).

> MR. ROBERT: Okay. So that's two outside contractors providing
> information that ended up in your database?
> MS. MILLS: That is correct.
> MR. ROBERT: Were there any more than just those two that you've
> described for us?
> MS. MILLS: Not that I can recall.
> MR. ROBERT: Okay. Now, you don't maintain the database?
> MS. MILLS: I do not.
> MR. ROBERT: That's the — the analytic team?
> MS. MILLS: The database — the IT database development team
> manages the incoming structure of the data.
> MR. ROBERT: Okay. How much do you know about how databases work?
> MS. MILLS: It's minimal. I mean I understand the overall concept,
> and I do know our — you know, our structure of how data comes
> in and how we store it. But I would say minimal from a
> technical standpoint. (Ex. 183, 1/11/16 Hrg. at 60).

Victoria Mills was an account manager for SHC (Ex. 184, 1/11/16 Hrg. at 14), an account manager being a salesperson, not an internally-facing data custodian or technical resource.

At trial, the Court disregarded the numerous indicia of inauthenticity to rule as follows:

> THE COURT: And the Court is satisfied that Ms. Mills, as the account executive, was — testified that she was familiar with the data that was not only requested, but populated in the spreadsheets, to the extent that she could identify them as data that was made at or near the — near the time. I recall her talking especially about the point of service information, but I can see that she talked about other data as well. (Ex. 164, Tr. at 52).

## B. Reliability

Victoria Mills' testimony at the hearing similarly indicated a lack of trustworthiness in the data the Government used her to authenticate:

> MR. ROBERT: Did the analytics team put the bold header there that we're looking at, which is Government's Exhibit 1 from the Daubert hearing?
> MS. MILLS: That is correct.
> MR. ROBERT: So when they put the starting date of April 1, 2011, that was their mistake?
> MS. MILLS: It would be if — right. If that's a mistake, that would be their mistake.
> MR. ROBERT: Well, because we clearly have a date that predates April 1, 2011, right?
> MS. MILLS: That is correct.
> MR. ROBERT: Okay. So the title of that document does not correctly reflect the contents of that document?
> MS. MILLS: Correct. (Ex. 183, 1/11/16 Hrg. at 66).

Witness for the defense Janet McHard gave testimony at the 10/28/15 hearing showcasing the degree of lack of trustworthiness in the data the Government sought to authenticate:

> MS. MESSEC: So if I open up the enhanced version, or I can try to. If we opened up the enhanced version, I think it would say recycling units on top of submitted, instead of recycling units on top of total payment, because the column headers were shifted.
> MS. MCHARD: Right.
> MS. MESSEC: The second level was shifted on one — by one column.

MS. MESSEC: Right. And fortunately, you just illustrated why
Excel is so unreliable, because it's so easy to do that kind
of shifting and change headings, and it's really easy to do.
Yeah. (Ex. 185, 10/28/15 Hrg. at 34).

MS. MCHARD: [T]he methods that I would expect to see in
maintaining the chain of custody of electronic evidence are
not present in this case. Those would be things like imaging
the actual data from OfficeMax and then being able to show, on
a generation basis, how that data has changed all the way up
to the time it's introduced as evidence in court. And I don't
see that in this case. And when you add that with the problems
in the data that we have highlighted in the report, that are
highlighted here specifically in the report, it makes me
believe that the data which is in the current Excel
spreadsheet is not reliable. (Ex. 186, 10/28/15 Hrg. at 53).

Gardner testified in detail as to the creative work he performed

on the original spreadsheet:

MS. VIERBUCHEN: This is the original.
MR. GARDNER: Yep.
MS. VIERBUCHEN: So this —
MR. GARDNER: Right.
MS. VIERBUCHEN: Is this the one you received from SHC?
MR. GARDNER: Yes.
MS. VIERBUCHEN: Are there any columns that you added on this one?
MR. GARDNER: Not on this one. But I — no, not on this one.
MS. VIERBUCHEN: Okay. But did you do something else for
formatting on the original, not the enhanced?
MR. GARDNER: Yes, on the original.
MS. VIERBUCHEN: Okay. What, if anything, did you do?
MR. GARDNER: What I did is I — where column A is, it was either
to the left or right I added a column. And I put in our — what
type of — what type of account it was. We kind of labeled them
as — according to their e-mail address, teechur, coach,
Bargle, or other.
MS. VIERBUCHEN: Uh-huh.
MR. GARDNER: And I went in and I figured out, you know, through
the e-mail sequencing, as well as V lookups, what grouping,
sub grouping it fit into, so that way if we needed to do some
sort of, you know, mathematics on it we could do that, right?
And I also did that on the sheet called all account details.
(Ex. 187, 1/11/16 Hrg. at 210-11).

The first day of trial, perhaps without realizing it was going to

be the first day of trial, Mr. Robert told the Court:

MR. ROBERT: But the fact is that that which the government seeks
to get the Court to agree in advance of trial to the
admissibility of, the spreadsheet, Daubert 1, is full of
worms. And those worms — for example, those five hidden
worksheets — suggest that their providence — its providence,
the providence of that spreadsheet — is a mess and doesn't

comport with the requirements of the rules. Thank you. (Tr. at 44).

## C. Authorship

The Government based its case-in-chief on two excel spreadsheet documents. During various times, these spreadsheets were confusingly referred to alternatively as "1963", "the original", "the enhanced", "Daubert 1", "EH6", and so on. In sum, the Government's exhibits derived from "the original" and "the enhanced".

Vicki Mills claimed authorship of the "enhanced spreadsheet" during the 1/11 Evidentiary Hearing:

> MR. ROBERT: All right. Now, when you were engaged in this process of creating a spreadsheet — and actually, there was an original and there was an enhanced. Are you familiar with those two things?
> MS. MILLS: The original, I don't believe I was involved in it, distributing it, at that time. The enhanced I was, because I was requested to add more date time frame to the information. That Steve had mentioned that he didn't have all the information he needed. It wasn't a full — the time frame that he needed, so I was asked to expand the time frame on it, which I asked our analytic department to do so.
> MR. ROBERT: All right. So you get a request from Mr. Gardner and you make a request to your technical people, the analytics people, and they query the database?
> MS. MILLS: That is correct.
> MR. ROBERT: And then Mr. Gardner would come back to you and say, I need a little more information. Could you do something different, add something? And then once again the query — the request goes to analytics and they make their query?
> MS. MILLS: That is correct.
> MR. ROBERT: That happened several times during the process of the construction of this spreadsheet?
> MS. MILLS: One additional time that I was involved in. (Ex. 183, 1/11/16 Hrg. at 71-72).

Vicki Mills implicated AUSA Paige Messec, Steve Gardner, and SA Jeffrey Moon in the creation of the "enhanced spreadsheet" as well:

> MR. ROBERT: I am going to hand you what has been marked as EHA.
> MS. MILLS: Okay.
> MR. ROBERT: I'm going to ask you if you recognize that.
> MS. MILLS: Yes. This is an e-mail that I had communicated with Paige.
> MR. ROBERT: I'm sorry. You communicated with whom?
> MS. MILLS: Paige and Steve Gardner are both on this, and Jeff.

> MR. ROBERT: Okay. So during the process of constructing the
>   spreadsheet you were in communication with both Mr. Gardner
>   from OfficeMax and with one of the Assistant US Attorneys who
>   was previously involved in prosecuting this case?
> MS. MILLS: That's correct. (Ex. 183, 1/11/16 Hrg. at 72-73).

In the same hearing, SA Jeffrey Moon claimed sole authorship of

the "enhanced spreadsheet", using 200 lines from "somebody else" to

make the numbers line up, "so that when we run totals we had one place

to calculate all our numbers into our groupings":

> MR. ROBERT: Agent Moon, you created the enhanced spreadsheet?
> AGENT MOON: That's correct.
> MR. ROBERT: On December 22, 2014?
> AGENT MOON: I couldn't tell you the exact date, but it would have
>   been probably roughly around that time.
> MR. ROBERT: And you did that for purposes of presenting this
>   case?
> AGENT MOON: That's correct. Well, presenting the case, in the
>   sense of knowing the totality of the accounts involved and
>   summarizing the transactions.
> MR. ROBERT: You prepared the enhanced spreadsheet for purposes of
>   — and it's the foundation for all the summary exhibits that
>   we're talking about in this case, right?
> AGENT MOON: That's correct.
> MR. ROBERT: And you prepared that spreadsheet for this case?
> AGENT MOON: That's correct. (Ex. 189, Hrg. at 289-90).

At trial, SA Jeffrey Moon changed his story:

> MR. ROBERT: There were two spreadsheets. One of them is called
>   original and one is called enhanced, right?
> AGENT MOON: Yes. Those were two of the documents provided by
>   Officemax.
> MR. ROBERT: And you looked at both of those, didn't you, during
>   the course of your investigation and preparation for trial?
> AGENT MOON: I have. (Ex. 190, Tr. at 1472).

The Government's spreadsheets, both "original" and "enhanced",

contained information listing their creator as "sgardner" (government

star witness and victim Steve Gardner) and their last modifier as

"MAguirre1" (the US Attorney's office).

The enhanced spreadsheet was thus created four times: by an

unknown analytics team, created by Vicki Mills, solely created by SA

Jeffrey Moon, and created by Steven Gardner. That, or it contains substantial indicia of unreliability.

According to AUSA Vierbuchen at the 1/6/16 Evidentiary Hearing, even more people had their fingers in the pie:

> THE COURT: So the government calls Daubert Exhibit Number 1 original. And I guess Daubert Exhibit Number 2 is a — is also an original, or is it a summary?
> MS. VIERBUCHEN: No, it's — it's an original. But it's enhanced only because we added those features to make it easier to search. (Ex. 25, 1/6/16 Hrg. at 117-18).

The "original" spreadsheet, as brought up in Ground XI, was authored by Steven Gardner according to Excel (Ex. 191), but not according to Steven Gardner himself under oath (Ex. 182, 1/11/16 Hrg. at 235-37). He further disavowed all authorship on redirect:

> MS. VIERBUCHEN: Some of the questions on cross-examination were about the data and the spreadsheets. I want to just start first with the enhanced spreadsheet. Did you create that spreadsheet?
> MR. GARDNER: The enhanced one? No.
> MS. VIERBUCHEN: The enhanced. Did you create the original?
> MR. GARDNER: No.
> MS. VIERBUCHEN: Did you create 1963 — that's the Bates number. That's Government Exhibit EH2.
> MR. GARDNER: No. (Ex. 192, Hrg. at 250)

The Government further led the witness:

> MS. VIERBUCHEN: And those were — those were information that was provided to you that you provide to the government for discovery?
> MR. GARDNER: Correct.
> MS. VIERBUCHEN: And did you make any changes to the data in either of those spreadsheets?
> MR. GARDNER: No, I did not.
> MS. VIERBUCHEN: Now you've been asked about questions about the reliability of the data in the spreadsheets, those two. Now I'm not talking about the enhanced, I'm talking about the two ones that we received from SHC. Do you have any reason to doubt that the data is accurate in those spreadsheets?
> MR. GARDNER: I found no reason to doubt that there's any issues with the data in these spreadsheets. You know, through all the different cross-validations, everything pans out every time. (Ex. 192, Hrg. at 251).

Although "1963" was supposed to be provided by SHC to the FBI for presentation to the jury, the Excel document reveals the modifications to "1963" were likewise last saved by "MAguirre1", a member of the US Attorney's office (Ex. 193).

Counsel never cross-examined Mr. Gardner about the impact on having his name as the creator of the spreadsheet, and the fact he denied it, as indicia of unreliability.

### D. 803(6)(E) Objections at Trial

Counsel never objected to Ms. Mills' qualifications, testimony, or authentication. Although Counsel joined vociferous and frequent objections on 803(6) grounds, and even joined under 803(6)(E) a few times (Ex. 194), Counsel waived appeal on the 803(6)(E) basis.

Counsel was ineffective for failing to bring this up to the Court, and Movant's Sixth Amendment right to confrontation was prejudicially violated when these fabrications were introduced into evidence resulting in a conviction.

### XIII. Movant's 5th Amendment Right To Due Process Of Law And 6th Amendment Rights To A Speedy And Public Trial, And To Be Informed Of Criminal Charges Against Her, And To Have Assistance Of Counsel For Her Defense, Were Violated When The Government Vindictively Prosecuted Her, And Her Counsel Both Supported The Plea Offer And Declined To Mention It To The Court

The original indictment in this case (Ex. 10) was issued March 27, 2013, and included eleven counts. Although it is far from certain exactly which crimes the counts intended for which defendant, it appeared that counts 1-6 charged Matthew Channon alone with creating 3 gmail accounts and creating 3 Maxperks accounts, under 18 USC §1343.

It appeared that counts 7-10 charged Matthew Channon with 18 USC §1343 wire fraud, and Movant with 18 USC §2 aiding and abetting, for creating 2 gmail accounts and creating 2 MaxPerks accounts.

And count 11, the conspiracy count, appeared to charge both under 18 USC §1349.

Movant received numerous plea offers from AUSA Messec over the course of these proceedings. When Movant and her Co-Defendant turned the first offers down, AUSA Messec became more aggressive, enacting a "package deal" approach, wherein neither defendant in this case could accept the plea offer unless the other also accepted it. (Ex. 195, 9/24/13).

Similar offers around 2/28/14 and 3/28/14 (Ex. 196) were similarly rebuffed. After this latest offer was declined, and Counsel relayed similar refusals, Messec brought forth a superseding indictment that added to the charges (Ex. 9) on 1/21/15. Neither the odd-numbered gmail account creation counts, nor the even-numbered Maxperks account creation counts were brought forward in the superseding indictment. Only the conspiracy count, coupled with different substantive counts but almost identical charging language of its own, remained.

The new charges were related to actions taken at Officemax registers (2-5) or e-mails following the issuance of rewards (6-7). Movant, having only faced four counts of §2 and one of §1349, now faced two new counts of §1343 (Ex. 9, at 8) and a conspiracy count also to be charged under §1343 (Ex. 9, at 3).

Matthew now faced an additional four counts of §1343 (Ex. 9, at 8) as well as a conspiracy count also to be charged under §1343 (Ex. 9, at 3).

Forfeiture was now sought jointly and severally against both defendants in its full amount (Ex. 9, at 8).

The original indictment alleged, "the defendant claimed approximately 47,688 purchases for MaxPerks accounts that he

controlled, generating more than $180,000 in MaxPerks rewards that were
to be issued to those accounts." (Ex. 10, ¶13, at 4).

The superseding indictment changed that to "Defendants claimed
and attempted to claim through online adjustments approximately 61,557
transactions for MaxPerks accounts that they controlled, with a total
claimed purchase value of approximately $1,890,540." (Ex. 9, ¶e, at 4).

AUSA Messec again sought "plea chaining" in late 2015,
characterizing a plea agreement before she was about to leave the case
on maternity leave as a "fire sale", to which Movant and Co-Movant
responded to Counsel in the negative (Ex. 295).


**XIV.**  **Movant's 5th Amendment Right To Due Process And 6th Amendment
Right To Assistance Of Counsel Were Violated Through The Court's
Adoption Of A Jury Instruction At Odds Both With The Statute And
Indictment, And Counsel's Waiver Of Objections**

Three different versions of jury instructions were provided the
Court between Movant, her co-defendant, and the Government.

Counsel's propounded instructions omitted any instruction for the
wire fraud count.

Co-Movant's counsel's propounded instructions omitted any
instruction for the conspiracy count. The Government's conspiracy count
instruction was patterned after the 11th Circuit's. Counsel's
instruction attached the 10th Circuit's 2.87 controlled substances
conspiracy instruction to the 10th Circuit's 2.19 pattern conspiracy
instruction (Ex. 293).

While not verbatim, the Court clearly based its instruction (Ex.
294) on Counsel's instruction. Both instructions included two redundant
paragraphs on interdependence, one as the section labeled "fifth" in
the bulleted list, and the other as the final paragraph.

The final paragraph for both began as follows:

You are also required to find that interdependence existed among the members of the conspiracy. (Ex. 74, Tr. at 1534).

The sentence differed in meaning from "You are also required to find whether…" Since the jury instruction's sentence was accompanied by no qualifying statement, such as, "In order to find the defendant guilty", it was worded in the imperative.

The instructions included, "You have no right to disregard or give special attention to any one instruction, or to question the wisdom or correctness of any rule I may state to you", encouraging a literal reading of the final paragraph.

Counsel failed to realize the prejudice caused by commanding the jury to find that interdependence existed, and failed to object during pretrial, trial, or appeal.

### XV. Movant's 6th Amendment Right To A Speedy And Public Trial, And 6th Amendment Right To Assistance Of Counsel, Was Violated When Her Counsel Failed To Raise A Speedy Trial Act Violation Both At The Trial Court And On Appeal

Well over 70 non-exempt days passed in the first year, and well over 70 non-exempt days passed after the last superseding indictment. The full accounting of days are summarized in Ex. 197.

#### A. Movant Aggressively Sought The Dismissal Motion

On numerous occasions, Movant and Co-Movant asked Counsel about moving to dismiss under Speedy Trial grounds, and were always rebuffed. Co-Movant counted the days and emailed them to Counsel. Co-Movant even went so far as to type up a 21-page draft motion to dismiss and sent that to Counsel on 9/18/15 (Exs. 198, 199, 200).

Co-Movant printed out and summed up *U.S. v. Koerber*, a similar D. Utah case, similarly found to contain Government misconduct and dismissed on STA grounds only months prior. Counsel and Co-movant's

counsel always argued that the judge would simply dismiss the indictment without prejudice, and then the Government would refile the charges with the clock reset to zero (Ex. 201).

Counsel never realized that the statute of limitations would have made a defense to a refiled indictment if they waited shortly thereafter. Counts 6 and 7 were already past the 5-year statute of limitations, and the latest substantive count took place on November 23, 2010 (Ex. 8, at 6). When October 9, 2015's Notice of Pretrial Conference and Jury Trial (Ex. 148) set the trial to begin after November 23, 2015, a window for a successful motion was in place, but Counsel simply buried the matter.

Counsel never made so much as a mention of a single Sixth Amendment Right to a Speedy Trial, Speedy Trial Act, or similar claim or motion during the entirety of the case.

**B. Neither Defendant Contributed Significantly To The Periods Of Delay In This Case, Despite The Arrival Of Their First Child**

As shown in Ex. 197, of the 1,006 days to run between arraignment and trial, Movant and Co-Defendant's motions for continuances only accounted for 278 of them, owing primarily to Co-Movant's Counsel withdrawal/substitution and h(1)(B) delay from the Government's superseding indictment.

Although they do not count toward the 70, The Hon. Judge Herrera's consideration of Movant and Co-Movant's motions consumed 435 days. Four of her twelve trial continuances (Dkts. 41, 170, 229, 246) were made without any permissible justification, and from July to October 2015, the trial went without a setting.

A noteworthy delay from the Government involved a sophisticated ruse in order to delay trial long enough to prepare and issue its first superseding indictment. When the trial date of January 26, 2015 neared,

the Government entered a notice of appearance for Tara Neda on November 24, 2014, without any mention of her availability issues. In the Government's Motion to Continue on December 31, 2014 (Dkt. 146), suddenly Ms. Neda was indispensable and had another trial scheduled on February 2, 2015 and training on February 9, 2015, neither of which were brought to the Court's attention prior to the Motion.

During Ms. Neda's yearlong tenure as co-counsel, the sum of her written contributions to the case were three notices of her own unavailability (Dkts. 167, 173, 247) and one motion for extension of time to file (Dkt. 251). Ms. Neda's benefit to the Government, outside of facilitation of impermissible delay, appears nonexistent.

The other excuse in the December 31, 2014 Motion was that Government's witness Steven Gardner might have had to stay longer in the Virgin Islands to testify in a civil case, potentially resulting in his missing the first one or two days of trial. Considering that jury selection took the entire first day of the trial, and the Government ended up calling so many witnesses that it could have easily waited until the third day of trial to call Gardner without prejudicing its case, not to mention the Court's ability to continue the in-progress case for a day or half-day in the event of travel delays, or the fact a minor witness in a civil case should not preempt a primary witness in a criminal case, this excuse similarly failed to hold water. Counsel did not oppose.

C. **The Delay Adversely Impacted Movant's Ability To Present A Defense**

In the nearly five year delay, OfficeMax was purchased by Office Depot, its headquarters moved, many of its employees (potential witnesses) left, and its database was taken offline, backed up, shipped

across state lines, made available strictly to the Government, then purged (Ex. 192, at 248-249).

By the time evidentiary hearings were held, months after the conviction, obtaining even the sparest shreds of exculpatory subpoenaed evidence from Office Depot, Inc. was very onerous (Ex. 202).

### D. The Government Filed Two Superseding Indictments To Successfully Discourage And Intimidate Movant's Counsel From Moving To Dismiss Under The Speedy Trial Act

Except for a few minor modifications, the conspiracy charge in the original indictment (Ex. 10) did not change in the superseding ones (Exs. 9, 8). The substantive charges did not change when the second superseding indictment was produced.

If one examines the differences between the first indictment and the ones that superseded it, the nature of the substantive charges was largely unchanged but the particulars were changed to the chronologically latest allegations the Government felt they could prove. The original counts 7 and 8 (Ex. 10, at 6) had already passed the statute of limitations when the superseding indictment came out, with the remainder of the original counts not far behind.

Counts 2-7 were identical verbatim from first to second superseding indictment (Exs. 9, at 6; 8, at 6). More powerful motivation than adjusting a few lines of text in the Government's shotgun shack of an indictment was again keeping ahead of the statute of limitations. If the Government convened a grand jury any later than they did, there were no similar acts to charge that occurred recently enough.

### E. Nowhere Near As Low As 70 Non-Exempt Days Passed

1,006 days elapsed from arraignment to trial, without a single objection raised as to the delay. Even if the Speedy Trial Act clock were somehow tolled for all of them, a Sixth Amendment Right to Speedy Trial objection would have been well-justified.

According to Ex. 197, 85 Speedy Trial days passed before the first superseding indictment: 24 were after arraignment, 61 were after a scheduling order (Ex. 203, Dkt. 41), where the Hon. Judge Herrera offered no ends-of-justice justification, and no motions were pending. Counsel did not need to object at this point, since plenty of time remained for the government to refile a dismissed claim.

When Count 11 in the original indictment became Count 1 in the superseding indictments, more time accrued on the speedy trial clock, becoming a minimum of 184 Speedy Trial Days on the eve of trial. Counsel did not object at this point, when it would have been too late for the Government to refile following a dismissal without prejudice.

**F. The Superseding Indictments Also Exceeded The Speedy Trial Clock**

Ex. 197 shows 99 non-exempt days elapsed from the first superseding indictment until trial (53 + 46). Given Counts 2-7 are identical between the indictments, the number of 70 was exceeded. Since Count 1 was a conspiracy count that could not occur by itself, even Count 1 could not have survived by itself.

**G. The Final Indictment Alone Exceeded The Speedy Trial Clock**

As shown in Ex. 197, 46 STA days passed between the second superseding indictment and trial; however, in addition to the 46, 40 of the 41 days from 8/22/15 to 10/8/15, listed under §3161(h)(1) in the table, were taken up solely by the Government's Motion For a Firm Trial Setting (Dkt. 231, Ex. 204), in which AUSA Messec requested accommodations for her pregnancy.

Even if one wishes to create a legal fiction where modifying one word out of hundreds can rescue a stale indictment from the Speedy Trial Act clock, the number of 70 was still exceeded (46 + 40 = 86).

### H. Counsel Failed To Move To Dismiss Under Speedy Trial Grounds On The Eve Of Trial

Not only were all counts way past the 70 day limit, whether mutated through stricken surplusage (Ex. 3, Dkt. 286) or not, but on the eve of trial, the statute of limitations on all of the counts had already run, though without a dismissal, the statute was tolled. According to Exs. 76 and 77 (Dkts. 379 & 380), the latest offense, count 6, ended 8/2/2010. The last statute of limitations thus ended 8/2/2015. Trial began in 2016.

Counsel could have moved to dismiss at any point between 8/3/2015 and trial, potentially winning the case without a fight, but actively chose not to. Counsel never brought this matter up during trial, at sentencing, or on appeal.

### XVI. Movant's 6th Amendment Right To Compel Witnesses To Appear And To Have Assistance Of Counsel For Her Defense Was Violated When Her Counsel Withdrew His Motion To Compel And Waived Subpoenas Until Trial Was Over

Counsel, along with Amy Sirignano, Co-Movant's first post-arraignment Counsel, filed a bevy of motions in January 2014 (Dkt. 48-57) based on significant misgivings about the case, though the other grounds of this motion indicate most were not done in the manner most likely to succeed. Foremost among these motions were a motion to dismiss, basically for lack of discovery (Ex. 66, Dkt. 56), and a corresponding motion to compel discovery (Ex. 205, Dkt. 57). After responses and replies, Ms. Sirignano unilaterally withdrew as Co-

Movant's counsel on 4/11/14, ostensibly due to health problems (Ex. 206, Dkt. 102).

On 4/24 Marc Robert took over as Co-Movant's Counsel, with Counsel and Ms. Sirignano's motions still pending. Five months later and six months after briefing completed, the Court simultaneously denied all motions, save one, on 9/22 (Dkt. 130). The motion still under consideration was Dkt. 57, Counsel and Ms. Sirignano's motion to compel discovery, which was referred to Magistrate Judge Kirtan Khalsa on 10/3 and an evidentiary hearing held 10/9. The minutes of said hearing (Ex. 207, Dkt. 133) indicated no evidence was discussed, and in lieu of a ruling, a meet and confer meeting between the government and both defense counsel was to take place by 10/13.

Mr. Robert filed a letter under seal to Magistrate Khalsa on 10/15/14 (Ex. 208, Dkt. 135), which Movant had to request in person from the District Court Clerk. Without making progress in getting the Government to divulge the sought-after discovery or getting Movant's input, Mr. Robert declared, "[Counsel for all parties] went down the list of the discovery issues raised in the motion, item by item, and determined that there does not appear to be a need to litigate any of those issues further."

Without seeking Movant's consent, Counsel and Mr. Robert unilaterally withdrew the motion to compel discovery (Ex. 209, Dkt. 140) on 11/20/14. When confronted by Co-Movant, Mr. Robert shrugged it off, oddly offering Co-Movant no upside to the withdrawal, merely stating "we weren't going to get it" and "we need to move on to a different issue". Counsel did not discuss the withdrawal with Movant.

Counsel waived Movant's first best chance to compel the Government to comply with its discovery obligations. While Counsel seemed convinced that no subpoena request would be taken seriously by

the Judge, Co-Movant's counsel did not even seek one directly against Officemax until the sentencing phase (Ex. 210, Dkt. 333), not joined by Counsel, whereupon it was granted, signifying Counsel was even more ineffective for avoiding diligent pursuit of these records until it was too late.

Every refusal from the AUSA to furnish the Officemax financial data included mention that the data was in the hands of OfficeMax themselves, a private party, and the Government thus did not have it, and if not expressly stating, emphatically implying that Counsel should seek it directly (Ex. 66, Dkt. 56, at 7; Dkt. 57-5, at 2; Ex. 68, Dkt. 76, at 4; Dkt. 267, at 6). Inexcusably, Counsel never took the hint and never contacted OfficeMax or Office Depot directly.


XVII. **Movant's 6th Amendment Right To Confront Witnesses, And To Compel Witnesses To Appear, And To Assistance Of Counsel, Were Violated When Counsel Failed To Call Any Witnesses, Be They Expert, Fact, Or Lay**

This highly unusual case involved a wide range of anomalous behavior by all participants, and the Government spent days explaining the procedures and motives associated with ink cartridge recycling, the MaxPerks rewards program, and the legal enforceability of MaxPerks terms and conditions, largely through a single witness, Steven Gardner. In response, Counsel picked nits but allowed a distorted caricature to emerge by waiving witnesses at the last minute, without any warning to Movant.


A. **Besides an Accountant Who Did Not Testify, Counsel Involved Zero Witnesses Total at Trial**

At no time did Movant's Counsel seek out and call as witnesses Officemax or former Officemax sales clerks to help the Court understand, let alone reasonably doubt, Mr. Gardner's unsubstantiated

claims on store procedures or ink cartridge recycling; or expert
witnesses on contract law and fictitious identity; or other known
"extreme ink cartridge recyclers", in an effort to lay a foundation for
a defense.

Even though the Court was struggling with the novelty and
technical nature of both sides' arguments, Counsel did not consider
calling witnesses from Clover (the recycling subcontractor Officemax
used), HP or Lexmark (on what constitutes fraud in the ink cartridge
market), or other commercial entities with knowledge of industry
practices. Co-Movant's counsel did not follow up with leads on Wander
Smelan (Brazilian former architect of the MaxPerks system) or
Bernadette Thacker-Pawlak (former administrator of the MaxPerks
program).


### 1. Officemax Did The Refilling When it Mattered

Steven Gardner, no more an expert on ink cartridge recycling than
forensic accounting, testified at trial:

> MR. GARDNER: We've actually done some studies and analysis, and
> when we send these cartridges out to our vendor, they have —
> they are the ones, in most cases, that will refill them. We do
> — we did refill some of them ourselves, but the vast majority
> were sent to a vendor to be refilled. When that vendor
> refilled it, they could only fill certain ones that worked.
> Not every one is going to work. (Ex. 12, Tr. at 333).

Counsel never called any witnesses to contradict Gardner's
claims. Although it appears Gardner's statements informed the Court at
sentencing, the Court misstated:

> So — so somebody else took these cartridges and did whatever they
> needed to do to make them usable. I heard some testimony that —
> that it's not just a matter of filling them up with ink and
> putting them out on the shelf. What I heard was that it was more
> complicated than that. There could be pieces from cartridges that
> are used or salvaged or usable or not usable. (Ex. 211,
> Sentencing Hrg. at 45).

At sentencing, the Court did not acknowledge that Gardner's testimony was that Officemax "did refill some of them ourselves". "What [The Court] heard", that it was not so simple as refilling and reshelving cartridges, and pieces could be salvaged from cartridges, was contrary to Gardner's testimony, and never otherwise introduced into evidence or testimony, on or off the record. Not only were the Court's remarks unfounded, they were inaccurate, and Counsel waived raising them, whether through bringing his own witnesses, further cross-examining Gardner, or objection.

**2. Officemax Distorted The Ink Numbers**

Officemax's ink recycling program fundamentally differed from Staples' and Office Depot's during the period in question. While Staples and Office Depot collected bounties from OEM manufacturers, regardless of the brand, type, or condition of the ink cartridge turned in through their programs, Officemax competed with OEM manufacturers and mom & pop ink cartridge refilling businesses to refill and resell the ink cartridges it acquired, making it hypersensitive to the finer details of the cartridges submitted: if a given model of cartridge was not profitable to refill, OfficeMax would accept it and send it to Clover, but they would not reward the customer for it.

As a first example, many ink cartridges were referred to in industry as "ink tanks", which do not contain any electronics, just plastic. OfficeMax would accept them and send them to Clover, but not reward the customer for them, though Office Depot and Staples would. In her opening statement, AUSA Kastrin held up two ink tanks and stated:

> MS. KASTRIN: Now, the second way that a customer could earn rewards was to take in empty ink cartridges for recycling. And this — this is what I'm talking about here, one of these. (Ex. 212, Tr. at 285).

As a second example, when an empty cartridge had been previously refilled, the industry term for it was "non-virgin" (vs. "virgin" for an empty cartridge that had not been refilled) (Ex. 213). OfficeMax would accept non-virgin cartridges and send them to Clover, but not reward the customer for non-virgin cartridges, though Office Depot and Staples would. OfficeMax would only accept virgin cartridges for credit.

Any OfficeMax employee who worked during the period in question could have testified whether they were expected to enforce these limitations, and that if Movant had tried to pass off ink cartridges that were not up to Officemax's standards, whether they would be allowed to credit her account, or anybody's account, for them.

Given that on the used cartridge market, many lots of used cartridges might be non-virgin, or a mix of ink tanks, virgin, and non-virgin, a reseller who specifically trades in virgin cartridges could end up spending far more per usable cartridge than the unit price would suggest.

While it is undisputed that Co-Movant acquired numerous cartridges on eBay at an average price of $0.35 or so per (Exs. 214, Tr. at 332; 215, Tr. at 1062), Co-Movant participated in all three retailers' programs, and also purchased directly from dealers (Exs. 215, Tr. at 1062; 216). Given the relative scarcity and higher demand for virgin ink cartridges, Co-Movant acquired most "Officemax-grade" cartridges from dealers in person, at a considerably higher unit price than the numbers the Government calculated from eBay.

After receipt of the subpoena responsive documents from Office Depot (Ex. 11), Counsel did not involve an expert witness on the ink recycling business to help the Court interpret the meaning and

significance of the data returned. Most essential was what the report did not include: revenues from in-store refills.

According to witness Steven Gardner, Officemax would charge $10–$15 for an in-store refill:

> MR. ROBBENHAAR: Again, Officemax would have to make some profit on that process?
> MR. GARDNER: They may make a little money on this. I haven't really looked at it, but it wouldn't be a large amount. The refill was more out of convenience so you don't make a customer wait 15 minutes to refill their ink cartridge. If you have the same brand and you've refilled a backstock of it, the customer says, I'd like to refill my ink cartridge. Oh, here. Here's this one. We're going to charge you — I think at the time it was, like, 14.99 or 10 or whatever. We'll give you this one because it's already filled, and it saves us that. (Ex. 6, Tr. at 961–62).

In Movant's case, a cartridge Movant dropped off on a Monday might be refilled on Tuesday, and when a different customer showed up to have their identical model cartridge refilled on Friday, Officemax would charge them the refill price ($15), accept their empty cartridge, and promptly hand them Movant's Monday cartridge they had refilled Tuesday, rather than making the customer wait for the machine to finish.

However, this usual transaction would not count toward the subpoenaed documents' (Ex. 11) numbers evenly: Movant's Monday ink recycling transaction would count toward the $22.2 million paid out on page 2, but would not count toward the $62.7 million Officemax earned from selling Clover products on page 13, since ink refill transactions were accounted for separately. Although specifically sought in the subpoena request (Ex. 210, Dkt. 333, at (d)), ink refill revenues or profits were not detailed in the responsive documents (Ex. 11).

In what was a popular business model (Ex. 213), Officemax would "skim the cream" from submitted cartridges, pulling the best ones aside and making $10-15 per cartridge for pennies in ink and downtime labor

costs, and only then involving Clover in the process by remitting the
remaining not-in-demand cartridges to Clover, netting $3.9 million (and
$0.49 per) for the transactions involving Clover (Ex. 11, at 13), and
an unknown, but higher amount (well over $3 on a per cartridge basis)
bonus for the refilled-in-house transactions.

According to Ex. 11, at 2, 7.4 million "Officemax-grade"
cartridges were credited, but 7.8 million "good cartridges" were
processed by Clover. An unknown number, but presumably a large
quantity, of "bad cartridges" must have also been sent to Clover.

Donations and hapless unpaid Maxperks members both contributed to
the 400,000 excess of good cartridges, but the difference between the
categories would be significantly higher than 400,000 if some of the
7.4 million cartridges Officemax claimed did not go out through Clover.

The Court ruled that neither the value of the Channons' ink
cartridges, nor their perceived value to the Channons, were to be taken
into consideration at sentencing.


**B. Due to Prosecutorial Misconduct and Judicial Error, Counsel
Ineffectively Failed to Lay the Basis for McHard to Testify**

The Government attempted to do whatever it could to keep Ms.
McHard off the witness stand, or at least neutralize her benefit by
offering its own paid forensic accountant witness, Sam Baca, to rebut
her testimony.

During this Court's first experience with Ms. McHard, the Daubert
Hearing held 10/28/15, Sam Baca was in the audience and Co-Movant's
counsel attempted to invoke the rule (Ex. 217) to exclude him. In
response, AUSA Messec misrepresented to the court, couching the
misrepresentation within an opinion, claiming:

> MS. MESSEC: Your Honor, I don't think the rule applies to a
>     Daubert hearing like this, especially when an expert is

allowed to listen to the testimony of the other expert. (Ex. 217, 10/28/15 Hearing, at 5).

Then, Messec hedged her misrepresentation with another misrepresentation:

MS. MESSEC: It's certainly something -- he would be allowed to read the transcript later… (Ex. 217, 10/28/15 Hearing, at 5).

The Hon. Judge Herrera acted upon the misstatement by adopting it:

THE COURT: I'll allow the expert to remain in the courtroom. Generally speaking, on issues such as these, I — experts are allowed to observe the testimony of other expert witnesses, so I'll overrule the objection for today's purposes. (Ex. 217, 10/28/15 Hearing, at 5).

Rather than call the Government out on its perfidy and correct the Court with the printed statute, Counsel ineffectively relented. Counsel could have, but never "requested the sequestration order extend to reading of the transcripts".

Sam Baca never appeared at a hearing or trial but Counsel seemed intimidated at the prospect of his testimony, as if Ms. McHard, once rebutted, could make Movant's situation worse.

### C. Neither Counsel Ever Called McHard to Testify

At the outset of trial, Co-movant's counsel announced Ms. McHard was scheduled to be called the coming Friday, but she would have to go out of the country afterward (Ex. 218). On the fourth day (Tuesday), Mr. Robert stated he was still planning on calling her on the seventh day (Friday). (Ex. 219, Tr. at 1040).

The Government objected repeatedly to getting Ms. McHard called, trying to convince the Judge she was already barred (Exs. 219, 45 (Tr. at 968-969)), but the Court, despite strongly hinting it might (Exs. 219, 45 (Tr. at 968-969)), never actually barred her. McHard's name came up during arguments over a Government witness's cross-examination on the sixth day (Thursday, Ex. 190, Tr. at 1464), but then almost

immediately thereafter, the Government rested. With minimal warning to
Movant, Counsel telegraphed that Movant and Co-Movant would rest
immediately (not calling any witnesses) after bringing their Rule 29
motions:

> Your Honor, I think it's only fair to let the Court and the
> government know that after we make our Rule 29 motion, the
> defense for Mr. Channon is going to rest (Ex. 190, Tr. at 1478).

Co-Movant's Counsel then argued a pathetic motion in 146 words
(Ex. 190, Tr. at 1482), coupled with Counsel's even more pathetic 128-
word motion (Ex. 190, Tr. at 1482-83).

Whether Ms. McHard was suddenly unavailable, or Counsel simply
opted not to call her, is not known. Perhaps Counsel believed it was
futile, but it would not have been frivolous.

With the sudden refusal to call Ms. McHard, who the Court had not
barred from testifying, Counsel sought zero witnesses in total, despite
the provision of dozens of other leads from Co-Movant. Ex. 220 shows a
chart of thirty witnesses Counsel or Co-Movant's Counsel should have
called and what they could have testified to. By calling zero out of
thirty, and contacting only four of them (through Co-Movant's counsel),
Counsel was thus ineffective, and substantial prejudice resulted.


### D. Without Defense Witnesses, The Court Did Not Understand The Indictment

The Court stated at Sentencing:

> THE COURT: The problem for me is that the Channons, along with
> whoever else in the world who brought empty inkjet cartridges
> to Officemax, the transaction between the Channons and
> Officemax was nothing more than we're selling you our used
> inkjet cartridges. That's the end of the story. They got the
> $3 benefit, the $3 gift card rewards benefit, and that was the
> end of it. Nothing more was expected of them by Officemax, and
> that was really the end of the story. (Ex. 211, Sentencing
> Hrg. at 44).

Without defense witnesses to further explain the nature of what went on, the Court acted as if the following Government testimony, which was accurate, was never understood:

> MS. VIERBUCHEN: But with the ink, with the qualifying purchase, don't I have to do something else? Do I just get to spend my $3 that I get when I recycled my one cartridge?
> MR. GARDNER: You have to wait until the — if you're a teacher — to the end of the quarter, or a business, until the end of the month, for that to get released into your reward card. (Ex. 221, Tr. at 645-646).

> MS. VIERBUCHEN: Okay. So I mean, you couldn't just take — take — if you recycle ink and you never spend you don't get any rewards?
> MR. GARDNER: Correct. If you just recycle ink with us but you never buy anything or equal that amount on qualified spend, you're not going to get — we don't release those rewards back out. (Ex. 221, Tr. at 645-646).

On cross-examination, the rules were further confirmed:

> MR. ROBBENHAAR: In this case customers could come in with their cartridges, they would be awarded $3 per cartridge?
> MR. GARDNER: Correct.
> MR. ROBBENHAAR: But to claim that credit they'd have to spend an equal amount of money back in the store, right?
> MR. GARDNER: Yes. (Ex. 222, Tr. at 950).

XVIII.   **Movant's 6th Amendment Right To Have Compulsory Process For Obtaining Witnesses In Her Favor, And To Have The Assistance Of Counsel For Her Defense, Was Violated When Her Counsel Failed To Introduce Or Develop Exculpatory Evidence**

Two bankers' boxes full of paper were necessary to represent the initial discovery provided to the defense, and hidden deep within this discovery were some troubling inconsistencies in the data, with an obvious and disturbing cause. Instead of federal investigators collecting and arranging the evidence and conducting the investigation, Steven Gardner, a non-law enforcement official, not even admitted as an expert witness, detailed his own evidence preparation techniques (odds, feelings, "what looks like") that underpinned the Government's entire case.

MR. GARDNER: The audit trail does not include her address but I am guessing I must have pulled that from another system. (Ex. 23).

MR. GARDNER: And then, you know, as I started going through the video and you see the same person over and over again, well, if you're -- if you have a feeling your person lives in New Mexico and you're looking at a video from California or Arizona or somewhere else and that person shows up on that day, you're kind of like, What's the odds of that happening where you've actually pulled the wrong transaction?

MS. VIERBUCHEN: And so just so I — just for a little more clarity. So you went through all of these videos yourself?

MR. GARDNER: Correct.

MS. VIERBUCHEN: And then what did you do with -- how did you marry them up to a transaction?

MR. GARDNER: I just -- I married them up by looking at what was purchased or being recycled. And if it's -- you know, if there shows 20 inkjet cartridges being recycled, you may all recall where I had that Ejournal and there was, like, that ink that it kept saying penny, penny, penny? Well, when you look at that video, that's a cashier shooting, with a gun, a little bar code 20 times, so that's pretty easy to identify. And then if right after that there was two gift cards being purchased in that transaction, okay, wow, there's 20 scans and now you've got a gift card here and a gift card here. Or another transaction and you see the person buying what looks like a glue stick and after it, you know, a prepaid credit card, well, here is that transaction. And from the video, yeah, that looks like what's occurring here. (Ex. 223, Tr. at 499-501).

Minutes after Robbenhaar got Gardner to admit that a receipt on 11/22 at 4:55PM did not match with the video evidence showing 11/23 at 1:55AM (Ex. 180, Tr. at 994-995), Gardner's subsequent sworn testimony portended the grim future of outsourced American law enforcement:

MR. HOTCHKISS: Well, since you have no personal knowledge of those transactions, your testimony is about what you believe happened in those transactions, correct?

MR. GARDNER: I don't think I'd call it believed, when I'm looking at a register transaction and I'm able to sync it up to an Ejournal that occurred at the same time showing ink recycle. I don't think there's any more alleged, to me. If that's a person and I see them recycling ink and I see that it's applied, according to our POS data to an account, then it's occurred. I don't need to stand there and hear them say anything. (Ex. 180, Tr. at 999-1000).

**A. The Government's Spreadsheet Evidence is Internally Inconsistent, Showing Movant and Co-Movant Traveling Between Stores at Unlikely Speeds**

Many of the records blamed on Movant and Co-Movant presupposed interstate travel between Officemax stores at thousands of miles per hour (as provided by the Government in Bates 1947/1619), as follows:

Ex. 224: 3/3/10. After a seventh Las Vegas store at 4:40PM, Midvale, UT (418 miles away) at 7:20PM (less than two hours with the time difference).

Ex. 225: 3/8/10. Albuquerque at 1:21PM; Salt Lake City at 2:25PM. Mailed two packages (Exs. 226, 227) in between.

Ex. 228: 3/9/10. Henderson, NV at 10:23AM; Salt Lake City at 3:56PM; Goodyear, AZ at 4:53PM; Albuquerque at 7:05PM; the same Henderson, NV store at 7:31PM; Tucson at 8:11PM. (From Bates 1561).

Ex. 229: 3/13/10. After a fourth Las Vegas store, Albuquerque 98 seconds later; Precisely 49 minutes after that, a fifth Las Vegas store; then five additional Las Vegas stores.

Ex. 230: 3/26/10. Flagstaff, AZ at 10:56AM; Las Vegas at 11:53AM; two more Las Vegas stores; Las Vegas at 2:54PM; Phoenix at 3:03PM; Las Vegas at 3:26PM; Phoenix at 3:38PM, 3:39PM, and 4:13PM; Las Vegas at 4:33PM; three more Phoenix stores starting at 6:16PM. (From Bates 3273).

Ex. 231: 4/26/10. Albuquerque at 9:19AM; Longmont, CO at 10:17AM; Albuquerque, 10:29AM; Boulder, CO at 10:41AM.

Ex. 232: 4/30/10. A fourth Albuquerque store at 2:15PM; the first of seven Las Vegas stores at 3:02PM.

Ex. 233: 5/11/10. Santa Fe store at 5:10PM; Las Vegas, NV at 6:01PM (adjusted for time zone). Same Santa Fe store at 6:31PM. (From Bates 3273).

Ex. 234: 6/17/10. Albuquerque at 8:54AM; Longmont at 9:54AM; then three additional Colorado stores.

Ex. 235: 7/6/10. Albuquerque at 2:06PM; Salt Lake City at 2:48PM; then two additional Albuquerque stores.

For each and every one of the above inconsistencies, the Government, despite introducing an exhaustive accounting of Movant's extensive travel history, produced zero indication that Movant or Co-Movant left Albuquerque during any of these times, whether by driving or flying.

**B. The Government's Spreadsheet Evidence Exhibits Other Time-And-Space Errors Due To Miskeys**

Ex. 236 is an excerpt of Bates 1368/1617 which shows another example of garbage in/garbage out. On 1/24/2011, at 1:20PM, twenty ink cartridges were recycled in Tucson, AZ; at 6:04PM, another twenty ink cartridges were recycled in Las Cruces, NM. The travel time between the cities' store locations, by car, is just over four hours. However, a separate transaction, involving a purchase and turning in one ink cartridge in Las Cruces 93 minutes prior to the other Las Cruces transaction, at 4:31PM, was also blamed on Movant or Co-Movant.

Either Movant and Co-Movant averaged 120 miles per hour to arrive in time to recycle one cartridge, then waited around 93 minutes to recycle twenty more, or the Government's evidence attributes the conduct of another customer to Movant and Co-Movant.

A miskey (mistake on the cash register keypad) caused by cashier error was known and admitted as a possibility to Steven Gardner, the witness who manufactured much of the Government's evidence (Ex. 237). Unlike a UPC bar code, where point-of-sale systems are able to obtain product information to return accurate pricing with nearly flawless consistency, Officemax's 9-digit member numbers were frequently typed in by hand, rendering the process prone to error. Worse, the accidental transposition of numbers, say typing "620149203" as "621049203", would

result in not only the transaction not being associated with the intended account, but a different account.

While credit card numbers feature error correction, allowing a computer to determine if a miskey was likely, Officemax used an algorithm prone to miskey errors. Worse yet, if the clerk typed in an extra digit, the system would accept it, but not award it. Also, as if designed to exacerbate the problem, OfficeMax changed their receipts to obscure the full Maxperks member number around 2010 (Ex. 238). Whether "620149203" or "621049203" was keyed, it would appear as "XXXXX9203" on the receipt, leaving a customer with no way to know if a miskey occurred, in order to anticipate or deduce why their rewards would not show up the following month.

In addition to membership numbers as a problem, the gift card number system was even worse. Gift card numbers (from Maxperks rewards) were always handkeyed, never barcoded, needlessly lengthy, nearly sequentially assigned, printed in ridiculously small type, and prone to similar miskeys. Cashiers had to type in, for example, "6006493709143721976", with no visual feedback from the POS system to show them what they had typed in, and in fact a simple transposition error like "6006493709143721679" often belonged to a different customer-issued rewards certificate in the same batch. So great was the pressure for the clerk to rush, and the difficulty of the task, that it was commonplace for a clerk to have to rekey the same gift card number 3-6 times in order to get it to go through.

**C. The Government's Spreadsheet Evidence Showcases Systemic Clerical Errors in Unlikely Places After All Relevant Conduct Had Ceased**

The Government's spreadsheets included transactions that further cast doubt on the fidelity of their evidence-gathering, showing the

ease with which cashiers' errors attributed impossible actions to Movant, even after the accounts were allegedly closed (Ex. 35, ¶2).

Ex. 239 showcases the Bates 3273 (a.k.a., "assigned to MaxPerks MemberID on Suspect List") inclusion of three transactions neither Movant nor Co-Movant could have made or caused: 6/2/11 in Macedonia, Ohio; 12/20/11 in Orlando, Florida; 2/4/12 in Flower Mound, Texas. Each was a straightforward purchase either with cash or credit card, was outside the scope of the indictments, on accounts that were allegedly closed, and even though neither Movant nor Co-Movant were in those places and thus could not have caused those transactions, each was pinned on Movant due to slipshod data entry, accounting, and/or investigative practices.

### D. Account Creation Times Overlapped with Store Checkout Times and Flight Times

Hidden deeply within the dozens of spreadsheets the Government produced in discovery were dozens of hidden spreadsheets. One such spreadsheet, which the Government and Officemax had attempted to conceal (Ex. 240, row 34), called "Sheet1" within the file labeled Bates 1291-1292, but not itself Bates numbered, contains exculpatory information: column "BZ" contains the account creation times of many "Group 2" accounts, which plainly contradict the Government's theory that Movant created these accounts.

By cross-referencing these account creation times with the Government's own air travel records and receipts from store visits that the Government introduced as evidence, one must conclude that either the evidence is false, or Movant and Co-Movant were able to create accounts both while in flight, and while conducting in-person transactions at stores. Although technology has since evolved to allow

mobile internet use, especially aboard planes in flight, these data transmissions allegedly occurred in 2010 and 2011, when these technologies were typically not available. The Government and Officemax bamboozled the Court into accepting that Movant and Co-Movant could not only travel between stores at the speed of sound, but could simultaneously create accounts while conducting business in those stores without even so much as having a phone out in the surveillance videos they appeared in.

Ex. 241: 7/7/10. While both Matthew and Movant were airborne on Southwest Flight 435 from ABQ to Dallas-Love between 6:50AM and 9:30AM, account 860568314, Terry Fiecke from Kearney, MO was created at 7:04AM.

Ex. 242: 8/25/10. While Co-Movant was airborne on Southwest Flight 12 from ABQ to LAX between 11:50AM and 12:45PM, account 861304574, Mary Kelly from Easton, MD was created at 12:36PM.

Ex. 243: 9/4/10. While both Matthew and Movant were airborne on Southwest Flight 2594 from ABQ to Providence, RI between 9:30AM and 4:50PM, account 861408574, James Fredrickson from Medford, MN was created at 9:43AM; account 861409058, Alfred Sexton from San Antonio, TX was created at 10:40AM; account 861411672, Bernice Rucker from Cincinnati, OH was created at 3:25PM.

Ex. 244: 6/4/10. While Movant and Co-Movant were purportedly turning ink cartridges in Las Vegas, NV, they were also purportedly creating Maxperks accounts consistent with the same "Bargle" pattern. After three store visits at 11:47AM, 12:32PM, and 12:49PM; an account creation at 1:50PM in the *name* of "BARGLE12345678@GMAILCOM D ANDREWS"; a store visit at 1:55PM; an account creation at 2:03PM in the *name* of "BARGLE12345678@GMAILCOM B MARTINEZ"; a store visit at 2:22PM; an account creation at 2:30PM in the *name* of "BARGLE12345678@GMAILCOM N

UPDEGRAFF"; a store visit at 3:26PM; and an account creation at 3:41PM in the name of "BARGLE12345678@GMAILCOM J HOLDSWORTH".

Even if one considers the typographical errors as further evidence of sophistication (they customarily indicate the opposite), applies a two-hour time difference (the times still overlap), and/or assumes Movant could fill out application forms online while driving (impossible using the technology available at the time), one cannot dismiss the fact that neither Movant nor Co-Movant has ever been inside any Nevada Officemax stores, whether during the entirety of the alleged conspiracy, before, or since, and in fact, Co-Movant met for lunch in Albuquerque on 6/4/10, for the first time in years, Sean Scott, who would later become his longtime business partner in a Silicon refinery project (Ex. 245).

Ex. 246: 6/17/10. In addition to traveling 500 miles in an hour in Ex. 234, Movant and Co-Movant also purportedly created 7 Bargle accounts, some of which were entered during the same miraculous hour.

Ex. 247: 7/13/10. After purportedly visiting the seventh of ten San Antonio-area stores, Movant and Co-Movant purportedly created five Bargle accounts in ten minutes, somehow creating two more while driving to isolated Kerrville, Texas.

Although numerous inconsistencies between the Government's case documents and the laws of physics were observed, only 697 account creations that the Government claimed were Movant's or Co-Movant's, had timestamps. Counsel never attempted to get timestamps for the remainder, and if such an attempt had succeeded, additional inconsistencies could have been identified. Counsel was ineffective for leaving it alone.

Even with the 697 the Government inadvertently turned over, Counsel never attempted to introduce these evidentiary inconsistencies to introduce reasonable doubt to the jury.

At the 1/6/16 evidentiary hearing, AUSA Vierbuchen discussed with the Court:

> MS. VIERBUCHEN: Okay. And so we could go on to Government's Exhibit 6, Judge.
>
> Okay. Again, this information is taken off what we were just looking at, just this — that — what we were looking at, the enrollment data that was on the all accounts tab of the Daubert Hearing Exhibit 2.
>
> And it's merely a summary of the enrollment data. Remember I drew your attention to the enrollment date?
>
> THE COURT: Uh-huh.
>
> MS. VIERBUCHEN: And so if you go and look, you will see the enrollment date for the first teechur account was in March. The last teechur account ended in April. You can see the rollover through these accounts.
> …
> And as I said, I think it's an important point. The defendants have not pointed to a single error in our summary. Obviously, if there were errors in what our summary of the data would be, that would be you know, something we would want to address, because we'd have — it needs to be an accurate summary of the underlying data. (Ex. 47, 1/6/16 Hrg. at 54-55)

Counsel did not contradict Vierbuchen, even though the errors were legion.

### E. Most Account Creations Were Done Via Paper Sign-Up And Could Not Have Been Reasonably Foreseen To Cause Wire Transmissions

According to (Ex. 248, Bates 1942), the majority of the group 1 accounts (constituting the lion's share of ink recycled) were shown to have originated via "ACT", or an actual in-store paper sign-up, meaning no use of the wire could have taken place (Ex. 249). The accounts in Counts 2, 4, and 5 in the second superseding indictment (Ex. 8) were included in this majority. Counsel never raised this issue.

**F. Movant Did Not Use "Advanced Computer Skills" Or "Scripts" To Create Accounts Or Perform Adjustments**

Despite the indictments charging no counts of computer crime, and the Government's evidence supporting only a very simple, if large-scale, series of acts, the Government sought to paint Co-Movant as a sophisticated computer mastermind, in an effort to enhance Movant's sentence, dehumanize her as married to as an evil psychopathic genius, and to make the judge and jury fear them both.

Counsel waived any objection to this circumstantial and incomplete evidence, and instead of presenting evidence to counter the conclusory accusations, or downplaying their relevance and severity, in many instances bolstered the Government's case by joining in them.

**1. Contrary Confession**

Movant's alleged confession disavowed any use of advanced computing skills for either defendant.

The 302 memorializing Agent Boady's 6/28/11 interview with Movant states: "Brandi advised that creating accounts was a full-time job for both her and Matt and they would do a lot of it by hand" (Ex. 104). At sentencing, Counsel recounted Boady's testimony:

> MR. HOTCHKISS: "And you have no evidence that Ms. Channon ever used a computer in this alleged conspiracy, correct?"
> MR. BOADY: "Yeah. I have no idea whether she used a computer or not." (Ex. 250, at 35).

**2.   Meaning of "Script"**

Counsel allowed the Government to confuse the Jury between "scrip" and "script".

The Government sought to confuse "Staples scrip program" (like the MaxPerks program) and "Staples script program" (a computer program) in order to insinuate that a seized Post-it note from Movant's

residence referred to a computer program instead of "scrip" (Ex. 251, Tr. at 727-28, lines 18-10). After lying to the judge again, this time about what 404(b) permits (Ex. 251, Tr. at 725, lines 18-21), AUSA Kastrin disingenuously introduced Government Exhibit 156 (Ex. 252) without providing any foundation as to what "Staples Scrip Program" meant, after assuring the Court she would. Counsel objected prior to the exhibit's introduction but waived objection after Kastrin's treachery had succeeded. Counsel also failed to object on the grounds that the notes had no identifying characteristics tying them to Movant, Co-Movant, or any of the three other occupants of the house, or that the entirety of this case as charged involved offenses against Officemax, not Staples.

At trial, Steven Gardner opined:

MR. GARDNER: To me, it meant that there was most likely some sort of a computer script at work here. For somebody to open this many and have one person or even a couple of people opening that many accounts in a day, they're going to be sitting at a computer for a very long period of time… (Ex. 253, Tr. at 401-402).

During Robbenhaar's cross-examination of Gardner, the following exchange occurred:

MR. ROBBENHAAR: Okay. Now, Mr. Gardner, you testified in this case that -- something about a computer script versus a scrip. One, the P with -- and then the script without --
MR. GARDNER: I think--
MS. VIERBUCHEN: Objection, Your Honor. That's facts not in evidence.
THE COURT: I don't recall it being mentioned. Sustained. (Ex. 254, Tr. at 990-991).

Yet the previous day of trial, the Judge recalled it in this exchange:

THE COURT: All right. Well, we've heard testimony about scrip. I mean, I heard Mr. Gardner talk about scrip.
MS. KASTRIN: So that is a different version, so -- he was talking about script, with a T. And this is —
THE COURT: I wasn't clear about that.
MS. KASTRIN: Yeah. So he has -- there is -- I mean, I will admit that there are two words that are similar in this. (Ex. 251, Tr. at 727-728).

After the Government and Judge ganged up on them, Counsel and Co-Movant's counsel were deterred from any further discussion on the topic.

### 3.    Typos Usually Indicate A Computer *Did Not* Do The Typing

The account creations were riddled with typos, as introduced in Government Exhibit 4. In addition to the strange use of e-mail addresses as first names (Exs. 244, 255), some accounts had an e-mail address for every value (Ex. 256, row 860671859); addresses as cities, names as addresses, addresses as school names (Ex. 257); and outright missing phone numbers and email addresses (Ex. 258). These records could have been used by Counsel to argue that providing fictitious information could not have been an essential part of the scheme, since blank or garbage information worked just as effectively to create accounts. Counsel waived this argument.

In regard to the typos, Steven Gardner opined that:

a normal person would not do that. So we wouldn't — I would not assume a normal person would put that in there. It also made us believe that, you know, there's probably something going on from a computer standpoint. This is more — almost like a script, maybe, putting in the wrong information. (Ex. 253, Tr. at 401-03).

At no point did any side argue that Movant or Co-Movant were normal people.

### 4.    Movant's Authorship Unquestioned

When cross-examining FBI computer forensics witness Jane Bales and her introduction of four deleted spreadsheet files recovered from the seizure at Movant's residence, Counsel advanced no query on the origin, ownership, or authorship of the deleted files, or the origin or

ownership of the computers they were found on, focusing instead on less relevant matters like Bales' credentials (Tr. at 1162-1181).

Despite finding three people in the house other than Movant and substantial evidence tying the others to similar acts, neither the Government nor Counsel ever established, or questioned whether, the Mac Mini's belonged to, and were used, by Movant or by Co-Movant, with the exception of the following vague speculation by SA Moon, which Counsel never addressed:

> MS. VIERBUCHEN: [I]s the Excel format the version that you
>     obtained it off the — one of the defendants' MacMinis?
> MR. MOON: That's correct. (Ex. 259, Tr. at 1436-7).

### 5.    There Was No Computer Program

Despite numerous Government actors, along with Counsel and Co-counsel, voicing their suspicions and beliefs that Co-Movant had created a script or computer program to facilitate a scheme (Ex. 260, Tr. at 289, lines 18-24; Ex. 253, Tr. at 401-02, lines 24-4; Ex. 194, Tr. at 418, lines 12-18; Ex. 251, Tr. at 723, lines 1-7; Ex. 251, Tr. at 725, lines 7-10; Ex. 251, Tr. at 725-26, lines 23-1), direct expert testimony by SA Moon, that all sides would go on to forget, contradicted the notion:

> MS. VIERBUCHEN: And just so I understand, by looking at this
>     Excel file by itself, would you be able to go onto OfficeMax's
>     website and fill in the profiles online to open a thousand --
>     thousands of MaxPerks accounts?
> MR. MOON: Not from this Excel document. There are functions
>     within Excel that allow you to do the process I described of
>     sending and receiving data. I did not have indications of that
>     within this document. Or you could write another program. But
>     this document, as it stands right now, could not do that on
>     its own.
> MS. VIERBUCHEN: Without an intervening step?
> MR. MOON: That's correct. But this document was found in
>     unallocated space, indicating it was deleted. So the
>     corresponding program that would have read this data could
>     have also been deleted and written over so our forensic tool
>     would not find it.
> MS. VIERBUCHEN: So just to be clear, we did not find that other
>     program?

> MR. MOON: We did not find that other program, or a program that interpreted this data, no. (Ex. 261, Tr. at 1444).

Counsel never objected to the rank speculation that the Government's "magic bullet" program existed on the hard drives but then could have been deleted, nor did Counsel made any attempt to further draw attention to the absence of computer program evidence. Despite Moon's testimony, all parties proceeded to disregard it, including the Government's closing and rebuttal described in more detail in Ground XXII.

> At sentencing, AUSA Messec went on to accuse:

> MS. MESSEC: But, no. What they did, and what you won't find any mention of in Matthew Channon's 22-page sentencing memorandum or his allocution now, is deploying a computer program in an attempt to steal hundreds of thousands of dollars from OfficeMax. (Ex. 262).

Counsel even piled on:

> MR. HOTCHKISS: And the evidence at trial was, of course, that they were created not by hand, but by some kind of a computer program or whatever the word would be, script or whatever, and that none of them were created by hand. (Ex. 250, at 37).

The evidence was not that. Hotchkiss' false statement also prejudiced Movant, because the Judge went on to sentence her, "…the Court is imposing this condition because the instant offenses involved the defendant using a computer to defraud OfficeMax." (Ex. 263, Sentencing Hrg., at 71-72, lines 21-23).

No evidence that a program existed was ever produced, despite seizures of dozens of email accounts and dozens of gigabytes of seized hard drives, and months of attention lavished by two skilled and educated cyber squad FBI agents who would have found any such program.

**G. Movant And Her Co-Defendant Were Provably Not "Sneaking Around"**

Movant's Counsel was also caught flat-footed when it came to witness's and government allegations of relevant conduct related to their physical presence and payment behavior at OfficeMax stores, specifically, the absurd notion Movant and her Co-Defendant were "sneaking around" and/or attempting to conceal their behavior.

### 1. No One With Knowledge Testified

By refusing to consider introducing as witnesses known ink recyclers Jason Moran and Roberta Duran; or any OfficeMax employee or former employee who worked in a retail location; or cross-examining FBI special agents Boady and Moon, or Officemax employee Gardner on the subject of concealment; or even working exculpatory information into their own opening or closing statements, Movant's Counsel missed multiple opportunities to ameliorate the jury's impressions of Movant's and her Co-Defendant's motives.

Mr. Hotchkiss's closing included an admission of this failure, as though it were the Government's job to present it: "[T]he cashier did not testify, and no one else testified with firsthand knowledge of what happened during the transactions." (Ex. 264, Tr. at 1615).

### 2.    No Innocuous Theory For Staggered Entrances Advanced

Counsel could have walked the Court through the process of an ink recycle transaction from a customer witness's or clerk witness's perspective, but did not. Counsel failed to demonstrate, through any of the above means, that staggered entrances to the stores were only necessary in order for Defendants to move as quickly as possible, or that arriving together but before entering the store, to ensure the fastest transactions and with the least amount of mess, Defendants

needed to place the proper number and proper type of ink cartridges in their bags from boxes in the car trunk, by only one person filling both bags in the parking lot, handing the first bag to the other person, and filling then bringing the second in himself (Movant would always enter first).

### 3.    No Innocuous Theory For Quick Behavior Advanced

Counsel failed to demonstrate the paramount importance of speed to the Defendants by not showcasing their ability to visit *dozens* of Officemax stores a day, working from open until close. Any demonstration or direct examination would have conveyed the message that meaningless gestures of surreptitious behavior were pointless to Defendants.

### 4.    No Employees Were Called to Testify

Counsel failed to demonstrate that the observer effect of cameras filming Defendants' staggered entrances did not impact the timing of Defendants nor affect the on-the-floor reality or feeling in the stores, where all employees, whether cashiers or loss prevention managers, knew what Defendants were there to do, and employees knew the Defendants knew the employees knew: the identical bags and contents, month after month, were a dead giveaway. No evidence was introduced of a single Officemax employee, out of the dozens Movant interacted with, filing so much as a police report, banning Movant from a store, or refusing to recycle her ink.

### 5.    Ridiculous Assertions About Video Evidence Unchecked

Counsel failed to demonstrate that the Government's assertions that Defendants did not talk to each other in stores could not be determined from the Government's grainy stop-motion video. This video was without audio, with Movant's and Co-Movant's heads cut off/out of frame, or back to the camera in every pertinent shot. According to Steven Gardner's testimony:

> MR. HOTCHKISS: And there was no audio for any of these transactions, correct?
> MR. GARDNER: Correct. We are not allowed to audiotape. (Ex. 180, Tr. at 999).

And Agent Moon's:

> MR. ROBERT: There are no audio -- there's no audio in any of these videos, is there?
> MR. MOON: No. (Ex. 265, Tr. at 1454).

Had Counsel reviewed the video evidence with the jury, Counsel would have made it clear that Movant and Co-Movant had no opportunity to talk to each other because they were already talking to the clerks. Finally, Counsel failed to call into question the relevance of lack of conversation before the camera: how much singing and dancing was necessary to meet the burden the Government imposed to contradict the Government's default presumption of sneaky behavior?

**6.    Interstate Travel Conclusions Uncontested**

The Government made a big deal out of the interstate travel: "…[A]s we've seen, the defendants have traveled to numerous states in furtherance of the scheme to defraud Officemax." (Ex. 48, Tr. at 1553). Instead of offering evidence to describe how the interstate travel was out of practicality and intended as anodyne, evidence that AUSA Kastrin explicitly taunted Counsel for failing to produce (Ex. 50, Tr. at 1646, lines 10-19), Co-Movant's counsel not only furthered the Government's mistaken position that it was to evade detection but drove it home, adopting the Government's exhibit no less:

> MR. ROBERT: Matt -- and to some extent I suppose Brandi, because
> we've seen her in some videos, just a couple -- devoted an
> extraordinary amount of time and effort to this. Ink recycling
> -- Exhibit 32, please -- in 12 states, at 229 stores. A ton of
> travel. I mean, the effort expended was extraordinary. (Ex.
> 266, Tr. at 1603).

Counsel failed to put the lie to the indictment's pronouncement, and the Government's position both, that Defendants were attempting to avoid detection by going to hundreds of stores in numerous states, by pointing out that this approach was guaranteed to maximize, not minimize, the attention of Officemax and authorities, and in fact had a simpler purpose: to adapt to the limited intake capacity for ink cartridges of individual stores, and to a lesser extent shop for the most profitable clearance items. Counsel did not ask, but should have asked, a witness, any witness, to corroborate the above, and ask what Defendants could have changed about their pattern of store choice to get themselves noticed more.

### 7.    Officemax Sales Associates Are Not Rubes

Counsel failed to establish Movant already knew by sight, if not by name, multiple shifts of staff at a number of Officemax stores, and they her, because she visited them regularly. Counsel failed to establish, by calling not a single employee or ex-employee, that the Government's implicit notion that the Officemax staff were gullible, mindless automatons, was faulty, and instead the Officemax personnel were, more often than not, well-informed businesspeople who had neither the motivation nor the ability to be materially influenced by what had been typed in to a backend database; possessed sufficient sophistication to recognize fraud when and if they saw it; and yet, numerous times without exception, conducted repeat business with Movant anyway.

Allowing the tail to wag the dog, Counsel waived introducing evidence that Officemax employees' *locus transactio* judgment took precedence over the fine print of corporate terms and conditions, in light of the fact that Officemax staff allowed Movant or Co-Movant to recycle on two consecutive transactions as two separate accounts (Ex. 267), generating receipts for ink recycling that were less than a minute apart and at the same register. Officemax staff in Missouri allowed an unknown individual to turn in 11 sets of 20 cartridges each to only two "2010's" accounts, 4 pairs of which took place on the same day (Ex. 268). Again, there is no evidence or reason to believe either Defendant was in Missouri at this time, yet these transactions counted toward Movant's forfeiture and restitution numbers.

### 8.    Invalid Mailing Addresses

Officemax knew most of the signed-up mailing addresses were invalid, having compiled a list containing all accounts, and despite knowing they were invalid, kept them open (Ex. 269). Counsel ineffectively waived bringing this up as well.

### 9.    Telephone Admissions

From the notes from Officemax's witness Steven Gardner's telephone call with Co-Movant, numerous excerpts indicated Matthew Channon's willingness to disclose what he had been doing, as if he did not consider the acts discussed to be something to hide:

> "Channon was asked how many MaxPerks accounts he had opened and was currently using and stated he had about 100 accounts that he recycled ink on and purchased Blackhawk credit cards with the rewards." (Ex. 18).

> "When questioned about performing on-line adjustments of purchases he did not make, to these accounts, Channon admitted to it" (Ex. 18).

"When I told Channon it [ink recycling] was closer to $40,000 Channon did not disagree" (Ex. 18)

AUSA Kastrin made it clear from her opening statement that "…you will hear that Matt Channon admitted to having numerous OfficeMax accounts. He admitted that he recycled ink with these accounts. And he admitted to claiming…". (Ex. 260, Tr. at 292-93). Counsel never introduced evidence to show how this was the opposite of being sneaky.

### 10.   Prejudice at Sentencing

Through Counsel's failure on all these fronts, the jury and the Hon. Judge Herrera were led to believe that the Defendants were sneaky and attempted to avoid detection.

Before sentencing Movant to probation, the Judge said, "[t]he Court is imposing this condition [ankle monitor] as a sanction because the defendant engaged in fraud for a period of almost two years." (Ex. 263, Sentencing Hrg. at 72).

Before sentencing Co-Movant to prison, the Judge said:

"It's hard for me to imagine that you thought it was acceptable, because you went to a great deal of trouble to — to avoid detection, to — to spread these activities around to different stores in different states. And so when I see the way you conducted yourself, it suggests to me that you knew that you were doing something wrong." (Ex. 42, Sentencing Hrg. at 105).

"I've already said that you went to great lengths to conceal your activities from OfficeMax. Even if one could argue that — that it appeared to be acceptable under their rules, clearly, the deceit and — and so forth that I've already addressed that went on in this case suggest otherwise." (Ex. 42, Sentencing Hrg. at 109).

Although available evidence plainly contradicts this notion, these facts were never introduced, demonstrated, nor a demonstration attempt made, by Counsel.

Co-Movant's counsel did get, absent any details or further follow-up, SA Moon to acknowledge:

```
MR. ROBERT: Matt did nothing with respect to his visual
    appearance in these stores to hide who he was?
MR. MOON: Not that I saw in the video, no. (Ex. 270, Tr. at
    1449).
```

XIX. **Movant's 6th Amendment Right To Confront Witnesses, And To Compel
     Witnesses To Appear, To Trial By An Impartial Jury, And To
     Assistance Of Counsel, Were Violated When The Judge Allowed
     Leading Testimony And Forbade Cross-Examination, And Counsel
     Failed To Object On Appeal**

   **A. Leading Witnesses**

   **1. Wholesale Leading**

   The Hon. Judge Herrera allowed leading question after leading

question by the Government, whereupon defense's objections were met

with "it is leading" but seldom overruled nor sustained:

```
MR. ROBBENHAAR: Your Honor, I have to object to the leading
    nature of this question and many of the others.
THE COURT: There has been some leading. So if you could ask
    direct questions, please. (Ex. 271, Tr. at 355).


MR. ROBERT: I will object to leading.
MS. VIERBUCHEN: I'm just trying to speed it up, it seems so very
    routine.
THE COURT: Well, it is leading, but I'll give you a little bit of
    leeway just because you're directing attention, at least, to
    specific areas of the document — of the exhibit, so go ahead.
    (Ex. 131, Tr. at 455).


MR. ROBBENHAAR: Your Honor, I have to object to leading
    questions.
THE COURT: Yes, they are leading questions. So if you could
    rephrase please. (Ex. 272, Tr. at 503-504).


MR. ROBBENHAAR: Your Honor, object to, again, leading.
MR. GARDNER: Correct.
THE COURT: And — yes, the question is leading. So please ask
    nonleading questions. (Ex. 273, Tr. at 654).


MR. ROBBENHAAR: Understood. And while we're here — and I don't
    mean to disrupt your flow. But a lot of the questioning is
    leading, and I'm all for moving this quickly, but I think we
    do have to follow the Rules of Evidence. It's very leading,
    very — it's testimony testifying for the witness at times. So
    I don't want to —
```

> MS. VIERBUCHEN: Well, I truly am trying to speed it up. And particularly in light of the opening statement where they conceded he did all of this, it's kind of — I'm just really trying to shorten the trial. But I don't think that it's — I think it's speeding things up. I don't think it's a material way, but I am concentrating on trying not to lead.
>
> THE COURT: All right. And the witness is certainly familiar enough with the evidence that I think that we can get where we need to go in an efficient and timely manner, so try not to lead. (Ex. 274, Tr. at 765-766).

> MR. ROBBENHAAR: Object to the leading nature of the question and the speculative answers here.
>
> THE COURT: Well, they are leading, but I think he let us know that he didn't know the answer to that specifically. (Ex. 275, Tr. at 1019).

> MR. ROBERT: Objection, leading.
>
> THE COURT: It is leading. If you could rephrase, please? (Ex. 276, Tr. at 1384).

The Government spent the entirety of trial spoon-feeding its narrative to the witnesses it called, leading so transparently that occasionally the Government would redirect their witnesses to re-ask the same questions, in order to alter the witness's original yes or no answers.

### 2.    AUSA Vierbuchen And The Court Legislated Their Own Subchapter Of 611 For "Foundational" Testimony

During direct examination of Steven Gardner, Mr. Robbenhaar objected (Counsel joining) in vain:

> MR. ROBBENHAAR: Your Honor, again, leading. It's all leading.
>
> THE COURT: Well, in this particular instance the Court will allow the questions because they are foundational. Go ahead. (Ex. 92, Tr. at 509-510).

When Mr. Robbenhaar objected to AUSA Vierbuchen's leading questions again, Vierbuchen responded, "Your honor, if I may, foundational questions are allowed to be leading under Rule 611." The Court adopted the position, responding, "And that was a foundational question, so the objection is overruled." (Ex. 277, Tr. at 514-515).

Counsel never moved for reconsideration by reacquainting the
Court with the text of the statute, nor raised the matter on appeal.


**B. Sandbagging The Defense**

As of the first day of trial, with the jury venire waiting in the
next room, the information about the hidden tabs and hidden
spreadsheets were supposed to be fair game to the defense:

> MS. VIERBUCHEN: The case law is clear that that goes to weight,
> not admissibility. [Ex. 188, Tr. at 45].

> MS. VIERBUCHEN: So again, this bit about the hidden tabs? Again,
> that would go to weight, not admissibility. [Ex. 188, Tr. at
> 46].

> MS. VIERBUCHEN: All the other arguments counsel is making goes to
> weight, not admissibility. [Ex. 188, Tr. at 47]


On the fourth day of trial, Counsel had its first opportunity to
cross-examine Steven Gardner. At a bench conference, the following
exchange occurred:

> MR. ROBBENHAAR: And just repeatedly throughout the case, the
> argument by the government that it only goes to weight, not
> admissibility, so here we are. We're talking about the same
> thing, and it is going to the weight of the government's
> evidence.
> THE COURT: Okay. But at this moment I think we're talking about
> foundation. So…
> MR. ROBBENHAAR: And I'm happy to lay a foundation…and the other
> issue that I would get into, just to avoid another parade up
> here, is talking about the hidden worksheets that are
> contained within the original.
> THE COURT: What's the —
> MR. ROBBENHAAR: Again, it goes to the integrity of the
> government's evidence. He didn't know what he provided the
> FBI. He provided all this personal data regarding thousands of
> other individuals to the FBI. I think that goes to not only
> the quality of his work and the quality of his investigation,
> it goes right to the integrity of the government's evidence…I
> think that I should get the opportunity to cross-examine this
> witness about how his investigation, in obtaining and
> producing the information from the database, gets produced to
> the FBI and how this stuff inadvertently got sent over to the
> FBI.
> MS. VIERBUCHEN: Well, Your Honor, I would just say I don't think
> that it has any relevance to this case. I mean the testimony
> at the prior hearing was that he wasn't even aware that the

hidden data was there. And there's been no evidence, either through their expert or through this witness, that the data was even used. So I think it's more of, perhaps, a Rule 403, where it's really unfairly prejudicial. There's no evidence it was used or consulted or relied upon in this case. They were hidden, and the witness didn't even know about it. So I think it's unfair to kind of suggest that that somehow makes the data untrustworthy, and I would ask that it be excluded, the reference to the hidden tabs.

THE COURT: All right. Well, at this point I'm going to — I'm not going to allow the reference to the hidden tabs and other individuals. Now, I don't know how it will all play out. We may be revisiting the issue. But at least at this point I have no — I've heard no evidence that that information was used with respect to the charges against these defendants.

MR. ROBBENHAAR: No, but those documents form the basis of the government's evidence in this case. It goes to the integrity of their evidence. It goes to the credibility of this witness. If he did a sloppy job of his investigation and presentation of his case, I should be able to cross-examine. The hidden worksheets apparently came from a template he testified to that he forgot came from a worksheet that he forgot was there. I mean, that goes to —

THE COURT: That testimony was at the pretrial hearing, right?

MR. ROBBENHAAR: Correct. Not in the trial, but a pretrial evidentiary hearing. That's right.

THE COURT: Well, at this point I'm not going to allow it. (Ex. 45, Tr. at 963-968).

Counsel timely joined objection (more than a dozen times) to both regions of abuse of discretion, but was ineffective for failing to raise any related issue on appeal.

## XX. **Movant's 6th Amendment Right To Trial By An Impartial Jury, And To Have Assistance Of Counsel For Her Defense, Was Violated When Her Counsel Refused To Bring Sleeping Jurors To The Court's Attention**

At least three jurors slept during different phases of the trial, Juror Neil audibly snoring at times, and this fact was well-known to the defense table (Ex. 31).

During trial, Movant and Co-Movant brought up this fact to Co-Movant's counsel, Mr. Robert, and was consistently told to make notes of the fact and to present them to Mr. Robert at trial closing, which Co-Movant did (Ex. 31).

At trial closing, Co-Movant brought up to Mr. Robert the fact that jurors had been sleeping, as he had been previously instructed, to which Mr. Robert refused to bring the fact up to the Hon. Judge Herrera, even stating "a sleeping juror is a friendly juror" (Ex. 31). Counsel did not raise the issue either. All jurors voted to convict. Neither of the alternates ever fell asleep, and both of them took copious notes.

After the Jury's guilty verdict, the Hon. Judge Herrera told the jury: "Again, I thank you. It was obvious that you-all were very attentive and took your duties seriously." (Ex. 278, Tr. at 1655-56). Neither the Government nor the defense ever raised the subject of sleeping jurors.

**XXI.** **Movant's 6th Amendment Right To Confront Witnesses, And To Have Assistance Of Counsel For Her Defense, Was Violated When Government Prosecutors Themselves Testified At Summation And Rebuttal And Her Counsel Refused To Object, And Movant's 8th Amendment Right To A Reliable Sentencing Determination Was Deprived By Government Prosecutors' Unfair Closing Arguments.**

Emboldened by a winning streak of decisions in the Government's favor, Government prosecutor Vierbuchen committed numerous gross improprieties in her Rule 29 response, trial summation, and trial rebuttal following six days of trial.

**A. Falsehoods in Rule 29 Response**

Leading in to summation, in response to the defense's short Rule 29 motions, AUSA Vierbuchen stated falsehoods to the Court:

> MS. VIERBUCHEN: [The Defendants] would go into stores and go to different stores and they would hide their identities by presenting MaxPerks account names in other people's numbers — excuse me — in other people's names. (Ex. 190, Tr. at 1484).

As described in Ground I(C), these assertions were matters not in evidence and in fact they were false: it was never alleged nor proven that other people's names were presented.

> MS. VIERBUCHEN: [The Defendants] would go into stores and they would pretend that they didn't know each other…And when they were in the store they actually passed each other on at least two occasions and gave no rec- -- no indication that they knew each other. (Ex. 190, Tr. at 1484-85).

As described in Ground XVIII(G), these assertions were matters not in evidence and in fact they were false: the video evidence never showed Defendants' faces and never captured their audio.

> MS. VIERBUCHEN: The enrollments for the accounts using the teechur, Bargle, and coach sequence, as we all know, that was intended to deceive OfficeMax into believing they were different people. And we know — what do we know? They all came back to the IP address associated with the Channons' home. (Ex. 190, Tr. at 1485).

As described in Ground VII, these assertions were matters not in evidence and in fact they were false: the enrollments for all but the "coach" sequence were not linked with Movant's home, and even the "coach" account had strong indications international entities were involved with it.

Counsel did not object during the Rule 29 response. The Court ruled:

> THE COURT: I'm going to deny the motion of — the Rule 29 motion on behalf of both defendants…And without the Court reciting the evidence, I acknowledge the examples that were provided to us by Ms. Vierbuchen. (Ex. 279, Tr. at 1488)

### B. Matters Not In Evidence During Summation And Rebuttal

#### 1. Vierbuchen Testifies The Channons Are Not Teachers

AUSA Vierbuchen painted Movant and her Co-Defendant as liars, using matters not in evidence:

> MS. VIERBUCHEN: "But these weren't the only lies that they told. Another lie, or false statements that they repeatedly told, was that they falsely claimed to be teachers." (Ex. 48, Tr. at 1552).

> MS. VIERBUCHEN: "The evidence is undisputed that neither of the defendants are teachers." (Ex. 48, Tr. at 1552).

Counsel never contested the "not teachers" allegation in the defense

summation, yet Vierbuchen hammered it again in rebuttal:

> MS. VIERBUCHEN: "if [Matthew and Brandi Channon] didn't lie about being teachers over 5,000 times…" (Ex. 49, Tr. at 1631).

> MS. VIERBUCHEN: "[Matthew Channon] wouldn't need to create fake accounts and fake names and falsely claim to be a teacher." (Ex. 50, Tr. at 1645).

> MS. VIERBUCHEN: "if [Matthew Channon and Brandi Channon] would not have identified themselves as teachers" (Ex. 50, Tr. at 1646).

No testimony or evidence at trial was offered regarding whether the

Channons were or had ever been teachers, with the possible exception of

the following exchange with Government witness Purushottaman

Nandukumar, whose sum knowledge of Co-Movant consisted of one brief

software job interview he conducted with Co-Movant, two years prior,

through videoconference, and having read Co-Movant's resume:

> MS. KASTRIN: And as part of the interview process and with the resume itself, did he ever represent himself to be a teacher?
> MR. NANDUKUMAR: Not to my recollection. (Ex. 54, Tr. at 433).

> **2.    Vierbuchen Testifies E-mails Crossed State Lines**

> MS. VIERBUCHEN: And as we learned with the e-mails in this case, the transmission of the e-mail is going to cross state lines. In fact the Google representative, Ms. Papageorge, I believe her name was, told you just that. That, in fact, there were no servers in New Mexico at that time; and, therefore, it would have had to bounce off a server outside of New Mexico. (Ex. 280, Tr. at 1564-65).

As described in more detail in Ground VII(C), no evidence was

presented and no witness testified that the e-mails were sent from New

Mexico and not another state. Ms. Vierbuchen simply made the

assumption, and in typical leading fashion, brought forward the

following hypothetical with Ms. Papageorge but did not follow up:

MS. VIERBUCHEN: And so regarding the dates of July 15, 2010, and July 28, 2010, when there were no servers in New Mexico, would that mean that an e-mail sent from New Mexico would have to hit off a server outside of the state of New Mexico if sent on that day —
MS. PAPAGEORGE: Yes.
MS. VIERBUCHEN: -- before reaching its ultimate destination?
MS. PAPAGEORGE: Yes. (Ex. 54, Tr. at 438).

**3.    Vierbuchen Testifies Movant Used Accounts That Were Themselves Fake**

MS. VIERBUCHEN: Ms. Channon is at one register. This is where she's presenting a fake — a fictitious account for — I believe it is High Speed account, and then her husband disappears off the screen (Ex. 281, Tr. at 1574).

It was never alleged or proven that the accounts themselves were fake or fictitious, merely that they were real accounts created with fake or fictitious information.

**4.    Vierbuchen Testifies the Channons Used Cards In Someone Else's Names**

MS. VIERBUCHEN: So now they are back-to-back. They are pretending they do not know each other. They are each presenting different cards, MaxPerks cards that aren't in their names. (Ex. 281, Tr. at 1574).

MS. VIERBUCHEN: They're not even representing giving a MaxPerks account card with their real name on it. (Ex. 281, Tr. at 1575).

MS. VIERBUCHEN: Now, we've seen not two videos — Mr. Hotchkiss referred to two videos — we actually have seen three videos with her. In all three videos she presents a MaxPerk [sic] rewards card in a different name. Those videos and corresponding Ejournals are at Exhibits 48 through 53 (Ex. 49, Tr. at 1632-33).

The videos at Exhibits 48 and 51 show Movant presenting a MaxPerks card that is yellow on one side and white on the other, whereupon the clerk scans a black barcode on the white side of the card to enter the account number associated with the card.

Since no one could have received mailed personalized cards at a fictitious addresses associated with the accounts, the cards could not

have had fictitious names on them. The cards used must therefore have
been generic, anonymous cards, picked up in store, prior to activation
of the accounts, in sign-up kits, which were commonly available (Ex.
282). Therefore, no names, including the names associated with the
accounts, could have been physically present on the cards, presenting
these cards could not have been in anyone's name, and therefore the
accounts' names could not influence the clerks.

### 5.    Vierbuchen Testifies As To What Words The Defendants Spoke

MS. VIERBUCHEN: Exhibit 48…She — Ms. Channon just walked right
    past her husband without a glance or a word. (Ex. 281, Tr. at
    1573-74).

MS. VIERBUCHEN: Exhibit 51…And not a word to her husband, who is
    right behind her. (Ex. 281, Tr. at 1575-76).

Both video exhibits had no sound. Both video exhibits only showed
the backs of the Channons' heads when they were in line. No witness
testified as to what words, if any, the Channons spoke between
themselves. AUSA Vierbuchen never explains how she can tell Movant and
Matthew are not talking to each other by only seeing the backs of their
heads during a muted video, and how she can tell well enough to testify
to that fact.

### 6.    Vierbuchen Testifies The Defendants Pretended Not To Know Each Other And Testifies As To Their State Of Mind

MS. VIERBUCHEN: Did you see there Brandi Channon, a familiar coat
    that we saw…that she was wearing. There she is. She walks
    right by her husband, not a look or word. She knows what she's
    doing is wrong and so does her husband. (Ex. 281, Tr. at
    1578).

MS. VIERBUCHEN: [A]nd then you have another video at Exhibit 66.
    And that was the February 6, 2011 video. [Brandi] herself is
    in there pretending not to know her husband and claiming ink
    recycling rewards to which she's not entitled. (Ex. 49, Tr. at
    1633).

The heavily edited video at Exhibit 66 barely shows Movant, if it is Movant, leaving the store, her head never entering the frame. Likewise, Matthew's head never enters the frame. AUSA Vierbuchen never explains how she can tell Movant is pretending not to know her future husband without Vierbuchen seeing Movant's head or Matthew's head, and how she can tell well enough to testify. Similarly, she never explains how she can tell someone's state of mind without seeing their head or hearing their voice.

### 7.    Vierbuchen Testifies When A Photograph Was Taken

Vierbuchen loaded an enlarged photograph onto the screen to finish her rebuttal:

> MS. VIERBUCHEN: I want to show you this photograph, which is from Government's Exhibit 149. And recall the testimony of Diana Parker? They would clear — they would pull everybody out of the house first, and then they would take photographs, and then they would do their search. And so this photograph is while they're clearing the house. And you see Ms. Channon on the far right. And what — Go ahead and hit the next one. And so this is after she's been told she's free to leave and that she wanted to stay because of her cat. But it's also before the interview by Mr. Boady. (Ex. 97, Tr. at 1637–38).

The image in question was never presented in Court to accompany testimony. AUSA Vierbuchen testified that "and so this photograph is while they're clearing the house", which is belied by Ex. 106 and other testimony. The image shows Movant and Movant's cousin Patrick Vigil at the edge of the property, after Vigil has been questioned and after Movant has been questioned, since they were not permitted to be together until after questioning, and the questioning had to follow the house being cleared. Movant and Vigil were never in the front yard together until after Movant was questioned (Ex. 106). AUSA Vierbuchen's testimony that "[I]t's also before the interview by Mr. Boady" is similarly baseless and contradicted by the facts.

### C. Unqualified Statements of Law

AUSA Vierbuchen uttered the following during summation:

MS. VIERBUCHEN: I submit to you that the only issue is — and it's
not really much of one — is whether or not what the defendants
did was a crime. And the law says it is. (Ex. 48, Tr. at
1554).

MS. VIERBUCHEN: The defendants are guilty of Count 1. So whether
you call it OfficeMaxing or whether you call it beating
OfficeMax at their own game, under the law, it's a crime. (Ex.
281, Tr. at 1580).

AUSA Vierbuchen uttered the following during rebuttal:

MS. VIERBUCHEN: "If you have to tell somebody something that's
not true so they will give you something in return, that's
fraud." (Ex. 49, Tr. at 1631).

### D. Unqualified Opinions of Guilt

MS. VIERBUCHEN: "They [Matthew and Brandi] are, indeed, partners
in crime." (Ex. 281, Tr. at 1572).

MS. VIERBUCHEN: "This is how the government believes this is
proof of their unity of purpose, their acting together and
their intent to deceive. They're not representing that they —
that they are even related…The Channons are partners in
crime." (Ex. 281, Tr. at 1575).

MS. VIERBUCHEN: "Again, they're acting as if they don't know each
other…And not a word to her husband, who is right behind her."
(Ex. 281, Tr. at 1576).

MS. VIERBUCHEN: "I think these videos of the defendants show
consciousness of guilt. They know what they're doing is
wrong." (Ex. 281, Tr. at 1576).

Upon rebuttal, AUSA Vierbuchen told the jury what she thought

Movant's state of mind was:

MS. VIERBUCHEN: And remember she also told Agent Boady that that
would make her nervous, waiting around. It made her nervous
because she knew what she was doing was wrong. (Ex. 97, Tr. at
1635).

She then vouched for testimony debunked in Ground IV(F):

MS. VIERBUCHEN: And the evidence in this case actually confirms
exactly what Ms. Channon told Agent Boady was, in fact, true.
(Ex. 97, Tr. at 1635).

For rebuttal, Vierbuchen further opined:

> MS. VIERBUCHEN: So the re- -- there is a reason the defense is
> trying to distract you by the stuff that's not in evidence.
> That's because they know if you really just looked at the
> evidence, then their clients are guilty. (Ex. 50, Tr. at
> 1641).

> MS. VIERBUCHEN: Now, I don't know how you can reasonably think
> that you can make $100,000 without producing anything, without
> performing a service for somebody, without adding anything of
> value to it…They added no value. It's not a business. It's a
> fraud. It's a scam. And the law says it's a crime. (Ex. 50,
> Tr. at 1643-44).

### E. Burden-shifting

AUSA Vierbuchen used her summation to shift the Government's

burden of demonstrating guilt into Movant's burden to demonstrate her

own innocence, including questioning her decisions such as not to call

witnesses and not to testify in her own defense.

> MS. VIERBUCHEN: And if the defendants' opening statements are any
> indication, there doesn't seem to be much in the way of
> dispute regarding the facts of this case. (Ex. 48, Tr. at
> 1554).

> MS. VIERBUCHEN: If they didn't believe what they were doing was
> wrong, why are they giving different accounts, MaxPerks
> accounts? Why are they pretending they didn't know each other?
> Why are they leaving the store without acknowledging each
> other? It's because they know what they are doing is wrong.
> (Ex. 281, Tr. at 1576)

AUSA Vierbuchen converted her rebuttal into additional cross-

examination in apostrophe, rhetorically asking Movant questions she

knew she could no longer respond to, and filled in the answers herself:

> MS. VIERBUCHEN: So either he knows the rules and conditions or
> he's ignoring them to commit the fraud. Either way it doesn't
> add up. If Matthew Channon truly believed that it was fine to
> adjust other people's transactions, then he wouldn't need to
> create fake accounts and fake names and falsely claim to be a
> teacher. If Matthew Channon really believed that OfficeMax
> didn't care about someone defrauding its system, then why
> would he have sent the e-mails to people telling them how to
> defraud the system? (Ex. 50, Tr. at 1645).

> MS. VIERBUCHEN: If he didn't believe that what he was doing was
> wrong, why would he say such things as, quote [] (Ex. 50, Tr.
> at 1645).

> MS. VIERBUCHEN: But they didn't do that. They went to all of
> these stores. They — and, seriously, they could have just gone

> to Albuquerque. Why not just go to Albuquerque? That's where
> they live. Why not keep going there? Because they knew what
> they were doing was wrong. (Ex. 50, Tr. at 1646).

### F. Admonishing the Jury to Imagine Movant's Guilt

> MS. VIERBUCHEN: And do you remember what Mr. Gardner told you,
> that if the scheme had not been stopped when it was, that
> would have netted the defendants over 400,000 in MaxPerks
> rewards. (Ex. 48, Tr. at 1553).

In fact, Mr. Gardner never told the jury the above. Vierbuchen's

recollection was from a pretrial hearing, and it was her leading

testimony that introduced the statement of opinion, her opinion, to the

jury:

> MS. VIERBUCHEN: And I believe that you had testified that,
> assuming that the accounts were maxed out, and because they
> were teechur accounts, that you estimated reward cards that
> could be redeemed — that could be issued based on this amount
> would have been over $400,000. Did I summarize that testimony
> correctly?
> MR. GARDNER: Yes, you did.
> MS. VIERBUCHEN: Okay. What — was over 400,000, in fact, in reward
> card spending issued in this case?
> MR. GARDNER: No. (Ex. 283, Tr. at 898).

AUSA Vierbuchen also had reason to doubt the veracity of the underlying

claim given her recent furnishing to the defense of Ex. 284 (Bates

3809) wherein, in a letter to AUSA Paige Messec, Steven Gardner could

not account for "why [Co-Movant] may have tapered off in 2011" other

than "due to the fact [Gardner] was tracking [Co-Movant] and pulling

video pretty regularly", a claim unsupported by any evidence or

testimony indicating Co-Movant was aware of Gardner or his surveillance

video pulls prior to Gardner's first phone call with Co-Movant.

In addition, AUSA Vierbuchen used the words "imagine" or

"imagination" four times in her summation (Ex. 281, Tr. 1578-80).

### G. Stoking Passion or Prejudice In The Jury

In summation and rebuttal, the Government sought to festoon Officemax with the jury's sympathy:

1. **Sympathy For "Real Teachers"**

> MS. VIERBUCHEN: They claimed to be teachers so that they could maximize the fraud committed on OfficeMax by taking advantage of a program specifically designed to help real teachers. It was designed to help real teachers minimize the out-of-pocket expenses for — because of the recognition that teachers often bought supplies for their students. (Ex. 48, Tr. at 1552).

None of the jurors were teachers in a position to know better (Juror Neil was a social worker, silent on the matter during voir dire).

However, during voir dire, Venirewoman Gail Love said it best:

> PROSPECTIVE JUROR: I am a teacher.
> THE COURT: You are a teacher.
> PROSPECTIVE JUROR: I am a teacher, and I participate in the — participated in the program. I had an Officemax perks card. I don't have it with me, but I did receive rewards for shopping there, and a special discount for educators.
> THE COURT: All right. Now, there are times when people belong to a rewards program but don't really use it. Would you call yourself a regular user of the rewards program?
> PROSPECTIVE JUROR: Quite honestly, Your Honor, they are very expensive, so I only used them when I couldn't get what I needed at Walmart. (Ex. 285, Tr. at 120-21).

Although Ms. Love was stricken for cause, her voir dire, and the voir dire of other teachers, did not corroborate the level of gratitude and charitable giving the Government sought to associate with Officemax.

2. **Sympathy For "Honest Business"**

AUSA Vierbuchen further attempted to paint Officemax as a sympathetic victim to the jury:

> MS. VIERBUCHEN: Officemax was simply trying to run a business in an honest way. Sure, like any business, they were trying to make money. (Ex. 48, Tr. at 1555).

In rebuttal, the Government doubled down:

> MS. VIERBUCHEN: And I'm not sure what kind of business [Mr. Channon's] is, but it certainly is an affront to every legitimate business that's out there like OfficeMax. OfficeMax and every other legitimate business are the American dream. They offer legitimately obtained products out in the open using their real names. (Ex. 50, Tr. at 1643).

### 3. Hostility Toward Movant's Veracity

AUSA Vierbuchen sought to stoke the jury's prejudice against the defendants through the following photograph, first described in (B)(7):

The Government enlarged the corner of a photo of the residence taken during the search and seizure (Ex. 286), showing Movant, two other individuals, and Movant's cousin Patrick Vigil on the edge of the property. Mr. Vigil's face was away from the camera. One unknown individual had a focused downward-looking expression, and the other individual was laughing. Movant's head was almost away from the camera, and her expression was not as clear.

> MS. VIERBUCHEN: I want to show you this photograph, which is from Government's Exhibit 149. … And you see Ms. Channon on the far right. And what — Go ahead and hit the next one. And so this is after she's been told she's free to leave and that she wanted to stay because of her cat. But it's also before the interview by Mr. Boady. Does she look remotely distraught? (Ex. 97, Tr. at 1637-38).
>
> MS. VIERBUCHEN: [Brandi] seems like she's sort of hamming it up with the agents, which suggests to you, as well, that the statement was voluntary, that her will was not overborne, and that she answered the questions that were asked by Agent Boady because she chose to. (Ex. 97, Tr. at 1638).

While the presence of the laughing individual suggested to AUSA Vierbuchen that Movant was also laughing, "sort of hamming it up", removing the grinning face from the picture (Ex. 287) suggests that Movant could have been distraught or relieved, and the individual found her distress, relief, and/or Mr. Vigil funny.

As described in section (B)(7) about Vierbuchen's testimony to facts not in evidence, her misstatement of the timing of this photograph as before the confession rather than after the confession, dramatically impacted the prejudicial effect from Ms. Vierbuchen's assertions: Movant's affidavit (Ex. 106) states that only after Movant's return from the backyard were they allowed to be together,

meaning the interview in the backyard had already occurred when the photograph was taken. Vierbuchen's statement "But it's also before the interview by Mr. Boady" is simply a lie, unsupported by any evidence, and contradicted by other evidence.

Vierbuchen's focus on Movant's laughter, if it was laughter, served to inflame the prejudice of the jury, making Movant appear two-faced: one, solemn and protesting her innocence toward the jury in the courtroom, and two, having a laugh about felony wire fraud and her confession to it where she thought no one would see.

### 4.    Further Hostility Toward Movant's Veracity

Although Movant never testified in her own defense at trial, Counsel spent much of his case-in-chief following up on SA Boady's testimony from the suppression hearing held in Santa Fe, as part of a strategy to gain sympathy from the jury or engender reasonable doubt in the jury, and in so doing made a number of assertions that AUSA Vierbuchen waited until the rebuttal to question and deride, when it was too late for Counsel to formally respond.

The evidentiary hearing had established that Movant was wearing a see-through nightgown when she was pulled from the house, and at some point later someone brought her a robe. However, at closing, Counsel stated:

> MR. HOTCHKISS: There are additional problems with [SA Boady] not having audio recorded Ms. Channon's statement. Boady could not recall what Ms. Channon was wearing and could not recall if Ms. Channon asked for a robe. (Ex. 111, Tr. at 1620).

AUSA Vierbuchen combined Counsel's two statements ("Boady could not recall what Ms. Channon was wearing" and "[Boady] could not recall if Ms. Channon asked for a robe") to distort them into a different straw man question for her response:

> MS. VIERBUCHEN: And although Agent Boady, you know, couldn't
> recall the color of the robe she was wearing — I mean we see
> it right there. It's purple. (Ex. 97, Tr. at 1637-38).

In so responding, AUSA Vierbuchen made it look like Movant had tried to make a trivial matter seem serious (when in fact Counsel's questions referred to a different serious matter from earlier in the day) and seem like it was answered by the Government's photograph.

Neither counsel objected to Vierbuchen's inflammatory assertions, then or ever.


### 5.   Hostility Toward The Channons' Photograph

Movant and Matthew had a small framed photograph of the two of them, taken shortly after they met, hanging in their residence, which the government photographed in order to indicate the relative position of Item 17, Movant's checkbook (Ex. 288). The Government's photograph was entered into evidence as one of 27 photos within Ex. 149 (Ex. 289, Tr. 702-08).

At the end of the Government's rebuttal Powerpoint presentation, the contained photograph was enlarged to the full screen (Ex. 290), accompanied by the language:

> MS. VIERBUCHEN: You now have the evidence. The puzzle pieces have
> come into play. The picture is complete, and the evidence
> shows that the defendants are guilty of wire fraud and
> conspiracy to commit wire fraud.
> MS. VIERBUCHEN: Now, the judge has told you about the verdict
> sheet. We would ask you, with respect to Brandi Channon, to
> find Brandi Channon guilty of Count 1, Count 2, and Count 4,
> and we ask you to find Matthew Channon guilty of Count 1,
> Count 3, Count 5, Count 6, and Count 7.
> MS. VIERBUCHEN: The picture is complete and the defendants are
> guilty. (Ex. 50, Tr. at 1647).

The photograph served no identifying purpose, since Counsel had stipulated the residence belonged to the Channons when the exhibit was introduced (Ex. 289, Tr. 704, 707), and the jury had been already been

looking directly at the Channons in person for seven days of trial. The Channons' expressions in the photograph, happy and together, frozen in time, literally in the jury's faces, were left on the screen by the Government for several minutes, including some time after the Government's rebuttal, where the Court excused the alternates and prepared to excuse the jury to deliberate.

Counsel failed to object to the Government's summation or rebuttal.