## BRANDI CHANNON'S 2255 MEMORANDUM TABLE OF CONTENTS

GROUNDS UNDER ARTICLE I, AMENDMENT IV, AMENDMENT VIII

**I. MOVANT'S ARTICLE I SECTION 1 RIGHT AGAINST EXTRACONGRESSIONAL LEGISLATION, ARTICLE I SECTION 9 RIGHT AGAINST EX POST FACTO LAWS, 6TH AMENDMENT RIGHT TO BE INFORMED OF CRIMINAL CHARGES, 5TH AMENDMENT RIGHT TO DUE PROCESS, AND 6TH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL, WERE VIOLATED WHEN HER COUNSEL FAILED TO CHALLENGE THE INDICTMENTS AGAINST HER FOR FAILURE TO STATE A CLAIM                                          1**

A. NO SCHEME OR ARTIFICE TO DEFRAUD WAS ALLEGED                           2
B. NO MATERIAL PRETENSES WERE ALLEGED FOR ACCOUNT CREATIONS               3
C. NO PRETENSES, MATERIAL OR OTHERWISE, WERE ACCURATELY ALLEGED FOR OTHER ACTS IN FURTHERANCE                                                               4
D. THE SUPERSEDING INDICTMENTS FAILED TO ALLEGE THAT DEFENDANTS TRANSMITTED, OR CAUSED ANY TRANSMISSION, IN COUNTS 1SS–5SS                            6
E. WHAT WAS SENT, OR CAUSED TO BE SENT, WERE NOT ALLEGED TO INCLUDE WRITINGS, SIGNS, SIGNALS, PICTURES, OR SOUNDS                                      7
F. THE SUPERSEDING INDICTMENTS FAILED TO STATE A CONSPIRACY CLAIM DUE TO USE OF DISJUNCTIVE AND/OR PASSIVE VOICE AND FAILED TO CHARGE IN THE CONJUNCTIVE        9
G. AFFIRMATIVE DEFENSES WERE APPLICABLE BUT NEVER RAISED BY COUNSEL       11
  1.  GOOD FAITH                                                          11
  2.  EXPRESS CONSENT                                                     12
  3.  NOVATION                                                            13
  4.  ENTRAPMENT                                                          14
H. THE MAXPERKS REWARDS RULES WERE NOT BINDING LAW                        18
I. THE INDICTMENTS DID NOT ALLEGE THE ACTUAL MAXPERKS REWARDS RULES WERE VIOLATED
                                                                         20
  1.  "ONE ACCOUNT PER PERSON"                                           20
  2.  "FOR TEACHERS ONLY"                                                22
J. THE GOVERNMENT SUPERSEDED A DEFECTIVE INDICTMENT TO AVOID DISMISSAL BUT ARGUED ITS CASE BASED ON THE DEFECTIVE INDICTMENT                           23
  1.  THE GOVERNMENT COULD NOT BEAT *CLEVELAND* AND STILL HAVE A CASE, SO IT PRETENDED IT HAD                                                        24
  2.  PREPAID GIFT CARDS ARE NOT MERCHANDISE                             25
K. MULTIPLE OPPORTUNITIES FOR ADEQUATE ASSISTANCE OF COUNSEL WERE OVERLOOKED OR FRUSTRATED, AND A SIMPLE ONE-PAGE MOTION BY DEFENSE COUNSEL COULD HAVE OBVIATED NOT ONLY THE REST OF THESE COUNTS BUT THE MULTIPLE YEARS OF LITIGATION IN THIS CASE                                                                26
L. THE SUPERSEDING INDICTMENTS FAILED TO STATE WHICH STATUTE WAS CHARGED UNDER WHICH COUNT                                                            29
  1.  WHEN IT CAME TO INDICTMENTS, THE COURT WAVERED                     29
  2.  THE JUDGE'S STRICKEN SURPLUSAGE OF THE INDICTMENT WAS POORLY EXECUTED, PREJUDICING DEFENDANT                                                   30
  3.  THE JUDGE'S HANDWRITTEN REVISION OF THE INDICTMENT WAS IMPERMISSIBLE   32

**II. MOVANT'S 4TH AMENDMENT RIGHT FOR NO WARRANTS TO ISSUE BUT UPON PROBABLE CAUSE, AND 6TH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL, WERE VIOLATED WHEN HER COUNSEL FAILED TO CHALLENGE A FALSIFIED SEARCH WARRANT AFFIDAVIT                                                        33**

**III.  MOVANT'S ARTICLE I SECTION 9 RIGHT AGAINST EX POST FACTO LAWS, 6TH AMENDMENT RIGHT TO COMPEL WITNESSES TO APPEAR, AND TO ASSISTANCE OF COUNSEL, WERE VIOLATED WHEN COUNSEL FAILED TO COMPREHEND THE RULES AND EVIDENCE                                                               35**

A. COUNSEL INEFFECTIVELY ASSISTED MOVANT BY FAILING TO REALIZE NO SCHEME COULD HAVE EXISTED ............................................................. 35
B. COUNSEL INEFFECTIVELY ASSISTED MOVANT BY FAILING TO REALIZE NO CONSPIRACY COULD HAVE EXISTED ............................................................. 38
C. VIOLATING A CONTRACT DURING ITS FORMATION CANNOT FORM THE BASIS FOR WIRE FRAUD ............................................................. 39
D. MOVANT'S COUNSEL FAILED TO OBJECT TO EX POST FACTO APPLICATION OF THE LAW ... 40
E. IN THE ALTERNATIVE, MOVANT'S RIGHTS WERE VIOLATED UNDER THE DUE PROCESS CLAUSE ............................................................. 41

IV. **MOVANT'S 1ST AMENDMENT RIGHT OF THE PRESS AND TO PEACEABLY ASSEMBLE, 4TH AMENDMENT RIGHT TO BE SECURE IN HER PERSON AND HOUSE, 5TH AMENDMENT RIGHT NOT TO BE COMPELLED IN A CRIMINAL CASE TO BE WITNESS AGAINST HERSELF NOR TO BE DEPRIVED OF LIBERTY WITHOUT DUE PROCESS OF LAW, NOR PRIVATE PROPERTY TAKEN FOR PUBLIC USE, AND 6TH AMENDMENT RIGHT TO HAVE ASSISTANCE OF COUNSEL FOR HER DEFENSE WERE VIOLATED WHEN HER HOME WAS INVADED, HER SMARTPHONE SEIZED, HER PERSON ABDUCTED, HER ASSOCIATION WITH FAMILY ABRIDGED, HER BACKYARD SEIZED TO FORM AN AD HOC INTERROGATION ROOM, HER WILL OVERBORNE, HER CONFESSION OBTAINED, AND COUNSEL FAILED TO EFFECTIVELY REPRESENT HER** .............................. 42

A. FAULTY NOTE TAKING ............................................. 43
B. BAD *BRUTON* CALLS ............................................. 45
C. MULTIPLE MEANINGS of "LEAVE" ................................. 46
D. *BEHELERIZING* MOVANT VIOLATED HER RIGHTS ..................... 47
E. INCONGRUITIES BETWEEN TESTIMONY AND MEMORANDUM OPINION ....... 52
   1.   "NERVOUS YET COMFORTABLE" ................................ 52
   2.   PULLED OUT THE FRONT DOOR ................................ 52
   3.   "BRIEF LITTLE PATDOWN" ................................... 54
   4.   PERMISSION NEVER GIVEN ................................... 54
F. COUNSEL DID NOT UNDERSTAND OR EXPLAIN MOVANT'S LUPUS ......... 55
G. RIGHT TO REPRESENTATION UNDER *MASSIAH* & *ESCOBEDO* ......... 57
H. MOVANT'S CAT WAS IN DANGER AND LEAVING WAS NOT VOLUNTARY .... 58
I. MOVANT'S SELF-DISCREDITING CONFESSION ....................... 59

GROUNDS UNDER AMENDMENT V

V. **MOVANT'S 5TH AMENDMENT RIGHT NOT TO BE HELD ON AN INFAMOUS CRIME, UNLESS ON AN INDICTMENT OF A GRAND JURY, WAS VIOLATED WHEN SHE WAS CHARGED BY WAY OF AN INDICTMENT LACKING ANY SIGNATURE** ............ 61

A. THE D.N.M. LOCAL RULES REQUIRE AN ACTUAL SIGNATURE .......... 61
B. OTHER DISTRICTS' LOCAL RULES DO NOT REQUIRE AN ACTUAL SIGNATURE 62
C. THE ASSISTANT U.S. ATTORNEYS AUTHORING THE INDICTMENTS VIOLATED MOVANT'S FIFTH AMENDMENT RIGHTS AND COMMITTED MISCONDUCT BY SHUNTING THE PROCESS OUTSIDE THE MAGISTRATE JUDGE AND COURT CLERK .................................... 62
D. FRCRMP 6(C)'S REQUIREMENT FOR THE FOREPERSON TO "SIGN ALL INDICTMENTS" IS APPLICABLE ................................................... 64
E. COUNSEL INEFFECTIVELY FAILED TO SEEK THE GRAND JURY MINUTES . 65
F. PREJUDICE WAS SUFFERED BY MOVANT ........................... 66
G. COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE ANY OF THESE ISSUES EITHER AS OBJECTION OR ON APPEAL, OR TO EVEN SEEK TO EXPLORE THEM .......... 67

VI. **MOVANT'S 5TH AMENDMENT RIGHT TO PROCEDURAL DUE PROCESS INVOLVING AN UNBIASED TRIBUNAL, 6TH AMENDMENT RIGHT TO TRIAL BY AN IMPARTIAL JURY, AND 8TH AMENDMENT RIGHT AGAINST EXCESSIVE FINES WERE VIOLATED WHEN THE JUDGE PREJUDGED HER GUILT** ....................................... 68

**VII.  MOVANT'S 5TH AMENDMENT RIGHT TO DUE PROCESS AND GRAND JURY SCREENING OF INDICTMENTS, AND 6TH AMENDMENT RIGHT TO BE INFORMED OF CRIMINAL CHARGES, CONFRONT WITNESSES, AND COMPEL WITNESSES TO APPEAR IN COURT WERE VIOLATED WHEN THE AUSA AND FBI MANUFACTURED EVIDENCE USED AT TRIAL                                                                    71**

    A. IP ADDRESS IRREGULARITIES                                          71
    B. NO GMAIL SERVERS IN NM                                            72
    C. SYNTHESIZED TRIAL EXHIBITS                                        73
    D. GRAND JURY IRREGULARITIES                                         74

**VIII.  MOVANT'S 5TH AMENDMENT RIGHT TO DUE PROCESS OF LAW AND 6TH AMENDMENT RIGHT TO HAVE THE ASSISTANCE OF COUNSEL FOR HER DEFENSE, WERE VIOLATED WHEN THE JUDGE FAILED TO PROVIDE AN OPPORTUNITY FOR, AND HER COUNSEL FAILED TO SEEK, A LAST-MINUTE CONTINUANCE BEFORE JEOPARDY ATTACHED                                                                 76**

**IX. MOVANT'S 6TH AMENDMENT RIGHT TO A JURY POOL COMPOSED OF A FAIR CROSS-SECTION OF THE COMMUNITY, AND 5TH AMENDMENT RIGHTS OF JURORS TO EQUAL PROTECTION UNDER THE LAW, WERE VIOLATED BECAUSE OF THE DISPARITY BETWEEN THE PERCENTAGE OF MEN ON THE QUALIFIED JURY VENIRE AND THE PERCENTAGE OF MEN IN THE POPULATION OF THE DISTRICT OF NEW MEXICO     78**

    A. MEN ARE A DISTINCTIVE GROUP IN THE COMMUNITY                       78
    B. REPRESENTATION OF MEN IS NOT FAIR AND REASONABLE IN RELATION TO THE NUMBER OF MEN IN THE COMMUNITY                                               79
    C. THE UNDERREPRESENTATION IS DUE TO SYSTEMIC EXCLUSION OF MEN IN THE JURY SELECTION PROCESS                                               80
    D. PREJUDICE RESULTED FROM A SYSTEMATICALLY UNFRIENDLY JURY           81

**X.  MOVANT'S 5TH AMENDMENT RIGHT NOT TO BE HELD ON AN INFAMOUS CRIME, UNLESS ON AN INDICTMENT OF A GRAND JURY, WAS VIOLATED WHEN HE WAS CHARGED BY WAY OF GRAND JURY PROCEEDINGS TAINTED BY PROSECUTORIAL MISCONDUCT; AND MOVANT'S 6TH AMENDMENT RIGHTS TO BE CONFONTED WITH THE WITNESSES AGAINST HER AND TO COMPEL WITNESSES IN HER FAVOR WERE VIOLATED WHEN BRADY EVIDENCE WAS PROVIDED LATE AND JENCKS EVIDENCE WAS WITHHELD                                                                 81**

    A. COUNSEL FAILED TO EXPLORE *JENCKS*                                82
    B. *BRADY* IMPEACHMENT EVIDENCE COULD HAVE ALTERED THE CASE'S OUTCOME  83

**XI. MOVANT'S 5TH AMENDMENT RIGHT TO DUE PROCESS AND 6TH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL WERE VIOLATED THROUGH GOVERNMENT WITNESS STEVEN GARDNER'S BLACKMAIL AND PERJURY, AND COUNSEL'S WAIVER OF OBJECTION                                                               84**

    A. BLACKMAIL                                                         84
    B. SA BOADY AND AUSA MESSEC SUBORNED THE BLACKMAIL                   86
    C. GARDNER'S PERJURY IN SPREADSHEET PREPARATION                     87

**XII.  MOVANT'S 5TH AMENDMENT RIGHT TO DUE PROCESS, HER 6TH AMENDMENT RIGHT TO TRIAL BY AN IMPARTIAL JURY, TO BE INFORMED OF CRIMINAL CHARGES, TO CONFRONT WITNESSES, TO COMPEL WITNESSES TO APPEAR IN COURT, AND TO HAVE ASSISTANCE OF COUNSEL FOR HER DEFENSE, WAS VIOLATED WHEN HER COUNSEL FAILED TO APPEAL THE USE OF UNTRUSTWORTHY HEARSAY EVIDENCE AGAINST HER                                                            88**

    A. CUT-AND-PASTE                                                     89
    B. AUTHORSHIP                                                        89
    C. CHAIN OF CUSTODY                                                  91

D. Waiver of Appeal                                                                       92

XIII.   MOVANT'S 5TH AMENDMENT RIGHT TO DUE PROCESS OF LAW AND 6TH
AMENDMENT RIGHTS TO A SPEEDY AND PUBLIC TRIAL, AND TO BE INFORMED OF
CRIMINAL CHARGES AGAINST HER, AND TO HAVE ASSISTANCE OF COUNSEL FOR HER
DEFENSE, WERE VIOLATED WHEN THE GOVERNMENT VINDICTIVELY PROSECUTED HER,
AND HER COUNSEL BOTH SUPPORTED THE PLEA OFFER AND DECLINED TO MENTION
IT TO THE COURT                                                                           93

XIV.   MOVANT'S 5TH AMENDMENT RIGHT TO DUE PROCESS AND 6TH AMENDMENT
RIGHT TO ASSISTANCE OF COUNSEL WERE VIOLATED THROUGH THE COURT'S
ADOPTION OF A JURY INSTRUCTION AT ODDS BOTH WITH THE STATUTE AND
INDICTMENT, AND COUNSEL'S WAIVER OF OBJECTIONS                                            94


GROUNDS UNDER AMENDMENT VI

XV. MOVANT'S 6TH AMENDMENT RIGHT TO A SPEEDY AND PUBLIC TRIAL, AND 6TH
AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL, WAS VIOLATED WHEN HER COUNSEL
FAILED TO RAISE A SPEEDY TRIAL ACT VIOLATION BOTH AT THE TRIAL COURT
AND ON APPEAL                                                                             96

    A. MOVANT ZEALOUSLY PURSUED A SPEEDY TRIAL                                            96
    B. COUNSEL'S FAILURE TO MOVE TO DISMISS UNDER SPEEDY TRIAL GROUNDS, ON THE EVE OF
       TRIAL, IS INDICATIVE OF PREJUDICE                                                  97
    C. DISMISSAL WITH PREJUDICE WOULD HAVE BEEN EASILY JUSTIFIED AND LIKELY               98
    D. NEITHER DEFENDANT CONTRIBUTED SIGNIFICANTLY TO THE PERIODS OF DELAY IN THIS
       CASE, DESPITE THE ARRIVAL OF THEIR FIRST CHILD                                     99
    E. THE DELAY ADVERSELY IMPACTED MOVANTS' ABILITY TO PRESENT A DEFENSE AND CAUSED
       SEVERE PERSONAL PREJUDICE                                                          100
    F. THE GOVERNMENT CAN NOT RESET THE SPEEDY TRIAL CLOCK BY FILING SUPERSEDING
       INDICTMENTS                                                                        102
    G. 18 USC §3282 WOULD APPLY, §3288 WOULD NOT APPLY                                    104
    H. 3161(H)(7)(A) IS NOT SATISFIED IN THREE CONTINUANCES, ADDING AN ADDITIONAL
       135 DAYS TO THE STA CLOCK                                                          106
    I. THE COURT VIOLATED 18 USC §3161(A) BY FAILING TO SET A TRIAL DATE FOR THREE
       MONTHS, AND ADDED ANOTHER 85 DAYS TO THE SPEEDY TRIAL CLOCK                        106
    J. AFTER JUDGMENTS CAME OUT, COUNSEL FAILED TO NOTICE THAT EVEN WHEN THE
       SUPERSEDING INDICTMENTS WERE FILED, THEIR COUNTS WERE ALREADY PAST THE STATUTE
       OF LIMITATIONS                                                                     108
    K. AT 1,006 DAYS ELAPSED FROM ARRAIGNMENT TO TRIAL, WITHOUT A SINGLE SPEEDY TRIAL
       OBJECTION RAISED AGAINST THIS EPIC OF CONSCIOUS INDIFFERENCE, THIS CASE RAISES
       THE BAR FOR DEFENSE MALPRACTICE IN THE TENTH CIRCUIT                               109

XVI.   MOVANT'S 6TH AMENDMENT RIGHT TO COMPEL WITNESSES TO APPEAR AND TO
HAVE ASSISTANCE OF COUNSEL FOR HER DEFENSE WAS VIOLATED WHEN HER
COUNSEL WITHDREW HIS MOTION TO COMPEL AND WAIVED SUBPOENAS UNTIL TRIAL
WAS OVER                                                                                 110

XVII.   MOVANT'S 6TH AMENDMENT RIGHT TO CONFRONT WITNESSES, AND TO
COMPEL WITNESSES TO APPEAR, AND TO ASSISTANCE OF COUNSEL, WERE VIOLATED
WHEN COUNSEL FAILED TO CALL ANY WITNESSES, BE THEY EXPERT, FACT, OR LAY
                                                                                         114

    A. COUNSEL CHOSE TO RELY ON CROSS-EXAMINATION TO ADVANCE MOVANT'S ARGUMENTS          115
    B. DUE TO PROSECUTORIAL MISCONDUCT, JUDICIAL NAIVETE, AND UNFAMILIARITY WITH THE
       LAW, COUNSEL INEFFECTIVELY FAILED TO LAY THE BASIS FOR MCHARD TO TESTIFY          116
    C. COUNSEL SELF-SABOTAGED HIS RULE 29 MOTION BY SHOWING MOVANT'S CARDS               117

D. WITHOUT DEFENSE WITNESSES, THE COURT DID NOT UNDERSTAND THE INDICTMENT     118

XVIII.   MOVANT'S 6TH AMENDMENT RIGHT TO HAVE COMPULSORY PROCESS FOR OBTAINING WITNESSES IN HER FAVOR, AND TO HAVE THE ASSISTANCE OF COUNSEL FOR HER DEFENSE, WAS VIOLATED WHEN HER COUNSEL FAILED TO INTRODUCE OR DEVELOP EXCULPATORY EVIDENCE     119

   A. TWO BANKERS' BOXES FULL OF PAPER WERE NECESSARY TO REPRESENT THE INITIAL DISCOVERY PROVIDED TO THE DEFENSE, AND HIDDEN DEEP WITHIN THIS DISCOVERY WERE SOME TROUBLING INCONSISTENCIES IN THE DATA.     119
   B. THE GOVERNMENT'S SPREADSHEET EVIDENCE EXHIBITS OTHER TIME-AND-SPACE ERRORS DUE TO MISKEYS     120
   C. GARBAGE IN, GARBAGE OUT: FLAWED GOVERNMENT-OFFICEMAX ASSUMPTIONS CREATED A UNIVERSE OF DEFECTIVE DATA     122
   D. A SMALL SUBSET OF ACCOUNT CREATION TIMES WAS PROVIDED, THOUGH THIS INFORMATION WAS NEVER USED AT TRIAL     124
   E. AS SHOWN IN EX. 248/BATES 1942, A MAJORITY OF THE GROUP 1 ACCOUNTS WERE SHOWN TO HAVE ORIGINATED VIA "ACT", OR AN ACTUAL PAPER SIGN-UP     125
   F. INCRIMINATING CONFESSIONS CANNOT BE CHERRY-PICKED     126
   G. MOVANT'S COUNSEL FAILED TO CALL OUT PROSECUTORIAL MISCONDUCT AND JUDICIAL BIAS, AND AT TIMES JOINED IN THEM TO PREJUDICE MOVANT     127
   H. IT WAS INCONVENIENT TO THE COURT THAT THERE WAS NOT A COMPUTER PROGRAM, SO EVERYBODY PRETENDED THERE WAS ONE     128
   I. COUNSEL WAS ALSO CAUGHT FLAT-FOOTED WHEN IT CAME TO WITNESS'S AND GOVERNMENT ALLEGATIONS OF RELEVANT CONDUCT RELATED TO THEIR PHYSICAL PRESENCE AND PAYMENT BEHAVIOR AT OFFICEMAX STORES, SPECIFICALLY, THE NOTION MOVANT AND HER CO-DEFENDANT WERE "SNEAKING AROUND"     129
   J. BY FAILING ON ALL THESE FRONTS, THE JURY AND JUDGE HERRERA WERE LEFT TO BELIEVE THAT THE DEFENDANTS WERE SNEAKY AND ATTEMPTED TO AVOID DETECTION     132

XIX.   MOVANT'S 6TH AMENDMENT RIGHT TO CONFRONT WITNESSES, AND TO COMPEL WITNESSES TO APPEAR, TO TRIAL BY AN IMPARTIAL JURY, AND TO ASSISTANCE OF COUNSEL, WERE VIOLATED WHEN THE JUDGE ALLOWED LEADING TESTIMONY AND FORBADE CROSS-EXAMINATION, AND COUNSEL FAILED TO OBJECT ON APPEAL     132

   A. LEADING WITNESSES     133
   B. SANDBAGGING THE DEFENSE     135

XX. MOVANT'S 6TH AMENDMENT RIGHT TO TRIAL BY AN IMPARTIAL JURY, AND TO HAVE ASSISTANCE OF COUNSEL FOR HER DEFENSE, WAS VIOLATED WHEN HER COUNSEL REFUSED TO BRING SLEEPING JURORS TO THE COURT'S ATTENTION     136

XXI.   MOVANT'S 6TH AMENDMENT RIGHT TO CONFRONT WITNESSES, AND TO HAVE ASSISTANCE OF COUNSEL FOR HER DEFENSE, WAS VIOLATED WHEN GOVERNMENT PROSECUTORS THEMSELVES TESTIFIED AT SUMMATION AND REBUTTAL AND HER COUNSEL REFUSED TO OBJECT, AND MOVANT'S 8TH AMENDMENT RIGHT TO A RELIABLE SENTENCING DETERMINATION WAS DEPRIVED BY GOVERNMENT PROSECUTORS' UNFAIR CLOSING ARGUMENTS.     138

   A. FALSEHOODS IN RULE 29 RESPONSE     138
   B. MATTERS NOT IN EVIDENCE DURING SUMMATION AND REBUTTAL     140
   C. UNQUALIFIED STATEMENTS OF LAW     141
   D. UNQUALIFIED OPINIONS OF GUILT     141
   E. BURDEN-SHIFTING     142
   F. ADMONISHING THE JURY TO IMAGINE MOVANT'S GUILT     142
   G. STOKING PASSION OR PREJUDICE IN THE JURY     143

XXII.   CONCLUSION     144

## BRANDI CHANNON'S 2255 MEMORANDUM CASELAW IN SUPPORT

*Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co.*, 891 F.2d 772, 779-80 (10th Cir. 1989) ..................................... 95

*AF Holdings v. Chris Rogers*, Dkt. 14, 3:12-cv-01519-BTM-BLM (S.D.Cal. 2013) ............................................................ 71

*Allen v. State*, 821 P.2d 371, 375-76 (Okl.Cr. 1991) ................. 41

*Allen v. U.S.*, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968) ............ 66

*Am. Bancard, LLC v. E. Payment Sols., Inc.* 18-cv-80681-BLOOM/Reinhart (Order on MTD, S.D.Fl. 2018) ...................................... 125

*Anderson v. Liberty Lobby, Inc*, 477 U.S. at 249 (1986) ............. 135

*Arizona v. Fulminante*, 499 US 279, 308 (1991) ..................... 68

*Arizona v. Youngblood*, 488 US 51, 109 S.Ct. 333, (1988, J. Blackmun dissenting) ...................................................... 119

*Associates in Adolescent Psychiatry, S.C., v. Home Life Ins. Co.*, 941 F.2d 561, 570-71, (7th Cir. 1991) ............................... 130

*Austin v. U.S.*, 409 U.S. 602 (1993) ............................... 71

*Ballard v. U.S.*, 329 U.S. 187 (1946) .............................. 79

*Banks v. Reynolds*, 54 F.3d 1508 (10th Cir. 1995) .................. 83

*Baranski v. Fifteen Unknown Agents*, 452 F.3d 433, (6th Cir. 2006) .. 33

*Barker v. Wingo*, 407 U.S. 514, (1972) ............................. 95

*Barnes v. State*, 220 Miss. 248 (S.C. Miss., 1954) ................. 68

*Barnes v. U.S.*, 412 U.S. 837, 850 (1973, J. DOUGLAS, dissenting) ... 23

*Batson v. Kentucky*, 476 U.S. 85-86 (1986) ......................... 80

*Beazell v. Ohio*, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925) ... 40,41

*Beler v. Blatt*, 480 F.3d 470 (7th Cir. 2007) ...................... 86

*Berger v. U.S.*, 295 U.S. 78, 88 (1935) ............................ 138

*Berkemer v. McCarty*, 468 U.S. 420, 438 (1984) ..................... 52

*Blount Fin. Servs. Inc. v. Walter E. Heller Co.*, 819 F.2d 151, 153 (6th Cir. 1987) ....................................................... 130

*Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct 2777, 73 L.Ed.2d 534 (1982) ............................................................ 17

*Bordenkircher v. Hayes*, 434 U.S. 360 (1978) ....................... 93

*Bouie v. City of Columbia*, 378 U.S. 347, 353, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964) ............................................... 41

*Brooks v. Tennessee*, 406 U.S. at 613, 92 S.Ct. at 1895 ............ 46

*Brown v. Illinois*, 422 U.S. 590, 604 (1975) ....................... 49

*Brumark Corp. v. Samson Resources Corp*, 57 F.3d 941 (10th Cir. 1995) .. 134

*Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) .................. 75

*Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011) ................... 90

*Caldwell v. Lewis*, 414 Fed.Appx. 809 (6th Cir. 2011) .............. 129

*California v. Beheler*, 463 U.S. 1121 (S. Ct. 1983) ................ 47

*Clark v. Clarke*, 14-6615 (4th Cir. 2016) .......................... 111

*Cleveland v. U.S.*, 531 U.S. 12 (2000) ............................. 24

*Cobbler Nevada, LLC v. Gonzales*, 17-35041 (9th Cir. 2018) ......... 72

*Coleman v. Saffle*, 869 F.2d 1377, 1385 (10th Cir. 1989) ........... 42

*Collins v. Youngblood*, 497 U.S. 46, 110 S.Ct. at 2721 (1990) ...... 40

*Commil USA, LLC v. Cisco Sys., Inc.* 2012-1042 (Fed. Cir. 2013) .... 95

*Commonwealth v. Taft*, J. S58007/17 (Sup. Ct. Penn. 2018) .......... 121

*Corbitt v. New Jersey*, 439 U.S. 212, 225 (1978) ................... 93

*Costello v. U.S.*, 350 U.S. 359 (1956) ............................. 75

*Cross v. U.S.*, 122 U.S.App. D.C. 283, 285 (1965) .................. 66

*Darden v. Wainwright*, 477 U.S. 168, 178-79 (1986) ................. 142

*Davis v. Duplantis*, 448 F.2d 921 (5th Cir. 1971) .................. 77

*Dennis v. United States*, 384 U.S. 855 (1966) ................................................ 82
*Devine v. New Mexico Dep't of Corrections*, 866 F.2d 339, 342, 344 (10th Cir. 1989) ............................................................................................................ 41
*Dixon v. Snyder*, 266 F.3d 693 (7th Cir. 2001) ............................................. 116
*Dobbert v. Florida*, 432 U.S. 282, 293, 97 S.Ct. 2290, 229, 53 L.Ed.2d 344 (1977) ..................................................................................................... 41
*Dombrowski v. Eastland*, 387 U.S. 82 (1967) .............................................. 120
*Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009) .................................. 83
*Duren v. Missouri*, 439 U.S. 357 (1979) ......................................................... 78
*Edens v. Hannigan*, 87 F.3d 1109 (10th Cir. 1996) ...................................... 93
*Edwards v. Balisok*, 520 U.S. 641 (1997) ....................................................... 68
*Environ Prods., Inc. v. Furon Co.*, 215 F.3d 1261, 1266–67 (Fed. Cir. 2000) .......................................................................................................... 95
*Escobedo v. Illinois*, 378 U.S. 478 (1964) ................................................. 54, 57
*Floyd v. Meachum*, 907 F.2d 347 (2nd Cir. 1990) ....................................... 139
*Freeman v. Lane*, 962 F.2d 1252 (7th Cir. 1991) ........................................ 144
*Frisbie v. U.S.*, 157 U.S. 160 (1895) ................................................................ 64
*Gaither v. U.S.*, 413 F.2d 1061 (D.C. Cir. 1969) ........................................... 61
*Gerena v. Puerto Rico Legal Services, Inc.*, 697 F.2d 447, (1st Cir. 1983) ........................................................................................................... 15
*Gibbons v. Lambert*, 358 F.Supp.2d 1048, (D. Utah 2005) ......................... 88
*Gilson v. Sirmons*, 520 F.3d 1196, 10th Cir. 2008) ...................................... 41
*Grady v. Artuz*, 931 F.Supp. 1048 (S.D.N.Y., 1996) ..................................... 29
*Gugliemi v. Fed. Bureau of Prisons*, 2013 WL 6844776 (D. Nev. 2013) ......... 15
*Guinan v. U.S.*, 6 F.3d 468, (7th Cir. 1993) ................................................... 33
*Hammond v. Brown*, 323 F. Supp. 326, (N.D. Ohio, 1971, affirmed as 450 F.2d 480, 6th Cir. 1971) ............................................................................. 63
*Harleysville Mutual Insurance Company v. Gray*, 1:2011-CV-234 (W.D.N.C. 2012) .......................................................................................................... 4
*Harrington v. Richter*, 131 S.Ct. 770, 789 (2011) ...................................... 114
*Heinrich Ex Rel. Heinrich v. Sweet*, 62 F.Supp.2d 282, D.Mass. 1999) ...... 17
*Hopkinson v. Shillinger*, 645 F.Supp. 374, 420 (D.Wyo. 1986) ................... 88
*Hubsch v. U.S.*, 256 F.2d 820, 823–24 (5th Cir. 1958) ................................. 38
*Hunter v. State of N.M.*, 916 F.2d 595, 598 (10th Cir. 1990) ...................... 30
In re Bittorrent Adult Film Copyright Infringement Cases, 2012 WL 1570765, at *3 (E.D.N.Y. May 1, 2012) ............................................... 71
*In Re: Hostetter*, (Ore. Sup. Ct S056471) .................................................... 34
*Ingenuity 13 LLC v. Doe*, Dkt. 48, 2:12-cv-8333-ODW(JCx) (C.D.Cal. 2012) ......................................................................................................... 71
*J.E.B. v. Alabama*, 511 U.S. 127 (1994) ........................................................ 80
*Johnson v. U.S.*, 613 A.2d 888 (D.C.C.A. 1992) .......................................... 131
*Jones v. Georgia*, 389 U.S. 24, 25, 88 S.Ct 4, 19 L.Ed.2d 25 (1967) ........... 79
*Jones v. U.S.*, 119 U.S.App.D.C. 213, 214 n. 3 (1964) ................................. 66
*Jurado v. Davis*, 08-cv-1400-jls (S.D.Cal. 2018) ........................................ 143
*Kalina v. Fletcher*, 522 U.S. 118, 126 (1997) ............................................... 75
*Kann v. U.S.*, 323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944) .... 37
*Kann v. U.S.*, 323 U.S. at 94 (1944) ................................................................ 4
*Kaupp v. Texas*, 538 U.S. 626, 633 (2003) ................................................... 49
*Kennedy v. Alvis*, 145 N.E.2d 361 (Ohio C.P. 1957) .................................... 67
*King v. U.S.*, 125 U.S.App.D.C. at 330 ........................................................... 66
*Kotteakos v. U.S.*, 328 U.S. 750, 765 (1946) ............................................... 66
*Kusnetsky v. Insurance* Co., 313 Mo. 143 (Sup. Ct. of Missouri, 1926) ...... 3
*Laird v. Air Carrier Engine Serv.*, 263 F.2d at 952 (5th Cir. 1959) ......... 77
*Lambert v. Midwest City Mem'l Hosp. Auth*, 671 F.2d 372 (10th Cir. 1982) ......................................................................................................... 143

*Lawrence v. Armontrout*, 900 F.2d 127 (8th Cir. 1990) .......................................... 114

*Le v. Mullin*, 311 F.3d 1002 (10th Cir. 2002) .......................................................... 140

*Lego v. Twomey*, 404 U.S. 477, 488–89 (1972) ....................................................... 60

*Lennon v. Miller*, 66 F.3d 416 (2nd Cir. 1995) ........................................................ 53

*Liteky v. U.S.*, 510 U.S. 555 (1994) ........................................................................ 69

*Little v. U.S.*, 73 F.2d 861 (10th Cir. 1932) ............................................................ 32

*LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988) ............................................... 112

*Lowenburg v. U.S.*, 156 F.2d 22 (10th Cir. 1946) ...................................................... 2

*Malibu Media v. Pelizzo*, 1:12–cv–22768, Dkt. 58 (S.D.Fla. 2014) ..................... 72

*Mangianello v. City of New York*, 07 Civ 3644, (S.D.N.Y. 2008) .......................... 74

*Marks v. U.S.*, 260 F.2d 377, 383 (10th Cir. 1958), cert. denied, 358
   U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959) ................................................... 140

*Marks v. U.S.*, 430 U.S. 188, 191–192, 97 S.Ct. 990, 992–93, 51 L.Ed.2d
   260 (1977) .......................................................................................................... 41

*Massiah v. U.S.*, 377 U.S. 201 (1964) ...................................................................... 57

*Massie v. Commonwealth*, 93 Ky. 598, 20 S.W. 704 .............................................. 69

*McGhee v. Pottawattamie County*, 547 F.3d 922 (8th Cir. 2008) .......................... 75

*MEMdata, LLC v. Intermountain Healthcare, Inc.* 2:08–CV–190 (D.Utah
   2010) ................................................................................................................... 92

*Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 2451, 96 L.Ed.2d. 351
   (1987) .................................................................................................................. 41

*Miller v. Meyer*, 2:14–cv–101 (S.D.Ohio 2014) ...................................................... 74

*Miller v. Mullin*, 354 F.3d 1288 (10th Cir. 2004) ................................................. 143

*Miller v. Universal City Studios*, 650 F.2d 1365 (5th Cir. 1981) .......................... 117

*Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009) ................................. 135

*Moore v. Gibson* 195 F.3d 1152, 1172 n.11 (10th Cir. 1999) ............................... 143

*Moore v. Valder*, 65 F.3d 189 (D.C.C.A. 1995) ...................................................... 75

*Moreno v. U.S.*, Civ 14–997–JAP–GBW (D.N.M. 2015) ....................................... 81

*Morris v. U.S.*, 564 A.2d 746 (D.C.C.A. 1989) ..................................................... 142

*Nat'l Hockey League [v. Metropolitan Hockey Club, Inc.]*, 427 U.S. 643
   (1976) .................................................................................................................. 88

*NBC v. Communication Workers of America*, 860 F.2d 1022 (11th Cir. 1988)
   ............................................................................................................................. 16

*Neder v. U.S.*, 527 U.S. 1, 25, 119 S.Ct. 1827, 1841, 144 L.Ed.2d 35
   (1999) .................................................................................................................... 3

*Nelson v. U.S.*, 07–3071 (W.D.Mo. 2008) .............................................................. 69

*Nichols v. Sullivan*, 867 F.2d 1250, 1254 (10th Cir. 1989) ................................... 70

*Nix v. Williams*, 467 U.S. 431 (1984) ...................................................................... 53

*North v. U.S.*, 530 A.2d 1161, 1162–63 (D.C. 1987) ........................................... 131

*Ouber v. Guarino*, 293 F.3d 19 (1st Cir. 2002) ................................................... 114

*Panama Ref. Co. v. Ryan*, 293 U.S. 388, 421 (1935) ............................................ 19

*Parr v. U.S.*, 363 U.S. at 393 (1960) ....................................................................... 4

*People v. Williams*, 239 Ill.2d 119 (2010) .............................................................. 19

*Piñon–Ayon v. U.S.*, 12–CV–17–ABJ, (D.Wyo. 2013) .......................................... 94

*Porter v. U.S.*, 769 A.2d 143 (D.C.C.A. 2001) .................................................... 105

*Re Confiscation Cases*, 20 Wall. 92, 87 U.S. 92, 104, 22 L.Ed. 320
   (1873) .................................................................................................................. 10

*Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, (2nd Cir. 1997) ...... 45

*Roome v. Jennings*, 2 Misc. 257, 21 N.Y.S. 938, (N.Y.C.P. 1893) ................. 85

*Russell v. U.S.*, 369 U.S. 749 (1962) ........................................................... 2, 31, 65

*Schneckloth v. Bustamante*, 412 U.S. 218, 228–29 (1973) .................................... 60

*Sherman Ex Rel. Situated v. Yahoo! Inc.*, 13–cv–41–GPC–WVG (S.D. Cal,
   2015) ................................................................................................................. 120

*Sherman v. U.S.*, 356 U.S. 369, 78 S.Ct. 819 (1958) ............................................ 14

*Shultz v. Rice*, 809 F.2d 643, 654–55 (10th Cir. 1986) ....................................... 133

*Smith v. Aldridge*, 17-6149 (10th Cir. 2018) ................................................ 137
*Sorich v. U.S.*, 555 U.S. 1204, 1205 (Scalia, J., dissenting from denial
   of certiorari) ................................................................................................ 4
*Sorrells v. U.S.*, 287 U.S. 435, 53 S.Ct. 210, (1932) ................................... 15
*Spano v. New York*, 360 U.S. 315, 326 (1959) ............................................. 57
*Stans v. Gagliardi*, 485 F.2d 1290 (2nd Cir. 1973) .................................... 76
*State v. Armijo*, 38 N.M. 73 (N.M.S.C. 1933) ............................................. 69
*State v. Grothmann*, 13 N.J. 90, 94-95 (S.C.N.J. 1953) ............................. 28
*State v. Orona*, 92 N.M. 450 (N.M.S.C. 1979) ............................................. 32
*State v. Roman*, 240 Kan. 611, 731 P.2d 1281 (S.C.Kan. 1987) .............. 77
*State v. Startup, 39 N.J.L. 423 (S.C.N.J. 1877)* ......................................... 28
*Steinkuehler v. Meschner*, 176 F.3d 441 (8th Cir. 1999) ......................... 34
*Stirone v. U.S.*, 361 U.S. 212, 217-18 (1960) ............................................. 31
*Strickler v. Greene,* 527 U.S. at 281-82, (1936) ......................................... 83
*Strunk v. U.S.*, 412 U.S. 434, 93 S.Ct. 2260 (S.Ct. 1973) ......................... 99
*Sylvester v. U.S.*, 15-1782 (6th Cir. 2017) ................................................... 98
*Theokary v. Shay (In re Theokary,* 3rd Cir. 2015) ..................................... 87
*Thornburg v. Mullin*, 422 F.3d 1113 (10th Cir. 2005) .............................. 140
*Towns v. Smith*, 395 F.3d 251, 258-61 (6th Cir. 2005) ............................. 129
*Tumey v. Ohio*, 273 U.S. 510 (1927) ..................................................... 68, 70
*Turns v. Commonwealth*, 6 Met. 224, 233, (1843) ..................................... 65
*U.S. ex rel O'Donnell v. Countrywide Home Loans*, 822 F.3d 650, 658 (2nd
   Cir. 2016) ..................................................................................................... 39
*U.S. v. Affleck*, 765 F.2d 944, 948 (10th Cir. 1985) ................................... 42
*U.S. v. Agurs*, 427 US 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) ...... 35
*U.S. v. Almaraz*, 306 F.3d 1031, 1037 (10th Cir. 2002) ........................... 94
*U.S. v. Apodaca*, 843 F.2d 421, 428 (10th Cir. 1988) ............................... 30
*U.S. v. Badders*, 240 US 391, 36 S.Ct. 367 (1916) ..................................... 36
*U.S. v. Barajas*, 14-2475-JWL, (D.Kan. 2015) .......................................... 137
*U.S. v. Becerra*, 992 F.2d at 963 (9th Cir, 1993) ....................................... 18
*U.S. v. Bermea* (30 F.3d 1539, 1567 (5th Cir. 1994) ................................ 102
*U.S. v. Black, 830 F.3d 1099 (*10th Cir. 2016) ........................................... 109
*U.S. v. Blackaby*, Motion for Suppression, (E.D.Ky. 2018) ..................... 49
*U.S. v. Boston*, 249 Fed.Appx. 807 (11th Cir. 2007) ........................... 43, 44
*U.S. v. Brown*, 79 F.3d at 1559 (11th Cir. 1996) ......................................... 5
*U.S. v. Bryant*, 523 F.3d 349, 362 (D.C. Cir. 2008) ................................... 80
*U.S. v. Buchanan*, 787 F.2d 477 (10th Cir. 1986) .................................... 116
*U.S. v. Cano-Varela*, 497 F.3d 1122 (10th Cir. 2007) ............................... 69
*U.S. v. Carleo*, 576 F.2d 846, 851 (10th Cir.), cert denied, 439 U.S.
   850 (1978) ................................................................................................. 139
*U.S. v. Carver*, 160 F.3d 1266 (10th Cir. 1998) ......................................... 69
*U.S. v. Casallas*, 59 F.3d 1173, 1178 (11th Cir. 1995) ............................. 69
*U.S. v. Cash*, 733 F.3d 1264 (10th Cir. 2013) ............................................. 51
*U.S. v. Chance*, 306 F.3d 356, 369 (6th Cir. 2002) .................................. 117
*U.S. v. Chee*, 514 F.3d 1106 (10th Cir. 2008) ............................................. 49
*U.S. v. Chiavola,* 744 F.2d 1271, (7th Cir. 1984) ..................................... 119
*U.S. v. Clemons*, 843 F.2d 741 (3rd Cir. 1988) ............................................. 9
*U.S. v. Cooper*, 956 F.2d 960 (10th Cir. 1992) ......................................... 105
*U.S. v. Corbitt*, 996 F.2d 1132, 1135 (11th Cir. 1993) .............................. 69
*U.S. v. Coyle*, 63 F.3d 1239 (3rd Cir. 1995) ............................................... 84
*U.S. v. Crandall*, 525 F.3d 907, 912 (9th Cir. 2008) ................................. 12
*U.S. v. Crim*, 527 F.2d 289 (10th Cir. 1975) ............................................... 38
*U.S. v. Cronic*, 900 F.2d 1511, 1516 (10th Cir. 1990) ................................. 5
*U.S. v. Curtis*, 506 F.2d 985 (10th Cir. 1974) ............................................... 9
*U.S. v. Davila*, 133 S.Ct.2139 (2013) ......................................................... 70

*U.S. v. Daychild*, 357 F.3d 1082, 1091 n.10 (9th Cir. 2004) ......................... 102
*U.S. v. de Francisco-Lopez*, 939 F.2d 1405, 1410-11 (10th Cir. 1991) .... 128
*U.S. v. De La Cruz (S.D.Tex. 2018)* ................................................................. 34
*U.S. v. De La Torre,* 599 F.3d 1198, 1204 (10th Cir. 2010) .......................... 95
*U.S. v. Doran*, 882 F.2d 1511, (10th Cir. 1989) ............................................. 109
*U.S. v. Falcon*, 766 F.2d 1469, 76 (10th Cir. 1985) ........................................ 60
*U.S. v. Francis*, 170 F.3d 546, 553 (6th Cir. 1999) ...................................... 144
*U.S. v. Frazier*, 53 F.3d 1105, (10th Cir. 1995) ............................................ 22
*U.S. v. Gabriel,* 715 F.2d 1447 (10th Cir. 1983) ........................................... 141
*U.S. v. Galbraith*, 20 F.3d 1054, 1056 (10th Cir. 1994) ................................. 7
*U.S. v. Gardner*, 490 F.2d 840 (5th Cir. 1974) ................................................ 4
*U.S. v. Gault*, 141 F.3d 1402-03 (10th Cir. 1998) ......................................... 79
*U.S. v. Gendron*, 18 F.3d 955, 961-62 (1st Cir. 1994) .................................. 17
*U.S. v. George*, 477 F.2d 508, (7th Cir. 1973) ............................................... 37
*U.S. v. Gilmer*, 814 F.Supp. 44 (D. Colo. 1992) ............................................ 21
*U.S. v. Goodwin*, 457 U.S. 368 (1982) ........................................................... 93
*U.S. v. Goxcon-Chagal*, CR 11-2002 JB, (D.N.M. 2012) ............................... 95
*U.S. v. Grady*, 544 F.2d 598 (2nd Cir. 1976) ............................................... 102
*U.S. v. Grisham*, 63 F.3d 1074 (11th Cir. 1995) ........................................... 78
*U.S. v. Gurolla*, 333 F.3d 944 (9th Cir. 2003) ............................................... 18
*U.S. v. Haddock*, 956 F.2d 1534 (10th Cir. 1992) ........................................ 11
*U.S. v. Hanley*, 190 F.3d 1017 (9th Cir. 1999) ........................................... 130
*U.S. v. Hasson*, 333 F.3d 1264 (11th Cir. 2003) ............................................. 5
*U.S. v. Hathaway*, 798 F.2d 902, 910 (6th Cir. 1986) ................................. 134
*U.S. v. Henry*, 447 U.S. 264, 271 (1980) ....................................................... 56
*U.S. v. Hess*, 124 U.S. 483, 487 (1888) ......................................................... 28
*U.S. v. Hicks*, 779 F.3d 1163 (10th Cir. 2015) .............................................. 97
*U.S. v. Holzer*, 816 F.2d 304, 309 (7th Cir. 1987) ......................................... 3
*U.S. v. Hopkins*, 744 F.2d 716, 718 (10th Cir. 1984) .................................... 11
*U.S. v. Hornung*, 848 F.2d 1040, 1046 (10th Cir. 1988) ............................. 134
*U.S. v. Ienco*, 92 F.3d 564 (7th Cir. 1996) .................................................. 135
*U.S. v. Izydore*, 167 F.3d 213, 219 (5th Cir. 1999) ...................................... 72
*U.S. v. Jackson*, 749 F.Supp.2d 19 (N.D.N.Y. 2010) ................................... 104
*U.S. v. Jackson*, 88 F.3d 845 (10th Cir. 1996) .............................................. 60
U.S. v. Jenkins, 92 F.3d 430, 438 (6th Cir. 1996) ......................................... 109
*U.S. v. Johnson*, 29 F.3d 940 (5th Cir. 1994) .............................................. 107
*U.S. v. Jones,* (U.S. Supreme Court, 1889) ................................................... 20
*U.S. v. Kendall*, 766 F.2d 1426 (10th Cir. 1985) ......................................... 127
*U.S. v. Koerber*, 281 F. Supp. 3d 1185 (10th Cir. 2017) ...................... 96, 105
*U.S. v. Kraus*, 137 F.3d 447, 452 (7th Cir. 1998) ......................................... 69
*U.S. v. Lampley*, 127 F.3d 1231 (10th Cir. 1997) ........................................ 93
*U.S. v. Latimer*, 511 F.2d 498, 503 (10th Cir. 1975) ................................. 139
*U.S. v. Lewis*, 313 Fed.Appx. 703 (5th Cir. 2009) ........................................ 84
*U.S. v. Liss*, 137 F.2d 995, 1002-03 (2nd Cir. 1943) .................................... 73
*U.S. v. Long*, 900 F.2d 1270, 1275 (8th Cir. 1990) ...................................... 102
*U.S. v. Lopez*, 437 F.3d 1059 (10th Cir. 2006) .............................................. 51
*U.S. v. MacKenzie*, 170 F. Supp. 797, 799 (D.Me. 1959) .......................... 9, 10
*U.S. v. Mann*, 884 F.2d 532, 536-7 (10th Cir. 1989) ................................... 11
*U.S. v. Maravilla*, 566 Fed. App'x. 704 (10th Cir. 2014) ............................. 62
*U.S. v. Marshall,* 2011 WL 3924160 (D. Conn. 2011) ................................. 62
*U.S. v. Marshall*, 935 F.2d 1298,1302 (D.C. Cir. 1991) ............................. 102
*U.S. v. Mayorqui-Rivera*, 87 F.Supp.3d 1288, 1291 (D. Colo. 2015) .......... 116
*U.S. v. Maze*, 414 U.S. at 402 (1974) .............................................................. 4
*U.S. v. McKeighan*, 685 F.3d 956, 973 (10th Cir. 2012) ............................. 137

*U.S. v. Mendoza-Salgado*, 964 F.2d 993, 1016 (10th Cir. 1992) ..................... 77
*U.S. v. Miller*, 771 F.2d 1219, 1237 (9th Cir. 1985) ................................. 89
*U.S. v. Mobile Materials, Inc.*, 871 F.2d 902 (10th Cir. 1989) .................... 96
*U.S. v. Montgomery,* 390 F.3d 1013, 1017 (7th Cir. 2004) ........................ 43, 44
*U.S. v. Mora*, 135 F.3d 1351, 1355 (10th Cir. 1998) ............................... 102
*U.S. v. Nagib*, 56 F.3d 798 (7th Cir. 1995) ...................................... 135
*U.S. v. Nardello*, 393 U.S. 286, 294 (1969) ...................................... 84
*U.S. v. Navarro-Vargas*, 408 F.3d 1184, 1213 (9th Cir. 2005) ..................... 64
*U.S. v. Nill*, 518 F.2d 793 (5th Cir. 1975) ...................................... 14
*U.S. v. Nolan*, 551 F.2d 271 (1977) .............................................. 127
*U.S. v. Oldman*, 2:00-CR-222, (D. Utah. 2001) ..................................... 57
*U.S. v. Olivo*, 69 F.3d 1057 (10th Cir. 1995) ................................... 133
*U.S. v. Pelaes*, 790 F.2d 254 (2nd Cir. 1986) .................................... 56
*U.S. v. Pendergraft*, 297 F.3d 1198, (11th Cir. 2002) ............................ 39
*U.S. v. Perdue*, 8 F.3d 1455 (10th Cir. 1993) .................................... 48
*U.S. v. Peterman*, 841 F.2d 1474, 1477 (10th Cir. 1988) .......................... 30
*U.S. v. Price*, 655 F.2d 958 (9th Cir. 1981) ..................................... 38
*U.S. v. Rantz*, 862 F.2d 808 (10th Cir. 1988) .................................... 45
*U.S. v. Reece*, 86 F.3d 994, 996-97, (10th Cir. 1996) ........................... 128
*U.S. v. Restivo*, 8 F.3d 274 (5th Cir. 1993) ..................................... 31
*U.S. v. Rigas*, 281 F.Supp.2d 660, (S.D.N.Y. 2003) ............................... 29
*U.S. v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990, en banc) .................. 143
*U.S. v. Roberts*, Memorandum Order, 11-cr-0018, (E.D.Pa 2012) .................... 48
*U.S. v. Rojas-Contreras*, 474 U.S. at 235-36 (1985) ............................. 102
*U.S. v. Roman*, 822 F.2d 261, 263-64 (2nd Cir. 1987) ............................ 102
*U.S. v. Rufai*, 732 F.3d 1175 (10th Cir. 2013) .................................. 139
*U.S. v. Rushin*, 642 F.3d 1299 (10th Cir. 2011) ................................. 102
*U.S. v. Saleh*, 875 F.2d 535,537 (6th Cir. 1989) ................................. 29
*U.S. v. Salemme*, 91 F.Supp.2d 141, 204, (D. Mass. 2009) ......................... 43
*U.S. v. Salerno*, 937 F.2d 797 (2nd Cir. 1991) .................................. 135
*U.S. v. Salman*, 241 F.Supp.3d 1288 (M.D.Fl., 2017) .............................. 43
*U.S. v. Sarno*, 456 F.2d 875, (1st Cir. 1972) .................................... 36
*U.S. v. Segal*, 649 F.2d 599, 604 (8th Cir. 1981) ............................... 139
*U.S. v. Sewar*, 468 F.2d 236, 237 (9th Cir. 1972) ............................... 126
*U.S. v. Sharpnack*, 355 U.S. 286 (1958) .......................................... 19
*U.S. v. Shinault*, 147 F.3d 1273 (10th Cir. 1998) ................................ 79
*U.S. v. Smalls*, 605 F.3d 765 (10th Cir. 2010) ................................... 60
*U.S. v. Sorensen*, 276 Fed.Appx. 758 (10th Cir. 2008) ............................. 2
*U.S. v. Spottsville*, 05-50095 (E.D.Mich. 2006) .................................. 49
*U.S. v. Stine*, 15-1449 (10th Cir. 2016) ........................................ 109
*U.S. v. Sturdivant*, 244 F.3d 71, 75 (2nd Cir. 2001) ............................. 29
*U.S. v. Taylor*, 663 F. Supp.2d 1157, 1163 (D.N.M. 2009) ......................... 78
*U.S. v. Test*, 550 F.2d 577, 591 (10th Cir. 1976) ................................ 78
*U.S. v. Thomas*, 788 F.2d 1250, 1258 (7th Cir. 1986) ............................ 102
*U.S. v. Tranakos*, 911 F.2d 1422 (10th Cir. 1990) ............................... 107
*U.S. v. Vasco*, 564 F.3d 12 (1st Cir. 2009) ...................................... 17
*U.S. v. Wacker*, 72 F.3d 1453, 1474 (10th Cir. 1995) ............................. 31
*U.S. v. Wang*, 898 F. Supp. 758 (D. Colo, 1995) .................................. 25
*U.S. v. Webb*, 480 F.Supp. 750 (E.D.N.Y. 1979) ................................... 49
*U.S. v. Webster* (778 F.Supp. 2d 237, N.D.N.Y. 2011) ............................. 47
*U.S. v. Weimert*, 819 F.3d 351 (7th Cir. 2016) ................................. 4, 12
*U.S. v. Welch*, 327 F.3d 1081 (10th Cir. 2003) .................................... 2
*U.S. v. Williams*, 429 F.3d 767, 772 (8th Cir. 2005) ............................. 43
*U.S. v. Williams*, 615 F.3d 657, 669 (6th Cir. 2010) ............................. 49

*U.S. v. Winans,* 612 F.Supp. 827, (S.D.N.Y. 1985) ..................................... 12
*U.S. v. Womack,* 985 F.2d 395, 397-98 (8th Cir. 1993) ......................... 80
*U.S. v. Wormer,* 80 U.S. 25 (1871) ................................................................ 13
*U.S. v. Young Bros., Inc.,* 728 F.2d 682, 694 (5th Cir. 1984) ...................... 90
*U.S. v. Young,* 470 U.S. 1 (1985) ................................................................. 142
*U.S. v. Young,* 528 F.3d 1294, 1296 (11th Cir. 2008) .......................... 102
*U.S. v. Young,* 78 F.3d 758, 760 (1st Cir. 1996) ............................... 17
*U.S. v. Younger,* 398 F.3d 1179 (9th Cir. 2005) ..................................... 141
*Wagenmann v. Adams,* 829 F.2d 196, 209-11 (1st Cir. 1987) ................ 16
*Warden v. Payton,* 544 U.S. 133, 160 (2005) ................................. 141
*Washington v. Texas,* 388 U.S. 14, 87 S.Ct. 1920 (1967) .................. 115
*Wesley v. Snedeker,* 04-CV-17-JB-DJS (D.N.M. 2007) ....................... 70
*Williams v. U.S.,* 343 F.3d 927 (8th Cir. 2003) .............................. 112
*Williams v. U.S.,* 458 U.S. 279, 284-285 (1982) ............................. 5
*Williamson v. Ward,* 110 F.3d 1508, 1522 (10th Cir. 1997) ................. 33
*Wilson v. Sirmons,* 536 F.3d 1267 (10th Cir. 2008) ......................... 143
*Withrow v. Williams,* 507 U.S. 680, 708-09 (1993, O'Connor dissenting) . 48
*Zedner v. U.S.,* 547 U.S. 489, 503 n.5 (2006) ............................... 98

UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

v.

MATTHEW CHANNON and
BRANDI CHANNON

Civil No. 1:19-CV-00201-JCH

Criminal No. 1:13-cr-00966-JCH-KK

---

**BRANDI CHANNON'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FILED UNDER 28 U.S.C. §2255**

Comes now BRANDI CHANNON, and files this her Memorandum of Law in Support of Motion Filed Under 28 U.S.C. § 2255.

**ISSUES AND SUPPORTING ARGUMENT TOGETHER WITH POINTS AND AUTHORITIES OF LAW**

I. **Movant's Article I Section 1 Right Against Extracongressional Legislation, Article I Section 9 Right Against Ex Post Facto Laws, 6th Amendment Right To Be Informed Of Criminal Charges, 5th Amendment Right To Due Process, And 6th Amendment Right To Assistance Of Counsel, Were Violated When Her Counsel Failed To Challenge The Indictments Against Her For Failure To State A Claim**

The most common shortcoming within legal complaints, even when they require substantially less explanation and imagination, is a failure to effectively state a claim. First, Counsel should have raised, at the outset, a motion to dismiss under Rule 12(B)(3)(b)(V) F.R.Crm.P. Second, Counsel should have raised, but did not raise, a motion to dismiss under Rule 7(C)(1) F.R.Crm.P., the admonition that indictments must be plain, concise, and definite. Counsel never attempted to dismiss any indictment under either basis, with the exception of a narrowly-focused *Cleveland* claim.

Even taken as true, all three indictments relied on multiple failures to state a cognizable claim, none of which should have gone unchallenged from this fundamental standpoint. The battle that Counsel should have fought was not at trial or over evidence but simply over the indictments themselves. Counsel never considered seeking dismissal

1

of any count on either Rule's basis, aside from the *Cleveland* claim, making Counsel's assistance completely inadequate and ineffective. The resulting prejudice required Movant to unfairly have to defend against misstatements of the law while limited to the tools of factual argument at trial.

The insufficiency of the indictment could not have been challenged on appeal.

> [A] defendant may only challenge the validity of his conviction under §2255. See *Bradshaw v. Storey*, 86 F.3d 164, 166 (10th Cir. 1996) (Quoted From *U.S. v. Sorensen*, 276 Fed.Appx. 758 (10th Cir. 2008)).

### A. No Scheme Or Artifice To Defraud Was Alleged

Likewise, both wire fraud (18 USC §1343), as well as conspiracy to commit wire fraud, no matter how charged (18 USC §1349 or 18 USC §2) "must allege a scheme to defraud, an intent to defraud, and use of [] wire." *U.S. v. Welch*, 327 F.3d 1081 (10th Cir. 2003). By allowing this deficiency to go unanswered during each indictment, Counsel allowed the prosecution an unassailable advantage, whereby once jeopardy attached, the Government's fantastic and incoherent assertions of scheme and artifice to defraud became legally manifest, and prosecutors could rely solely on matters the government needed only to have factually proven.

"[S]ome substantial indication of the nature or character of any scheme or artifice to defraud, or to obtain money or property by means of false pretenses, representations or promises is requisite. And it is not sufficient in this regard to merely plead the statutory language." *Cf. Russell v. United States*, 369 U.S. 749, 82 S. Ct. 1038, 8 L. Ed. 2d 240 (1962); *Lowenburg v. United States*, 156 F.2d 22 (10th Cir. 1946).

## B. No Material Pretenses Were Alleged For Account Creations

While the code of 18 USC § 1343 does not mention materiality, the superseding indictments in this case do. "A scheme to defraud requires proof of material misrepresentations, or the omission or concealment of material facts", *Neder v. U.S.*, 527 U.S. 1, 25, 119 S.Ct. 1827, 1841, 144 L.Ed.2d 35 (1999).

The only pretenses alleged throughout the rambling conspiracy count were statements of personal identifying information belonging to the accountholder(s), "using fictitious names, mailing addresses, and phone numbers" and "fictitious schools".

Contrary to the Government's copy-pasted mention of "materially false pretenses and representations" (Dkt. 155, at ¶10), Movant could not defraud OfficeMax by furnishing a fictitious name, address, and phone number incident to account creation alone, whether doing so once, or a million times. Any such pretenses, while admittedly false, are simply immaterial. "We do agree that the words 'scheme or artifice to defraud' don't reach everything that might strike a court as unethical conduct or sharp dealing." *U.S. v. Holzer*, 816 F.2d 304, 309 (7th Cir. 1987).

Fictitious information is often a legal and necessary business practice. In the formation of any business or corporation, state incorporation forms include a blank for "fictitious name". Fictitious data must exist and be submitted to authorities in order to legally validate this information. "The statute requiring one doing business in a fictitious name to register it with the Secretary of State was intended to *prevent* fraud," *Kusnetsky v. Insurance* Co., 313 Mo. 143 (Sup. Ct. of Missouri, 1926, emphasis added). To declare, in blanket fashion, the submission of information about a fictitious business to

be unlawful, is to make the ordinary act of starting a business
unlawful.

"The mail and wire fraud statutes have 'been invoked to impose
criminal penalties upon a staggeringly broad swath of behavior,'
creating uncertainty in business negotiations and challenges to due
process and federalism." (*U.S. v. Weimert*, 819 F.3d 351, 356 (7th Cir.
2016, citing *Sorich v. United States*, 555 U.S. 1204, 1205 (Scalia, J.,
dissenting from denial of certiorari)).)

In *U.S. v. Gardner*, 490 F.2d 840 (5th Cir. 1974), the use of a
fictitious name incident to mail fraud (18 USC §1342) was ruled too
remote to support a conviction, and Congress has not enacted a
corresponding analog law for fictitious names incident to wire fraud.

Moreover, at no point in any indictment was it alleged that this
identifying information was ever accessed by Officemax for use in
consideration as to whether or not to complete any transaction. As far
as the indictment was concerned, the information was stored away to no
other purpose related to commerce. It could thus not have been
material. *Kann v. U.S.*, 323 U.S. at 94 (1944); *Parr v. U.S.*, 363 U.S.
at 393 (1960); and *U.S. v. Maze*, 414 U.S. at 402 (1974), have well
established that not all fictitious information disclosed is material
to a scheme.

This indictment "fails to allege any facts that would give rise
to a claim that [Officemax] was actually deceived or otherwise relied
upon the Defendant's misrepresentations." *Harleysville Mutual Insurance
Company v. Gray*, 1:2011-CV-234 (W.D.N.C. 2012).


**C. No Pretenses, Material Or Otherwise, Were Accurately Alleged For
Other Acts In Furtherance**

Even taken as true, for counts 2-5 in the superseding
indictments, Movant and her Co-Defendant made no pretenses at all,
other than they were submitting actual ink cartridges for credit, which
was never in dispute. No identification was sought nor offered during

any of the thousands of alleged transactions. The transaction was as simple as an anonymous low-dollar cash deposit to a store account: no pretenses can be alleged, and thus, the act of anonymous tendering cannot be an act of wire fraud.

> "A person of ordinary prudence would not rely on all misrepresentations. Puffery, for example, is not part of a scheme to defraud because a person of ordinary prudence would not rely on it; nor would a person of ordinary prudence engaged in an arm's length purchase rely on the seller's representations regarding the market value of the property when the market value can be, and should be, easily verified by consulting other sources." *U.S. v. Brown*, 79 F.3d at 1559 (11th Cir. 1996), from *U.S. v. Hasson*, 333 F.3d 1264 (11th Cir. 2003).

*Williams v. U.S.*, 458 U.S. 279, 284-285 (1982) held that the writing of a check [in a kiting scheme] does "not involve the making of a 'false statement'" because a check does not "make any representation as to the state of [the customer's] bank balance." While a bag of ink cartridges accompanied by a printed 9-digit account number is not an exact analog of a check for purposes of *Williams*, the check is more authenticating, rather than less, and it still fails to count as a false representation.

> "If no representation is made by passing a bad check, either as to the state of the maker's bank balance or otherwise, *Williams v. United States, United States v. Bonnett*, nothing is left in the bare check kite itself which *can* be a misrepresentation, absent other acts or communication." *U.S. v. Cronic*, 900 F.2d 1511, 1516 (10th Cir. 1990).

Counts 2-5 vaguely implied that to leave a store with less than one walked in with, placing faith in the store to pay for what one gave them as agreed in the next 30-120 days, at a price the store set and a schedule they and they alone controlled, where the store could change its mind after the fact (and on occasion did), using an account number the store created for this exact purpose and for no one else, was a

pretense. More accurately, the language of counts 2-5 (Ex. 4) did not allege pretense at all, merely identifying characteristics of alleged uses of wire, especially considering the account information was at the end of the count, implying the decision to associate it was Officemax's. A fatal variance within this claim is that it was never alleged nor proven at trial that the point-of-sale transmissions even included the business or teacher names, so the pretenses could not have existed as alleged.

The 10th Circuit has confronted this exact issue before, in *Cronic*, reversing the conviction. "Because the jury instructions limited the jury's consideration of the evidence to that [scheme to obtain money by means of false or fraudulent pretenses] portion of the statute, and because the government failed to prove any false pretense, representation or promise, [they were] obliged to reverse Cronic's conviction." The jury instructions in this case (Dkt. 298) only contain the term "defraud" in the recitation of the statute and in an ancillary definition. The jury instructions were, according to the same jurisprudence as in *Cronic*, unconstitutionally deficient, and Counsel ineffectively waived objection on this basis.


**D. The Superseding Indictments Failed To Allege That Defendants Transmitted, Or Caused Any Transmission, In Counts 1ss-5ss**

In each retail transaction where Defendants dropped off ink cartridges and supplied an account number, Defendants themselves performed no wire transmissions.

Through sloppy use of passive voice, the superseding indictments claim, "Details of the purchase would then be routed by wire to MaxPerks Rewards computer servers in Illinois, and the purchase would be eventually credited to the customer's MaxPerks account" [Ex. 9, ¶7]. The indictments never state who or what performs or performed the

routing or the crediting. If the Defendants caused wire transmissions, the indictments do not claim so here. Nor do they claim so elsewhere as to counts 1ss-5ss.

Specifically looking at the table in the superseding indictments, and contrasting counts 2ss-5ss with 6ss-7ss, the latter counts allege the phrase "via e-mail" (itself potentially a wire use), but the earlier counts make no mention about what manner and means was used or caused to be used. If Officemax did not use carrier pigeons to transmit data, and instead used a wire means, the indictment never says so.

The elements of the crime of wire fraud are: (1) a scheme to defraud; and (2) use of interstate wire communications to facilitate the scheme. *U.S. v. Galbraith*, 20 F.3d 1054, 1056 (10th Cir. 1994).

Since the superseding indictments' count 1 also manages to omit the word "wire", it along with counts 2-5 are fatally defective and Counsel ineffectively failed to raise this issue with the Court, whether through the aforementioned Rules or on appeal.

### E. What Was Sent, Or Caused To Be Sent, Were Not Alleged To Include Writings, Signs, Signals, Pictures, Or Sounds

Black's Law Dictionary defines "writings" as "letters or marks placed upon paper, parchment, or material substance." No writings as thus defined were overtly alleged in these indictments, since no paper or other hard substance was alleged to have been used at trial. While one might argue a computer might print on paper a representation of what it received, the law is concerned with sending, not receiving, and the indictments were not concerned whatsoever with "writings" except as to copy-paste the term from the proverbial textbook.

"signs" is less well-defined, though Black's Law Dictionary states "signs" pertains merely to signatures. The term could also involve gestures, as with sign language. No signatures or gestures were

alleged in the indictment. Alternatively, it might be redundant with "pictures".

"pictures" might include photographs or videotape. Neither was alleged to have been sent or caused to be sent in the indictment.

"sounds" might include a telephone call or audiotape. Neither was alleged to have been sent or caused to be sent in the indictment.

This leaves the Government with "signals", which Black's Law Dictionary defines as an "electronic, acoustic, or visual means that is used for transmitting a piece of information". When the wire fraud statute was written, all means for quickly transmitting a piece of information across state lines literally used a physical wire, and this is where the term "wire fraud" originated. As of the 21st century, telecommunications across state lines no longer use actual wires, now exclusively using fiber optic, radio, or microwave carriers, none of which are electronic, acoustic, or visual means (nor are they, in fact, wire in nature).

Black's Law Dictionary defines "wire" as "strip of metal that is smaller than 3/16th inches in diameter". The indictments never allege "over wired cable" or "over copper telephone conductors", and through the shortcoming, means the Government never addressed its impossible burden (demonstration of actual wire use) to demonstrate guilt under the wire fraud statute.

Thus, no signals or alternative means of communication were alleged to have been sent or caused to be sent in any indictment.

It would be common prosecutorial practice to conjunctively charge all five methods proscribed by law (writings, signs, signals, pictures, *and* sounds) as a catch-all, but the Government fails to state how any was used, or that any was used, meaning all counts of the superseding indictments failed to allege acts of wire fraud as required by law.

The consequence of charging in the alternative may lead to rendering the indictment insufficient for uncertainty, as in *U.S. v. MacKenzie*, 170 F. Supp. 797, 799 (D.Me. 1959). *Expressio unius est exclusio alterius.*

> What the 'scheme and artifice to defraud', or the 'false and fraudulent pretenses, representations and promises' referred to in the indictment were, is left to speculation. And by the curious comminglement of references to the scheme with allegations of various means utilized to carry it out, the indictment is confusing as well as vague. *U.S. v. Curtis*, 506 F.2d 985 (10th Cir. 1974)

The language in the indictment was vague and confusing to the jury, resulted in a miscarriage of justice, and undermined the jury's verdict. By failing to object on this ground, Counsel was ineffective, causing the jury to convict on any of the conjunctive elements without specifying which one. The Government's presented evidence, even in the most favorable light, simply fails to cover any of the elements (sounds, writings, signals, pictures, and signs).

**F. The Superseding Indictments Failed To State A Conspiracy Claim Due To Use Of Disjunctive And/Or Passive Voice And Failed to Charge In the Conjunctive**

¶11a. "One or both Defendants signed up…"
¶11b. "The name…was used to create…"
¶11c. "…Rewards accounts were registered to…"
¶11d. "One or both Defendants would obtain…One or both Defendants would access.."
¶11l. "Defendants themselves redeemed, or sold to other individuals who redeemed…"

"The passive voice is desirable '[w]hen the agent performing the action is thought of as too unimportant or too obvious to mention and is less significant than the object of the action… [or] [w]hen the agent performing the action is indefinite or unknown" — *U.S. v. Clemons,* 843 F.2d 741 (3rd Cir. 1988). This is not an acceptable standard for an indictment to survive a challenge.

While the replacement of the disjunctive with the conjunctive in an indictment is nearly universally agreed as fraught, jurisprudential practice remains to always reframe disjunctive allegations in the conjunctive, lest they be called into question, as stated in the *US Attorney's Criminal Resource Manual*, ¶227. ¶227 specifically mentions *U.S. v. MacKenzie*, 170 F. Supp. 797, 799 (D.Me. 1959), the precedential opinion where the indictment was ruled insufficient due to uncertainty:

In *Re Confiscation Cases,* 20 Wall. 92, 87 U.S. 92, 104, 22 L.Ed. 320 (1873), the Supreme Court thus stated the reason for the rule:

> "It may be conceded that an indictment or a criminal information which charges the person accused, in the disjunctive, with being guilty of one or of another of several offences, would be destitute of the necessary certainty, and would be wholly insufficient. It would be so for two reasons. It would not give the accused definite notice of the offence charged, and thus enable him to defend himself, and neither a conviction nor an acquittal could be pleaded in bar to a subsequent prosecution for one of the several offences."

While the cases mentioned referred to disjunctive use of two criminal charges (assault *or* battery) or disjunctive use of manner and means (in his possession or custody, *or* under his control), there is no reason "who" should not be every bit as essential as "what" or "how" in the indictment: "Bonnie *or* Clyde robbed the bank", for example. The consequence of charging in the alternative may lead to rendering the indictment insufficient for uncertainty, as in *MacKenzie*.

To take the grammarian out of it, the superseding indictments fail to allege that misrepresentations in the MaxPerks account signups were made with Movant's permission or at her direction.

The indictments likewise fail to allege any overt acts were Movant's, nor was there allegation of "knowledge" of a conspiracy.

These fatal flaws were ineffectively waived by Counsel, prejudicially forcing Movant and Co-Movant to prove a negative: that nobody committed these acts, rather than just Movants.

### G. Affirmative Defenses Were Applicable But Never Raised By Counsel

#### 1. Good Faith

The unsupported narrative that Officemax is an environmentally-minded nonprofit that exists to lose money on its ink recycling program, despite being listed and registered as a profit-seeking corporation that otherwise sets up its programs to make money, would never have caused Movant's conviction if Counsel had enthusiastically raised, early on, a "good faith" defense; namely, that Officemax made money on recycled ink cartridges, and Movant believed in good faith Officemax made money on recycled ink cartridges.

There would be "no error in good faith instruction that defendant acting upon 'honest opinion or belief is not chargeable with fraudulent intent even if his opinion is erroneous or his belief is mistaken or wrong'" *U.S. v. Haddock*, 956 F.2d 1534 (10th Cir. 1992). In fact, the evidence subpoenaed after trial proves Movant's opinion was not erroneous, mistaken, or wrong (Ex. 11, under "Private Label Ink"). Counsel never sought the instruction, whether through oral argument or submitted jury instructions, though Mr. Robert ineffectively laid it on at closing arguments, where it could not produce the intended effect.

"In this circuit, we have held that general instructions on willfulness and intent are insufficient to fully and clearly convey a defendant's good faith defense to the jury." *U.S. v. Mann,* 884 F.2d 532, 536-7 (10th Cir. 1989); *U.S. v. Hopkins*, 744 F.2d 716, 718 (10th Cir. 1984).

The indictment fails to state a claim because good faith is mutually exclusive with a scheme or artifice to defraud, which is an essential element for wire fraud. "With respect to [] wire fraud counts[], good faith would be a complete defense: the burden is on the

government to show lack of good faith beyond a reasonable doubt." *U.S. v. Winans,* 612 F.Supp. 827, (S.D.N.Y. 1985).

Further, Counsel should have argued Movant was engaging in "legitimate services rendered", whether through jury instruction or other methods of advocacy beyond summation, and ineffectively did not. District courts should "take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss." *U.S. v. Crandall,* 525 F.3d 907, 912 (9th Cir. 2008).

In fact, good faith is not mutually exclusive with non-material deception. "[D]eception about negotiating positions—about reserve prices and other terms and their relative importance—should not be considered material for purposes of mail and wire fraud statutes." *U.S. v. Weimert*, 819 F.3d 351, 358 (7th Cir. 2016).

Counsel's failures to raise the matter before or during trial and on appeal were ineffective and highly prejudicial, since Movant was convicted and remanded to house arrest, probation, restitution, and forfeiture as a direct result.


### 2. Express Consent

It is undisputed Officemax expressly authorized Movant to adjust receipts from purchases she did not make. In the affidavit for search warrant [Ex. 13, pg. 10], the Officemax receipt adjustment page explicitly authorizes Movant to adjust a purchase she did not make by stating, "Enter a receipt to receive credit for a purchase made in a store without your MaxPerks ID Card." In this instance, "your" captures the root of the meaning of the web page. Since anyone's card (except the purchaser's) can be used, the indictment's "to which he was not entitled" language is, and always has been, unsupported and conclusory.

This likewise shows that the adjustment page's language is vague and modifies the terms and conditions the Government relied upon as evidence of intent and knowledge (Ex. 96).

No one can defraud another if the other is overtly and explicitly aware of the nature of the transaction they are engaging in, especially while soliciting it, and it does not get much more clear and explicit than express written text, which Officemax prompted before each and every one of its tens of thousands of receipt adjustments.

> "If he chose, under these circumstances, to fling up his contract, he must be content to suffer any incidental damage which he may have incurred in making preparations for its performance. It was a damage voluntarily sustained, and the maxim, volenti non fit injuria, applies to the case." *U.S. v. Wormer*, 80 U.S. 25 (1871).

Counsel was ineffective for failure to raise Express Consent as a jury instruction, affirmative defense, through a defense witness at trial, and/or on appeal. The failure was highly prejudicial, since Movant was convicted and remanded to house arrest, probation, restitution, and forfeiture as a direct result.

### 3. Novation

It was implicitly assumed that Movant defrauded Officemax by taking credit for purchases Movant did not make, but the fact is that a novation took place involving Officemax as the obligor, the original purchaser as the original obligee, and Movant as the new obligee. OfficeMax owed the obligee the ability to gain reward credit, the original obligee waived this ability by opting not to use a rewards card or sign up for one, and most importantly, as in the express consent defense, Officemax specifically wrote to Movant, "enter a receipt…for a purchase made…without your MaxPerks ID card", thus authorizing the novation.

"[N]ovation, which extinguishes the old debt, may be implied from the facts and circumstances attending the transaction and the parties' subsequent conduct…On the other hand, [the] law requires an express agreement that the giving of a promissory note or negotiable instrument shall operate as payment before it can have that effect." *U.S. v. Nill*, 518 F.2d 793 (5th Cir. 1975). Counsel was ineffective for failure to raise novation as a jury instruction, affirmative defense, at trial, and/or on appeal. The failure was highly prejudicial, since Movant was convicted and remanded to house arrest, probation, restitution, and forfeiture as a direct result.

### 4. Entrapment

Judge Learned Hand's famous opinion in *Sherman v. U.S.*, 356 U.S. 369, 78 S.Ct. 819 (1958) laid out a two-prong test for entrapment, since shortened to inducement and predisposition.

To establish a predisposition, or the lack thereof, in this highly complex case, is actually straightforward: would Movant have continued turning in ink cartridges if the inducements (dogged advertising, in addition to received items of value) were taken away? Given that acquiring ink cartridges to tender and nationwide travel were direct expenses Movant could only recoup through the proceeds of the inducements, the state of Movant's mind need not be supposed: the state of her pocketbook, emptied by expenses related to the enterprise but not refilled by any proceeds dependent on inducements, would dictate the answer to be "no" very quickly, if the slightest change to tighten store policies had been enacted.

The legal question then falls to whether OfficeMax and Steven Gardner could be considered agents of law enforcement for the purposes

of inducement of entrapment. Instances where Fifth Amendment rights are

coopted by corporations are not unknown:

> "CCA's authority to incarcerate prisoners stems from its
> agreement with the BOP, a federal agency…Accordingly, although
> CCA is a private entity, it is considered a federal actor rather
> than a state actor for purposes of this case." *Gugliemi v. Fed.*
> *Bureau of Prisons,* 2013 WL 6844776 (D. Nev. 2013).

> "[PRLS] is a federal government actor for purposes of the due
> process clause of the fifth amendment." *Gerena v. Puerto Rico*
> *Legal Services, Inc.*, 697 F.2d 447, (1st Cir. 1983).

These instances, where the constable rents out his badge to the

victim, and the victim and the constable become indistinctly the same

party, are also prejudicial and reversible breaches of fairness of

proceedings:

> The first duties of the officers of the law are to prevent, not
> to punish crime. It is not their duty to incite to and create
> crime for the sole purpose of prosecuting and punishing it. Here
> the evidence strongly tends to prove, if it does not conclusively
> do so, that their first and chief endeavor was to cause, to
> create, crime in order to punish it, and it is unconscionable,
> contrary to public policy, and to the established law of the land
> to punish a man for the commission of an offense of the like of
> which he had never been guilty, either in thought or in deed, and
> evidently never would have been guilty of if the officers of the
> law had not inspired, incited, persuaded, and lured him to
> attempt to commit it. *Sorrells v. U.S.*, 287 U.S. 435, 53 S.Ct.
> 210, (1932).

A publicly traded corporation and its employee would at first

glance seem unlikely agents of law enforcement. If Officemax was a mere

fraud victim, a reasonable degree of corporate investigation and

cooperation with law enforcement would be insufficient to establish

agency. Even the act of paid corporate employee testimony, while under

the reimbursement of the U.S. Government, is not sufficient to

establish agency.

> [W]e address the question as to whether "the State had so far
> insinuated itself into a position of interdependence with the
> [private party] that it was a joint participant in the
> enterprise." *Jackson*, 419 U.S. at 357-58, 95 S.Ct. at 456-57. To
> charge a private party with state action under this standard, the
> governmental body and private body must be intertwined in a

"symbiotic relationship." *Id.* At 357, 95 S.Ct. at 456-57. Recently the Supreme Court has suggested that the symbiotic relationship must involve the alleged constitutional violation. *San Francisco,* ___ U.S. at ___ n.29, 107 S.Ct. at 2986 n. 29. 19 [From *NBC v. Communication Workers of America,* 860 F.2d 1022, 11th Cir. 1988].

In *Wagenmann v. Adams,* 829 F.2d 196, 209-11 (1st Cir. 1987), the Court affirmed the finding that a private citizen was a state actor because of evidence that he exerted influence over a police investigation. To claim Officemax and Steven Gardner merely "exerted influence" would be understatement. "[W]hat happened here involved more an egregious trespass into constitutionally well-marked terrain than an accidental inching across some vaguely defined legal border." *Wagenmann,* at 209.

With reckless abandon, the agency threshold was crossed, through the conduct of the FBI agents and assistant US attorneys in this case, who are duty-bound to maintain a separation between any victim and the powers of law enforcement. The agents and prosecutors arbitrarily and capriciously entered into a conspiracy to informally deputize Gardner as evidenced through the following acts:

• By advising, coordinating, and planning search and seizure of Movant's residence with Gardner;

• By divulging Movant's privileged information to Gardner (including bank statements, checking account routing and transaction numbers, privileged attorney work product regarding Co-Movant's bankruptcy, cable bills, and Co-Movant's college report cards and SAT scores);

• By giving Gardner Movant's personal property seized;

• By treating Gardner as a fellow law enforcement officer, including covering for him when he violated the law;

16

• By teaming with Gardner to iteratively fabricate evidence for which he had no direct custodial access,

• and otherwise befouling the bright line between law enforcer and alleged victim.

The aforementioned acts evidence a symbiotic relationship between Officemax and the Government. Officemax provided the testimony and the evidence, and the Government provided the authority, the immunity from prosecution for the witness, the financial backing, and the ability to charge Movant criminally as the target. Officemax would then get to claim restitution, and the Government would get to claim forfeiture.

> Essentially, the analysis [for showing the existence of an agreement or conspiracy between a government actor and a private party] is whether, due to a sufficient nexus between the private [party] and the United States, "the challenged action of the regulated entity … may be fairly treated as that of the [United States] itself." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct 2777, 73 L.Ed.2d 534 (1982). (From *Heinrich Ex Rel. Heinrich v. Sweet*, 62 F.Supp.2d 282, D.Mass. 1999).

To establish the inducement portion of an entrapment, once the agency of law enforcement can be taken as a given, is easily shown.

> To demonstrate inducement, a defendant must show not only that the government provided the defendant with the opportunity to commit the crime, but also the existence of a "plus" factor that raises concerns of "government overreaching." *U.S. v. Gendron*, 18 F.3d 955, 961-62 (1st Cir. 1994). Examples of overreaching include "intimidation, threats, dogged insistence," *U.S. v. Young,* 78 F.3d 758, 760 (1st Cir. 1996). [quoted in *U.S. v. Vasco,* 564 F.3d 12 (1st Cir. 2009, cites adjusted for consistency).

This case is exemplary of dogged insistence: an entire corporate enterprise, with tens of thousands of employees, devoted to inducement, through thousands of mailings, e-mails, and friendly cashiers who would recognize Movant by sight, continue to engage in commerce with her, and encourage (and in some instances look forward to) her return visits.

Counsel shrugged off Gardner being "in bed with" the prosecution, any and all entrapment claims (including sentencing entrapment, wherein

Gardner continued to induce Movant by leaving accounts open in order to meet the FBI's $100,000 threshold for investigation), and thus ineffectively waived argument, jury instructions, objections and appeal on these bases.

"Only 'slight [entrapment] evidence' entitles a defendant to present his defense to the jury." *U.S. v. Becerra*, 992 F.2d at 963 (9th Cir, 1993, quoted by *U.S. v. Gurolla,* 333 F.3d 944 (9th Cir. 2003), cite fixed).

The prejudice suffered is multifaceted. Movant's Fourth Amendment Right to be secure against unreasonable search was violated through Gardner's access and possession of the fruits of that search. This was not an example of "is this your stolen property?" Movant's bank statements inarguably did not belong to Officemax, nor did materials with the Staples logo, and yet Officemax gained possession of them nonetheless. Movant's Fifth Amendment Right not to be deprived of liberty or property, without due process of law, was violated through the joint and FBI-backed inducement acts supporting entrapment. Counsel's failure was highly prejudicial, since Movant was convicted and remanded to house arrest, probation, restitution, and forfeiture as a direct result.

**H. The Maxperks Rewards Rules Were Not Binding Law**

This is apparently an issue of first impression for Federal Courts, because while a few have fallen victim to confusion as to whose authority it is to write laws they are sworn by oath to interpret, Movant could locate no other decisions that imbued legislative authority in a corporation beyond any branch of Government.

Article I, Section 1, of the U.S. Constitution states, "All legislative Powers herein granted shall be vested in a Congress of the

United States, which shall consist of a Senate and a House of Representatives." Section 8 imbues Congress alone with the "Power…To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers".

"Congress manifestly is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 421 (1935). "The power to make laws under which men are punished for crimes calls for [serious] deliberation…" *U.S. v. Sharpnack*, 355 U.S. 286 (1958).

Yet, Counsel and the Court never questioned that Officemax, Inc. could promulgate its own set of rules with the same force and weight as Congress's. For Movant to be guilty of violating Officemax MaxPerks Terms and Conditions by "violating the rules" was erroneously held by all to be sufficient grounds for convictions under these indictments.

In *People v. Williams*, 239 Ill.2d 119 (2010), the Supreme Court of Illinois affirmed a lower court's ruling that the defendant's violation of "rules and regulations" failed to count as criminal official misconduct, because a police department's "rules and regulations" were not "law" as enacted by a lawmaking body. "[E]ven if the rules and regulations had been codified by the Village as ordinances, they are not "laws" because only the legislature can promulgate a law." *Id*. The defendant in *Williams* was not being charged with violating the rules and regulations, but with official misconduct; just as in this case, Movant was not charged with violating the MaxPerks rules, but with wire fraud, though the rules and regulations were in both cases critical to the flawed indictments anyway. In short, the Government's indictments incorporated the Maxperks Terms and Conditions by reference and used them as de facto elements of the crimes charged.

Reversible error was committed when the Court granted excessive deference to Officemax, Inc., vesting it with the powers reserved to Congress to write laws. As the record shows without exception, particularly at sentencing, the Hon. Judge Herrera revealed no separation between her values for, or cognizance of, the relative importance and necessary remedies for violations of Congress's laws versus violations of Officemax's contracts of adhesion. "It involves all the mischiefs which usually attend the exercise of usurped powers, super-added to those which always accompany private legislation — erroneous conclusions arising from haste and neglect, and the injustice of caprice, favor or corruption." *U.S. v. Jones,* (U.S. Supreme Court, 1889).

Counsel was ineffective for failing to raise this perspective throughout the entirety of the trial, failing to seek dismissal, and failing to appeal on this basis as well.

Prejudice is easily demonstrated: The usurped language ("they were not entitled") within each indictment produces an incoherent failure to state a claim, relying on words like "redeemed", "presented", and "claimed", and never "defrauded", "cheated", "stole", "tricked", or "deceived" except during rote mention of the statute. With these deficiencies, no trial result therefrom could be reliably predicted, and no reasonable jurist would have allowed the result.

**I. The Indictments Did Not Allege The Actual Maxperks Rewards Rules Were Violated**

**1. "One account per person"**

The conclusory narrative, unquestioned by Counsel, that MaxPerks Rewards rules "limited each customer to one MaxPerks account" and that by creating multiple accounts, Movant violated OfficeMax's rules, which the Court found enforceable as laws, misapprehends the actual text of

the rules, which actually stated "one account per person *at any given time*" (Ex. 96, at 1, "How to Enroll"; Ex. 96, at 3, "How to Enroll", emphasis added).

The surrounding passages in the rules indicate the context of the "one account" phrase was in explaining the technical limitations of the point-of-sale systems in the rewards program (under "How to Enroll", not "Eligibility"), and not in admonishing members that possession of multiple accounts would render themselves criminally liable. At no point did the indictment allege that Movant used more than one account per person at any given time.

Counsel was ineffective by adopting the Government's mistaken notion that the phrase could be truncated even if doing so meant its meaning was substantially altered. "The government obviously disagrees, in several instances by taking findings out of context and twisting them." *U.S. v. Gilmer*, 814 F.Supp. 44 (D. Colo, 1992).

Finally, the Government's "one account per person" oversimplification was an attempt by Officemax to legislate a new section under 18 USC 1343, which despite this Court's eagerness to empower the unelected and unanswerable private corporation with the powers of Congress, was an unconstitutional act.

With the marketing webpage in Ex. 46 in direct conflict with the "official terms and conditions" in Ex. 96 as canonized by the Court, Counsel failed to seek an explanation as to how the Government can not only enforce corporate terms and conditions as law, but also pick and choose which terms and conditions apply and which can be ignored, further insulting Movant's Sixth Amendment Right to be informed of the nature and cause of the accusations against her.

## 2. "For teachers only"

Another conclusory portion Counsel ineffectively argued against was that the "MaxPerks for Teachers" was a legally-enforceable limitation that barred all nonteachers, or individuals who did not meet Officemax's standards for teachers, from membership or participation. According to Officemax's star witness Steven Gardner at trial, Officemax did no vetting of teachers, but the Government desperately claimed otherwise, with Counsel failing to object whenever they did.

Officemax claimed to require all memberships to be "MaxPerks for Teachers" with the only other option being "MaxPerks for Business", and yet many members who enrolled under the latter program did not work for, own, or operate businesses. The difference in titles and rules made the choice of program one a customer was legally able to decide for herself (and in some cases, a confusing one, given that some customers are both businesspeople and teachers, and some neither). The MaxPerks Terms & Conditions never defined who a teacher was and was not. Further, Counsel ineffectively missed bringing up the point that Co-Movant would not have been unjustified to consider himself a teacher after having taught at UNM, New Mexico Tech, and Georgia Tech.

Awareness of Co-Movant's donation of office supplies to APS schools, prior to any sign of trouble, would have engendered substantial doubt in the jury, and in addition, its impact on the Judge's palpable displeasure with Defendant's conduct would have also been enough to tilt the scales in Movant's favor during trial and sentencing. "Thus, at no time during the commission of the offense did Defendant appeal to the generosity and charitable or trusting impulses of his victim by falsely declaring that he had authority to act on behalf of an educational organization." *U.S. v. Frazier*, 53 F.3d 1105, (10th Cir. 1995).

Prosecutors and prosecution witnesses violated Movant's Sixth Amendment Right to notice of charges by claiming Movant and Co-Movant were not teachers (absent any corresponding claims in the indictments), and Counsel was ineffective for failing to call irrelevant or contradict the Government's claims of Movant's "false[] claim to be a teacher" (Ex. 50, Tr. at 1645). Counsel failed to effectively argue the notion that claiming oneself is a teacher is not a material claim toward fraud, and instead Counsel joined the Government on the notion during voir dire, doing the Government's job for them by advancing that Movant and Co-Movant were both not teachers and that representing oneself as a teacher (when one was not) could be considered by some to be a material basis for fraud (Ex. 55, Tr. At 219).

### J. The Government Superseded a Defective Indictment To Avoid Dismissal But Argued Its Case Based on The Defective Indictment

No reasonable jury would convict a woman of shoplifting if there were no eyewitness account, no video evidence, and no evidence of her possession or disposal of the exact item allegedly shoplifted. In this case, the jury was similarly unreasonable, convicting Movant of the equivalent of shoplifting, leaving a store with merchandise she had no right to, without video of merchandise leaving the store, without eyewitness testimony of the merchandise leaving the store, and without evidence that the merchandise in Movant's residence or tied to Co-Movant's eBay accounts originated with Officemax. Counsel could have used this distinction alone to make a strong Rule 29 case, but ineffectively failed to.

The use of presumptions and inferences to prove an element of the crime is indeed treacherous, for it allows men to go to jail without any evidence on one essential ingredient of the offense. It thus implicates the integrity of the judicial system. *Barnes v. U.S.*, 412 U.S. 837, 850 (1973, J. DOUGLAS, dissenting).

### 1. The Government Could Not Beat *Cleveland* And Still Have A Case, So It Pretended It Had

The *Cleveland* claim that formed the basis of Counsel's Motion to Dismiss originated with *Cleveland v. U.S.*, 531 U.S. 12 (2000), where the Supreme Court held that it was not enough that the defendant gained something of value: the victim had to lose something of value, and in Cleveland's case, it was a Louisiana video poker license, which has no value in the hands of the state.

MaxPerks rewards were argued by Counsel to be similar in nature. Despite some specious argument by analogy by AUSA Messec, (Ex. 37, 7/7/15 Hrg. at 5-6), the Court held a hearing and declined to rule on whether rewards were property in the hands of Officemax, though only because the second superseding indictment allowed the Court to confuse the motion to dismiss the first superseding indictment and the changes in the second one: "since the [objective] was to obtain merchandise— undisputedly "property"—*Cleveland* does not support Defendants' motion" (Ex. 37, 7/7/15 Hrg. at 6).

While the Court's conclusion would have been properly reached if Counsel had objected to the second superseding indictment on these grounds, or the Court found the original argument mooted by the second superseding indictment, the Court showed itself susceptible to the Government's groundwork of conflation between the two indictments that allowed it to argue its case from both, using whichever indictment better suited its purposes at the time.

After the Government superseded the indictment a second time, in direct response to Movant's motions to dismiss, the Government argued the rewards were "steps" in the plot to receiving merchandise (Ex. 37, 7/7/15 Hrg. at 5-6).

While the Government could have amended the indictment to include "OfficeMax Merchandise and Prepaid Gift Cards" or simply "Officemax-issued Prepaid Gift Cards", and been well within in its rights to do so, the Government chose not to, leaving Movant's rewards out of contention, since the evidence pointed to gift card after gift card, not office supplies.

With the Court's dismissal of the right motion (Dkt. 177) against the wrong indictment (Dkt. 197), Counsel could have objected, or sought clarification, but did not. A hybrid of two indictments thus followed Movant through trial, prejudicing Movant's right to be informed of the charges against her, and allowing the Government to convict her on an indictment they pretended to supersede.

### 2. Prepaid Gift Cards Are Not Merchandise

Merchandise can include numerous commodity items and goods, but merchandise does not include cash or negotiable financial instruments, the latter of which is precisely the nature of a prepaid gift card.

Caselaw on what is and is not merchandise is sparse. In *U.S. v. Wang*, 898 F. Supp. 758 (D. Colo, 1995), a stolen computer program was ruled as property but not as merchandise:

> Although a computer program does not constitute "goods, wares, merchandise, securities or money" for purposes of the National Stolen Property Act, 18 USC §2314, a computer program is intangible intellectual property. *Id.* at 760.

Because AUSA Messec characterized the object of the first superseding indictment rewards as "prepaid debit cards and other merchandise" (Ex. 57, Dkt. 179, at 1-2), the Government acknowledged that the prepaid cards did not belong under the same umbrella as simply "merchandise".

The second superseding indictment was fatally flawed because it did not specify in the conjunctive "merchandise and gift cards". It merely specified "merchandise", and merchandise totaling $105,191 was never demonstrated at trial.

Movant's and Co-Movant's Sixth Amendment Right to be informed of the nature and cause of the accusation against them were violated when the Government backtracked to its first superseding indictment and the Court found Co-Movant guilty in addition to merchandise "of money, [] whatever the case may be", and Movant's Sixth Amendment right to assistance of counsel was violated when Counsel ignored the Government's implicit substitution of indictments. The resulting prejudice was a guilty verdict (from jury instructions corresponding to an indictment that did not match with the Government's case's indictment) and a harsher sentence.

### K. Multiple Opportunities For Adequate Assistance Of Counsel Were Overlooked Or Frustrated, And A Simple One-Page Motion By Defense Counsel Could Have Obviated Not Only The Rest Of These Counts But The Multiple Years Of Litigation In This Case

Counsel's late filing of the Motion for a Bill of Particulars, which was filed without seeking leave, played a significant part in its denial, with the Judge noting the above. Given the numerous shortcomings in the indictment, the unjustifiably late Motion prejudiced Movant by calling into question, too late, the predictability of the trial to follow.

Further, the motion itself was inadequate. While it recognized shortcomings in the indictment, complaining of vagueness, it was written as if the counts were valid but should have been described with more detail. While this point (the counts were vague) was valid, the Court rightfully recognized it as unimportant, and it would be disingenuous to argue that prejudice resulted from the ruling on the

motion as presented, since it was not only what the indictment *did not* include that was prejudicial, but what it did include, which Counsel ineffectively waived any objection to.

"The problem...is not that the pleading fails for lack of specificity with respect to the particular documents," but that the "pleading fails for lack of an allegation of the nature of the fraud alleged." *Cooper v. Broadspire Services*, 2005-WL-1712390, (E.D.Pa 2005.)

The superseding indictments did not allege any conscious thought by Movant, let alone any basis for a scheme. "Although the government is not required to prove actual injury [to an intended victim of fraud,] it must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims." *U.S. v. Starr*, 816 F.2d 94, (2nd Cir. 1987).

Aside from some further glancing attempts during the *Cleveland* hearings, on which Counsel ended up losing the argument, Counsel ignored these fundamental flaws. Counsel's continual failure to provide assistance through multiple defective indictments and to raise the defects on appeal was thus ineffective. "[A]n indictment's failure to state an offense is a defect that may be raised at anytime, including on appeal." *U.S. v. Haddock*, 956 F.2d 1534, (10th Cir. 1992, quoting *U.S. v. Freeman*, 813 F.2d 303, 304, 10th Cir. 1987).

Counsel's successful attempt to strike surplusage prejudiced Movant, as the Judge's stripped-down version would have been extremely vulnerable to objections regarding failure to state a claim under Rule 7(c)(1), yet Counsel ineffectively waived the objections. According the Dept. of Justice Criminal Resource Manual, CRM 971:

> According [to Rule 7(c)(1)], a mail fraud or wire fraud
> indictment should contain a reasonably detailed description of
> the particular scheme the defendant is charged with devising to
> ensure that the defendant has sufficient notice of the nature of

the offense. *See Yefsky*, 994 F.2d at 893 ("The indictment may incorporate the words of the statute to set forth the offense, but the statutory language '"must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged."'") (quoting *Hamling*, 418 U.S. at 117-18 (quoting *U.S. v. Hess*, 124 U.S. 483, 487 (1888)))

The Judge's fatally deficient and streamlined indictment [Ex. 4], now less than 2 pages long, did not describe anything at all. It contained literally nothing except recitations of statute and cryptic one-line counts (i.e. "Transmission from OfficeMax retail store to MaxPerks Rewards database") that did not specify what the overt act was or how it involved a wire, which became unconstitutionally vague and oversimplified jury instructions (Dkt. 298, 3-4), railroading Movant and violating her Sixth Amendment rights.

> An indictment is amendable in form but not in substance. The substantive process is exclusively the grand jury's under the constitutional limitation cited *supra*. And an amendment in matter of form is not permissible if thereby the accused will suffer prejudice to his substantial rights. By the early common law an indictment was not amendable. And this is still the federal law with some modifications.
> It is fundamental in the constitutional limitation than an indictment is not amendable by the court to charge an offense not found by the grand jury, either by a substitution of offenses or to supply substantive omissions. *State v. Grothmann*, 13 N.J. 90, 94-95 (S.C.N.J. 1953), quoting State *v. Startup, 39 N.J.L. 423 (S.C.N.J. 1877))*.

For all of the ineffective assistance received, severe prejudice to Movant resulted, since the defective indictments prevented Movant from raising a defense at trial, making the proceeding fundamentally unfair. The 10th Circuit said it best in *Curtis*:

> In sum, the indictment here, after all has been said and done, pleads little more than the statutory language without any fair indication of the nature or character of the scheme or artifice relied upon, or the false pretenses, misrepresentations or promises forming a part of it. To the contrary, the surplusage set out in connection with allegations of mailing, and the masking of acts, documents or conduct innocuous in themselves by appellations of 'falsity' did more to confuse than to clarify. The trial court's instructions, however accurate, could not have resuscitated these fatally defective charges, but the difficulty

28

was not ameliorated if, indeed, it was not compounded by their generality.


## L. The Superseding Indictments Failed To State Which Statute Was Charged Under Which Count

### 1. When It Came To Indictments, The Court Wavered

Movant's Sixth Amendment right to be informed of the charges against her was violated when the charges themselves were duplicitous: not explicitly stated under a single statute, but under multiple statutes, leaving the Court, the grand juries, the petit jury, and the Judge to pick-and-choose which crime (18 USC §2, 1343, or 1349) fit the narrative better on any given day. In particular, the confusion of the petit jury matters most.

> The vice of duplicity is that a jury may convict a defendant without unanimously agreeing on the defendant's guilt of the same offense. *U.S. v. Saleh,* 875 F.2d 535,537 (6th Cir. 1989)

> An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed.R.Crim.P. 8(a)'s requirement that there be 'a separate count for each offense,' and 2) the defendant is prejudiced thereby. *U.S. v. Rigas,* 281 F.Supp.2d 660, (S.D.N.Y. 2003, quoting *U.S. v. Sturdivant,* 244 F.3d 71, 75 (2nd Cir. 2001).

> Appellate counsel's failure to raise the claim of duplicity in the indictment on [Movant's] direct appeal...was deficient performance below an objectively reasonably [sic] standard of legal performance. And [Movant] was prejudiced by that failure. *Grady v. Artuz,* 931 F.Supp. 1048 (S.D.N.Y., 1996).

Just as in *Grady v. Artuz,* Movant was prejudiced by that failure.

This duplicitous, multiple-crimes-per-count deviance also constituted a fatal variance between any matter at trial and the contents of the indictments. "A fatal variance denies a defendant this fundamental guarantee [of the Sixth Amendment right to be informed of the accusations against him] because it destroys his right to be on notice of the charge brought in the indictment." *U.S. v. Peterman,* 841

F.2d 1474, 1477 (10th Cir. 1988, quoted in *Hunter v. State of N.M.*, 916

F.2d 595, 598 (10th Cir. 1990)).

> On the [prejudicial] side of the variance spectrum are more
> severe alterations described as "constructive amendments" of the
> indictment. "An indictment is constructively amended if the
> evidence presented at trial, together with jury instructions,
> raises the possibility that the defendant was convicted of an
> offense other than that charged in the indictment." *U.S. v.
> Apodaca*, 843 F.2d 421, 428 (10th Cir. 1988). (*Hunter* at 599).

"A variance which rises to the level of a constructive amendment

is reversible per se." *Apodaca,* at 428. Movant's Counsel failed to

object to the indictments on this basis as well. The prejudice suffered

under this lack of specificity was extreme, given that the Government

was able to press a case that hybridized charges, never meeting the

burden, and, left unchecked, never required to meet the burden, of

fully proving conspiracy; or aiding and abetting; or abject wire fraud,

instead mixing and matching a menagerie of evidence that satisfied the

lay jury sans objection from Counsel on this subject. The result of the

trial was thus both unreliable and unfair.

Demonstrating an additional part of the prejudice suffered, the

U.S. Sentencing Guidelines charge 18 USC §1343 under the harsh §2B1.1,

and 18 USC §2 and §1349 under the far more lenient §2X2.1 and §2X1.1,

respectively. The duplicitous indictment misinformed both the

presentence report (most counts charged under §1343), and, crucially,

the Judge's interpretation of that presentence report, through

Certificate of Judgment (Ex. 77), wherein *all* counts were charged under

§1343). As such, the sentencing guidelines were misdetermined at a far

higher level, resulting in proceedings fundamentally unfair to Movant.

### 2. The Judge's Stricken Surplusage of The Indictment Was Poorly Executed, Prejudicing Defendant

Instead of striking only surplusage, the Hon. Judge Herrera did

not keep to her word where she would retain the statute §1349, instead

left it out, and illegally influenced the jury to put in §1349 again, only to leave it out again at Judgment.

If an indictment could be changed by the Court or by the prosecutor, then it would no longer be an indictment returned by a grand jury. Indeed, in *Russell v. United States*, 369 U.S. 749, 769 (1962), the Court pointed out that a consequence of amending the indictment is that the defendant "could then be convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury which indicted him." "Thus, the Fifth Amendment forbids amendment of an indictment by the Court, whether actual or constructive." *U.S. v. Wacker*, 72 F.3d 1453, 1474 (10th Cir. 1995); *petition for cert. filed*, (Jun. 10, 1996)(No. 95-9284).

> The *Bain* case, which has never been disapproved, stands for the rule that a court cannot permit a defendant to be tried on charges that are not made in the indictment against him…Yet the court did permit that in this case…And it cannot be said with certainty that with a new basis for conviction added, [Movant] was convicted solely on the charge made in the indictment the grand jury returned. Although the trial court did not permit a formal amendment of the indictment, the effect of what it did was the same…Deprivation of such a basic right is far too serious to be treated as nothing more than a variance and then dismissed as harmless error. Compare *Berger* v. *United States*, 295 U.S. 78. The very purpose of the requirement that a man be indicted by grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting independently of either prosecution attorney or judge. *Stirone v. U.S.*, 361 U.S. 212, 217-18 (1960).

Blame for the decision to reversibly alter the indictment to make it even more confusing rests squarely with the Court. No jury could be argued to have understood the jury instructions with this level of judicial vacillation.

> The Fifth Amendment guarantees that a criminal defendant will be tried only on charges presented in a grand jury indictment. Incident to this constitutional guarantee is the longstanding principle of our criminal justice system that the charges contained in an indictment may not be broadened *or altered* through amendment, except by the grand jury itself. *U.S. v. Restivo*, 8 F.3d 274 (5th Cir. 1993, internal quotes and cites removed and emphasis mine).

31

### 3. The Judge's Handwritten Revision of The Indictment Was Impermissible

Co-Movant's counsel reiterated for the record (and Counsel adopted) that the Judge's passing of notes in the absence of the defendants was objected to and overruled, but Counsel waived the matter on appeal. According to *State v. Orona*, 92 N.M. 450 (N.M.S.C. 1979):

> The law in New Mexico is well settled that it is improper for the trial court to have any communication with the jury concerning the subject matter of the court proceedings, except in open court and in the presence of the accused and his counsel…When such communication takes place, a presumption of prejudice arises which the State has the burden to overcome. State v. *Brugger, supra.* The State made no attempt whatsoever to overcome this presumption. Having failed to rebut the presumption, we must hold that the judge's communications with the jury were prejudicial and entitled defendant to a new trial.

*Orona* is non-precedential in a federal Court, but an aid consistent with federal law forbidding the absence of a defendant in communications with a jury. This fact is bolstered by *Little v. U.S.*, 73 F.2d 861 (10th Cir. 1932):

> It appears that the jury addressed a note to the judge, apparently asking for the indictment, certain exhibits, and a copy of the court's instructions. In the colloquy in chambers, defendant's counsel objected to the exhibits going to the jury and to any further instruction. The trial judge properly refused to act in chambers in the absence of the defendant; the jury was called in and [] proceedings had in court.

It was reversible judicial error at best for this contact to occur outside the presence of the defendants and off the record, involving hand-scrawled notes passed between the judge and the jury.

If the Court had instead refused to modify the indictment, leaving the jury to deliberate further while facing down a confusing and self-contradictory charging document that was unintelligible before the Court modified it and even more unintelligible afterward, they may have decided on an acquittal for both parties under the first count, or

perhaps all counts. Hence, the prejudice suffered by Movant and her Co-Defendant is easily measured.

A reasonable probability exists that the outcome of the trial would have been different if the jury had heard a defense witness, or the proper scrutiny had been raised regarding jury and prosecutorial misconduct.

> [W]e, like the Fifth Circuit, "are not insensitive to the hardships imposed on appointed counsel who work with little or no compensation under difficult conditions. It is very often a thankless undertaking. Nevertheless, there is a duty to investigate which cannot be abridged because counsel is only appointed, not retained." *Williamson v. Ward*, 110 F.3d 1508, 1522 (10th Cir. 1997).

To further explore the impact upon Movant's representation, an evidentiary hearing to explore Mr. Hotchkiss' distraction and preparation is hereby requested, as described in *Guinan v. U.S.*, 6 F.3d 468, (7th Cir. 1993).

II. **Movant's 4th Amendment Right For No Warrants To Issue But Upon Probable Cause, And 6th Amendment Right To Assistance Of Counsel, Were Violated When Her Counsel Failed To Challenge A Falsified Search Warrant Affidavit**

"The Fourth Amendment provides in part that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation…'" *Baranski v. Fifteen Unknown Agents*, 452 F.3d 433, (6th Cir. 2006).

With the questions furnished him that morning by Co-Movant (Ex. 84), Counsel had a clear opportunity to impeach SA Boady during cross-examination by asking him if he had switched signature pages, and potentially to open the door to a full dismissal. Counsel began to follow the questions he had been furnished, but ineffectively failed to finish the line of furnished questioning, achieving a similar effect to telling a joke and forgetting the punchline (Ex. 85). There had been no objection to interrupt Counsel's line of thought, merely a lack of

confidence and persistence. Counsel's performance fell below an objective standard of reasonableness, and was deficient.

By allowing SA Boady's lie-by-omission and naked misconduct to go unanswered, Counsel was ineffective. Prejudice resulted therefrom, by forcing Movant to be subject to the fruits of an illegal search, wherein Movant had been directed to undergo a "noncustodial interview" after being abducted at gunpoint from her own home, allowing the FBI to proffer an unrecorded, false, and incoherent confession.

This confession (or this Court-sanctioned fictional analog of a confession, employed under a dubious *Bruton* pretext) played a pivotal role in the jury's decision to convict Movant. As a result, Movant suffered severe prejudice from SA Boady's dishonest acts and Counsel's failure to force Boady to choose between discrediting the Government's case or risk getting caught committing perjury.

The switching of a signature page is not a mere typographical error. In *In Re: Hostetter*, (Ore. Sup. Ct S056471), "The trial panel concluded that the accused violated RPC 8.4(a)(3) [conduct involving dishonesty] when he 'acquiesced [in] the removal' of a notarized signature page from one deed and had it placed on a second deed, which contained a different legal description, and then had the altered deed recorded."

Boady's switched affidavit, if brought to the forefront, would have "clearly impacted his credibility. It evidenced a willingness by the only law enforcement officer who testified [about what Movant said] to do whatever was necessary to get a conviction." *Steinkuehler v. Meschner*, 176 F.3d 441 (8th Cir. 1999).

Though prosecutors would like to argue that this type of misconduct is imaginary or at the least very rare, consider *U.S. v. De La Cruz,* where in a superseding indictment on May 9, 2018, in the S.D.

of Texas, county bailiff Oscar De La Cruz was accused of forging U.S. Magistrate Judge Dorina Ramos' signature, for the purposes of authenticating a document, to wit, an anticipatory search and seizure warrant.

Though the forgery misconduct was Boady's, prosecutorial misconduct applied here, as well. "The prosecutor's knowing use of false testimony involves, not 'just' prosecutorial misconduct, but 'more importantly…[the] corruption of the truth-seeking function of the trial process.'" *U.S. v. Agurs*, 427 US 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). AUSA Kastrin's leading questions in Ex. 86 demonstrate her knowledge of, and involvement in, the forgery misconduct, and her desire to cover it up, because the witness had just prior implicated her office in its drafting: "Was anything added?" "Nothing." "Other than the repeat of that one line?" "Nothing." (Ex. 86). Counsel had ineffectively given up on raising leading objections by that point, even though they would have continued to be meritorious.

Likewise, Counsel had been made aware of the discrepancy many months prior and was thus also ineffective for failing to raise these matters after cross-examination during trial, post-trial proceedings, or on appeal.

III. **Movant's Article I Section 9 Right Against Ex Post Facto Laws, 6th Amendment Right To Compel Witnesses To Appear, And To Assistance Of Counsel, Were Violated When Counsel Failed To Comprehend The Rules And Evidence**

A. **Counsel Ineffectively Assisted Movant By Failing To Realize No Scheme Could Have Existed**

The Government deceived the jury through a largely uncontested overload of information, peppered with dryly presented technical summaries. The Government's deceit succeeded only because Counsel failed to contradict the lines of reasoning used, and Counsel failed

largely because they did not comprehend the flaws in those lines of reasoning.

Both wire fraud and conspiracy (thus, all counts in this case) require a scheme. A scheme cannot begin before anybody involved in the scheme is aware of its existence. Although it is conceivable that a defendant may be accused of involvement in a scheme in which the scheme changes, adapting to involve, and even require, the defendant's earlier, otherwise innocuous acts, from prior to the change, the burden to argue that a late adaptation to a new scheme renders the accused not guilty (strictly from being unaware of the scheme at its beginning) is extremely difficult to meet. To prove when a scheme began, as required in this case, is to prove a negative. A defendant cannot prove what a defendant did not think about, because the defendant's word alone is already suspect, particularly, if taking her word could ensure a perfect crime.

A time does exist before the existence of a conspiracy, as with *U.S. v. Sarno*, 456 F.2d 875, (1st Cir. 1972), where "the jury was [ruled to have been] adequately instructed not to consider against the defendant statements prior to the existence of the conspiracy."

*U.S. v. Badders,* 240 US 391, 36 S.Ct. 367 (1916) held that "[i]ntent may make criminal an act, otherwise innocent, if it is a step in a plot.", but intent is the key here: if one *could not* have come up with a scheme due to physical impossibility, one could not have had *intent* to make a step in a plot to further that scheme.

If a defendant *could* have conceived of a scheme at its outset, committed otherwise innocuous acts at its outset, and only committed substantive acts of fraud years into the process, most would regard the above as good enough cause to convict.

This reasoning has a loophole. If the accused schemer could not possibly have known of the nature of upcoming changes to the scheme when he committed the initial innocuous acts, then it can be proven that the nature of the initial otherwise innocuous acts can not be considered part of the scheme. If such initial otherwise innocuous acts are essential to prove guilt, then anyone thus accused is not guilty.

> The [mail and wire] fraud statute requires the existence of a scheme to perpetrate this fraud, and the question of evidentiary sufficiency boils down to whether the Government has proven that the defendants contemplated that [the victim] suffer the loss. *U.S. v. George*, 477 F.2d 508, (7th Cir. 1973)

Consider two friends who eat breakfast together in their car every weekday, parked in the same place. Five years into the pattern, a bank is built within view of that car. One year after opening, the bank is robbed, and the friends are charged with conspiracy. Suggest the prosecutor can only produce evidence to link the friends together at their very first breakfast.

The friends could have conspired to rob the bank together, but their conspiracy could not predate the bank itself.

In order to meet the statutes' requirements, a [wire] must be "for the purpose of executing the scheme" *Kann v. U.S.*, 323 U.S. 88, 94, 65 S.Ct. 148, 151, 89 L.Ed. 88 (1944). And yet it is unquestionable that the purpose for the wire creating accounts prior to the publication of the 2010 rules could not have been to violate the 2010 version of the rules, because since they did not yet exist, Movant could not have known about them.

By failing to call its own witnesses, objecting to the Government's introduction of exculpatory evidence, and relying on Government witness Steven Gardner to introduce defense evidence, Counsel assisted ineffectively. If Counsel had not failed to apprehend and communicate the impact of changes to Officemax's rules, Counsel

could have demonstrated that the portions of the conspiracy count, which listed the creation of numerous accounts for the purposes of taking credit for other people's purchases in order to redeem ink cartridges, suffered from this "bank" problem.

When the "group 1" accounts were created, the rules (corporate rules now being enforced as federal laws) did not require any purchases (under the Trial Exhibit 1/2009 version of the rules) in order to gain credit for ink recycling. These group 1 accounts could be used, and were used, to convert ink cartridges to store credit, without any purchases or receipt adjustments. After their creation, it would only have become necessary *after* Trial Exhibit 2's October 2010 version of the rules for them to be used to claim credit for ink cartridge recycling. No scheme to violate the 2010 rules could exist prior to 2010.

### B. Counsel Ineffectively Assisted Movant By Failing To Realize No Conspiracy Could Have Existed

Since conspiracy to commit wire fraud also requires a falsehood to couple with the use of a wire, the government argued the falsehood occurred at the beginning of the scheme: the fictitious identity of the accountholder. Counsel never argued the legal possibility that the names submitted were done so legally, as aliases:

> We do not hold that if a person assumes a fictitious name as an alias, and it neither appears that the name assumed was a factor in procuring credit upon the instrument signed with the fictitious name nor that the alias was previously assumed for a dishonest purpose, the signing of the alias or assumed name would be a forgery. *Hubsch v. U.S.*, 256 F.2d 820, 823-24 (5th Cir. 1958).

> Some courts have distinguished alias cases from fictitious identity cases. In the alias case, the maker who simply has adopted a name other than his real name and who is known by that name by his payees may not be liable for forgery. *See U.S. v. Crim*, 527 F.2d 289 (10th Cir. 1975), *cert. denied*, 425 U.S. 905, 96 S.Ct. 1476, 47 L.Ed.2d 755 (1976). (quoted from *U.S. v. Price*, 655 F.2d 958 (9th Cir. 1981, citations shortened)).

Notwithstanding Ground I(B)'s reminder of legitimate uses of fictitious names in business, and notwithstanding *Hubsch*, the identity of the accountholder could not have been fraudulently presented for the purpose of taking credit for others' purchases in order to enable store credit from ink cartridge recycling, as argued, because the 2009 rules did not require taking credit from any purchases at the time the 2007-2009 accounts were created.

The conspiracy could thus not have existed prior to September 2010, because the substantial acts arguably in furtherance took place antecedent to any possible scheme designed around the 2010 changes to the rules. "Since there was no intent to deceive, there was no 'scheme to defraud'" *U.S. v. Pendergraft*, 297 F.3d 1198, (11th Cir. 2002).

Further, during the time of these account creations in 2007-February 2010, there was very limited indication that the rules were likely to change, yet there was substantial financial incentive (and yet perfectly legal reasons) for anyone to create accounts using fictitious information, prior to the change. Counsel failed to expose this distinction and compromised the fairness of the trial.

### C. Violating A Contract During Its Formation Cannot Form The Basis For Wire Fraud

Assuming the Courts still conclude that violating a contract can be construed as a basis for wire fraud, consider *U.S. ex rel O'Donnell v. Countrywide Home Loans*, 822 F.3d 650, 658 (2nd Cir. 2016), which held that a "scheme to defraud", where the alleged misrepresentation was contained in the agreement itself, requires proof of an intent not to perform the contract at the time of its execution. "[A] subsequent breach of the contract, even if willful and malicious[,] does not

constitute fraud for purposes of the mail or wire fraud statutes." *Id*, at 662.

### D. Movant's Counsel Failed To Object To Ex Post Facto Application Of The Law

Multiplying the Court's induced prejudice from interpreting Officemax's rules as laws, the entirety of the group 1 accounts, charged under violating 2010's rules in count 1, were created prior to 2010's rules. It would be bad enough if the Court convicted Movant as a criminal for scheming to break private rules after they went into effect, but the Court in this case convicted Movant as a criminal for scheming to break private rules *before* they went into effect, or were known at all. The Court violated Movant's Article I, Section 9 Right not to be subject to ex post facto laws.

> [A]ny statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto." *Beazell v. Ohio,* 269 U.S. 167-70, 46 S.Ct. 68-69, 70 L.Ed. 216 (1925).

The second superseding indictment made two very small changes from the first, and the first change was from "in order to receive the ink rewards, the MaxPerks Reward [sic] member had to spend…" (Ex. 9, at 3) to "in order to receive the ink rewards *after January 1, 2010*, the MaxPerks Reward [sic] member had to spend…" (Ex. 8, at 3, emphasis added). Despite this obvious prompt that the Government was keenly aware of the timing of rule changes and its import to their case, Counsel failed to raise or appeal the ex post facto nature of the charges, making for ineffective assistance.

> Changes [whether procedural or substantive], whatever their form, can lead to ex post facto violations because "[s]ubtle ex post facto violations are no more permissible than overt ones. *Collins v. Youngblood,* 497 U.S. 46, 110 S.Ct. at 2721 (1990).

> The prohibition against ex post facto law requires the finding of two elements: first, that the law was enacted subsequent to the conduct to which it was being applied; and second, that it must disadvantage the offender affected by it. *Allen v. State*, 821 P.2d 371, 375-76 (Okl.Cr. 1991; quoted by *Gilson v. Sirmons*, 520 F.3d 1196, 10th Cir. 2008).

Co-Movant, Matthew Channon, met with Counsel and his counsel dozens if not hundreds of times over the course of this prosecution, and although Counsel absorbed some portions of his explanations, Counsel never quite "got" why the prosecution was wrong: the anachronistic terms and conditions that underpinned the faulty assumptions in the charges. By failing to comprehend it, Counsel could not explain it to the judge or the jury, nor justify Movant's actions or distinguish them from illegal acts. For this reason as well, Counsel was ineffective.

### E. In The Alternative, Movant's Rights Were Violated Under The Due Process Clause

Since the decision to enforce Officemax rules as laws ex post facto was the Court's decision, not a Legislature's, an alternative legal justification for reversal also applies: Movant's Fifth Amendment Rights which extend the ex post facto prohibition to judicial acts:

> [Movant's] constitutional rights here derive from the Due Process Clause because the law change at issue was by judicial construction; the prohibition against ex post facto laws applies only to legislative enactments. *Marks v. United States,* 430 U.S. 188, 191-192, 97 S.Ct. 990, 992-93, 51 L.Ed.2d 260 (1977); *Devine v. New Mexico Dep't of Corrections,* 866 F.2d 339, 342, 344 (10th Cir. 1989). Nevertheless, "an unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an ex post facto law," *Bouie v. City of Columbia*, 378 U.S. 347, 353, 84 S.Ct. 1697, 1702, 12 L.Ed.2d 894 (1964), so we apply ex post facto principles to decide the due process issue. The critical test, as stated in recent Supreme Court cases, is whether, as applied, the change impairs "substantial personal rights," or merely changes "modes of procedure which do not affect matters of substance." *Dobbert v. Florida,* 432 U.S. 282, 293, 97 S.Ct. 2290, 229, 53 L.Ed.2d 344 (1977) (quoting *Beazell v. Ohio*, 269 U.S. 167, 171, 46 S.Ct. 68, 69, 70 L.Ed. 216 (1925)); see also *Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 2451, 96 L.Ed.2d. 351 (1987); *U.S. v. Affleck*, 765 F.2d

41

944, 948 (10th Cir. 1985) (en banc) (no ex post facto violation
if new law is merely procedural and does not increase punishment
for, or change the elements of, an offense, or alter facts
necessary to establish guilt.) (From *Coleman v. Saffle,* 869 F.2d
1377, 1385 (10th Cir. 1989), citations shortened).

Counsel failed to bring up this concept as well. By proceeding
forward with this extralegal argument combining ex post facto
interpretations of illegitimate rules, Movant's substantial and
personal right to fair and reproducible proceedings were prejudicially
eviscerated by the Court, misbehaving prosecutors, and by her Counsel's
failure to raise them.

IV.   **Movant's 1st Amendment Right Of The Press And To Peaceably
      Assemble, 4th Amendment Right To Be Secure In Her Person And
      House, 5th Amendment Right Not To Be Compelled In A Criminal Case
      To Be Witness Against Herself Nor To Be Deprived Of Liberty
      Without Due Process Of Law, Nor Private Property Taken For Public
      Use, And 6th Amendment Right To Have Assistance Of Counsel For
      Her Defense Were Violated When Her Home Was Invaded, Her
      Smartphone Seized, Her Person Abducted, Her Association With
      Family Abridged, Her Backyard Seized To Form An Ad Hoc
      Interrogation Room, Her Will Overborne, Her Confession Obtained,
      And Counsel Failed To Effectively Represent Her**

The motion to suppress hearing on 6/11/2014 showcased, between
AUSA Messec and Counsel, a battle for the truth. Due to ineffective
assistance and not due to a weaker position on the facts, Movant never
stood a chance.

Two narratives competed: Movant's, where Movant was coerced and
trapped in the backyard, the interview was custodial, and the lack of a
Miranda warning meant any confession would have been inadmissible; and
the Government's, where Movant voluntarily went into the backyard, the
interview was noncustodial, and there was no need for a Miranda
warning.

To break the stalemate, both SA Boady and Movant testified at the
hearing, with SA Boady briefly redirected and recrossed. The Court had
no trouble finding for the Government based on this testimony, as

Counsel failed to explain Movant's words and state of mind, Counsel asked questions that were not helpful, and Counsel waived both objection and follow-up when Messec phrased her questions deceptively.

### A. Faulty Note Taking

In the conspiracy trial of Orlando Pulse Shooter Omar Mateen's wife Noor Salman, in which the jury acquitted, the jury foreperson said, "I wish that the FBI had recorded their interviews with Ms. Salman as there were several significant inconsistencies with the written summaries of her statements." *Orlando Sentinel,* March 30, 2018, subsequent to *U.S. v. Salman,* 241 F.Supp.3d 1288 (M.D.Fl., 2017).

> "You can have a conversation with an [FBI] agent," says Edwin O. Guthman, [Attorney General] Kennedy's press secretary, "and when it is over he will send a memo to the files. Any relation between the memo and what was said in the conversation may be purely coincidental. You would think you were at different meetings." *U.S. v. Salemme*, 91 F.Supp.2d 141, 204, (D. Mass. 2009).

While the Courts have time and again found the FBI's self-serving ban on recording suspects undeserving of scrutiny, and the act of recording "not required by the Constitution", *U.S. v. Boston*, 249 Fed.Appx. 807 (11th Cir. 2007); *U.S. v. Montgomery,* 390 F.3d 1013, 1017 (7th Cir. 2004); *U.S. v. Williams*, 429 F.3d 767, 772 (8th Cir. 2005), in unequivocally custodial interrogations, let alone "interviews" where custody was in dispute, the Courts seem unconcerned with the Constitution's similar lack of requirement that the Courts weigh the word of an FBI Agent, with the power to allow or provide the recording, far more heavily than the word of the suspect he testifies against, disempowered by the FBI agent to provide their own recording.

This case again evidences the FBI's unconstitutional tradition of bad faith suppression of evidence in order to secure convictions, and the unfortunate tendency of trial judges to "see no evil, hear no evil"

when the prejudicial impact of that tradition looms large over their docket.

Courts hold up some kind of "standard FBI policy" to not document the interactions of their agents with the accused, perhaps unaware about the source of that determination being completely extralegal and outside the mandates of Congress.

> Although a rule requiring the government to record statements during custodial interrogations might be sound policy, we agree with other circuits that the Constitution does not require us to adopt such a rule. *U.S. v. Boston*, 249 Fed.Appx. 807 (11th Cir. 2007).

"[N]o one has intimated that [state laws requiring the recording of interrogations] were constitutionally required, and we see no hint that the Supreme Court is ready to take such a major step. We therefore decline [the defendant's] invitation to enlarge Miranda so as to require the electronic recording of all interrogations." *U.S. v. Montgomery,* 390 F.3d 1013, 1017 (7th Cir. 2004).

This holding, that by not explicitly requiring a Right, in this case a Right to Record, the Constitution denies the Right, runs full face into the text of the Ninth Amendment. Regardless of what the Seventh or Eleventh circuits hold, the blanket ban on recordings that the FBI held in effect during the time in question violated Movant's Ninth Amendment Right to herself conduct a recording of the interview, and her First Amendment Right to Freedom of the Press. By refusing to record the interview and confiscating Movant's own means of recording the interview, Movant's First and Ninth Amendments Right was violated.

During even this most recent caselaw, limitations of contemporary technology meant that audio and video recordings were expensive, unreliable, and esoteric. Since 2010, however, most Americans at any given time have the on-demand capability to take full audio and video recordings at the drop of a hat. The FBI's tendency to confiscate their

suspects' smartphones, as happened in this case, does not sail through a bare unwritten section of the Constitution: it runs smack into the Fifth Amendment.

Despite factual inconsistencies in Government testimony and reports, the case agent's slipshod note-taking practices were allowed to make as gospel what should have been at the very least questioned by Counsel, in order to impeach a damaging and self-contradictory confession. More accurately, what was passed off as Movant's confession was a highly damaging imaginary account memorialized in a 302 two days after the incident, with no more evidence than the agent's distracted memory and a Blackberry device that was neither produced nor sought by Counsel.

> Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable "corruption of the truth-seeking function of the trial process." *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, (2nd Cir. 1997).

By failing to ask the Court to force the Government to produce these notes, Counsel was ineffective.

### B. Bad *Bruton* Calls

*Bruton* frequently comes up in cases without recordings, so frequently, in fact, that "*Bruton* problems", being commonplace, need no introduction. One wonders if the Courts realize that *Bruton* fictions, and the Court's well-established practice of peddling fictions before juries, would largely become a thing of the past if recordings were mandated.

> In effect, this [Bruton] type of situation requires a defendant to either testify to rebut the co-defendant's confession, or waive the right to testify and leave standing the unrebutted inculpatory testimony. *U.S. v. Rantz*, 862 F.2d 808 (10th Cir. 1988).

Counsel brought multiple objections up to the Court's reframing under *Bruton* of everything Movant allegedly said in the form of "they" to the form of "I". These took the form of 404(b) objections and motions to sever, and were improperly denied by the Court.

> Although the trial court's intentions were laudable, this requirement is in violation of an accused's right to due process and interferes with the "guiding hand of counsel." *Brooks v. Tennessee*, 406 U.S. at 613, 92 S.Ct. at 1895. (*Rantz* at 812).

Counsel failed to raise the 404(b) matter or motion to sever on appeal, and was thus ineffective as appellate Counsel.

### C. Multiple Meanings of "Leave"

Counsel never directly addressed the meaning of "leave" during the search, seizure, and interview. If Movant was in the front yard and not in custody, "leave" could mean to walk off the property. If Movant were in the back yard, surrounded by agents and block walls, "leave" would mean to exit the backyard but stay within the property.

A third meaning of "leave" could be to leave the front yard with Boady to go through the house to the backyard. Movant's repeated message that she "didn't want to leave" referred to her desire not to leave her cat and cousin, not to leave the entire property, and thus the third meaning applies, but Counsel never advanced this fact.

Context makes all the difference. If an unarmed shooting victim yelled "I'm going to kill you!", his shooting might be argued as self defense, but not if he only said it after he was shot. If the shooter's testimony does not establish the context by saying <u>when</u> the victim said it, a Court might in error find in the shooter's favor.

It is undisputed that Movant was told she was "free to leave" when in the front yard.

It is also undisputed that Movant was never told she was "free to leave" when in the back yard.

What is in dispute is what "to leave" actually meant, and Counsel never established that it meant to Movant, "to leave the front yard with an agent to be interviewed". Movant was never free to "not leave".

### D. *Behelerizing* Movant Violated Her Rights

Law enforcement officials have developed an approach for the judicial system, wherein they can custodially interrogate a suspect without the need for Mirandizing them or allowing them to contact legal representation, and nonetheless obtain a confession that courts will hold admissible.

Named after *California v. Beheler*, 463 U.S. 1121 (S. Ct. 1983), law enforcement has begun using the phrases "you are not under arrest" and "you are free to leave" frequently and redundantly, as if arcane incantations to passify suspects and ward off inadmissibility, making "the *Beheler* Admonition", or "to *Behelerize",* the preferred alternative to Mirandizing suspects law enforcement wishes to incriminate.

*U.S. v. Webster* (778 F.Supp. 2d 237, N.D.N.Y. 2011) called this practice the "Kansas Two Step".

> In the Kansas Two Step, "[y]ou break contact, give them their
> information back, tell them they are free to leave…[b]ecause by
> law they have to feel free to leave to give consent to search."
> *Webster*, at 256.

Abuse of the *Beheler* Admonition is rife. Officers need only to disingenuously state, "you are not under arrest" and "you are free to leave", even when the suspect is handcuffed or trapped in a locked room, or about to be placed in handcuffs or brought to a locked room.

Movant was not placed in handcuffs but *was* brought to a locked room. Whether the floor was grass, the roof was open, her friend was next to her being interviewed, or it was larger than a typical room is

irrelevant. The fact that multiple armed individuals had exerted control over the yard itself, dictated its rearrangement and goings-on, and stood guard at its only exit made it not a familiar environment but a coercive one, no matter if the yard had previously been familiar or not. The yard was effectively seized, and Movant was effectively seized as well.

> Police officers must make a choice - if they are going to take highly intrusive steps to protect themselves from danger, they must similarly provide protection to their suspects by advising them of their constitutional rights. *U.S. v. Perdue*, 8 F.3d 1455 (10th Cir. 1993).

This matter has four discrete moments of importance: 1. The knock and announce with the M4 assault rifles pointed at Movant; 2. Movant entering the front yard; 3. Boady talking to Movant about going to the backyard; 4. Movant seated in the open backyard.

The Court ruled that a coercive situation dissipated from the first moment, when Movant was abducted at gunpoint, to the fourth moment, when the confession allegedly occurred.

However, dissipation must occur as surely after a Beheler Admonition as it does after a Miranda Warning. An agent would not consider a suspect Mirandized for life: if he gave a suspect a Miranda warning two months prior to a custodial situation, he can not proceed as if the Miranda warning has not dissipated. See *U.S. v. Roberts*, Memorandum Order, 11-cr-0018, (E.D.Pa 2012).

> A *Miranda* claim, by contrast, requires no evidence of police overreaching whatsoever; it is enough that law enforcement officers commit a technical error. Even the forgetful failure to issue warnings to the most wary, knowledgeable, and seasoned of criminals will do. *Withrow v. Williams*, 507 U.S. 680, 708-09 (1993, O'Connor dissenting).

Thus, a Beheler admonition must dissipate as soon as the situation changes. If a suspect is not under arrest and is free to leave, and then conditions change to where they are now in a new

48

location and not free to leave that location, the Beheler admonition from the previous scene must be recognized as dissipated, at least in the mind of a reasonable individual, provided it is not reestablished.

On the one hand Movant believed that five minutes was not sufficient time for the trauma of having assault rifles pointed at her head to dissipate a sense of coercion, and on the other hand, the Court believed it was over ten minutes, contrary to the testimony at the hearing. The Court committed plain error twice, first, in the determination of the amount of time that passed was over ten minutes; and second, the determination that ten minutes was sufficient.

"In *Brown,* the fact that 'less than two hours passed between the unlawful arrest and post-Miranda confession weighed against dissipation.'" *U.S. v. Williams*, 615 F.3d 657, 669 (6th Cir. 2010) (citing *Brown v. Illinois*, 422 U.S. 590, 604 (1975)).

In *Webster,* evidence was suppressed following a Terry stop case with similar hallmarks: No Miranda warning; very close temporal proximity between detention and consent; no intervening circumstances to warrant investigation; and flagrancy of the illegal stop, considered the four factors in *Kaupp v. Texas*, 538 U.S. 626, 633 (2003).

In *U.S. v. Webb*, 480 F.Supp. 750 (E.D.N.Y. 1979), "the court finds that Webb's statement was not sufficiently an act of free will to purge the taint. It was made approximately four hours after her illegal arrest." See also *U.S. v. Blackaby*, Motion for Suppression, (E.D.Ky. 2018): "mere minutes"; *U.S. v. Spottsville*, 05-50095 (E.D.Mich. 2006): "only minutes".

This Court, in its memorandum opinion, relied heavily on *U.S. v. Chee*, 514 F.3d 1106 (10th Cir. 2008), which set forth the following factors the court misunderstood and misapplied to this case:

"Indications of whether the police are in full control may include whether the suspect was separated from his family", *Chee*, at 1113. Movant mentions in the record repeatedly her concern about her cousin Patrick (her family) and her concern about Patrick after she was taken to the back yard. While SA Boady did not specifically recall her mention of Patrick, it is undisputed that Patrick was on the premises, was in the front yard, and was not taken into the backyard when Movant was taken. Hence, Movant was separated from her family.

"…and isolated in a nonpublic questioning room", *Chee*, at 1113. SA Boady admitted the backyard was private and isolated ("the neighbors weren't seeing it, and it was more out of the way", "we try to be out of the way"), and admitted "questioning" Movant.

"…there was the threatening presence of several officers", *Chee*, at 1113. It is undisputed that in Movant's case, there were at least four agents in the backyard conducting interviews, one guarding the only escape from the backyard, and multiple agents in the house and in the front yard, many of whom physically threatened Movant less than ten minutes prior. Most reasonable people would feel, after being physically pulled out of their home at gunpoint, that the same agents ten minutes later would be threatening, whether they were overtly armed this time or not.

"…there was any display of weapons or physical contact with the suspect", *Chee*, at 1113. Movant testified she was pulled out of her house, and this position was undisputed by SA Boady: "I guess pulled". To pull is unequivocally to establish physical contact. The display of weapons was aggressive behavior, and neither *Chee* nor other caselaw prescribes a period of seconds until a threatening display of weapons dissipates as coercion.

*Chee* is completely inapposite to this case, as Mr. Chee traveled willingly to the police station (by appointment), never saw a weapon, was never pulled out of his home, was never touched, was never threatened or promised leniency, never saw more than two officers, had a clear path to escape at all times, and produced a ten-minute written confession.

Similarly, *U.S. v. Cash*, 733 F.3d 1264 (10th Cir. 2013) is inapposite because Cash had been duly arrested, unlike Movant, and sought the patrol officer's attention before his incriminating statements, not the reverse.

The Court's heavy reliance on *U.S. v. Lopez*, 437 F.3d 1059 (10th Cir. 2006) was also misplaced: Lopez, under arrest, was Mirandized each of the three times he talked with federal agents. Movant was never Mirandized.

AUSA Messec's pronouncement in the suppression hearing that "[The FBI] showed concern for the occupants of the residence, just by taking Ms. Channon to the backyard so she would not be questioned in front of all her neighbors" (Dkt. 145, at 76-77) raises two important points: first, that running police lights, blocking off the street, pounding on the door, loudly announcing "FBI", extracting Movant from her home and searching her half-naked body in full view of the neighbors, required no privacy, but avoiding a "conversational tone" in full view of the neighbors due to concerns about Movant's privacy was suddenly of paramount concern; second, that the Government realized full well that "taking Ms. Channon to the backyard" was coercive. Boady testified in the affirmative that he "took her into the backyard" (Hrg. at 25).

Movant's privacy is not a matter to be bestowed by the FBI when it suits them, but is a constitutionally guaranteed Right, and Messec's characterization of Boady's decision, not Movant's decision, to take

Movant to the backyard for questioning as "concern" is bad faith that
Counsel could have, should have, and did not object to on the spot.

> [E]xposure to public view both reduces the ability of an
> unscrupulous policeman to use illegitimate means to elicit self-
> incriminating statements and diminishes the motorist's fear that,
> if he does not cooperate, he will be subjected to abuse."
> *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984).

The admission that Boady did not actually "ask" but "tell" was
never pursued by Counsel, who instead said, "All right. I had asked a
different question, but I'll move on." (Hrg. at 33). Counsel failed to
paint the picture of coercion, and was thus ineffective.

In short, Movant's Fifth Amendment Right not to "be compelled in
any criminal case to be a witness against h[er]self" was violated, and
Counsel failed to raise the matter on appeal, whether interlocutory or
after trial.


**E. Incongruities Between Testimony and Memorandum Opinion**

**1. "Nervous yet comfortable"**

The dictionary definition of "nervous" is "anxious or
apprehensive". Its antonyms are "calm, relaxed, easygoing". The
applicable dictionary definition of "comfortable" is "free from stress
or fear". Its antonyms are "vulnerable, threatened, unsettled, tense".

Nervous and comfortable are opposite states of mind. One can be
either, but one can never simultaneously be both. Counsel was
ineffective for failing to object to Boady's self-contradictory
statements, which the Court adopted.


**2. Pulled Out The Front Door**

On page 2 of the memorandum opinion and order, the Court writes,
"As Brandi walked out the front door, a female agent pulled her and
moved her more quickly away from the door". This is plain error,

unsupported by the record. At no point did either witness claim Brandi

walked out the front door; both agreed she was pulled.

"Since the officer did not arrest the defendant for any crime in

connection with her possession of the vehicle, the officer had no

authority to remove the defendant from the vehicle[.]" *Lennon v.*

*Miller*, 66 F.3d 416 (2nd Cir. 1995). It was not any more objectively

reasonable for Movant to be pulled out of her home than it was for

Lennon to be removed from her vehicle.

*Nix v. Williams*, 467 U.S. 431 (1984) held that:

> [W]hen, as here, the evidence in question would inevitably have
> been discovered without reference to the police error or
> misconduct, there is no nexus sufficient to provide a taint and
> the evidence is admissible.

While the above holds that no matter what misconduct the FBI committed

against Movant during the search and seizure would not impact the

fruits of the search warrant, the brutish abduction of Movant, wherein

she was coerced to open her door at gunpoint and pulled out of her

home, in a violation of her Fourth Amendment Right to be "secure in her

person[ and] house[]," necessarily taints any subsequent conversations

between Movant and the FBI, which, had Movant been frisked in the

privacy of her own home and allowed to remain in the home, could well

have resulted in a noncoercive environment where Movant realized she

was free not to answer questions and also free not to preemptively

confess to whatever the agents desired.

The Government argued that lack of awareness of the contents of

the residence justifies the forcible removal of its occupants, but

Lennon was no less likely than Movant to have hidden a weapon or

unknown person in the vehicle she was removed from. This Court

similarly felt that, "[t]he Court cannot conclude that there was no

coercive activity by the agents." (Dkt. 123, at 19).

Although the Court considered multiple aspects of coercive activity by agents, it mistakenly forgot to include the forced removal and clearing of residents from the home, which was neither authorized by the search warrant nor necessary to conduct the search.

The Court assumed that the FBI was justified in evicting the occupants of the house into the front yard when clearing the house. In fact, the act of clearing the house was unnecessary, not authorized by the search warrant, and not at all a typical search and seizure. This is not a matter where, as in *Escobedo v. Illinois*, 378 U.S. 478 (1964), "the officer denied making the promise and the trier of fact believed him…the confession was voluntary".

### 3. "Brief little patdown"

"The Court finds that the patdowns were brief and minimally intrusive; Brandi herself did not characterize this as a significant event, testifying that it was only a "brief little patdown." [Hrg. at 53].

The court erred again, because the "brief little patdown" was followed by "And then I was escorted to the tree and they did a further search. Everything — you could see what I was wearing. There was nothing underneath it." (Hrg. at 53).

### 4. Permission Never Given

"Agents requested permission to interview Brandi, and she gave permission." (no cite) (123 at 19)

Instead of the Court finding Movant's contrary remarks unpersuasive, the Court ignored them entirely by mistake. In declining to cite in the transcript, the Court committed plain and reversible error.

While the Court appeared to struggle with whether Movant was coerced and used mistakes of fact to find Movant was not, coercion is plainly evident in Boady's account of what Movant said: "Whatever it is, I did it and I want to be blamed for it." Prior to the advent of common law, the entire practice of Judicial Torture was to produce an unconditional admission of guilt exactly like Movant produced. No reasonable person would produce such a confession if they did not find the surrounding experience unbearable. Coercion tampers with the inherent trustworthiness of confessions, and since federal courts must follow the Federal Rules of Evidence and not the Sixteenth Century's rules of Judicial Torture, no reasonable Court would let stand the admission of Movant's blanket confession.

The fact the confession was introduced by Movant's own Counsel at trial, torpedoing the Court's *Bruton* strategy, doubly reinforces the prejudicial effect: whether ineffective assistance of Counsel, judicial error, or misconduct from the Government, or more than one of the above, the error undermined the fairness of the trial and contributed to a miscarriage of justice.

### F. Counsel Did Not Understand Or Explain Movant's Lupus

Counsel failed to object to the Government's calling for rank speculation of what Boady would have done, had he actually listened to Movant's health concerns. The speculation was simply irrelevant, as the purpose of the hearing was to determine Movant's state of mind (would a reasonable person find the environment coercive from the suspect's perspective?), not to establish whether it was Boady's intent to create a coercive environment (which ignores the possibility that he contributed to one despite an intent not to). When the constable blunders, it does not matter if the blunder was inadvertent: it is

still a blunder. In *U.S. v. Pelaes*, 790 F.2d 254 (2nd Cir. 1986),

quoting *U.S. v. Henry*, 447 U.S. 264, 271 (1980):

> Even if the agent's statement that he did not intend that Nichols
> would take affirmative steps to secure incriminating information
> is accepted, he must have known that such propinquity likely
> would lead to that result.

Although Movant claimed she told Boady about her condition in

detail and Boady denied recollection of any such conversation, Counsel

failed to establish that it was not Movant's burden to tell Boady her

health was being harmed multiple times until he actually understood it,

or her burden to correctly choose which agent to tell. When Movant

realized the chairs were in full summer sun, and that fact would cause

her a Lupus flare-up reaction, Boady had been facing away from Movant,

had been moving away from Movant to lead her to the backyard, was not

yet in a position to take notes of anything Movant told him, and "kind

of had some focus" more on leading rather than listening. Agent Berry

did not testify, but her presence in the group with Boady and Movant

meant that it was possible that Boady thought at the time that Movant

was telling her instead of him. Counsel failed to subpoena Berry, and

failed to effectively question Boady on the matter.

Counsel failed to understand and establish that one cannot

discern if someone suffers from Lupus or a Lupus trigger just by

glancing at them. The physical sensation to a Lupus sufferer being

exposed to bright sunlight has been described as a mist of boiling

water or acid: an unpleasant sensation but one the sufferer realizes

will cause burns unless they immediately move away from it.

The 30-45 minutes in direct sunlight was more than sufficient to

cause a severe flare-up that lasted for the better part of a week but

did not cause Movant to be bedridden until about 12 hours after

exposure.

## G. Right to Representation Under *Massiah* & *Escobedo*

Movant, newly married to Matthew Channon, was represented by Donald Kochersberger during the search and seizure.

> [O]nce the government has entered into a formalized adversarial relationship with an individual, it needs to tread carefully so as not to infringe upon the defendant's Sixth Amendment right to counsel. *U.S. v. Oldman*, 2:00-CR-222, (D. Utah. 2001).

SA Boady knew, or should have known, that Movant was or could have been represented by counsel prior to his decision to seek an on-the-record interview with Movant.

> By intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel, the Government violated Henry's Sixth Amendment right to counsel. This is not a case where, in Justice Cardozo's words, "the constable…blundered,"…; rather, it is one where the "constable" planned an impermissible interference with the right to assistance of counsel. *Pelaes* (quoting *Henry* at 274-75).

SA Boady deliberately elicited incriminating information from Movant during the search and seizure. Deliberate elicitation is defined as the intentional creation of circumstances by government agents that are likely to produce incriminating information from the defendant, and is well-evidenced by the rearrangement of lawn chairs in the backyard.

> In *Massiah v. United States*, 377 U.S. 201 [(1964)], [the Supreme] Court observed that "a Constitution which guarantees a defendant the aid of counsel at…trial could surely vouchsafe no less to an indicted defendant under interrogation by the police in a completely extrajudicial proceeding. Anything less…might deny a defendant 'effective representation by counsel at the only stage when legal aid and advice would help him.'" *Id*, at 204, quoting DOUGLAS, J., concurring in *Spano v. New York*, 360 U.S. 315, 326 (1959).

> The interrogation here was conducted before petitioner was formally indicted. But in the context of this case, that fact should make no difference. When petitioner requested, and was denied, an opportunity to consult with his lawyer, the investigation had ceased to be a general investigation of "an unsolved crime." *Spano v. New York*, 360 U.S. 315, 327 (STEWART, J., concurring). *Escobedo v. Illinois*, 378 U.S. 478 (1964).

It was never asked nor answered in this case's proceedings whether Movant had requested an opportunity to consult with her lawyer. Based on Movant's affidavit (Ex. 106), SA Boady knew full well he was violating Movant's Right to have her attorney present. "Petitioner had, for all practical purposes, already been charged[.]" *Escobedo*, at 486.

By failing to raise a defense under *Massiah* or *Escobedo* during pretrial, trial, or appeal, Counsel waived the easier "represented by counsel" argument and pinned Movant's hopes on the less meritorious "coercive environment" argument, which failed.


### H. Movant's Cat Was In Danger and Leaving Was Not Voluntary

All sides seemed nonplussed about the mention of Brandi's cat, and this owes to ineffective assistance of counsel.

As the exhibit with the front door wide open shows, the agents propped it open and did not guard the door, contrary to Boady's testimony during the hearing.

Movant, having been in the front yard briefly, was in a position to know about the front door. Given the danger she felt her cat was in, from over a dozen 200-pound agents rifling through every hiding place and potentially stepping on her cat, Movant's inability to protect, restrain, or render aid to the cat because she was barred from her own house, would have given her substantial reason to believe that she and she alone was the only party capable of and responsible for ensuring her cat's safety, in the likely event the cat was shooed to or bolted for the busy street in front of the house.

Likewise, Movant's testimony indicates a high degree of concern for her cousin Patrick, a minor at the time, who was to be placed in handcuffs and also in the front yard.

The reasoning becomes important when considering Movant's rationale for abruptly leaving the front yard for the back yard ("she didn't want to leave") when the danger to her cat and her cousin had not passed. Either Brandi is a simpleton, and simply forgot about her cat and her cousin as soon as an agent asked her to join them in her backyard (a characteristic contrary to the Government's repeat mention of Brandi's sophistication throughout the hearing and trial); or her will was overborne: in this case, her will to ensure her cat's safety and cousin's welfare by "not leaving" the front yard.

The fact that neither the Court nor Ms. Vierbuchen could comprehend the relevance of Brandi's love for her cat can be traced directly to ineffective assistance of Counsel. Had Counsel adequately described Movant's state of mind and connected the dots for the Court, the Court could have realized the cat's relevance and importance, and also how fishy and impossible SA Boady's "immaculate noncustody" fiction was. If Counsel had not failed to achieve that, Movant's confession (and the resulting effect it had on both defendants in spite of *Bruton*) would have been ruled inadmissible, leaving the Government without a conspiracy count to charge and probably without much of a case at all against either defendant.

### I. Movant's Self-Discrediting Confession

Movant, in stating that she did it and wanted to take the blame for it, in a blanket admission of guilt even before being confronted with specifics, should have, in so doing, successfully discredited the entirety of the confession to follow.

While Counsel adequately informed Movant she had the right not to testify in her own defense at trial, Counsel completely waived any objection to Boady's testimony of what Movant said, on Rule 801(d)(2)

and 804(b)(3) hearsay issues, at the suppression hearing, at trial, and on appeal.

801(d)(2)(A) makes admissible an opposing party's (Movant's) statement, provided it was "made by [Movant] in an individual or representative capacity".

However, Movant's initial declaration that "whatever it is the FBI was there for, she did it and wanted to take the blame for it" was not a statement under 801(d)(2)(A). An actual incriminating statement would have necessarily involved at a minimum the most tangential mention of a criminal act, which this portion of the confession did not actually include.

> A "statement" is defined in Rule 801(a)(1) as "an oral or written assertion." Although "assertion" is not defined in Rule 801, the advisory committee notes state that "nothing is an assertion unless intended to be one." *U.S. v. Jackson,* 88 F.3d 845 (10th Cir. 1996).

804(b)(3) makes admissible "[a] statement which…at the time of its making…so far tended to subject the declarant to…criminal liability…that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." *U.S. v. Smalls*, 605 F.3d 765 (10th Cir. 2010). Whether Movant was a reasonable person at the time of the confession, and whether any reasonable person could make a blanket admission of guilt without context, were matters incumbent upon Counsel to raise.

Counsel did file a motion to suppress (Dkt. 52) under *Schneckloth v. Bustamante*, 412 U.S. 218, 228-29 (1973); *Lego v. Twomey*, 404 U.S. 477, 488-89 (1972); and *U.S. v. Falcon*, 766 F.2d 1469, 76 (10th Cir. 1985), but these were objections based on voluntariness, not the admissibility of hearsay.

By waiving the hearsay arguments, Counsel ineffectively represented Movant, not only causing prejudice in the form of allowing

a highly damaging confession to be presented to the jury, but
delivering to the jury himself a cross-examination which served to
simultaneously paint Movant as a manipulative liar and SA Boady as an
agent with the ability to discern irrelevant statements from
incriminating ones.

**V. Movant's 5th Amendment Right Not To Be Held On An Infamous Crime, Unless On An Indictment Of A Grand Jury, Was Violated When She Was Charged By Way Of An Indictment Lacking Any Signature**

None of three indictments were signed by a Grand Jury Foreperson
(Ex. 10, at 8; Ex. 9, at 9; Ex. 8, at 9), making them invalid.

**A. The D.N.M. Local Rules Require An Actual Signature**

While e-signatures are becoming more accepted in other districts,
this district's local rules (LR1.5 from both 2012 and 2016 revisions to
D.N.M. Local Rules) explicitly require the image of all required
signatures, which includes the Grand Jury Foreperson's image signature.

Even if an e-signature were valid, the signature block would
still be deficient- a properly redacted e-signature would look more
like "/s/Grand Jury Foreperson" and not just "/s". In effect, the copy
provided to Defendants was "signed by no one", and it is likely that
the official copy was not signed according to the local rules,
effectively likewise signed by no one. The D.C. Circuit held:

> In our opinion in chief in this case, issued April 8, 1969, we
> held that the indictment procedure long followed in this
> jurisdiction violated Rule 6, FED.R. CRIM.P., in that it did not
> include approval of the indictment by the requisite 12 grand
> jurors. We announced that all indictments brought under that
> procedure after the date of our decision would be subject to
> dismissal, without any inquiry whether the grand jury would have
> approved the indictment had it been given the chance. *Gaither v.
> U.S.*, 413 F.2d 1061 (D.C. Cir. 1969).

**B. Other Districts' Local Rules Do Not Require An Actual Signature**

In *U.S. v. Maravilla,* 566 Fed. App'x. 704 (10th Cir. 2014), a second or successive 2255 petition was filed along similar lines (jury foreman signature or lack thereof) in the Northern District of Oklahoma. Maravilla's petition was held to have failed under 2255(h)(1) for two reasons that are inapplicable here: one, the fact his petition was second or successive required "actual factual innocence" to be dispositive, rather than mere "legal innocence" as he alleged, and two, substantially different local rules:

> "Under the local rules, for the Northern District of Oklahoma, the foreperson's actual signature must be redacted from the public docket. N.D.Okla. Local Civil Rule 47.1(g)(3)(B). The clerk of court retains a sealed hard copy of the original indictment with the written signature." *Maravilla*, at page 6.

Similarly, in *U.S. v. Marshall,* 2011 WL 3924160 (D. Conn. 2011), local rule XI.C "permitted a '/s/' signature".

The instant case is distinguished from *Maravilla* and *Marshall* at least twofold: this is an original 2255 petition, meaning this case can be reversed using the more lenient standard of "legal innocence"; and D.N.M. local rules neither require nor permit substitution on the public docket of an anonymous e-signature for the grand jury foreperson's actual written one.

**C. The Assistant U.S. Attorneys Authoring The Indictments Violated Movant's Fifth Amendment Rights And Committed Misconduct By Shunting The Process Outside The Magistrate Judge And Court Clerk**

AUSA's Messec and Kastrin both committed misconduct by short-circuiting the Grand Jury signature process, which, according to Rule 6(f) F.R.Crm.P, requires the foreperson's submission to a Magistrate Judge in open court; as well as according to Rule 6(c) F.R.Crm.P, the foreperson's signature and the foreperson's filing with the clerk.

Trial and Appellate Counsel was ineffective for failing to call the irregularity to the Court's attention, and/or failing to request an *in camera* review to ensure the Grand Jury had actually endorsed the indictments.

Trial and Appellate Counsel was ineffective in failing to object to each invalid indictment, and without a valid indictment, the Court was without jurisdiction to try the case or sentence Movant.

> *Gaither,* at 1061-3, states:
>
> The Fifth Amendment requires that an indictment be brought by a grand jury. The grand jury is interposed "to afford a safeguard against oppressive actions of the prosecutor or a court." The decision to hale a man into a court is a serious one, subject to official abuse. For this reason, 12 ordinary citizens must agree upon an indictment before a defendant is tried on a felony charge.

The fatal insufficiency in the indictments was not to the lack of endorsement, or lack of formality, but to the lack of authentication. Given the AUSA's absolute power to adulterate the Grand Jury process, including sole custody of the Grand Jury's signed indictment during the time between the foreperson's signature and submission to the court clerk, and other indicia of the AUSA's tampering with the Grand Jury process, as brought up in other grounds, this prejudice went beyond a simple typographical formality.

"An indictment, void because it is unsigned by the foreman, cannot be cured by the entry of the grand jury that incorrectly reports that a secret indictment was signed by the foreman." *Hammond v. Brown,* 323 F. Supp. 326, (N.D. Ohio, 1971, affirmed as 450 F.2d 480, 6th Cir. 1971).

This is a situation indistinguishable from one in which, each time, the Grand Jury voted "ignoramus" and the AUSA opted to move forward ahead anyway, in spite of the Grand Jury's decision and

authority and in spite of the law, knowing there was no proof nor risk of detection, nor any real personal consequences in the unlikely event her conduct was discovered.

> In the government's eye, the grand jury is a mere instrument of prosecutorial will, a probable cause screening device obligated to act at the direction of the prosecutor and then only when the prosecutor has decided whom and how much to charge. *U.S. v. Navarro-Vargas*, 408 F.3d 1184, 1213 (9th Cir. 2005).

Counsel was ineffective in failing to object to this invalid indictment, for without a valid indictment, the Court was without jurisdiction to try the case or sentence Movant.

To demonstrate the above, Movant requests the Court hold a hearing and call as fact witnesses Magistrate Judges W. Daniel Schneider, Karen Molzen, and/or Kirtan Khalsa; to corroborate that Magistrate judges in this District in practice do not communicate directly with Grand Jurors in the manner prescribed in Rule 6(f).

### D. FRCrmP 6(c)'s Requirement For The Foreperson To "Sign All Indictments" Is Applicable

*Frisbie v. U.S.*, 157 U.S. 160 (1895) states, "The omission of the formal endorsement of an indictment as 'a true bill,' signed by the foreman of the grand jury, is not necessarily and under all circumstances fatal, although it is advisable that the indictment should be endorsed". The mechanics of a Grand Jury indictment in Frisbie's time differed substantially from those of today: the Grand Jury foreman literally handed the endorsed indictment to the Judge or Clerk, and it is the act of this handing over that made the signature-bearing endorsement a necessary and satisfied formality.

Distinguishing the instant case, the Grand Jury foreperson in each of these indictments never so much as saw the clerk or a judge. The AUSA produced the indictments, gathered them up, and then filed

them herself into CM/ECF. By eliminating both the signature and the handoff, *Frisbie* is unavailing as a loophole for violations of Rule 6(c), no form of which existed in *Frisbie's* time. *Frisbie* also stated "that in the mother country, formerly at least, such endorsement and authentication were essential."

> *Frisbie* (id. at 164) states:
>
> "1 Bish.Crim.Proc. sec. 700, it is said:
> "In the absence of a mandatory statute, it is the better view that both the words 'a true bill' and the signature of the foreman may be dispensed with if the fact of the jury's finding appears in any other form in the record.""

In the instant case, there *is* a mandatory statute, Title 18 App. Rule 6(c), and in fact, there is zero appearance of the jury's finding in any other form in the record.

The signature of the foreman of the Grand Jury to an indictment, certifying it to be "a true bill", legally imports that it was found by twelve or more grand jurors. *Turns v. Commonwealth*, 6 Met. 224, 233, (1843).

### E. Counsel Ineffectively Failed To Seek The Grand Jury Minutes

The indictment as a charging instrument has been recognized to have two chief purposes — first to apprise the accused of the charges against him, so that he may adequately prepare his defense, and second to describe the crime with which he is charged with sufficient specificity to enable him to protect against future jeopardy for the same offense. *Russell v. U.S.*, 369 U.S. 749 (1962).

> Upon a defendant's motion to dismiss the indictment because only the foreman had ratified it, the foreman's signature should raise a presumption that the indictment reflects the will of the grand jury. In order to attack that presumption, the defense should have access to the grand jury minutes. *Gaither, at 1063-4.*
>
> If on the basis of those minutes and the presentment voted by the grand jury the defense can show a reasonable possibility that the jurors would not have approved of the indictment actually

> returned to court, but would have insisted on an indictment
> different in some material respect, the indictment should be
> dismissed. *Gaither, at 1064.*

In determining whether the actual indictment deviated from the will of the Grand Jury, the Court should be guided by the principles laid down by the Supreme Court in *Stirone*.

Of course, the Government may have objections to disclosing Grand Jury minutes that would not otherwise be available to the defense under *Allen v. U.S.*, 129 U.S.App.D.C. 61, 390 F.2d 476 (1968). In such cases it will have to choose between such disclosure and reindictment of the defendant. *Gaither, at 1064 (citation shortened).*

### F. Prejudice Was Suffered By Movant

> The applicable test for prejudice is whether we can say, "with
> fair assurance, after pondering all that happened without
> stripping the erroneous action from the whole, that the judgment
> was not substantially swayed by the error." *Kotteakos v. United
> States*, 328 U.S. 750, 765 (1946). The decisive factors are the
> closeness of the case, *Cross v. United States*, 122 U.S.App. D.C.
> 283, 285 (1965); Jones v. United States, 119 U.S.App.D.C. 213,
> 214 n. 3 (1964), the centrality of the issue affected by the
> error, *King v. United States*, 125 U.S.App.D.C. at 330 ("nerve
> center issue"), and the steps taken to mitigate the effects of
> the error, *Cross*, 122 U.S.App. D.C. at 285. *Gaither, at 1079*
> (footnotes inlined and cites shortened).

Unlike in *Gaither*, the instant case was quite close in terms of the Court's novel interpretations of the law, and in the admissibility of the evidence. Prosecutor Margaret Vierbuchen stated, on the actual day of trial, "If these summary charts are not admissible at trial, judge, the government would not be able to go forward" (Ex. 116, Tr. At 5). Had the Trial Judge gotten a more likeable or vigorous defense from either defense Counsel, her prior rulings coupled with her mentions of her own struggles to adopt the Government's evidence indicate her ruling could have gone the other way and the case would have been dismissed or driven toward acquittal.

The centrality of the issue affected by the error, whether on each occasion the Grand Jury moved to indict or not, is as central as issues get. Twice unsatisfied with the indictments they had already procured, unknown AUSA's (no printed name on any indictment, and both superseding indictments having different illegible signatures) followed the same recipe, repeating the error involving the Grand Jury foreperson's signature, and making no effort to actually obtain and redact it. This pattern of misconduct exacerbated, rather than mitigated, the shortcomings in the indictments. As such, all three prongs of Gaither's test for prejudice fall squarely in Movant's favor.

### G. Counsel Was Ineffective For Failing To Raise Any Of These Issues Either As Objection Or On Appeal, Or To Even Seek To Explore Them

"The question presented to the court is not whether there is a defect in an indictment but whether there is in this case an indictment." *Kennedy v. Alvis*, 145 N.E.2d 361 (Ohio C.P. 1957).

According to Matthew Channon's affidavit (Ex. 115), the D.N.M. Court Clerk is not aware of any involvement by a magistrate judge in any criminal indictment (as prescribed in Rule 6(f)), nor does the clerk ever receive anything directly from a jury foreperson, instead derelicting the verification of a true bill to the one entity the clerk is entrusted with keeping honest: the assistant U.S. attorney producing the indictment.

Under D.N.M. Local Rule 49.6, Documents that are electronically filed and require original signatures other than that of the Registered Participant (i.e. the original signed indictments) must be maintained in paper form by the Registered Participant until one (1) year after all time periods for appeals and post conviction relief expire.

Movant hereby requests the court, under Federal Rules of Criminal Procedure Rule 6(E)(ii), require the production of these original

indictments, Grand Jury minutes and Grand Jury transcripts and conduct

an *in camera* review hearing to verify whether the original signatures

are genuine, proper, and not electronic.

Further, Movant submits her Counsel was ineffective for failing to

seek the same relief from the Court, or to raise this matter on appeal,

and resulting prejudice included an unfair trial and criminal

conviction.


**VI.** **Movant's 5th Amendment Right To Procedural Due Process Involving An Unbiased Tribunal, 6th Amendment Right To Trial By An Impartial Jury, And 8th Amendment Right Against Excessive Fines Were Violated When The Judge Prejudged Her Guilt**

Before trial, one of the Judge's remarks could qualify as simply

misspeaking, but the repeated pattern indicated, if there existed no

sincerely-held bias, there was a plausible basis for Movant to gain an

impression that one did exist. "Prejudgment has no suitable place in

the judicial mind nor was judicial power intended to be exercised to

give effect to whims of the judge's will." *Barnes v. State*, 220 Miss.

248 (S.C. Miss., 1954).

> "A criminal defendant tried by a partial judge is entitled to
> have his conviction set aside, no matter how strong the evidence
> against him." *Tumey v. Ohio*, 273 US 510, 535 (1927); *Arizona v.
> Fulminante*, 499 US 279, 308 (1991). [From *Edwards v. Balisok*, 520
> U.S. 641 (1997, italics added)].

One would be hard-pressed to find each of the other grounds in this

motion to have existed absent any judicial bias. Counsel no doubt

picked up on it and adjusted their trial strategy accordingly, but

absent objections, so adjusted to Movant's detriment.

> It is a matter of common knowledge that jurors, as well as
> officers in attendance upon court, are very susceptible to the
> influence of the judge. [Law enforcement], as a rule, are anxious
> to do his bidding; and jurors watch closely his conduct, and give
> attention to his language, that they may, if possible, ascertain
> his leaning to one side or the other, which, if known, often
> largely influences their verdict. *Barnes, at 252.*

> The limited [basis for a bias or partiality motion] is where the circumstances demonstrate "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. U.S.*, 510 U.S. 555 (1994)(quoted in *Nelson v. U.S.*, 07-3071 (W.D.Mo. 2008), citation adjusted).

Anti-defendant interactions between the Jury and the Judge cannot be proved or disproved from a printed transcript, nor can Movant submit an affidavit therefor, but their existence would be moot.

> What would it avail the accused in a criminal prosecution to have a trial by an impartial jury if the proceedings are to be presided over by a biased and partial judge? It is common knowledge that a biased judge may prejudice a party's cause without this appearing on the record. *Massie v. Commonwealth*, 93 Ky. 598, 20 S.W. 704 (quoted in *State v. Armijo*, 38 N.M. 73 (N.M.S.C. 1933).

The off-the-record remarks regarding "resolv[ing] this" were highly unprofessional, and betray the Court's serious misprioritization for clearing the Judge's docket over faithfully discharging her Constitutional oath. "[I]t is true that Rule 11(e) prevents a judge from shaping the terms of a plea bargain or pressuring a criminal defendant to settle his case." *U.S. v. Carver*, 160 F.3d 1266 (10th Cir. 1998).

The pressure was not an occasional slip of the tongue. Whereas one could construe the Judge's on-the-record questioning of Counsel as a one-time status update, a desire to receive "*a* decision" on whether a plea bargain would be obtained, rather than encourage one, numerous similar off-the-record moments established a pattern of implicit coercion. "Don't take this personally…Is there any chance?" is far more entreaty than "Have you decided?"

> Rule 11 "'is designed to totally eliminate judicial pressure from the plea bargaining process.'" *U.S. v. Casallas*, 59 F.3d 1173, 1178 (11th Cir. 1995) (quoting *U.S. v. Corbitt*, 996 F.2d 1132, 1135 (11th Cir. 1993)). "Excluding the judge from the plea discussions . . . serves three purposes: it minimizes the risk that the defendant will be judicially coerced into pleading guilty, it preserves the impartiality of the court, and it avoids any appearance of impropriety." *U.S. v. Kraus*, 137 F.3d 447, 452

(7th Cir. 1998). (From *U.S. v. Cano-Varela*, 497 F.3d 1122 (10th Cir. 2007), citations shortened).

According to the *ABA Standards for Crim. Justice* (Chapter 14- Pleas of Guilty), "A judge shall not through word or demeanor, either directly or indirectly, communicate to the defendant or defense counsel that a plea agreement should be accepted or that a guilty plea should be entered". "Rule 11(c)(1)'s prohibition on judicial participation in plea discussions [] becomes operative *before* a defendant has decided whether to plead guilty or to stand trial." *U.S. v. Davila*, 133 S.Ct.2139 (2013).

To the extent that refusing to take the Judge on can be called ineffective, Counsel was ineffective. The resulting prejudice was severe, came from all sides, and drove the trial to a fundamentally unfair and unreliable result.

After witnessing and factoring in the numerous examples of judicial bias and prejudgment stated in this ground, and their fruits, particularly after trial began, Movant had a substantial basis to believe that even if she took the stand, she would be denied her right to testify in her own defense, free of judicial interference with due process. "To succeed on his claim of judicial bias…Movant must show that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused." *Nichols v. Sullivan*, 867 F.2d 1250, 1254 (10th Cir. 1989, quoted by *Wesley v. Snedeker*, 04-CV-17-JB-DJS (D.N.M. 2007). Her remarks at the evidentiary hearing, "This case is about the Channons" (Ex. 118); "they obtained these rewards" (Ex. 37); "the facts are that the defendants were, you know, [guilty]" (Ex. 37); "I don't dispute that the Channons did something here." (Ex. 2), make the requisite showing of prejudice.

Under *Tumey*, the eponymous habeas petitioner's conviction and his $100 fine were reversed because the judge had a "direct pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village." While this Court's remuneration is fixed, the ordered forfeiture, now on its second journey to the 10th Circuit, raises important questions as to the Court's "official motive to convict and to graduate the [forfeiture] to help the financial needs" of the FBI, *contra Tumey*, *contra Austin v. U.S.*, 409 U.S. 602 (1993) and in violation of Movant's Fifth, Sixth, and Eighth amendment rights.

VII. **Movant's 5th Amendment Right To Due Process And Grand Jury Screening Of Indictments, And 6th Amendment Right To Be Informed Of Criminal Charges, Confront Witnesses, And Compel Witnesses To Appear In Court Were Violated When The AUSA And FBI Manufactured Evidence Used At Trial**

A. **IP Address Irregularities**

District courts throughout the country are starting to realize just how limp IP address evidence is:

> To allege copyright infringement based on an IP snapshot is akin to alleging theft based on a single surveillance camera shot: a photo of a child reaching for candy from a display does not automatically mean he stole it. No Court would allow a lawsuit to be filed based on that amount of evidence… *Ingenuity 13 LLC v. Doe*, Dkt. 48, 2:12-cv-8333-ODW(JCx) (C.D.Cal. 2012).

> In <u>In re Bittorrent Adult Film Copyright Infringement Cases</u>, 2012 WL 1570765, at *3 (E.D.N.Y. May 1, 2012), the district court explained that "it is no more likely that the subscriber to an IP address carried out a particular computer function…than to say an individual who pays the telephone bill made a specific telephone call." The court explained that due to the increasing popularity of wireless routers, it is even more doubtful that the identity of the subscriber to an IP address correlates to the identity of infringer who used the address. *AF Holdings v. Chris Rogers*, Dkt. 14, 3:12-cv-01519-BTM-BLM (S.D.Cal. 2013).

SA Moon had the Court believing that one could link a universe of behavior, or in fact any universe of behavior, to a single act (the creation of one free email account from an IP address), and disregarded

the remaining universes of possibilities. Although Moon insisted that

all users of an IP address are the same person and related, the 9th

Circuit differs:

> Internet providers, such as Comcast or AT&T, can go so far as to
> identify the individual who is registered to a particular IP
> address (i.e., an account holder) and the physical address
> associated with the account, but that connection does not mean
> that the internet subscriber is also the infringer. The reasons
> are obvious—simply establishing an account does not mean the
> subscriber is even accessing the internet, and multiple devices
> can access the internet under the same IP address. *Cobbler
> Nevada, LLC v. Gonzales*, 17-35041 (9th Cir. 2018).

Timing is also critical, as internet service providers furnished

with the wrong date can occasionally give incorrect information

regarding IP addresses, as happened in *Malibu Media v. Pelizzo*, 1:12-

cv-22768, Dkt. 58 (S.D.Fla. 2014).

The Government's wishful thinking preceded Moon's entry to the

case, dating back at least to SA Boady's affidavit for search warrant,

which the above indicates should have been susceptible to a *Franks*

motion. Counsel refused to file any such motion even after learning

about Boady's reckless disregard for the conflicting IP addresses made

the nexus to Movant's personal behavior tenuous at best.

Counsel waived dozens of opportunities to correct the prejudicial

result the Government brought about through specious reasoning,

including motions practice, objections, introducing the missing body of

evidence through its own witnesses, and on appeal.

### B. No Gmail Servers In NM

It remains unproven and unalleged that Co-Movant was in New

Mexico during the emails sent in Counts 6 and 7. "The communication at

issue must satisfy the interstate nexus requirement set forth in §1343;

it is an immutable requirement." *U.S. v. Izydore*, 167 F.3d 213, 219

(5th Cir. 1999). Credit card records, receipts, IP address logs, and

other indicia could have proven Movant's and Co-Movant's actual whereabouts during the time of the e-mails, but Counsel never sought to introduce them or hold the Government to produce them.

Counsel could have eviscerated Co-Movant's counts 6 and 7, and their resulting impact on count 1, not from an argumentative perspective but from an interstate wire perspective, on jurisdictional grounds, assuming actual wires would have been involved to begin with. If Co-Movant might not have been in NM, then Co-Movant might not have committed the acts in counts 6-7, and hence Movant might not have conspired in count 1. Counsel did not try to catch the Government's lapse in logic, prejudicing Movant to face an unfair proceeding that convicted through assumption.

### C. Synthesized Trial Exhibits

Selectively combining the information in two documents is not summarizing the information, any more than this sentence is summarizing the dictionary: it cannot be justified just because all the words in this sentence can be found in the dictionary. When the documents summarized are from different time periods, fatal errors of context doom the end result, like approving a search warrant to a murder suspect's known former address from 25 years prior. Neither component document needs to be inaccurate for the error to be fatal.

> It is difficult for me to believe that the jury, at the end of this long trial, was able to keep in mind the distinction between the second and third conspiracies and to comprehend, with any degree of clarity, that evidence relevant to the second should not be considered in determining whether there was guilty participation in the third, or vice versa. The jury may well, then, have erroneously combined the evidence and found guilt when it would not have done so had it observed the distinction. *U.S. v. Liss*, 137 F.2d 995, 1002-03 (2nd Cir. 1943, Judge FRANK dissenting).

73

Although Co-Movant's counsel tirelessly and vociferously objected to (and Counsel joined objection to) each of the dozens of summaries, even taking the objections through the 10th Circuit and to the Supreme Court, Counsel never introduced evidence or an expert to make clear to the District Court or jury exactly how and why these summaries were improper. Ms. McHard would have sufficed, had her report (the report Counsel requested she write) centered more on the suspect history of the spreadsheets themselves rather than the suspect nature of the data they contained.

Since AUSA Messec did not argue the case at trial, her work product cannot be considered advocacy from the Government.

> [W]hen she manufactured evidence against them, Defendant Little was acting as an investigator rather than a prosecutor such that absolute prosecutorial immunity does not apply. *Miller v. Meyer*, 2:14-cv-101 (S.D.Ohio, 2014)

In effect, Messec personally attested to the truth of the evidence presented to the Court when each of those exhibits was admitted. As such, each of the exhibits she prepared was inadmissible hearsay. This type of hearsay is distinct from the standing hearsay objections of Counsel, and Counsel ineffectively failed to object on this ground, at trial and appeal.

### D. Grand Jury Irregularities

Agent Boady's testimony about the contents found on the seized computers was incompetent evidence, given the fact his case file had been deleted prior to his appearance before the first known grand jury.

Boady linked up the IP address information during his testimony and materially omitted the nonmatching IP address information that his evidence was rotten with.

74

> [The case agents] induced the prosecutor to commence proceedings based on manufactured evidence [and] further induced the prosecutor to continue the proceedings by giving testimony before the grand jury that was false and/or contained material omissions. *Mangianello v. City of New York*, 07 Civ 3644, (S.D.N.Y. 2008).

By not acting as advocate at trial and having an extensive participation in the preparation of ill-based exhibits at both trial and the three known grand juries, Messec crossed the line from prosecutor to both investigator and witness, expressly barred under *Kalina v. Fletcher*, 522 U.S. 118, 126 (1997).

> That concern therefore justifies absolute prosecutorial immunity only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct. *Moore v. Valder*, 65 F.3d 189 (D.C.C.A. 1995).

> [As] the function test of *Imbler* recognizes, the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor. *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

> Convening a grand jury to consider the evidence [prosecutors'] work produced does not retroactively transform that work from the administrative into the prosecutorial. *Buckley,* at 289.

> [I]mmunity does not extend to the actions of a County Attorney who violates a person's substantive due process rights by obtaining, manufacturing, coercing and fabricating evidence before filing formal charges, because this is not "a distinctly prosecutorial function." *McGhee v. Pottawattamie County*, 547 F.3d 922 (8th Cir. 2008).

While *Costello v. U.S.,* 350 U.S. 359 (1956) upholds the ability of a grand jury to indict based on nothing more than hearsay, in this instance the Government went beyond hearsay to false information, and the effect at trial was devastating.

Counsel, armed with these facts, waived all *Franks* or similar arguments concerning these shenanigans.

The redacted second known grand jury transcript and withheld contra *Jencks* third transcript further display the use of manufactured or materially omitted evidence. Counsel never put in for a motion in

limine to see the unredacted grand jury transcripts, ineffectively assisting and prejudicing Movant's Fifth and Sixth Amendment Rights to examine witnesses and be made aware of the evidence and charges against her. Movant hereby requests the Court require the unredacted versions of these transcripts to be produced, and if the court deems it necessary, subject to redaction by a competent and disinterested third party.

VIII.   **Movant's 5th Amendment Right To Due Process Of Law And 6th Amendment Right To Have The Assistance Of Counsel For Her Defense, Were Violated When The Judge Failed To Provide An Opportunity For, And Her Counsel Failed To Seek, A Last-Minute Continuance Before Jeopardy Attached**

Decisions that most judges would have been reached weeks prior to trial were reached at the threshold of trial, or never reached.

The Court's literally last-minute decision to rule on pivotal evidence, call a recess, and call in the jury venire, sought no input from Counsel on whether Counsel was ready. The Court's decision, coupled with Counsel's waiver of speaking up during the recess, violated Movant's Sixth Amendment Right to have the effective assistance of Counsel, since Counsel was forced to be ineffective by the massive impact of the Court's unexpected ruling on the Government's evidence minutes before jeopardy attached and before Counsel could comprehend it.

> [C]ounsel tell us that if the case should go to trial this afternoon as scheduled, they will be obliged to answer "Not ready." We are convinced this representation is made in complete good faith. *Stans v. Gagliardi*, 485 F.2d 1290 (2nd Cir. 1973).

Judicial procrastination resulted in the entire jury venire not finding out their presence Monday and Tuesday was unnecessary until the Friday before, or perhaps not then. While the judge frequently remarked that she did not like to keep the jury waiting or to waste their time, her actions indicated a clear lack of concern for the jury's time,

76

availability, or state of mind. When the jury panel was finally seated, this flaky approach would have compounded resentment toward the proceedings that most reasonable jurors would feel. After introducing herself without shouldering any responsibility to the jury for the delays the Court caused, or admonishing the jury that Movant was not the cause of the neglectful treatment they received, the Court left the jury to wonder whose fault the delays were, further prejudicing Movant's right to a fair trial.

"Procrastination, whether it be prosecutorial or judicial, is not the fault of a defendant and should not be charged to him or her." *State v. Roman*, 240 Kan. 611, 731 P.2d 1281 (S.C.Kan. 1987).

Even though "[a] trial court 'enjoys broad discretion on matters of continuances, even when the parties implicate Sixth Amendment issues'" *U.S. v. Mendoza-Salgado*, 964 F.2d 993, 1016 (10th Cir. 1992), the Court gave no indication that a last-minute continuance was barred. Counsel should have been willing to take that chance in order to assertively defend Movant's Fifth and Sixth Amendment Rights, and by waiving the argument at the threshold of jeopardy, as well as on appeal, prejudicially failed to do so.

See *Davis v. Duplantis*, 448 F.2d 921 (5th Cir. 1971); *cf. Laird v. Air Carrier Engine Serv.*, 263 F.2d at 952 (5th Cir. 1959, withdrawal of stipulation after commencement of trial resulted in prejudice where "plaintiffs come to Court expecting to try one lawsuit and found themselves facing something quite different").

The judge might have been within her discretion to deny a continuance and declare the court would be moving forward with jury selection and trial anyway, but Counsel did not ask once for more time (nor did Co-Movant's counsel). Counsel was thus ineffective. One needs only look to one or two other grounds in this motion or its sister

motion for the prejudicial effect caused by this lack of preparation and lack of objection to become clear.

IX. **Movant's 6th Amendment Right To A Jury Pool Composed Of A Fair Cross-Section Of The Community, And 5th Amendment Rights Of Jurors To Equal Protection Under The Law, Were Violated Because Of The Disparity Between The Percentage Of Men On The Qualified Jury Venire And The Percentage Of Men In The Population Of The District Of New Mexico**

The jury selection process used by the District of New Mexico violated Movant's rights under the Fifth and Sixth Amendments of the U.S. Constitution and the Jury Selection and Service Act by systematically excluding men.

"To establish a prima facie case that a jury selection process does not produce a fair cross-section of the community, a defendant must show (1) that the group alleged to be excluded is a distinctive group in the community, (2) that representation of the group in venires is not fair and reasonable in relation to the number of such persons in the community, and (3) that the underrepresentation is due to systemic exclusion of the group in the jury-selection process." *U.S. v. Grisham*, 63 F.3d 1074 (11th Cir. 1995, quoting *Duren v. Missouri*, 439 U.S. 357 (1979)

A. **Men Are A Distinctive Group In The Community**

Just as Indians unquestionably form a distinctive group in the community, so do men, dating back to the time when women were first allowed to serve as jurors.

A group is 'distinctive' under the first prong of the test if this group has: (1) some quality or attribute which defines or limits the group; (2) a cohesiveness of attitudes or ideas or experiences which distinguishes the group from the general social milieu; and (3) an interest which may not be represented by other segments of society. *United States v. Test*, 550 F.2d 577, 591 (10th Cir. 1976). (quoted in *U.S. v. Taylor*, 663 F. Supp.2d 1157, 1163 (D.N.M. 2009)).

"I believe this language tends to show that men qualify as a distinctive group." *Taylor*, at 1163. "[I]f the shoe were on the other foot, who would claim that a jury was truly representative of the community if all men were intentionally and systematically excluded from the panel?" *Ballard v. U.S.*, 329 U.S. 187 (1946).

### B. Representation Of Men Is Not Fair And Reasonable In Relation To The Number Of Men In The Community

In *Taylor*, at 1165, the Hon. W.P. Johnson writes:

> [T]he Defendant [Taylor]'s statistics reveal an absolute disparity of 4.7 percent and a comparative disparity of 12.8 percent. The 4.7 percent absolute disparity is far lower than the ten percent that the Tenth Circuit has suggested as a threshold disparity number. *See [U.S. v.] Shinault*, 147 F.3d at 1273. In fact, the Tenth Circuit has upheld jury selection procedures which resulted in absolute disparities of up to seven percent. *[U.S. v.] Gault*, 141 F.3d at 1402-03. Furthermore, the disparity here does not even begin to approach the absolute disparity numbers that the Supreme Court has found adequate to make out a prima facie violation of the Sixth Amendment. See [] *Jones v. Georgia*, 389 U.S. 24, 25, 88 S.Ct 4, 19 L.Ed.2d 25 (1967) (14.7% absolute disparity).

In this case, the absolute disparity was 17.1 percent and the comparative disparity was 34.2 percent. Given the suspicious coincidence between the Court's newly enacted modified jury plan, which this case was one of the first to use, if not the first, and the stark numerical difference with the first majority-male venire this case was originally slated to use, it is unquestionable that the second venire, the one the Court employed, was not reflective of the community from which the jury was derived.

"[I]f the absolute disparity between these two percentages is ten percent or less, the second element is not satisfied." *Grisham*, at 1078-79. In the instant case, *Grisham*'s second element is fully satisfied at over seventeen percent.

### C. The Underrepresentation Is Due To Systemic Exclusion Of Men In The Jury Selection Process

By switching the venire system to an unproven and buggy computerized one in November 2015, the D.N.M. judiciary created a situation where a bad venire could no longer be labeled "out of the ordinary" because there was suddenly no longer an ordinary.

> In order to show that a group has been systematically excluded from jury venires, a defendant need not show that the exclusion is intentional. *Duren*, 439 U.S. at 366, 99 S.Ct. 664. Rather, he need only show that the exclusion is "inherent in the particular jury-selection process utilized." *Taylor,* at 1166.

Unlike Taylor's assertions that jury rolls themselves systematically excluded a distinct group, the flaw here is in the synthesis of the jury wheel from the jury rolls, and/or the venire selection from the jury wheel.

The statistical likelihood of a truly random survey of a voter roll system, made up of about fifty percent men, returning less than one-third men, starts out as high (for a venire of four, the odds of three of them being women is 25 percent), but diminishes quickly as the total venire size increases. The odds of 47/70 coin flips coming up heads is 0.15 percent, perhaps possible but not ordinary.

While it has been held by various courts that a discrepancy on a single venire panel cannot alone demonstrate systematic exclusion, as in *U.S. v. Womack*, 985 F.2d 395, 397-98 (8th Cir. 1993) and *U.S. v. Bryant*, 523 F.3d 349, 362 (D.C. Cir. 2008), 32% men is not a discrepancy but a disparity, and the other evidence encourages examination of the other eJuror results from this time period with a jaundiced eye.

Counsel was ineffective for failing to notice or act upon the unprecedented slant to the jury pool. "The defendant does have the

right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria." *Batson v. Kentucky*, 476 U.S. 85-86 (1986).

> Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. *J.E.B. v. Alabama*, 511 U.S. 127 (1994).

### D. Prejudice Resulted From A Systematically Unfriendly Jury

Co-Movant's Amazon Mechanical Turk surveys, conducted in November 2015 among U.S. residents not residing in the District of New Mexico, measured men and women in roughly equal numbers, and showed numerically that men, while still more likely to convict than not convict, were statistically less likely to convict than women were.

The reasoning behind the participants' decisions, provided in short essay form, helped inform a few defense decisions before trial, but the process was largely ignored by Counsel. The chief takeaway from the research was that jury selection mattered, and to ensure Movant's best chances at trial, women, particularly divorced women (in the research voting to convict at a ratio of 6:1), should not be overrepresented.

When a venire full of divorced women was disclosed, and Counsel refused to ask for a new venire, the die was cast. Counsel was ineffective both at trial and on appeal for failing to raise the matter. Movant was denied a right to a fair trial by a jury of her peers, and was convicted in an unfair trial.

X.  <u>Movant's 5th Amendment Right Not To Be Held On An Infamous Crime, Unless On An Indictment Of A Grand Jury, Was Violated When He Was Charged By Way Of Grand Jury Proceedings Tainted By Prosecutorial Misconduct; And Movant's 6th Amendment Rights To Be Confronted With The Witnesses Against Her And To Compel Witnesses In Her Favor Were Violated When Brady Evidence Was Provided Late And Jencks Evidence Was Withheld</u>

Although it is widely held that the withholding of *Brady* and *Jencks* material does not itself form the basis for a cognizable claim under §2255 (see *Moreno v. U.S.*, Civ 14-997-JAP-GBW (D.N.M. 2015)), ineffective assistance of counsel can.

The fraught proposition that the individual tasked with bringing charges in a legal and transparent manner can be singlehandedly trusted with the custody and turnover of the records of the corresponding event yields a perfect crime: if an AUSA lied to, harassed, or intimidated a grand juror, or indicated on the record that she or other AUSA's fabricated the evidence used, or skipped the grand jury proceeding altogether by manufacturing a forged or unsigned indictment herself, the AUSA alone can cover up the evidence of her own misconduct to railroad any defendant she chooses, and repeatedly get away with it.

Based on the Courts' treatment of §3500, the only practical bulwark against this abuse of process is a vigorous advocate for the defense, one who will hold accountable, or at least place on the record an attempt to hold accountable, abusers of prosecutorial power.


**A. Counsel Failed to Explore *Jencks***

When faced with Grand Jury transcripts and minutes that were conspicuously absent, an effective Counsel would have brought the matter before the Court, putting the Government in a situation where it had to own up to its decisions to withhold them on the record.

> In many respects, we are troubled by the Government's plea of a crisis in transcribing grand jury proceedings…The notion that defendants have a right to access grand jury transcripts is not a new one…At least since the decision of the Supreme Court in *Dennis v. United States* [384 U.S. 855 (1966)], a major trend in criminal procedure has been toward liberalized defense access to grand jury minutes. The sound principle behind the trend is that "[i]n our adversary system for determining guilt or innocence, it is rarely justifiable for the prosecution to have exclusive access to a storehouse of relevant fact. *Gaither,* at 1083-84.

Under *Youngblood*, "except where the Government can show an overriding case for secrecy, such as national security", "defendants should have automatic access to the grand jury testimony of Government witnesses at trial" *Gaither*, at 1084.

> The prosecutor's misconduct [] was not merely inadvertent, but was instead willful and intentional. A habeas petitioner can succeed on a Brady claim by establishing that the government suppressed evidence material to the defense while acting either intentionally or inadvertently. *See Strickler [v. Greene],* 527 U.S. at 281-82, 119 S.Ct. 1936. *Douglas v. Workman,* 560 F.3d 1156 (10th Cir. 2009).

Counsel's failure to hold the Government to account resulted in impeachment evidence remaining hidden and prejudiced Movant's right to a fair trial.

### B. *Brady* Impeachment Evidence Could Have Altered The Case's Outcome

Secondarily among the evidence divulged was proof that Agent Boady and AUSA Messec were made contemporaneously aware of, and authorized after-the-fact, their star witness's attempt to blackmail Movant's Co-Defendant.

"Because the withheld evidence was exculpatory and material under *Brady*, the prosecution's failure to disclose it was harmful as a matter of law." *Banks v. Reynolds*, 54 F.3d 1508 (10th Cir. 1995).

This late disclosure, and Counsel's failure to act upon it, impacted the other grounds listed in the following ways:

Evidence of knowledge of blackmail by agent Boady and AUSA Messec was not used to impeach them or star witness Gardner.

Counsel could not have brought a timely *Franks* motion against Boady's seizure for his illegal co-conspiratorial actions with Gardner (enacting a 2-week delay in the search and seizure to consider the ramifications of Gardner's blackmail meant the same warrant would need to be submitted and signed again with a different date), explaining why

Boady would need to switch signature pages in his affidavit for search warrant.

Moving for a mistrial based on this evidence would have been well within Counsel's abilities, and could have formed the basis for an appeal. By waiving these arguments, Counsel prejudiced Movant's right to present evidence for a fair and reproducible trial.

XI. **Movant's 5th Amendment Right To Due Process And 6th Amendment Right To Assistance Of Counsel Were Violated Through Government Witness Steven Gardner's Blackmail And Perjury, And Counsel's Waiver Of Objection**

A. **Blackmail**

Blackmail (18 USC §873) is a rarely-prosecuted statute, with no known precedent in the 10th Circuit or any of its districts. "[T]he case law on blackmail is 'sparse.'" *U.S. v. Coyle*, 63 F.3d 1239 (3rd Cir. 1995). According to *U.S. v. Nardello*, 393 U.S. 286, 294 (1969), the Blackmail statute was formerly known as "Extortion by Informer".

§873 provides that: "Whoever, under a threat of informing, or as a consideration for not informing, against any violation of any law of the United States, demands or receives any money or other valuable thing, shall be fined under this title or imprisoned not more than one year, or both."

Blackmail under the statute therefore contains three necessary elements:

        (1) demanding money or other valuable thing from the victim;
        (2) under a threat of informing, or as a consideration for not informing, against
        (3) a violation of a law of the United States.
        *U.S. v. Lewis*, 313 Fed.Appx. 703 (5th Cir. 2009).

The first element, the demand to pay, took the form of Gardner's June 9th demand letter. The letter so unconcerned the Government as to blackmail that it was introduced by the Government as an exhibit in Movant's trial not once, but twice: once to showcase its content and

once to prove a copy of the demand letter was found in Movant's home.

Within the letter it can not get less equivocal:

> So to recap you owe OfficeMax $81,231.75 for these fraudulent MaxPerks accounts and you would like to resolve this issue by paying restitution. Please send a money order made out to OfficeMax in the amount of $81,231.75 to the address below by June 23, 2011. (Ex. 171).

By calling it restitution, Gardner blurred not only the by-now-completely-indistinct lines between prosecution and victim, but the lines between the judiciary (the only entity that can award restitution) and victim.

> Upon the discovery of fraud inducing a contract, the injured party has an election, namely, he may either rescind the contract or stand to it. If he rescind he may assert his title to the property lost by the contract and recover it by replevin or its value in trover. If he affirm the contract, his only redress, as here, is an action or counterclaim for the damages sutained by reason of the fraud in its concoction. But he cannot do both; he cannot affirm and disaffirm; he cannot repudiate the contract as rescinded and demand restitution of what he has lost, and at the same time treat it as subsisting and recover the damages he has suffered by reason of it. *Roome v. Jennings*, 2 Misc. 257, 21 N.Y.S. 938, (N.Y.C.P. 1893).

The second element, consideration for not informing, was established in Gardner's follow-on letter of June 10th (Ex. 172).

In contrast to the demand letter of June 9th calmly describing a phone call on June 8th and requesting payment within two weeks, by the 23rd, it took Gardner only a day (June 10th) to amp up his blackmailer's demand:

> I have not been able to get a hold of you lately but expect that you will call me back so we can discuss how resolve [sic] this issue. If I do not hear back by Monday June 13, 2011 I will be forced to present my findings to the FBI in Albuquerque. (Ex. 172).

Gardner had already been working with the FBI in Albuquerque for months, but never divulged that fact. Informing the FBI was his express threat.

The final element, which likely accounts for the rarity of prosecutions under §873, was a violation of the law of the United States. Wire fraud, the section under which the case was brought, is a crime against the United States, not a private party.

> The blackmail statute thus reaches those who would evade their responsibility to inform the authorities about a violation of the law by exchanging the promise to forebear from giving such information for some benefit. It is the use of the information in this manner that Congress sought to penalize. *Coyle*, at 1250.

## B. SA Boady and AUSA Messec Suborned The Blackmail

SA Boady became aware of Gardner's conduct, stating "I can't believe [Gardner] did this", and then shared the information with Messec anyway, while making the determination that he would suborn the blackmail by delaying his search and seizure by exactly the two week period Gardner had set forward in Gardner's June 9th letter. In so doing, Boady violated Movant's Fifth Amendment Right to Equal Protection Under the Law under the Due Process Clause, by, instead of charging Gardner with blackmail of Co-Movant, acting as an accessory to Gardner's blackmail of Co-Movant in order to investigate and punish Movant for wire fraud reported by Gardner.

> A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt.  Without limiting the general application of the foregoing, the following conduct is a violation of this section:… (3) The solicitation by a debt collector of any postdated check or other post-dated payment instrument for the purpose of threatening or instituting criminal prosecution. *Beler v. Blatt*, 480 F.3d 470 (7th Cir. 2007).

In effect, Boady had decided he would act as Gardner's collections agent: giving Movant and Co-Movant two weeks to pay up, then bringing at least 17 FBI agents to collect, turning over the spoils of the raid to Gardner. Had Gardner acted as a passive victim's representative and avoided the temptation to contact Co-Movant directly, Boady's actions could have been above reproach. But since

this did not happen, Boady made the conscious decision to derelict his duty.

Once their star witness-victim had struck a foul blow in an effort to exert control of the investigation and "beat the FBI to the window" in extorting Co-Movant's money, Boady and Messec, made fully aware of Gardner's activities by Gardner himself, declined to prosecute Gardner for blackmail but continued to rely on Gardner to prosecute Movant for wire fraud, again in violation of Movant's Fifth Amendment Right to Equal Protection.

Counsel, by waiving any and all pretrial motions on the subject and refusing to cross-examine Gardner or Boady as to the subject of blackmail, in spite of Co-Movant's e-mails and lines of questioning, ineffectively assisted and prejudiced Movant's right to confront the witnesses against her.

### C. Gardner's Perjury in Spreadsheet Preparation

Co-Movant's counsel's conditional pronouncement, that "I think we have a problem" in the event Mr. Gardner did not say he created the spreadsheet, came to fruition. The problem was not merely the defense's, but the entire Court's.

The Government's enthusiasm in using the spreadsheets for the truth of the matter asserted, but only selectively, and ignoring the inconvenient facts of their own authorship, lay a strong case for prosecutorial misconduct, suborning the perjury of their star witness, who they had substantial basis to believe had broken the law and would continue to break the law in order to benefit from his prosecution of the Channons.

In *Theokary v. Shay (In re Theokary,* 3rd Cir. 2015), the Court directed "production of unredacted copies of [a] report and curriculum vitae."

Upon receipt of the unredacted report and curriculum vitae, counsel for Shay and Abbatiello questioned their authenticity and obtained from the Bankruptcy Court an order directing that the documents be produced in their native electronic file format, i.e., the format in which they were created…Theokary, however, did not produce the unredacted curriculum vitae and report in native file format. Instead, on the day of Paparo's deposition, an amended version of the report in portable document format was produced. *Theokary*, at 4-5.

"And the fact that the report that Theokary manufactured simply tracked the plainly inflated damages set forth in a pretrial statement does not lessen the fraud he attempted to perpetrate." *Id.*, at 11.

A court, therefore, is empowered to vacate its own judgment upon a showing that a party has committed fraud, Chambers, 501 US 44, or to dismiss an ongoing action as a sanction for a party's "flagrant bad faith" conduct, *Nat'l Hockey League [v. Metropolitan Hockey Club, Inc.]*, 427 U.S. at 643. *Theokary,* at 7.

Where a party is responsible for providing false information or manufactured evidence that influences a decision whether to prosecute, he may be held liable for malicious prosecution. *Gibbons v. Lambert*, 358 F.Supp.2d 1048, (D. Utah 2005).

Counsel ineffectively let Gardner's perjury go unconfronted at trial, where impeaching him would have been quite straightforward if a defense witness had introduced the proof Gardner had already been confronted with at the evidentiary hearing, or if his remarks on the record were used during his cross-examination. Resulting prejudice was an unfair trial, where the jury did not realize they were being asked to take, tricked into taking, the word of a blackmailer and perjurer.

XII.  **Movant's 5th Amendment Right To Due Process, Her 6th Amendment Right To Trial By An Impartial Jury, To Be Informed Of Criminal Charges, To Confront Witnesses, To Compel Witnesses To Appear In Court, And To Have Assistance Of Counsel For Her Defense, Was Violated When Her Counsel Failed To Appeal The Use Of Untrustworthy Hearsay Evidence Against Her**

[The Sixth Amendment's Confrontation C]lause countenances only hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule.'" *Hopkinson v. Shillinger*, 645 F.Supp. 374, 420 (D.Wyo. 1986).

The least trustworthy contention from the Government in the entirety of this case was the assertion that the spreadsheet evidence was machine-generated.

In addition to various misspelled headings, variable widths, and handtyped notes, and a lack of any printed indicia of the data's origin or authenticity, the spreadsheets contained hidden worksheets containing an unrelated dump of thousands of Officemax's customers' personal information.

### A. Cut-and-paste

The Hon. Judge Herrera could not appear to reach a consistent opinion on whether the documents were machine generated or not, but admitted that there was "some cut and paste", which any reasonable jurist would conclude meant they were not machine generated. The Court committed a reversible error in failing to do so, and Counsel failed to object on the spot or at trial.

> The record will not be admissible, however, if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. *U.S. v. Miller*, 771 F.2d 1219, 1237 (9th Cir. 1985).

The resulting prejudice was substantial and provable, as the Government mentioned multiple times that this evidence was crucial to their case-in-chief and its inadmissibility would result in a dismissal.

### B. Authorship

The Government's case-in-chief relied on spreadsheets that contained information listing their creator as "sgardner" (government star witness and blackmailer Steve Gardner) and their last modifier as "MAguirrel" (the US Attorney's office). During various times, these

spreadsheets were confusingly referred to alternatively as "1963", "the original", "the enhanced", "Daubert 1", "EH6", and so on. Mr. Gardner testified under oath that he did not create any of the spreadsheets even though nearly every government spreadsheet listed him as the document's creator. On the other hand, FBI Special Agent Jeffrey Moon testified under oath that he did create the "enhanced" spreadsheet using 200 lines from "somebody else" to make the numbers line up, "so that when we run totals we had one place to calculate all our numbers into our groupings".

Although "1963" was supposed to be provided by OfficeMax contractor SHC to the FBI for presentation to the jury, the Excel document reveals the modifications to "1963" were likewise last saved by "MAguirre1", a member of the AUSA's office. Excel does not keep track of individual changes, but as it is AUSA Paige Messec's office that made those latest modifications, it appears highly likely that Ms. Messec had a hand in the latest modifications.

A further indicator of authorship is the complete lack of mention of "SHC" or related companies anywhere in the Microsoft Excel spreadsheets provided. The authentication testimony of SHC employee Victoria Mills alleged that "the team" was responsible for running the reports from the database and her relay of these reports was sufficient to authenticate it as original evidence, even though "the team" was never named.

In addition, Victoria Mills was not "one who has knowledge of the particular record system" as defined by *U.S. v. Young Bros., Inc.*, 728 F.2d 682, 694 (5th Cir. 1984), because she testified under oath that she had "limited knowledge — technical knowledge" of how the record system worked (Ex. 183, Hrg. at 50-51) and "minimal" knowledge of how databases in general worked (Ex. 183, Hrg. at 60). Even though the

Government and the Court relied on Mills' testimony as an authenticating expert, her lack of knowledge should have disqualified her. Counsel waived all objection to her testimony.

In *Bullcoming v. New Mexico*, 131 S.Ct. 2705 (2011), DWI defendant Bullcoming challenged an inculpatory forensic report written by analyst Caylor, who was neither called to testify nor asserted as unavailable. New Mexico instead called a different analyst, Razatos. The U.S. Supreme Court ruled:

> In short, when the State elected to introduce Caylor's certification, Caylor became a witness Bullcoming had the right to confront. Our precedent cannot sensibly be ready any other way. See *Melendez-Diaz*, 447 U.S., at ___ (slip op. at 6) (KENNEDY, J. dissenting) (Court's holding means "the…analyst who must testify is the person who signed the certificate").

*Bullcoming* is instructive here, as the anonymous "analytics team" certified the inculpatory evidence against Movant much as Caylor did, was never asserted as unavailable, and the Government tried to pass off Ms. Mills in a similar capacity to Razatos.

### C. Chain of Custody

The privilege afforded to government prosecutors at trial to make up arguments and evidence does not apply here, as the AUSA Paige Messec was not a trial prosecutor.

The concept of "original" and "enhanced" spreadsheets did not originate with Mr. Gardner or SHC, but were provided by AUSA Messec to the defense as part of discovery. Perhaps there may have been some original basis from SHC data at some point in time, but the conspicuous absence of even the most basic forensic chain-of-custody evidence in place puts the lie to the argument that these documents are original. In fact, they are fabricated evidence, inadmissible by nature, generated by Government agents with the express purpose of convicting

Movant and her Co-Defendant, and not subject to a hearsay exemption because they were fraudulently passed off as originals.

Excel does not keep track of individual changes, but as it is AUSA Paige Messec's office that made those latest modifications, it appears highly likely that Ms. Messec had a hand in the latest modifications.

Counsel was ineffective for failing to bring Messec's and others' modifications up to the court, and Movant's Sixth Amendment right to confrontation was prejudicially violated when these fabrications were introduced into evidence resulting in a conviction.

> Without a witness who can testify as to the methodology employed in creating the scrubbed spreadsheets, Defendants would be significantly limited in their ability to test the trustworthiness and reliability of these spreadsheets. *MEMdata, LLC v. Intermountain Healthcare, Inc.* 2:08-CV-190 (D.Utah 2010).

### D. Waiver of Appeal

Counsel picked a losing argument to take to the appellate stage: namely, that computer summaries are not originals and thus inadmissible hearsay. Effective Counsel would have recognized that although they had a sound basis for believing their position was correct, that their consistent failures to out-argue the Government that their position warranted suppression of the Government's evidence on the summaries basis risked dooming Movant, as long as their 803(6) matters of appeal did not include seeking suppression on the "lacking indicia of trustworthiness" basis.

Despite laying a strong foundation and having introduced in prior hearings numerous shreds of evidence calling into question the 803(6)(E) reliability of the Government's spreadsheets, evidence the jury was barred from seeing, Counsel instead chose to rely on the far less meritorious 803(6)(B) and 1001 matters for appeal. By failing to

raise the 803(6)(E) issue on appeal, Counsel was ineffective, and

Movant's conviction and sentence were prejudicially affirmed.

XIII. **Movant's 5th Amendment Right To Due Process Of Law And 6th
Amendment Rights To A Speedy And Public Trial, And To Be Informed
Of Criminal Charges Against Her, And To Have Assistance Of
Counsel For Her Defense, Were Violated When The Government
Vindictively Prosecuted Her, And Her Counsel Both Supported The
Plea Offer And Declined To Mention It To The Court**

Proving vindictive prosecution requires a movant to carry an

already heavy burden in most circuits, but 10th Circuit jurisprudence

as in *U.S. v. Lampley*, 127 F.3d 1231 (10th Cir. 1997) disregards the

more lenient caselaw of other circuits and defers to the Supreme Court

decisions in *Bordenkircher v. Hayes*, 434 U.S. 360 (1978), and *U.S. v.

Goodwin*, 457 U.S. 368 (1982).

> [Under] *Bordenkircher*, the State did not trespass on the
> defendant's rights "so long as the accused [was] free to accept
> or reject" the choice presented to him by the State, 434 U.S., at
> 363, that is, to go to trial and face the risk of life
> imprisonment or to seek acceptance of a *non vult* plea and the
> imposition of the lesser penalty authorized by law. *Corbitt v.
> New Jersey*, 439 U.S. 212, 225 (1978).

In the instant case, however, the odious practice of "plea

chaining", wherein one defendant cannot accept her plea offer so long

as his co-defendant refuses his, or vice versa, means that the plea

offers in this case fail the *Bordenkircher* test, since neither

defendant was "'free to accept or reject' the choice presented to him

by the State."

The 10th Circuit has been forced to reverse rulings under similar

conditions in *Edens v. Hannigan*, 87 F.3d 1109 (10th Cir. 1996), where

two defendants' representation by a single attorney forced a reversal

based on the conflict of interest concerning a plea offer for one and

not the other. *Edens* demonstrated the entire judicial system, not just

defendants, pays a heavy price resulting from when defense attorneys

are allowed or forced to join defendants with divergent interests: not

only a price paid with additional appeals and grounds for appeal, but the advent of nearly compulsory individual representation and the multiplicative financial costs that requires. Courts have not yet ruled against that similar notion that prosecutors who engage in plea chaining step over the same line.

Absent cover from *Bordenkircher*, the Government can be held to have vindictively prosecuted Movant if additional charges were piled on, following rejection of the first chained plea offer. This occurred with the first superseding indictment, exposing both Defendants to increased criminal penalties, larger alleged losses, as well as subjecting Movant to additional forfeiture.

The Supreme Court in *Goodwin* "declined to adopt a *per se* rule that in the pretrial context no presumption of vindictiveness will ever lie." *Doran*, at 1521.

Ineffective assistance of counsel existed in this matter as well, as Counsel encouraged joint acceptance of the plea offers without raising the vindictive prosecution before the Court, or on appeal. The resulting prejudice included lack of preparation, including withdrawing motions and calling no witnesses, depriving Movant of effective trial representation and a fair trial proceeding.


XIV.  **Movant's 5th Amendment Right To Due Process And 6th Amendment Right To Assistance Of Counsel Were Violated Through The Court's Adoption Of A Jury Instruction At Odds Both With The Statute And Indictment, And Counsel's Waiver Of Objections**

Given the 10th Circuit's lack of a pattern jury instruction for 18 USC §1349, the Court's decision to seek versions from of all parties was a correct one. In fact, if the Court had adopted the Government's propounded instruction, Movant would have avoided the prejudice suffered at the hands of Counsel, who proffered the flawed instruction.

94

By the Court's phrasing of the instruction, "You are also required" without qualification, a reasonable juror, who would follow the instruction and take it literally, would be forced to convict Movant under that instruction, without consideration as to the law, evidence or testimony.

> Courts "presume jurors attend closely to the language of the instructions in a criminal case and follow the instructions given them." *United States v. Almaraz*, 306 F.3d 1031, 1037 (10th Cir. 2002) (quoted from *Piñon-Ayon v. U.S.*, 12-CV-17-ABJ, (D.Wyo. 2013)).

Had Counsel objected, or otherwise brought the taken-as-literal flaw to the Court's attention, the Court would have been well within its right to correct the instruction.

> The district court correctly noted that this portion of the Pattern Instruction incorrectly states the law of this circuit. *U.S. v. De La Torre,* 599 F.3d 1198, 1204 (10th Cir. 2010).

> In cases where the district court has given a legally erroneous jury instruction, and where the jury might have based its verdict upon, prejudice exists, and reversal is required. <u>See Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co.,</u> 891 F.2d 772, 779-80 (10th Cir. 1989) (quoted in *U.S. v. Goxcon-Chagal*, CR 11-2002 JB, (D.N.M. 2012)).

Final judgment listed the count 1 conviction under 18 USC §1343, even though the flawed jury instruction for §1349 played a central role in the jury's reaching the decision to convict.

> In order to set aside a jury verdict, we must find not only that the jury instruction was legally erroneous, but also that the instruction had a prejudicial effect. *Sulzer Textil*, 348 F.3d at 1364 ("[I]t is not enough to merely show that a jury instruction is erroneous; [Movant] also must show that the erroneous jury instruction was prejudicial."). If the erroneous jury instruction "could not have changed the result, the erroneous instruction is harmless." *Environ Prods., Inc. v. Furon Co.*, 215 F.3d 1261, 1266-67 (Fed. Cir. 2000) . (Quoted in *Commil USA, LLC v. Cisco Sys., Inc.* 2012-1042 (Fed. Cir. 2013).

Counsel's failure to object to the instruction also proved highly prejudicial, and deprived Movant of a fairly determined verdict.

XV. **Movant's 6th Amendment Right To A Speedy And Public Trial, And 6th Amendment Right To Assistance Of Counsel, Was Violated When Her Counsel Failed To Raise A Speedy Trial Act Violation Both At The Trial Court And On Appeal**

In accordance with *Barker v. Wingo*, 407 U.S. 514, (1972), four factors govern whether delays can be considered prejudicial to Movant. They are 1) the length of the delay; 2) the reason for the delay; 3) the time and manner in which the defendant has asserted [her] right; and 4) the degree of prejudice to the defendant which the delay has caused.

### A. Movant Zealously Pursued A Speedy Trial

First consideration is the third *Barker* factor, the time and manner in which Movant has asserted her right. In *U.S. v. Mobile Materials, Inc.,* 871 F.2d 902 (10th Cir. 1989), the 10th Circuit held that "in deciding whether a period of delay is reasonable, it is essential to measure dimensions other than length" and "[w]hether the delay was reasonable will depend on the facts of each case."

If Movant had sat on her rights and kept quiet during the 1006-day delay, the Court might have some justification, however limp, for affirming the prosecution, trial, and conviction on Speedy Trial Act grounds.

Instead, on numerous occasions, Co-Movant repeatedly asked both Counsels, with Movant's support, about moving to dismiss under speedy trial grounds, and was always rebuffed. Co-Movant counted the days and emailed them to Counsel. Co-Movant even went so far as to type up a 21-page motion to dismiss and sent that to Counsel on 9/18/15. Co-Movant printed out and summed up *U.S. v. Koerber*, a similar D. Utah case, containing similar Government misconduct and dismissed on STA grounds only months prior. Counsel refused to act each time. When confronted, Counsel argued that the judge would simply dismiss the latest

indictment without prejudice, and then the prosecutor would refile charges in a new indictment with the speedy trial clock reset to zero.

While an overripe Speedy Trial Act clock no doubt looms over numerous criminal cases as a mirage beset with loopholes, and Counsel no doubt had learned not to get his hopes up with it, no effective Counsel would make the decision to waive it, yet in this case, waiver occurred before, during, and after trial, even when no defeating loopholes were present, and in spite of Movant's enthusiasm.

### B. Counsel's Failure To Move To Dismiss Under Speedy Trial Grounds, On The Eve Of Trial, Is Indicative of Prejudice

Not only were all counts well past the 70 day limit, whether stricken for surplusage or not, but on the eve of trial, the statute of limitations on all of the counts had already run. One need only look at Ex. 77 (Dkt. 380) to see the dates the offenses ended. The latest ending date, for count 6, was 8/2/2010. The statute of limitations on wire fraud and related sections being five years, the last statute of limitations thus expired 8/2/2015.

If Counsel had moved to dismiss at any point between 8/3/2015 and trial, the Court would have most likely dismissed all counts with prejudice, whether explicitly or *ipso facto* in light of the statute of limitations. In effect, Counsel could have won the case without a trial by making the filing on the eve of trial.

The Hon. Judge Herrera might have improperly denied the motion to dismiss, but at least then a straightforward appeal could have been brought, and Counsel's assistance would have been effective:

> Thus, the speedy trial clock expired on or about November 10, 2012, and the Act was violated. The district court therefore erred in denying Hicks' motion to dismiss pursuant to the Speedy Trial Act. *U.S. v. Hicks*, 779 F.3d 1163 (10th Cir. 2015).

The cost to Counsel in terms of time and strategy would have been negligible. Failing to file to win the case is an example of extremely ineffective assistance of Counsel, and extreme prejudice (felony conviction, restitution and forfeiture, and a sentence of house arrest, excessive drug testing, and probation) was suffered. Movant's Sixth Amendment Rights under the Speedy Trial act to a fair trial, as well as to effective assistance of Counsel, were violated.

> Because the Speedy Trial Act was violated and those violations would have led to a dismissal of the charges brought under the First and Second Superseding Indictments, Sylvester's counsel rendered deficient performance by not bringing those violations to the attention of the court either at trial or on appeal. *Sylvester v. U.S.*, 15-1782 (6th Cir. 2017), at 9.

### C. Dismissal With Prejudice Would Have Been Easily Justified and Likely

> [I]n accordance with the Act, trial courts must take into account three factors "when deciding whether to dismiss an action with or without prejudice: 1) the seriousness of the offense; 2) the facts and circumstances that led to the dismissal; and 3) the impact of reprosecution on the administration of the Speedy Trial Act and on the administration of justice." United States v. Moss, 217 F.3d 426, 430 (6th Cir. 2000) (citing 18 U.S.C. § 3162(a)). *Sylvester*, at 10.

This case, and the offenses accused therewith, was as un-serious as federal cases subjected to *Barker*'s tests can practically get. The amount of time, money, and effort the FBI and Department of Justice caused the U.S. taxpayer to pay for was grossly disproportionate to the alleged losses. The nature of the offenses required a tortured reading of the wire fraud statute coupled with rampant prosecutorial misconduct and ineffective assistance of defense Counsel.

The combination of unique factors in this case will ensure that its like will probably never be seen again, meaning the end result will unfortunately mean little in terms of changes to the administration of justice in general and the Speedy Trial Act in particular following this case's final briefing.

[E]ven if a case is dismissed without prejudice, a defendant may derive some benefit. For example, the time and energy that the prosecution must expend in connection with obtaining a new indictment may be time and energy that the prosecution cannot devote to the preparation of its case. *Zedner v. U.S.*, 547 U.S. 489, 503 n.5 (2006).

Though the statute of limitations should be reason enough to believe a dismissal would have successfully established the prejudice in this case, there are additional reasons to believe a dismissal would have been with prejudice. The Court may have realized that its resources were better devoted toward matters of far greater import, considering an even further watered-down indictment against Defendants would promise even greater consumption of the Court's time for an even smaller amount of money in dispute. The Court may have realized that the propounded evidence had undergone sufficient spoliation to make a just proceeding impossible. The Court may also have tired of going out of its way to help the Government fix its indictments and keep its vindictive and frivolous case alive.

"In light of the policies underlying the right to a speedy trial, dismissal must remain, as noted in *Barker v. Wingo*, 407 U.S. 514, 522, 'the only possible remedy' for deprivation of this constitutional right." *Strunk v. U.S.*, 412 U.S. 434, 93 S.Ct. 2260 (S.Ct. 1973).

### D. Neither Defendant Contributed Significantly To The Periods Of Delay In This Case, Despite The Arrival Of Their First Child

In consideration of the second *Barker* factor, the reason for the delay, the following factors militate against blaming the reason on Movant.

Since the Speedy Trial Act contains loopholes under 3161(h) which permit otherwise countable days from counting toward the 70, none took place under (1)(A), (1)(B), (1)(C), (1)(E), (1)(F), (1)(G), (2), (3), (4), (6), or (8).

While the caselaw is replete with instances of defendant-caused delays such as mental examinations, hospitalizations, firing counsel, or frivolous motions, none of the above exists in this case.

The Government's bad faith delay on December 31, 2014, which was merely a pretext to delay in order to supersede the indictment, would lend weight to a mitigating presumption toward Movant's good faith attempts to avoid delay, and Movant hereby requests the Court review the stunt for sanctions under 18 USC §3162(b)(4).

Of the 1,006 days to run between arraignment and trial, Defendants' pretrial motions tolled a sizable plurality of them, though none were labeled frivolous. Co-Movant Matthew Channon's first attorney developed cancer and closed her legal practice, making a counsel substitution necessary. This can hardly be ascribed to any complicity, malingering, or contribution whatsoever on the part of the Defendants in this case.

### E. The Delay Adversely Impacted Movants' Ability To Present A Defense And Caused Severe Personal Prejudice

Considering the final *Barker* criterion, the degree of prejudice to Movant that the delay has caused, we must first consider the slow spoliation of the available evidence.

In the nearly five year delay, Officemax was purchased by Office Depot, its headquarters moved, many of its employees and its contractors' employees (potential witnesses) left, and its database was taken offline, backed up, shipped across state lines, made available strictly to the Government, then purged.

By the time evidentiary hearings were held, months after the conviction, obtaining even the sparest shreds of exculpatory subpoenaed evidence from Office Depot, Inc. was very onerous. This prejudiced

Movant, as getting the evidence subpoenaed even six months earlier may have allowed for a more responsive subpoena return, and thus a stronger defense case against the restitution and forfeiture amounts requested by the Government.

Counsel, even if they incorrectly felt the Speedy Trial Act was a losing issue, had ample justification for a Sixth Amendment Right claim to a speedy trial. In failing to consider either, along with Counsel's failure to secure exculpatory evidence they could see fading away, Movant was prejudicially deprived of her right to inform the jury as to the facts.

In addition, Movant would have encountered a completely different outcome from the prosecution had the delays not occurred. Even assuming the superseding indictments and short timetable would have changed nothing, one example would be the richer availability of database information for subpoena before sentencing.

The interminable delays have taxed Movant's marriage in ways that have not been previously divulged. Movant attempted suicide in front of Co-Movant, due to, and immediately before, a joint meeting with Counsel, resulting in an involuntary commitment. The timing was not immediately after indictment but years into the process. Movant could no longer bear being reminded of the interminable waiting anymore.

Movant's need for extreme medication and intense therapy has led to a loss of consortium. Continuous family counseling has been necessary since the indictment began, along with intensive therapy in excess of the Court's severe requirements. The necessary sense of closure, of moving on with one's life, has been unavailable to the Channons for almost an entire decade due to the delays in prosecution, and continues to be unavailable today.

Lastly, Movant's 1,006 days on supervised release pending trial might have weighed against her at sentencing differently than if it had been 69 days.

## F. The Government Can Not Reset The Speedy Trial Clock By Filing Superseding Indictments

The Government will presumably put forward a specious argument that in order to reset the Speedy Trial Clock (already violated as early as July 2013 and definitely by October 2013) that it need only to put forward a superseding indictment with slightly reframed charges, as it did twice in 2015.

> [A]s the Eleventh Circuit correctly noted, "the exclusion of the period of time between the dismissal of an indictment and the filing of a new indictment under § 3161(h)(6), as well as the Speedy Trial Act more generally, would make little sense if the government could reset the speedy-trial clock at will and effectively 'circumvent[ ] the speedy trial guarantee through the simple expedient of obtaining superseding indictments with minor corrections.' " Young, 528 F.3d at 1296 (quoting Bermea, 30 F.3d at 1567). *Sylvester,* at 8-9.

This flawed argument has also met defeat in *U.S. v. Bermea* (30 F.3d 1539, 1567 (5th Cir. 1994); *U.S. v. Young*, 528 F.3d 1294, 1296 (11th Cir. 2008); *U.S. v. Daychild*, 357 F.3d 1082, 1091 n.10 (9th Cir. 2004); *U.S. v. Marshall*, 935 F.2d 1298,1302 (D.C. Cir. 1991); *U.S. v. Long*, 900 F.2d 1270, 1275 (8th Cir. 1990); *U.S. v. Roman,* 822 F.2d 261, 263-64 (2nd Cir. 1987); *U.S. v. Thomas*, 788 F.2d 1250, 1258 (7th Cir. 1986); and *U.S. v. Novak*, 715 F.2d 810, 819 (3rd Cir. 1983). See also *U.S. v. Rojas-Contreras*, 474 U.S. at 235-36 (1985), and *U.S. v. Rushin*, 642 F.3d 1299 (10th Cir. 2011) citing *U.S. v. Mora*, 135 F.3d 1351, 1355 (10th Cir. 1998).

Nonetheless, it is a cheap argument and the Government routinely wins it at the district level.

In superseding the original indictment, the Government did not broaden the conspiracy charge, despite the Government's overt attempts

to take tactical advantage of the Speedy Trial Act clock by renumbering the conspiracy count from 11 to 1. The reframing of the balance of the charges for the superseding indictments from the original are direct examples of prosecutorial bad faith, since 9 of the original 10 substantive counts would have been time-barred by the statute of limitations by the time the Government's second superseding indictment was offered. None of the six new counts related back to the originals.

As in *U.S. v. Grady*, 544 F.2d 598 (2nd Cir. 1976):

> Since the statute [of limitations] stops running with the bringing of the first indictment, a superseding indictment brought at any time while the first indictment is still validly pending, if and <u>only if it does not broaden the charges</u> made in the first indictment, cannot be barred by the statute of limitations. *Grady*, at 601 (emphasis added).

While the Government can broaden an indictment within the statute of limitations, the Government is not allowed to reset the speedy trial clock on the non-broadened counts.

The Government engaged in a bad faith attempt to squelch the Speedy Trial Act's protections. Had the Government waited an additional month to issue its second superseding indictment, two of its newly formed charges would have also been time-barred. The indictment would have been defenseless as soon as Counsel objected to it.

The Court must deter acts of Government misconduct by declining to reward this act of bad faith by reversing Movant's convictions. The timing of both superseding indictments points to a Government bent on taking advantage of the enormous delay it had a hand in creating, with the express purpose of deterring Movant from exerting her Speedy Trial Rights, giving the appearance of a Government in sole control of a speedy trial clock it can reset at will. The Government's goal was to strategically delay trial in order to fortify its position when time was running out, by leveraging Ms. Neda's and Mr. Gardner's last-minute

unavailability, knowing full well that if Movant achieved an STA-related dismissal, the Government had the ability to reframe and refile the charges whenever it wanted.

> Notably, the Act does not provide for a resetting of the Speedy Trial Clock for existing charges where the government has filed a superseding indictment adding new charges to existing ones. *Sylvester, at 7.*

### G. 18 USC §3282 Would Apply, §3288 Would Not Apply

The dust has yet to settle on Pub. L. 100-690, Congress' 1988 modifications to 18 USC §3288. Prior to 1988:

> [A] six-month extension of time after the dismissal of an indictment [was] provided by 18 USC §3288 and [was] available only if the dismissal [was] for technical defects or irregularity in the grand jury. *United States v. DiStefano*, 347 F.Supp. 442, 444-45 (S.D.N.Y. 1972); *United States v. Moriarty*, 327 F.Supp. 1045, 1047-48 (E.D.Wis. 1971). (Quoted in *U.S. v. Grady*, 544 F.2d 598, 2nd Cir. 1976).

Although Counsel would have had ample justification in calling the indictments "defective" or "insufficient", Counsel could have had them dismissed, immune to §3288 and limitations-barred, by declaring them simply expired under the Speedy Trial Act.

By changing "whenever an indictment is dismissed for any error, defect or irregularity" to "whenever an indictment…is dismissed for any reason", Congress at first gloss might have appeared to render the Speedy Trial Act a nullity, since "any reason" can include exceeding the 70-day Speedy Trial Clock. We see the impact of the change within post-1988 caselaw, namely, *U.S. v. Jackson*, 749 F.Supp.2d 19 (N.D.N.Y. 2010) where the N.D.N.Y. held Jackson's Speedy Trial rights nullified at Government convenience.

What *Jackson* missed is 1988's change to the end of §3288: adding "This section does not permit the filing of a new indictment or information where the reason for the dismissal was…some other reason that would bar a new prosecution".

That "some other reason" is 18 USC 3282(a): "**In General.**— Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed."

Since §3288 does not expressly provide for a new indictment, but does so conditionally, and the Speedy Trial Act and Sixth Amendment of the Constitution both also count as "some other reason that would bar a new prosecution", §3282(a) must be the controlling statute. Considered in tandem, §3282 and §3288 prescribe the Speedy Trial Act is still a rule with a remedy, particularly for cases not alleging defective or insufficient indictments, and applicable to the winning scenario Counsel refused to put into motion. Even in the event *Jackson* is dispositive for cases in the 2nd Circuit, it does not appear to be controlling in the 10th:

> It is true that upon dismissal of a case, federal courts do not suspend or toll the time during which the original indictment was pending under the general federal statute of limitations, 18 USC §3282 (1994). See *United States v. Midgley*, 142 F.3d 174, 177 (3rd Cir. 1998) (holding that "for purposes of [18 U.S.C.] § 3282, counts of an indictment do not survive a dismissal"); see also *United States v. Peloguin*, 810 F.2d 911, 913 (9th Cir. 1987). (Quoted in *Porter v. U.S.*, 769 A.2d 143 (D.C.C.A. 2001).

> Despite the holdings in other circuits, the law of this circuit is that the statute of limitations is a bar to prosecution. *Waters v. United States*, 328 F.2d 739, 743 (10th Cir. 1964). Although *Waters* has been questioned by other courts, *see Arky*, 938 F.2d at 582, it has never been overruled by our en banc court. *U.S. v. Cooper*, 956 F.2d 960 (10th Cir. 1992).

This brings us to *U.S. v. Koerber*, 281 F. Supp. 3d 1185 (10th Cir. 2017), which wrestled with a number of issues reminiscent of the ones in this case, but with important distinctions: "[In *Koerber*], neither party contends §3288 does not apply" *Id.* at 1189.

**H. 3161(h)(7)(A) Is Not Satisfied in Three Continuances, Adding an Additional 135 Days To The STA Clock**

According to *Rushin*:

Because subsection (h)(7)(A) dictates the district court grant an "ends-of-justice" continuance only "on the basis of its findings," the appropriate time for the court to place its findings on the record is just prior to or contemporaneously with the grant of the continuance. (*Id.* at 1303)

While the court issued twelve trial continuances, many of which invoked (h)(7)(A), with many of those failing to meet the *Rushin* standard of making detailed and contemporaneous findings, the (h)(7)(A) delays should not need to be closely examined: 70 days should be easily reached in numerous other ways without second-guessing the Court's less robust (h)(7)(A) filings (Dkts. 28, 45, 96).

Nonetheless, they should be considered in case the Court finds a way to discount the numerous other STA days. According to the chart at Ex. 197, Dkt. 28 (Ex. 291) produced 62 days of delay under the guise of (h)(7)(A), and Dkt. 45 (Ex. 292) produced 73 days of delay under (h)(7)(A). Dkt. 96 arguably produced no days of delay due to Movant;s and Co-Movants' pending motions under (h)(1)(D) and (h)(1)(H). While Dkt. 28 invoked (h)(7)(A) and Dkt. 45 invoked simply (h), both justifications in the form of single sentences, they stand in contrast to the well-written and thorough continuances from the Court in Dkts. 122 and 139, which have multiple paragraphs of justification each.

Counsel need not have litigated the additional 135 (62 + 73) days, but even Counsel's reliance on the 135 days alone would have counted as effective assistance and saved Movant substantial prejudice.

**I. The Court Violated 18 USC §3161(a) By Failing To Set A Trial Date For Three Months, and Added Another 85 Days To The Speedy Trial Clock**

§3161(a) reads thus:

(a) In any case involving a defendant charged with an offense, the appropriate judicial officer, at the earliest practicable time, shall, after consultation with the counsel for the defendant and the attorney for the Government, set the case for trial on a day certain, or list it for trial on a weekly or other short-term trial calendar at a place within the judicial district, so as to assure a speedy trial.

Unless the Court would argue that the earliest practicable time from July 7, 2015 was over three months later on October 9, 2015, §3161(a) alone affords a justifiable reason for dismissal under the Speedy Trial Act.

Counsel ineffectively failed to raise §3161(a) as well. In *U.S. v. Tranakos*, 911 F.2d 1422 (10th Cir. 1990) Tranakos brought §3161(a) up as one of his appellate issues, and the 10th Circuit rejected it, primarily because Tranakos' attorney admitted on the record that he had motions to dismiss pending during that case's seemingly endless procession of judicial recusals, rejections of indictments, and deaths, and co-defendants joined through the equivalent of 3161(h)(6). In contrast, the instant case during the majority of this time had only motions in limine pending (not pretrial motions), a mooted motion to continue, and the Government's motion to set a trial date, none of which are pretrial motions.

The government relies on *United States v. Santoyo*, 890 F.2d at 728, for the proposition that the period following the filing of a motion in limine is excludable under Subsection [D], but its reliance is misplaced…In this case, there was no hearing, and the district court did not carry the motion for hearing at trial. Therefore, the district court had thirty non-excludable days in which to rule upon the motion in limine. *U.S. v. Johnson*, 29 F.3d 940 (5th Cir. 1994).

With the exception of Movant's Dkt. 240, Motion to Continue Hearing, filed 9/16/15 and promptly ruled upon 9/23/15, the remaining span of 85 days is properly further added toward the Speedy Trial Clock under 3161(h). Although the Government would be wrong to argue that its

superseding indictments reset the Speedy Trial clock to zero each time, this contention should be irrelevant, as the 85 days plus 46 non-exempt days are sufficient by themselves to exceed the 70-day limit.

### J. After Judgments Came Out, Counsel Failed To Notice That Even When The Superseding Indictments Were Filed, Their Counts Were Already Past The Statute Of Limitations

According to Dkt. 379 & 380, count 1 ended 3/29/10, count 2 ended 4/5/10, count 3 on 5/29/10, count 4 on 5/29/10, count 5 on 6/4/10, count 6 on 8/2/10, and count 7 on 11/4/09!

The judgments' values are legally binding, but have no apparent corroboration in the briefs or in the hearings or trials, and are an exhibit of what can only be described as incompetence in their preparation. Taking the judgments as written, when the first superseding indictment [Dkt. 155] was filed on 1/21/15, count 7 (not relating back to any previous count) was already well past the statute of limitations. By the time the second superseding indictment [Dkt. 197] was filed on 6/24/15, all counts except count 6 (also broadened from the first superseding indictment) were past the statute of limitations, according to the official judgments. Counsel was ineffective for failing to move to set aside the judgment(s) given the counts' exceeding the statute of limitations (having "Offense Ended" date values that brought them well in excess of the 5-year statute), whether failing to file an instant motion or bring the matter up on appeal.

Absent any speedy trial issues, little prejudice would have resulted from Counsel's ineffective assistance regarding the shoddy judgments, but given the massive opportunities to get the case dropped, squandered by Counsel through inaction before trial, even a motion to set aside the judgment, post the judgment, using this as a basis, could

have opened the door to setting aside the convictions, if Counsel only

realized late about the speedy trial and statute of limitations issues.

Counsel was ineffective here as well, and Movant's prejudice came in

the form of a flawed indictment, unfair jury trial, unfair conviction,

and life-ruining delays.

### K. At 1,006 Days Elapsed From Arraignment To Trial, Without A Single Speedy Trial Objection Raised Against This Epic Of Conscious Indifference, This Case Raises The Bar For Defense Malpractice In The Tenth Circuit

Finally, Movant confronts the first *Barker* factor: the length of

the delay.

> The requirements of the Speedy Trial Act are specific, and
> Congress intended exact compliance with those requirements. If a
> defendant is not brought to trial within the seventy-day
> deadline, dismissal of the indictment is mandatory. *U.S. v.
> Doran*, 882 F.2d 1511, (10th Cir. 1989).

Movant could only locate two cases in the 10th Circuit to compare

this quadruple-digit time period against: 1,567 days (*U.S. v. Black,

830 F.3d 1099 (10th Cir. 2016)*), a case with multiple superseding

indictments, changed pleas, in an ongoing conspiracy for a career

offender), and 527 days (*U.S. v. Stine,* 15-1449 (10th Cir. 2016)).

Since "the defendant bears the burden of 'producing a calendar

and showing that more than seventy days have passed since the

indictment (or first appearance) and trial ha[d] yet to begin.' R. 145,

ID # 679 (quoting U.S. v. Jenkins, 92 F.3d 430, 438 (6th Cir. 1996))",

*Sylvester*, at 5, a more succinct version than Ex. 197 is hereby

proffered:

**24 DAYS COUNTED:** April 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and May 1, 2, 3, 4 and 5 (2013)

**61 DAYS COUNTED:** August 28, 29, 30, 31, and September 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and October 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, and 27 (2013)

**52 DAYS COUNTED:** April 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and May 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 23, 24, 25, 26, 27, 28, 29, 30, 31, and June 1 (2015)

**46 DAYS COUNTED:** October 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and November 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25 (2015)

UNDER SECTION H, **135 DAYS COUNTED:** June 28, 29, 30, and July 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, and 27, and November 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, and December 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and January 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25 (2013/14)

UNDER SECTION I, **85 DAYS COUNTED:** July 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and August 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and September 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 24, 25, 26, 27, 28, 29, 30, and October 1, 2, 3, 4, 5, 6, 7, and 8 (2015)

IN TOTAL, **403 DAYS COUNTED > 70 DAYS PERMITTED BY SPEEDY TRIAL ACT.**

### XVI. <u>Movant's 6th Amendment Right To Compel Witnesses To Appear And To Have Assistance Of Counsel For Her Defense Was Violated When Her Counsel Withdrew His Motion To Compel And Waived Subpoenas Until Trial Was Over</u>

The motion to compel discovery, having survived the Hon. Judge Herrera's axe, was seemingly the last glimmer of hope against a case where the facts would be solely the Government's to determine, and Movant could do little but nit-pick some of the finer points, await a guilty verdict, and roll the dice at the 10th Circuit.

While many definitions exist for ineffective assistance of counsel, where Counsel's inadequacies are so egregious that Movant might as well have not had representation, snuffing out the last glimmer of Ms. Sirignano's efforts might have been forgivable, had Counsel exacted a price for the concession, be it a compromise or other

relief. But short of an overture toward a plea offer Movant didn't want, Counsel effectively traded away Movant's hopes for nothing at all.

Counsel oddly offered no upside to the withdrawal. It is highly unlikely a concession was obtained with Counsel forgetting or declining to mention it.

Counsel's decision to support withdrawal of the motion to compel proved especially ineffective, for two reasons. First, given the tendency of pending motions to toll the speedy trial clock, one might wonder if a withdrawal might have enabled Counsel to stop tolling and eventually move for a dismissal on speedy trial act grounds; yet, despite multiple opportunities to so move, Counsel never so moved. Restarting the STA clock was also unnecessary, since a survey of the non-tolled days revealed the 70-day limit had been reached and exceeded the previous year, on 10/5/13.

Second, despite Mr. Robert's assurances that "we weren't going to get [the records from Officemax]", the four years to follow were filled with his attempts to do or complain about just that, including numerous mentions in pretrial hearings, dozens of objections at trial, sentencing, circuit appeal, and Supreme Court petition. Counsel waived Movant's first best chance to compel the Government to comply with its discovery obligations. Had Counsel persisted, the Court may have granted the original motion to compel, which was not denied along with its contemporaries, and presumably for good reason. Or the original motion may have been denied, opening further avenues for motions and appeals. While Counsel seemed convinced that no subpoena request would be granted by the Judge, Counsel left it to Mr. Robert to seek one until the sentencing phase, at which point it was granted, which suggests that Counsel was even more ineffective for avoiding diligent

pursuit of these records until it was too late. In *Clark v. Clarke*, 14-6615 (4th Cir. 2016), "trial counsel advised [] Clark to plead guilty, and then waited until sentencing to show that the [conviction] 'was inherently incredible and uncorroborated by other evidence'", causing reversal of Clark's conviction under §2254.

If the jury had seen the records produced by Office Depot prior to sentencing, the determination on whether Officemax had made or lost money; had been defrauded, or not; and the resulting fact decision on Movant's guilt or culpability, could have been made by twelve diverse minds within a petit jury as the finder of fact, rather than a Judge who had already been handed a verdict.

Counsel's motives to prejudice his client's access to discovery may have reflected a desire to induce a plea agreement. By "throwing the game" with regard to discovery, Counsel implicitly exerted pressure on Movant, forcing her to choose between a "quick and easy" plea or a prejudiced trial. To withdraw the motion to compel was not a "reasonable strategy" or "sound strategy" as in *Williams v. U.S.*, 343 F.3d 927 (8th Cir. 2003), but the prejudice was obvious to Movant, as it would have been obvious to any reasonable defendant actively participating in her defense and maintaining a close watch on the machinations of her case.

While it would be difficult to argue prejudice resulted from Counsel urging Movant to take a plea she did not end up taking (plea wiring notwithstanding), especially where, in Movant's case, the combined sentence ended up being less than the best plea offered, severe prejudice nonetheless resulted: Counsel's lack of diligence in the form of absent discovery evidence, which was central to disproving the Government's case. Even if Counsel's would-be attempts to obtain

discovery directly failed, waiver by Counsel in order to coerce a plea violated Movant's Fifth and Sixth Amendment rights.

Every refusal from the AUSA to furnish the data underlying the spreadsheets included a mention that the data was in the hands of Officemax themselves, a private party, and they thus did not have it (and if not expressly stating, implying) that Counsel should seek it directly. Without justification, no Counsel (whether Sirignano or Robert, Robbenhaar or Hotchkiss) ever took the hint and contacted Officemax directly or sought a single subpoena for anything prior to the verdict. Even if Counsel's beliefs were valid, that it should never be necessary to contact private parties to disprove that which it should be the Government's burden to prove, and that Officemax would have refused to cooperate, the character and outcome of the years of litigation to follow could have been markedly less prejudicial. Facing a subpoena request to the victim they joined forces with and hid behind, the Government could no longer hide behind a private party privilege, and their attempt to withhold exculpatory evidence might not have succeeded, once Officemax's refusal to furnish data was manifest and made known to the Court.

The likeliest conclusion in this case is that the Judge would have denied Officemax's motions to set aside the subpoena and required the data to be produced, since exactly this happened during the sentencing phase. Since the information demonstrated a basis for Movant's belief that Officemax made a profit on its ink recycling programs, a friendly verdict, dismissal, dropped case, or grounds for a successful appeal could have resulted instead of the highly unfortunate result Counsel ineffectively assisted to bring about, all because they were too shy, busy, conflicted, or proud, to reach out directly or seek a subpoena when it was needed most. The aforementioned caused Movant

grievous prejudice, by rendering the result of the trial unreliable and fundamentally unfair.

XVII. **Movant's 6th Amendment Right To Confront Witnesses, And To Compel Witnesses To Appear, And To Assistance Of Counsel, Were Violated When Counsel Failed To Call Any Witnesses, Be They Expert, Fact, Or Lay**

Counsel's failure to line up any witnesses was objectively unreasonable and ineffective assistance of counsel.

Since no witnesses were able to explain to the Court that Officemax refilled its more valuable cartridges on its own, and no witness was called to contradict Gardner's testimony or interpret Office Depot's subpoena response, both of which downplayed that information, the Court and Jury were misinformed as to the gravity of the accusations against Movant.

Co-Movant's counsel's failure to call Ms. McHard as announced, without any explanation as to why, and Counsel's failure to mitigate that failure, was also objectively unreasonable and ineffective assistance of Counsel.

> At the heart of this [2255 motion] lies a broken promise (or, more precisely put, a series of broken promises): defense counsel's repeated vow that the jurors would hear what happened[]…Thus, the error attributed to counsel consists of two inextricably intertwined events: the attorney's initial decision to present [] testimony as the centerpiece of the defense (and his serial announcement of that fact to the jury in his opening statement) in conjunction with his subsequent decision to advise the [witness] against testifying. *Ouber v. Guarino*, 293 F.3d 19 (1st Cir. 2002).

While "Counsel [is] entitled to formulate a strategy that [is] reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies", *Harrington v. Richter,* 131 S.Ct. 770, 789 (2011), Counsel's only trial tactic and strategy, if they can be so called, was to rest without warning.

### A. Counsel Chose to Rely on Cross-examination to Advance Movant's Arguments

By leaving it to the Government to fill in the procedures and motives associated with ink cartridge recycling, the MaxPerks rewards program, and the legal enforceability of MaxPerks terms and conditions, Counsel let several falsehoods and distortions go unanswered.

> [Movant] argued [] that his trial counsel's failure to investigate and call alibi witnesses amounted to ineffective assistance of counsel. [We] held his trial counsel's failure to interview witnesses constituted a breach of his duty to provide reasonably competent legal representation. *Lawrence v. Armontrout*, 900 F.2d 127 (8th Cir. 1990).

Co-Movant's counsel did make perfunctory efforts to interview Jason Moran, Roberta Duran-Gonzales, and Bernny Thacker-Pawlak, but did not attempt to call them as witnesses. Counsel did not even attempt to interview dozens of other Officemax and former Officemax employees, including Wander Smelan, architect of the MaxPerks system, let alone call them.

Ms. McHard was more qualified and disinterested than any of the witnesses the Government sought, and yet every witness the Government sought was waved through with the Court's blessing, and Ms. McHard all but blocked. Through the Court's indications it would find her testimony blanket inadmissible, the Court and Counsel joined to violate Movant's Sixth Amendment right to have compulsory process for obtaining witnesses in her favor.

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law. *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920 (1967).

Counsel, along with Co-Movant's counsel, simply waived Ms. McHard at the eleventh hour without any explanation given. With Ms. McHard out of the lineup, Counsel had zero witnesses in total, having put all Movant's eggs in one basket. Counsel was thus ineffective, and substantial prejudice resulted.

> As for defense counsel's decision not to present [witness's impeachment evidence], the [] courts did not rule on this issue thus we may determine, *de novo*, whether counsel's actions fell below the permissible level of performance. We find that there was no rational explanation for why counsel did not introduce [witness's impeachment evidence] as evidence. There was absolutely no risk in doing so. *Dixon v. Snyder*, 266 F.3d 693 (7th Cir. 2001).

**B. Due To Prosecutorial Misconduct, Judicial Naivete, And Unfamiliarity With The Law, Counsel Ineffectively Failed To Lay The Basis For Mchard To Testify**

Rule 615 F.R.E. is short:

> At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own. But this rule does not authorize excluding:
> (a) a party who is a natural person;
> (b) an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney;
> (c) a person whose presence a party shows to be essential to presenting the party's claim or defense; or
> (d) a person authorized by statute to be present.

Sam Baca as a rebuttal witness did not meet any of Rule 615's exceptions, was so inessential that the Government was not sure they would need to call him at all, and AUSA Messec knew or should have known the preceding when she claimed otherwise. Baca may well have argued against the applicability of Benford's law in McHard's report, but he never testified, nor needed to.

While it was not permissible, it was understandable why Co-Movant's counsel failed to follow through putting Ms. McHard on the witness stand at trial. Witnessing Messec's lies consistently adopted by the Court would quickly wear down most advocates:

> Because a court may only decline to grant a party's request to sequester particular witnesses under one of the Rule 615 exemptions, the rule carries a strong presumption in favor of sequestration. The party opposing sequestration therefore has the burden of demonstrating why the pertinent Rule 615 exception applies…and why the policy of the Rule in favor of automatic sequestration is inapplicable in that situation. *U.S. v. Mayorqui-Rivera*, 87 F.Supp.3d 1288, 1291 (D. Colo. 2015).

Messec was held to no burden.

> We further explained in *Johnston* that Rule 615 has changed the law and makes exclusion demandable as of right, instead of being merely discretionary with the trial court. U.*S. v. Buchanan*, 787 F.2d 477 (10th Cir. 1986).

> Whether or not it would be reasonable for a trial court to exempt an expert witness from a sequestration order, there is no required exemption implied under rule 615. *Miller v. Universal City Studios*, 650 F.2d 1365 (5th Cir. 1981).

Prosecutorial and judicial misconduct aside, the aforementioned acts by Messec and the Court informed Counsel's eleventh-hour decision not to call McHard as a witness himself. This decision was tantamount to having no Counsel at trial. McHard may well have illuminated the numerous holes in the Government's case, and it was Counsel's responsibility to give her that opportunity. Movant's resulting prejudice was severe: a fundamentally unfair trial without any witnesses in her favor and a guilty verdict closely linked to that deprivation.

### C. Counsel Self-Sabotaged His Rule 29 Motion By Showing Movant's Cards

If Counsel had merely read off his perfunctory and inexplicably brief Rule 29 motion, without telegraphing Movant's case was immediately resting, the Court would have had to weigh, in its decision on whether to grant the Rule 29's, the potential that a case (witnesses) would actually be brought. The numerous flaws and shortcomings in the Government's theory of the case merited a spirited argument, not the phoned-in version Counsel presented.

> "Although specificity in a Rule 29 motion is not required, where
> the defendant makes a Rule 29 motion on specific grounds, all
> grounds not specified in the motion are waived." *U.S. v. Chance,*
> 306 F.3d 356, 369 (6th Cir. 2002).

Counsel could have made up for prior mistakes, including waiver of the

other grounds in the instant Petition, by bringing them up in Rule 29.

Counsel chose not to, prejudicing Movant through his refusal to present

matters that would have, properly brought to the Court's attention,

resulted in an acquittal.

By announcing the fact he planned to call no witnesses to present

a case, Counsel sabotaged Movant's Rule 29 motion before making it,

effectively prefacing two minutes of perfunctory Rule 29 argument with,

"My client has no case to argue, and". Movant essentially had no

counsel in the time between cross-examination of the Government's last

witness, and closing argument, for all the backhanded defense she was

afforded.


### D. Without Defense Witnesses, The Court Did Not Understand The Indictment

At sentencing, the Court, in justifying why Officemax did not owe

Movants anything, or have any involvement with them, after paying them

$3 per cartridge, betrayed a deep misunderstanding of the way the case

was charged.

The testimony at trial from both sides held that Officemax set up

a byzantine credit system for submission of ink cartridges, and

although the Government held that identity of the recycler was of

paramount importance, the Court held the transaction "was nothing more

than we're selling you our used ink cartridges. That's the end of the

story." (Ex. 211, at 44).

All testimony on the matter had to come through Steven Gardner,

and the Court did not have the benefit of a corroborating witness. The

Court reversibly erred in its rulings, given the fact that if the Court could not understand the fundamental nature of the indictment, a reasonable jury could not convict. Movant's prejudice included a trial that did not return a reproducible result.

XVIII. **Movant's 6th Amendment Right To Have Compulsory Process For Obtaining Witnesses In Her Favor, And To Have The Assistance Of Counsel For Her Defense, Was Violated When Her Counsel Failed To Introduce Or Develop Exculpatory Evidence**

The constitution requires that criminal defendants be provided with a fair trial, not a "good faith" try at a fair trial. Respondent here, by what may have been nothing more than police ineptitude, was denied the opportunity to present a full defense. *Arizona v. Youngblood*, 488 US 51, 109 S.Ct. 333, (1988, J. Blackmun dissenting).

Just as in *Youngblood*, spoliation of potentially exculpatory evidence tainted this case, though Counsel's disregard of exculpatory evidence was far more prejudicial. While it may not have been the exculpatory evidence Counsel wanted, the Government furnished different exculpatory evidence and Counsel ignored it. The exculpatory evidence described below would have shown Movant and Co-Movant could not have committed the acts the Government alleged.

A. **Two Bankers' Boxes Full Of Paper Were Necessary To Represent The Initial Discovery Provided To The Defense, And Hidden Deep Within This Discovery Were Some Troubling Inconsistencies In The Data.**

Records showed transactions blamed on Movant and Co-Movant where they were able to travel at thousands of miles per hour, most notably a series of transactions blamed on them, including one where ink was recycled at a store in Colorado, then 12 minutes later in Albuquerque, then another 12 minutes later at a different store in Colorado.

"A truism applicable here is that one person cannot be in two places at one time. Thus, either the prosecution's witnesses or the alibi witnesses presented incorrect testimony." *U.S. v. Chiavola*, 744 F.2d 1271, (7th Cir. 1984). Unlike in *Chiavola*'s case, the multiple

conflicts here lie within the same prosecution document. Counsel got so hung up on the improprieties of the introduction of this evidence that Counsel refused to present inconsistencies within the evidence itself, in this case Movant's ability to teleport between stores, often in non-bordering states, in a span of minutes. The Government's data shows not the acts of one or two Defendants, but perhaps hundreds or thousands of different people (who might legitimately have hundreds or thousands of accounts between them). The examples detailed in this Ground show the transactions were pinned on Movant despite overwhelmingly contradictory evidence. Being made aware of this fact would have engendered reasonable doubt in the jury, as well as informed the Court's discussion during sentencing and appeal.

### B. The Government's Spreadsheet Evidence Exhibits Other Time-And-Space Errors Due To Miskeys

Gardner refers in the evidence to "miskeys" and "miskey's". Officemax's systemic combination of handkeying and poor number allocation and assignment meant that Movant's rewards gift cards were sometimes confused with other Maxperks members' rewards gift cards, and vice versa. When a miskey occurred, both rewards gift cards could be presented as valid, but one customer's rewards would be innocently taken by another, allowing Officemax to withhold the miskeyed customer's rewards (to its benefit) and leaving the aggrieved customer to argue it out with the store, which given the small monetary value, often did not happen.

Mentions of miskeys in jurisprudence are rare, but they are emerging as a thing. In *Sherman Ex Rel. Situated v. Yahoo! Inc.,* 13-cv-41-GPC-WVG (S.D. Cal, 2015):

> Yahoo contends that reverse lookup systems are fraught with difficulties and are unlikely to provide accurate contact information two years later…Yahoo requests that the Court take judicial notice of…lookup results from five online services…for a

particular individual who likely miskeyed his/her phone number…in order to demonstrate that users may miskey their phone numbers…

In fact, the import of a disputed typographical error on certain documents caused reversal in *Dombrowski v. Eastland*, 387 U.S. 82 (1967).

Poor number assignment might be more familiar to the Court through the Social Security Number system. It became clear in the 2000's that a Social Security Number could be guessed from nothing more than one's birthplace and birthdate, since they were regionally and sequentially assigned, and whether caused by clerical errors or fraud, often resulted in shared numbers between individuals purporting to share similar birthplaces and birthdates. To prevent fraud and errors, the Social Security Administration learned from its mistakes and moved to a random number assignment system in 2011 (https://www.ssa.gov/employer/randomization.html). Officemax, unfortunately, did not recognize this as a problem, causing Officemax's records to be riddled with inaccuracies.

The FBI has a dismal track record in terms of wrongfully suborning convictions by lending its credibility toward pseudoscience and quackery, for example in regard to discredited hair analysis as described in Pennsylvania's *Commonwealth v. Taft*, J. S58007/17 (Sup. Ct. Penn. 2018):

> The FBI concluded that its examiners' testimony in at least 90% of cases contained erroneous statements. The FBI's findings "confirm[ed] that the FBI microscopic hair analysts committed widespread, systematic error, grossly exaggerating the significance of their data under oath with the consequence of unfairly bolstering the prosecution's case…."

Counsel likewise failed to comprehend or communicate this systemic flaw, to draw attention to the FBI's overconfident vouchery of the spreadsheet evidence or the data itself within the spreadsheet

evidence, and thus prejudicially failed Movant to ensure exculpatory evidence was introduced, or at least an attempt made to introduce it.

### C. Garbage In, Garbage Out: Flawed Government-Officemax Assumptions Created a Universe of Defective Data

The joint investigation between SA Boady, SA Moon, Gardner, and AUSA Messec further relied on debunked investigative techniques. By making enough of the following flawed assumptions, a small and innocuous set of activities can be expanded, increasing the size of the catch but also introducing false positives, by attributing mere coincidences to the wrong individuals.

Just as fishermen using finer and finer nets to collect larger masses of fish would lower the corresponding quality of the catch by also catching things that are not fish, the Government agents preparing the spreadsheets sought to maximize the size of their catch, knowing the Court would be ill-equipped to recognize the equivalent of plastic trash in the Government's evidence.

Taken to the extreme, systematically ignoring these errors could eventually "rule in" the entirety of every store's transactions to a single target customer. These faulty assumptions include:

**1.** On every receipt, every credit or debit card ending in "4445", out of hundreds of thousands of cards used each year at Officemax, each marked "**** **** **** 4445", and all MaxPerks accounts tied in with any such card, must have been Co-Movant's, whether the accounts were tied in through rewards gift cards, or hand-keyed in, without error correction, by a cashier.

**2.** Every rewards gift card used as payment must have been generated by Movant or Co-Movant, and Movant or Co-Movant could not have non-fraudulently purchased them from a third party.

3. No rewards gift card would ever be given to another individual as a gift card.

4. Every retail transaction that seemed suspicious to Mr. Gardner or SA Moon, within a couple hours of a different transaction linked with Movant or Co-Movant, must be another of Movant's or Co-Movant's.

5. Every Maxperks account thought to be Movant's or Co-Movant's, that is linked with other Maxperks accounts related to the same transaction, must mean every account is Movant's *and* Co-Movant's.

6. No MaxPerks account itself could ever be created by one individual and transferred to another, or shared between multiple individuals, and this could never occur more than once, or at scale.

7. Every receipt adjustment to an account controlled by Movant or Co-Movant, was from somebody else's transaction, never Movant's or Co-Movant's. Concerning those receipts, no clerk would ever fail to type in and associate a MaxPerks rewards number they were presented with, before completing the transaction and generating the receipt. In other words, Officemax's receipt adjustment screen had no legitimate purpose, since transactions predating account creations were barred from adjustments.

8. Paradoxes, where data show the target is in more than one place at once, do not betray mistakes in the data, nor flaws in the methodology used, and no effort need be made to audit or otherwise address discrepancies in the data.

9. The complaint, preparation of evidence, its arrangement, the ensuing investigation, and expert testimony can all be performed or directed by a single Officemax employee, uncredentialed and unauthorized in evidence gathering or chain of custody, with the FBI merely derelicting its duty and delegating its authority to this

individual and acting as intermediary, passing information back and forth to the AUSA.

Movant could have gone into depth on the above faulty assumptions to fill a week of trial, whether Counsel brought them up on cross-examination for any number of witnesses, or on direct through one of the number of defense witnesses on or off the witness list. Counsel instead threw in the towel as soon as the Government rested, prejudicing Movant's right to a fair trial with a reproducible result by ignoring these discrepancies and jettisoning reasonable doubt, causing these discrepancies, well-known to Movant and well-brought-up antecedent to trial, to remain hidden to the jury and Court and to result in a guilty verdict.

### D. A Small Subset Of Account Creation Times Was Provided, Though This Information Was Never Used At Trial

By cross-referencing this ground's hidden and withheld spreadsheets' account creation times with the Government's air travel records and receipts from store visits, one would conclude that Movant was able to create accounts while conducting in-person transactions simultaneously at stores in Nevada, Colorado, New Mexico, and while in flight. Although technology has evolved to allow mobile internet use, especially aboard planes in flight, this data transmission allegedly occurred in 2010 and 2011, when these technologies were typically not available.

Even though numerous inconsistencies between the Government's case documents and the laws of physics were observed, fewer than 700 of the 5,000+ account creation transactions which the Government claimed were Movant's and Co-Movant's doing, had timestamps. Counsel never attempted to get timestamps for the remainder, and if it had,

additional inconsistencies would no doubt have surfaced. Counsel was
ineffective for leaving it alone.

Even with the 697 the Government did turn over, Counsel never
attempted to introduce these evidentiary inconsistencies to introduce
reasonable doubt to the jury. The jury should have been informed that
the evidence was likely not solely tied to Movant and Co-Movant, and it
was more likely a semi-random assortment of records that they should
not take the Government's word for being Movant's and Co-Movant's.
Rather than making the jury aware of the possibility that multiple
customers' transactions constituted the data summarized, Counsel never
brought it up. By failing to attempt to challenge the veracity of the
Government's evidence, counsel was thus ineffective.

### E. As Shown In Ex. 248/Bates 1942, A Majority Of The Group 1 Accounts Were Shown To Have Originated Via "Act", Or An Actual Paper Sign-Up

Without the production of signup sheets, the Government could not
tie the Group 1 accounts to prove they were Movant's or Co-Movant's
creations.

Given the Government's case presupposed the accounts were created
online, over a wire, by Movant or Co-Movant, and argued the information
provided via the sign-up was the requisite false statement, Counsel
failed to seek to introduce contrary evidence during cross-examination.

The avoided prejudice of revealing to the Court that there could
be no wire involved in any fictitious statements for the entirety of
the ink recycling in question may have simply been limited to halving
the amount of determined losses, restitution, and forfeiture, but even
this level of prejudice was still substantial.

> The use of the wire here was simply an electronic transfer of
> funds. That electronic transfer does not constitute a
> transmission of a writing, sign, signal, picture, or sound for
> the purposes of executing the scheme to defraud or to obtain the
> money by false representations. While a wire may have been used,

the wire was not used in furtherance of the scheme as the
purported fraud consisted of the misrepresentations Defendants
made to the merchants upon entering their premises. *Am. Bancard,
LLC v. E. Payment Sols., Inc.* 18-cv-80681-BLOOM/Reinhart (Order
on MTD, S.D.Fl. 2018).

Counsel never brought this up through cross-examination or
defense witnesses, and waived exploiting this low-risk and high-reward
fatal flaw in the Government's case-in-chief.

### F. Incriminating Confessions Cannot Be Cherry-Picked

The Court was comfortable enough further fictionalizing (invoking
*Bruton*) the already fictional confession that Movant gave to SA Boady
coincident with the search and seizure on June 28, 2011, and
representing it to the jury as true, such that the jury understood
Movant's role in the preceding events as active and, expertly framed by
the Judge and Government to spite *Bruton* in *Bruton*'s name, co-
conspiratorial.

Yet, Movant stated she did not create the accounts using a
computer program, and neither she nor Matthew Channon created the
accounts using a computer program, but "did a lot of it by hand," facts
corroborated by SA Boady, who would have no known motivation to
misrepresent what he heard in a way that could mitigate the punishment
Movant would end up receiving. If what according to Boady's reports
Movant said ought to be taken at face value when considering guilt and
relevant conduct, it should be taken as truth and nothing but the
truth, whether it helps the Government's case or harms it in other
areas.

"Not every blunder by investigators should result in the
exclusion of relevant, competent, important evidence." *U.S. v. Sewar*,
468 F.2d 236, 237 (9th Cir. 1972).

It is high hypocrisy for any Court to admit any confession this fraught with factual inconsistencies (Movant claiming to have done everything; Movant claiming account names belonging to the other suspect when she already had hundreds of her own), to which there exists no corroborating evidence, good cause for skepticism, and then pick and choose which alleged statements in the confession it will ignore when they become inconvenient.

Counsel, by adopting the Government's position in order to enhance both Defendants' sentences, with no strategic upside to the adoption, was worse than no counsel, and prejudiced Movant's rights to competent representation and a fair trial.

### G. Movant's Counsel Failed To Call Out Prosecutorial Misconduct and Judicial Bias, And At times Joined In Them to Prejudice Movant

While it is believable that a presiding judge may remember Thursday's testimony on Friday but forget it occurred on Monday, and possible to accept that the above occurred simply as error and not bias, it nonetheless opened the door to an anonymous post-it note to leave to the jury to insinuate Movant or Co-Movant was writing vague notes to herself or himself to write computer software to defraud Staples.

In retrospect, few disinterested parties would disagree that the probative value of the post-it notes was zero, given AUSA Kastrin's satisfaction with completely neglecting mentioning them after their admittance.

> In [U.S. v.] *Nolan*, we enumerated some guidelines to test whether evidence of such crimes or acts should be admitted. The evidence (1) must tend to establish intent, knowledge, motive, identity, or absence of mistake or accident; (2) must also be so related to the charged offense that it serves to establish intent, knowledge, motive, identity, or absence of mistake or accident; and (3) must have real probative value, not just possible worth. 551 F.2d at 271. The uncharged crime or act must also be close in time to the crime charged. *U.S. v. Kendall*, 766 F.2d 1426 (10th Cir. 1985).

Here, none of *Kendall's* four conditions were met. AUSA Kastrin specified the post-it notes were intended to establish "knowledge and intent and opportunity" but then never used them to establish anything of the sort, or anything at all; the relationship between Officemax's and Staples' programs were never established; no probative value resulted from the contextless admittance itself, except negative probative value by Agent Parker's distinguishing "scrip"'s meaning from "script"; and the age of the post-it note was never put forward: it could have been 10 years old, with no dates of its own and the other note bearing dates of "6/2004", "1/2005", and "8/07", each well outside the indictments. Without fingerprints, handwriting analysis, or even a lay opinion, it is not even clear who wrote them.

During cross-examination of Gardner, Counsel no doubt felt defeated after fighting and losing so many meritorious arguments by that point, but it was still Counsel's job to remind the Court about Gardner's direct "scrip"/"script" testimony it had heard when the Hon. Judge Herrera forgot about it. Counsel ineffectively waived that argument, and Movant was prejudiced by the effect it had on the jury.

### H. It Was Inconvenient To The Court that There Was Not A Computer Program, So Everybody Pretended There Was One

The substantial volumes of typos "that a normal person would not do" were hardly indicia of a computer program, and militated toward the opposite conclusion: that Movant did not employ one. Counsel failed to draw attention to the distinction, letting Officemax get away yet again with another specious but uncontested set of conclusions the jury had no alternative but to adopt.

Counsel let go unquestioned the history of the mystery computer, seized when Co-Movant was not near it and three others besides Movant were, its actual or constructive possession never established, brought

up as a jury instruction, or even considered. That the spreadsheets may have been on the computer or its hard drive and deleted some time prior to whoever in the house acquired it, was also never considered.

> A conviction cannot be affirmed [] based only upon evidence that tends to show that a defendant was negligent or otherwise should have known about a criminal venture. *U.S. v. de Francisco-Lopez*, 939 F.2d 1405, 1410-11 (10th Cir. 1991). Moreover, even if the jury disbelieved the entire testimony presented by the defense, that disbelief cannot constitute evidence of the crime charged or somehow substitute for the requirement that affirmative evidence be presented to demonstrate constructive possession by Mr. Reece of the contraband discovered. See Mills, 29 F.3d at 550. A verdict that is, in fact, based upon a guess or a mere possibility cannot be upheld. *U.S. v. Reece*, 86 F.3d 994, 996-97, (10th Cir. 1996, citation shortened).

Further, the presence of spreadsheets but the absence of corresponding scripting programs, the difference between which might be likened to the difference between the address of a building and the building itself, got no attention from Counsel, with SA Moon's rank speculation that the scripting software might have existed on the drive before it was somehow deleted going deliberately unchallenged.

Counsel did not act strategically in Movant's interest when implicating her involvement with a computer program at sentencing, serving the Government's ends without any justification. Had Movant been ably represented by Counsel, the Court would have been reminded that no such program was ever found, instead of Counsel inculpating Movant.

I. **Counsel Was Also Caught Flat-Footed When It Came To Witness's And Government Allegations Of Relevant Conduct Related To Their Physical Presence And Payment Behavior At Officemax Stores, Specifically, The Notion Movant And Her Co-Defendant Were "Sneaking Around"**

By refusing to consider introducing as witnesses known ink recyclers Jason Moran and Roberta Duran, or any Officemax employee or former employee who worked in a retail location, or effectively cross-

examining FBI special agents Boady and Moon on the topic, Officemax employee Gardner on the topic, or even working exculpatory information into their own opening or closing statements, Counsel missed multiple opportunities to allay the jury's impressions of Movant's and her Co-Defendant's motives.

In *Towns v. Smith*, 395 F.3d 251, 258-61 (6th Cir. 2005), Counsel provided ineffective assistance by failing to properly pursue a potentially favorable defense witness, as cited in a similar reversal, *Caldwell v. Lewis*, 414 Fed.Appx. 809 (6th Cir. 2011).

Counsel could have demonstrated, through any of the above means, that the staggered entrances to the stores were necessary in order for Defendants to place the proper number and proper type of ink cartridges in the bags from the boxes in the car trunk, in the fastest amount of time possible, with the least amount of mess, by only one person filling both bags separately in the parking lot, handing the first bag to the other person, and bringing the second in himself. Counsel could have demonstrated the paramount importance of speed to the Defendants by showcasing their ability to visit *dozens* of stores a day, from open until close, meant that meaningless gestures of surreptitious behavior were pointless to Defendants. Counsel could have demonstrated that the observer effect of cameras filming Defendants' staggered entrances did not impact the timing of Defendants nor affect the on-the-floor reality or feeling in the stores, where employees knew what Defendants were there to do, and employees knew the Defendants knew the employees knew: the identical bags and contents were a dead giveaway.

> *Associates in Adolescent Psychiatry, S.C., v. Home Life Ins. Co.*, 941 F.2d 561, 570-71, (7th Cir. 1991) held, in a RICO action, that there was no scheme to defraud when the plaintiffs could have verified the veracity of the allegedly fraudulent statements in newspapers. *U.S. v. Hanley*, 190 F.3d 1017 (9th Cir. 1999).

> *Blount Fin. Servs. Inc. v. Walter E. Heller Co.*, 819 F.2d 151,
> 153 (6th Cir. 1987) held, in a RICO action, that there was no
> scheme to defraud when the plaintiff could have
> "verified…independently" the alleged misrepresentations. *Hanley*,
> at 1017.

Counsel could have demonstrated that the Government's assertions that Defendants did not talk to each other in stores could not be determined from the Government's grainy stop-motion video without sound. Counsel could have demonstrated that Co-Movant's sustained and repeated use of the same personally identifying credit cards was the opposite of being sneaky. Counsel could have put the lie to the indictment's pronouncement that Defendants were attempting to avoid detection by going to hundreds of stores in numerous states, by pointing out that this approach was guaranteed to maximize, not minimize, the attention of Officemax and authorities, and asking a witness, any witness, what Defendants could have changed about their pattern of store choice to get themselves noticed more. Counsel could have attempted to establish Movant already knew, by sight, staff at multiple Officemax stores in New Mexico, because she visited them often.

Co-movant's counsel reached out to Moran and Duran in a perfunctory manner, but despite Moran's and Duran's cooperative responses, Counsel concluded that once these witnesses were familiarized with the liabilities of testifying to the highly similar acts they committed, that no helpful testimony would result, Counsel abandoned the notion of asking or forcing them to testify. Counsel failed to realize that the statute of limitations had run on any of their acts, making the witnesses' liability to subsequent criminal charges insignificant.

**J. By Failing On All These Fronts, The Jury And Judge Herrera Were Left To Believe That The Defendants Were Sneaky And Attempted To Avoid Detection**

Although the evidence plainly contradicts sneaky behavior, these facts were never demonstrated, nor a demonstration attempt made, by Counsel or Co-Movant's counsel. This substantially prejudiced Movant, eliminating a chance of convincing a juror to acquit, and particularly convincing the judge that a custodial sentence was necessary. Consider *Johnson v. U.S.*, 613 A.2d 888 (D.C.C.A. 1992):

> [I]n a case where the evidence showed that two defendants engaged in surreptitious behavior before breaking into a basement and then left without taking anything — according to the government, because there was nothing in the basement "both small and valuable enough to steal" — we concluded that the evidence was insufficient to sustain a burglary conviction. *North v. U.S.,* 530 A.2d 1161, 1162-63 (D.C. 1987).

*Johnson* shows us that surreptitious behavior in and of itself, even if one insists on seeing it where it does not exist, is nonetheless not a crime nor indicia punishable as a different crime.

Concealing or furtive behavior in a retail setting is something one might associate with shoplifting or pickpocketing, but not fraud, because fraud, however the Government theorizes it, necessarily involves overt contact and conversation with cashiers. One cannot both escape notice and make fraudulent representations. Movant and her Co-Defendant were not skulking around in trenchcoats and fedoras, ducking under counters and hiding their faces. The notion of a furtive fraudster is an oxymoron that the Court mistakenly fell for, and Counsel failed to dispel. To put it bluntly, it is impossible to lie to someone behind their back.

XIX. <u>Movant's 6th Amendment Right To Confront Witnesses, And To Compel Witnesses To Appear, To Trial By An Impartial Jury, And To Assistance Of Counsel, Were Violated When The Judge Allowed Leading Testimony And Forbade Cross-Examination, And Counsel Failed To Object On Appeal</u>

By misapplying Rule 611 F.R.E., the Hon. Judge Herrera created a loophole in her application of the law big enough for the Government to maneuver its case-in-chief through. The judge successfully kept material facts from the jury, abusing her discretion.

The old saw about a judge's job being to call balls and strikes was apropos here, though ironically: balls for the government, strikes for the defense.

### A. Leading Witnesses

Counsel timely objected to leading numerous times, but failed to argue against the Government and Court's excuses for permitting the leading testimony under Rule 611. The pertinent section of Rule 611, 611(c), states:

> **(c) Leading Questions.** Leading questions should not be used on direct examination except as necessary to develop the witness's testimony. Ordinarily, the court should allow leading questions:
> **(1)** on cross-examination; and
> **(2)** when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party.

In the case of Steven Gardner's testimony, neither subsections (1) or (2) applied. This just leaves the proposition that foundational matters were "necessary to develop the witness's testimony". The 10th Circuit in *U.S. v. Olivo*, 69 F.3d 1057 (10th Cir. 1995) laid out three situations that were applicable to *Olivo* but not here:

> Situations where leading questions are allowed are:
> (1) where a witness is hostile, Fed.R.Evid. 611(c);
> (2) where a witness is reluctant or unwilling[]; and
> (3) where an adult witness has difficulty communicating.
> *Id.* at 1065.

The 10th Circuit abortion-law case in *Shultz v. Rice*, 809 F.2d 643, 654-55 (10th Cir. 1986) likewise involved an adverse witness, which was applicable to *Shultz* but not here. Gardner's "led" testimony (or more

accurately Vierbuchen's testimony and Katrin's testimony) was simply impermissible, and Counsel failed to raise the matter on appeal.

While an archetypical court might tolerate a little bit of leading to expedite a lengthy stretch of undisputed testimony, the prejudicial effect of the leading in this case was devastating to Movant, given the wide gulf between the threadbare desurplusaged indictment and witnesses' inability to answer in an informed, succinct, and directed manner. This case's testimony came from AUSA's Vierbuchen and Kastrin first and foremost, rather than actual witnesses.

Through the Court's reversible approach to leading, the Jury formed its opinions first and foremost from the Government's leading questions, with the witnesses themselves only rounding out the picture and the indictment running a distant third as an information source.

To call Vierbuchen's and Kastrin's spoon-feeding "constructive amendment" would be understating the effect.

> A constructive amendment of an indictment "occurs when the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.'" *U.S. v. Hornung*, 848 F.2d 1040, 1046 (10th Cir. 1988) (quoting *U.S. v. Hathaway*, 798 F.2d 902, 910 (6th Cir. 1986)).

Counsel could have moved for reconsideration, to alter or amend the judgment, or interlocutory appeal, particularly considering the Court committed a clear error of law, and so moving could prevent manifest injustice. Counsel did not, and Movant was ineffectively assisted and prejudiced, since the jury convicted on the testimony of prosecutors.

> [T]he decision to grant reconsideration is committed to the sound discretion of the district court; in exercising that discretion, courts consider whether there has been an intervening change in the law, new evidence, or the need to correct clear error or to prevent manifest injustice. *Brumark Corp. v. Samson Resources Corp*, 57 F.3d 941 (10th Cir. 1995).

**B. Sandbagging The Defense**

On the flipside, the judge continually barred cross-examination of prosecution witnesses in matters affecting the witnesses' credibility. This bias was made manifest in the matter of the hidden spreadsheets and their impact on the evidence.

During preliminary hearings, the judge ruled to allow the Government's spreadsheet evidence in spite of the defense's concerns about the hidden spreadsheets, ruling at first that it was a question of weight versus admissibility for the jury to decide; then, during the defense's turn to cross-examine during trial, the judge whipsawed the defense by flip-flopping on that position, adopting wholesale the Government's latest argument that any such evidence of hidden spreadsheets was irrelevant, even to impeach government witnesses.

Movant's constitutionally guaranteed right to attempt to impeach adverse witnesses was continually defeated by the judge, and given little explanation other than "at this point I'm not going to allow it" and "we may need to revisit the issue".

A "failure to state the reasons for an evidentiary ruling can be a factor in finding an abuse of discretion" *U.S. v. Nagib*, 56 F.3d 798 (7th Cir. 1995).

This practice, known in the vernacular as "sandbagging" the defense, occurs frequently in caselaw. In *U.S. v. Ienco*, 92 F.3d 564 (7th Cir. 1996), it was held as prejudicial error for the judge to announce during the prosecution's case-in-chief that he would not give a *Pinkerton* instruction, and then after both sides completed examining witnesses, changed his mind and said he would give such an instruction.

Just as happened in the instant case with the hidden spreadsheets, in *U.S. v. Salerno*, 937 F.2d 797 (2nd Cir. 1991), that

judge admitted exculpatory material "to the weight of the evidence" at a preliminary hearing, and then ruled it "irrelevant" at trial.

After the parties have presented their evidence, "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson [v. Liberty Lobby, Inc]*, 477 U.S. at 249, 106 S.Ct. 2505. (From *Moldowan v. City of Warren*, 578 F.3d 351 (6th Cir. 2009).

Counsel failed to effectively raise some issues at trial but was even more ineffective as appellate counsel, waiving every Rule 611 matter during appeal. Movant was deprived of her Fifth and Sixth Amendment Rights, including the right to confront witnesses against her, and the right to a fair trial with a reproducible result. Prejudice is demonstrated through the Court keeping the jury in the dark as to the Government's witnesses' lack of candor and lack of competence, decisions a jury should factor and not a judge. Had the jury been allowed even an inkling of how crooked Mr. Gardner was, Movant may have been acquitted on all counts.

XX. **Movant's 6th Amendment Right To Trial By An Impartial Jury, And To Have Assistance Of Counsel For Her Defense, Was Violated When Her Counsel Refused To Bring Sleeping Jurors To The Court's Attention**

It is one of the peculiarities of a modern court setting that prosecutors and judges seldom have a direct view of the jury, but the defense table stares at them by default.

At least three jurors slept during different phases of the trial, Juror Neil audibly snoring, and this fact was well-known to the defense table.

During trial, Movant and Co-Movant brought up this fact to Co-Movant's Counsel, and Co-Movant was consistently told to make notes of the fact and to present them to Counsel at trial closing, which he did.

At trial closing, Co-Movant brought up to Mr. Robert the fact that jurors had been sleeping, as he had been previously instructed, to which Mr. Robert refused to bring the fact up to the judge, even stating "a sleeping juror is a friendly juror". Given the fact that all jurors voted to convict, Mr. Robert was mistaken. Counsel was also constitutionally ineffective for this reason, by delaying and then censoring this vital information when the Court could have been notified, even off the record and outside the jury's presence, in a manner which would have admonished jurors to keep alert or replace jurors unable to stay awake during testimony with the alternates. As a note, neither of the alternates ever fell asleep, and both of them took copious notes.

> A defendant could be deprived of the Fifth Amendment right to due process or the Sixth Amendment right to an impartial jury if jurors fall asleep and are unable to fairly consider the defendant's case. *U.S. v. McKeighan*, 685 F.3d 956, 973 (10th Cir. 2012).

In *Smith v. Aldridge*, 17-6149 (10th Cir. 2018) an Oklahoma defendant's attorney allegedly similarly kept her concerns of sleeping jurors quiet, but in that particular case, the judge went on record "insist[ing] he zealously watched the jury and only saw one juror sleeping at one point during the trial." *Smith*, at 10, despite five affidavits from other jurors to the contrary. No such pronouncement by the judge took place in this case. See also *U.S. v. Barajas*, 14-2475-JWL, (D.Kan. 2015), where the same occurred.

In *McKeighan*, both prosecution and defense attorneys brought the sleeping juror to the court's attention, whereas it was never brought to the Court's attention in this case.

Counsel failed to move for a mistrial and failed to relay Movant's concerns to the Court for the Court to make a just determination.

The prejudice that Movant suffered was that the case-in-chief was introduced during cross-examinations while some jurors were unconscious, who then stayed unaware of flaws in the Government's case. Movant's Fifth and Sixth Amendment Rights were violated, and the unchecked juror misconduct makes it questionable if a second trial would have produced a consistent result.

XXI. **Movant's 6th Amendment Right To Confront Witnesses, And To Have Assistance Of Counsel For Her Defense, Was Violated When Government Prosecutors Themselves Testified At Summation And Rebuttal And Her Counsel Refused To Object, And Movant's 8th Amendment Right To A Reliable Sentencing Determination Was Deprived By Government Prosecutors' Unfair Closing Arguments.**

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done…But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger* v. *U.S.,* 295 U.S. 78, 88 (1935).

The prosecutors in this case made so many impermissible remarks, striking so many foul blows, that no other case Movant could locate would make a more succinct yet comprehensive example for teaching law students how not to wrap up a trial.

### A. Falsehoods in Rule 29 Response

While AUSA Vierbuchen's response at 106 lines was substantially longer than Counsels' motions at 19 lines each, the three matters not in evidence cited in the ground constituted the majority of Vierbuchen's response.

The Court acknowledged as its primary basis for denying the Rule 29 motions "the examples that were provided to us by Ms. Vierbuchen".

Since these matters were not in evidence, Ms. Vierbuchen was testifying against Movant, violating Movant's Fifth Amendment Right to due process and Sixth Amendment Right to confront witnesses against her. Counsel's ineffective failure to object to matters not in evidence prejudiced Movant not only through the denial of Rule 29, but long afterward at sentencing, as it was Vierbuchen's unqualified testimony, of matching IP addresses and furtive behavior, that informed the Court's decisions on Movant's sentence.

Based on the foregoing, the Court reversibly erred when it denied the Rule 29 motion, and the result was caused by prosecutorial misconduct. In *U.S. v. Rufai*, 732 F.3d 1175 (10th Cir. 2013), Rufai's counsel similarly failed to raise a specific argument in the Rule 29 motion, yet the 10th Circuit was convinced Rufai met the plain error standard and reversed his convictions.

> Allegations of prosecutorial misconduct implicate the due process rights of a defendant. *U.S. v. Carleo*, 576 F.2d 846, 851 (10th Cir.), cert denied, 439 U.S. 850, 99 S.Ct 153, 58 L.Ed.2d 152 (1978).

By laying the groundwork and testing the waters in their Rule 29, to gauge and groom both the Court and Counsel to see and expand how much misconduct they could get away with at summation, the Government successfully exploited the opportunity and adjusted their summation and rebuttal accordingly, not holding anything back.

In addition to her Rule 29 response, Assistant U.S. Attorney Vierbuchen violated Movant's Fifth and Sixth Amendment Rights by stepping over the line in trial summation and rebuttal, prejudicing Movant by manipulating the jury into a conviction rather than doing her job as *Berger* defined it.

> Due process will not permit a prosecutor to use his closing argument to testify to a jury. *U.S. v. Segal*, 649 F.2d 599, 604 (8th Cir. 1981); *U.S. v. Latimer*, 511 F.2d 498, 503 (10th Cir. 1975).

## B. Matters Not In Evidence During Summation And Rebuttal

"This is one of those rare cases where the improper comments in a prosecutors' summation were so numerous and, in combination, so prejudicial that a new trial is required." *Floyd v. Meachum*, 907 F.2d 347 (2nd Cir. 1990).

> We also emphasize that, unlike many appeals raising claims of prosecutorial misconduct, this case does not involve one, or a few isolated, brief episodes; rather, it involves repeated and escalating prosecutorial misconduct from initial to closing summation. *Floyd*, at 353.

The Second Circuit came to this opinion after a similar buffet of Government misconduct, though at least Floyd's counsel moved for a mistrial, even if the court did not rule on it before charging the jury. *Floyd*, at 352. Floyd's counsel also filed motions for a new trial and judgment of acquittal, heard preliminary to sentencing, as well as appealing due to claims of error in the prosecutor's summation. Counsel did not, and was thus ineffective.

> A prosecutor is allowed to comment on the evidence and draw inferences therefrom, but he may not speculate or refer to evidence never presented to the jury. *Thornburg v. Mullin*, 422 F.3d 1113 (10th Cir. 2005).

> Similarly, he may not mention facts not in evidence to support a finding of guilt, *Latimer*, 511 F.2d at 503; *Marks v. United* States, 260 F.2d 377, 383 (10th Cir. 1958), cert. denied, 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959).

After she made full use of the Court's carte blanche to lead prosecution witnesses, the extent to which Vierbuchen herself testified in summation and rebuttal constituted not only a substantial percentage of the Government's case-in-chief, but also prejudicial and reversible error.

> The mischaracterization of the record is of concern given the weight with which jurors generally view a prosecutor's remarks. Since jurors usually have no access to the testimonial record during deliberation, the risk that the prosecution's characterization would be remembered in lieu of the correct

statement [] is increased. *Le v. Mullin*, 311 F.3d 1002 (10th Cir. 2002).

## C. Unqualified Statements of Law

In summation, AUSA Vierbuchen twice told the jury what the law was, a role a judge traditionally reserves for herself.

> The prosecutor's objectionable comment was not a statement about evidence but a statement of law. Telling the jury that a statement of law was not evidence did nothing to correct its functional error in misstating the law. *Warden v. Payton*, 544 U.S. 133, 160 (2005).

In rebuttal, AUSA Vierbuchen described an inaccurate generalization about fraud. Her description of fraud, "tell[ing] somebody something that's not true so they will give you something in return" is no less aptly descriptive of extortion, blackmail, professional acting, stand-up comedy, prostitution, playing poker, parenting, or sharp dealing.

> [T]he cumulative effects of the prosecutors' remarks, which included both inflammatory comments and erroneous statements of law, and which implicated Floyd's specific constitutional right to remain silent, diverted the jury from the charges on which Floyd was being tried, and from the fundamental principles by which a jury must discharge its duty. *Floyd*, at 356-57.

## D. Unqualified Opinions of Guilt

AUSA Vierbuchen substituted her judgment for that of the Court, bridging the gap between what was proved and guilty verdicts with her own opinions.

> Such conduct [prosecutor saying "I think"] risks a reversal that is unnecessary and easily avoided. *U.S. v. Gabriel*, 715 F.2d 1447 (10th Cir. 1983).

> [T]he term "we know" as in "we know the defendant did such and such . . ." should not be used in closing argument since it tends to blur the line between improper vouching and legitimate summary. *U.S. v. Younger*, 398 F.3d 1179 (9th Cir. 2005).

### E. Burden-shifting

The jury would have understood the Government's repeated questions as an improper comment on Movant's and her Co-Defendant's failures to testify, and that the repeated rhetorical questions ("Why?"; "Why?"; "Why?) were an impermissible attempt to dilute the Government's burden of proof and to undermine Movant's presumption of innocence.

> Petitioner next contends that the prosecution's closing argument at the guilt-innocence stage of the trial rendered his conviction fundamentally unfair and deprived the sentencing determination of the reliability that the Eighth Amendment requires. *Darden v. Wainwright*, 477 U.S. 168, 178-79 (1986).

### F. Admonishing the Jury to Imagine Movant's Guilt

Vierbuchen saw the need to embellish the Government's case in order to ensure a conviction and maximize Movant's sentence, in the form of a higher dollar amount unleashed by the imagination. While she may have established Movant's actions as worthy of conviction, driving home the point with Movant's imagined potential actions would bring the guilty verdicts more quickly, even if there was no correlating basis for the imagination.

> "First, [the prosecutor] repeatedly emphasized his personal opinion that Young was guilty of fraud. Second, he made predictions about the continuing effects of Young's conduct based on his prosecutorial "experience in these matters". *U.S. v. Young*, 470 U.S. 1 (1985).

Vierbuchen also seized an impermissible advantage by more conventional admonishments to the jury to use their imaginations, repeatedly stating, "It doesn't take much imagination to see" during her mention of Defendants' interstate travels and how it conveniently matches the Government's case.

> Under most circumstances, asking the jury to imagine is highly speculative and impermissible…Because an invitation to "imagine" runs the risk of bidding the jury to consider possibilities outside those intended by the prosecutor, more exact language

should virtually always be used. *Morris v. U.S.*, 564 A.2d 746
(D.C.C.A. 1989).

### G. Stoking Passion or Prejudice In The Jury

Playing on the jury's sympathies for teachers was prosecutorial
overreach, especially in light of Ground I(I)(2)'s points that Movant
or Co-Movant had the right to call themselves teachers, and the fact
OfficeMax's focus on teachers, free to shop elsewhere as Venirewoman
Love stated, was focused on loyalty and high prices rather than
charity.

Playing on the jury's sympathy for Officemax was similarly
overreach.

> We do "not condone prosecutorial remarks encouraging the jury to
> allow sympathy to influence its decision." *Moore v. Gibson* 195
> F.3d 1152, 1172 n.11 (10th Cir. 1999), in *Wilson v. Sirmons*, 536
> F.3d 1267 (10th Cir. 2008).

Counsel waived objection on the spot and on appeal. These errors
served individually and cumulatively to prejudice Movant's Rights to
due process, confront witnesses, and to a fair trial. The 10th Circuit
holds in *U.S. v. Rivera*, 900 F.2d 1462, 1471 (10th Cir. 1990, en banc)
that a cumulative-error analysis applies only where there are two or
more actual errors. However, the aforementioned errors in this ground
alone exceed ten in number.

> Reversible error is committed when counsel's closing argument to
> the jury introduces extraneous matter which has a reasonable
> probability of influencing the verdict. *Lambert v. Midwest City
> Mem'l Hosp. Auth*, 671 F.2d 372 (10th Cir. 1982) (setting aside
> judgment where counsel's remarks were "improper and prejudicial")

> [I]rrelevant information or inflammatory rhetoric that diverts
> the jury's attention from its proper role or invites an
> irrational, purely subjective response should be curtailed.
> *Jurado v. Davis*, 08-cv-1400-jls (S.D.Cal. 2018).

The Government's use of Powerpoint in its rebuttal, both to
showcase the robe and the Channons' photo, was not to review the
evidence and testimony but to introduce new testimony, and not to push

the Government's case over the finish line on the merits but to make

the jury despise the defendants in order to convict.

> Nevertheless our precedent suggests caution in pushing the
> prosecutorial envelope.  Given the lack of notice of the use of
> the transparencies, we note that their dramatic presentation
> during final closing and the potentially inflammatory nature of
> the prosecutor's comments raise concern. *Miller v. Mullin*, 354
> F.3d 1288 (10th Cir. 2004).

> The prosecutor here simply failed in her duty to "refrain from
> improper methods," and did so pervasively and repeatedly
> presenting to the jury without substantiated arguments, implicit
> opinions, and conclusory assertions. Although individual review
> of each remark or of the separate sets of remarks within Leon and
> Bess are not as severe, our review of all of the statements
> throughout the whole trial, compels us to remand these cases for
> new trials. *U.S. v. Francis*, 170 F.3d 546, 553 (6th Cir. 1999).

Since Counsel waived objection in closing, Movant can only and

thus does point to prosecutorial misconduct and ineffective assistance

of Counsel as grounds for reversal, the prejudice suffered being

conviction at an unfair trial.

> Cause is established by the failure of his counsel on direct
> appeal to raise and preserve the federal constitutional issue
> central to his case.  Prejudice is established because, as we
> have pointed out in the foregoing discussion, the point abandoned
> by counsel was a meritorious one. *Freeman v. Lane*, 962 F.2d 1252
> (7th Cir. 1991).

## XXII.  Conclusion

WHEREFORE, Ms. Channon is entitled to relief under §2255 because

of the aforementioned grounds, which detail numerous constitutional and

jurisdictional errors leading to her unlawful convictions. These errors

individually and cumulatively prejudiced Ms. Channon, and warrant

reversal. Ms. Channon therefore respectfully requests that this Court

hold the requested hearings and set aside her convictions.

Respectfully submitted,

Brandi R. Channon, Movant

7100 Gladden Ave. NE

Albuquerque, NM  87110