

**ALBUQUERQUE PUBLIC SCHOOLS**

Comanche Elementary School

Expect Great Things!

Winston Brooks
SUPERINTENDENT

Rena Highland
PRINCIPAL

March 23, 2010

Mr. Matt Channon
7100 Gladden NE
Albuquerque, NM  87110

Dear Mr. Channon:

We are grateful for your very generous contribution of the cases of paper and markers for Comanche Elementary School.

As resources get scarcer your donation takes on added importance so that we may continue to supply our schools with the necessary materials.

Thank you again for your support.

Sincerely,

Rena Highland / pag

Rena Highland,
Principal

**BRANDI CHANNON'S EXHIBIT**

**1**

1:13-CR-966-JCH-KK   2255 MOTION

*Celebrate the 8 essential goals toward better education for the Albuquerque*

1    Court says, Okay.  They paid full price for them.

2    What's your beef?  You got paid.  You didn't lose any

3    property.   You didn't lose anything.

4           And so that the -- that fact, regardless of

5    the fact that what they did later on could have been

6    a violation of 841, could have been all kinds of

7    things that they used to acquire money by selling

8    these things, was irrelevant to the question of

9    whether wire fraud jurisdiction applied.

10          And that -- so I think Sadler is

11   instructive in the Court's consideration of whether

12   or not that next step is an appropriate target for

13   the wire fraud statute in this indictment.

14          Thank you.

15          THE COURT:  And you know, that kind of gets

16   to my point -- or I shouldn't say my point, but my

17   issue.

18          My concern is I don't -- I don't dispute

19   that the Channons did something here.  I'm just

20   trying to figure out whether it was a violation of

21   the -- of the federal statute regarding wire fraud.

22   I mean --

23          MR. ROBERT:  That's the question.

24          THE COURT:  -- that's my issue.

25          Do you have anything to add to this,

BRANDI CHANNON'S
EXHIBIT

2

1:13-CR-966-JCH-KK   2255 MOTION

1    Mr. Hotchkiss?

2            MR. HOTCHKISS:   I don't, Your Honor.

3    Mr. Robert has covered all the necessary points.

4            THE COURT:   All right.   Thank you.

5            Anything else?

6            MS. MESSEC:   Just briefly, Your Honor.

7            THE COURT:   Okay.

8            MS. MESSEC:   Now that we know what the

9    Court's concern is regarding the steps --

10           THE COURT:   Uh-huh.

11           MS. MESSEC:   -- that count under wire

12   fraud, we would suggest that we go back and brief

13   that particular issue for the Court.

14           But I think what is clear is that there are

15   reasons to deny the motion regardless of that issue,

16   because it's simply not an appropriate issue to be

17   presenting first on a motion to dismiss the

18   indictment.

19           The law is very clear that the Court should

20   not look to facts outside of the indictment to

21   determine whether the allegations in the indictment

22   are sufficient.

23           And you can't determine whether MaxPerks

24   rewards are property without looking to facts that

25   are outside of the indictment.   That's why we

Case 1:13-cv-00201-JCH-SMV Document 4 Filed 03/11/19 Page 4 of 400

Page 27

1    superseded the indictment, to avoid even having to

2    determine whether MaxPerks rewards are property.

3            But if the Court still needs to come down

4    to that issue, that's going to be something that's

5    going to require a lot of evidence that we can't

6    present today.

7            THE COURT:  Would that not be a legal issue

8    for the Court to decide?  I mean, how would the trial

9    and the evidence presented at trial address the issue

10   of whether or not the rewards were property?  I mean,

11   how would you even --

12           MS. MESSEC:  I mean --

13           THE COURT:  -- wouldn't you just be

14   assuming that this is merchandise, end of story, much

15   like your response to the motion to dismiss?

16           MS. MESSEC:  Well, if we're -- I mean, we

17   can assume merchandise is property.  But if the Court

18   is also concerned with whether MaxPerk rewards are

19   property, then that is a -- it's a legal question

20   that has to be based on facts.

21           THE COURT:  Right.  And I agree with you on

22   that.

23           But I guess what I am saying is, that's not

24   an issue that would be factually developed during the

25   course of the trial on this.  So it sounds like we

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

  vs.                                      Cr. No. 13-966 JCH/KK

MATTHEW CHANNON, and
BRANDI CHANNON,

      Defendants.


## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants' *Motion To Strike Surplusage from the Second Superseding Indictment* [Doc. 274]. The Government filed *United States' Motion To Strike as Untimely Defendants' Motion To Strike Surplusage* [Doc. 278]. Having reviewed the motions, briefs, and relevant law, the Court concludes that Defendants' motion [Doc. 274] should be granted and the Government's motion [Doc. 278] should be denied.


## DISCUSSION

The Government points out that Defendants' motion should have been filed earlier, under the rules and the Court's scheduling order. The only prejudice asserted by the Government, however, is that Defendants' motion "divert[ed] the Government's attention from preparing for trial during the final critical days." [Doc. 278, p. 3]

Defendants ask the Court to strike surplusage from the Second Superseding Indictment [Doc. 197] under Federal Rule of Criminal Procedure 7(d). They recognize that language in the indictment describing the essential elements of the crimes alleged is not surplusage and cannot

**BRANDI CHANNON'S EXHIBIT**

**3**

1:13-CR-966-JCH-KK    2255 MOTION

be stricken. *See United States v. Collins*, 920 F.2d 619, 631 (10th Cir. 1990). The Court, however, has discretion to strike as surplusage allegations not relevant to the charge at issue. *See id*. Defendants argue that these principles would allow the Court to strike Paragraphs 1 through 9 and Paragraph 11 under Count 1, and to strike Paragraph 1 under Counts 2-7.

The Court agrees with Defendants' observation that the Second Superseding Indictment contains a mass of detailed factual allegations that would be more appropriately included in the Government's opening statement than in the Court's statements and instructions to the jury. The Court must scrupulously maintain both the essence and appearance of impartiality, and must avoid appearing to emphasize or agree with factual allegations and theories advanced by either side—particularly at the outset of the case.

Having carefully considered the parties' arguments and the interests of fairness and justice, the Court will strike the surplusage as requested in Defendants' motion. Under Count 1, the Court will strike Paragraphs 1 through 9, and Paragraph 11. [Doc. 197, pp. 1-3] In addition, the Court will strike the heading "General Allegations" on page 1, the heading "The Conspiracy" on page 3, the numeral "10" at the beginning of the second full paragraph on page 3, and the heading "Manner and Means" on page 3. The Court will not strike the last line of Count 1 on page 5, thus retaining: "In violation of 18 U.S.C. § 1349." Under Counts 2-7, the Court will strike Paragraph 1 on page 6; the Court will also strike the numeral "2" at the beginning of the second full paragraph on page 6.

The Court finds that the Second Superseding Indictment, as modified in accordance with this Order, sufficiently sets forth the essential elements of the crimes alleged.

**IT IS THEREFORE ORDERED** that:

(1)   Defendants' *Motion To Strike Surplusage from the Second Superseding Indictment* [Doc.

274] is **GRANTED**, as discussed above; and

(2)   *United States' Motion To Strike as Untimely Defendants' Motion To Strike Surplusage* [Doc.

278] is **DENIED**.


**UNITED STATES DISTRICT JUDGE**

The defendants are on trial before you upon a second superseding indictment brought by the grand jury charging:

### COUNT 1:   CONSPIRACY

Between on or about August 25, 2009, and continuing through on or about June 8, 2011, in the District of New Mexico and elsewhere, Defendants MATTHEW CHANNON and BRANDI CHANNON did knowingly, voluntarily, and interdependently conspire and agree to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false pretenses and representations, and to transmit and cause to be transmitted certain wire communications in interstate and foreign commerce for the purpose of executing the scheme, in violation of 18 U.S.C. § 1343; to wit, Defendants conspired to obtain OfficeMax merchandise through the use of MaxPerks Reward certificates to which they were not entitled.

### COUNTS 2-7:   WIRE FRAUD

Between on or about August 25, 2009, through on or about June 8, 2011, in the District of New Mexico and elsewhere, Defendants MATTHEW CHANNON and BRANDI CHANNON knowingly and intentionally devised a scheme and artifice to defraud and for obtaining money and property by means of materially false pretenses and representations.  For the purpose of executing Defendants' scheme and artifice, the listed Defendant knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce the following writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2:

Count 2:   Brandi Channon – Nov. 22, 2010 –  Transmission   from   OfficeMax retail  store  to  MaxPerks  Rewards  database  crediting  the  recycling  of  19  ink cartridges to MaxPerks Rewards Business account 643138158, under the business name High Speed Stone.

Count 3:   Matthew Channon – Nov. 22, 2010 – Transmission from OfficeMax retail  store  to  MaxPerks  Rewards  database  crediting  the  recycling  of  20  ink cartridges to MaxPerks Rewards Business account 796198559, under the business name SLC Metro Desk.

Count 4:   Brandi Channon – Nov. 23, 2010 – Transmission from OfficeMax retail store to MaxPerks Rewards database crediting the recycling of 20 ink cartridges to MaxPerks  Rewards  Business  account  658092537,  under  the  business  name American Clay Products.

Count 5:   Matthew Channon – Nov. 23, 2010 – Transmission  from  OfficeMax

3

BRANDI CHANNON'S
EXHIBIT

4

1:13-CR-966-JCH-KK   2255 MOTION

retail store to MaxPerks Rewards database crediting the recycling of 20 ink cartridges to MaxPerks Rewards Business account 620354481, under the business name Trighm Law.

Count 6:  Matthew Channon – July 15, 2010 – Transmission via email of five MaxPerks Rewards certificates of $30 each that had been issued to the following accounts:

Teacher account 796510854, Colonie Elementary School, Colonie, NY, teech.u.r.12.3.45678@gmail.com;

Teacher account 796652713, St. Louis Elementary School, St. Louis, MO, t.eechu.r12.345.6.78@gmail.com;

Teacher account 796740019, Los Angeles Elementary School, Los Angeles, CA, no email address on account;

Teacher account 820053974, Austin Elementary School, Austin, TX, coach.12.3.4.5678@gmail.com;

Teacher account 796724757, Bensenville Elementary School, Bensenville, IL, teechur123.4.5.6.78@gmail.com.

Count 7:  Matthew Channon – July 28, 2010 – Transmission via email of seven MaxPerks Rewards certificates of $100 each that had been issued to the following accounts:

Teacher account 796543132, New York Elementary School, New York, NY, teechur12.3.4.5.678@gmail.com;

Teacher account 796542357, Riverside Elementary School, Riverside, CA, teech.u.r1.23.4.5.678@gmail.com;

Teacher account 796533919, Wakefield Elementary School, Wakefield, NE, teechur.1234.5.678@gmail.com;

Teacher account 796520477, Pomona Elementary School, Pomona, CA, teech.u.r.12.3.4.5678@gmail.com;

Teacher account 796519177, Charlotte Elementary School, Charlotte, NC, teechur.1.23.4.5678@gmail.com;

Teacher account 796510978, Atlanta Elementary School, Atlanta, GA, teechu.r1.2.3.45678@gmail.com;

Teacher account 796627972, West Palm Beach Elementary School, West Palm Beach, FL, t.eech.u.r.12345.678@gmail.com

Steven Gardner - Cross by Mr. Robbenhaar

Page 954

1              Does the sales associate ask for any

2    identification?

3    A.    No.

4    Q.    Okay.  So at no point in any of the videos

5    we've seen is that sales associate at OfficeMax

6    asking for identification to verify the individual?

7    A.    No, they're not.

8    Q.    All right.

9              And we're going to be looking at -- if we

10   could pause it, please -- what's been already

11   admitted as Government's Exhibit 48.

12             We've gone over this.

13             Do you recognize this video?

14   A.    Yes, this video looks familiar.

15   Q.    Just before we start, what's the date stamp on

16   this?

17   A.    You've got to clear that top header thing.  I

18   can't quite -- 11-22-2010.

19   Q.    And the time that this is occurring?

20   A.    1854.

21   Q.    6:54 p.m.?

22   A.    Correct.

23   Q.    All right.

24             MR. ROBBENHAAR:  If we could just run that

25   video.

PAUL BACA, OFFICIAL COURT REPORTER

**BRANDI CHANNON'S EXHIBIT**

**5**

1:13-CR-966-JCH-KK    22SS MOTION

Steven Gardner - Cross by Mr. Robbenhaar

Page 955

1          (Whereupon the video recording was played.)

2    BY MR. ROBBENHAAR:

3    Q.    Now, you've previously identified that

4    individual as Ms. Channon?

5    A.    Yes, I did.

6    Q.    All right.

7          And then Mr. Channon, correct?

8    A.    That is correct.

9          MR. ROBBENHAAR:  All right.  If we could

10   pause right there for a moment.

11   BY MR. ROBBENHAAR:

12   Q.    So here at the lower left quadrant you'll see

13   Ms. Channon at the counter.  I'm drawing a blank,

14   sir.  The name of -- I'm going to call it point of

15   sale.

16   A.    The register.

17   Q.    The register.  Thank you.  Sorry.

18         She's at the register and she's put a bag

19   onto the counter.

20         MR. ROBBENHAAR:  If you could just play it

21   a little bit further.

22         (Whereupon the video recording was played.)

23         MR. ROBBENHAAR:  And pause there.

24   BY MR. ROBBENHAAR:

25   Q.    So it looks like the teller, or the sales

Steven Gardner - Cross by Mr. Robbenhaar

Page 958

1   A.    Yes.

2   Q.    All right.  And who did that editing?

3   A.    My understanding is Special Agent Jeff Moon.

4   Q.    Did you do it?

5   A.    No.

6   Q.    All right.  All right.

7          What you produced to the FBI was the

8   complete video?

9   A.    Yes, I did.

10  Q.    Now, Mr. Channon is still at the counter.

11         MR. ROBBENHAAR:  If we could play?

12  BY MR. ROBBENHAAR:

13  Q.    Let me back up.  I'm sorry.  I forgot to ask

14  you a question.

15         MR. ROBBENHAAR:  If we could go right where

16  he walked right up to the counter first.

17         A little bit further back, probably.

18         Try there.

19         A little further back.  I'm sorry.

20  BY MR. ROBBENHAAR:

21  Q.    I guess the question I have for you --

22         MR. ROBBENHAAR:  If we could return it a

23  little bit further.  Let's see if that works.

24  BY MR. ROBBENHAAR:

25  Q.    Okay.  So Mr. Channon has arrived, he's pulled

PAUL BACA, OFFICIAL COURT REPORTER



BRANDI CHANNON'S
EXHIBIT

**6**

1:13-CR-966-JCH-KK   2255 MOTION

Steven Gardner - Cross by Mr. Robbenhaar

1    the bag out of the box.

2           Again at no point does this teller ask for

3    his identification.

4           You would agree with that?

5    A.    I would agree with that.

6    Q.    All right.  And similarly, this associate does

7    not count the cartridges as did -- as did not the

8    other.

9           That's a poorly phrased question.  Sorry.

10          She didn't count these cartridges either

11   did she?

12   A.    I would have to watch the whole transaction to

13   make sure, but she may not have.

14   Q.    And that wouldn't be unusual?

15   A.    I don't know if I would call it unusual.  A lot

16   of cashiers did count them, some may not have.

17          MR. ROBBENHAAR:  Let's pause right there.

18   BY MR. ROBBENHAAR:

19   Q.    So she's carrying this bag of cartridges.  And

20   I see also in the same frame, lower right quadrant,

21   the other sales associate is in the same area.

22          Do you agree with that?

23   A.    Yes.

24   Q.    What's that big machine right behind the female

25   sales associate?

Steven Gardner - Cross by Mr. Robbenhaar

Page 960

1    A.    That is the ink refill machine.

2    Q.    All right.  So this particular store has an ink

3    refill machine, doesn't it?

4    A.    It sure does.

5    Q.    And if we watch this video long enough, sir, we

6    could see these associates removing the cartridges

7    from the bag, perhaps placing them in the ink refill

8    machine, and the ink refill machine refilling the

9    cartridges.

10            Is that correct?

11   A.    I don't think they would be refilling them all.

12   You can only refill specific types of cartridges, and

13   they have to be in a certain condition to do it.

14            But could they have done some of them?

15   Yes.

16   Q.    So this -- this store -- in this store

17   associates could be refilling appropriate cartridges,

18   right?

19   A.    They could be.

20   Q.    And would they then be boxed up and put back on

21   the shelf for resale?

22   A.    I believe the way it worked here was they were

23   actually resold from behind the counter in most

24   cases, because they had a different sale price than

25   the recycled one I just looked at, because they're

Steven Gardner - Cross by Mr. Robbenhaar

1    getting filled up here, and it was more of a

2    convenience thing so the customer doesn't have to

3    wait to get their ink cartridge refilled.

4            And I can explain how this program works,

5    if you'd like.

6    Q.    No, that's okay.

7    A.    Okay.

8    Q.    Someone from behind the counter has refilled

9    ink cartridges, is what you're telling us?

10   A.    Could you repeat that?

11   Q.    You're saying that rather than placing them in

12   a box, as happens now in Office Depot, you're saying

13   that they would be placed behind the counter,

14   refilled cartilages, and then people could buy those?

15   A.    Some of them would be, but they would be sold

16   through the ink recycle -- the ink refill program,

17   not the ink -- the OfficeMax branded program.

18   They're two different things and two different price

19   points.

20   Q.    Again, OfficeMax would have to make some profit

21   on that process?

22   A.    They may make a little money on this.  I

23   haven't really looked at it, but it wouldn't be a

24   large amount.  The refill was more out of convenience

25   so you don't make a customer wait 15 minutes to

Steven Gardner - Cross by Mr. Robbenhaar

Page 962

1    refill their ink cartridge.

2         If you have the same brand and you've

3    refilled a backstock of it, the customer says, I'd

4    like to refill my ink cartridge.

5         Oh, here.  Here's this one.  We're going to

6    charge you -- I think at the time it was, like, 14.99

7    or 10 or whatever.  We'll give you this one because

8    it's already filled, and it saves us that.

9    Q.    I'll get back to Exhibit 48 in a little bit.

10        Now, you were -- you testified earlier in

11   this case about the data that you provided that

12   you -- your office and your third-party vendor

13   provided to the FBI.

14   A.    Correct.

15   Q.    All right.  And we've heard discussion of the

16   various spreadsheets that underlie, or form the

17   foundation, of all the -- many of the summary

18   spreadsheets introduced in this case by the

19   government.

20        MS. VIERBUCHEN:  Objection, Your Honor,

21   facts not in evidence.

22        THE COURT:  Well, actually, it was a bit

23   confusing.  So if you could clarify the question, and

24   then I can take up your objection.

25        MR. ROBBENHAAR:  All right.

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Redirect by Ms. Vierbuchen

Page 1002

1    rewards being assessed to any account controlled or

2    belonging to Ms. Channon, correct?

3    A.    Correct.

4    Q.    To your knowledge, through your testimony and

5    evidence presented through that, Ms. Channon never

6    presented any false identification, correct?

7    A.    She didn't present any false identification.

8    Q.    And you have no evidence that Ms. Channon ever

9    used a computer in this alleged conspiracy, correct?

10   A.    Yeah.  I have no idea whether she used a

11   computer or not.

12   Q.    And finally, you never sought to speak with

13   Ms. Channon at any point in time.

14            Is that correct?

15   A.    No, I didn't.

16            MR. HOTCHKISS:  No further questions,

17   Your Honor.

18            THE COURT:  Is there redirect?

19            MS. VIERBUCHEN:  Yes, Your Honor.

20                    REDIRECT EXAMINATION

21   BY MS. VIERBUCHEN:

22   Q.    Defense counsel asked you if you had ever

23   linked Ms. Channon to any false identification.

24            Do you recall that question?

25   A.    Yes, I do.

PAUL BACA, OFFICIAL COURT REPORTER

BRANDI CHANNON'S
EXHIBIT

7

1:13-CR-966-JCH-KK  2255 MOTION

Steven Gardner - Redirect by Ms. Vierbuchen

Page 1003

1          MS. VIERBUCHEN:  The Court's indulgence for

2    one moment.

3          And if we could pull up Government's

4    Exhibit 48.

5    BY MS. VIERBUCHEN:

6    Q.   Okay.  This is a video that we saw both in your

7    direct testimony, as well as in cross-examination by

8    Mr. Robbenhaar.

9          MS. VIERBUCHEN:  Can we take a look at this

10   video, if you could just play it?

11         (Whereupon the video recording was played.)

12   BY MS. VIERBUCHEN:

13   Q.   And I just want you to get your bearings on

14   this because we're going to go to the Ejournal next.

15         So are you comfortable that you see what

16   that transaction is about?

17   A.   Yes.

18   Q.   Okay.

19         MS. VIERBUCHEN:  Now if we go to

20   Government's Exhibit 49.

21   BY MS. VIERBUCHEN:

22   Q.   And you had testified earlier that this was the

23   electronic receipt that corresponded with

24   Ms. Channon's recycling of -- I believe you said 19

25   or 20, you would have to count them up -- but 19 or

Steven Gardner - Redirect by Ms. Vierbuchen

Page 1004

1    20 ink cartridges?

2    A.    Yes.  I just need to get to the bottom of this.

3    Q.    Okay.  And with regard to -- what MaxPerks

4    number was provided for this transaction?

5    A.    High Speed Stone.

6    Q.    And if we go to Government's Exhibit 19, and I

7    have you take a look at Row Number 23.

8          And if you can see, the contact name is

9    High Speed Stone.

10          Do you see the address?

11    A.    Yes, 7240 West Allison Road.

12    Q.    And where is the city and state for this

13    alleged customer?

14    A.    Chandler, Arizona.

15    Q.    Does that match up with what you know about

16    Brandi Channon's residence?

17    A.    No.  I may have misspoken in my prior

18    testimony.  I wasn't looking at it from that

19    standpoint.  I was looking at it from, are you ID'ing

20    somebody when they come into the building and asking

21    them for their driver's license?

22          And no, we never did that with Brandi,

23    other than during the return.

24          During the ink recycle, if somebody says

25    that they are -- they live in Chandler and they're

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Redirect by Ms. Vierbuchen

Page 1005

1    whatever that business name was, we're going to

2    accept that at face value.

3    Q.    So then similarly with Government's Exhibit 51,

4    I just want to play the video.  It's a brief video,

5    but just to get your bearings when I ask you a

6    question about the underlying transaction.

7              This has already been offered into evidence

8    and admitted, 51.

9              (Whereupon the video recording was played.)

10   BY MS. VIERBUCHEN:

11   Q.    And do you see who is at the counter at the

12   moment?

13   A.    In that one it looked like it was Brandi.

14   Q.    And let's see if you have a better view.

15             Can you tell now?

16   A.    Yes, that was Brandi.

17   Q.    Okay.  And going to Government's Exhibit 52.

18             In response to the defendant's question as

19   to whether or not she ever provided false

20   identification, do you see the MaxPerks number that

21   was provided by Ms.- --

22   A.    Yes, American --

23   Q.    -- at the time of the purchase?

24   A.    Yes.  American Clay Products.

25   Q.    And let's go to Government's Exhibit 19, Row

Steven Gardner - Redirect by Ms. Vierbuchen

1    31.

2              And if you could tell the jury who enrolled

3    in that MaxPerks -- with that MaxPerks ID number.

4    A.    American Clay Products, 311 West Baseline Road,

5    Number 311, Tempe, Arizona.

6    Q.    Does that comport with your knowledge of where

7    Ms. Channon lives?

8    A.    No, it's not.

9    Q.    Defense counsel asked, I believe, if you ever

10   linked Ms. Channon to anything other than ink

11   recycling.

12             Do you recall that question?

13   A.    I do recall that.

14   Q.    And I think your answer was no?

15   A.    Yeah.  I didn't recall that.

16   Q.    Okay.  And I'm sorry.  You didn't recall what?

17   A.    I didn't recall linking her to other

18   transactions.  I may have, but I just -- I didn't

19   recall.

20   Q.    Okay.  And let's take a look at -- defense

21   counsel asked you -- Mr. Hotchkiss asked you whether

22   or not that a refund in and of itself was something

23   that was unauthorized.

24             And I think you said it wasn't?

25   A.    Yeah.  They are allowed.  You don't have a

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

IN THE UNITED STATES DISTRICT COURT      JUN 2 4 2015

FOR THE DISTRICT OF NEW MEXICO MATTHEW J. DYKMAN
CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 13-966 JCH |
| | ) | |
| vs. | ) | Count 1: 18 U.S.C. § 1349: Conspiracy |
| | ) | to Commit Wire Fraud; |
| **MATTHEW CHANNON** and | ) | |
| **BRANDI CHANNON,** | ) | Counts 2-7: 18 U.S.C. § 1343: Wire |
| | ) | Fraud. |
| Defendants. | ) | |

## SECOND SUPERSEDING INDICTMENT

The Grand Jury charges:

### Count 1

General Allegations

1.     At all times relevant to this indictment, OfficeMax, a national retailer of office

supplies and other products, administered a customer reward program called MaxPerks

Rewards.

2.     In exchange for purchases made at OfficeMax, customers with MaxPerks

Rewards accounts could earn rewards in the form of credit toward future purchases at

OfficeMax.  Purchases of certain limited categories of items, such as computers, did not earn

MaxPerks credit; any type of purchase that did earn MaxPerks credit was called a "qualifying

purchase."

3.     There were two types of MaxPerks Rewards accounts: MaxPerks Rewards for

Business, which were available to any customer, and MaxPerks Rewards for Teachers, which

were available only to teachers.  For every $500 on qualifying purchases that a Business

customer spent at OfficeMax, the customer earned $25 in rewards; for every $75 on

**BRANDI CHANNON'S EXHIBIT**

**8**

1:13-CR-966-JCH-KK   2255 MOTION

purchases that a Teacher member spent at OfficeMax, the customer earned $10 in rewards, up to an annual maximum of $100 in rewards.

4.     The terms of the MaxPerks Rewards program limited each customer to one MaxPerks account.

5.     Customers could sign up for a MaxPerks account in person at an OfficeMax store, over the phone, or online.  When a customer created an account online, the customer was required to provide his or her name, mailing address, phone number, and email address.  The customer also created an account password.  The information submitted by the customer would be transmitted via the internet to MaxPerks Rewards computer servers in Illinois.

6.     A customer could access his or her MaxPerk account online by providing either the account number or the email address associated with the account and the password.

7.     To credit a MaxPerks account with a purchase made at OfficeMax, the customer provided the cashier with his or her MaxPerks card or number, or the cashier could look up the customer's MaxPerks number.  Details of the purchase would then be routed by wire to MaxPerks Rewards computer servers in Illinois, and the purchase would be eventually credited to the customer's MaxPerks account.

8.     If the customer forgot to provide his or her MaxPerks account during the purchase, the customer could later log in to his or her MaxPerks account online and add the purchase to his or her account.  This process was known as an "online adjustment."  Until sometime in late September 2010, when OfficeMax made changes to the online adjustment process, a MaxPerks online adjustment required just four pieces of information, which were located on the store receipt: the store number, date, register number, and transaction number.  The customer claiming the purchase was not required to supply the amount of the purchase.

2

9.      MaxPerks members could also earn MaxPerks Rewards by recycling used ink and toner cartridges at OfficeMax.  The terms of the recycling program were revised periodically, but at all times relevant to this indictment, the recycling program was subject to monthly limits, and in order to receive the ink rewards after January 1, 2010, the MaxPerks Reward member had to spend a certain amount on qualifying purchases at OfficeMax.  If a customer did not have a sufficient balance of qualifying purchases, then the issuance of the ink reward would be delayed and could eventually be forfeited if the qualifying purchase balance never reached the required level.

### The Conspiracy

10.      Between on or about August 25, 2009, and continuing through on or about June 8, 2011, in the District of New Mexico and elsewhere, Defendants **MATTHEW CHANNNON** and **BRANDI CHANNON** did knowingly, voluntarily, and interdependently conspire and agree to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false pretenses and representations, and to transmit and cause to be transmitted certain wire communications in interstate and foreign commerce for the purpose of executing the scheme, in violation of 18 U.S.C. § 1343; to wit, Defendants conspired to obtain OfficeMax merchandise through the use of MaxPerks Reward certificates to which they were not entitled.

### Manner and Means

11.      To further the goals and objects of the conspiracy, Defendants used the following manners and means:

a.      One or both Defendants signed up for more than 5,400 MaxPerks Rewards accounts using fictitious names, mailing addresses, and phone numbers.

3

b.     The name of a fictitious elementary school was used to create approximately 5,186 of the accounts, all of which were opened under the MaxPerks for Teachers program.  Other accounts not containing the name of a fictitious school were opened under the MaxPerks for Business program.

c.     Approximately 5,247 of the MaxPerks Rewards accounts were registered to one of four email addresses that Defendants controlled: teechur12345678@gmail.com, coach12345678@gmail.com, bargle12345678@gmail.com, and garble12345678@gmail.com. To make these four email addresses appear to OfficeMax to be 5,247 unique addresses, one or more periods were inserted between the characters preceding the "@" symbol.  In reality, Gmail accounts do not recognize periods within usernames, and so email messages sent to t.e.e.c.h.u.r.1.2.3.4.5.6.7.8@gmail.com and to teechur12345678@gmail.com would be received by the same account.

d.     One or both Defendants would obtain an OfficeMax receipt containing a store number, date, register number, and transaction number.  Because only those four pieces of information were required to claim a transaction through an online adjustment, Defendants would use this information to extrapolate store numbers, dates, register numbers, and transaction numbers for other purchases that they had not made.  One or both Defendants would access online the MaxPerks accounts that they controlled to claim purchases made by other customers, causing MaxPerks Rewards to be issued to those accounts.

e.     Defendants claimed and attempted to claim through online adjustments approximately 61,557 transactions for MaxPerks accounts that they controlled, with a total claimed purchase value of approximately $1,890,540.

4

f.     Defendants would also use their many MaxPerks accounts to evade the limits of the ink cartridge recycling program.  Defendants acquired thousands of used ink or toner cartridges at low cost from sellers on eBay and other sources.  Defendants presented approximately 26,114 used ink or toner cartridges for recycling at OfficeMax; they also claimed approximately 1,739 additional recycled cartridges for their accounts through online adjustments.

g.     Defendants relied in large part on the fraudulent online adjustments they claimed using their MaxPerks accounts to generate the balance of qualifying purchases required for the issuance of the ink recycling rewards.

h.     To avoid detection, Defendants in total traveled to approximately 361 different OfficeMax stores in approximately 28 states to recycle ink cartridges and to redeem the rewards issued to their accounts.

i.     Defendants often redeemed the MaxPerks Rewards they accrued on their accounts to purchase prepaid Visa or American Express debit cards at OfficeMax, and they could then use those prepaid cards wherever they were accepted.

j.     Defendants also used the MaxPerks Rewards to purchase merchandise at OfficeMax, which Defendant **MATTHEW CHANNON** would then resell to other individuals.

k.     Defendant **MATTHEW CHANNON** also sold to other individuals a number of the MaxPerks Rewards certificates that were issued to Defendants' accounts.

l.     Defendants themselves redeemed, or sold to other individuals who redeemed, MaxPerks Rewards certificates with a total value of approximately $105,191.

In violation of 18 U.S.C. § 1349.

<u>Counts 2 – 7</u>

1.　　　Paragraphs 1 through 9 and 11 of Count 1 are incorporated as part of Counts 2

through 7 as if fully restated here.

2.　　　Between on or about August 25, 2009, through on or about June 8, 2011, in the

District of New Mexico and elsewhere, Defendants **MATTHEW CHANNON** and **BRANDI**

**CHANNON** knowingly and intentionally devised a scheme and artifice to defraud and for

obtaining money and property by means of materially false pretenses and representations.  For

the purpose of executing Defendants' scheme and artifice, the listed Defendant knowingly

transmitted and caused to be transmitted by means of wire communication in interstate

commerce the following writings, signs, signals, pictures, and sounds:

| Count | Defendant | Date | Description |
|-------|-----------|------|-------------|
| 2 | **BRANDI CHANNON** | November 22, 2010 | Transmission from OfficeMax retail store to MaxPerks Rewards database crediting the recycling of 19 ink cartridges to MaxPerks Rewards Business account 643138158, under the business name High Speed Stone. |
| 3 | **MATTHEW CHANNON** | November 22, 2010 | Transmission from OfficeMax retail store to MaxPerks Rewards database crediting the recycling of 20 ink cartridges to MaxPerks Rewards Business account 796198559, under the business name SLC Metro Desk. |
| 4 | **BRANDI CHANNON** | November 23, 2010 | Transmission from OfficeMax retail store to MaxPerks Rewards database crediting the recycling of recycling 20 ink cartridges to MaxPerks Rewards Business account 658092537, under the business name American Clay Products. |
| 5 | **MATTHEW CHANNON** | November 23, 2010 | Transmission from OfficeMax retail store to MaxPerks Rewards database crediting the recycling of recycling 20 ink cartridges to MaxPerks Rewards Business account 620354481, under the business name Trighm Law. |

| 6 | **MATTHEW CHANNON** | July 15, 2010 | Transmission via email of five MaxPerks Rewards certificates of $30 each that had been issued to the following accounts:<br><br>Teacher account 796510854, Colonie Elementary School, Colonie, NY, teech.u.r.12.3.45678@gmail.com<br><br>Teacher account 796652713, St. Louis Elementary School, St. Louis, MO, t.eechu.r12.345.6.78@gmail.com<br><br>Teacher account 796740019, Los Angeles Elementary School, Los Angeles, CA, no email address on account<br><br>Teacher account 820053974, Austin Elementary School, Austin, TX, coach.12.3.4.5678@gmail.com<br><br>Teacher account 796724757, Bensenville Elementary School, Bensenville, IL, teechur123.4.5.6.78@gmail.com. |
| 7 | **MATTHEW CHANNON** | July 28, 2010 | Transmission via email of seven MaxPerks Rewards certificates of $100 each that had been issued to the following accounts:<br><br>Teacher account 796543132, New York Elementary School, New York, NY, teechur12.3.4.5.678@gmail.com<br><br>Teacher account 796542357, Riverside Elementary School, Riverside, CA, teech.u.r1.23.4.5.678@gmail.com<br><br>Teacher account 796533919, Wakefield Elementary School, Wakefield, NE, teechur.1234.5.678@gmail.com<br><br>Teacher account 796520477, Pomona |

| | | | | Elementary School, Pomona, CA, teech.u.r.12.3.4.5678@gmail.com<br><br>Teacher account 796519177, Charlotte Elementary School, Charlotte, NC, teechur.1.23.4.5678@gmail.com<br><br>Teacher account 796510978, Atlanta Elementary School, Atlanta, GA, teechu.r1.2.3.45678@gmail.com<br><br>Teacher account 796627972, West Palm Beach Elementary School, West Palm Beach, FL, t.eech.u.r.12345.678@gmail.com. |
|---|---|---|---|---|

In violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2.

### FORFEITURE ALLEGATION

Counts 1 through 7 of this Indictment are incorporated as part of this section of the indictment as if fully re-alleged herein for the purpose of alleging forfeiture to the United States pursuant to U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

Upon conviction of any offense in violation of 18 U.S.C. § 1343 or § 1349, Defendants **MATTHEW CHANNON** and **BRANDI CHANNON**, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461 any property, real or personal, which constitutes or is derived from proceeds traceable to such violation, or a conspiracy to commit such offense. The property to be forfeited to the United States includes, but is not limited, to the following:

MONEY JUDGMENT

A sum of money equal to at least $105,191.00 in U.S. currency, including any interest accruing to the date of the judgment, representing the amount of money constituting or derived from proceeds of the offense, for which Defendants are jointly and severally liable.

8

SUBSTITUTE ASSETS

If any of the above described forfeitable property, as a result of any act or omission of

Defendants:

      A.   cannot be located upon exercise of due diligence;

      B.   has been transferred or sold to, or deposited with, a third person;

      C.   has been placed beyond the jurisdiction of the Court;

      D.   has been substantially diminished in value; or

      E.   has been commingled with other property which cannot be subdivided without

difficulty;

it is the intent of the United States, pursuant 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. §

982(b)(1) and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of Defendants up to

the value of the forfeitable property described above.


                        A TRUE BILL:


                           /s/
                        FOREPERSON OF THE GRAND JURY


Assistant United States Attorney

9

UNITED STATES DISTRICT COURT
ALBUQUERQUE, NEW MEXICO

**JAN 2 1 2015**

**MATTHEW J. DYKMAN**

**CLERK**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 13-966 JCH |
| | ) | |
| vs. | ) | Count 1: 18 U.S.C. § 1349: Conspiracy |
| | ) | to Commit Wire Fraud; |
| **MATTHEW CHANNON** and | ) | |
| **BRANDI CHANNON,** | ) | Counts 2-7: 18 U.S.C. § 1343: Wire |
| | ) | Fraud. |
| Defendants. | ) | |

SUPERSEDING INDICTMENT

The Grand Jury charges:

Count 1

General Allegations

1.     At all times relevant to this indictment, OfficeMax, a national retailer of office

supplies and other products, administered a customer reward program called MaxPerks

Rewards.

2.     In exchange for purchases made at OfficeMax, customers with MaxPerks

Rewards accounts could earn rewards in the form of credit toward future purchases at

OfficeMax.  Purchases of certain limited categories of items, such as computers, did not earn

MaxPerks credit; any type of purchase that did earn MaxPerks credit was called a "qualifying

purchase."

3.     There were two types of MaxPerks Rewards accounts: MaxPerks Rewards for

Business, which were available to any customer, and MaxPerks Rewards for Teachers, which

were available only to teachers.  For every $500 on qualifying purchases that a Business

customer spent at OfficeMax, the customer earned $25 in rewards; for every $75 on e

**BRANDI CHANNON'S
EXHIBIT**

**9**

1:13-CR-966-JCH-KK   2255 MOTION

purchases that a Teacher member spent at OfficeMax, the customer earned $10 in rewards, up to an annual maximum of $100 in rewards.

4.    The terms of the MaxPerks Rewards program limited each customer to one MaxPerks account.

5.    Customers could sign up for a MaxPerks account in person at an OfficeMax store, over the phone, or online.  When a customer created an account online, the customer was required to provide his or her name, mailing address, phone number, and email address.  The customer also created an account password.  The information submitted by the customer would be transmitted via the internet to MaxPerks Rewards computer servers in Illinois.

6.    A customer could access his or her MaxPerk account online by providing either the account number or the email address associated with the account and the password.

7.    To credit a MaxPerks account with a purchase made at OfficeMax, the customer provided the cashier with his or her MaxPerks card or number, or the cashier could look up the customer's MaxPerks number.  Details of the purchase would then be routed by wire to MaxPerks Rewards computer servers in Illinois, and the purchase would be eventually credited to the customer's MaxPerks account.

8.    If the customer forgot to provide his or her MaxPerks account during the purchase, the customer could later log in to his or her MaxPerks account online and add the purchase to his or her account.  This process was known as an "online adjustment."  Until sometime in late September 2010, when OfficeMax made changes to the online adjustment process, a MaxPerks online adjustment required just four pieces of information, which were located on the store receipt: the store number, date, register number, and transaction number. The customer claiming the purchase was not required to supply the amount of the purchase.

9.      MaxPerks members could also earn MaxPerks Rewards by recycling used ink and toner cartridges at OfficeMax.  The terms of the recycling program were revised periodically, but at all times relevant to this indictment, the recycling program was subject to monthly limits, and in order to receive the ink rewards, the MaxPerks Reward member had to spend a certain amount on qualifying purchases at OfficeMax.  If a customer did not have a sufficient balance of qualifying purchases, then the issuance of the ink reward would be delayed and could eventually be forfeited if the qualifying purchase balance never reached the required level.

<div align="center">The Conspiracy</div>

10.      Between on or about August 25, 2009, and continuing through on or about June 8, 2011, in the District of New Mexico and elsewhere, Defendants **MATTHEW CHANNNON** and **BRANDI CHANNON** did knowingly, voluntarily, and interdependently conspire and agree to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false pretenses and representations, and to transmit and cause to be transmitted certain wire communications in interstate and foreign commerce for the purpose of executing the scheme; to wit, Defendants engaged in a scheme to open thousands of MaxPerks Rewards accounts under false pretenses and to use the accounts to generate MaxPerks Reward certificates to which they were not entitled, in violation of 18 U.S.C. § 1343.

<div align="center">Manner and Means</div>

11.      To further the goals and objects of the conspiracy, Defendants used the following manners and means:

a.      One or both Defendants signed up for more than 5,400 MaxPerks Rewards accounts using fictitious names, mailing addresses, and phone numbers.

<div align="center">3</div>

   b. The name of a fictitious elementary school was used to create approximately 5,186 of the accounts, all of which were opened under the MaxPerks for Teachers program.  Other accounts not containing the name of a fictitious school were opened under the MaxPerks for Business program.

   c. Approximately 5,247 of the MaxPerks Rewards accounts were registered to one of four email addresses that Defendants controlled: teechur12345678@gmail.com, coach12345678@gmail.com, bargle12345678@gmail.com, and garble12345678@gmail.com.  To make these four email addresses appear to OfficeMax to be 5,247 unique addresses, one or more periods were inserted between the characters preceding the "@" symbol.  In reality, Gmail accounts do not recognize periods within usernames, and so email messages sent to t.e.e.c.h.u.r.1.2.3.4.5.6.7.8@gmail.com and to teechur12345678@gmail.com would be received by the same account.

   d. One or both Defendants would obtain an OfficeMax receipt containing a store number, date, register number, and transaction number.  Because only those four pieces of information were required to claim a transaction through an online adjustment, Defendants would use this information to extrapolate store numbers, dates, register numbers, and transaction numbers for other purchases that they had not made.  One or both Defendants would access online the MaxPerks accounts that they controlled to claim purchases made by other customers, causing MaxPerks Rewards to be issued to those accounts.

   e. Defendants claimed and attempted to claim through online adjustments approximately 61,557 transactions for MaxPerks accounts that they controlled, with a total claimed purchase value of approximately $1,890,540.

f.      Defendants would also use their many MaxPerks accounts to evade the limits of the ink cartridge recycling program.  Defendants acquired thousands of used ink or toner cartridges at low cost from sellers on eBay and other sources.  Defendants presented approximately 26,114 used ink or toner cartridges for recycling at OfficeMax; they also claimed approximately 1,739 additional recycled cartridges for their accounts through online adjustments.

g.      Defendants relied in large part on the fraudulent online adjustments they claimed using their MaxPerks accounts to generate the balance of qualifying purchases required for the issuance of the ink recycling rewards.

h.      To avoid detection, Defendants in total traveled to approximately 361 different OfficeMax stores in approximately 28 states to recycle ink cartridges and to redeem the rewards issued to their accounts.

i.      Defendants often redeemed the MaxPerks Rewards they accrued on their accounts to purchase prepaid Visa or American Express debit cards at OfficeMax, and they could then use those prepaid cards wherever they were accepted.

j.      Defendants also used the MaxPerks Rewards to purchase merchandise at OfficeMax, which Defendant **MATTHEW CHANNON** would then resell to other individuals.

k.      Defendant **MATTHEW CHANNON** also sold to other individuals a number of the MaxPerks Rewards certificates that were issued to Defendants' accounts.

l.      Defendants themselves redeemed, or sold to other individuals who redeemed, MaxPerks Rewards certificates with a total value of approximately $105,191.

In violation of 18 U.S.C. § 1349.

<u>Counts 2 – 7</u>

1.      Paragraphs 1 through 9 and 11 of Count 1 are incorporated as part of Counts 2

through 7 as if fully restated here.

2.      Between on or about August 25, 2009, through on or about June 8, 2011, in the

District of New Mexico and elsewhere, Defendants **MATTHEW CHANNON** and **BRANDI**

**CHANNON** knowingly and intentionally devised a scheme and artifice to defraud and for

obtaining money and property by means of materially false pretenses and representations.  For

the purpose of executing Defendants' scheme and artifice, the listed Defendant knowingly

transmitted and caused to be transmitted by means of wire communication in interstate

commerce the following writings, signs, signals, pictures, and sounds:

| Count | Defendant | Date | Description |
|---|---|---|---|
| 2 | **BRANDI CHANNON** | November 22, 2010 | Transmission from OfficeMax retail store to MaxPerks Rewards database crediting the recycling of 19 ink cartridges to MaxPerks Rewards Business account 643138158, under the business name High Speed Stone. |
| 3 | **MATTHEW CHANNON** | November 22, 2010 | Transmission from OfficeMax retail store to MaxPerks Rewards database crediting the recycling of 20 ink cartridges to MaxPerks Rewards Business account 796198559, under the business name SLC Metro Desk. |
| 4 | **BRANDI CHANNON** | November 23, 2010 | Transmission from OfficeMax retail store to MaxPerks Rewards database crediting the recycling of recycling 20 ink cartridges to MaxPerks Rewards Business account 658092537, under the business name American Clay Products. |
| 5 | **MATTHEW CHANNON** | November 23, 2010 | Transmission from OfficeMax retail store to MaxPerks Rewards database crediting the recycling of recycling 20 ink cartridges to MaxPerks Rewards Business account 620354481, under the business name Trighm Law. |

6

| 6 | **MATTHEW CHANNON** | July 15, 2010 | Transmission via email of five MaxPerks Rewards certificates of $30 each that had been issued to the following accounts: |
|---|---|---|---|
| | | | Teacher account 796510854, Colonie Elementary School, Colonie, NY, teech.u.r.12.3.45678@gmail.com |
| | | | Teacher account 796652713, St. Louis Elementary School, St. Louis, MO, t.eechu.r12.345.6.78@gmail.com |
| | | | Teacher account 796740019, Los Angeles Elementary School, Los Angeles, CA, no email address on account |
| | | | Teacher account 820053974, Austin Elementary School, Austin, TX, coach.12.3.4.5678@gmail.com |
| | | | Teacher account 796724757, Bensenville Elementary School, Bensenville, IL, teechur123.4.5.6.78@gmail.com. |
| 7 | **MATTHEW CHANNON** | July 28, 2010 | Transmission via email of seven MaxPerks Rewards certificates of $100 each that had been issued to the following accounts: |
| | | | Teacher account 796543132, New York Elementary School, New York, NY, teechur12.3.4.5.678@gmail.com |
| | | | Teacher account 796542357, Riverside Elementary School, Riverside, CA, teech.u.r1.23.4.5.678@gmail.com |
| | | | Teacher account 796533919, Wakefield Elementary School, Wakefield, NE, teechur.1234.5.678@gmail.com |
| | | | Teacher account 796520477, Pomona |

| | | | | Elementary School, Pomona, CA, teech.u.r.12.3.4.5678@gmail.com<br><br>Teacher account 796519177, Charlotte Elementary School, Charlotte, NC, teechur.1.23.4.5678@gmail.com<br><br>Teacher account 796510978, Atlanta Elementary School, Atlanta, GA, teechu.r1.2.3.45678@gmail.com<br><br>Teacher account 796627972, West Palm Beach Elementary School, West Palm Beach, FL, t.eech.u.r.12345.678@gmail.com. |

In violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2.

## FORFEITURE ALLEGATION

Counts 1 through 7 of this Indictment are incorporated as part of this section of the indictment as if fully re-alleged herein for the purpose of alleging forfeiture to the United States pursuant to U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

Upon conviction of any offense in violation of 18 U.S.C. § 1343 or § 1349, Defendants **MATTHEW CHANNON** and **BRANDI CHANNON**, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461 any property, real or personal, which constitutes or is derived from proceeds traceable to such violation, or a conspiracy to commit such offense. The property to be forfeited to the United States includes, but is not limited, to the following:

MONEY JUDGMENT

A sum of money equal to at least $105,191.00 in U.S. currency, including any interest accruing to the date of the judgment, representing the amount of money constituting or derived from proceeds of the offense, for which Defendants are jointly and severally liable.

8

SUBSTITUTE ASSETS

If any of the above described forfeitable property, as a result of any act or omission of

Defendants:

      A.   cannot be located upon exercise of due diligence;

      B.   has been transferred or sold to, or deposited with, a third person;

      C.   has been placed beyond the jurisdiction of the Court;

      D.   has been substantially diminished in value; or

      E.   has been commingled with other property which cannot be subdivided without

difficulty;

it is the intent of the United States, pursuant 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. §

982(b)(1) and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of Defendants up to

the value of the forfeitable property described above.

                         A TRUE BILL:

                         _/s/_____

                         FOREPERSON OF THE GRAND JURY

_____
Assistant United States Attorney

9

FILED
At Albuquerque NM

MAR 27 2013

MATTHEW J. DYKMAN
CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 13-CR-966 |
| | ) | |
| vs. | ) | Counts 1-6: 18 U.S.C. § 1343: Wire |
| | ) | Fraud; |
| **MATTHEW CHANNON** and | ) | |
| **BRANDI CHANNON,** | ) | Counts 7-10: 18 U.S.C. § 1343: Wire |
| | ) | Fraud; 18 U.S.C. § 2, Aiding and |
| Defendants. | ) | Abetting; |
| | ) | |
| | ) | Count 11: 18 U.S.C. § 1349: |
| | ) | Conspiracy to Commit Wire Fraud. |

## I N D I C T M E N T

The Grand Jury charges:

### Counts 1 through 6

1.      Between in or about March 2010, through in or about September 2010, in

Bernalillo County, in the District of New Mexico and elsewhere, the defendant, **MATTHEW**

**CHANNON**, knowingly and intentionally devised a scheme and artifice to defraud and for

obtaining money and property by means of materially false pretenses and representations.  For

the purpose of executing the defendant's scheme and artifice, the defendant knowingly

transmitted and caused to be transmitted by means of wire communication in interstate

commerce certain writings, signs, signals, pictures, and sounds.

### Introduction

2.      OfficeMax, a national retailer of office supplies and other products,

administers a customer reward program called MaxPerks Rewards.

3.      In exchange for qualifying purchases, customers with MaxPerks Rewards

1

BRANDI CHANNON'S
EXHIBIT

**10**

1:13-CR-966-JCH-KK    2255 MOTION

accounts earn rewards in the form of credit toward future purchases at OfficeMax.  There are two types of MaxPerks Rewards accounts: MaxPerks for Business, which are available to any customer, and MaxPerks for Teachers, which are available only to teachers.  For every $500 a Business customer spends at OfficeMax, the customer earns $25 in rewards; for every $75 a Teacher member spends at OfficeMax, the customer earns $10 in rewards, up to an annual maximum of $100 in rewards.  OfficeMax permits one MaxPerks account per person.

4.     Customers may sign up for an account in person at an OfficeMax store, over the phone, or create an account online.  When a customer creates an account online, the customer is required to provide his or her name, mailing address, phone number, and email address.  The customer also creates an account password.

5.     A customer can access his or her MaxPerk account online by providing the customer's email or account number and password.

6.     To credit a MaxPerks account with a purchase made at OfficeMax, the customer may provide the cashier with his or her MaxPerks card, or an employee can look up the customer's MaxPerks member number.  The purchase is then credited to that customer's MaxPerks account.

7.     If the customer forgets to use his or her MaxPerks account during the purchase, the customer can later log in to his or her MaxPerks account online and add the purchase to it.  Prior to in or about October 2010, a MaxPerks online adjustment required four pieces of information located on the store receipt: the store number, date, register number, and transaction number.

8.     MaxPerks members may also earn MaxPerks rewards by recycling used

2

ink and toner cartridges at OfficeMax. Prior to April 1, 2012, a customer received three dollars in MaxPerks rewards for each cartridge recycled, up to a maximum of $60 per month, as long as the customer's account reflected qualified purchases at OfficeMax at least equal to the amount of the award to be issued.

<div align="center">The Scheme and Artifice</div>

9.      The defendant's scheme and artifice consisted of opening MaxPerks Rewards accounts under fictitious names, addresses, and phone numbers and then falsely claiming purchases made by other customers as his own to generate MaxPerks rewards for the accounts he controlled.

10.     As part of his scheme and artifice, the defendant created more than 5,400 MaxPerks Rewards accounts using fictitious names, mailing addresses, and phone numbers.

11.     As part of his scheme and artifice, the defendant associated approximately 5,247 of the MaxPerks Rewards accounts with one of four email addresses that he controlled: teechur12345678@gmail.com, coach12345678@gmail.com, bargle12345678@gmail.com, and garble12345678@gmail.com. The defendant inserted one or more periods between the characters of the address preceding the "@" to make these four email addresses appear to OfficeMax to be approximately 5,247 unique addresses.

12.     As part of his scheme and artifice, the defendant would obtain an OfficeMax receipt containing a store number, date, register number, and transaction number. From that, he would extrapolate store numbers, dates, register numbers, and transaction numbers for other purchases that he had not made. He would then log-in online to the MaxPerks accounts that he controlled to claim purchases made by other customers, causing MaxPerks rewards to be issued to those accounts.

<div align="center">3</div>

13.     As part of his scheme and artifice, the defendant claimed approximately 47,688 purchases for MaxPerks accounts that he controlled, generating more than $180,000 in MaxPerks rewards that were to be issued to those accounts.

14.     As part of his scheme and artifice, the defendant would use the MaxPerks rewards accrued by the accounts he controlled to purchase items at OfficeMax, which he would then resell.

<div align="center">The Wires</div>

15.     For the purpose of executing such scheme and artifice, on or about the dates listed below, the defendant **MATTHEW CHANNON** attempted to and did transmit and cause to be transmitted by means of wire communications in interstate commerce the following writings, signals, and sounds:

| Count | Date | Description |
|---|---|---|
| 1 | March 9, 2010 | Online request to Google to create the email account teechur12345678@gmail.com, under the name of Tee Chur. |
| 2 | April 5, 2010 | Online request to OfficeMax to create MaxPerks account in the name of Florence D. Wheeler at Milwaukee Elementary School, with an address of 3747 Joseph St., Milwaukee, WI, and an email address of t.eech.u.r.1.2345.6.78@gmail.com. |
| 3 | May 5, 2010 | Online request to Google to create the email account coach12345678@gmail.com, under the name of Coach Alphabet. |
| 4 | May 29, 2010 | Online request to OfficeMax to create MaxPerks account in the name of Thelma B. Johnson at Toledo Elementary School, with an address of 201 Hill St., Toledo, OH, and an email address of co.a.ch.1.2.3.4.56.78@gmail.com. |
| 5 | June 4, 2010 | Online request to Google to create the email account bargle12345678@gmail.com, under the name of Bargle Bargleton. |
| 6 | August 2, 2010 | Online request to OfficeMax to create MaxPerks account in the name of Bernice W. Henry at Decatur Elementary School, with an address of 2494 Isaacs Creek Road, Decatur, IL and an email address of b.a.rgl.e.12.34.56.78@gmail.com. |

In violation of 18 U.S.C. § 1343.

## Counts 7 Through 10

1.        Paragraphs 2 through 8 of the Introduction to Counts 1 through 6 are incorporated as part of Counts 7 through 10 as if fully restated here.

2.        Between on or about September 18, 2009, through on or about June 28, 2011, in the District of New Mexico and elsewhere, the defendants, **MATTHEW CHANNON** and **BRANDI CHANNON,** knowingly and intentionally devised a scheme and artifice to defraud and for obtaining money and property by means of materially false pretenses and representations.  For the purpose of executing the defendants' scheme and artifice, the defendants knowingly transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures, and sounds.

## The Scheme and Artifice

3.        The defendants' scheme and artifice consisted of opening MaxPerks Rewards accounts under names, addresses, and phone numbers that were either fictitious or that did not belong to them.  The defendants would then use the many MaxPerks accounts they controlled to evade the limits of the ink and toner cartridge recycling program.

4.        As part of their scheme and artifice, the defendants created approximately 120 MaxPerks Rewards accounts with false or fictitious names, mailing addresses, and phone numbers.

5.        As part of their scheme and artifice, the defendants purchased thousands of used ink or toner cartridges at low cost.

6.        As part of their scheme and artifice, the defendants presented approximately

24,934 used ink or toner cartridges for recycling at OfficeMax, causing approximately $74,800

in MaxPerks rewards to be issued to accounts they controlled.

<div align="center">The Wires</div>

For the purpose of executing such scheme and artifice, on or about the dates listed below,

the defendants **MATTHEW CHANNON** and **BRANDI CHANNON** attempted to and did

transmit and cause to be transmitted by means of wire communications in interstate commerce

the following writings, signals, and sounds:

| Count | Date | Description |
|-------|------|-------------|
| 7 | November 4, 2009 | Online request to Google to create email address sandeepshwawar@gmail.com, under the name of Sandeep Shwawar. |
| 8 | December 10, 2009 | Online request to OfficeMax to create MaxPerks account in the name of Sandeepshwawar Decor, with an address of 2701 E. Helen St., Tucson, AZ, and an email address of sandeepshwawar@gmail.com. |
| 9 | January 28, 2010 | Online request to Google to create email address ameriodespatch@gmail.com, under the name of Amerio Despatch. |
| 10 | February 20, 2010 | Online request to OfficeMax to create MaxPerks account in the name of Waterspout Cinema, with an address of 1150 E. 800 S. Salt Lake City, UT, and an email address of a.m.eriodespatch@gmail.com. |

<div align="center">In violation of 18 U.S.C. § 1343 and 18 U.S.C. § 2.</div>

<div align="center">Count 11</div>

1.    Paragraphs 2 through 8 of the Introduction to Counts 1 through 6 and paragraphs

3 through 6 of Counts 7 through 10 are incorporated as part of Count 11 as if fully restated here.

2.    Between on or about September 18, 2009, through on or about June 28, 2011, in

the District of New Mexico and elsewhere, the defendants, **MATTHEW CHANNON** and

**BRANDI CHANNON**, did knowingly and voluntarily conspire and agree and act

<div align="center">6</div>

interdependently with each other and with others known and unknown to the Grand Jury to

commit an offense under 18 U.S.C. § 1343: wire fraud.

In violation of 18 U.S.C. § 1349.

### FORFEITURE ALLEGATION

Counts 1 through 5 of this Indictment are incorporated as part of this section of the

indictment as if fully re-alleged herein for the purpose of alleging forfeiture to the United States

pursuant to U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

Upon conviction of any offense in violation of 18 U.S.C. § 1343, the defendant,

**MATTHEW CHANNON**, shall forfeit to the United States pursuant to 18 U.S.C. §

981(a)(1)(C) and 28 U.S.C. § 2461 any property, real or personal, which constitutes or is derived

from proceeds traceable to such violation, or a conspiracy to commit such offense.  The property

to be forfeited to the United States includes but is not limited to the following:

MONEY JUDGMENT

A sum of money equal to at least $109,158.38 in U.S. currency, including any interest
accruing to the date of the judgment, representing the amount of money constituting or
derived from proceeds of the offense.  Of that amount, the defendant **MATTHEW
CHANNON** is liable for approximately $34,356.38, and both defendants are jointly and
severally liable for approximately $74,802.

Upon conviction of any offense in violation of 18 U.S.C. § 1343, the defendant,

**BRANDI CHANNON**, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C)

and 28 U.S.C. § 2461 any property, real or personal, which constitutes or is derived from

proceeds traceable to such violation, or a conspiracy to commit such offense.  The property to be

forfeited to the United States includes but is not limited to the following:

MONEY JUDGMENT

A sum of money equal to at least $74,802 in U.S. currency, including any interest

accruing to the date of the judgment, representing the amount of money constituting or derived from proceeds of the offense, for which both the defendants are jointly and severally liable.

SUBSTITUTE ASSETS

If any of the above described forfeitable property, as a result of any act or omission of the defendants:

    A.  cannot be located upon exercise of due diligence;

    B.  has been transferred or sold to, or deposited with, a third person;

    C.  has been placed beyond the jurisdiction of the Court;

    D.  has been substantially diminished in value; or

    E.  has been commingled with other property which cannot be subdivided without

difficulty;

it is the intent of the United States, pursuant 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. §

982(b)(1) and 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendants up

to the value of the forfeitable property described above.

A TRUE BILL:

/s/

_____
FOREPERSON OF THE GRAND JURY

_____
Assistant United States Attorney

8



**CLOVER**
Innovative Environmental Solutions

Clover Technologies utilizes a closed-loop environmental process that ensures all cartridges are either reused or recycled.  Clover first evaluates every empty cartridge; first for refurbishment and secondarily for material recovery through recycling.  A remanufactured cartridge is disassembled and as many components as possible are reused.  Cartridges that are not reused in the remanufacturing process are disassembled, sorted into material types and recycled. Recovered plastics are recycled into useful products that substitute for virgin resources.

This process ensures that every component of the empty cartridges collected is either remanufactured or recycled.

OMX-

BRANDI CHANNON'S
EXHIBIT

**11**

1:13-CR-966-JCH-KK   2255 MOTION

## Overview of the MaxPerks Program

- $22.2 million in rewards were paid to customers for recycling 7.4 million ink cartridges.
- Our ink recycler, Clover, paid OfficeMax $3.9 million for the recycled cartridges for a shortfall of $18.3 million

**OfficeMax**
WORK WITH US

7.4 million cartridge is based on the reward information paid through the MaxPerks program.
Clover accepted 7.8 million good cartridges recycled from OfficeMax at an average of $.498

On average, $.498 per working cartridge; amount varies between $.041 - $1.046 each as shown below.  This information is 2010 YTD.

**Grand**

   **7,871,745**

$  **3,917,610**

$        **0.498**

They don't give us anything for non-working cartridges.

There are no additional costs for OMX to recycle cartridges.  We basically source the cartridges for Clover for use by OMX and other retailers.

OMX-Channon 002



**OfficeMax MaxPerks - 2010 Sales & Statemented Reward Totals\*\***

Sales activity for calendar year 2010 (1/1/2010-12/31/2010), 2010 Statements included only

Recycling Reward

$22,202,437

TOTAL

OMX-Channon 003

|  | Contract | | Retail | | Total | |
|---|---|---|---|---|---|---|
|  | 2010 | 2011 | 2010 | 2011 | 2010 | 2011 |
| January | 75,239 | 64,690 | 1,123,413 | 877,790 | 1,198,652 | 942,480 |
| February | 91,490 | 67,166 | 786,759 | 713,674 | 878,249 | 780,840 |
| March | 95,457 | 70,712 | 864,789 | 939,194 | 960,246 | 1,009,906 |
| April | 83,888 | 88,793 | 568,264 | 873,362 | 652,152 | 962,155 |
| May | 78,872 | 95,773 | 974,620 | 862,051 | 1,053,492 | 957,824 |
| June | 162,258 | 169,450 | 893,646 | 868,959 | 1,055,904 | 1,038,409 |
| July | 435,266 | 91,646 | 707,817 | 697,115 | 1,143,083 | 788,761 |
| August | 83,662 |  | 868,209 |  | 951,871 |  |
| September | 84,331 |  | 812,160 |  | 896,491 |  |
| October | 64,136 |  | 843,903 |  | 908,039 |  |
| November | 112,283 |  | 812,534 |  | 924,817 |  |
| December | 88,835 |  | 782,518 |  | 871,353 |  |
| YTD Tracking | 587,204 | 648,230 | 5,211,491 | 5,832,145 | 5,798,695 | 6,480,375 |
| Variance |  | 61,026 |  | 620,654 |  | 681,680 |
| TOTAL | 1,455,717 | 648,230 | 10,038,632 | 5,832,145 | 11,494,349 | 6,480,375 |

OMX-Channon 004

| Qtr | Retail # of Ctgs | Retail Dollars |
|---|---|---|
| Jul-10 | 707,817 | $ 342,031 |
| Aug-10 | 868,209 | $ 388,168 |
| Sep-10 | 812,160 | $ 348,970 |
| Oct-10 | 843,903 | $ 361,244 |
| Nov-10 | 812,534 | $ 292,297 |
| Dec-10 | 782,518 | $ 307,283 |
| Jan-11 | 877,790 | $ 280,682 |
| Feb-11 | 713,674 | $ 244,210 |
| Mar-11 | 939,194 | $ 299,263 |
| Apr-11 | 873,362 | $ 269,163 |
| May-11 | 862,051 | $ 276,859 |
| Jun-11 | 868,959 | $ 292,344 |

OMX-Channon 005

| | 3Q10 | | 4Q10 | | 1Q11 | | 2Q11 | |
|---|---|---|---|---|---|---|---|---|
| | Qty | Amount | Qty | Amount | Qty | Amount | Qty | Amount |
| TOTAL | 2,653,069 | $ 1,079,170 | 2,703,555 | $ 1,073,143 | 2,756,925 | $ 824,156 | 2,819,755 | $ 838,366 |

CMX-Channon 006

**OfficeMax**

OfficeMax - In-Store Recycling Summary Report

| Fiscal Year | Fiscal Week | YTD Member Count | YTD Recycling Transactions | YTD Total Cartridges Submitted | YTD Qualified Cartridges Submitted | YTD Qualified Cartridges Pending Purchase | YTD Qualified Cartridges - Pending Next Statement | YTD Cartridges Issued Prior | YTD Qualified Reward $ -Pending Purchase | YTD Qualified Reward $ - Pending Next Statement | YTD Reward $ Issued Prior |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2010 | 6 | | 858,784 | 890,598 | 248,329 | 642,269 | 0 | | $744,587 | $1,926,860 | $0 |
| 2010 | 7 | | 1,023,184 | 1,305,304 | 309,615 | 491,747 | 494,560 | $806,905 | $1,226,241 | $1,493,747 | |
| 2010 | 8 | | 1,202,913 | 1,353,332 | 305,664 | 601,669 | 494,565 | $1,183,294 | $2,466,019 | $1,482,835 | |
| 2010 | 9 | | 1,981,625 | 1,866,368 | 417,673 | 457,968 | 939,397 | $1,733,919 | $1,423,994 | $2,535,137 | |
| 2010 | 10 | | 2,203,747 | 2,117,383 | 475,478 | 723,996 | 374,119 | $1,437,234 | $2,150,196 | $2,134,257 | |
| 2010 | 11 | | 2,466,223 | 2,618,684 | 639,529 | 180,364 | 1,494,251 | $1,688,582 | $540,512 | $4,992,734 | |
| 2010 | 12 | | 2,689,623 | 2,636,247 | 547,124 | 630,929 | 1,653,195 | $1,639,272 | $1,867,766 | $4,999,585 | |
| 2010 | 20 | | 3,105,606 | 3,085,993 | 583,743 | 305,027 | 2,197,220 | $1,751,229 | $915,081 | $8,591,693 | |
| 2010 | 21 | | 3,286,862 | 3,281,647 | 586,603 | 306,103 | 2,398,135 | $1,761,788 | $914,527 | $9,361,318 | |
| 2010 | 23 | | 3,547,811 | 3,515,147 | 623,139 | 698,589 | 2,193,419 | $1,869,417 | $2,095,767 | $8,569,252 | |
| 2010 | 25 | | 3,667,417 | 3,803,996 | 623,111 | 479,042 | 2,699,738 | $1,873,345 | $1,432,125 | $8,099,214 | |
| 2010 | 26 | | 4,145,968 | 4,070,998 | 645,090 | 731,011 | 2,738,797 | $1,938,220 | $2,152,033 | $8,264,861 | |
| 2010 | 29 | | 4,409,845 | 4,337,426 | 668,287 | 269,175 | 3,380,074 | $2,004,821 | $807,465 | $10,142,072 | |
| 2010 | 31 | | 4,741,324 | 4,956,046 | 660,721 | 987,572 | 3,127,713 | $2,040,162 | $1,752,716 | $10,133,319 | |
| 2010 | 33 | | 5,093,153 | 4,975,998 | 695,457 | 268,611 | 3,920,530 | $2,090,311 | $1,072,513 | $11,781,590 | |
| 2010 | 35 | | 5,213,648 | 5,299,158 | 699,439 | 431,394 | 3,822,616 | $2,097,924 | $1,507,188 | $11,780,046 | |
| 2010 | 36 | | 5,184,346 | 5,084,718 | 699,309 | 431,394 | 3,922,048 | $2,097,924 | $1,507,188 | $11,752,262 | |
| 2010 | 38 | | 5,578,822 | 5,405,851 | 715,321 | 765,721 | 3,917,470 | $2,145,981 | $2,534,517 | $11,752,262 | |
| 2010 | 39 | | 6,041,577 | 5,920,381 | 746,034 | 827,601 | 4,059,705 | $2,228,320 | $1,682,503 | $12,079,230 | |
| 2010 | 41 | | 6,272,763 | 6,254,187 | 786,155 | 752,566 | 4,735,642 | $2,258,477 | $2,257,588 | $14,230,329 | |
| 2010 | 43 | | 6,705,411 | 6,566,302 | 773,380 | 484,637 | 5,308,375 | $2,319,210 | $1,454,511 | $16,023,110 | |
| 2010 | 45 | | 7,044,493 | 6,883,782 | 790,067 | 692,784 | 5,302,922 | $2,350,251 | $2,072,435 | $15,958,791 | |
| 2010 | 47 | | 7,302,964 | 7,219,329 | 805,372 | 462,072 | 5,623,605 | $2,410,116 | $1,440,216 | $17,783,022 | |
| 2010 | 49 | | 7,672,618 | 7,523,381 | 797,935 | 798,157 | 5,629,289 | $2,703,968 | $2,397,471 | $17,778,649 | |
| 2010 | 51 | | 7,884,966 | 7,822,221 | 793,957 | 305,676 | 6,029,206 | $1,380,071 | $1,510,976 | $19,583,182 | |
| 2010 | 53 | | 8,016,107 | 8,113,004 | 733,686 | 495,887 | 6,257,267 | $2,305,907 | $1,456,967 | $19,547,225 | |
| 2011 | 1 | | 158,412 | 168,165 | 10,926 | 110,750 | 654,546 | $991,480 | $332,905 | $536,150 | |
| 2011 | 3 | | 462,002 | 714,087 | 169,467 | 958,414 | 205,941 | $509,616 | $708,972 | $956,673 | |
| 2011 | 5 | | 841,123 | 1,008,738 | 265,442 | 517,631 | 285,461 | $736,324 | $1,531,593 | $803,150 | |
| 2011 | 7 | | 1,181,271 | 1,381,585 | 330,792 | 264,351 | 792,442 | $652,378 | $925,253 | $2,377,329 | |
| 2011 | 9 | | 1,484,907 | 1,674,684 | 389,525 | 516,742 | 796,341 | $1,108,515 | $1,550,310 | $2,365,161 | |
| 2011 | 11 | | 1,826,605 | 1,881,222 | 412,540 | 782,425 | 798,757 | $1,237,820 | $2,317,223 | $2,358,774 | |
| 2011 | 13 | | 2,144,091 | 2,337,744 | 455,054 | 809,701 | 1,257,869 | $1,365,162 | $2,420,373 | $3,930,657 | |
| 2011 | 15 | | 2,451,043 | 2,620,082 | 488,249 | 553,969 | 1,578,634 | $1,464,747 | $1,655,907 | $5,110,672 | |
| 2011 | 17 | | 2,804,762 | 2,969,685 | 526,114 | 485,342 | 1,972,431 | $1,576,242 | $1,399,020 | $5,932,235 | |
| 2011 | 19 | | 3,134,786 | 3,296,543 | 583,475 | 756,713 | 1,976,431 | $1,860,425 | $2,270,755 | $5,869,576 | |
| 2011 | 21 | | 3,459,737 | 3,626,060 | 523,061 | 477,733 | 2,523,345 | $1,743,078 | $1,418,891 | $7,568,028 | |
| 2011 | 23 | | 3,783,252 | 3,968,587 | 619,334 | 741,965 | 2,527,809 | $1,782,700 | $2,214,385 | $7,583,054 | |
| 2011 | 25 | | 4,093,824 | 4,103,362 | 607,253 | 467,044 | 3,091,169 | $1,811,750 | $1,451,132 | $9,273,258 | |
| 2011 | 26 | | 4,428,541 | 4,539,950 | 602,373 | 785,423 | 3,091,000 | $1,819,700 | $2,359,815 | $9,172,150 | |
| 2011 | 28 | | 4,922,858 | 4,789,600 | 675,688 | 318,787 | 3,935,915 | $2,017,094 | $1,031,567 | $11,820,745 | |
| 2011 | 30 | | 4,922,369 | 5,080,428 | 685,610 | 544,003 | 3,930,119 | $2,016,848 | $1,637,729 | $11,450,167 | |
| 2011 | 31 | | 5,163,725 | 5,419,473 | 697,085 | 906,596 | 3,815,822 | $2,051,253 | $2,713,998 | $11,447,466 | |
| 2011 | 34 | | 5,348,482 | 5,958,134 | 718,573 | 830,919 | 4,403,940 | $2,171,579 | $2,509,457 | $13,262,722 | |
| 2011 | 37 | | 6,270,351 | 6,216,953 | 733,509 | 443,577 | 5,039,987 | $2,218,707 | $1,330,731 | $15,119,561 | |
| 2011 | 40 | | 6,590,819 | 6,587,928 | 758,539 | 811,531 | 5,027,828 | $2,274,019 | $2,434,592 | $15,053,484 | |
| 2011 | 42 | | 6,914,699 | 6,929,495 | 749,282 | 474,890 | 5,704,518 | $2,307,190 | $1,426,703 | $17,113,552 | |
| 2011 | 45 | | 7,287,879 | 7,310,708 | 787,860 | 953,192 | 5,533,545 | $2,346,510 | $2,859,576 | $16,621,287 | |
| 2011 | 48 | | 7,859,733 | 7,862,783 | 739,446 | 589,711 | 6,433,063 | $2,368,170 | $1,769,173 | $19,290,480 | |
| 2011 | 52 | | 8,307,983 | 8,253,953 | 756,987 | 875,878 | 6,481,295 | $2,272,961 | $2,628,937 | $19,443,885 | |
| 2011 | 53 | | 8,429,044 | 8,536,200 | 738,549 | 692,609 | 7,108,481 | $2,218,547 | $1,952,927 | $21,325,443 | |
| 2011 | 57 | | 8,770,181 | 8,860,348 | 728,311 | 807,647 | 7,138,209 | $2,184,533 | $2,422,941 | $21,414,660 | |

**Definitions**

YTD Unique Member Count — Cumu count of unique members with statement eligible status as of report date that have submitted 1+ recycling cartridge (qual/unqualified)
YTD Recycling Transactions — Cumu count of unique transactions for statement eligible members with 1+ recycling cartridge (qual/unqualified)
YTD Total Cartridges Submitted — Cumu count of total cartridges submitted by statement eligible members YTD
YTD Qualified Cartridges Submitted — Cumu count of total cartridges submitted by statement eligible members YTD with maximum of 20 cartridges submitted per member per calendar month
YTD Qualified Cartridges - Pending Purchase — Cumu count of total cartridges not yet qualified to receive recycling bonus award (YTD due to meeting program criteria
YTD Qualified Cartridges - Pending Next Statement — Cumu count of total cartridges qualified to receive recycling bonus award but have not been issued yet (to be included in next statement)
YTD Cartridges Issued Prior — Cumu count of total qualified cartridges already rewarded in prior months' statement issuances (Does not include prior Q4 2009 recycling reward submissions issued in 2010 statements)

**OFFICEMAX FINANCIAL SCHEDULE 2011**

| Empties | January | | February | | March | | April | | May | | June | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Units | Dollars | Units | Dollars | Units | Dollars | Units | Dollars | Units | Dollars | Units | Dollars | Units | Dollars |
| Retail | 877,790 | $ 280,682 | 713,674 | $ 244,210 | 939,194 | $ 299,263 | 873,362 | $ 269,163 | 862,051 | $ 276,859 | 868,959 | $ 292,344 | 5,135,030 | $ 1,662,521 |
| Contract | 64,690 | $ 32,055 | 67,166 | $ 33,571 | 70,712 | $ 36,459 | 88,793 | $ 45,036 | 95,773 | $ 56,886 | 169,450 | $ 111,952 | 556,584 | $ 315,959 |
| eLables | | | | | | | | | 948 | $ 172 | 1,859 | $ 560 | 2,807 | $ 732 |
| Total Empties | 942,480 | $ 312,737 | 780,840 | $ 277,781 | 1,009,906 | $ 335,722 | 962,155 | $ 314,199 | 958,772 | $ 333,917 | 1,040,268 | $ 404,856 | 5,694,421 | $ 1,979,212 |

OMX-Charron 008

2011 Business Liability Accural Report

Recycle Rewards:

| | |
|---|---|
| Final Jan '11 Statement Liability | $1,521,003.00 |
| Final Feb '11 Statement Liability | $1,445,859.00 |
| Final Mar '11 Statement Liability | $1,760,907.00 |
| Final Apr '11 Statement Liability | $1,684,701.00 |
| Final May '11 Statement Liability | $1,702,197.00 |
| Final Jun '11 Statement Liability | $1,771,383.00 |
| Final Jul '11 Statement Liability | $1,762,275.00 |
| Final Aug '11 Statement Liability | $2,009,868.00 |
| Final Sept '11 Statement Liability | $1,836,627.00 |
| Final Oct '11 Statement Liability | $1,951,230.00 |
| Final Nov '11 Statement Liability | $1,985,079.00 |
| Final Dec '11 Statement Liability | $2,110,332.00 |
| Total | $21,541,461.00 |

OMX-Channon 009

OMX-Channon 010

**2011 Clover VI Breakdown**



| | Retail | Contract | Total |
|---|---|---|---|
| Empties Collections | $3,250,000 | $630,000 | $3,880,000 |

OMX-Channon 011



**Clover Store POS Sales** **08/25/2009 - 06/08/2011**

| | Sales Quantity | Gross Profit |
|---|---|---|
| Total | 5,049,392 | $ 88,649,090.29 |

OMX-Channon 012

**Clover Store POS Sales 08/25/2009 - 06/08/2011**

| Class Desc | Sales Quantity | Gross Profit |
|---|---|---|
| 3rd Party Category 025 | 11,102 | $ 99,123.05 |
| Branded | 20,279 | $ 15,548.04 |
| Default Electronic Consumables | 156 | $ 10,023.54 |
| Kits | 165 | $ 15,025.02 |
| OEM Ink | 125 | $ 4,980.32 |
| OEM Toner | 144 | $ 6,998.99 |
| Private Label Fax Film | 165,845 | $ 3,791,395.86 |
| Private Label Ink | 4,281,367 | $ 62,758,935.94 |
| Private Label Toner | 570,209 | $ 21,947,059.53 |
| Total | 5,049,392 | $ 88,649,090.29 |

OMX-Channon 013

Steven Gardner - Direct by Ms. Vierbuchen

1   A.     Right.  $3 per cartridge.

2   Q.     And I think I -- okay.

3          So if you could just kind of go back to

4   where we were before I asked you to stop.

5   A.     The reason for all the changes?

6   Q.     Yes, please.  Thank you.

7   A.     All right.  As we began to do some analysis

8   around this, we learned that our average customer

9   wasn't recycling 20 cartridges.

10         The people that were recycling 20

11  cartridges were the people that were buying these

12  cartridges online and were giving them to us.

13         And the downside here for us is that a lot

14  of people think at $3 a cartridge we're probably

15  making money, right, because we can refill them and

16  do all these other things with them.

17         We've actually done some studies and

18  analysis, and when we send these cartridges out to

19  our vendor, they have -- they are the ones, in most

20  cases, that will refill them.  We do -- we did refill

21  some of them ourselves, but the vast majority were

22  sent to a vendor to be refilled.

23         When that vendor refilled it, they could

24  only fill certain ones that worked.  Not every one is

25  going to work.  And we would calculate what we called

BRANDI CHANNON'S
EXHIBIT

**12**

1:13-CR-966-JCH-KK   2255 MOTION

Steven Gardner - Direct by Ms. Vierbuchen

Page 334

1    a blended average for what are all those cartridges

2    worth per year to us.  And those cartridges, we would

3    get about 41 cents a cartridge.

4           So if you're giving someone $3 and you're

5    getting 41 cents back every time and you've got

6    people out there that are recycling 20 cartridges

7    because they're buying them online, it's not -- it's

8    not a good situation for us to be in.

9           Like I said, this program was a loyalty

10   program.  It's -- you know, we're trying to reward

11   people.  We are a business.  We do want to make

12   money, so we had to -- as any business, if anyone has

13   ever, you know, worked in a business or anything,

14   you've got to adjust along the way.

15          And we've noticed that, you know what?  We

16   have to make adjustments.  You know we try to be --

17   we try to run our business to 99 percent of the

18   people that are going to be fair and honest with it

19   and not to cause what we would call friction on them.

20   But once in a while we have to make adjustments so we

21   can make sure that we're not losing too much money on

22   programs.

23   Q.    Losing too much money on programs through

24   fraud?

25   A.    Yes.

Steven Gardner - Direct by Ms. Vierbuchen

Page 335

1    Q.    Is that why the -- there was a change in the

2    amount of recycling, the limits on the recycling as

3    well as the amount that was issued for the recycling?

4    A.    Yes.  Prior to the merger we had dropped it

5    down to $2 a cartridge, to be in line with our

6    competitors Staples and Depot.

7          We were told -- throughout some of our

8    investigations people would say -- you know, people

9    that were doing the fraud and abuse, we would say,

10   Why are you coming to us?

11         And they'd say, Because you pay more money

12   on your inkjet cartridge.

13         So we figured we probably needed to get in

14   line with everyone else.

15   Q.    Now, with the -- the ink recycling, are you

16   familiar with kind of this thought process that went

17   into that portion of the program?

18   A.    Uh...

19   Q.    The reason that ink recycling was offered?

20   A.    Yes.  The reason we wanted to offer ink

21   recycling is it has to do with the green, the whole

22   green initiative, right?  What do we, as OfficeMax,

23   sell or do that could help support the green

24   initiative?

25         Well, the time this -- you've got to think

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Direct by Ms. Vierbuchen

Page 336

1   back before this digital -- everything going digital

2   and nobody printing anything out anymore.  But this

3   was back in 2009, when people were still printing a

4   lot, buying paper.

5           We realized, you know what?  There's a lot

6   of inkjet cartridges going in the landfills.  So part

7   of the green was we could pull these out and get

8   people to bring us their inkjet cartridges.  It was

9   ink that's not going into the landfill, and we could

10  reuse a lot of these.

11          If it is a good cartridge and it's -- we

12  could send it out and get it refilled and reuse it.

13          But I'm not -- if I tell you, You know

14  what?  I'll give you 30 or 40 cents if you bring me

15  your inkjet cartridge in when you go shopping, are

16  you -- is the customer likely to take that and put it

17  in a little plastic bag and get ink all over their

18  hands?  Probably not.

19          So we had to do something to entice them to

20  make them feel, yeah, let's do this.

21  Q.    So the reason really was twofold for, then, the

22  environmental.  And also, of course, OfficeMax is in

23  the business of -- to make money?

24  A.    Sure.

25  Q.    So they're encouraging people to come back into

PAUL BACA, OFFICIAL COURT REPORTER

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IN THE MATTER OF THE SEARCH OF:
7100 GLADDEN AVENUE, NE,
ALBUQUERQUE, NM 87110

Case No. _____

### AFFIDAVIT IN SUPPORT OF AN
### APPLICATION UNDER RULE 41 FOR A
### WARRANT TO SEARCH AND SEIZE

I, Michael Boady, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a warrant to search the premises known as 7100 GLADDEN

AVENUE, NE, ALBUQUERQUE, NM 87110, hereinafter "PREMISES," further described in

Attachment A, for the things described in Attachment B.

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of

Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal

laws.  I have been a Special Agent (SA) with the Federal Bureau of Investigation ("FBI") for

almost seven years.  I have participated in investigations of computer crimes, crimes against

children on the Internet and, among other things, have conducted or participated in surveillance,

the execution of search warrants, and debriefings of informants.  Through my training, education

and experience, I have become familiar with the manner in which computers, computer

equipment, software, and electronically stored information are used in furtherance of criminal

activity.

3.      This affidavit is intended to show only that there is sufficient probable cause for

the requested warrant and does not set forth all of my knowledge about this matter.

BRANDI CHANNON'S
EXHIBIT

**13**

1:13-CR-966-JCH-KK   2255 MOTION

## PROBABLE CAUSE

4.      Since October 2010, the Albuquerque Division of the FBI has been investigating

a pattern of criminal activity causing a significant loss of money for several New Mexico retail

stores including OfficeMax, Office Depot, and Staples.

5.      The OfficeMax MaxPerks Loyalty program issues a reward card number that

allows each of their customers to earn gift card rewards toward future OfficeMax purchases.

There are two types of MaxPerks accounts, "MaxPerks for Teachers" and "MaxPerks for

Business" accounts.  The Business account is available for any customer.  For every $500 spent

at OfficeMax using the Business reward card, OfficeMax rewards that customer with $25 in

MaxPerks reward certificates, which are issued monthly.  The Teacher accounts are more

lucrative and only available to teachers.  Every $75 spent at OfficeMax using the Teacher reward

card results in a $10 MaxPerks reward certificate, which is issued quarterly and has an annual

maximum of $100.

6.      If a customer signs up in person, he/she fills out the registration card and

immediately receives a MaxPerks card with a MaxPerks account number.  If the customer

registered online, the MaxPerks card is provided electronically to be printed out.  When signing

up for an account, customers are asked to provide their name, address, phone, type of account

(business or teacher), and email.  Each MaxPerk account can be accessed online by providing the

customer's email or account number and a password.  To get credit for a purchase made at an

OfficeMax, the customer can provide the cashier with either his/her MaxPerks card number,

telephone number, or mailing address associated with the account.  The purchase is then

associated with that MaxPerks account.

7.      If the customer forgets to utilize his/her card during the purchase, the customer can log-in to his/her account via the internet and add the purchase to it.  An online adjustment requires four pieces of information: the store number, date, register number, and transaction number.  This information is located on the store receipt.  At the end of the month or quarter, depending on the type of account, the customer can log-in to his/her account and print out the rewards.  These rewards are credits towards future OfficeMax purchases and cannot be redeemed for cash.

8.      All MaxPerks customers are allowed to participate in the ink and toner cartridge recycling program.  The ink and toner recycling program is intended to protect the environment by recycling cartridges that would otherwise be discarded.  Customers can return their cartridges to OfficeMax and receive $3 per cartridge, with a maximum of $60 per month.

9.      To receive rewards for recycling ink or toner cartridges, a customer is required to spend an equal amount at OfficeMax prior to issuance.  For example, if a customer brings five ink cartridges to OfficeMax for recycling, his or her MaxPerks account must reflect a "qualified purchase balance" of $15 before the customer will be issued the $15 MaxPerks award.

10.     The terms and conditions for the MaxPerks program, which must be agreed before setting up an account, limit one MaxPerks account per person.  MaxPerks rewards are not transferrable.

### Discovery of the Fraud

11.     Around August 2010, OfficeMax discovered that the MaxPerks loyalty program began to show a significant increase in MaxPerks rewards claimed from customer purchases.

12.     OfficeMax suspected fraud and began to investigate the accounts used to claim the rewards.  The OfficeMax investigation identified over 5,400 MaxPerks accounts that were set

3

up between March 3, 2010 and January 24, 2011, with similarities in the subscriber information and/or method of payment(s) that led OfficeMax to believe it was the same individual(s) who set up all of the accounts.

13.     To date, the created accounts have generated approximately $179,373 in rewards, which were issued to Matthew Channon ("CHANNON"), the suspected perpetrator of the schemes.  Of the approximately $179,373 in rewards, OfficeMax was successful in voiding approximately $133,000 of the pending rewards before they were received by CHANNON. Additionally, OfficeMax was able to void approximately $11,888 in rewards which had previously been issued to CHANNON, prior to him using them.  OfficeMax believes that if the fraud had not been discovered, the company could have paid out approximately $540,000 dollars for the over 5,400 accounts that were created.

14.     To execute the MaxPerks scheme, the fraudster had to perform several tasks. First, since each Teacher account only allows a $100 payout annually, the fraudster had to set up numerous "MaxPerks for Teachers" accounts and associate each one with a different name, email address, and mailing address.  The MaxPerks program requires a unique email address and mailing address for each reward account, to prevent a person from having more than one account.

15.     Next, the fraudster had to be able to claim in-store purchases previously made by other customers that were not already associated with a MaxPerk reward account.  In order to claim a purchase online, the fraudster had to obtain certain pieces of information about the in-store purchases.

16.     To execute the portion of the scheme involving the cartridge recycling, the fraudster needed have access to large quantities of spent ink or toner cartridges and also needed a

4

large number of MaxPerks accounts.  As mentioned previously, each account is allowed to recycle only 20 cartridges per month for $3 each (for a total of $60), and for every dollar in ink rewards, an equal amount of money had to be spent at OfficeMax.

## MaxPerks Accounts

17.     Of the over 5,400 MaxPerks accounts identified by OfficeMax, approximately 5,287 were created with one of four email sequences: Bargle12345678, Garble12345678, Coach12345678, and Teechur12345678, (herein referred to as "BARGLE", "GARBLE", COACH", and "TEECHUR").  Additionally, OfficeMax identified approximately 96 accounts, which are referred to as "Elementary Accounts," which are discussed further in paragraphs 28 and 29 below.

18.     Before a MaxPerk account can be set up online, the email address associated with the account must be validated - that is, the customer will receive an email at the email account provided and will have to click on a link to confirm that they are the email account holder.  All of the accounts were associated with Google Mail ("Gmail") accounts. The sequencing of the email addresses appears to be computer generated.  The periods inserted within the sequences make them appear unique to OfficeMax.  For example, the MaxPerks system recognizes B.argle12345678@gmail.com to be a distinct email address from Ba.rgle12345678@gmail.com.

19.     The business names of the BARGLE, GARBLE, COACH, and TEECHUR accounts also appear to be computer generated.   For many of these accounts, the member's address or city was part of the member's listed business name.  The name was the city or address plus "Elementary School," "Academy," or similar.  An example of this would be that an account registered to Denver, CO would have the business name of "Denver Elementary School."

5

20.     Apart from the BARGLE, GARBLE, COACH, and TEECHUR accounts, OfficeMax identified approximately 120 accounts that appear to have been part of the same scheme.  As with many of the accounts associated with those four sequences, these 120 other accounts all have a business name using the city or address plus "Elementary School."  These accounts did not have email addresses associated with them.  This could be because the account was set up in the store and the registrant did not provide one, or it could be that the registrant logged into the account and deleted the email associated with it.

21.     According to Google, Gmail accounts do not recognize special characters such as a period (".").  An email sent to C.OA.CH.1.23.4.5.6.7.8@gmail.com, where there are periods placed between the alpha-numerical characters, is recognized by Gmail as being sent to COACH12345678@gmail.com.  Therefore, only one Gmail address is associated with all of the different COACH email sequences; the same is true for the BARGLE, GARBLE, and TEECHUR sequences.

22.     There were approximately 2,358 "BARGLE" accounts created between June 4, 2010 and August 5, 2010. The subscriber information for this account, provided by Google, includes the following:

Name: Bargle Bargleton

Email: bargle12345678@gmail.com

Secondary Email: Teechur12345678@gmail.com

Created on: 2010/06/04-18:36:41-UTC

IP: 166.205.9.207, on 2010/06/04-18:36:41-UTC

6

23.     There were approximately 1092 "GARBLE" accounts created between August 17, 2010 and September 17, 2010.  The subscriber information for this account, provided by Google, includes the following:

Name: Garble Garbleton

Email: garble12345678@gmail.com

Secondary Email: bargle12345678@gmail.com

Created on: 2010/08/17-16:28:35-UTC

Registration IP: 204.8.156.142 on 2010/08/17-16:28:35-UTC

24.     There were approximately 908 "COACH" accounts created between May 4, 2010 and June 4, 2010.  The subscriber information for this account, provided by Google, includes the following:

Name: Coach Alphabet

Email: coach12345678@gmail.com

Secondary Email: sws11@live.com

Created on: 2010/05/05-02:00:49-UTC

Registration IP: 98.230.199.128 on 2010/05/05-02:00:49-UTC

25.     There were approximately 920 "TEECHUR" accounts created between March 3, 2010 and April 22, 2010.  The subscriber information for this account, which was provided by Google includes the following:

Name: Tee Chur

Email: teechur12345678@gmail.com

Created on: 2010/03/09-01:32:00-UTC

Registration IP: 166.205.9.73, on 2010/03/09-01:32:00-UTC

26.    It should be noted that the BARGLE, COACH, and TEECHUR accounts have all been accessed from IP address 192.251.226.206. This confirms that all of the accounts have likely been accessed from the same computer network and is likely the same person. Additionally, as mentioned above, the GARBLE account provided the BARGLE account as a secondary email address.

27.    This chart provides a sampling of the typical subscriber information that was provided for the suspicious MaxPerks accounts.

| Business Name | Contact Name | Address | City | State | Phone | Email Address |
|---|---|---|---|---|---|---|
| HOUSTON ACADEMY | MARIA R CROSS | 3044 GAMBLER LANE | HOUSTON | TX | 281-966-8904 | T.EECH.UR12345678@GMAIL.COM |
| MOUNTAIN VIEW ELEMENTARY SCHOOL | DAMIAN E VICKERY | 3089 GROVE AVENUE | MOUNTAIN VIEW | OK | 580-347-3093 | TEECH.U.R.12345678@GMAIL.COM |
| WASHINGTON ELEMENTARY SCHOOL | RUTH R ROYER | 905 LAKE FLOYD CIRCLE | WASHINGTON | DC | 301-944-5281 | TEECH.U.R12345678@GMAIL.COM |
| TIFTON ELEMENTARY SCHOOL | ANTHONY R LOTT | 1557 JUNKINS AVENUE | TIFTON | GA | 229-556-2971 | TEECH.UR.12345678@GMAIL.COM |
| EAGLEVILLE ELEMENTARY SCHOOL | SONIA S BASH | 1787 FRANKLEE LANE | EAGLEVILLE | PA | 484-597-7646 | TEECHU.R.12345678@GMAIL.COM |
| THOUSAND OAKS ELEMENTARY SCHOOL | HOLLY D BAKER | 1292 LEISURE LANE | THOUSAND OAKS | CA | 805-491-2314 | TEECHUR.12345678@GMAIL.COM |

As is demonstrated by the bolded selections, the business name and the city usually have commonalities. A review of the account subscriber information provided by the fraudster showed that the physical addresses provided were invalid.

28.    The chart below is a sampling of the "Elementary Accounts" of which there were approximately 96:

8

| Business Name | Contact Name | Address | City | ST | Zip | Phone |
|---|---|---|---|---|---|---|
| CUYAHOGA FALLS ELEMENTARY SCHOOL | BARGLE12345678@GMA J WARD | 1482 BRIARHILL LANE | CUYAHOGA FALLS | OH | 44221 | 3302509319 |
| MAPLEWOOD ELEMENTARY SCHOOL | BARGLE12345678@GMAIL D KILLINGER | 2289 LAUREL LEE | MAPLEWOOD | MN | 55119 | 6517329326 |
| PITTSBURGH ELEMENTARY SCHOOL | BARGLE12345678@GM L KUHL | 4136 STILES STREET | PITTSBURGH | PA | 15226 | 4125615136 |

29.     Although the "Elementary Accounts" do not have an email address associated

with them, in some instances, like those above, the contact name included the "BARGLE" email

sequence and then a name (e.g. J Ward).  These discrepancies give cause to believe that the

accounts were created through the use of a computer script—that is, a list of commands that can

be executed without user interaction—and that this script was improperly configured, leading to

errors such as the entry of the BARGLE email sequence in the name field.

### Online Adjustments

30.     As mentioned above, if a customer forgets to provide his/her MaxPerks

information when making a purchase at a store, he/she can go online to the MaxPerks website,

log-in from his/her home computer, and add four pieces of information from the receipt (store

number, register number, receipt number, and date of purchase) associated with the purchase

they made.  The customer's MaxPerks account will then be credited for that sale.  Below is a

picture of where those items would be found on a typical OfficeMax receipt and where they

9

could be added to a MaxPerks account online:



31.     In order to execute the scheme, the fraudster would have to be able to claim purchases made by legitimate customers.  To accomplish this, he would first go to an OfficeMax store around the country and make a purchase, thereby obtaining a legitimate receipt.

32.     The fraudster would then log-in to one of the previously created MaxPerks accounts.  Using the information from the receipt, the fraudster would be able to deduce previous and future purchases at OfficeMax by using the four pieces of information from his receipt.  Since the store number and register number do not change, the fraudster is believed to have written a computer script that repeatedly decremented and/or incremented the receipt number by

10

one to claim previous and future purchases made at that store. Furthermore, the fraudster could take notice of how many registers were in the store and increment and/or decrement the register number accordingly to claim purchases at other registers.

33.     Since each account only allowed $100 in rewards annually (corresponding to $750 in purchases), the fraudster would use the numerous accounts he set up to claim transactions up to $750 worth of purchases. At that point, the account was no longer used to claim transactions, since the account reached the annual reward limit of $100.

34.     Between May and September 2010, there were over 58,000 transactions adjusted online relating to the suspicious accounts. This is an average of 482 transactions per day. Assuming a keying time of 30 seconds per transaction, it would take about 4.2 hours per day to key that many transactions. This number excludes any adjustments that were not accepted by the system because they had already been awarded, were mis-keyed, or did not match a specific transaction. On one date there were 1,172 transactions keyed, which using this logic would require over 9.7 hours of continuous keying.

35.     Taking into consideration the volume of adjustments done per day, the sequencing of the Gmail addresses that were registered, and the unique subscriber details provided for each account, it would be unlikely that someone manually entered this information. The most viable explanation is that a computer script was employed to parse through the different email account possibilities, placing periods in different places to create MaxPerks accounts, and then apply the MaxPerks online adjustments.

**Identifying the Fraudster**

11

36.     Investigation had identified the individual who is believed to be the perpetrator of the fraud scheme as Matthew CHANNON, who resides at 7100 Gladden Ave, Albuquerque, NM.  Below is a copy of his NM Driver's License Photo:



37.     A review of the over 4,500 MaxPerks accounts believed to have been created by CHANNON identified several accounts that were set up using either a home address, email address, P.O. Box, and/or telephone number that is directly linked to CHANNON.  Some of the examples of this are shown in the chart below:

| Account # | Name | Address | City | State | Phone | Email |
|---|---|---|---|---|---|---|
| 45422487 | CSOL CORP | 7100 GLADDEN AVE | ALBUQUERQUE | NM | 505-242-6289 | stoopido@aol.com |
| 648012993 | CONVENIENT VIDEO | PO BOX 90504 | ALBUQUERQUE | NM | 408-598-1528 | cvid.us@gmail.com |
| 629459324 | OMICRON CONSULTANTS | 7100 GLADDEN AVE | ALBUQUERQUE | NM | 520-857-0685 | je.h.najehnsen@gmail.com |

12

38.     On March 30, 2011, the Honorable W. Daniel Schneider, United States

Magistrate Judge for the District of New Mexico issued a search warrant authorizing a search of

thirteen Google email ("GMAIL") accounts believed to be created and controlled by

CHANNON, including, the BARGLE, TEECHUR, COACH, GARBLE sequences,

hydrazok@gmail.com, jehnajehnsen@gmail.com, mattchannonconsulting@gmail.com,

cvidus@gmail.com, jrqqqq@gmail.com, mahashamaranka@gmail.com, amclay2@gmail.com,

smoked@gmail.com, and furnituu@gmail.com.

39.     During a review of those email accounts, there were emails received in all of the

searched accounts which further confirmed that the accounts were CHANNON's.  The

cvidus@gmail.com account had numerous emails from Staples and OfficeMax that confirmed

that the account was being used to accept proceeds from fraud.  One example of how these

accounts confirm that they are CHANNON's, in the cvidus@gmail.com account, CHANNON

established a Netflix account associated with this email address with the following subscriber

information:

Matt Channon
7100 GLADDEN AVE NE
PMB 8
ALBUQUERQUE, NM 87110-1464

40.     There was also an eBay account setup with the cvidus@gmail.com account which

on at least one occasion purchased an item and had it shipped to:

Matt Channon
7100 Gladden Av NE
Albuquerque, NM 87110

41.     Information provided by Google provided the following subscriber information

for the jehnajehnsen@gmail.com account:

Name: Jehn Ajehnsen

13

Created on: 2009/11/11-03:40:24-UTC

Registration IP: 166.205.5.173, on 2009/11/11-03:40:24-UTC

42.     During a review of the jehnajehnsen@gmail.com account, on May 1, 2010, an

email was received in this account showing that a car GPS device was purchased from Staples,

which was to be mailed to the following address:

> JEHNAJ EHNSEN
> 7100 NE Gladden Ave., NE
> PMB 288C
> Albuquerque, NM 87110

It is believed that JEHNAJ EHNSEN is a fictitious name that CHANNON used to make a

purchase using his fraudulently obtained Staples rewards.  Investigative databases confirm that

there is no one with that name who resides at that address.


### PayPal Debit Card

43.     Through a review of transactions in which fraudulently acquired MaxPerks

Reward certificates were used to make purchases, a personal debit card was identified that was

used to pay the remaining balances on the transactions.  The debit card is a PayPal debit card

ending in 4445, which is registered to CHANNON. In other words, when a MaxPerks account

did not have sufficient rewards to cover the full amount of the purchase, the personal debit card

registered to CHANNON would be used to cover the difference.

44.     The debit card registered to CHANNON has been directly connected to

approximately 82 of the suspect MaxPerks accounts and to over 227 transactions in which

fraudulently acquired MaxPerks Rewards and a debit card registered to CHANNON were both

used.  All of these accounts also have a significant number of online adjustments.

14

45.     Below is a partial transaction record showing a purchase of $161.04 in

merchandise from OfficeMax in which three fraudulently acquired $50 MaxPerks rewards

certificates were used and then the remaining balance of $11.04 was paid with the debit card

registered to CHANNON:



46.     Records from OfficeMax show that on numerous occasions the debit card

registered to CHANNON was used in stores outside of New Mexico to make purchases,

including Arizona, Missouri, Texas, Colorado, Wisconsin, California, Illinois and Nevada.  As

seen in the transaction record below, a fraudulently acquired $80 MaxPerks reward certificate

was used to purchase merchandise in Phoenix, Arizona on June 9, 2010, and the remaining

balance of $15.71 was paid with the debit card registered to CHANNON:

```
Store: 743    Register:     1 Operator: NKRAUS  Receipt Nbr: 6208

Date/Time:          Customer receipt    Audit receipt    Customer signature
  6/9/2010 12:57:14 PM -   5:  Store Coupon # 17079011060610 (20%)        ($21.90)
  6/9/2010 12:59:28 PM     6:  Store Coupon # 17079011060610 (20%)        ($21.90)
Type:                      7:  Store Coupon # 17079011060610 (20%)        ($21.90)
  Sale                     8:  Store Coupon # 17079011060610 (20%)        ($21.90)
  ☐ Voided                 9:  Store Coupon # 17079011060610 (20%)        ($21.90)
                           0:  Store Coupon # 17079011060610 (20%)        ($21.90)
  ☐ Training               0:                              SUBTOTAL        $87.57
  ☐ Offline                0:                                              $5.78
Total:                     0:                                              $0.61
  95.71                    0:                                              $1.75
                           0:                              TOTAL           $95.71
                           0:                              SUBTOTAL        $87.57
                           0:                                              $5.78
                           0:                                              $0.61
                           0:                                              $1.75
                           0:                              TOTAL           $95.71
                           0:     Access Code: 229835
                           0:     STAN Code: 610800
                           0:     Remaining Balance: $0.00
                          11: Gift Card                                   ($80.00)
                          11: Entry Method:Keyed
                          11: Acct #**************6202
                           0: Approved     Authorization CD: 20080005
                          12: Debit                                       ($15.71)
                          12: Auth             Entry Method:Scanned
                          12: Acct #***********4445         Exp Date   5/31/2011
                              Card Holder:  KATT
                           0: 000    Authorization CD:
                           0: PrintEvent PrintID = 96  EventID = RC096 Description = Fed Ex Sweepstakes
                          End of Transaction: # 6208   6/9/2010 12:59 PM
```

47.    Some of the email accounts that were identified by OfficeMax through the use of

the PayPal debit card registered to CHANNON included mattchannonconsulting@gmail.com,

mahashamaranka@gmail.com, jrqqqq@gmail.com and smokedb@gmail.com.  Each of these

account were associated with several purchases made using the debit card registered to

CHANNON.  The accounts were left open until June 20, 2011, and were still being used by

CHANNON for fraud.

48.    The mahashamaranka@gmail.com account has been used by CHANNON to

profit from fraud as recently as May 25, 2011, at an OfficeMax store in San Francisco, CA.  On

at least five occasions, OfficeMax was able to obtain video of CHANNON using the

mahashamaranka@gmail.com account at stores in Arizona, California, and New Mexico.  With

this account, CHANNON has received and used over $1,700 worth of MaxPerks Rewards.

49.    The mattchannonconsulting@gmail.com MaxPerks account was registered with

an Albuquerque address and the phone number 505-344-4322, which is associated with

16

CHANNON.   The smokedb@gmail.com MaxPerks account was registered with P.O. Box 90504, which is the same address provided for the MaxPerks Convenientvideo account.

50.     The mahashamaranka@gmail.com email address was used for nine different OfficeMax accounts, with periods (".") randomly placed between the alpha-numeric characters. Several of these accounts were directly connected to the debit card registered to CHANNON. All nine were left open by OfficeMax and are still being used.

<u>**Video Evidence**</u>

51.     OfficeMax obtained video of CHANNON conducting fraudulent transactions on several occasions.  The below photograph was taken on November 22, 2010, as he was entering an OfficeMax store in Albuquerque, NM to conduct a transaction reported to be fraudulent.



52.     The below photograph was taken on November 22, 2010, as CHANNON entered a different OfficeMax store in Albuquerque, NM, to conduct a transaction reported to be fraudulent.



53. The below photograph is from a video of CHANNON making a transaction reported to be fraudulent at OfficeMax store in Tuscon, Arizona on December 21, 2010:



54. On several occasions, video evidence shows a female who is believed to be an accomplice to CHANNON. This female traveled to stores throughout the country and made purchases using the fraudulent MaxPerks Rewards certificates as well. On November 22, 2010 and November 23, 2010, the female was observed walking in to the OfficeMax stores in Albuquerque just prior to CHANNON entering the stores. She recycled ink on an account that

18

had previously been identified as CHANNON's by OfficeMax.  Below are two of the screenshots that were taken from Albuquerque OfficeMax stores:





55.    The female has been identified as Brandi Lucero ("LUCERO").  According to Lucero's driver's license information, LUCERO resides at 7100 Gladden Ave., Albuquerque, NM 87110, with CHANNON.  Below is the driver's license photograph of LUCERO which confirms that she is the accomplice who was identified by OfficeMax:

19



56.     The MaxPerks account to which LUCERO credited the returned ink was associated with amclay2@gmail.com, which is registered to an address in Tempe, Arizona. This MaxPerks account was previously associated with CHANNON because the debit card registered to CHANNON was once used in connection with the account.

### Making an Initial Purchase

57.     Information provided by OfficeMax shows that MaxPerks accounts associated with CHANNON were redeemed in at least 21 different states. Subpoena records from Southwest Airlines also confirm that CHANNON has traveled to many of these states in and around the time the fraudulent transactions were made.

58.     A review of the online adjustments and video from OfficeMax stores shows on numerous occasions CHANNON would make a purchase. Then, shortly after the purchase, online adjustments from other customers purchases, both before and after CHANNON's, would begin to show up as being associated with CHANNON's MaxPerks accounts.

59.     After discovering the fraud, OfficeMax shut down the majority of the suspicious MaxPerks accounts but decided to keep approximately 120 suspicious accounts open in order to

20

assist with the ongoing investigation.  The accounts left open were the ones that did not fall

under the four different email chains (BARGLE12345678, GARBLE12345678,

COACH12345678, and TEECHUR12345678).

### Recent Activity

60.     More recently, OfficeMax has changed their online adjustments program to

require that the actual amount of purchase be provided to claim a purchase.  Since that change,

on November 30, 2010, CHANNON was caught on video in an OfficeMax store in Albuquerque,

NM, where he made a purchase while taking note of the amounts spent by other individuals who

were ahead of him and/or behind him in line.  Online adjustments confirmed that those

customers' purchases were later claimed as purchases on suspected MaxPerks accounts

associated with CHANNON.

61.     In addition to observing the purchases of others, CHANNON has also devised a

scheme using the approximately 120 accounts that were left open by OfficeMax to profit from

recycling empty ink and toner cartridges.  Based on information provided by eBay, between

September 2009 and August 2010, eBay accounts associated with CHANNON were used to

purchase over 14,000 empty ink jet cartridges.

62.     The average price paid by these eBay accounts for a cartridge is $0.355.

Recycling the cartridge at OfficeMax yields a $3.00 credit, which would have netted about

$38,000 in profit.  Since each account is only allowed 20 ink cartridges per month, CHANNON

used his 120 MaxPerks accounts to allow him to recycle 2400 cartridges per month (120 x 20).

To receive payment for recycling the ink, a customer must spend an equal amount to receive the

rewards.  It appears that CHANNON had been purchasing debit cards from OfficeMax and

associating them with the 120 accounts.  Then, CHANNON would recycle ink on that same

account, up to $60 per month, which resulted in OfficeMax issuing him a Reward Certificate for
the amount spent.

63.     To date, OfficeMax has identified approximately $46,375 worth of ink recycling
rewards that have been issued to CHANNON. According to OfficeMax, they believe that the
cost to CHANNON for each $60 Reward certificate that he received from ink recycling is no
more than $9. OfficeMax advised that this scheme is in violation of the policy agreement that
every customer must agree to in order to obtain a MaxPerk account.

64.     As recently as May 25, 2011, CHANNON was identified at OfficeMax stores in
California, recycling ink with the MaxPerks accounts that were not shut down.

### eBay/PayPal Records

65.     As mentioned above, investigation has discovered that CHANNON was
connected to several eBay accounts, which he used to sell items obtained with MaxPerks
rewards.

| Account ID | Name | Address | City | State | Email | Phone |
|---|---|---|---|---|---|---|
| doctor_zoidberg | Matt J Channon | 7100 Gladden Av NE | Albuquerque | NM | hydrazok@gmail.com | 505-344-4322 |
| convenientvideo | Matthew J Channon | 7100 Gladden Av NE | Albuquerque | NM | cvidu.s@gmail.com | 408-598-1528 |
| rmamyway | Chris Channon | 12245 Yellowstone NE | Albuquerque | NM | cchannon@yahoo.com | 505-292-5393 |
| furnitu | Convenient Video | P O Box 90504 | Albuquerque | NM | furnituu@gmail.com | 505-344-4322 |

66.     The "doctor_zoidberg" eBay account, which is connected to email account
hydrazok@gmail.com, has sold approximately 1,200 items including ink cartridges, computer
media (DVD-R's, CDR's, flash drives, etc.), printers, telephones, and computer equipment, most
of which can be purchased at OfficeMax, Staples, and Office Depot stores. The total value of
items sold was over $45,000 USD from this account. Additionally, this account has made

22

numerous purchases including coupons for Staples and OfficeMax, ink cartridges, and computer

equipment. According to transaction records, these coupons were used in addition to the

fraudulently acquired MaxPerks Rewards to purchase items from OfficeMax at a discount.

67.     On February 25, 2011, in an undercover capacity, the writer made a bid for Canon

210XL 211XL Ink Cartridges, which were being sold on eBay with the doctor_zoidberg account.

On February 27, 2011, the writer was informed that the auction had been won by the writer and

that the eBay item was in Albuquerque, NM.

68.     The doctor_zoidberg account allowed payment to be received via the PayPal

account associated with hydrazok@gmail.com.  Therefore, the writer paid for the item and

requested that it be shipped to an FBI controlled address in Dallas, TX.  After paying for the item

on PayPal, the writer received a receipt showing that the Payment was to Channon Silichem,

which had a customer service email address of hydrazoic@aol.com.  In addition to the receipt

from PayPal, the writer received a receipt from eBay showing that the item had been won from

Matt J. Channon, Albuquerque, NM 87110.

69.     Information provided by Google provided the following subscriber information

for the hydrazok@gmail.com account:

```
Name: Matt Channon
Created on: 2009/11/04-22:16:39-UTC
IP: 76.113.79.124, on 2009/11/04-22:16:39-UTC
Date/Time                    Event     IP
2010/12/27-14:49:03-UTC      Logout    174.56.56.220
2010/12/27-14:23:57-UTC      Login     174.56.56.220
2010/12/26-16:52:52-UTC      Logout    174.56.56.220
2010/12/26-15:24:51-UTC      Login     174.56.56.220
2010/12/25-22:23:50-UTC      Login     166.205.11.35
```

70.     The "convenientvideo" eBay account, which is connected to email account

cvidu.s@gmail.com and is registered with CHANNON's name and address, has purchased

23

thousands of empty ink cartridges and OfficeMax coupons. Furthermore, on September 22, 2010, this account placed a $300 OfficeMax MaxPerks Rewards Certificate Gift Card up for auction on eBay. The Furnitu eBay account purchased this certificate. It is believed that CHANNON put the gift card up for auction, but in an attempt to prevent someone from purchasing it for less than the desired price, he purchased it from himself using the Furnitu account.

71.     As mentioned previously, the cvidus@gmail.com account was used to create an eBay account and a MaxPerks Rewards account. Information provided by Google included the following subscriber information for the cvidus@gmail.com account:

> Name: Convenient Video
> Created on: 2009/09/04-01:35:47-UTC
> IP: 76.18.86.2, on 2009/09/04-01:35:47-UTC
> Other Usernames: cvid.us@gmail.com

72.     From the "rmamyway" eBay account, which is connected to email account cchannon@yahoo.com, over $31,000 worth of items have been sold, including a significant number of cameras and camera equipment.

73.     From the "furnitu" eBay account, which is associated with furnituu@gmail.com, over $4,700 worth of items have been sold, including Office Depot Rewards Certificates valued at $1,647.77, OfficeMax MaxPerks Rewards certificates valued at $3,122, and Staples Rewards Certificates valued at $2,100. The eBay subscriber information for the furnitu account includes the following:

> User ID: furnitu
> Full Name: Convenient Video
> Contact Info: Convenient Video, P O Box 90504, Albuquerque, NM, 87199, 505-344-4322 5
> Shipping Address: M. J. Channon, 1829 Commercial Street N.E., Albuquerque, NM, 87102.

74.     Information provided by Google provided the following subscriber information for the furnituu@gmail.com account:

                Name: Furnit U
                Created on: 2009/11/22-09:23:12-UTC
                IP: 166.205.137.71, on 2009/11/22-09:23:12-UTC
                Date/Time                       Event           IP
                2010/12/18-13:12:21-UTC         Logout          174.56.56.220
                2010/12/18-13:11:51-UTC         Login           174.56.56.220

This IP address, 174.56.56.220, is the same used to log-in to the hydrazok@gmail.com email account.

### Prepaid Gift Cards

75.     From November 2009 through September 2010, the Furnitu and the doctor_zoidberg accounts logged into eBay from an IP address 98.230.199.128. That IP address is registered to Comcast Cable and appears to be a customer in the Albuquerque, NM area. CHANNON was a Comcast subscriber at that time. In October 2010, CHANNON's home internet service changed to Qwest, and the Furnitu and the doctor_zoidberg began logging in from IP addresses associated with Qwest instead. Furthermore, the first bill that CHANNON received from Qwest was paid using American Express Debit Card number 3743-2869-1820-263.

76.     The American Express (AMEX) Debit Card used to pay CHANNON's Qwest bill, 3743-2869-1820-263, was purchased in an OfficeMax store in Albuquerque, NM with fraudulently acquired MaxPerks Rewards certificates. That same card was also used on October 21, 2010, to make purchases at a Staples store in Framingham, MA for $32.82. Prior to making the purchase, a balance-inquiry call was placed from telephone number 505-888-6288 to the American Express IVR number on the back of the debit card.

25

77.     In addition to the above-mentioned AMEX card, on October 23, 2010, MaxPerks

rewards from accounts associated with CHANNON purchased three other AMEX Gift Cards,

numbers 3790-1446-3184-790, 3743-2876-6943-727, and 3790-1446-3185-078.  A review of the

transaction detail for those gift cards show that these cards were used to make payments at

establishments in the Albuquerque area.

78.     According to information provided by Qwest, CHANNON's Qwest account

includes the following subscriber information:

> Name: Matt Channon
> Address: 7100 Gladden Ave NE, Albuquerque, NM 87110
> Phone: 505-888-6288

As mentioned above, the 505-888-6288 number is the number used to call American Express to

determine the balance on a fraudulently acquired gift card.

### Shipping Packages

79.     On numerous occasions, CHANNON is believed to have visited OfficeMax stores

around the country, including Texas, Illinois, Oregon, Washington, Pennsylvania, and California,

and purchased items with the suspicious MaxPerks Rewards at an OfficeMax store.  Then, using

the MaxPerks Rewards as payment, the items would be shipped via FedEx, a service offered by

OfficeMax, to CHANNON's residence in Albuquerque, NM.

80.     As recently as January 26, 2011, a person using the name of MATTHEW

CHANNON has used the FedEx services at OfficeMax to send packages, paid for with the

suspicious MaxPerks Rewards.

81.     Between December 28, 2009 and January 18, 2010, someone using the name

Chris Channon ("CHRIS") sent five FedEx Packages from an OfficeMax store in Albuquerque,

NM.  Four of the five were paid for with a gift card ending in 9211 and a pre-paid American

26

Express card ending in 3557, while the other item that was shipped from CHRIS was paid for

with the PayPal debit card registered to CHANNON ending in 4445.  The address used by the

sender was 12245 Yellowstone Rd., NE, Albuquerque, NM, which is the residence of CHRIS,

who is believed to be a relative of CHANNON's.

### Channon's Background

82.     The writer conducted a "Google search" on www.Google.com for 'Convenient

Video' and discovered the following:

> Convenient Video, 7100 Gladden Ave NE, 87110, telephone 505-888-6288
> Principal: Matthew Channon.

The 505-888-6288 number was also used to register the Qwest service at his residence and to call

the American Express IVR service to determine the balance of a card he purchased with

MaxPerks Rewards.

83.     CHANNON's "Linked-in" profile shows he has extensive computer knowledge.

84.     CHANNON obtained a Masters in Computer and Electrical Engineering at

Georgia Tech and Bachelors in Material Engineering at New Mexico Tech.

85.     CHANNON maintains a website for a solar power business at

www.silichem.com, which includes the following contact information on the website: 7100

Gladden Ave., Albuquerque, NM 87110, telephone number 408-598-1528.  The 408-598-1528

number is the same one he used to register the "Convenient Video" eBay and MaxPerk accounts.

86.     The Silichem.com account was registered with Tucows.com, a domain registrar,

with the following information:

> Matt Channon
> hydrazo.k@gmail.com
> 7100 Gladden Ave NE
> Albuquerque, NM 87110

27

505-344-4322

As mentioned previously, the hydrazok@gmail.com account was used to register the doctor_zoidberg eBay account. Additionally, the 505-344-4322 number was also used for the doctor_zoidberg and furnitu eBay accounts.

### Staples

87.    When Staples was informed of the potential fraud, Staples reviewed its database and discovered over $10,000 in losses connected to CHANNON, who is believed to have executed a similar scheme related to their rewards program and the recycling of ink.

88.    Investigation conducted by Staples identified 89 Staples Rewards accounts that are believed to be CHANNON's, including four that were directly connected to CHANNON, either by name, address, or telephone number, which were:

| Member # | 2189783844 | 2062562935 | 2121820126 | 2090794708 |
|---|---|---|---|---|
| Name | Matt Channon | Matt Channon | C. T. Teaching | Convenient Video |
| Address | 7100 GLADDEN AVE NE | PO BOX 37451 | PMB 1105 7100 GLADDEN AVE NE | PO BOX 90504 |
| Phone | 505-344-4322 | 505-344-4322 | | 408-598-1528 |
| Email | stoopido@aol.com | mattchannonconsulting@gmail.com | j.rqqqq@gmail.com | cvid.us@gmail.com |

89.    A review of all transactions associated with these four Staples Rewards Accounts discovered 10 Credit Card Accounts and 1 Debit Card. A review the transaction history for each of the cards identified an additional 85 rewards accounts linked to CHANNON.

90.    The cards identified by Staples that appear to have been used by CHANNON include the following:

   - PayPal debit card 4445

28

- Mastercards ending in 1482, 1841, 2248, and 7503
- Visa Cards ending in 1710 and 1945
- American Express Cards ending in 0533, 0577, 1116, and 3811

As mentioned previously, the PayPal debit card ending in 4445 is the same card that was used to purchase items from OfficeMax.

91.     Based on the transaction history of the 89 Staples Rewards accounts it appears that CHANNON is primarily recycling ink and then using the Ink Recycling Rewards Checks, along with Staples Coupons, to purchase electronic items at a reduced price.  A total of 3,728 cartridge recycles were associated with the 89 rewards accounts, resulting in the issuance of $10,703 worth of Ink Recycling Rewards Checks since August 2009.

92.     Only one Staples Rewards Account is permitted per customer, per household. Customers are allowed to recycle up to 10 Ink/Toner Cartridges per month.  Customers receive $2 per cartridge (formerly $3 per cartridge), payable monthly in the form of an Ink Recycling Rewards Check that can be redeemed at any Staples Store.

### Office Depot

93.     As mentioned above, eBay accounts associated with CHANNON were used to sell over $1,600 worth of Office Depot Rewards Cards.  Office Depot found four accounts, including jrqqqq@gmail.com and smokedb@gmail.com, which have paid over $2,200 in Office Depot Rewards.  Office Depot identified those four accounts because all four were associated with the PayPal Debit Card registered to CHANNON ending in 4445.

94.     According to Office Depot, in or around April 2011, the smokedb@gmail.com account was scheduled to pay $485 in Rewards, but Office Depot was not able to identify any purchases made by this account which would justify the Reward.  This suggests that CHANNON may be using an additional scheme at Office Depot.

**TECHNICAL TERMS**

95.     Based on my training and experience, I use the following technical terms to

convey the following meanings:

a.      IP Address: The Internet Protocol address (or simply "IP address") is a

unique numeric address used by computers on the Internet. An IP address looks like a series of

four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every

computer attached to the Internet computer must be assigned an IP address so that Internet traffic

sent from and directed to that computer may be directed properly from its source to its

destination. Most Internet service providers control a range of IP addresses. Some computers

have static—that is, long-term—IP addresses, while other computers have dynamic—that is,

frequently changed—IP addresses.

b.      Internet: The Internet is a global network of computers and other

electronic devices that communicate with each other. Due to the structure of the Internet,

connections between devices on the Internet often cross state and international borders, even

when the devices communicating with each other are in the same state.

c.      Storage medium: A storage medium is any physical object upon which

computer data can be recorded. Examples include hard disks, floppy disks, flash memory, CD-

ROMs, and several other types of magnetic or optical media not listed here.

**COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS**

96.     As described above and in Attachment B, this application seeks permission to

search for records that might be found on the PREMISES, in whatever form they are found. One

form in which the records might be found is data stored on a computer's hard drive or other

storage media. Thus, the warrant applied for would authorize the seizure of electronic storage

30

media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

97.    *Probable cause.*  I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

      a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

      b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

      c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.

Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

        d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

        e.      Based on review of the evidence related to this investigation, I am aware that computer equipment was used to generate and store documents and records used in the above mentioned fraud schemes.

        98.    *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the PREMISES because:

        a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic

33

programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

    f.    When an individual uses a computer to commit fraud, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

    99.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires agents to seize physical storage media and later review the media consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

    a.    The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it

34

will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.      Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.      Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

100.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), when officers executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit officers either to seize or to image-copy storage media that reasonably appear to contain some or all of the evidence described in the warrant, and then later examine the seized storage media or image copies consistent with the warrant. The examination may require searching authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

101.    I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Michael Boady
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on June 27, 2011:

UNITED STATES MAGISTRATE JUDGE

38

**ATTACHMENT A**

The property to be searched is 7100 Gladden Avenue, NE, Albuquerque, NM 87110, further described as a single story red brick house with a pitched roof.  The residence is located on the Northeast corner of the street where Comanche Rd. and Gladden Avenue intersect.

**ATTACHMENT B**

1.      All records, in any form, relating to violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud) involving MATTHEW CHANNON and BRANDI LUCERO, including:

a.      Usernames, passwords, and other account information for email accounts, customer rewards accounts, accounts for online marketplaces such as eBay, online payment accounts such as PayPal, accounts for credit, debit, or gift cards, and online storage accounts;

b.      Records which are computer scripts or are related to the use of computer scripts;

c.      Records related to travel by either CHANNON or LUCERO;

d.      Bank records, checks, credit or debit card bills, account information, and other financial records; -

e.      Customer rewards cards or certificates from retailers such as Office Max, Staples, and Office Depot, and any prepaid debit or gift cards from such retailers;

f.      Lists of personal identification information including, name, address, telephone numbers, and email addresses which could be used to populate the subscriber fields for the MaxPerks accounts, Gmail accounts, Staples Rewards accounts, Office Depot Rewards accounts, or any similar retailer;

g.      Records relating to the provision of internet and phone service;

h.      Any documentation showing the shipping of items that could have been purchased at a retailer such as Office Depot, OfficeMax, and Staples.

i.      Records showing the technical or computer knowledge of CHANNON.

2.      Ink cartridges and unopened packages or boxes of consumer goods available for purchase at Office Max, Staples, or Office Depot.

3.      Any computers or electronic media that were or may have been used as a means to commit the offenses described on the warrant.

4.      For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.      evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the lack of such malicious software;

d.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

e.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

f.      evidence of the times the COMPUTER was used;

g.      passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

2

    h.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

    i.  contextual information necessary to understand the evidence described in this attachment.

  5.  Records and things evidencing the use of computers and/or the internet to commit fraud against OfficeMax, Staples, Office Depot, or any other similar retailer, including:

    a.  routers, modems, and network equipment used to connect computers to the Internet;

    b.  records of Internet Protocol addresses used;

    c.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

  As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

3

ADD A RECEIPT                                                                    close ✖

**Enter a receipt to receive credit for a purchase made in a store without your MaxPerks ID card.**

Credit for purchases made in a store will appear in your account on the "My Rewards" page within 2 - 3 business days.

* = Required Information

* Store #:
* Register #:
* Receipt #:
* Transaction Date :
  (mm/dd/yyyy)

**SUBMIT**

You may submit receipts for purchases occurring in the last 90 days only. Purchases older than 90 days are not valid for MaxPerks credit.



ORDER BY PHONE 1-877-OFFICEMAX

GOVERNMENT
EXHIBIT
3

BRANDI CHANNON'S
EXHIBIT

**14**

1:13-CR-966-JCH-KK   2255 MOTION



*Fraud Investigations Team*

| | |
|---|---|
| **Law Enforcement Officer:** | Gardner, Steve |
| **Law Enforcement Agency:** | OfficeMax |
| **Requested On:** | Mon, 11 Oct 2010 19:29:36 |
| **Evidence Gathered On:** | Tue, 12 Oct 2010 22:24:17 |
| **Timezone:** | GMT |
| **Case Info:** | Bargle |

| Registration Information | |
|---|---|
| User ID | convenientvideo |
| Full Name | MatthewJ Channon |
| Company Name | |
| Email Address | cvidu.s@gmail.com |
| Contact Info | MatthewJ Channon, 7100 Gladden Av NE, PMB 11, Albuquerque, NM, 87110, US, 408 598 1528 |
| Shipping Address | Matt Channon, 2025 Santa Rita Rd, Pleasanton, CA, 94566-4729, US, 505 710 8151 |
| Daytime Phone Number | 408 598 1528 |
| Evening Phone Number | |
| Date of Birth | Fri, 18 Mar 1977 |
| Registration Date | Sun, 24 Jan 2010 4:59:48 |
| Registration Country | United States |
| Registration IP | 208.252.168.35 |
| Status | CONFIRMED |
| First Active Suspension Date | |
| Closed/Deleted Date | |
| Personal ID | |
| Feedback Score | 20 |

This document is sent electronically and does not require any signature.

The information in this document has been gathered and communicated based on the request from the Law Enforcement Officer named above.

CONFIDENTIALITY NOTICE:
This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

Channo

**BRANDI CHANNON'S EXHIBIT**

**15**

1:13-CR-966-JCH-KK   2255 MOTION



*Fraud Investigations Team*

**Law Enforcement Officer:** Sipko, Charles
**Law Enforcement Agency:** Office Max
**Requested On:** Thu, 23 Sep 2010 18:11:28
**Evidence Gathered On:** Thu, 23 Sep 2010 23:18:27
**Timezone:** GMT
**Case Info:** Bargle

| Registration Information | |
|---|---|
| User ID | **convenientvideo** |
| Full Name | MatthewJ Channon |
| Company Name | |
| Email Address | cvidu.s@gmail.com |
| Contact Info | MatthewJ Channon, 7100 Gladden Av NE, PMB 11, Albuquerque, NM, 87110, US, 408 598 1528 |
| Shipping Address | Matt Channon, 2025 Santa Rita Rd, Pleasanton, CA, 94566-4729, US, 505 710 8151 |
| Daytime Phone Number | 408 598 1528 |
| Evening Phone Number | |
| Date of Birth | Fri, 18 Mar 1977 |
| Registration Date | Sun, 24 Jan 2010 4:59:48 |
| Registration Country | United States |
| Registration IP | 208.252.168.35 |
| Status | CONFIRMED |
| First Active Suspension Date | |
| Closed/Deleted Date | |
| Personal ID | |
| Feedback Score | 20 |

| User ID History | | | |
|---|---|---|---|
| User ID | Effective Date | End Date | IP Address |
| convenientvideo | 01/24/10 | <Present> | |

| Email Address History | | | |
|---|---|---|---|
| Email Address | Effective Date | End Date | IP Address |
| cvidu.s@gmail.com | 01/24/10 | <Present> | |

| Contact Info History | | | |
|---|---|---|---|
| Contact Info | Effective Date | End Date | IP Address |
| MatthewJ Channon, 7100 Gladden Av NE, PMB 11, Albuquerque, NM, 87110, US, 408 598 1528 | 01/24/10 | <Present> | |

| Password History | | | |
|---|---|---|---|
| Password | Effective Date | End Date | IP Address |
| Current Password | 01/24/10 | <Present> | |

BRANDI CHANNON'S EXHIBIT

**16**

1:13-CR-966-JCH-KK   2255 MOTION

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription    10/14/2010

         Steve Gardner (Gardner), Sr. Investigator for OfficeMax
Corporation ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓was telephonically contacted.  After being advised of the
identity of the interviewing agent and the nature of the interview,
Gardner provided the following information:

         Gardner advised that he was originally asked by OfficeMax
to look into a potential scam into the MaxPerk's Reward Program.
Gardner advised that the MaxPerk's Program gives a percentage back
of all purchases to the customer in the form of OfficeMax gift
cards.  In order to receive credit for a purchase, the customer can
either present their MaxPerk's card at the time of purchase or they
can go online and using their purchase receipt, enter it on the
MaxPerk's website.

         After logging in to the MaxPerk's site, in order to claim
credit for a purchase, the customer needs to provide three pieces
of information, which are found on the store receipt: Store Number,
Register Number, and Transaction Number.  Gardner advised that the
transaction number on the receipt is the only thing that changes
from one purchase to the next, and the number is incrementing by
one.

         Over the last year, an unknown individual (UNSUB) created
numerous MaxPerk's accounts using with different email addresses
that are slightly varied from the previous email address, usually
with a "." in a different place in the character string.  Gardner
advised that UNSUB discovered that using the information from a
legitimate OfficeMax receipt UNSUB would be able to determine what
the transaction numbers were for previous and future purchases.

         Gardner advised that based on the logs, it appears that
UNSUB has written a script which goes through every previous and
future transaction number incrementing one at a time, for each
store and claims those purchases were made on the account(s) setup
by UNSUB.

         To date, UNSUB has earned $171,000-$173,000 in MaxPerk's
rewards.  According to Gardner, approximately $36,000 - $37,000 of
the MaxPerk's rewards were already sent out to UNSUB and redeemed
at stores in Arizona, California, Colorado, and New Mexico.

| | | | |
|---|---|---|---|
| Investigation on | 10/14/2010 | at | Naperville, IL              (telephonically) |

File # 288A-AQ-63579                                    Date dictated  NA

by   SA Michael Boady:mb

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your ▓
it and its contents are not to be distributed outside your agency.

BRANDI CHANNON'S
EXHIBIT

**17**

1:13-CR-966-JCH-KK   2255 MOTION

FD-302a (Rev. 10-6-95)

288A-AQ-63579

Continuation of FD-302 of _____ Steve Gardner _____ , On 10/14/2010 , Page ___2___

    Gardner advised that New Mexico stores have taken the majority of the losses.  Gardner advised that OfficeMax closed most of the accounts that were setup by UNSUB and also blocked the remainder of the MaxPerk's rewards from being issued.

    Gardner advised that another way that UNSUB scammed OfficeMax stores is through their inkjet cartridge return credit. Gardner explained that each cartridge is worth $3 in OfficeMax credit.  Gardner believes that UNSUB has been purchasing empty cartridges online for approximately .50 cents and then returning them for $3 to OfficeMax.  Gardner advised that the only requirement for obtaining the credit is that a customer has to spend an equal amount of money in the store in order to obtain the $3 credit.

    Gardner advised that on 30-40 of the accounts controlled by UNSUB, a purchase was made using a Debit card.  OfficeMax determined that the debit card is owned by an individual named Matthew Channon (Channon), who resides in Albuquerque, NM.

    Gardner explained that Channon appears to be aware of the locations of the camera's in OfficeMax stores and so far, they have only one video from a Washington state store showing the individual making a purchase using one of the UNSUB accounts.  Gardner advised that one minute after a purchase was made by UNSUB, who is believed to be Channon, a female went to the same register and made a seperate purchase using the same MaxPerk's account.

    Gardner advised that UNSUB has used the OfficeMax shipping services on numerous occassions and when he is outside of New Mexico, he ships the items he purchases to an Albuquerque address, which has been connected to Channon.  Then, when he is in New Mexico and makes a purchase, he sends the items to other addresses throughout the country.

    Gardner advised that he believes UNSUB is selling items on Ebay, then going into the store to purchase them and ship them to his customers using the MaxPerk's Rewards.

    In addition to these types of purchases, UNSUB is purchasing Amex, Visa, and Southwest Airlines gift cards from OfficeMax using the MaxPerk's rewards.

    According to Gardner, Channon's Ebay accounts show that he has sold $112,000 worth of ink cartridges in 2010.  Gardner

**Channon 0024**

FD-302a (Rev. 10-6-95)

288A-AQ-63579

Continuation of FD-302 of _____Steve Gardner_____, On 10/14/2010 , Page ___3___

advised that UNSUB has purchased many cartridges from OfficeMax,
but not enough for the total of $112,000.  Gardner explained that
the debit card records show that Channon has made many purchases
with Staples and Office Depot as well, which lead him to believe
that he could be doing the same crimes against those stores as
well.

**Channon 0025**

# INVESTIGATIVE NOTES
## PRIVILEGED INFORMATION SUBJECT TO ATTORNEY-CLIENT PRIVILEGE

### Steven Gardner (Manager – Investigations and ORC)

Subject: Telephone Interview Recap Of Matt Channon
Date Conducted: 6/8/2011                                      Page 1 of 1

On 6/8/2011 I performed a telephone interview of Matt Channon who resides at 7100 Gladden Avenue NE, Albuquerque, NM. Channon was contacted via his telephone at the above residence (505-888-6288). Chuck Sipko (Manager of Field Investigations & ORC) was a witness and located in the conference room of the OfficeMax Corporate Offices (2W890) at 263 Shuman Blvd, Naperville, IL. The interview began at about 11:30 am on 6/8/2011 and concluded at 12:00pm.

Channon had been linked to two frauds against OfficeMax. The 1st was a scheme detected in September of 2010 where someone had created a computer script that opened 4,251 MaxPerks accounts and then credited them with purchases via on-line adjustments. The fraud created $179,373 in MaxPerks rewards, the majority of which would have paid out at the end of September 2010. The scheme had already netted $46,244 in rewards to be issued. OfficeMax was able to void $11,888 in rewards for an actual loss of $34,356 in spent rewards. Some of the reward cards were directly linked to Channon by use of his debit card in the same transaction as the reward cards.

The 2nd scheme involved the creation of about 123 MaxPerks accounts under fictitious names and addresses by Channon which he used to recycle empty ink cartridges and perform on-line adjustments against. Many of these transactions were captured on video. This fraud began in 2009 and continued through the date of the interview.

Channon's name and address was validated at the beginning of the interview. I explained to Channon who I was and what I do and the reason for the call. Channon was asked how many MaxPerks accounts he had opened and was currently using and stated he had about 100 accounts that he recycled ink on and purchased Blackhawk credit cards with the rewards. Channon said he had been out of work for awhile and needed money so he thought up the idea of recycling empty ink cartridges that he purchased on eBay as well as from other sources. When questioned about performing on-line adjustments of purchases he did not make, to these accounts, Channon admitted to it agreeing that he would watch the transaction after one he completed and memorize the amount and later key it into the MaxPerks on-line receipt adjustment system. Channon felt he was only responsible for a few thousand dollars in fraud via the MaxPerks ink recycle that involved the 123 accounts. When I told Channon it was closer to $40,000 Channon did not disagree but wanted to see the proof. I told Channon I would be willing to send him a summary by account of what he received in reward dollars.

When Channon was questioned about the 1st scheme involving on-line fraud he denied doing it stating that he had purchased the MaxPerks accounts from someone on eBay. Channon said the person who sold him the accounts had the email address of teechur12345678@gmail.com. I asked Channon for the person's eBay id but Channon could not locate it. Channon said he made the purchases of MaxPerks accounts in the summer of 2010. I told Channon that I not did not believe him, but if someone supplied him with the accounts and he did not create them himself he needed to provide me with that information. Our information showed that Channon was in possession of the accounts as early as June of 2010. Channon said he would look to see if he could find the information on the person that provided him with the accounts.

Channon asked if there was anything he could do to re-pay the monies, commenting that he had $10,000 in the bank and would be willing to pay the rest over time. I told Channon that the total amount would probably be closer $80,000 but I would get him a total. Channon asked for some documentation to support the number. I told Channon that I would provide him with the on-line fraud amount and detail as well as for the accounts he was currently using. Channon agreed to look over the documents and then discuss the option of re-payment. I told Channon I could not make the decision to let him pay it back but I would review it with my supervisor. I then reminded Channon that I needed to know who was responsible for creating the 4,251 accounts, if not him, so that we could contact them. Channon stated again it was not him, but agreed to look for his contact. Channon gave me the email address of 'hydrazok@gmail.com' as where to send the documentation of the accounts. I then validated that was also the email registered to his eBay account.

I called Channon back at about 2:00pm and spoke with him until about 2:04pm. I told Channon that we would be sending him an "Agreement to Repay" as well as, account documentation via email. Channon said great and the he would be looking for it. We agreed to talk again on 6/9/2011.

**BRANDI CHANNON'S EXHIBIT**

**18**

1:13-CR-966-JCH-KK   2255 MOTION

Jason McDevitt - Cross by Mr. Robbenhaar

Page 622

1    enforcement requests that we sent to.

2    Q.    Do you remember any other names that you

3    responded to?

4    A.    No.

5    Q.    No?

6    A.    Not without looking at the documents.

7    Q.    Okay.

8              MR. ROBBENHAAR:  May I approach the

9    witness, Your Honor?

10             THE COURT:  You may.

11   BY MR. ROBBENHAAR:

12   Q.    Mr. McDevitt, would you look at that, please?

13             And without commenting on the results at

14   this point, tell me when you're satisfied with that

15   document.

16   A.    Certainly.

17   Q.    Is that a document that was produced through

18   your office to the government in this case?

19   A.    It appears so, yes.

20   Q.    And the individual listed as law enforcement

21   officer, what's his name?

22   A.    Charles Sipko.

23   Q.    Okay.  And is he a law enforcement officer?

24   A.    The law enforcement agency was OfficeMax.

25             MS. VIERBUCHEN:  Your Honor, can I

PAUL BACA, OFFICIAL COURT REPORTER

BRANDI CHANNON'S
EXHIBIT

19

1:13-CR-966-JCH-KK  2255 MOTION

1   Q.     And what do you do at the FBI?

2   A.     I work on a cyber crime squad investigating

3   computer crimes.

4   Q.     Are you the case agent on this matter?

5   A.     Yes.

6   Q.     Have you always been the case agent on this

7   matter?

8   A.     No.

9   Q.     Approximately when did you start your

10  involvement in this case?

11  A.     Roughly mid 2013.

12  Q.     Are you familiar with the spreadsheet data in

13  the case?

14  A.     Yes, I am.

15  Q.     And as part of the preparation of this case,

16  have you reviewed numerous spreadsheets provided by

17  OfficeMax?

18  A.     I have.

19  Q.     Was the meaning of the data contained in those

20  spreadsheets immediately apparent to you?

21  A.     No, it was not.

22  Q.     What helped, if anything, to shed light on that

23  meaning?

24  A.     Working directly with OfficeMax

25  representatives, who explained in detail what the

BRANDI CHANNON'S
EXHIBIT

20

1:13-CR-966-JCH-KK   2255 MOTION

1    data represented.

2    Q.    Can you estimate how much time you've spent

3    with OfficeMax personnel on the intricacies of the

4    spreadsheet data?

5    A.    I couldn't give an exact number, but I would

6    estimate over 100 hours.

7    Q.    Was that time and access to OfficeMax staff

8    critical in acquiring your understanding of the data?

9    A.    Yes, it was.

10   Q.    Now over the course of the investigation, were

11   multiple spreadsheets created to display and analyze

12   the transactions that are alleged to be associated

13   with the scheme?

14   A.    Yes, over the length of the whole

15   investigation.

16   Q.    Do all of them try to show the same selection

17   of data?

18   A.    No.   Multiple spreadsheets represent different

19   datasets, and each of those spreadsheets may have a

20   different search criteria data that was put into

21   them, so they don't represent the same thing.

22   Q.    In preparing for the trial in this case, have

23   you ended up primarily relying on a particular set of

24   data?

25   A.    Yes, one primary spreadsheet.

Steve Gardner - Cross by Mr. Robbenhaar

Page 230

1   accounts have done, right?

2          And now March rolls around.  If I need more

3   online adjustment information or I need to make sure

4   I didn't miss something, you know, from trying to

5   track them through another POS software, mostly

6   online adjustment stuff, I would have to ask SHC to

7   give me an undated run so I could add that in.

8          But if it is something that I'm just

9   tracking on my own, I wouldn't have to go to them.

10  Q.    Right.  But when you did need that extra

11  information that you didn't have access to,

12  obviously, it was in the hands of SHC?

13  A.    Correct.

14  Q.    All right.  Now when you were first contacted,

15  or you -- I'm sorry.  Let me rephrase that.

16         When you reached out and contacted law

17  enforcement, and I think it was October of 2011, I

18  think you stated?

19  A.    No, 2010.

20  Q.    2010?

21  A.    It was shortly after we identified the scheme

22  and kind of figured out what we thought had happened.

23  Q.    So for the last five years --

24  A.    Uh-huh.

25  Q.    -- four years, at least, you've been working

PAUL BACA, OFFICIAL COURT REPORTER

BRANDI CHANNON'S
EXHIBIT

21

1:13-CR-966-JCH-KK   2255 MOTION

Steve Gardner - Cross by Mr. Robbenhaar

Page 231

1    with law enforcement on this case.

2              Is that right?

3    A.    On and off.

4    Q.    Correct.  Of course.

5              But the spreadsheets that were produced by

6    your office to law enforcement were produced in

7    anticipation of this case, wouldn't you say?

8    A.    Correct.

9    Q.    All right.  And you worked closely with Agent

10   Boady, and then perhaps more recently Agent Moon.

11             Is that right?

12   A.    Yeah.  I wouldn't know if I'd call it closely,

13   but I worked with them.

14   Q.    You would have, at least, e-mail

15   communications.  If more information was requested of

16   you, you would be responsive to their requests?

17   A.    Uh-huh.  Correct.

18   Q.    All right.  There's an exhibit in this case,

19   Daubert Exhibit 1, which basically is the spreadsheet

20   entitled -- dated December 22 of 2014 --

21   A.    Okay.

22   Q.    -- enhanced.

23             Now there was a discussion earlier about

24   original versus enhanced, and I believe you indicated

25   that there was some information that had been moved

Steve Gardner - Cross by Mr. Hotchkiss

1   A.    Probably.

2   Q.    Hundreds?

3   A.    I don't know if it was hundreds.  But...

4   Q.    A hundred?

5   A.    Maybe.  I don't know.

6   Q.    And then at some point in time you had contact

7   with Agent Moon, because he took over for

8   Agent Boady, correct?

9   A.    Correct.

10   Q.    When did you start having contacts with

11   Agent Moon?

12   A.    I believe I started having contact with

13   Agent Moon in 2014, maybe, or 2015, in that area.

14           And it was -- I think it was somewhere in

15   that area, 2014, '13, in that area.

16   Q.    And about how many contacts did you have with

17   Agent Moon?

18   A.    A lot.  Probably as many as I had, you know, or

19   almost as many I had with Mike Boady.

20   Q.    As a matter of fact, you -- at a certain point

21   in time you were having daily telephone conversations

22   with Agent Moon and the former Assistant US Attorney

23   in this case, correct?

24   A.    Yes.

25   Q.    How long did those daily telephone

BRANDI CHANNON'S
EXHIBIT

22

1:13-CR-966-JCH-KK   2255 MOTION

Steve Gardner - Cross by Mr. Hotchkiss

Page 244

1    conversations go on?

2    A.    Those -- they were usually done during the

3    week.  They were, like, a two-hour call.  We would

4    try to schedule them for almost every day.

5            But as things come up it doesn't always

6    happen every day.

7    Q.    Sure.

8    A.    I've got other business to run.  But they went

9    on for quite a few months, in preparation.  I think

10   it was a couple -- no, maybe two, three months.  I

11   don't know, a month.

12   Q.    Two or three months of two-hour phone calls per

13   working day?

14   A.    Probably two months.

15   Q.    Two months?

16   A.    Two months, yeah.  Because what I'm trying to

17   remember here is part of what caused these things to

18   happen is, the postponement of the -- the trial kept

19   getting postponed.  So what would happen is as we got

20   close to a date, you know, like four weeks out I

21   would have conversations.

22           And then something would happen to postpone

23   it.  So it's like, well, we've got to -- why don't we

24   put it on hold and we'll get a new date.

25           And then as you get closer to that new date

| | |
|---|---|
| **From:** | Steven Gardner |
| **To:** | Messec, Paige (USANM) |
| **Cc:** | Moon Jr. Jeffrey P. (AO) (FBI) |
| **Subject:** | Re: question from Aspect spreadsheet |
| **Date:** | Tuesday, March 31, 2015 7:48:57 AM |
| **Attachments:** | Brandi MC.zip |

Paige,

I was able to determine the Merchandise Credit was attached to Brandi because on 2/9/11 she did a no receipt refund at store 1156.  That Merchandise Credit was then used to make purchases on 3 subsequent occasions.  I attached an ejournal of the refund and the 3 transactions.  When you look at the refund you will see Brandi's name in the audit trail.  The audit trail does not include her address but I am guessing I must have pulled that from another system.  Hope that helps and we can discuss today.

thanks,

**Steven Gardner, CFE**

Manager - Corporate Investigations | Office Depot, Inc.
6600 N Military Tr, C415S | Boca Raton, FL 33496-2434



CONFIDENTIALITY NOTICE: The information contained in this email and attached document(s) may contain confidential information that is intended only for the addressee(s). If you are not the intended recipient, you are hereby advised that any disclosure, copying, distribution or the taking of any action in reliance upon the information is prohibited. If you have received this email in error, please immediately notify the sender and delete it from your system.

Channo

**BRANDI CHANNON'S EXHIBIT**

**23**

1:13-CR-966-JCH-KK   2255 MOTION

**From:** Steven Gardner
**To:** Messer, Paige (USANM); Moon Jr, Jeffrey P. (AO) (FBI)
**Subject:** Fwd: OrderMax Information to pull (Bargle)
**Date:** Tuesday, May 12, 2015 3:11:43 PM
**Attachments:** Steve Gardner .jsx

Paige and Jeff,

Attached is the raw report that Jim was able to pull for us.  When you open it you will see there are actually about 117 lines of orders.  That is because each line corresponds to a payment (credit card or gift card #).  Therefore some of the order #'s will be duplicated.  Hope this information helps and let me know if you would like to discuss it prior to Friday.

Sincerely,

**Steven Gardner, CFE**
Manager - Corporate Investigations | Office Depot, Inc.



CONFIDENTIALITY NOTICE: The information contained in this email and attached document(s) may contain confidential information that is intended only for the addressee(s). If you are not the intended recipient, you are hereby advised that any disclosure, copying, distribution or the taking of any action in reliance upon the information is prohibited. If you have received this email in error, please immediately notify the sender and delete it from your system

---------- Forwarded message ----------
**From: James La-Fontaine**
Date: Tue, May 12, 2015 at 3:41 PM
Subject: Re: OrderMax Information to pull (Bargle)
To: Steven Gardner

Steve,
   Here you go...there are a couple duplicate order numbers in the file so they will be in my results twice.   Call me when you receive this and I will walk you through why there are more lines that order numbers provided.

**Jim LaFontaine**
Principal Engineer | Office Depot, Inc

Channo

**BRANDI CHANNON'S EXHIBIT**

**24**

1:13-CR-966-JCH-KK   2255 MOTION

Page 117

1          So part of my attempt to understand all of

2    this is an attempt to try to understand what

3    originals really are.

4          And you're telling me today -- the

5    government is telling me today that the Daubert

6    Exhibit Number 1 is an original because it contains

7    business records.  Daubert Exhibit 1 and Daubert

8    Exhibit 2 basically are comprised of information that

9    comes from business records, but because of the

10   computer age, that's the original.

11          So I'm struggling with that because, to my

12   way of thinking, an original is like these cash

13   register receipts.  And so that starts a transaction,

14   or signing up for rewards and entering whatever the

15   information is that's requested starts that ball

16   rolling.

17          And the way I understand it, Exhibit 1, as

18   well as Exhibit 2, both from the Daubert hearing,

19   were created by calling up, so to speak -- and

20   forgive my terminology, because I'm not a computer

21   person -- but by calling up certain other

22   information.

23          So the government calls Daubert Exhibit

24   Number 1 original.  And I guess Daubert Exhibit

25   Number 2 is a -- is also an original, or is it a

BRANDI CHANNON'S
EXHIBIT

25

1:13-CR-966-JCH-KK   2255 MOTION

1    summary?

2              MS. VIERBUCHEN:  No, it's -- it's an

3    original.  But it's enhanced only because we added

4    those features to make it easier to search.

5              THE COURT:  Right.  Okay.  So --

6              MS. VIERBUCHEN:  The original is simply

7    what they -- what was provided by -- from SHC to

8    Steve Gardner and then provided to us.

9              THE COURT:  Which raises other questions in

10   my mind as to how those were kept in the ordinary

11   course, or whether they were somehow put together for

12   purposes -- Mr. Robert called it for litigation

13   purposes, and so I will use that term, I guess, as

14   well.

15             So you know, I'm not saying that -- well,

16   let me just finish my thought, to say that where --

17   where you're calling an exhibit an original, to my

18   61-year-old brain, I'm thinking of it as a document

19   that was created using other pieces of information

20   that already exists.

21             And so I'm having a hard time understanding

22   why Daubert Exhibit 1 or Daubert Exhibit 2 are

23   original business records.  It might be the original

24   version that was put together from all of this.

25             But to my way of thinking, whatever

Steven Gardner
**Manager Investigations & ORC, Loss Prevention**


**WORK WITH US®**

CONFIDENTIALITY NOTICE: The information contained in this e-mail and attached document(s) may contain confidential information that is intended only for the addressee(s). If you are not the intended recipient, you are hereby advised that any disclosure, copying, distribution or the taking of any action in reliance upon the information is prohibited. If you have received this e-mail in error, please immediately notify the sender and delete it from your system.

**From:** Boady, Michael
**Sent:** Friday, January 25, 2013 11:27 AM
**To:** Gardner, Steven
**Subject:** Hi

Steve,
I am sure you are starting to wish I would leave you alone by now, but we are getting very close to finished. Do you know how many online adjustments (and for how much money) were done under the Garble account? This spreadsheet doesn't include Garble. I realize the Garble12345678@gmail was only opened about a month before Channon was shut down, so I assume it is not a huge number, but if that data is readily available, I would like to have it.
Thanks,
Mike


FBI ALBUQUERQUE
Special Agent Michael Boady

Channon

**BRANDI CHANNON'S EXHIBIT**

**26**

1:13-CR-966-JCH-KK   2255 MOTION

| | |
|---|---|
| **From:** | Boady, Michael (FBI) |
| **To:** | Messer, Paige (USANM) |
| **Cc:** | Forensic, Susan (FBI); Murray, Richard J. (FBI) |
| **Subject:** | FW: Channon is Back at OfficeMax |
| **Date:** | Thursday, June 16, 2011 1:00:21 PM |
| **Attachments:** | INVESTIGATIVE NOTES Channon Interview 06082011.docx |

Paige,

I was planning on writing up the search warrant for the OfficeMax subject this week and hoping to execute it next week. Then I got this email from OfficeMax. Not sure if this changes anything, but I thought I would pass it on to you. I can't believe they did this without informing me of it in advance....see below.

**From:** Gardner, Steven <span style="background:black">████</span>
**Sent:** Thursday, June 16, 2011 12:46 PM
**To:** Boady, Michael
**Subject:** RE: Channon is Back at OfficeMax

Special Agent Boady,

Sorry that it has taken so long to get back with you. I have been working on the case and recently spoke with Channon regarding the frauds. On 6/8/2010 I contacted Channon via telephone and discussed the 2 fraud schemes. I will attach my notes of the interview so you can review the detail. Initially he seemed like he was going to work with us on the frauds but has now obtained a lawyer and is denying everything. I can provide you with the lawyers information, if you would like it. We also closed all open accounts (123) and they totaled about $58,000 bringing the combined loss to $92,000.

Please call me at your earliest convenience and I can update you on the rest of the matter.

Lastly, I embedded my responses to your questions into the body of your email.

Sincerely,

Steven Gardner
Manager Investigations & ORC, Loss Prevention

<span style="background:black">████████████████</span>



CONFIDENTIALITY NOTICE: The information contained in this e-mail and attached document(s) may contain confidential information that is intended only for the addressee(s). If you are not the intended recipient, you are hereby advised that any disclosure, copying, distribution or the taking of any action in reliance upon the information is prohibited. If you have received this e-mail in error, please immediately notify the sender and delete it from your system.

Channo

**BRANDI CHANNON'S EXHIBIT**

**27**

1:13-CR-966-JCH-KK   2255 MOTION

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription    09/16/2011

On 7/12/2011, the writer and Office Max Investigator Steven Gardner reviewed the evidence obtained from a search warrant at the residence of Matthew and Brandi Channon, which was executed on June 28, 2011.  The review of the collected evidence included, but is not limited to the following:

There appears to be an LLC created in the name of Roberta Duran-Gonzales, called Office Supplies to You, LLC, SCC#4457388, which was established on June 21, 2011, and associated with the address PO Box 1984, Taos, NM 87571.

There was a flight reservation made with Southwest Airlines, confirmation number W)JB6K, for Roberta Duran Gonzales and Jason Moran to fly June 28, 2011 on Flight 901 from ABQ to California.

There was a hotel reservation for the San Jose Airport Garden Hotel in the name of Jason Moran, 1105 Luz Del Sol, Taos, NM 87571, which was paid for with a Visa card ending in 6699.  The confirmation number for the reservation was 136377603.

There was over 110 Staples Rewards Cards and approximately 50 Office Max Rewards cards which were in the baggage of Jason Moran and Roberta Duran-Gonzales.

There was proof of a purchase of 500 PC Canon Cartridges in Roberta Gonzales' name.

The appears to be a Wells Fargo Bank account for Sil chem, a company which Matthew Channon established, which ends in ▇3218.

There was a CSOL Corp account with Sandia Laboratory Federal Credit Union, account number ▇90-21▇▇ in the name of Matthew J. Channon.  Additionally, Channon had a loan associated with account number ▇90-21▇, which appears to be for a Mozda RX-8.

There also appears to be a Citi Mortgage Account number ▇▇▇▇045-4.

| | | |
|---|---|---|
| Investigation on | 7/12/2011 | at  Albuquerque, NM |

File # 288A-AQ-63579

Date dictated    NA

by    SA Michael Boady

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your ▇ it and its contents are not to be distributed outside your agency.

Channo▇

**BRANDI CHANNON'S EXHIBIT**

**28**

1:13-CR-966-JCH-KK    2255 MOTION

FD-302a (Rev. 10-6-95)

288A-AQ-63579

Continuation of FD-302 of _____Investigation Conducted_____ , On _7/12/2011_ , Page _2_

     In June 2011, the law firm Moore, Berkson & Ganderilla, was in some sort of Chapter 7 bankruptcy proceedings, associated with Case #09-12552-j7, in reference to an apparent $13,018.62 which Channon owed.  The US District Court of NM case number is 09-12552 related to the Chapter 7 bankruptcy.  The court case appeared to be David Forlano and Debra Mansini vs. Matthew Channon.

     Receipts showed that Channon had an account with CU Anytime, which ended with 5364.

     There appears to be an AT&T account for phone number 505-307-2540 and 505-710-8151, which were around August 27, 2009.

     It appears that Channon has a Bank of America ███████████ 4098 (checking) and ███████████4139 (IRA).

     There was documentation showing that Matthew Channon was associated with 2311 N. Grand Avenue, Apartment B, Roswell, NM.

     There was an letter in Channon's possession from Office Max dated June 9, 2011, in which he was informed of allegations of fraud.

     On or about May 22-25, 2011, Matthew Channon made a reservation with Advantage Rent-A-Car, reservation number F11132478CO, using email address jrqqqq@gmail.com, which was supposed to be picked up and returned to San Jose Airport.

     There was a Delta Airline reservation, confirmation number GOQPBB, for flights that took place on June 1, 2011 through June 3, 2011.

     There was a printout of an email from Office Max to Hydrazoik@gmail.com.

     There was a Comcast bill for account number 8497-95-005-1937786, which was due on 6/11/2011.

     There appears to be an account with New Mexico Educator's Federal Credit Union, member number ████9030CH.  On 6/13/2011, Channon apparently spent $2,500 on an attorney.

     There appears to have been an bill from Qwest Communications Account #505-888-6288 579R, dated 5/16/2011.

**Channon 0020**

FD-302a (Rev. 10-6-95)

288A-AQ-63579

Continuation of FD-302 of _____Investigation Conducted_____ , On 7/12/2011____ , Page ___3___

      On May 22, 2011 thru May 25, 2011, Matthew Channon had a
flight reservation with Southwest Airlines, confirmation code
W5KF8Y.  During that same period, Channon booked a car reservation
with CarRentals.com using the name M Channon, 505-344-4322,
jrqqqq@gmail.com, fax confirmation number LFX0079a83.

      There was a receipt showing a purchase made at Wal-Mart
in Matthew Channon's name with debit card ending in 4445,
expiration 03/13.

      There were several Gift cards, credit cards, etc that
were seized during the search warrant including the following:



AMEX: ███xx-xxxx-0090, ███xx-xxxx-3276, ███xx-xxxx-
2443, ███xx-xxxx-3991, ███xx-xxxx-8569, ███xx-xxxx-
8256.
  sa Gift Cards: ███X-XXXX-8876, ███-XXXX-8934, ███
███XX-XXXX-2801, ███XXXX-1925
Paypal Debit Ca ██████XX-XXXX-3107 ███ame Brandi Lucero
    Max GC: ███-XXXXXXX-4459, ███XXXXXXX-9745,
███-XXXXXXX-8741

      There was also a NM Educators Federal Credit Union
███ng account in the name of Brandi Lucero, Checking Account
███0316; Routing 307083665.

**Channon 0021**

| | |
|---|---|
| **From:** | Gardner, Steven |
| **Sent:** | Thursday, July 21, 2011 12:43 PM |
| **To:** | Boady, Michael |
| **Subject:** | Person claiming to own MaxPerks account number 815424964. |

Special Agent Boady,

A person with the phone # 978-912-2964 and email of jimmoran3@msn.com claims to own MP #815424964.  I have not called him but from my research the email and phone # do not match the MaxPerks account.  We got the account from the your evidence room in the Index Card Box marked "June OfficeMax" , it was a small key chain card so someone else will have the full size card.  Also there are no transactions associated with it on  the east coast.  I was not sure if you wanted me to call the person back or you would like to handle?  Below is the information

Here is what the phone # comes back to on FastData.

cid:image002.png@01CC4793.5ECBF050

Here is the what we show for MaxPerks Information.

cid:image003.png@01CC4794.D7EAC140

Steven Gardner
Manager Investigations & ORC, Loss Prevention

BRANDI CHANNON'S
EXHIBIT

**29**

1:13-CR-966-JCH-KK   2255 MOTION

From: Gardner, Steven █████████████████
Sent: Thursday, July 14, 2011 6:29 AM
To: Plante, Kevin
Cc: Boady, Michael
Subject:     Possible Staples Item in New Mexico
Attachments:   IMG00281.jpg; Staples Cards.xlsx

Kevin,

I meet with  Special Agent Mike Boady of the FBI yesterday on the Channon case.  As I told you they searched his house and seized merchandise as well as loyalty program information from both Staple and OfficeMax.  They have 3 more suspects (Channon's wife who confessed, a friend of hers and her friend's boyfriend).   They seized maps, that contained addresses of OfficeMax's and Staples in CA along with an itinerary of where they were going.  It looks like they were going to be flying out that night.  They also frequent Colorado and of course New Mexico, where they live.  I included addresses for two of the suspects and Channons wife's name is Brandi.  I have video of what looks like of 4 people but not sure yet if they are the suspects listed above, we think 3 of they are I will forward pictures them when I get confirmation from the FBI.

I listed out all the Staples Reward information they had and put it on a spreadsheet.  Some of the information was from reward coupons and some was actual member cards.  The information is attached and lists 120 accounts.  Can you pull the customer information on them, purchase detail, and  any video associated with the transactions?  Special Agent Boady would like whatever you can put together.  I copied him on this email.

As for merchandise, they had a lot of empty ink, new OEM ink, computers and laptops.  Only some of the stuff had labels on it and only one was possibly yours.  I attached a picture of it.  It is an HP920 Fax machine with a label date of 11/14/2010. Let me know if it is yours.

Call me when you get a chance

Name and address of two other suspects

Roberta Duran Gonzales
PO Box 1684
Taos, NM
This address  is also for a business she just opened called "Office Supplies To You llc"

Jason Moran
1105 Luce Del Sol
Taos, NM 87571

Steven Gardner
Manager Investigations & ORC, Loss Prevention

████████████████████████████████████████████████

CONFIDENTIALITY NOTICE: The information contained in this e-mail and attached document(s)

Channo█

**BRANDI CHANNON'S EXHIBIT**

**30**

1:13-CR-966-JCH-KK   2255 MOTION

Affidavit of Matthew J. Channon

On June 8, 2011, I received a telephone call from Steven Gardner, an employee of Officemax. Mr. Gardner alleged a number of accusations about ink recycling and multiple accounts, which I admitted. At the end of the phone call, Mr. Gardner started to sound frustrated, then his tone of voice changed and became belligerent, stating that the call had been recorded and he had a witness to the call.

In November 2014, when Mr. Robert withdrew our Motion to Compel, I confronted him about it, because I didn't see any reason for him to have done it. He said, "We weren't going to get it", and "we need to move on to a different issue."

During my trial in January 2016, I noticed many of the jurors closing their eyes and nodding off. I told Mr. Robert this was happening, and he told me to take notes of it, and let him know about it at the end of trial, so I took notes.

Brandi and Ms. Porter, seated on either side of me, also said they noticed the sleeping jurors.

After the prosecution rested, I came up to Mr. Robert and asked him if he was going to tell the judge about the sleeping jurors. He told me, "No. A sleeping juror is a friendly juror."

During the trial, my wife Brandi and I were told by courtroom staff we weren't allowed to have our cellphones in the courtroom, even though we had an infant. Juror Brunner checked his smartphone in the courtroom during voir dire, and Ju     Browne left her phone off silent for a call during trial. I saw Mr. Robbenhaar playing Words with Friends on his phone on the sixth day of trial. On the second and third days of trial, Brandi and I overheard Mr. Gardner having to coordinate with the Government to let him bring his laptop past security, which had delayed his appearance and they successfully intervened with the security personnel to allow.

FURTHER THE AFFIANT SAYETH NAUGHT.

Matthew J. Channon

Official Seal
PRISCILLA VEGA
Notary Public
State of New Mexico
My Comm. Expires 2/14/22

State of New Mexico
County of Bernalillo
This instrument was signed or acknowledged before
me on 3-4-19 by Matthew J. Channon
(Name of signer)
_____ (Notary Signature)
[Affix seal/stamp to the left or below]

BRANDI CHANNON'S
EXHIBIT

**31**

1:13-CR-966-JCH-KK    2255 MOTION

**A.  *Bruton***

Defendants each made a statement to investigators.  They assert that introduction of these statements at a joint trial would violate *Bruton v. United States*, 391 U.S. 123 (1968).  [Doc. 55, pp. 4-5]

The Government's redacted version of Brandi's statement omits any references to Matthew and uses the singular pronouns "she" and "her" in place of "they" and "them."  [Doc. 126-1]  The Government advises that Brandi's statement would be introduced at trial through testimony by Special Agent Boady, in accordance with this redacted version.  [Doc. 126, p. 1] So presented, the testimony would not show that Matthew, or any other person, was even involved—except for the references to Moran and Gonzales.  [Doc. 74, p. 5; Doc. 126-1]

The right of confrontation guarantees the right of a defendant to cross-examine witnesses against him.  *Richardson*, 481 U.S. at 206.  *Bruton* held that when two defendants are tried jointly, the pretrial statement of one defendant cannot be admitted against the other unless the confessing defendant takes the stand.  *Bruton*, 391 U.S. at 135-36.  The Supreme Court later distinguished *Bruton* as a case in which the statement was "facially incriminating," and "'expressly implicat[ed]' the defendant as his accomplice."  *Richardson*, 481 U.S. at 207-08 (quoting *Bruton*, 391 U.S. at 124 n.1).  *Bruton* prohibits use of a codefendant's statement when "there was not the slightest doubt that it would prove 'powerfully incriminating'"; in contrast, *Richardson* allowed a confession that "was not incriminating on its face, and became so only when linked with evidence introduced later at trial."  *Richardson*, 481 U.S. at 208 (quoting *Bruton*, 391 U.S. at 135).  *Richardson* held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to

53

**BRANDI CHANNON'S EXHIBIT**

**32**

1:13-CR-966-JCH-KK   2255 MOTION

mattchannonconsulting@gmail.com copy — On My Mac (792 messages, 783 unread)

Get Mail   New Message   Archive   Delete   Junk   Reply   Reply All   Forward   Flag   Move to...   Move   Search   Search

Mailboxes   Inbox   Sent

Sort by Date ⌄

**MaxPerks**                                3/29/11
Online Exclusive Paper Deal + Save Big on New Tec...
Trouble viewing this email? View in Web Browser |
View on Mobile Device To ensure delivery to your inb...

**MaxPerks**                                3/23/11
Last Chance – Get 20% Back in Bonus Rewards
Trouble viewing this email? View in Web Browser |
View on Mobile Device To ensure delivery to your inb...

**MaxPerks**                                3/21/11
Appreciation Event Starts Today – Get 20% Back in...
Trouble viewing this email? View in Web Browser |
View on Mobile Device To ensure delivery to your inb...

**MaxPerks**                                3/17/11
It's Madness! Only 3 Days Left to Save + In-Store H...
Trouble viewing this email? View in Web Browser |
View on Mobile Device To ensure delivery to your inb...

**MaxPerks**                                3/16/11
Your Reward is Now Available
Trouble viewing this email? View in Web Browser |
View on Mobile Device Please add officemax@mailbo...

**MaxPerks**                                3/13/11
It's Madness! Save up to 70% Online
Trouble viewing this email? View in Web Browser |
View on Mobile Device To ensure delivery to your inb...

**MaxPerks**                                3/6/11
Don't Miss Our 2-Day Deals
Trouble viewing this email? View in Web Browser |
View on Mobile Device To ensure delivery to your inb...

**MaxPerks**                                3/4/11
Hurry In – 2 Days Left to Save 15%
Trouble viewing this email? View in Web Browser |
View on Mobile Device To ensure delivery to your inb...

**MaxPerks**                                2/25/11
In-Store Bag Event - Starts Sunday
Trouble viewing this email? View in Web Browser |
View on Mobile Device To ensure delivery to your inb...

● **MaxPerks**                              2/24/11

---

**MaxPerks**                           mattch...s.com copy   March 16, 2011 at 3:21 PM

Your Reward is Now Available

To:  mattchannonconsulting@gmail.com,

Reply-To:  MaxPerks

Trouble viewing this email? View in Web Browser | View on Mobile Device
Please add officemax@mailbox.officemax.com to your address book to ensure future notification of savings! Learn How.

OfficeMax                      Weekly Ad Store Locator      MaxPerks ID: 649730326
                                                            Name: M C Consulting

# $60.00 REWARD

Redeem your February 2011 reward. Click Here

**LOG IN**
Enter your MaxPerks ID# 649730326 at officemax.com/maxperks.
Then enter your password and click the "SIGN IN" button.

**BRANDI CHANNON'S
EXHIBIT**

**33**

1:13-CR-966-JCH-KK   2255 MOTION

# Office DEPOT. OfficeMax

Visit the store nearest you

## Shop the way you want



**Click & chat**
officedepot.com

**Call or text 24/7**
(800-463-3768)
800-GO-DEPOT

**Visit us in store**

**Buy online.
Pick up in 1 hour.**

**Delivery is on us.
Fast & FREE!**



OFFICE DEPOT
ALBUQUERQUE
5001 CUTLER NE
(505) 881-3145

OFFICE DEPOT
ALBUQUERQUE
1409 RENAISSANCE BLVD NE
(505) 342-2962

******AUTO**SCH 5-DIGIT 87110

VALUED CUSTOMER
OR CURRENT OCCUPANT
LOTERY LLC
7100 GLADDEN AVE NE
ALBUQUERQUE, NM 87110-1464

Postmaster please deliver
between 1/2/18 - 1/4/18

Source Code          Customer#

33326                1425

06-A-2229-0551-070733

K0812058729

PRSRT STD
U.S. POSTAGE
PAID
CAROL STREAM IL
PERMIT NO. 7078

BRANDI CHANNON'S
EXHIBIT
34
1:13-CR-964-JCH-KK   2255 MOTION

FD-302 (Rev. 10-6-95)

- 1 -

**FEDERAL BUREAU OF INVESTIGATION**

Date of transcription   12/08/2010

     Steven Gardner (Gardner), Manager of Field Investigations and Organized Retail Crime and Claude Poucher (Poucher), Director ▮▮▮▮▮▮▮▮▮ telephonically contacted the writer.  After being advised of the identity of the interviewing agent and the nature of the interview, Gardner and Poucher provided the following information:

     Gardner advised that the majority of the MaxPerk's Rewards accounts of Matthew Channon's (Channon) were closed, but he decided to leave 89 of the accounts open to observe Channon's criminal activity.

     Gardner advised that each of the 89 accounts that remain open have been connected to either Channon's debit card or through the use of a reward that Channon fraudulently obtained.  The accounts that remain open did not sequence the same way as the other accounts did which appear to have been created through the use of a script that created new email addresses with the same word(s), but slightly differ by one character each time.

     Poucher explained that each of these accounts Channon setup were with fictitious names, addresses, email accounts, etc.

     Gardner advised that approximately 30-40 of those accounts are about to receive rewards totaling over $3,000 USD, which OfficeMax does not want to payout.  Gardner advised that the accounts were due to receive the rewards for returning empty ink cartridges to OfficeMax on December 9-10, 2010.

     Gardner advised that Channon has executed 64 transaction th OfficeMax since November 10 including 55 transactions related to recycling inkjet cartridges.

     Currently, OfficeMax pays $3 per cartridge up to 20 per month, totaling 60 per account.  So far, Channon has recycles 1053 cartridges for $3 each.  On 11/16/2010, Channon went to two stores in Tucson, Arizona and one store in Chandler, Arizona.  On 11/17/2010, Channon went to 10 other stores in the Phoenix, Arizona area.  On 11/22/2010, 11/23/2010, and 12/3/2010, Channon used his

| | | |
|---|---|---|
| Investigation on | 12/7/2010 | at Albuquerque, NM |
| File # | 288A-AQ-63579 | Date dictated   NA |
| by | SA Michael Boady | |

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

**BRANDI CHANNON'S
EXHIBIT**

**35**

1:13-CR-966-JCH-KK   2255 MOTION

**From:** Gardner, Steven 
**Sent:** Monday, February 21, 2011 12:41 PM
**To:** Boady, Michael
**Subject:** RE: Q Photo of female store 217 (ABLQ) 11/22/10 and store 1156 (ALBQ ) on 11/23/2010

Ok, so far I only have those two transactions where she is recycling ink against one of the two of the accounts I left open. If you look on the last spreadsheet I sent with the open accounts and go the last column (video) filter it to any that say female and that is her.

Steven Gardner
Manager Investigations & ORC, Loss Prevention

CONFIDENTIALITY NOTICE: The information contained in this e-mail and attached document(s) may contain confidential information that is intended only for the addressee(s). If you are not the intended recipient, you are hereby advised that any disclosure, copying, distribution or the taking of any action in reliance upon the information is prohibited. If you have received this e-mail in error, please immediately notify the sender and delete it from your system.

**From:** Boady, Michael
**Sent:** Monday, February 21, 2011 1:39 PM
**To:** Gardner, Steven
**Subject:** Re: Q Photo of female store 217 (ABLQ) 11/22/10 and store 1156 (ALBQ ) on 11/23/2010

Great news, I know who she is! Whatever transactions we can show she made would be great!

**From:** Gardner, Steven 
**To:** Boady, Michael
**Sent:** Mon Feb 21 14:36:37 2011
**Subject:** FW: Q Photo of female store 217 (ABLQ) 11/22/10 and store 1156 (ALBQ ) on 11/23/2010

Now that I opened the video it is her.

Steven Gardner
Manager Investigations & ORC, Loss Prevention

CONFIDENTIALITY NOTICE: The information contained in this e-mail and attached document(s) may contain confidential information that is intended only for the addressee(s). If you are not the intended recipient, you are hereby advised that any disclosure, copying, distribution or the taking of any action in reliance upon the information is prohibited. If you have received this e-mail in error, please immediately notify the sender and delete it from your system.

**From:** Boady, Michael

Channo

**BRANDI CHANNON'S EXHIBIT**

**36**

1:13-CR-966-JCH-KK   2255 MOTION

Page 4

1    of -- raised by the defendants about -- well, I guess

2    I need clarification on exactly what the scheme is,

3    what the objective of the scheme is, and whether or

4    not what the defendants obtained from OfficeMax was

5    property.

6            And I will confess to you that the issue is

7    a lot more complicated than I thought it would be

8    when I first started looking at it.

9            And I looked at your response, Ms. Messec,

10   or Ms. Neda, whoever, and I didn't really get a lot

11   of clarification.  And I wasn't even sure that the

12   superseding indictment clarified the property issue

13   for me.

14           So whoever wants to go first.  I think

15   probably it would be more useful for me to hear from

16   the government.

17           MS. MESSEC:  Your Honor, it's our position

18   that with a superseding indictment the issue raised

19   by the defendants has been mooted.

20           The indictment now alleges that the

21   defendants engaged in the conspiracy to defraud

22   OfficeMax by obtaining OfficeMax's merchandise, and

23   that that is the explicit object of the conspiracy.

24           THE COURT:  Well, did -- so the explicit

25   object is merchandise?

Paul Baca, Official Court Reporter

BRANDI CHANNON'S
EXHIBIT

**37**

1:13-CR-966-JCH-KK   2255 MOTION

Page 5

1          MS. MESSEC:  Yes.

2          THE COURT:  But they obtained these

3     rewards.  And so how do you get from Point A to Point

4     B under the statute?

5          MS. MESSEC:  Well, the obtain- -- the thing

6     that is obtained by the wire directly doesn't have to

7     be the object of the scheme.  The scheme is executed

8     by wire, but the purpose of it is to obtain OfficeMax

9     merchandise that OfficeMax would not be giving to the

10    defendants if OfficeMax had not been deceived as to

11    material facts in the meantime.

12          OfficeMax, in its own terms and conditions

13    for the MaxPerks program, retains the right to cancel

14    MaxPerks rewards at any time if they have been

15    obtained by fraud, or in violation of the terms of

16    the program, even.  And so if OfficeMax knew that

17    these certificates had been obtained by fraud, that

18    they certainly would not have accepted them as a form

19    of payment for the merchandise that the defendants

20    had obtained using these certificates that they were

21    not entitled to.

22          So I just think it's very clear, under the

23    law, merchandise would be considered property.  We're

24    not talking about the scheme being -- the purpose is

25    not just to obtain MaxPerks rewards, because

Page 6

1    obtaining MaxPerks rewards, if not being able to use

2    the MaxPerks rewards, is useless.

3          THE COURT:  And I guess part of where I get

4    maybe caught up, because -- because the rewards

5    themselves are not of value to the company.   The

6    rewards are of value to the defendant who may or may

7    not use them -- or I said the defendant -- the

8    customer who may or may not use them.

9          So I guess I am wondering how -- you know,

10   it seems like there are steps, and I'm just not clear

11   how the law treats the steps, because some of the

12   cases that were cited by the defense seem to suggest

13   that if something has value to the customer or the

14   recipient, that's not the factor that is of

15   importance.   What's of importance is whether or not

16   whatever was taken from the victim is property.

17         MS. MESSEC:  Well, the government would

18   dispute that MaxPerks rewards are property in the

19   hands of OfficeMax.

20         But we, feeling that the superseding

21   indictment took away that issue, didn't get much into

22   that in the briefing.  And I apologize if that wasn't

23   useful to the Court.

24         We didn't want to get into, really, a

25   complicated issue that we felt had been removed.

Page 7

1          But all -- the Cleveland case and all of

2    the cases following it have to do with unissued

3    licenses in the hands of a state government.   None of

4    the cases apply to property in the hands of a

5    corporate entity whose interest is entirely economic

6    in the property.

7          So Cleveland doesn't really have anything

8    to say about whether MaxPerks would be considered

9    property.   And I think we would probably have to look

10   to state property law to resolve that.

11         But the defendants make a bunch of

12   allegations about MaxPerks rewards not being

13   property, that we would have to bring witnesses to

14   explain it.   They say things like, Well, they don't

15   account for them in any way.   I don't think that

16   that's true.

17         They are not useful -- they are not worth

18   anything to OfficeMax.   They can't, for instance,

19   collateralize debt with them, they said.   I don't

20   know why they couldn't.

21         I mean if you can find somebody who wants

22   to take out a loan and somebody is willing to accept

23   the MaxPerks rewards as collateral for that debt, I

24   don't know why you couldn't use them, because they do

25   have value.

Page 8

1          And to the company, having something out

2    there that they must accept, if valid, as -- as

3    payment for their merchandise, is a negative value to

4    them.

5          And so first, we just don't think that the

6    Cleveland case has any application here.   This is

7    just not what it's about.

8          The Supreme Court was very clear that at

9    issue in that case was about whether these unissued

10   regulatory licenses are property.   Because if it

11   were, then that would expand the wire fraud statute

12   to every kind of state regulatory violation.

13         But expanding the wire -- there is no

14   expansion of the wire fraud statute when you're

15   talking about economic interests in the hands of a

16   very economic entity like a corporation.   That's just

17   the usual application of the wire fraud statute.

18         So I don't think that the Cleveland

19   concerns are really at issue here.   But it would be a

20   fact intensive and a law intensive inquiry to decide

21   whether MaxPerks rewards are the property.

22         But the fact is the indictment alleges that

23   a property to be obtained by the scheme is OfficeMax

24   merchandise.

25         And -- and I think there is

Paul Baca, Official Court Reporter

Page 9

1    well-established into law that the indictment has to

2    be read on its face.   And if the government alleges

3    that that's what the property is, then that is

4    sufficient for the indictment.

5              And so again, we didn't rely much on that

6    argument because we felt that it had been -- that the

7    issue had been mooted by the superseding indictment.

8              The superseding indictment now in no way

9    refers to obtaining MaxPerks rewards as their

10   property.

11             The conspiracy count is now limited to

12   obtaining OfficeMax merchandise through the use --

13   obtaining OfficeMax merchandise as the object of a

14   scheme.

15             And the wire fraud counts --

16             THE COURT:   But it says through the use of

17   MaxPerks rewards certificates to which they were not

18   entitled.

19             MS. MESSEC:   That's the manner and means of

20   the scheme.

21             THE COURT:   Right.

22             MS. MESSEC:   But it's not the object of the

23   scheme.   The object of the scheme is to obtain

24   property.   And that property, as alleged in the

25   indictment, is OfficeMax merchandise.

Page 10

 1          The way through which they did this was by

 2    using MaxPerks rewards that they had acquired in a

 3    way that they should not have and that OfficeMax

 4    would not have accepted for payment had they known.

 5    Never would have been issued, never would have

 6    accepted for payment, had they known these material

 7    facts.

 8          But the manner and means is distinct from

 9    the property that's alleged to have been taken from

10    OfficeMax.

11          THE COURT:  Well, the defense mentioned

12    the -- I believe it was the Sadler case.

13          Why does that not provide us with a useful

14    precedent?

15          MS. MESSEC:  I don't believe that the

16    Sadler case has -- has bearing here.  Because in the

17    Sadler case what you had was a woman who was running

18    a pain clinic.  And my understanding is -- was

19    issuing controlled substance prescriptions to people

20    who had never been examined at that clinic.

21          And the wire fraud pieces of that case were

22    with regards to the pharmaceutical company who was

23    paid full price in money for the product.

24          And the most that the government had there

25    was that one of the pharmaceutical reps said that if

Page 11

1    she had known what the defendant was doing with that

2    property she would have had some concerns, which

3    is -- which is not the same as this situation.

4            If OfficeMax would have had concerns, they

5    wouldn't have taken the property at all -- or they

6    wouldn't have taken that as payment at all.

7            And the Court there said:

8            "Defendant may have had many unflattering

9    motives in mind providing the pills.  But unfairly

10   defrauding the distributors of their property was not

11   one of them."

12           In this case, depriving OfficeMax of its

13   property is the entire point of the scheme.

14           THE COURT:  And that's, I guess, one of the

15   reasons why I said at the outset that I -- I was -- I

16   wanted you to tell me about the scheme.  And one of

17   the things that -- that maybe confuses me is that --

18   you know I don't dispute the facts here.  I mean, the

19   facts are that the defendants were, you know,

20   creating a way to get many, many, many, many, many

21   more rewards than they would have been entitled to

22   based on their own purchases.

23           But I guess the thing that confuses me is

24   that what -- it seems to me that we're not talking

25   about falsifying purchases.  I mean somebody made

Paul Baca, Official Court Reporter

COURT102020160931_Channon Sentencing.txt

5      saw him the day of the presentence report interview

6      at the Channons' residence, played a little ball with

7      him in the living room  He's a nice little boy.

8              And it was very apparent, as is the case

9      with any mother who has a very good relationship with

10     her child, that that is, in fact, the case here.  And

11     the letters certainly objectively confirmed that.

12             And the pain in the letters that I

13     interpreted from family members about the possibility

14     that Brandi would be taken away from little Quinton

15     is a very big concern, and is one of the major

16     reasons we are requesting a noncustodial sentence,

17     but not the only reason.

18             Ms. Channon has no prior criminal history.

19     As one of the letters also revealed, no one in her

20     family has been in this kind of a situation before.

21             She would have a very supportive family and

22     lots of people to assist her in successfully

23     completing a term of probation.

24             A significant event in this case, and one

25     that has caused Ms. Channon a great degree of

                                                        67

1      anxiety, was the execution of the search warrant at

2      her residence.  It itself serves as an indication of

3      how far away she is from criminal milieu.

4              The agents acted, under their testimony, as

5      they typically do.  And Ms. Channon, not being

6      familiar at all and having the background that she

7      did, this has caused her to have great anxiety, and I

                         Page 59

BRANDI CHANNON'S
EXHIBIT

38

1:13-CR-966-JCH-KK  2255 MOTION

COURT102020160931_Channon Sentencing.txt

8      think that's reflected in the medical records that

9      were supplied to the Court.

10            She still -- I asked her to document the

11     medications that she is presently taking, and she's

12     taking seven anxiety-related medications, and she

13     still has nightmares and panic attacks traceable to

14     that event.

15            And -- and I offer that as evidence of the

16     fact that she is not likely to be involved in any

17     further criminal activity.  Her -- this one event has

18     so traumatized her, this execution of the warrant,

19     that that is, in a legal sense, a great deterrence to

20     her.

21            She also has physical ailments.  She has

22     lupus and fibromyalgia.  And three of the medications

23     that she is taking are anxiety-related to lupus and

24     fibromyalgia.

25            And she, I think indicated in the

                                                          68


1      presentence report, that the pain is such that it

2      does impact her ability to have -- to do certain

3      things with her little boy, and the anxiety

4      associated with facing prison time has exacerbated

5      that anxiety.

6             And again, in the legal sense, this all is

7      indicative of a basis for deterring her from any

8      possible further involvement in the criminal justice

9      system.

10            Your Honor, we would request that as

11     recommended in the -- by the presentence report

                         Page 60

BRANDI CHANNON'S
EXHIBIT

39

1:13-CR-966-JCH-KK   2255 MOTION

COURT102020160931_Channon Sentencing.txt

1    have been no need to create so many fictitious

2    accounts, thousands of fictitious accounts, and scour

3    the country for OfficeMax stores to obtain

4    transaction information that clearly wasn't yours.

5           So the long and short of it is:  You were

6    convicted, and so my job here is to arrive at a

7    sentence that is sufficient but not greater than

8    necessary to accomplish the goals of sentencing.

9           I have taken into consideration the very

10   kind and loving comments your family members have

11   made about you.

12          I have taken into consideration the fact

13   that you have pretty significant health issues.

14          You have a young child who you care for and

15   who, despite the fact that you have a pretty large

16   family and friend support group here, the information

17   I saw said that there really wasn't anyone else who

18   could help with your child.

19          I read that Mr. Channon's mother and father

20   are willing to care for him, but I also read that

21   they're elderly and there are health issues.

22          So because of these facts, I have

23   determined that a sentence below the guideline range

24   is appropriate.  The guideline range is 30 to 37

25   months.

75

1           And you have no criminal history.  You

2    have, again, health conditions.  You have a young

3    child who is in need of care, and so I have concluded

4    that a probationary sentence is appropriate for you,

Page 66

BRANDI CHANNON'S
EXHIBIT

40

1:13-CR-966-JCH-KK   2255 MOTION

Matt Channon Case Summary

OfficeMax has been investigating Matt Channon of Albuquerque, NM for about 3 months. Channon is believed to have perpetrated fraud against OfficeMax in excess of $450,000. Channon's fraud involves two 2 schemes that manipulate the OfficeMax Customer Loyalty Program known as MaxPerks. The MaxPerks program rewards its loyal customers with money toward future purchases. The program is open to any legal resident of the US who is 18 years or older. Channon manipulated the program by creating multiple accounts that he would fraudulently apply credits to and recycle ink against. Channon was linked to these accounts by use of his debit card (ending 4445) during purchases that credited the accounts, reward cards that were used from the accounts, and some of the manual online adjustments he made to the accounts.

Channon's activities began in September of 2009 when he started opening multiple MaxPerks accounts under different names. Channon used these accounts to recycle empty ink jet cartridges which he purchased on eBay. Channon has purchased over 14,000 empty ink jet cartridges via eBay between Sept of 2009 and August of 2010. An average cartridge costs Channon about $0.355 and when he recycles it at OfficeMax he receives a $3.00 credit. This would have netted Channon about $38,000 in profit.

MaxPerks members can recycle their empty ink jet cartridges with OfficeMax and receive reward credits. Prior to 2010 customers could recycle 10 empty ink jet cartridges per week. The customers would then receive $3 per recycled cartridge in the form of a Reward card. Beginning in 2010 the program was changed to allow customers to only recycle 20 empty ink jet cartridges per month and they needed to spend the equivalent amount of money with OfficeMax in order to be issued the reward. The program is only intended for customers to recycle empty ink cartridges that they had used. Channon created multiple accounts so he could recycle more cartridges then the program allowed and thus make money from the program. eBay activity by Channon showed him buying as many as 1,000 empty cartridges at a time.

Additionally a review of on-line adjustments to the OfficeMax MaxPerks database indentified 4,251 fraudulent accounts that were linked back to Channon. These accounts would have provided Channon with over $420,000 in OfficeMax Rewards, had OfficeMax not closed all the accounts and taken the adjustment portion of the website offline. OfficeMax had previously issued $46,244 in rewards but successfully voided $11,888 in rewards.

This 2nd scheme was based on the purchase loyalty portion of the "MaxPerks for Teachers" program. MaxPerks for Teachers allows teachers to receive monies, in the form of reward cards, from OfficeMax, on purchases that the teacher makes. Teacher accounts are credited with $10 in rewards for every $75 that they spend, with a maximum reward of $100 per year. If a customer forgets to provide their MaxPerks information when making a purchase at a store they can go on-line to the MaxPerks website. Customers can access the MaxPerks website from their home pc and add receipt information associated with the purchase they made. The customer will then be credit for that sale. Channon figured out how to read the receipt information needed to generate a transaction. He then used this knowledge to generate transactions which he did not make. Review of the sequencing of the transactions linked them to prior purchases and stores where he completed one of the transactions in the sequence.

All but 96 of these accounts were linked by having one of 3 email sequences (Bargle, Coach, or Teechur). The Bargle Coach and Teechur accounts went back to email accounts from Google Mail. The other 96 accounts matched a scenario where the members address or city was part of the business name. The name was city or address plus "Elementary School." An example of this would be that an account registered to Denver Co would have the Business name of "Denver Elementary School". The accounts with the sequenced emails also had this business name labeling. The sequencing of the email addresses and business names appeared to be computer generated and contained numbers and periods (.) that were inserted to make them unique. Review of the accounts also showed that the physical address information was invalid.

**Channo**

BRANDI CHANNON'S
EXHIBIT

**41**

1:13-CR-966-JCH-KK   2255 MOTION

In May of 2010 these accounts began to receive significant and consistent online adjustments. Between May and September of 2010 there were 58,090 transactions adjusted on-line. This is an average of 482 transactions per day. It would take about 4.2 hours per day to key at a keying time of 30 seconds per transaction. This number excludes any adjustments that were not accepted by the system because they had already been awarded, were miss-keyed or did not match a specific transaction. On one date there were 1,172 transactions keyed, using this logic that would require over 9.7 hours of continuous keying.

Taking into consideration the volume of adjustments done per day and the sequencing of the Gmail addresses that were registered it would be unlikely that someone hand keyed this information. The most viable explanation would be that a computer script was employed to create the Gmail accounts and then apply the MaxPerks adjustments.

OfficeMax has left 85 of the original accounts that Channon set-up to perpetrate ink recycle fraud open and has been monitoring the activity on these accounts. Recent activity by Channon in November shows him recycling over 1,000 cartridges at OfficeMax stores located in AZ and NM. The recycled cartridge rewards were applied to many of the accounts that OfficeMax left open. Channon has also been linked to 4 eBay accounts which OfficeMax is currently monitoring for sales.

The MaxPerks loyalty program is one based on a trust that OfficeMax customers will participate in a fair manner. Channon took advantage of this trust by creating multiple accounts and purchasing empty ink cartridges to recycle ink for a profit. He also fraudulently claimed sales that he did not make. These frauds are a severe violation of our terms and conditions. Furthermore rewards earned are clearly stated as non-transferable so there should be no acceptable reason for Channon to be connected to so many different accounts.

By the end of 2010 OfficeMax losses could exceed $50,000 and Staples is currently reporting about $10,000 in losses due to his scheme. I have not heard from Office Depot but assume that they are also being targeted by Channon's scheme. OfficeMax knows that if we had not detected the on-line adjustments Channon would have caused losses in excess of $500,000 by the year end. OfficeMax is confident that he is linked to this scheme as either the creator of the script or the person laundering the monies from. OfficeMax has gone as far as to link 3rd party gift cards (AMEX) that Channon purchased with rewards to personal purchases that he made at other establishments. This clearly shows a scheme for profit. Any assistance the FBI would provide in investigating OfficeMax's claims and prosecuting the fraud would be greatly appreciated.

**Channon 1552**

COURT102020160931_Channon Sentencing.txt

22    guideline sentence or a government-sponsored

23    reduction.

24              The median variance or departure for fraud

25    offenders is only 12 months.  A sentence of probation

117

1    would put Matthew Channon way out of line with other

2    offenders who are similarly situated.

3              For all of those reasons the government

4    asks the Court to impose a sentence within the

5    guideline range of 46 to 57 months.

6              THE COURT:  All right.  Thank you.

7              Let me ask Mr. Channon, Mr. Robert to come

8    forward.

9              Well, I -- I may repeat some of what I said

10    to Mrs. Channon to you as well, Mr. Channon.  But

11    this is, again, not my standard scenario.  I don't --

12    I don't usually have defendants like you and your

13    wife in court for sentencing on cases like -- like

14    your case.

15              There are a lot of things about you that I

16    would expect that I would never see you in federal

17    court for sentencing.

18              And I -- and I told your wife, and I'll

19    tell you as well.  If you put your -- your brains and

20    your background to work in a way that is appropriate

21    and aboveboard, I can't imagine all the things that

22    you could have accomplished.

23              But for someone like you to -- to get

24    involved in a scheme like this -- you told me why it

25    happened -- it is -- it is somewhat surprising.

Page 104

BRANDI CHANNON'S
EXHIBIT

42

1:13-CR-966-JCH-KK   2255 MOTION

COURT102020160931_Channon Sentencing.txt

118

1           And I know the -- the argument has been
2      made that this was an opportunity, and you reviewed
3      the program rules or whatever the screen was that you
4      saw that referred to a transaction as opposed to your
5      transaction, and -- and thought that there was an
6      opportunity.
7           It's hard for me to imagine that you
8      thought it was acceptable, because you went to a
9      great deal of trouble to -- to avoid detection, to --
10     to spread these activities around to different stores
11     in different states.
12          And so when I see the way you conducted
13     yourself, it suggests to me that you knew that you
14     were doing something wrong.
15          Even taking what you said earlier, that
16     not -- that you might not have considered that
17     violating a store's program rules would be a
18     violation of federal law, I mean, you were obtaining
19     something that you weren't entitled to obtain, even
20     using other people's transactions without their
21     knowledge, all suggest to me that you knew you were
22     doing something that you should not be doing.
23          So again, I -- as I said to your wife, I
24     understand that you have your appeal issues that
25     you'd like to take up with the Tenth Circuit, so

119

COURT102020160931_Channon Sentencing.txt

1    you're not in a position to acknowledge guilt.

2    That's certainly your right.

3              But looking at the evidence in this case,

4    it's difficult to imagine, based on what I saw, that

5    you didn't understand that you were doing something

6    wrong.

7              And fraud is fraud.  So -- so I

8    understand -- I understand what you're saying, I just

9    don't agree with your -- with your view of it.

10             So as I look at your case and I look at

11   what an appropriate sentence would be in your case, I

12   have to say that taking everything into

13   consideration, I do think that a sentence of

14   imprisonment is appropriate.  I do.

15             I don't, however, think that a low end

16   guideline sentence is appropriate in this case, so I

17   would be inclined to grant a variance for a number of

18   reasons.

19             For one, you -- you have no criminal

20   history, no history of violence.

21             I recognized that the presentence report

22   has identified some situations in the past where you

23   have been accused of embezzlement, or there have been

24   disputes that you've had with -- with others.  It's

25   hard for me to -- it's hard for me to -- to say that

                                                  120



1    your -- you were right or they were right or you were

2    wrong or they were wrong.  I simply am not in a

3    position to litigate those particular situations.

4              So I don't -- I don't use them to formulate
                          Page 106

COURT102020160931_Channon Sentencing.txt

5      a punishment for you other than to say to you that it

6      looks to me like you have tried to -- well, let me

7      say it this way.

8              It looks to me like your motivation to make

9      money, get money, is something that might have led

10     you down this particular path, which is why --

11     another reason why I think that restitution is not

12     only warranted, but I see that as a way not only to

13     make OfficeMax whole for the fraud that you

14     committed, but it looks to me like it would be

15     painful for you, because you seem to have been

16     motivated by ways to make money.

17             And so I'm hoping that the restitution

18     award, along with the forfeiture award, will get your

19     attention that this is certainly not conduct that you

20     should repeat.

21             Now I know restitution has its purposes,

22     and I know forfeiture has its purposes.  But it's an

23     obligation that I'm going to be requiring in your

24     sentencing, that you repay OfficeMax and that you

25     also provide forfeiture to the government for your

                                                            121

1      conduct in this case.

2              Now, I have not -- you know, I saw the --

3      the argument about the government being OfficeMax's

4      collection agent.  I heard Ms. Messec take exception

5      to that.

6              The fact of the matter is, you defrauded

7      OfficeMax and you defrauded them of $105,191 worth of

COURT102020160931_Channon Sentencing.txt

8    money, merchandise, whatever the case may be.

9            So obviously, OfficeMax is entitled to be

10   reimbursed for that and made whole, and so I will

11   order that.

12           I have not seen any kind of a statement

13   from OfficeMax about what position, if any, they take

14   on the issue of incarceration.  I'm going to assume

15   that, based on Ms. Messec's argument, that they are

16   in harmony, that they would agree that a low end

17   guideline sentence is appropriate in this case.

18           Let me tell you that if I had seen anything

19   that suggested that you had harmed people -- and I

20   used the example in your wife's sentencing of

21   someone's life savings or someone's retirement -- I

22   wouldn't have any problem at all sentencing you to a

23   low end guideline sentence.

24           In this case what we have is a situation

25   where I'm not aware of any individuals who claim they

                                                    122

1    were deprived of any money or property because of

2    your conduct.

3            I am aware of OfficeMax saying that because

4    of your conduct and the way you manipulated their

5    rules you ended up with over $100,000 of value that

6    they would never have sent your way if they had known

7    the true state of the situation.

8            So -- so money is one way that OfficeMax

9    receives justice in this case.

10           Because your history is not one of

11   committing crimes, not one of violence.  I don't see

COURT102020160931_Channon Sentencing.txt

12    any drug issues here either as, you know, a user or a

13    seller.

14              I mean, a lot of times I -- if I see people

15    who are committing some sort of crime, oftentimes

16    it's because they're trying to fund a drug habit or

17    somehow are involved in other illegal situations, and

18    I don't see that in your case.

19              So I am looking at what is a sentence that

20    would be sufficient but not greater than necessary to

21    accomplish the sentencing goals.

22              Here we've got a statute that outlines for

23    us what some of the sentencing factors are that I am

24    required to take into consideration.

25              The nature and the circumstances of the

                                                        123


1     offense.  I've already said that you went to great

2     lengths to conceal your activities from OfficeMax.

3     Even if one could argue that -- that it appeared to

4     be acceptable under their rules, clearly, the deceit

5     and -- and so forth that I've already addressed that

6     went on in this case suggest otherwise.

7               And a six-figure loss, you know, to some

8     businesses, to some corporations, that might not be

9     significant.  But in the world of courtrooms it is a

10    significant amount of money.

11              So I do recognize that this is a

12    substantial crime.  It went on for some time, and so

13    I have taken into consideration the nature and the

14    circumstances of the offense.

## MAXPERKS REWARDS FOR BUSINESS AND CONSUMER - TERMS & CONDITIONS

Last Update: October 8, 2010

### OVERVIEW

MaxPerks Rewards for Business ("MaxPerks") is an OfficeMax® customer reward program that allows you to earn $25 in rewards to spend at OfficeMax for every $500 in qualified purchases that you make during the year. Additionally, from time to time, OfficeMax may offer MaxPerks Bonus Rewards for purchases of specified products. You will also receive exclusive savings offers through the mail and email. If you do not want the exclusive savings offers, just log into your account and change your profile or call 1-866-MAXPERKS (1-866-629-7375).

### HOW TO ENROLL

To open a new MaxPerks Rewards for Business account, you can fill out an application at any OfficeMax location, online at www.officemax.com/maxperks, or by phone at 1-866-MAXPERKS (1-866-629-7375). You will be given a MaxPerks member ID after you complete the enrollment process. If you enroll in an OfficeMax store, you will be given a membership kit that contains your MaxPerks member ID at the time of enrollment. If you enroll online or by phone, we will mail a MaxPerks membership ID to you. You may begin using your MaxPerks membership immediately for all qualifying purchases including MaxPerks Bonus Rewards. Only one MaxPerks account and member ID per person is permitted at any given time. After you enroll, you will need to go to www.officemax.com/maxperks to set up your user name and password so that you can view your balance and keep track of your rewards.

### ELIGIBILITY

MaxPerks is open to legal residents of the 50 United States (and D.C., Puerto Rico, and the Virgin Islands) age eighteen (18) years and older who have internet access to manage their MaxPerks account. Employees of OfficeMax are eligible to participate, but purchases made with their MaxPerks ID may only be for their own personal use. By enrolling in MaxPerks, you agree to jurisdiction in Cook County, Illinois. Jurisdiction means that if you sue OfficeMax for a violation of your rights under this program, you will have to bring the suit in Cook County, Illinois. MaxPerks is void where prohibited by law.

### HOW TO EARN REWARDS

If you are shopping in a retail store, you can earn rewards by presenting your MaxPerks member ID card at checkout. If you do not have your MaxPerks member ID card with you, a store associate can look up your member ID number at the time of purchase. If you are shopping online or by phone or fax be sure to provide your MaxPerks member ID number at checkout. If you do not know your MaxPerks member ID number at the time of purchase, you can later earn credit for your purchase towards a reward by logging in to your MaxPerks account and entering the information from your purchase receipt that is requested in order to obtain credit for your purchase. Customer service is also available at 1-866-MAXPERKS (1-866-629-7375) to assist you with obtaining credit for your purchase with receipt information. For MaxPerks Bonus Reward offers, such offers are only available at the time of purchase with your member ID number. You will receive credit for every qualified purchase that you make. If a purchased item is returned, the amount of the returned item will be deducted from your current account balance.

If you have not reached the $500 minimum in any calendar month, your qualified purchase balance will be carried over month to month until you reach the $500 minimum or January 1st of the following year, whichever comes first. For example, if you spend $300 in Month 1, $0 in Month 2, and $200 in Month 3, your total account balance at the end of Month 3 will be $500 and a $25 reward will be issued to you by the end of Month 4. Your $25 reward expires ninety (90) days after it is issued, unless you are a Florida resident, in which case it expires one (1) year from the date of issue, so be sure to log into your account and print it out as soon as it becomes available.

From time to time, OfficeMax may also offer its members MaxPerks Bonus Reward opportunities in which members can earn extra rewards (which may vary in amount) for purchasing specified products or completing a required action. To take advantage of the MaxPerks Bonus Rewards special purchase offers, you must have your MaxPerks member ID number at the time of purchase and it must be applied to that purchase. No MaxPerks Bonus Reward adjustments will be made after purchase. MaxPerks Bonus Rewards will be issued in the next statement cycle regardless of your qualified purchase balance.

### QUALIFYING PURCHASE

Qualifying purchases are any products or services in our stores, catalogs or web site except for computers, gift cards, general use prepaid cards, Sprint™ service plans, phone cards, purchases with Retail Connect℠ pricing, sales tax, purchases made prior to the date of enrollment, and purchases made with your MaxPerks rewards. You will start earning credit for purchases with your MaxPerks member ID number the day you sign up.

### HOW TO OBTAIN AND USE REWARDS

You can easily keep track of your account balance and any rewards you have earned by logging in to your MaxPerks account online at www.officemax.com/maxperks. OfficeMax will send you electronic statements via email at the end of each month, so that you can see the total amount of qualified purchases that you have made. The e-statement will be sent by the end of the following month. You may opt-out of receiving this notification by logging in to your account and updating your communication preferences. Once you have reached the $500 minimum or have earned a MaxPerks Bonus Reward, you can log into your account and print your reward card. Your reward card will be available to you the month after you have reached the $500 minimum. For example, if you reach the $500 minimum on March 11, your $25 reward card will be available by the end of April. You may use your reward card at any OfficeMax retail location, online at www.officemax.com, or by phone at 1-877-OFFICEMAX (1-877-633-4236). You may use up to three (3) reward cards from the same MaxPerks account in a single transaction. Reward cards are not redeemable for OfficeMax brand gift cards and are not redeemable for cash unless otherwise required by law. No amount of your reward card may be applied as payment to any credit account.

### EXPIRATION OF BALANCES AND REWARDS

You earn credit during each calendar year, from January 1 through December 31. If you do not reach the minimum $500 spending requirement by December 31, your account balance will be reset to $0 on January 1 of the following year. Accounts with a balance of over $500 are eligible for a $25 reward card for each $500 spent by the end of each month. Remaining account balances less than $500 after issuance of a reward card during the year will also reset to $0 at the end of the year. MaxPerks Bonus Rewards will be issued in the next statement cycle regardless of your qualified purchase balance. For new customers who sign up for the program after October 1 of any given year, for your first year of participation only, your balance will not be reset to $0 on December 31; the balance will be carried over to the next calendar year.

**BRANDI CHANNON'S EXHIBIT**

**43**

1:13-CR-966-JCH-KK   2255 MOTION

**REWARD CARDS EXPIRE NINETY (90) DAYS AFTER THEY ARE ISSUED.**
The expiration date will appear on the front of the card and in your online account. If you are a resident of Florida, your reward card will expire one (1) year from the date it is issued.

**LOST, STOLEN OR DAMAGED REWARD CARDS**
To report a lost, stolen, or damaged reward card, or for balance information, call 1-866-MAXPERKS (1-866-629-7375).
OfficeMax will not replace the value on a lost or damaged reward card, or on a reward card used without your permission or that has expired.

**MAXPERKS RECYCLING PROGRAM**
As a member of MaxPerks Rewards, simply bring in any visibly undamaged HP, Dell, or Lexmark, ink/toner cartridges to an OfficeMax retail store and earn a $3 reward per qualified cartridge, with a maximum reward of $60 per calendar month per member (or 20 cartridges per calendar month per member). HP02, HP11, and HP88 series cartridges and remanufactured ink/toner cartridges are not eligible for rewards under the recycling program. Recycling program rewards are: calculated monthly, earned and issued in $3 increments, and are issued in the form of a Reward Card that will be issued to you electronically through your MaxPerks account, by the end of the following month, along with any other rewards you may have earned that month. Total recycling reward dollars issued for recycling may not exceed your total MaxPerks program qualified purchase balance. For example, if you bring in 20 cartridges throughout Month 1 and spend $50 on qualified purchases, your Month 1 Recycling rewards earned will be $60 but the rewards that will be issued to you will be $48 (which is $3 for each of 16 cartridges). The remaining $12 for the last 4 cartridges will be held in your account in a "pending" status until you make additional qualified purchases in at least $3 increments in subsequent months or until January 1 of the following year, when the account balance will be reset to $0. Recycling rewards can be used online, in-store or over the phone. While there is no limit to the number or brand of ink/toner cartridges you may recycle, you will only receive credit for the visibly undamaged qualifying cartridges identified above and in the limits identified above. Customers can sign up for MaxPerks at time of recycling drop off to participate.

MaxPerks Recycling Programs are not open to customers that broker or re-sell ink and/or toner cartridges and any rewards earned through those activities may be forfeited and the MaxPerks account closed.

Effective January 1, 2010, the Bulk Mail-in Recycling program is no longer available.

**MODIFICATIONS AND TERMINATION OF MAXPERKS**
OfficeMax reserves the right to modify any of these Terms and Conditions including the qualified purchases, the amount of the rewards, and any of the options available to you on your MaxPerks account at any time, with or without notice, even though these changes may affect your ability to accrue or use rewards. Your continued participation in MaxPerks constitutes your acceptance of any changes to these Terms and Conditions. You are responsible for remaining knowledgeable as to any changes that OfficeMax may make to these Terms and Conditions. The most current version of these Terms and Conditions will be available at www.officemax.com/maxperks and will supersede all previous versions of these Terms and Conditions.

OfficeMax reserves the right to terminate MaxPerks at any time, for any reason, with or without notice, even though termination may affect your ability to accrue or use your rewards.

**GENERAL TERMS AND CONDITIONS**
OfficeMax reserves the right to close your MaxPerks account if you engage in any fraudulent activity or use MaxPerks in a manner inconsistent with these Terms and Conditions or any federal, state or local, laws, statutes or ordinances. Discontinued membership may result in the loss of all accumulated rewards including but not limited to rewards earned from Bonus Reward offers and rewards from the ink and toner recycling programs. In the event that OfficeMax should discontinue a membership, any ink or toner cartridge submitted but not rewarded will not be returned nor will the monetary value of those cartridges be refunded. In addition to discontinued membership, OfficeMax shall have the right to take appropriate administrative and/or legal action, including criminal prosecution, as it deems necessary in its sole discretion, and you will not be permitted to participate in the MaxPerks program in the future.

Rewards are not your property and may be revoked by OfficeMax at any time as set forth herein. Rewards may not be sold, transferred or assigned, and are not transferable upon death, as part of a domestic relations matter or otherwise by operation of law.

OfficeMax is not responsible for any incorrect or inaccurate information supplied by you while participating in MaxPerks.

All questions or disputes regarding eligibility for MaxPerks, earning or redemption of rewards, or your compliance with these Terms and Conditions will be resolved by OfficeMax in its sole discretion.

All issues and questions concerning the construction, validity, interpretation and enforceability of the Terms and Conditions, or your rights and obligations shall be governed by, and construed in accordance with, the laws of the State of Illinois, without giving effect to any choice of law or conflict of law rules.

These Terms and Conditions constitute the entire agreement between OfficeMax and you. They supersede all prior or other arrangements, understandings, negotiations and discussions, whether oral or written. No waiver of any of the provisions of these Terms and Conditions shall be deemed or shall constitute a waiver of any other provisions hereof, nor shall waiver constitute a continuing waiver unless otherwise expressly provided.

If any provision of these Terms and Conditions is found to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be severed from the remainder of these Terms and Conditions, which will otherwise remain in full force and effect.

This reward card is issued by OfficeMax North America, Inc.

**LIMITATIONS OF LIABILITY**
OfficeMax and its partners, affiliates, subsidiaries, parent corporations and their respective agents and agencies ("Releasees") are not responsible for incorrect or inaccurate transcription of information, for problems related to any of the equipment or programming associated with MaxPerks, for any human error, for any interruption, deletion, omission, defect, or line failure of any telephone network or electronic transmission, for problems relating to computer equipment, software, inability to access the rules or online service, or for any other technical or non-technical error or malfunction. In the event of a printing error or problem with any items purchased with rewards, Releasees shall not have any liability. UNDER NO CIRCUMSTANCES, INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE, SHALL ANY OF THE RELEASEES BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING FROM MAXPERKS OR MERCHANDISE PURCHASED

Case 1:19-cv-00201-JCH-SMV   Document 4   Filed 03/11/19   Page 158 of 400

WITH MAXPERKS REWARDS, EVEN IF ANY OR ALL OF THE FOREGOING OR ANY OF THEIR AUTHORIZED REPRESENTATIVES
HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IF OFFICEMAX IMPROPERLY DENIES YOU ANY REWARDS,
LIABILITY WILL BE LIMITED TO THE EQUIVALENT AMOUNT OF REWARDS OR $100, WHICHEVER IS LESS. BY
PARTICIPATING IN MAXPERKS, YOU ARE WAIVING ANY AND ALL RIGHTS TO BRING ANY CLAIM OR ACTION RELATED TO
SUCH MATTERS IN ANY FORUM BEYOND NINETY (90) DAYS AFTER THE FIRST OCCURRENCE OF THE KIND OF ACT, EVENT,
CONDITION OR OMISSION UPON WHICH THE CLAIM OR ACTION IS BASED. You agree to rely solely on the manufacturer's
warranties, if any, for any products purchased with MaxPerks rewards.

2.0.28.13

Case 1:19-cv-00201-JCH-SMV   Document 4   Filed 03/11/19   Page 159 of 400

## MAXPERKS REWARDS FOR TEACHERS - TERMS & CONDITIONS

Last Update: October 8, 2010

### OVERVIEW
MaxPerks Rewards for Teachers ("MaxPerks") is an OfficeMax® customer reward program for teachers, which gives you $10 in rewards to spend at OfficeMax for every $75 in qualified purchases that you make during the year, up to a maximum reward of $100 per year. Additionally, from time to time, OfficeMax may offer MaxPerks Bonus Rewards for purchases of specified products. You will also receive exclusive savings offers through the mail and email. If you do not want the exclusive savings offers, just log into your account and change your profile or call 1-866-MAXPERKS (1-866-629-7375).

### HOW TO ENROLL
To open a new MaxPerks Rewards for Teachers account, you can fill out an application at any OfficeMax location, online at www.officemax.com/maxperks, or by phone at 1-866-MAXPERKS (1-866-629-7375). You will be given a MaxPerks member ID after you complete the enrollment process. If you enroll in an OfficeMax store, you will be given a membership kit that contains your MaxPerks member ID at the time of enrollment. If you enroll online or by phone, we will mail a MaxPerks membership ID to you. You may begin using your MaxPerks membership immediately for all qualifying purchases, including MaxPerks Bonus Rewards. Only one MaxPerks account and member ID per person is permitted at any given time. After you enroll, you will need to go to www.officemax.com/maxperks to set up your user name and password so that you can view your balance and keep track of your rewards.

### ELIGIBILITY
The MaxPerks Rewards for Teachers Program is open to teachers who are legal residents of the 50 United States (and D.C., Puerto Rico, and the Virgin Islands), age eighteen (18) years and older, and who have internet access to manage their MaxPerks account. By enrolling in MaxPerks, you agree to jurisdiction in Cook County, Illinois. Jurisdiction means that if you sue OfficeMax for a violation of your rights under this program, you will have to bring the suit in Cook County, Illinois. MaxPerks is void where prohibited by law.

### HOW TO EARN REWARDS
If you are shopping in a retail store, you must present your MaxPerks member ID card at checkout. If you do not have your MaxPerks member ID card with you, a store associate can look up your member ID number at the time of purchase. If you are shopping online, by phone or by fax, you must provide your MaxPerks member ID number at checkout. If you do not know your MaxPerks member ID number at the time of purchase, you can later earn credit for your purchase towards a reward by logging into your MaxPerks account and entering the information from your purchase receipt. You can also call customer service at 1-866-MAXPERKS (1-866-629-7375) to assist you with obtaining credit for your purchase towards a reward by providing the customer representative with the information from your receipt. For MaxPerks Bonus Reward offers, such offers are only available at the time of purchase with your member ID number. You will receive credit for every qualified purchase that you make. If a purchased item is returned, the amount of the returned item will be deducted from your current account balance.

If you have not reached the $75 minimum in any calendar quarter, your qualified purchase balance will be carried over quarter to quarter until you reach the $75 minimum, or January 1 of the following year, whichever comes first. For example, if you spend $50 in Quarter 1, $0 in Quarter 2, and $30 in Quarter 3, your total account balance will be $80 and your $10 reward will be issued to you by the end of October. Your $5 balance will be carried over into Quarter 4. If you then spend $70 in Quarter 4, your account balance at the end of Quarter 4 will be $75 and your $10 reward will be issued to you by the end of January of the following year. However, if you spend $10 in Quarter 1, $5 in Quarter 2, $30 in Quarter 3, and $20 in Quarter 4, your total account balance will reset to $0 on January 1. Your $10 reward expires ninety (90) days after it is issued, unless you are a Florida resident, in which case it expires one(1) year from the date of issue, so be sure to log into your account and print it out as soon as it becomes available.

From time to time, OfficeMax may also offer MaxPerks Bonus Rewards permitting you to earn extra rewards (which may vary in amount) for purchasing specified products or completing a required action. To take advantage of the MaxPerks Bonus Rewards special purchase offers, you must have your MaxPerks member ID number at the time of purchase and it must be applied to that purchase. No MaxPerks Bonus Reward adjustments will be made after purchase. MaxPerks Bonus Rewards will be issued in the next statement cycle regardless of your qualified purchase balance.

### QUALIFYING PURCHASE
Qualifying purchases are any products or services in our stores, catalogs or web site except for computers, gift cards, general use prepaid cards, phone cards, Sprint® service plans, phone cards, purchases with Retail Connect™ pricing, sales tax, purchases made prior to the date of enrollment, and purchases made with your MaxPerks rewards. You will start earning credit for purchases with your MaxPerks member ID number the day you sign up.

### HOW TO OBTAIN AND USE REWARDS
You can easily keep track of your account balance and any rewards you have earned by logging into your MaxPerks account online at www.officemax.com/maxperks. OfficeMax will send you quarterly electronic statements via email by the end of the month following the quarter end so that you can see the total amount of qualified purchases that you have made. You may opt out of receiving this notification by logging into your account and updating your communication preferences. Once you reach the $75 minimum or have earned a MaxPerks Bonus Reward, OfficeMax will begin processing your reward card and it will be electronically issued to you by the end of the month following the end of the quarter when you reached the $75 minimum. For example, if you reach the $75 minimum on January 13, your $10 reward card will be available no later than April 30. Simply log into your account and print your $10 reward card. Use your reward card at any OfficeMax retail location, online at www.officemax.com, or by phone at 1-877-OFFICEMAX (1-877-633-4236). You may use up to three (3) reward cards from the same MaxPerks account in a single transaction. Your reward card is not redeemable for OfficeMax brand gift cards, and is not redeemable for cash unless otherwise required by law. No amount of your reward card may be applied as payment to any credit account.

### EXPIRATION OF BALANCES AND REWARDS
You earn credit during each calendar year, from January 1 through December 31. If you do not reach the $75 minimum by December 31, your account balance will be reset to $0 on January 1 of the following year. Accounts with a balance of over $75 are eligible for a $10 reward card for each $75 spent by the end of each quarter. Remaining account balances less than $75 after issuance of a reward card during the year will also reset to $0 at the end of the year. MaxPerks Bonus Rewards will

be issued in the next statement cycle regardless of your qualified purchase balance. If you are a new member and signed up for the program after October 1 of any given year, for your first year of participation only, your balance will not be reset but will be carried over to the next calendar year. **Reward cards expire ninety (90) days after they are issued.** If you are a resident of Florida, your reward card will expire one (1) year from the date it is issued. The expiration date will appear on the front of the card and in your online account.

## LOST, STOLEN OR DAMAGED REWARD CARDS
To report a lost, stolen, or damaged reward card, or for balance information, call 1-866-MAXPERKS (1-866-629-7375). OfficeMax will not replace the value on a lost or damaged reward card, or on a reward card used without your permission or that has expired.

## MAXPERKS RECYCLING PROGRAM
As a member of MaxPerks Rewards for Teachers, simply bring in visibly undamaged HP, Dell, or Lexmark ink/toner cartridges to an OfficeMax retail store and earn a $3 reward per qualified cartridge, with a maximum reward of $60 per calendar month per member (or 20 cartridges per calendar month per member). HP02, HP11, and HP88 series cartridges and remanufactured ink/toner cartridges are not eligible for rewards under the recycling program. Recycling program rewards are: calculated quarterly, earned and issued in $3 increments, and are issued in the form of a reward card that will be issued to you electronically through your MaxPerks account, by the end of the month following the quarter end, along with any other rewards you may have earned that quarter. Total recycling reward dollars issued for recycling may not exceed your total MaxPerks program qualified purchase balance. For example, if you bring in 20 cartridges throughout Quarter 1 and spend $50 on qualified purchases, your Quarter 1 recycling rewards earned will be $60 but the rewards that will be issued to you will be $48 (which is $3 for each of 16 cartridges). The remaining $12 for the last 4 cartridges will be held in your account in a "pending" status until you make additional qualified purchases in at least $3 increments in subsequent Quarters or until January 1 of the following year, when the account balance will be reset to $0. Recycling rewards can be used online, in-store or over the phone. While there is no limit to the number or brand of ink/toner cartridges you may recycle, you will only receive credit for the qualifying cartridges identified above, and in the limits identified above. Teachers can sign up for MaxPerks at time of recycling drop off to participate.

MaxPerks Recycling Programs are not open to customers that broker or re-sell ink and/or toner cartridges, and any rewards earned through those activities may be forfeited and the MaxPerks account closed.

Effective January 1, 2010, the Bulk Mail-in Recycling program is no longer available.

## MODIFICATIONS AND TERMINATION OF MAXPERKS
OfficeMax reserves the right to modify any of these Terms and Conditions including the qualified purchases, the amount of the rewards, and any of the options available to you on your MaxPerks account, at any time, with or without notice, even though these changes may affect your ability to accrue or use rewards. Your continued participation in MaxPerks constitutes your acceptance of any changes to these Terms and Conditions. You are responsible for remaining knowledgeable as to any changes that OfficeMax may make to these Terms and Conditions. The most current version of these Terms and Conditions will be available at www.officemax.com/maxperks and will supersede all previous versions of these Terms and Conditions.

OfficeMax reserves the right to terminate MaxPerks at any time, for any reason, with or without notice, even though termination may affect your ability to accrue or use your rewards.

## GENERAL TERMS AND CONDITIONS
OfficeMax reserves the right to close your MaxPerks account if you engage in any fraudulent activity or use MaxPerks in a manner inconsistent with these Terms and Conditions or any federal, state or local, laws, statutes or ordinances. Discontinued membership may result in the loss of all accumulated rewards including but not limited to rewards earned from Bonus Reward offers and rewards from the ink and toner recycling programs. In the event that OfficeMax should discontinue a membership, any ink or toner cartridge submitted but not rewarded will not be returned nor will the monetary value of those cartridges be refunded. In addition to discontinued membership, OfficeMax shall have the right to take appropriate administrative and/or legal action, including criminal prosecution, as it deems necessary in its sole discretion, and you will not be permitted to participate in the MaxPerks program in the future.

Rewards are not your property and may be revoked by OfficeMax at any time as set forth herein. Rewards may not be sold, transferred or assigned, and are not transferable upon death, as part of a domestic relations matter or otherwise by operation of law.

OfficeMax is not responsible for any incorrect or inaccurate information supplied by you while participating in MaxPerks.

All questions or disputes regarding eligibility for MaxPerks, earning or redemption of rewards, or your compliance with these Terms and Conditions will be resolved by OfficeMax in its sole discretion.

All issues and questions concerning the construction, validity, interpretation and enforceability of the Terms and Conditions, or your rights and obligations shall be governed by, and construed in accordance with, the laws of the State of Illinois, without giving effect to any choice of law or conflict of law rules.

These Terms and Conditions constitute the entire agreement between you and OfficeMax. They supersede all prior or other arrangements, understandings, negotiations and discussions, whether oral or written. No waiver of any of the provisions of these Terms and Conditions shall be deemed or shall constitute a waiver of any other provisions hereof, nor shall waiver constitute a continuing waiver unless otherwise expressly provided.

If any provision of these Terms and Conditions is found to be invalid or unenforceable by a court of competent jurisdiction, such provision will be severed from the remainder of these Terms and Conditions, which will otherwise remain in full force and effect.

This reward card is issued by OfficeMax North America, Inc.

## LIMITATIONS OF LIABILITY
OfficeMax and its partners, affiliates, subsidiaries, parent corporations and their respective agents and agencies ("Releasees") are not responsible for incorrect or inaccurate transcription of information, for problems related to any of the equipment or programming associated with MaxPerks, for any human error, for any interruption, deletion, omission, defect, or line failure of any telephone network or electronic transmission, for problems relating to computer equipment, software, inability to access the rules or online service, or for any other technical or non-technical error or malfunction. In the event of a printing error or problem with any items purchased with rewards, Releasees shall not have any liability. UNDER NO CIRCUMSTANCES,

INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE, SHALL ANY OF THE RELEASEES BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING FROM MAXPERKS OR MERCHANDISE PURCHASED WITH MAXPERKS REWARDS, EVEN IF ANY OR ALL OF THE FOREGOING OR ANY OF THEIR AUTHORIZED REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IF OFFICEMAX IMPROPERLY DENIES YOU ANY REWARDS, LIABILITY WILL BE LIMITED TO THE EQUIVALENT AMOUNT OF REWARDS OR $100, WHICHEVER IS LESS. BY PARTICIPATING IN MAXPERKS, YOU ARE WAIVING ANY AND ALL RIGHTS TO BRING ANY CLAIM OR ACTION RELATED TO SUCH MATTERS IN ANY FORUM BEYOND NINETY (90) DAYS AFTER THE FIRST OCCURRENCE OF THE KIND OF ACT, EVENT, CONDITION OR OMISSION UPON WHICH THE CLAIM OR ACTION IS BASED. You agree to rely solely on the manufacturer's warranties, if any, for any products purchased with MaxPerks rewards.

2.0.28.13

Steven Gardner - Direct by Ms. Vierbuchen

Page 347

1    could call in.

2    Q.     Okay.  Does that happen very often?

3    A.     The phone piece, not as often.  Most people

4    don't call in anymore to place orders.  They do

5    everything online.

6    Q.     And terms and conditions, right here?

7    A.     Correct.  Only one MaxPerk account -- one

8    MaxPerks account and member ID per person is

9    permitted at any given time.

10   Q.     Okay.  And then we've got an eligibility?

11   A.     Yes.  Legal residents of the 50 United States

12   age 18 years and older who have internet access to

13   manage their account.

14   Q.     Okay.  And then it also explains how to

15   actually earn rewards?

16   A.     Correct.

17   Q.     And it explains how those rewards are

18   calculated?

19   A.     Correct.

20   Q.     How does the customer get a copy of the terms

21   and conditions?

22   A.     They print it off when they sign up.  If they

23   sign up in store they're given a package, and from my

24   recollection, that package would then have the terms

25   and conditions as to what they were given.

BRANDI CHANNON'S
EXHIBIT

44

1:13-CR-966-JCH-KK   2255 MOTION

Steven Gardner - Cross by Mr. Robbenhaar

Page 963

1    BY MR. ROBBENHAAR:

2    Q.    You previously testified in this case about the

3    underlying spreadsheets?

4    A.    Correct.

5          MS. VIERBUCHEN:  Objection, Your Honor.  I

6    don't think that's a fair representation of the

7    testimony.

8          If we could approach?

9          THE COURT:  Okay.

10         (Bench discussion:)

11         THE COURT:  So the question was:  You

12   previously testified in this case about the

13   underlying spreadsheets?

14         MS. VIERBUCHEN:  The clarification was, are

15   we talking today or the prior hearing?  I'm sorry.

16   This trial or a prior hearing?  Because I don't think

17   the word spreadsheets has been mentioned during this

18   trial.

19         MR. ROBBENHAAR:  The word spreadsheet has

20   been mentioned numerous times, if you look at the

21   index of the transcripts.  It's replete with the word

22   spreadsheet.

23         But the underlying information that forms

24   the basis of the summary spreadsheets, the original,

25   enhanced, and Bates 1963, I should be able to ask him

PAUL BACA, OFFICIAL COURT REPORTER

BRANDI CHANNON'S
EXHIBIT

**45**

1:13-CR-966-JCH-KK   2255 MOTION

Steven Gardner - Cross by Mr. Robbenhaar

Page 964

1   questions about that, because that forms the

2   foundation of the government's case.  It's fair game

3   for cross-examination.

4            MS. VIERBUCHEN:  Well, I agree that we had

5   the discussion about using weight, burden -- going to

6   weight versus admissibility.  But he's just using

7   terms that haven't come up, so that's why I had the

8   foundation argument.

9            I would just suggest we lay a foundation,

10  because this jury has not heard the word

11  spreadsheets.  That was all --

12           MR. ROBBENHAAR:  That's fair.  I'm happy to

13  lay a foundation.

14           THE COURT:  All right.  So lay a

15  foundation.

16           MR. ROBBENHAAR:  And just repeatedly

17  throughout the case, the argument by the government

18  that it not only goes to weight, not admissibility,

19  so here we are.  We're talking about the same thing,

20  and it is going to the weight of the government's

21  evidence.

22           THE COURT:  Okay.  But at this moment I

23  think we're talking about foundation.  So...

24           MR. ROBBENHAAR:  And I'm happy to lay a

25  foundation.

Steven Gardner - Cross by Mr. Robbenhaar

Page 965

1            THE COURT:  You'll lay a foundation and
2    we'll see where we go.
3            MS. VIERBUCHEN:  And the other thing
4    about -- Counsel had mentioned cross-examination on
5    the enhanced.  I would remind the Court that the
6    enhanced was -- I don't believe the Court had a
7    ruling that those would be admissible under the --
8    as --
9            THE COURT:  I think I limited my ruling to
10   the original and 1963.
11           MR. ROBBENHAAR:  That's fine.  I'm just --
12           MS. VIERBUCHEN:  If I could also just
13   remind the Court that this witness has already
14   testified that he did not create the enhanced,
15   either, so just for foundation.
16           MR. ROBBENHAAR:  And the other issue that I
17   would get into, just to avoid another parade up here,
18   is talking about the hidden worksheets that are
19   contained within the original.
20           THE COURT:  What's the --
21           MR. ROBBENHAAR:  Again, it goes to the
22   integrity of the government's evidence.  He didn't
23   know what he provided the FBI.  He provided all this
24   personal data regarding thousands of other
25   individuals to the FBI.  I think that goes to not

Steven Gardner - Cross by Mr. Robbenhaar

Page 966

1    only the quality of his work and the quality of his

2    investigation, it goes right to the integrity of the

3    government's evidence.

4              THE COURT:  You're talking about other

5    individuals?

6              MR. ROBBENHAAR:  I'm not going to get into

7    the specifics, but I want to question him on how it

8    went down, how it happened.

9              THE COURT:  I'm not sure what you mean by

10   that.

11             MR. ROBBENHAAR:  Well, I'm not going to ask

12   him -- okay.  I see John Smith and his identifiers.

13   I'm not going to put that in there.

14             But I think that I should get the

15   opportunity to cross-examine this witness about how

16   his investigation, in obtaining and producing the

17   information from the database, gets produced to the

18   FBI and how this stuff inadvertently got sent over to

19   the FBI.

20             MS. VIERBUCHEN:  Well, Your Honor, I would

21   just say I don't think it has any relevance to this

22   case.  I mean the testimony at the prior hearing was

23   that he wasn't even aware that the hidden data was

24   there.  And there's been no evidence, either through

25   their expert or through this witness, that that data

Steven Gardner - Cross by Mr. Robbenhaar

Page 967

1    was even used.

2         So I think it's more of, perhaps, a Rule

3    403, where it's really unfairly prejudicial.  There's

4    no evidence it was used or consulted or relied upon

5    in this case.  They were hidden, and the witness

6    didn't even know about it.

7         So I think it's unfair to kind of suggest

8    that that somehow makes the data untrustworthy, and I

9    would ask that it be excluded, the reference to the

10   hidden tabs.

11        THE COURT:  All right.  Well, at this point

12   I'm going to -- I'm not going to allow the reference

13   to the hidden tabs and other individuals.

14        Now, I don't know how it will all play out.

15   We may be revisiting the issue.

16        But at least at this point I have no --

17   I've heard no evidence that that information was used

18   with respect to the charges against these defendants.

19        MR. ROBBENHAAR:  No, but those documents

20   form the basis of the government's evidence in this

21   case.  It goes to the integrity of their evidence.

22   It goes to the credibility of this witness.

23        If he did a sloppy job of his investigation

24   and presentation of his case, I should be able to

25   cross-examine.  The hidden worksheets apparently came

Steven Gardner - Cross by Mr. Robbenhaar

Page 968

1    from a template he testified to that he forgot came

2    from a worksheet that he forgot was there.  I mean,

3    that goes to --

4              THE COURT:  That testimony was at the

5    pretrial hearing, right?

6              MR. ROBBENHAAR:  Correct.  Not in the

7    trial, but a pretrial evidentiary hearing.  That's

8    right.

9              THE COURT:  Well, at this point I'm not

10   going to allow it.

11             As I say, if there's something that comes

12   up that makes it more relevant we can revisit the

13   issue.  But at this point...

14             MS. VIERBUCHEN:  And, Your Honor, could I

15   also make another point?

16             As I recall from a pretrial ruling from

17   this Court, and in response to the hearing we had to

18   exclude the testimony of Ms. McHard, I understood the

19   Court's ruling to be that if things we're not relying

20   on to form the basis of our summary charts could --

21   were not a permissible form of testimony for

22   Ms. McHard.

23             So along those same lines, again, the

24   evidence is clear that, one, we did not rely on all

25   of the tabs that were not hidden, and the testimony

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Cross by Mr. Robbenhaar

Page 969

1   was clear that we did not even know about hidden tabs

2   in doing our analysis, and the government's analysis

3   through Mr. Gardner.

4            So just another point.

5            MR. ROBBENHAAR:   Okay.   So -- but McHard

6   will be allowed to testify regarding the original,

7   the enhanced, and the 1963?

8            THE COURT:   We'll just -- I'm not going to

9   rule on that right now because I need to hear how

10  things develop.   I mean if I'm making a decision

11  right this second, based on what I've heard so far,

12  I'd say it's not -- it's not relevant with respect to

13  this -- these defendants.

14           But I don't know -- I'll just have to

15  reserve any further ruling on it.

16           MR. ROBBENHAAR:   Very well.

17           (End of bench conference.)

18  BY MR. ROBBENHAAR:

19  Q.    Mr. Gardner, earlier in your testimony in this

20  case you testified that individuals, when they sign

21  up for the MaxPerks program, you can go online and do

22  that, right?

23  A.    Yes, you could.

24  Q.    All right.   You could do it in the store or you

25  could do it online?

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Cross by Mr. Robbenhaar

Page 970

 1    A.    Yes.

 2    Q.    And I think your testimony was OfficeMax wanted

 3    to make it as easy as possible to do that?

 4    A.    Correct.

 5    Q.    All right.  So there was this online function

 6    where you signed up for it.

 7          You're familiar with the various terms and

 8    conditions of the MaxPerks program?

 9    A.    Pretty familiar.

10    Q.    Have you had a chance to review those prior to

11    coming into court in this case?

12    A.    Yes, some of the different years.

13    Q.    Okay.  We talked a little bit about some of the

14    changes made to the ink recycling program.

15          Those changes are reflected in the terms

16    and conditions documents?

17    A.    They would be reflected in -- yes, they should

18    be reflected in those terms and conditions or ones

19    that came after.

20          MR. ROBBENHAAR:  So the jury won't see,

21    because this is a document not yet admitted.

22    BY MR. ROBBENHAAR:

23    Q.    On your screen, Mr. Gardner, you have what's

24    been labeled as Exhibit R.

25          Do you see that?

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Cross by Mr. Robbenhaar

Page 971

1   A.    I do.

2   Q.    All right.

3         MR. ROBBENHAAR:  If you could go to the top

4   of the document, please.

5   BY MR. ROBBENHAAR:

6   Q.    Do you recognize what this document is?

7   A.    It looks like it would be a snapshot from

8   enrolling online.

9   Q.    Okay.

10        MR. ROBBENHAAR:  If you could scroll down.

11  BY MR. ROBBENHAAR:

12  Q.    And what is that window there?

13  A.    That looks like that would be the window for

14  the terms and con- -- terms and conditions

15  acknowledgment.

16  Q.    And when was it last updated?

17  A.    That one says October 8, 2010.

18  Q.    And in your preparation for testifying in this

19  case, is this a document or a window that you're

20  familiar with?

21  A.    This particular enrollment screen?

22  Q.    Yes, sir.

23  A.    I haven't looked at it in a long time.

24  Q.    Okay.  Does this -- does it appear consistent

25  with enrollment screens that you've reviewed in the

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Cross by Mr. Robbenhaar

Page 972

1    past?

2    A.    Yeah, I guess.

3    Q.    Well --

4    A.    It looks pretty consistent.  I mean, you're

5    asking me to think back to what the enrollment screen

6    looked like five years ago.

7              I think it looks pretty close to it.

8              Could I say 100 percent?  No.

9    Q.    Okay.  Let me ask you just a question about the

10   terms and conditions.

11             You mentioned earlier, sir, in your

12   testimony, that if someone needed to know the terms

13   and conditions you could just print it off, I think

14   is what your testimony was.

15   A.    Yes.  You could pull them off of the website.

16   Q.    All right.  Is that evident on this particular

17   box?

18   A.    How to -- how to pull them off?

19   Q.    How to print them off.

20   A.    No, it's not evident on this box.

21   Q.    Okay.  There is a box that states that you

22   could just agree, just real quickly, by checking the

23   box, right?

24   A.    Right.  I don't know if you have to scroll

25   through it or not.  I -- we -- I don't remember if we

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Cross by Mr. Robbenhaar

Page 973

1    put the feature in.  I thought we did, where you

2    would have to scroll down in order to do that.

3              I don't know if that was the case at this

4    point, at this juncture.

5    Q.    Does it appear in this box that, in this case,

6    that you have to scroll through the -- all the

7    language of the terms and conditions, or can you just

8    check the agree box?

9    A.    It looks like you can check it, but I don't

10   know if that's the case.  I know with other terms and

11   conditions on other programs I've signed up for, even

12   though you can check the box, sometimes it will error

13   out on you and it will say, Must review.

14             And then you've got to scroll through them

15   all, so I don't know.

16   Q.    Let me ask you a question about that.

17             Are you, by chance, an Apple product owner?

18   A.    Yes.

19   Q.    And --

20             MS. VIERBUCHEN:  Objection, Your Honor, for

21   relevance.

22             MR. ROBBENHAAR:  I'm talking about the

23   terms and conditions and the ability just to agree.

24             THE COURT:  Are you asking the witness

25   about his own experience with terms and conditions --

Steven Gardner - Cross by Mr. Robbenhaar

Page 974

```
 1              MR. ROBBENHAAR:  Yes.

 2              THE COURT:  -- on Apple products?

 3              MR. ROBBENHAAR:  Yes.  As it relates to

 4   this case.

 5              THE COURT:  As it relates to this case?

 6   Overruled.

 7              MS. VIERBUCHEN:  Your Honor, I have an

 8   outstanding objection that I would like to approach

 9   on.

10              THE COURT:  All right.

11              (Bench discussion:)

12              MS. VIERBUCHEN:  Your Honor, before we keep

13   asking questions about this exhibit, I think it's

14   important to establish -- to either offer it versus

15   continuing talking about it.

16              This is -- this is information that's

17   provided by the defense.  I don't think this witness

18   even knows how this information was obtained, and so

19   I would be objecting to --

20              THE COURT:  You're talking about Exhibit R?

21              MS. VIERBUCHEN:  Exhibit R right now.  But

22   I'm anticipating, if you have the defense list --

23   Judge, if I could just draw your attention to R.  At

24   the top of it, what we're not seeing on the screen --

25   does Your Honor have a copy of R?
```

Steven Gardner - Cross by Mr. Robbenhaar

Page 975

 1              But I could show you our copy.  It's
 2    easier, Judge.
 3              There's -- just at the top of the screen
 4    there is a notation.  I don't know where this came
 5    from.  I think another witness may have to testify to
 6    this.
 7              I think the question just needs to be asked
 8    if he can say that this is a true and accurate
 9    reflection of the business records of OfficeMax,
10    because I don't know what that is, Wayback Machine.
11              It's not OfficeMax's records, so I just
12    don't think there's a foundation.
13              I mean, maybe it is OfficeMax records, but
14    to continue to ask questions of the witness about the
15    document without moving for the admission so we can
16    resolve the issue as --
17              MR. ROBBENHAAR:  I will try to move the
18    admission of the document.  This is from, I think,
19    called the Wayback Machine, which establishes
20    websites from years ago.
21              THE COURT:  So is this an OfficeMax
22    archive?
23              MR. ROBBENHAAR:  No, the Wayback is not
24    part of OfficeMax.
25              MS. VIERBUCHEN:  So I think there is a

Steven Gardner - Cross by Mr. Robbenhaar

Page 976

1    fundamental issue as to the source of this.

2            THE COURT:  Well, you'll have to lay a

3    foundation if you can do it.  But...

4            So at some point are you planning on moving

5    the admission of this document?

6            MR. ROBBENHAAR:  I wasn't necessarily going

7    to, but I could, yeah.  I will.  I was just going to

8    use it as a demonstrative aid for this witness.

9            THE COURT:  Because the jury is not seeing

10   any of that.

11           MR. ROBBENHAAR:  No, they're not seeing any

12   of that.

13           THE COURT:  Well, you know, if the jury has

14   not seen it yet, do you have more questions on this

15   exhibit?

16           MR. ROBBENHAAR:  Sure.  I can see if we can

17   establish the foundation for it to move it in.

18           THE COURT:  All right.

19           MR. ROBBENHAAR:  If not, then we'll move

20   on.

21           THE COURT:  Okay.

22           (End of bench conference.)

23   BY MR. ROBBENHAAR:

24   Q.   Mr. Gardner, how long have you been employed at

25   OfficeMax, now Office Depot?

Steven Gardner - Cross by Mr. Robbenhaar

1   A.    16, 17 years, in that area.

2   Q.    From the early 2000s?

3   A.    1999.

4   Q.    All right.  And the document that you've been

5   referring to, that we've been referring to,

6   Defendant's Exhibit R, is that a document that is

7   consistent with the terms and conditions of the

8   sign-up program for the MaxPerks -- MaxPerks program?

9   A.    For a period of time it would be, but it

10  wouldn't be -- it would change.  If what you're

11  talking about is these terms and conditions, they

12  would change as the terms and conditions changed

13  at -- throughout the program.

14  Q.    Is there anything in this document that causes

15  you to think that this is not an accurate and true

16  reflection of the -- let me go to the top -- the

17  login and signup information for the MaxPerks program

18  in October of 2010?

19          MS. VIERBUCHEN:  Objection, Your Honor.

20          The document that's being displayed on the

21  screen is not at all consistent with the document

22  that's been listed as the exhibit.  It's missing

23  something at the top.

24          THE COURT:  Can you lay any additional

25  foundation, or what -- there's -- I don't --

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Cross by Mr. Robbenhaar

Page 978

1           MR. ROBBENHAAR:  This document is what's
2  being introduced.
3           The document that the government has in its
4  binder is a --
5           MS. VIERBUCHEN:  This is the document the
6  defense provided us as being Defendant's Exhibit R.
7  So I just want to make sure we're talking about the
8  same exhibit.
9           MR. ROBBENHAAR:  I'm talking the digital
10  version that's on the screen here.
11           THE COURT:  Do you have a position about
12  the document you see on the screen?
13           MS. VIERBUCHEN:  Your Honor, if it came
14  from the same place that Defendant's Exhibit R has
15  that was provided to the government, then yes, I do
16  have questions as to the authenticity.
17           THE COURT:  All right.  Well --
18           MR. ROBBENHAAR:  I guess --
19           THE COURT:  You're all going to have to
20  approach again.
21           (Bench discussion:)
22           THE COURT:  So the witness has been shown
23  the document on the screen, and that is what the
24  witness is asked to identify and authenticate.
25           Now, this is different.  So what's -- what

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Cross by Mr. Robbenhaar

Page 979

 1   are we --

 2              MR. ROBBENHAAR:  I don't understand, in all

 3   honesty, Judge, how this got on the documents that

 4   were produced to the government.

 5              What was produced digitally -- or at least

 6   which is what's being called up by my paralegal

 7   digitally, that would be the final exhibit.

 8              If he can establish the foundation, great.

 9   If not -- but I think it's a document that he

10   recognizes as true and accurate.

11              THE COURT:  I guess I'm just trying to

12   figure out why that's different from what was --

13              MS. VIERBUCHEN:  If you notice the logo,

14   that has the OfficeMax logo.  That's absent here.

15              THE COURT:  Right.  Yeah.  I see that.

16              MS. VIERBUCHEN:  And I think if the witness

17   had this additional information he -- it may change

18   his opinion as to whether or not he can represent

19   that that appears to be an OfficeMax record.  And so

20   I -- I'm a little concerned about why there is a nice

21   little stamp that says OfficeMax here that does not

22   show up on the copy that was provided to the

23   government.

24              These are two different documents that

25   purport to be really containing the same information.

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Cross by Mr. Robbenhaar

Page 980

1    And if the information was obtained off of Wayback

2    Machine, then I think it would be improper to offer

3    this through that witness.  And I think it's a little

4    misleading to put that one up if, in fact, the source

5    of the document is really this Wayback Machine.

6             THE COURT:  Well, I don't know what the

7    source of the document is.  But if the witness can

8    identify it...

9             MR. ROBBENHAAR:  As a signup sheet for a

10   term by a program that he is well aware of.  And if

11   he can say that it is accurate to the best of his

12   recollection, I think that's appropriate foundation.

13            In all fairness, I don't know, honestly,

14   where that came from.  But that's the document that

15   we're relying upon for this trial.

16            THE COURT:  And I haven't compared them.

17   What else is different, if anything, besides the

18   header?

19            MR. ROBBENHAAR:  It would appear to be

20   that's the only header.

21            MS. VIERBUCHEN:  And of course if you see

22   at the top of the document there, Judge, they have a

23   nice little MaxPerks program that doesn't appear

24   here, so it seems to suggest it was printed off the

25   actual OfficeMax website, which I believe it was

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Cross by Mr. Robbenhaar

Page 981

1    printed off this Wayback Machine, because OfficeMax

2    doesn't exist anymore.

3              THE COURT:  Well, I don't -- I guess that's

4    what laying the foundation is all about.  We'll just

5    have to hear what the witness says.

6              If he can lay a foundation, fine.  If he

7    can't, then that's the end of that.

8              (End of bench conference.)

9    BY MR. ROBBENHAAR:

10   Q.    Mr. Gardner, directing your attention to

11   Exhibit R.

12   A.    Yes.

13   Q.    To the best of your knowledge, given your

14   experience as a 16-year employee veteran of

15   OfficeMax, now Office Depot, is this document a fair

16   and accurate representation of the signup sheet for

17   the MaxPerks program as it would have -- as it would

18   have appeared in October of 2010?

19   A.    I wouldn't be able to say for sure.  I mean

20   looking at the bottom here you have this 2.0.28.12,

21   which tells me this is some sort of a snapshot from

22   something.

23              So if -- unless I could validate it through

24   our company, I would not be able to say that.

25              I do know in my history of researching

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Cross by Mr. Robbenhaar

Page 982

```
 1    coupon cases, we've had numerous coupons which people

 2    have -- and I'm not saying that's the case here.  I'm

 3    just saying I would need to validate it through our

 4    company.

 5              We've had coupons which people have been

 6    able to adjust and add things to, and our cashiers

 7    can't pick it up.

 8              So would I be able to say that 100 percent?

 9    No.

10    Q.    So you're unable to establish that this is a

11    valid OfficeMax terms and conditions?

12    A.    Unfortunately, no.

13    Q.    All right.  You're familiar with --

14              MR. ROBBENHAAR:  So we can take that off

15    the screen.

16    BY MR. ROBBENHAAR:

17    Q.    Despite not being able to establish that this

18    is a fair and accurate representation of a signup

19    form, in the term -- you're familiar with the general

20    language of the terms and conditions, are you not?

21    A.    I think I'm somewhat familiar with them.

22    Word-for-word no, but I think I get the spirit of it.

23    Q.    Sure.  In your testimony earlier in this case

24    you testified about, basically, the terms and

25    conditions limited one account per person?
```

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Cross by Mr. Robbenhaar

1   A.    Yes.

2   Q.    All right.  And would one person be able to

3   have two accounts?

4   A.    According to the terms and conditions, no, we

5   wouldn't want somebody to have two accounts.

6   Q.    What if an individual with an account had

7   forgotten, somehow, that he or she had an account and

8   established a second account?

9         Would that be allowed?

10  A.    What would happen is, if we -- if we identified

11  there was just one account, or maybe even a third

12  account, once we identify that we would reach out to

13  the customer and say, We need to link your accounts

14  together.

15        But when you get into the hundreds and

16  thousands of accounts, the likelihood that that was

17  accidental is kind of diminished.

18  Q.    So if a person has an account for a home, and

19  let's say that person also wanted to have an account

20  for his or her church, would that be permissible?

21  A.    We would tell them no, that you should link

22  those accounts together.

23  Q.    Okay.  How about a business on one hand, and a

24  home on the other?

25  A.    The same thing.  They should be linking those

PAUL BACA, OFFICIAL COURT REPORTER

OfficeMax | MaxPerks – Recycling Program

11/4/18, 4:28 AM



**SIGN UP IN STORE?**

If you signed up for MaxPerks in a store or over the phone and this is your first time to the site, you'll need to activate your online account below.

Enter your 9 Digit Member ID:

https://www.officemaxperks.com/RecyclingProgram.aspx   Go   JUN DEC JUL

12 captures

◀ 27 ▶

Password:

Remember Me

## MaxPerks Recycling Program

MaxPerks members can earn $3 in rewards for each qualifying† visibly undamaged HP, Dell or Lexmark ink or toner cartridges dropped off in an OfficeMax store location. Simply present your MaxPerks ID when submitting cartridges to ensure you receive credit and your rewards will be issued in the next statement cycle along with any other MaxPerks rewards you may have earned during the same period. You can earn up to $60 in rewards per calendar month per member (from 20 ink or toner cartridges). While there is no limit to the number or brand of ink/toner cartridges you may recycle, you will only receive rewards for the qualifying† items and limited quantity noted, and the total amount of your recycling rewards issued cannot exceed your total qualified* purchase amount in your MaxPerks account.

· Click Here to see how it works for the MaxPerks Rewards for Business Program
    For example, if you bring in 20 cartridges throughout Month 1 and spend $50 on qualified purchases, your Month 1 recycling rewards earned will be $60, but the rewards that will be issued to you will be $48 (which is $3 for each of 16 cartridges). The remaining $12 for the last 4 cartridges will be held in your account in a "pending" status until you make additional qualified* purchases in at least $3 increments in subsequent Months or until January 1 of the following year, when the account balance will be reset to $0.

· Click Here to see how it works for the MaxPerks Rewards for Teacher Program
    For example, if you bring in 20 cartridges throughout Quarter 1 and spend $50 on qualified purchases, your Quarter 1 recycling rewards earned will be $60, but the rewards that will be issued to you will be $48 (which is $3 for each of 16 cartridges). The remaining $12 for the last 4 cartridges will be held in your account in a "pending" status until you make additional qualified* purchases in at least $3 increments in subsequent Quarters or until

    January 1 of the following year, when the account balance will be reset to $0.

† Qualifying cartridges are any visibly undamaged HP, Dell or Lexmark ink or toner cartridges. Excludes HP02, HP11, HP88 series and remanufactured cartridges of any brand. Qualified items are determined by OfficeMax at its sole discretion. Total recycling reward dollars issued for recycling may not exceed your total purchase qualified purchase balance. Please see MaxPerks Terms and Conditions for full recycling program details.

*Qualifying merchandise is any product and/or service in our retail stores, online or in our catalogs, except: computers, gift cards, general use prepaid cards, Sprint™ service plans, phone cards, purchases with Retail Connect™ pricing, sales tax and purchases made prior to the date of enrollment. Purchases with your MaxPerks Reward Card do not count toward the qualifying spend requirement. Please see officemax.com/maxperks for full program details.

2.0.28.14

**BRANDI CHANNON'S EXHIBIT**

**46**

1:13-CR-966-JCH-KK   2255 MOTION

Page 54

1    Judge, where -- like where every school said

2    elementary school, the name that preceded it -- say

3    it was Houston Elementary School.  You will see that

4    this person was also registered -- the account was

5    registered in Houston, Texas.

6            If it was San Antonio Elementary School it

7    was registered, you know, in San Antonio, Texas.

8            THE COURT:  Right.

9            MS. VIERBUCHEN:  And so there was a little

10   bit more to the scheme, as well, to kind of make it

11   look like this person was a teacher when, in fact, we

12   know that they're not teachers.  But...

13           THE COURT:  All right.  So what other

14   summary exhibits do you have?

15           MS. VIERBUCHEN:  Okay.  And so we could go

16   to Government's Exhibit 6, Judge.

17           Okay.  Again, this information is taken off

18   what we were just looking at, just this -- that --

19   what we were looking at, the enrollment data that was

20   on the all accounts tab of the Daubert Hearing

21   Exhibit 2.

22           And it's merely a summary of the enrollment

23   data.  Remember I drew your attention to the

24   enrollment date?

25           THE COURT:  Uh-huh.

BRANDI CHANNON'S
EXHIBIT
47
1:13-CR-966-JCH-KK   2255 MOTION

Page 55

1          MS. VIERBUCHEN:  And so if you go and you

2    look, you will see that the enrollment date for the

3    first teechur account was in March.  The last teechur

4    account ended in April.  You can see the rollover

5    through these accounts.

6          And then the defendants opened up coach

7    only for two months.  728 enrollments in the month of

8    May.

9          Again, that was all in that data that we

10   were looking at, the enrollment data.

11         So you would -- if you went and looked at

12   each line you would -- you would observe 728

13   enrollments on -- in the month of May.

14         And as I said, I think it's an important

15   point.  The defendants have not pointed to a single

16   error in our summary.  Obviously, if there were

17   errors in what our summary of the data would be, that

18   would be, you know, something we would want to

19   address, because we'd have -- it needs to be an

20   accurate summary of the underlying data.

21         And again, we're doing this to save time.

22         If we print out that spreadsheet,

23   Your Honor, I really can't even estimate how many

24   thousands and thousands of pages it would be.  And...

25         THE COURT:  Which spreadsheet are you

Page 1552

1    businesses residing or operating in all of the 50

2    states and the District of Columbia.

3             But these weren't the only lies that they

4    told.

5             Another lie, or false statements that they

6    repeatedly told, was that they falsely claimed to be

7    teachers.  They claimed to be teachers so that they

8    could maximize the fraud committed on OfficeMax by

9    taking advantage of a program specifically designed

10   to help real teachers.  It was designed to help real

11   teachers minimize the out-of-pocket expenses for --

12   because of the recognition that teachers often bought

13   supplies for their students.

14            The evidence is undisputed that neither of

15   the defendants are teachers.

16            The other lies and false representations

17   that the defendants made were when they claimed over

18   60,000 online transactions for purchases they never

19   made.  And that's reflected in Government's

20   Exhibit 26.

21            And to understand the scope of the scheme,

22   you have to understand that these 60,000 fraudulent

23   online transactions were made to in-store purchases

24   in 13 states in 282 stores.

25            And by falsely claiming over 60,000 online

BRANDI CHANNON'S
EXHIBIT

**48**

1:13-CR-966-JCH-KK   2255 MOTION

Page 1553

1    transactions -- or online adjustments, it resulted in

2    the defendants claiming almost $2 million in

3    purchases that they never made.

4           And do you remember what Mr. Gardner had

5    told you, that if the scheme had not been stopped

6    when it was, that would have netted the defendants

7    over 400,000 in MaxPerks rewards.

8           Now there's another part to this scheme,

9    more false statements and lies, and that involves the

10   ink recycling program.

11          Now, you heard -- the evidence in this case

12   was that the scheme involved over 27,000 ink

13   cartridges being recycled, and this was to get around

14   the recycling limits that OfficeMax imposed per

15   customer.

16          And we -- I think we all know what those

17   are by now.  It was 20 per month, 240 per year.

18          And by pretending to be 5,400 other people

19   or businesses, the defendants were able to recycle

20   ink in hundreds of different stores across the

21   country and in 12 different states.

22          And as the evidence has often shown, and as

23   we've seen, the defendants have traveled to numerous

24   states in furtherance of the scheme to defraud

25   OfficeMax.  You see the stores in which the

PAUL BACA, OFFICIAL COURT REPORTER

Page 1554

1    defendants traveled or made online adjustments to.

2    And we see that the reward cards that were redeemed

3    resulted in a loss of over $100,000 to OfficeMax.

4              Now, you've heard a lot of evidence in the

5    past five days in the form of witness testimony and

6    exhibits.

7              And if the defendants' opening statements

8    are any indication, there doesn't seem to be much in

9    the way of dispute regarding the facts of this case.

10             I submit to you that the only issue is --

11   and it's not really much of one -- is whether or not

12   what the defendants did was a crime.

13             And the law says it is.

14             Now the Court had earlier read to you the

15   charges in the indictment, and I would like to

16   discuss those with you now.

17             As the Court noted, Count 1 of the

18   indictment charges Matthew and Brandi Channon with

19   conspiracy to commit wire fraud from the time period

20   of August 25, 2009, to June 8, 2011.

21             Now, Counts 2 through 7 are what we call

22   substantive counts of wire fraud.

23             Specifically in Counts 2 and 4, Brandi

24   Channon is charged with wire fraud.

25             And in Counts 3, 5, 6, and 7, Matthew

Page 1555

1    Channon is charged with wire fraud.

2            Now the defense, in their opening

3    statement, called the defendants' scheme to defraud

4    OfficeMax extreme couponing by energetic customers.

5            The law calls it wire fraud and conspiracy

6    to commit wire fraud.

7            The defense claims that the Channons were

8    just trying to beat OfficeMax at their own game by

9    taking advantage of the customer loyalty program.

10           OfficeMax didn't know it was a game.

11   OfficeMax was tricked into providing over $100,000 in

12   merchandise based on the false representations of the

13   defendants.

14           The only people playing the game were the

15   defendants, and it was a game of deceit and fraud.

16           OfficeMax was simply trying to run a

17   business in an honest way.  Sure, like any business,

18   they were trying to make money.  But like every

19   person or business, OfficeMax is entitled to

20   protection of the law when people are stealing from

21   them.

22           Now the judge described for you the law

23   that you must apply in this case, and I'd like to go

24   over that with you and show how the facts and the

25   evidence in this case prove that the defendants are

PAUL BACA, OFFICIAL COURT REPORTER

Page 1631

1                    CLOSING STATEMENT

2    BY MS. VIERBUCHEN:

3              If you have to tell somebody something

4    that's not true so they will give you something in

5    return, that's fraud.

6              It's common sense that fraud is illegal and

7    it's wrong.

8              Now Matthew and Brandi Channon knew that if

9    they went into the OfficeMax stores and they gave

10   their real names and their real addresses and their

11   real e-mail addresses, and if they didn't lie about

12   being teachers over 5,000 times, that if they had

13   told the truth, OfficeMax was not going to give them

14   another MaxPerks account, let alone 118 more, let

15   alone 5,343 more.

16             Now, I would like to start off with some

17   comments in response to Mr. Hotchkiss' presentation.

18             He claims that because there's less

19   evidence regarding Brandi Channon's involvement, that

20   somehow means she's not culpable.

21             Well, as you've heard from the Court, that

22   is not the law.

23             Mr. Hotchkiss makes it sound like Brandi

24   must have been linked to every piece of evidence in

25   the case and there must be equal amounts of other

PAUL BACA, OFFICIAL COURT REPORTER

BRANDI CHANNON'S
EXHIBIT
**49**
1:13-CR-966-JCH-KK   2255 MOTION

Page 1632

1    evidence.

2              This is just wrong, and it's contrary to

3    law.

4              You were instructed by the Court on the law

5    of conspiracy, and you were specifically

6    instructed -- and you will see those in the

7    instructions which will be sent back with you

8    specifically that, quote:

9              "A person may belong to a conspiracy for a

10   brief period of time or play a minor role."

11             That is exactly what has happened here.

12   Don't let the defense counsel try to fool you into

13   believing there had to be an equal amount of evidence

14   involving Brandi Channon that there was for Matt

15   Channon.

16             It's just not true, and the Court's

17   instructions are clear on that.

18             Now, there is sufficient evidence that does

19   link Brandi Channon to the scheme at hand and shows

20   the conspiracy and that she knows what she's doing is

21   wrong.

22             Now, we've seen not two videos --

23   Mr. Hotchkiss referred to two videos -- we actually

24   have seen three videos with her.

25             In all three videos she presents a MaxPerk

PAUL BACA, OFFICIAL COURT REPORTER

Page 1633

1   rewards card in a different name.  Those videos and

2   corresponding Ejournals are at Exhibits 48 through

3   53, and then you have another video at Exhibit 66.

4   And that was the February 6, 2011, video.

5          She herself is in there pretending not to

6   know her husband and claiming ink recycling rewards

7   to which she's not entitled.

8          Very importantly is when she -- when

9   Agent Boady approached her at the time of the search

10  warrant and he asked her if she knew why he was

11  there.

12         What did she say?

13         The OfficeMax thing.

14         And she also told Agent Boady that all

15  the -- all the details that indicated she knew what

16  the scheme was about.

17         Recall what she told him?

18         She told him about the dots in the gmail

19  that were used to create additional accounts, and

20  that she knew that OfficeMax created additional --

21  considered those dots to be separate accounts though

22  gmail didn't.

23         This is evidence of her knowledge and of

24  her guilt.  She knows all of the details of the

25  scheme.

PAUL BACA, OFFICIAL COURT REPORTER

Page 1641

1              And I want you to keep that in mind,

2    because a lot of what you heard from Mr. Robert was

3    not in evidence, and you cannot consider it.

4              So the re- -- there is a reason the defense

5    is trying to distract you by the stuff that's not in

6    evidence.  That's because they know if you really

7    just looked at the evidence, then their clients are

8    guilty.

9              Mr. Robert expressed concerns over

10   reasonable doubt.  And I think he gave you an analogy

11   to, like, a civil case where it was 49 percent versus

12   51, and he expressed doubt.

13             What's the number for reasonable doubt?

14   What's the number?

15             That need not concern you.  The Court has

16   given you the instruction on beyond a reasonable

17   doubt, and it doesn't involve any numbers.

18             And that is the law that you have taken an

19   oath and sworn to follow.

20             And let me read to you what that is.

21             "Proof beyond a reasonable doubt is proof

22   that leaves you firmly convinced of the defendants'

23   guilt.  There are few things in this world that we

24   know with absolute certainty, and in criminal cases

25   the law does not require proof that overcomes every

PAUL BACA, OFFICIAL COURT REPORTER

BRANDI CHANNON'S
EXHIBIT

**50**

1:13-CR-966-JCH-KK   2255 MOTION

Page 1642

1    possible doubt.  It is only required that the

2    government's proof exclude any reasonable doubt

3    concerning the defendants' guilt.

4            "A reasonable doubt is a doubt based upon

5    reason and common sense after careful and impartial

6    consideration of all the evidence."

7            That's the only thing you need to concern

8    yourself with.

9            Now, Mr. Robert started off talking about

10   the cashiers at Smith's and a Starbucks guy, and

11   asked if these were crimes.

12           That is not your consideration.  As the

13   Court told you, we are -- that case is not before

14   you.  We are prosecuting the case here that's before

15   you involving OfficeMax being defrauded by the

16   defendants, Matthew and Brandi Channon.

17           Whether or not you're getting some extra

18   free coffees at Starbucks or some gas points at

19   Smith's is not the issue, and that's not the reason

20   that we are here.

21           And I would ask you to disregard that and

22   not speculate as to matters that are not before you.

23           The only question before you is whether or

24   not what the defendants did in this case was a crime

25   under the law, whether they devised a scheme to cheat

PAUL BACA, OFFICIAL COURT REPORTER

1    OfficeMax out of its stuff, and the resounding answer

2    is yes.

3            Now, Mr. Robert said something about the

4    defendant Mr. Channon living the American dream and

5    he had the entrepreneurial spirit in starting a

6    business.

7            And I'm not sure what kind of business this

8    is, but it certainly is an affront to every

9    legitimate business that's out there like OfficeMax.

10           OfficeMax and every other legitimate

11   business are the American dream.  They offer

12   legitimately obtained products out in the open using

13   their real names.

14           Now, I don't know how you can reasonably

15   think that you can make $100,000 without producing

16   anything, without performing a service for somebody,

17   without adding anything of value to it.

18           Mr. Robert referred to Merry Maids.  Well,

19   as I understand Merry Maids, you pay them money and

20   they clean your house or they do something.

21           In this case the defendants went online and

22   stole other people's purchases and then used the

23   reward cards to purchase a lot of stuff.

24           They added no value.  It's not a business.

25   It's a fraud.  It's a scam.  And the law says it's a

PAUL BACA, OFFICIAL COURT REPORTER

Page 1644

1    crime.

2              It's a scam that leeched money from

3    OfficeMax and for which the defendants are guilty.

4              There was a reference by Mr. Robert to

5    abandoned rewards.

6              But by claiming other people's rewards,

7    that means those rewards aren't there for the

8    other -- for the true legitimate customer to claim.

9              The defense -- Mr. Robert specifically

10   argued that it was about the terms and conditions and

11   said that Mr.- -- Mr. Channon was really familiar

12   with those terms and conditions.

13             But the defense argument in this regard is

14   internally inconsistent.

15             On the first hand they say Matt Channon

16   knew the terms and conditions so well that he was

17   able to identify loopholes in the OfficeMax terms and

18   conditions and was able to exploit those conditions.

19             But the evidence is clear that the terms

20   and conditions allowed only a single account and no

21   transfer of rewards.

22             So -- a single account, I'm sorry, per

23   customer.

24             So there was no loophole.  It was just that

25   the defendant just flatly broke the rules and cheated

Page 1645

1  OfficeMax.

2          Exact- -- strike that.

3          He cheated exactly what the law makes a

4  crime.

5          But there's an inconsistency here about

6  this loophole.  Because if they claim that they had

7  no idea that the online adjustments were limited to

8  his own purchase, it's expressly stated in the terms

9  and conditions that you can't do that, that it's

10  limited to your own.

11          So either he knows the rules and conditions

12  or he's ignoring them to commit the fraud.

13          Either way it doesn't add up.

14          If Matthew Channon truly believed that it

15  was fine to adjust other people's transactions, then

16  he wouldn't need to create fake accounts and fake

17  names and falsely claim to be a teacher.

18          If Matthew Channon really believed that

19  OfficeMax didn't care about someone defrauding its

20  system, then why would he have sent the e-mails to

21  people telling them how to defraud the system?

22          Remember the numerous e-mails that we saw,

23  a lot of them yesterday and some the day before.

24          If he didn't believe what he was doing was

25  wrong, why would he say such things as, quote:

PAUL BACA, OFFICIAL COURT REPORTER

Page 1646

1          "Since OfficeMax expressly forbids the

2     resale of these items, don't use your own MaxPerks

3     account number with my fraudulent reward card."

4          He didn't have the word "fraudulent," but

5     "with my reward card," which wasn't his, because it

6     was obtained under false pretenses.

7          And if Matthew Channon and Brandi Channon

8     really believed that OfficeMax didn't care, they

9     would have gone into the stores together, they would

10    have not identified themselves as teachers, they

11    would not have flown to various places in the country

12    and go to various OfficeMaxes, I think over 300, if

13    what they were doing they believed was lawful.

14         But they didn't do that.  They went to all

15    of these stores.  They -- and, seriously, they could

16    have just gone to Albuquerque.  Why not just go to

17    Albuquerque?  That's where they live.  Why not keep

18    going there?  Because they knew what they were doing

19    was wrong.

20         At the beginning of this case you may

21    recall that my colleague, Ms. Kastrin, appeared

22    before you over a week ago and asked you to bear with

23    us as we presented the evidence.  And I think she

24    might have even said the presentation might have been

25    a little tedious at times.  I think we might have

PAUL BACA, OFFICIAL COURT REPORTER

Page 1647

1    lived up to that -- that statement.

2            Now, we -- during that time she said to you

3    that if you bear with us we'll put the evidence to

4    you and that the pieces -- that the puzzle pieces

5    would all come into play.

6            You now have the evidence.  The puzzle

7    pieces have come into play.  The picture is complete,

8    and the evidence shows that the defendants are guilty

9    of wire fraud and conspiracy to commit wire fraud.

10           Now, the judge has told you about the

11   verdict sheet.  We would ask you, with respect to

12   Brandi Channon, to find Brandi Channon guilty of

13   Count 1, Count 2, and Count 4, and we ask you to find

14   Matthew Channon guilty of Count 1, Count 3, Count 5,

15   Count 6, and Count 7.

16           The picture is complete and the defendants

17   are guilty.

18           Thank you.

19           THE COURT:  All right.

20           Ladies and gentlemen of the jury, the case

21   will now be submitted to you for your deliberations.

22           Now, this -- you-all probably figured out

23   that there are a couple of alternates that have been

24   seated here, so I am going to excuse the alternates,

25   but I am not going to dismiss the alternates.  I'm

Get rewarded with MaxPerks—the office rewards program and teacher rewards program from OfficeMax. Join today!

11/4/18, 4:29 AM





## SIGN UP IN STORE?

If you signed up for MaxPerks in a store or over the phone and this is your first time to the site, you'll need to activate your online account below.

Enter your 9 Digit Member ID:

## MaxPerks®
## Rewards for

With MaxPerks Rewards for Business, you'll get rewarded just for buying the supplies you need for your business or home office.

As a member, you'll earn a $25 reward in your MaxPerks account for every $500 you spend on qualified* purchases. Plus, there's no limit on how much you can earn throughout the calendar year.

## MaxPerks®
## Rewards for Teachers

The MaxPerks Rewards for Teachers program is specifically tailored for your classroom needs and budgeting concerns.

As a member, you'll earn a $10 reward in your MaxPerks account for every $75 you spend on qualified* purchases - up to $100 per calendar year.

## RETURNING MEMBERS LOGIN

Email Address or Member ID:

Password:

Remember Me

**Earn up to $60 in Rewards monthly** with our updated **MaxPerks® Recycling Program.** learn more

### EARN REWARDS ON YOUR PURCHASES WITH MAXPERKS — THE OFFICE REWARDS PROGRAM FROM OFFICEMAX.

**MaxPerks Rewards for Business- Earn rewards just for buying the supplies you need.**
At OfficeMax®, we believe in rewarding you just for buying the supplies you need. That's why the MaxPerks Rewards for Business program is specifically tailored for your business essentials and budgeting concerns. Join our office rewards program today to become a MaxPerks member and start earning a $25 reward in your MaxPerks account every time you spend a minimum of $500 on qualified* purchases. Plus, there's no limit on how many rewards you can earn.

**MaxPerks Rewards for Teachers- Introducing an even better way to reward your classroom.**
The MaxPerks Rewards for Teachers program is specifically tailored for your classroom supply list and budgeting concerns. As a member, you'll start earning a $10 reward in your MaxPerks account when you spend a minimum of $75 on qualified* purchases—up to $100 per calendar year. Sign up today for the MaxPerks Rewards for Teachers program and start saving on your classroom supplies.

**BRANDI CHANNON'S EXHIBIT**

**51**

1:13-CR-966-JCH-KK   2255 MOTION

OfficeMax | MaxPerks - Learn More

11/4/18, 4:22 AM



INTERNET ARCHIVE

https://www.officemaxperks.com/LearnMoreTeachers.aspx          Go          NOV   DEC   MAY

28 captures                                                    ◀ 27 ▶
10 Dec 2010 - 11 Mar 2016



MaxPerks Rewards for

Introducing an even better way to reward your classroom. the
MaxPerks Rewards for Teachers program is specifically tailored
for your classroom needs and budgeting concerns.

**SIGN UP IN STORE?**

If you signed up for MaxPerks in a store
or over the phone and this is your first
time to the site, you'll need to activate
your online account below.

Enter your 9 Digit Member ID:


**RETURNING MEMBERS LOGIN**

Email Address or Member ID:


Password:


Remember Me

## How to Enroll

If you'd like to enroll in the MaxPerks Rewards for Teachers
program, visit any OfficeMax location near you to complete
an application and receive your member ID card. You can
also sign up online, or call 866.MAXPERKS, and you'll receive
your member ID card in the mail.

Once you're a member, you must log in to your account at
officemax.com/maxperks to access your quarterly rewards
(requires a valid email address and acceptance of the terms
and conditions).

## Help the Environment
## and Earn Rewards

OfficeMax is committed to supplying our products and
services in a manner that is sensitive to environmental
issues. To demonstrate this commitment, OfficeMax is
excited to offer our Ink and Toner Recycling Program, with
special rewards for MaxPerks customers. It's your chance to
earn rewards and help the environment.

Earn a $3 MaxPerks reward for each qualifying† visibly
undamaged HP, Dell or Lexmark ink or toner cartridge you

## How to Earn Rewards

Earn a $10 reward in your MaxPerks account every time you
spend a minimum of $75 on qualified* purchases between
January 1st — December 31st — up to $100 per calendar
year.

Your spending balance gets carried over quarter to quarter
up to one calendar year or until you reach the $75 threshold
in qualified* purchases, whichever comes first.

All account balances less than $75 will be reset to $0 on
January 1st except for any member who enrolled October
thru December of the previous year. Those purchases made
in October thru December will carry over into the next full
calendar year.

Present your MaxPerks ID card with all purchases to
maximize your reward.

**BRANDI CHANNON'S
EXHIBIT**

**52**

1:13-CR-966-JCH-KK   2255 MOTION

recycle at any OfficeMax store location - up to 20 ink or toner cartridges ($60 in rewards) per calendar month per member.

## Get Started Today!

To get your MaxPerks Rewards for Teachers member ID card, join today. We'll assign a MaxPerks ID to you right away and send your membership kit that contains your permanent ID card to you in the mail within the next few weeks. Or if you prefer, visit any OfficeMax store near you to complete the application and get the membership kit that contains your permanent ID card immediately.

## How to Redeem Your Rewards

At the end of each quarter, we review all accounts and issue any rewards you may have earned, electronically in your secure, online account. This reward will be issued by the 20th of the following month. Simply log in to your account, print your card, and visit any OfficeMax location near you to redeem your rewards. You can also redeem them online at officemax.com or by phone at 866.MAXPERKS.

*Qualifying cartridges are any visibly undamaged HP, Dell or Lexmark ink or toner cartridges. Excludes HP02, HP11, HP88 series and remanufactured cartridges of any brand. Qualified items are determined by OfficeMax at its sole discretion. Total recycling reward dollars issued for recycling may not exceed your total MaxPerks program qualified purchase balance. Please see MaxPerks Terms and Conditions for full recycling program details.

*Qualifying merchandise is any product and/or service in our retail stores, online or in our catalogs, except: computers, gift cards, general use prepaid cards, Sprint™ service plans, phone cards, purchases with Retail Connect℠ pricing, sales tax and purchases made prior to the date of enrollment. Purchases with your MaxPerks Reward Card do not count toward the qualifying spend requirement. Please see officemax.com/maxperks for full program details.

2.0.28.10

## MY AVAILABLE REWARDS                                      close ⊠

You do not have any available rewards.

Purchase to earn .

Steven Gardner - Cross by Mr. Robbenhaar

Page 939

1    also wasn't a teacher, I had to choose one or the

2    other, right?

3    A.    You would be put in the business one.  When you

4    asked, we would put you inside the business one.

5    Q.    Okay.  But the signup screen says to select

6    which one is most appropriate, correct?

7    A.    Correct.

8              MS. VIERBUCHEN:  Objection, Your Honor, for

9    lack of foundation.

10             THE COURT:  Overruled.

11   BY MR. ROBBENHAAR:

12   Q.    So individuals were asked to self-place

13   themselves within the business or the teacher

14   columns, if you will?

15   A.    Yes.

16   Q.    All right.  Now if someone selected teacher,

17   would OfficeMax -- would the system require some sort

18   of credentials?

19   A.    No, they wouldn't.

20   Q.    All right.  And that's -- I think that's to

21   your point earlier that this was an honor system, if

22   you will?

23   A.    Yes.

24   Q.    All right.  Great.

25             Now you mentioned earlier a couple of other

PAUL BACA, OFFICIAL COURT REPORTER

BRANDI CHANNON'S
EXHIBIT

53

1:13-CR-966-JCH-KK  2255 MOTION

Purushottaman Nandukumar - Cross by Mr. Robert

1    A.    Yes, he did.

2    Q.    Okay.

3          MS. KASTRIN:  With the Court's indulgence,

4    one second.

5    BY MS. KASTRIN:

6    Q.    And as part of the interview process and with

7    the resume itself, did he ever represent himself to

8    be a teacher?

9    A.    Not to my recollection.

10          MS. KASTRIN:  No further questions,

11   Your Honor.

12          THE COURT:  Mr. Robert, you may

13   cross-examine the witness.

14          MR. ROBERT:  Thank you, Your Honor.

15                 CROSS-EXAMINATION

16   BY MR. ROBERT:

17   Q.    Hello, Mr. Nandukumar.

18          My name is Marc Robert.

19          The interview was conducted, I think you

20   said, in December of 2013?

21   A.    That is correct.

22   Q.    It's a little over two years ago?

23   A.    Uh-huh.

24   Q.    Was the interview done in person or was it done

25   over the phone?

BRANDI CHANNON'S
EXHIBIT

54

1:13-CR-966-JCH-KK   2255 MOTION

PAUL BACA, OFFICIAL COURT REPORTER

Purushottaman Nandukumar - Cross by Mr. Robert

Page 434

```
 1   A.     It was done at -- in a GoToMeeting session.

 2   Q.     Okay.  Was that a visual or just an audio?

 3   A.     That was a visual.

 4   Q.     Okay.  So you -- did you actually see the

 5   person that you were talking to?

 6   A.     I did on a video.

 7   Q.     Okay.  All right.

 8              MR. ROBERT:  I think that's all I've got.

 9              THE COURT:  All right.  Is there anything

10   further?

11              MS. KASTRIN:  No, Your Honor.

12              THE COURT:  May this witness be permanently

13   excused?

14              MS. KASTRIN:  Yes, Your Honor.

15              THE COURT:  All right.

16              Thank you for your testimony today.

17              THE WITNESS:  Thank you.

18              THE COURT:  Are we back to Mr. Gardner?

19              MS. VIERBUCHEN:  No, Your Honor.  We are

20   back to Despina Papageorge.

21              THE COURT:  Of course I'll have the witness

22   spell that, but would you tell me how --

23              MS. VIERBUCHEN:  I think it's spelled

24   P-A-P-A-G-E-O-R-G-E, first name D-E-S-P-I-N-A.

25              THE COURT:  All right.  Thank you.
```

Despina Papageorge - Direct by Ms. Vierbuchen

Page 435

1              Before you take your seat I will have my

2    clerk administer the oath.

3              (Witness duly sworn.)

4              THE COURT:  And before you begin, I'm going

5    to ask you to spell your first and last name for us.

6              THE WITNESS:  Despina Papageorge.

7    D-E-S-P-I-N-A, P-A-P-A-G-E-O-R-G-E.

8              Thank you.  Very good.

9              You may proceed.

10             MS. VIERBUCHEN:  Thank you.

11       DESPINA PAPAGEORGE, GOVERNMENT'S WITNESS, SWORN

12                     DIRECT EXAMINATION

13   BY MS. VIERBUCHEN:

14   Q.    Ms. Papageorge, where do you work?

15   A.    Google.

16   Q.    And where is your -- the Google office located?

17   A.    In Mountain View, California.

18   Q.    And what do you do for Google?

19   A.    I am a custodian of records.

20   Q.    Do you have a title?

21   A.    Legal specialist, custodian of records.

22   Q.    And what are your responsibilities at Google as

23   a legal specialist?

24   A.    I respond to legal process served on Google for

25   user account information.

PAUL BACA, OFFICIAL COURT REPORTER

Despina Papageorge - Direct by Ms. Vierbuchen

Page 436

1              I also testify at trial, and I'm a

2    supervisor.

3    Q.    And how many people do you supervise?

4    A.    Currently, 10 people.

5    Q.    And can you describe the unit that you work in

6    that you supervise?

7    A.    We handle US criminal legal requests.

8    Q.    And as a legal specialist with Google, are you

9    familiar with, and do you have knowledge of the

10   procedures for making and safeguarding regularly kept

11   business records?

12   A.    Yes.

13   Q.    Tell the jury what Google is.

14   A.    Google is an internet-based company, and we

15   provide free services such as e-mail or gmail, among

16   others.

17   Q.    And I'd like to talk a little bit about the

18   gmail service that you provide.

19              Can you just give a brief overview of what

20   the service is?

21   A.    Gmail is a free e-mail service that the user

22   can access on any type of web browser and send

23   e-mails to other people.

24   Q.    And how does one sign up for -- to use the

25   gmail and get a gmail account?

Despina Papageorge - Direct by Ms. Vierbuchen

Page 437

1    A.    The user will register their account online.

2    And we collect some basic information, but we

3    actually don't verify that information.

4          So first and last name, a user can put

5    whatever they want.  We don't verify their first and

6    last name.

7    Q.    Now, did you receive legal process from the

8    United States concerning whether or not Google had

9    servers located in New Mexico on two specific dates?

10   A.    Yes.

11         MS. VIERBUCHEN:  And if I could pull up,

12   for identification purposes only, 161.

13   BY MS. VIERBUCHEN:

14   Q.    Do you recognize this document?

15   A.    Yes.

16   Q.    And can you -- were you able to conduct

17   research to determine whether or not that Google --

18   whether or not Google had servers in New Mexico on

19   the dates of July 15, 2010, and July 28, 2010?

20   A.    On those two dates, Google did not maintain

21   servers in New Mexico.

22   Q.    Now can you explain to the jury, in a very

23   basic way, how it is that an e-mail travels from a

24   computer to its destination, from its origin to its

25   destination?

PAUL BACA, OFFICIAL COURT REPORTER

Despina Papageorge - Direct by Ms. Vierbuchen

Page 438

1    A.    When a user sends their e-mail it will need to

2    hit or bounce off a Google server before reaching

3    that destination.

4    Q.    And so regarding the dates of July 15, 2010,

5    and July 28, 2010, when there were no servers in

6    New Mexico, would that mean that an e-mail sent from

7    New Mexico would have to hit off a server outside of

8    the state of New Mexico if sent on that day --

9    A.    Yes.

10   Q.    -- before reaching its ultimate destination?

11   A.    Yes.

12   Q.    Now in your capacity as a custodian did you

13   receive legal process, such as subpoenas and search

14   warrants, from the Federal Bureau of Investigation in

15   this case?

16   A.    Yes.

17   Q.    How many?

18   A.    Three subpoenas and one search warrant.

19   Q.    And did Google comply with those subpoenas and

20   search warrant?

21   A.    Yes.

22   Q.    What, if anything, did Google do to comply with

23   the search warrant -- strike that -- with the

24   subpoenas?

25   A.    For the subpoenas, we checked the validity of

1                    PROSPECTIVE JUROR:  I don't think so.  If I

2    did something bad I don't think she should be

3    responsible.

4                    MR. HOTCHKISS:  Okay.  Okay.

5                    Does anybody else on the panel feel

6    differently than Mr. Kaisem?

7                    No hands.

8                    Thank you, Mr. Kaisem.

9                    PROSPECTIVE JUROR:  Thank you.

10                   MR. HOTCHKISS:  Also, evidence may be

11   presented that fraud allegedly occurred when accounts

12   for teachers were opened by people who were not

13   teachers.

14                   Is there any panel member, including any

15   past or present teachers who, as a result of that,

16   might view the evidence less favorably on behalf of

17   the defendants or more favorably on behalf of the

18   government?

19                   I see no hands.

20                   Those are the only two questions that I

21   have.

22                   It's been a long day.  Thank you very much.

23                   THE COURT:  Thank you, Mr. Hotchkiss.

24                   So, ladies and gentlemen of the panel,

25   we'll take a little longer break now.  I'm going to

PAUL BACA, OFFICIAL COURT REPORTER

BRANDI CHANNON'S
EXHIBIT

**55**

1:13-CR-966-JCH-KK   2255 MOTION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Cause No. CR 13-966 JH |
| | § | |
| MATTHEW CHANNON and | § | |
| BRANDI CHANNON, | § | |
| | § | |
| Defendants. | § | |

## JOINT MOTION TO DISMISS INDICTMENT

MATTHEW CHANNON, Defendant, by and through the undersigned appointed

counsel, Marc H. Robert, Assistant Federal Public Defender, joined by co-defendant BRANDI

CHANNON, by and through her appointed counsel, Todd Hotchkiss, move the Court for an

order dismissing the charges set forth in the superseding indictment [Doc. 155] for the reasons

set forth below, and in support of this motion would respectfully show the Court as follows[1]:

1.      Mr. and Ms. Channon are charged by superseding indictment with wire fraud

and conspiracy in violation of 18 U.S.C. §§ 1349 and 1343. [Doc. 155]. Both are charged in

count 1 with conspiracy in violation of § 1349. Mr. Channon is charged in Counts 3, 5, 6 and

7, and Ms. Channon was charged in Counts 2 and 4, with wire fraud in violation of 18 U.S.C.

§ 1343.

---

[1] Counsel have chosen to file this motion seeking dismissal of the indictment, rather than
as a Rule 29 motion for judgment of acquittal following the close of the government's evidence,
in order that the parties and the Court might have a full opportunity to evaluate the legal merits of
the issue before the trial has begun.

**JOINT MOTION TO DISMISS INDICTMENT - PAGE 1**

BRANDI CHANNON'S
EXHIBIT

**56**

1:13-CR-966-JCH-KK   2255 MOTION

2.      Specifically, Mr. and Ms. Channon are charged with conspiring with one another and having "engaged in a scheme to open thousands of MaxPerks Rewards accounts under false pretenses and to use the accounts to generate MaxPerks Reward certificates to which they were not entitled, in violation of 18 U.S.C. § 1343." Count 1 of the Superseding Indictment alleges that Mr. Channon and Ms. Channon engaged in criminal activity by fraudulently creating more than 5,400 MaxPerks Rewards accounts, falsely claiming to represent elementary schools in 5,186 of the accounts. The indictment alleges that they obtained OfficeMax receipts and extrapolate data "for other purchases they had not made", and log-in online to the MaxPerks accounts they had created and controlled to claim false purchases to cause MaxPerks rewards to be issued to those accounts. (Doc.155 at ¶¶11 a-d) Mr. Channon and Ms. Channon allegedly claimed through online adjustments approximately 61,557 transactions for MaxPerks accounts with a total claimed purchase value of approximately $1,890,540. (Doc.155 at ¶¶11 e,g).

3.      Mr. Channon and Ms. Channon allegedly then used the MaxPerks rewards in those accounts to purchase prepaid Visa or American Express debit cards at OfficeMax which "they" used wherever accepted; and to purchase merchandise at OfficeMax, which Mr. Channon would then resell. (Doc.155 at ¶11 I-k). Mr. Channon also allegedly "sold to other individuals a number of the MaxPerks Rewards certificates that were issued to Defendants' accounts." (Doc.155 at ¶11 k). "Defendants themselves redeemed, or sold to other individuals who redeemed, MaxPerks Rewards certificates with a total value of approximately $105,191." (Doc.155 at ¶11 l).

**JOINT MOTION TO DISMISS INDICTMENT - PAGE 2**

4.     In Counts 2 and 4, Ms. Channon is charged with having "knowingly and intentionally devised a scheme and artifice to defraud and for obtaining money and property by means of materially false pretenses and representations" and to execute said alleged scheme and artifice "knowingly transmitted or caused to be transmitted by means of wire communications in interstate commerce the following writings, signs, signals, pictures and sounds: ... [t]ransmissions from an OfficeMax retail store to MaxPerks Rewards database the recycling of 19 [and 20] ink cartridges" to specific MaxPerks Rewards accounts under specific false or fictitious business names on November 22, 2010 and November 23, 2010, respectively, in violation of 18 U.S.C. § 1343.

5.     In Counts 3 and 5, Mr. Channon is charged with having "knowingly and intentionally devised a scheme and artifice to defraud and for obtaining money and property by means of materially false pretenses and representations" and to execute said alleged scheme and artifice "knowingly transmitted or caused to be transmitted by means of wire communications in interstate commerce the following writings, signs, signals, pictures and sounds: ...[t]ransmissions from an OfficeMax retail store to MaxPerks Rewards database the recycling of 20 ink cartridges" to specific MaxPerks Rewards accounts under specific false or fictitious business names on November 22, 2010 and November 23, 2010, respectively, in violation of 18 U.S.C. § 1343.

6.     In Counts 6 and 7, Mr. Channon is charged with having "knowingly and intentionally devised a scheme and artifice to defraud and for obtaining money and property by means of materially false pretenses and representations" and to execute said alleged scheme

and artifice "knowingly transmitted or caused to be transmitted by means of wire communications in interstate commerce the following writings, signs, signals, pictures and sounds: ... [t]ransmissions via email of five [and seven] MaxPerks Rewards certificates of $30 [and $100] each that had been issued to" identified OfficeMax accounts under specific false or fictitious names and teacher accounts on July 15, 2010 and July 28, 2010, respectively, in violation of 18 U.S.C. § 1343.

7.     The Superseding Indictment also includes forfeiture allegations based "Upon conviction of any offense in violation of 18 U.S.C. § 1343 or § 1349" Defendants "shall forfeit to the United States . . .  Any property, real or personal, which constitutes or is derived from proceeds traceable to such violation, or a conspiracy to commit such offense." (Doc.155 at 8).

8.     The indictment clearly and unequivocally alleges that Mr. and Ms. Channon sought to obtain MaxPerk reward credits through the alleged scheme.  They can only be found to have violated the law, or to have conspired to violate the law, if MaxPerk rewards constitute *property* within the meaning of the wire fraud statute.

## SUMMARY OF ARGUMENT

9.     In order to constitute a violation of the wire fraud statute, the alleged scheme must seek to deprive the alleged victim of "money or property".  In order for the object of the alleged scheme to be considered property, it must be property in the hands of the victim.  The object of the alleged scheme in this case was customer rewards credits, which had no intrinsic value in the hands of the alleged victim.  Because the conduct alleged does not violate 18 U.S.C. § 1343, the indictment should be dismissed.

JOINT MOTION TO DISMISS INDICTMENT - PAGE 4

## ARGUMENT AND AUTHORITY

10. "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio or television communication in interstate or foreign commerce, any writings, signs, signals, pictures or sounds for the purpose of executing such scheme or artifice" violates 18 U.S.C. § 1343.

11. The Channons are charged with using "wires", implicating interstate commerce, to fraudulently obtain MaxPerk reward credits. Such credits are issued by Office Max as a part of its broader marketing scheme whereby it seeks to build customer loyalty by providing an incentive for customers to return to Office Max and spend money there. Those reward credits were the object of the alleged enterprise. The question before the Court, then, is whether those reward credits are, in fact, *property* within the meaning of 18 U.S.C. § 1343.

12. The United States Supreme Court provided the answer in *Cleveland v. United States*, 531 U.S. 12, 121 S.Ct. 365 (2000). In that case the defendant was convicted of mail fraud[2] as a result of false statements to a Louisiana licensing authority in an effort to obtain a license to operate video poker games within the state. Mr. Cleveland argued that the license did not constitute property for purposes of the mail fraud statute, and the district court disagreed. The Fifth Circuit Court of Appeals likewise rejected the defendant's argument.

---

[2] The mail fraud and wire fraud statutes are to be interpreted interchangeably and identically. *See Pasquantino v. United States*, 544 U.S. 349, 355 (2005).

**JOINT MOTION TO DISMISS INDICTMENT - PAGE 5**

The Supreme Court reversed, analyzing the language of the statute and the law relating to the concept of property. "We conclude that § 1341 requires the object of the fraud to be 'property' in the victim's hands and that a Louisiana video poker license in the State's hands is not 'property' under § 1341." 531 U.S. at 26-27. "It does not suffice, we clarify, that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." *Id.* at 15.

13.     "Moreover, to the extent that the word "property" is ambiguous as placed in § 1341, we have instructed that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Id.* at 26.

14.     The Court recognized that the state of Louisiana has a significant financial interest in the video poker game business. The state collected an application processing fee, another fee for each annual renewal, a device operation fee for each machine, and a percentage of the revenue collected from the operation of the machines. *Id.* at 22. Before they are issued, however, the licenses did not "generate an on-going stream of revenue". *Id.*

15.     Similarly, the reward credits involved in this case were not assets in the hands of Office Max at all. After their issuance, the rewards constituted at most a conditional liability to the company. However, before their issuance, *in the hands of the alleged victim*, the rewards were a nullity in the context of the definition of property. Office Max created the rewards from ones and zeros in digital cyberspace. The rewards had no monetary value. Office Max did not, and could not, sell those credits in their stores or online. The company could not pay debts with rewards points. The company could not collateralize debt with

**JOINT MOTION TO DISMISS INDICTMENT - PAGE 6**

rewards.  The rewards have no value unless and until they are issued to a customer and presented by the customer for redemption at an Office Max store.  Steps must be taken before the rewards can be turned into something of value to the Office Max customer.  The rewards may be used toward the purchase of items from Office Max, but they have no monetary value until that happens.  Even then, the rewards have value only in the hands of the customer, not in figurative hands of Office Max.  The rewards had no intrinsic value in the hands of the alleged victim, Office Max.  The rewards were not property in the hands of Office Max.

16.     The *Cleveland* court placed the burden of clarity on Congress in this regard.  "In deciding what is 'property' under § 1341, we think 'it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite.'  *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 222, 73 S.Ct. 227, 97 L.Ed. 260 (1952)".  *Cleveland*, 531 U.S. at 25.

17.     The wire fraud statute was amended following the *Cleveland* decision, in 2002 and 2008.  Congress has had ample opportunity to clarify the statute in keeping with the concerns expressed in *Cleveland*.  Because it did not, those concerns continue to exist.  The *Cleveland* court rejected a "sweeping expansion" of the criminal law that would result from a definition of "property" that exceeded the Supreme Court's interpretation in that case.

18.     The significance of Congress' failure to respond to the message of *Cleveland* becomes more telling in light of its response to the Court's decision in *McNally v. United States*, 483 U.S. 350 (1987).  In that case, the Supreme Court declined to extend the reach of the mail fraud statute to a situation in which the prosecutor alleged that a scheme deprived

Kentucky's citizens of the right to have the state's affairs conducted honestly. The Court held similarly in *Carpenter v. United States*, 484 U.S. 19 (1987). In 1988, Congress amended the mail fraud statute to include the intangible right to honest services (and only that). Congress is capable of clarifying language when it sees fit to do so. *See Cleveland*, 531 U.S. at 19-20.

19.    The *Cleveland* decision has been applied to this effect during the time since its issuance. *See, e.g., United States v. Griffin*, 324 F.3d 330 (5th Cir. 2003) (unissued tax credits have zero intrinsic value in the hands of the issuer and do not therefore constitute property); *United States v. Turner*, 465 F.3d 667 (6th Cir. 2006) (an elected official's salary does not constitute property in the hands of the victim and is therefore beyond the reach of the mail fraud statute); *United States v. Shoss*, 523 Fed. Appx. 713 (11th Cir. 2013) (unpublished) (distinguishing *Cleveland* because the object of the fraud had monetary value in the hands of the victim).

20.    Because Mr. and Ms. Channon did not obtain from Office Max something that meets the statutory definition of property, they did not violate 18 U.S.C. § 1343 as a matter of law, and the Superseding Indictment must be dismissed.

21.    It is presumed that the government opposes this motion.

**WHEREFORE**, for the foregoing reasons, MATTHEW CHANNON, Defendant, joined by BRANDI CHANNON, Defendant, by and through their respective undersigned appointed counsel, respectfully prays that the Court enter an order dismissing the superseding indictment in this cause, and providing for such other and further relief to which the Court may find Mr. and Ms. Channon to be justly entitled.

Respectfully Submitted,

FEDERAL PUBLIC DEFENDER
111 Lomas Blvd NW, Suite 501
Albuquerque, New Mexico 87102
(505) 346-2489
Fax (505) 346-2494

*filed electronically on June 2, 2015*
MARC H. ROBERT
Assistant Federal Public Defender
marc_robert@fd.org

*Counsel for Mr. Channon*


TODD B. HOTCHKISS
TODD B. HOTCHKISS, ATTORNEY AT
LAW, LLC
610 Gold Ave. SW , Suite 228
Albuquerque, New Mexico 87102
(505)243-6776
todd@toddhotchkisslaw.com

*Counsel for Ms. Channon*

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Unopposed Motion to Dismiss Indictment was served on Assistant United States Attorneys Paige Messec and Tara Neda, P.O. Box 607, Albuquerque, New Mexico 87103, through the operation of the CM/ECF electronic filing system and pursuant to the CM/ECF Administrative Procedures Manual §§ 1(a), 7(b)(2), on June 2, 2015.

*Filed electronically on June 2, 2015*
MARC H. ROBERT

L:\Robert\channon\pleadings\mtn dismiss.wpd


**JOINT MOTION TO DISMISS INDICTMENT - PAGE 9**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Cr. No. 13-966 JCH |
| | ) | |
| vs. | ) | |
| | ) | |
| **MATTHEW CHANNON and** | ) | |
| **BRANDI CHANNON,** | ) | |
| | ) | |
| Defendants. | | |

### UNOPPOSED MOTION TO EXTEND THE DEADLINE TO RESPOND TO DEFENDANTS' MOTION TO DISMISS INDICTMENT [DOC. 177]

The United States respectfully seeks leave of the Court to file its response to Defendants'

Joint Motion to Dismiss Indictment by Friday, June 26, 2015, and in support states:

1.      Defendants filed a Joint Motion to Dismiss Indictment on June 2, 2015.   Under

Local Rule 47.8, the response of the United States is due by Friday, June 19, 2015.

2.      Defendants' motion argues that the indictment fails to allege that they obtained

"money or property" from OfficeMax in violation of 18 U.S.C. § 1343 and argues that MaxPerks

Rewards certificates do not constitute "property" in the hands of the victim, as required by

*Cleveland v. United States*, 531 U.S. 12, 121 S.Ct. 365 (2000).

3.      The United States disagrees with Defendants that MaxPerks Rewards certificates

are not "property" of OfficeMax, and the United States further disagrees that the indictment

limits the "property" obtained through the scheme to MaxPerks Rewards certificates.  The

superseding indictment, as it stands, alleges not only that Defendants obtained MaxPerks

Rewards certificates to which they were not entitled but that Defendants used the MaxPerks

Rewards certificates that they had been issued to obtain prepaid debit cards and other

merchandise from OfficeMax. Doc. 155 at 5. The indictment also alleges that Defend[...]

BRANDI CHANNON'S
EXHIBIT

**57**

1:13-CR-966-JCH-KK   2255 MOTION

1

other individuals to whom they sold the MaxPerks Rewards certificates redeemed certificates with a total value of $105,191. *Id.* The United States therefore does not believe that Defendants' motion has merit.

       4.      Nevertheless, to avoid a lengthy dispute before this Court, a significant distraction at trial, and a potential appellate issue, the United States intends to seek a modification of the superseding indictment from the grand jury that will remove any dispute about whether the indictment limits the "money or property" obtained by Defendants' scheme to MaxPerks Rewards certificates. The proposed modification, notice of which was provided to Defendants on June 9, 2015, would explicitly designate OfficeMax merchandise as the property that formed the object of the conspiracy and scheme.

       5.      If the grand jury returns a second superseding indictment with the change sought, it will moot or at least simplify the issues presented by Defendants' Motion to Dismiss. The United States therefore submits that there is good cause to extend its response deadline until the grand jury has had an opportunity to consider the modification that the United States intends to propose.

       6.      Defendants do not oppose extending the response deadline.

     In conclusion, the United States respectfully requests that the Court grant a one-week extension of the response deadline until Friday, June 19, 2015.

                                  Respectfully submitted,

                                  DAMON P. MARTINEZ
                                  United States Attorney

                                  /s
                                  C. PAIGE MESSEC
                                  Assistant U.S. Attorney
                                  201 Third St. NW, Suite 900

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

   vs.                                       Cr. No. 13-966 JCH

MATTHEW CHANNON, and
BRANDI CHANNON,

        Defendants.

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' *Joint Motion To Dismiss Indictment*. [Doc. 177]  The Government filed a response [Doc. 203], and Defendants filed a reply [Doc. 223].  After discussion of this issue at the July 7, 2015 pretrial conference, the Court ordered supplemental briefing.  The Government and Defendants filed supplemental briefs.  [Docs. 230, 233]  Having considered the pleadings, briefs, and relevant law, the Court concludes that the motion to dismiss will be denied.

### DISCUSSION

The Second Superseding Indictment charges Defendants with conspiracy and a total of six counts of wire fraud.  18 U.S.C. § 1343.  [Doc. 197 (filed 6/24/15)]  The Government limited its theory to one "specific type of scheme to defraud," a scheme to obtain money or property by means of false or fraudulent pretenses, representations, or promises.  *See United States v. Zar*, 790 F.3d 1036, 1050 (10th Cir. 2015); *United States v. Kalu*, 791 F.3d 1194, 1203 & n.11 (10th Cir. 2015).

BRANDI CHANNON'S
EXHIBIT

**58**

1:13-CR-966-JCH-KK   2255 MOTION

Defendants argue in their motion to dismiss that the objective of the alleged scheme was to obtain MaxPerks Rewards, which do not constitute "property" in the hands of OfficeMax under *Cleveland v. United States*, 531 U.S. 12, 20 (2000).[1]  Defendants contend that § 1343 therefore does not reach fraud in obtaining MaxPerks Rewards.  *See id.*

The Government states in its supplemental brief that it will limit its case to the theory that the objective of Defendants' scheme was to obtain merchandise from OfficeMax.[2]   The Government argues that:  Defendants' ultimate goal was to obtain OfficeMax merchandise, through the use of MaxPerks Rewards to which they were not entitled; the acquisition of MaxPerks Rewards was just one intermediate step in the scheme; and Defendants' scheme did not reach fruition until OfficeMax merchandise had been obtained.  *See Schmuck v. United States*, 489 U.S. 705, 712-15 (1989).

The Court observes that the law is complicated, and the issue raised under *Cleveland* cannot be resolved without determining the extent of the fraudulent scheme with which Defendants are charged.  The Supreme Court held in *Schmuck*:  "The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time . . . ."  *Id.* at 715.  *Schmuck* held that the defendant's scheme in rolling back car odometers and selling to dealers at inflated prices "did not reach fruition until the retail dealers resold the cars and effected transfers of title"; thus the dealers' mailing of title-registration applications after the cars were resold was "part of the execution of the fraudulent scheme."  *Id.* at 712.  Depending on the allegations made, and the proof presented, it must be

---

[1] Since the first two elements of the mail fraud statute and wire fraud statute are identical, *Cleveland*'s holding regarding mail fraud applies equally to wire fraud.  *See Pasquantino v. United States*, 544 U.S. 349, 355 n.2 (2005); *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003).

[2] "The United States is willing to limit itself—and indeed, is planning to do so, absent contrary guidance by the Court—to proof and argument at trial that the property to be obtained by the scheme was OfficeMax merchandise." [Doc. 230, p. 14]

determined whether something is "'a step in [the] plot.'" *Id.* at 710-11 (quoting *Badders v. United States*, 240 U.S. 391, 394 (1916)). *Compare United States v. Primrose*, 718 F.2d 1484, 1489-90 (10th Cir. 1983) (holding that mailings were integral to execution of the fraudulent plans, necessary to complete the scheme, and therefore made before fruition of the scheme), *and United States v. Weiss*, 630 F.3d 1263, 1269-71 (10th Cir. 2010) (holding that overall, ongoing scheme included mailings to complete each loan), *and United States v. Washington*, 634 F.3d 1180, 1183-84 (10th Cir. 2011) (holding that use of Federal Express to send closing documents was a step in the execution of fraudulent mortgage scheme), *with United States v. Redcorn*, 528 F.3d 727, 738-42  (10th Cir. 2008) (holding that subsequent wire transmission of funds was not part of fraudulent scheme, because once defendants deposited embezzled funds into their personal bank accounts "they had accomplished their crime and the funds were available for their personal use").

Defendants' argument under *Cleveland* depends on their assertion that their fraudulent scheme reached fruition as soon as they acquired MaxPerks Rewards.  The Court disagrees, and concludes that the Second Superseding Indictment alleges that acquisition of MaxPerks Rewards was merely a step in the scheme.  The Second Superseding Indictment charges that obtaining OfficeMax merchandise was "a part of the execution of the scheme as conceived by [Defendants] at the time." *Schmuck*, 489 U.S. at 715.  Since the alleged objective of Defendants' scheme was to obtain merchandise—undisputedly "property"—*Cleveland* does not support Defendants' motion.

The Government alternatively argues that the MaxPerks Rewards constitute "property" in the hands of OfficeMax.  Given the Court's ruling above, the Court need not reach this alternative argument.

## **CONCLUSION**

The Court denies Defendants' motion to dismiss the Second Superseding Indictment.

**IT IS THEREFORE ORDERED** that Defendants' *Joint Motion To Dismiss Indictment*

[Doc. 177] is **DENIED**.

_____
**UNITED STATES DISTRICT JUDGE**

From: Gardner, Steven [█████████████████████]
Sent: Monday, February 21, 2011 12:49 PM
To: Boady, Michael
Subject: RE: New items that match: doctor_zoidberg - Bargle

We sell all of that ink but unfortunately I cannot tie any of it to Channon. He is only using his rewards to buy prepaid credit cards. It is possible that he is using the credit cards to buy ink I just have not seen any of those transactions.

Steven Gardner
Manager Investigations & ORC, Loss Prevention

CONFIDENTIALITY NOTICE: The information contained in this e-mail and attached document(s) may contain confidential information that is intended only for the addressee(s). If you are not the intended recipient, you are hereby advised that any disclosure, copying, distribution or the taking of any action in reliance upon the information is prohibited. If you have received this e-mail in error, please immediately notify the sender and delete it from your system.

-----Original Message-----
From: Boady, Michael [█████████████████]
Sent: Friday, February 18, 2011 10:42 PM
To: Gardner, Steven
Subject: Re: New items that match: doctor_zoidberg - Bargle

I would like to purchase an item from him that you may be able to confirm was recently purchased from an OfficeMax store. Would you recommend any of the listed items for me to purchase?

----- Original Message -----
From: Gardner, Steven [█████████████████]
To: Boady, Michael
Sent: Fri Feb 18 23:16:52 2011
Subject: FW: New items that match: doctor_zoidberg - Bargle

He just posted this.

From: eBay [ebay@ebay.com]
Sent: Friday, February 18, 2011 6:43 PM
To: Gardner, Steven
Subject: New items that match: doctor_zoidberg - Bargle

[http://q.ebaystatic.com/aw/pics/logos/ebay_95x39.gif] eBay sent this message to Steven Gardner (maxmustang). Your registered name is included to show this message originated from eBay. Learn more<http://pages.ebay.com/help/confidence/name-userid-emails.html>.

[http://q.ebaystatic.com/aw/pics/globalAssets/ltCurve.gif]     Still looking for doctor_zoidberg - Bargle? We found it!

Channo

BRANDI CHANNON'S
EXHIBIT

59

1:13-CR-966-JCH-KK   2255 MOTION

Steven Gardner - Direct by Ms. Vierbuchen

Page 918

1    that it was the defendant and to establish his

2    intent, knowledge, and identity.

3           MR. ROBBENHAAR:  Everything we've seen thus

4    far includes actions that Mr. Channon has done

5    throughout the course of this scheme.  What happens

6    next is irrelevant to the case.

7           THE COURT:  All right.  Well, I am going to

8    overrule the objection.  I do think that this

9    evidence does go to the overall scheme.  I think it

10   goes to intent, it goes to knowledge.  It's offered

11   for a purpose that is not irrelevant, and so the

12   Court will allow the testimony.

13          MS. VIERBUCHEN:  Thank you.

14          (End of bench conference.)

15   BY MS. VIERBUCHEN:

16   Q.    Did you ask Mr. Channon what he would do with

17   the reward cards he received pursuant to the ink

18   recycling?

19   A.    Yes, I did.

20   Q.    What did he say?

21   A.    He was purchasing the prepaid gift cards and

22   credit cards.

23   Q.    And is this purchase activity that Mr. Channon

24   admitted to, is that consistent with the purchase

25   activity you saw in these accounts?

**BRANDI CHANNON'S EXHIBIT**

**60**

1:13-CR-966-JCH-KK   2255 MOTION

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Direct by Ms. Vierbuchen

Page 919

```
 1   A.    Yes.

 2   Q.    And is that consistent with some of the

 3   activity that the jury was shown on these accounts?

 4   A.    Yes.

 5   Q.    Did Mr. Channon give an estimate of how much

 6   ink that he believed he had -- was responsible for

 7   recycling?

 8   A.    Yes.  He believed he was -- when we talked

 9   about the amount of responsibility, he thought it was

10   a few thousand dollars.

11   Q.    Okay.  Did you challenge him on that?

12   A.    Yes.

13   Q.    What did you say?

14   A.    I told him the ink was closer to 40,000, at the

15   time.

16   Q.    Now, did you discuss online adjustments of

17   these Group 1 or Group 2 accounts with Mr. Channon?

18   A.    Yes, I did.

19   Q.    And what did he say about the online

20   adjustments to these accounts?

21   A.    What he said was, with the online adjustments,

22   he would make his purchase or recycle his ink, and

23   then he would wait around for the next customer, if

24   they were there, and he would just look at

25   whatever -- you know, the information needed, which
```

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Direct by Ms. Vierbuchen

Page 920

1    was the dollar amount and remember that.  And then

2    when he went home later he would just apply it to his

3    transaction.

4    Q.    And so he said he would wait around.

5            And how would he obtain the information?

6    A.    By waiting around and -- I didn't ask him

7    specifics, but it would have either been by waiting

8    around or looking at the screen and listening to what

9    the cashier says.

10   Q.    And did we see some of that activity in some of

11   the videos that we saw today in court?

12   A.    Yes.

13   Q.    And how so?

14   A.    When you see him walk away from the

15   transaction, as opposed to just leaving the building,

16   you see him kind of walk to the side, standing there.

17           Or in other cases I could have -- apply --

18   or in the reverse, you're just standing behind

19   someone, and it's probably even easier if you're the

20   next person in line to get information.

21   Q.    Now, did you believe that was the full extent

22   of Mr. Channon's activity with respect to online

23   adjustments?

24   A.    No.

25   Q.    Did you tell Mr. Channon that you believed the

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Direct by Ms. Vierbuchen

Page 921

1    number was much higher?

2    A.    Yes.

3    Q.    Specifically, how many accounts did you refer

4    to during your conversation with Mr. Channon?

5    A.    I believe I referred to around 4,359, 4,259, a

6    little over 4,000 accounts.

7    Q.    And did you specifically list out the accounts?

8    A.    No, I didn't specifically list out all the

9    accounts.

10   Q.    Such as -- did you use the words Bargle, coach,

11   or teechur in your conversation?

12   A.    I don't -- that piece I don't recall as well.

13   I don't think I did in that conversation, but I

14   can't -- I can't say for sure.

15              I know I asked him about this second scheme

16   that was going on with the -- what we thought was a

17   computer script.

18   Q.    And the second scheme is -- you're referring to

19   as?

20   A.    The Group 2 accounts getting all of these

21   online adjustments.

22   Q.    And what did Matthew Channon say about those

23   accounts?

24   A.    He said that those weren't his accounts.  He

25   had purchased them from somebody on eBay -- or he

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Direct by Ms. Vierbuchen

Page 922

1    didn't create them.  I guess he had purchased them

2    from somebody on eBay.

3    Q.    Okay.  So did you ask him for the information

4    of the eBay customer who had sold him -- who

5    allegedly sold him those accounts?

6    A.    Yes.

7    Q.    And was that information provided to you?

8    A.    He said he didn't remember their user name, but

9    he did remember an e-mail address that was associated

10   with those, with the sale of that.

11   Q.    And who did he say -- what did he say was the

12   e-mail address that was associated with this alleged

13   sale of Group 2 accounts to him?

14   A.    It was at teechur the teechur 12345678 at

15   gmail, that e-mail address.

16   Q.    Did you ask Mr. Channon for that person's eBay

17   identification or their account name?

18   A.    Yes, I did.

19   Q.    And did he provide it to you?

20   A.    He said he couldn't find it.

21           And I asked him, I said, I need you to get

22   me that information.  If that, in fact, is the case,

23   I need to talk to this person as well.

24   Q.    And did he ever provide you with the

25   information?

COURT102020160931_Channon Sentencing.txt

5    a punishment for you other than to say to you that it

6    looks to me like you have tried to -- well, let me

7    say it this way.

8          It looks to me like your motivation to make

9    money, get money, is something that might have led

10    you down this particular path, which is why --

11    another reason why I think that restitution is not

12    only warranted, but I see that as a way not only to

13    make OfficeMax whole for the fraud that you

14    committed, but it looks to me like it would be

15    painful for you, because you seem to have been

16    motivated by ways to make money.

17          And so I'm hoping that the restitution

18    award, along with the forfeiture award, will get your

19    attention that this is certainly not conduct that you

20    should repeat.

21          Now I know restitution has its purposes,

22    and I know forfeiture has its purposes.   But it's an

23    obligation that I'm going to be requiring in your

24    sentencing, that you repay OfficeMax and that you

25    also provide forfeiture to the government for your

                                     121

1    conduct in this case.

2          Now, I have not -- you know, I saw the --

3    the argument about the government being OfficeMax's

4    collection agent.   I heard Ms. Messec take exception

5    to that.

6          The fact of the matter is, you defrauded

7    OfficeMax and you defrauded them of $105,191 worth of

BRANDI CHANNON'S
EXHIBIT

61

1:13-CR-966-JCH-KK   2255 MOTION

COURT102020160931_Channon Sentencing.txt

8      money, merchandise, whatever the case may be.

9             So obviously, OfficeMax is entitled to be

10     reimbursed for that and made whole, and so I will

11     order that.

12            I have not seen any kind of a statement

13     from OfficeMax about what position, if any, they take

14     on the issue of incarceration.  I'm going to assume

15     that, based on Ms. Messec's argument, that they are

16     in harmony, that they would agree that a low end

17     guideline sentence is appropriate in this case.

18            Let me tell you that if I had seen anything

19     that suggested that you had harmed people -- and I

20     used the example in your wife's sentencing of

21     someone's life savings or someone's retirement -- I

22     wouldn't have any problem at all sentencing you to a

23     low end guideline sentence.

24            In this case what we have is a situation

25     where I'm not aware of any individuals who claim they

                                                      122


1      were deprived of any money or property because of

2      your conduct.

3             I am aware of OfficeMax saying that because

4      of your conduct and the way you manipulated their

5      rules you ended up with over $100,000 of value that

6      they would never have sent your way if they had known

7      the true state of the situation.

8             So -- so money is one way that OfficeMax

9      receives justice in this case.

10            Because your history is not one of

11     committing crimes, not one of violence.  I don't see

                          Page 108

Ms. Channon made a living for more than a year from the OfficeMax scheme and the related schemes at other office-supply retailers. Indeed, she described aspects of the scheme as a "full time job." *Id.* at 1065. The United States does not believe that Ms. Channon came up with the computer programs that automated the creation of accounts or the online adjustment claims — but not being the mastermind of the offense does not on its own entitle her to a role reduction. Ms. Channon was intimately familiar with the "scope and structure of the criminal activity." *See* § 3B1.2 App. Note 3(C)(i). Her participation was extensive. *Id.* at 3(C)(iv). She stood to benefit a great deal from the activity, and indeed she did so. *Id.* at 3(C)(v). There is simply no indication that she was anything other than a full and willing participant in the offense. A mitigating role adjustment is not warranted.

¶¶ 26-31 — Mr. Channon, referring to the section of the PSR that addresses the Channons' involvement in schemes at Office Depot and Staples, objects "to the inclusion of uncharged and unadjudicated allegations of fraud against other alleged victims." Doc. 328 at 4. Mr. Channon cites no legal authority for this objection, and it is well established that "a district court may consider uncharged conduct in fashioning a sentence so long as the district court's finding is supported by a preponderance of the evidence." *United States v. Mumma*, 509 F.3d 1239, 1245 n.4 (10th Cir. 2007). The unchallenged facts set forth in the PSR regarding Staples and Office Depot clearly support a finding by a preponderance of the evidence that Defendants were engaged in similar schemes at these retailers. The United States also notes that the information about Staples and Office Depot — while properly considered "relevant conduct" — has no impact on the Channons' Guidelines ranges because the losses from those schemes were never quantified.

BRANDI CHANNON'S
EXHIBIT

62

1:13-CR-966-JCH-KK   2255 MOTION

(Rev. 05-01-2008)

<center>UNCLASSIFIED</center>

<center>FEDERAL BUREAU OF INVESTIGATION</center>


**Precedence:**  ROUTINE                          **Date:**  03/02/2011

**To:**  Albuquerque

**From:**  Albuquerque
          Squad 12
          **Contact:**  SA Michael Boady, ████████████████

**Approved By:**  Ferensic Susan

**Drafted By:**  Boady Michael:mb

**Case ID #:** 288A-AQ-63579    (Pending)

**Title:**  MATTHEW CHANNON;
          OFFICEMAX - VICTIM;
          INTRUSION MATTER

**Synopsis:**  To document UC purchase from Channon's eBay account.

**Details:**  On 2/25/2011, the writer placed a bid on eBay for "New Genuine Canon 210XL 211XL Ink Cartridges, FREE SHIP" for $55.00 being the maximum the writer was willing to pay for the item.

On 2/27/2011, the auction was closed for the item and the writer was informed that the bid was won for $43.05.

According to the eBay information, the item was located in Albuquerque, NM.

On 2/27/2011, the writer sent a payment through Paypal to the seller, doctor_zoidberg, who is believed to be the subject of the captioned case.  The item was requested to be shipped to the following address:

Technology Resource Services
Michael Roberts
10455 N. Central Expressway Ste. 109-371
Dallas, TX 75321

According to the Paypal receipt, the seller had the email address of hydrazok@gmail.com. The transaction ID was 3C3042079H8065019.  According to the Paypal receipt, the account name appears to be Channon Silichem.  Additionally, the Business

<center>UNCLASSIFIED</center>

<center>BRANDI CHANNON'S EXHIBIT

**63**

1:13-CR-966-JCH-KK   2255 MOTION</center>

**UNCLASSIFIED**

```
To:  Albuquerque  From:  Albuquerque
Re:  288A-AQ-63579, 03/02/2011
```

contact information for the sellers Paypal account shows
hydrazoic@aol.com as the customer service email address.

          According to shipping information, the item was shipped
via US Postal Service, tracking number 9101785091401919020988.

          The eBay seller information shows that the item was
sold by Matt J. Channon, Albuquerque, NM 87110.


◆◆

**UNCLASSIFIED**

2

**Channon 0086**



a preferred
shipping service on **ebY**

**UNITED STATES**
**POSTAL SERVICE.**

**1**

03/01/11
From 85008
0 lbs 12 ozs

US POSTAGE PAID
Pitney Bowes

NO SURCHARGE
024P0007776232

## USPS FIRST CLASS MAIL®

Matt J. Channon
7100 Gladden Ave NE
Albuquerque NM 87110-1464

0000

Technology Resource Services
10455 N Central Expy
Michael Roberts Ste 109-371
Dallas TX 75231-2213

**ZIP - e/ USPS DELIVERY CONFIRMATION**

420 75231 9101 7850 9140 1919 0209 88

Electronic Rate Approved #785091401

Cut on dotted line

The safer, easier way to pay **PayPal**

https://ibdswebp12-ext.pb.com/.....es/USPS/HTMLFolders/HTML10/...

1 of 1

itom 2

Printed By Pitney Bowes

3/1/2011 10:58 AM

**BRANDI CHANNON'S
EXHIBIT**

**64**

1:13-CR-966-JCH-KK   2255 MOTION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

     Plaintiff,

v.                                           Case No. 13-CR-966 JCH

MATTHEW CHANNON, and
BRANDI CHANNON,

     Defendants.

## DEFENDANTS' JOINT MOTION FOR A BILL OF PARTICULARS

COME NOW Matthew Channon, through Amy Sirignano, Esq., and Kevin L.

Nault, Esq., of the Law Office of Amy Sirignano, PC, and Brandi Channon, through

Todd Hotchkiss, Esq., of Frechette & Associates PC, and pursuant to Federal Rules of

Criminal Procedure 7(f) and 12(b)(3)(B), and the Fifth and Sixth Amendments to the

United States Constitution, respectfully move this Court to issue an order requiring the

government to furnish Mr. and Mrs. Channon with a Bill of Particulars as to each count

of the Indictment (Doc. 2).  In support of their motion, defendants state as follows.

### FACTS

1.     Counts 1-6 of the Indictment (Doc. 2) in this matter state:

> For the purpose of executing such scheme or artifice
> [described in paragraphs 9-14 on pp. 3-4], on or about the
> dates listed below, the defendant MATTHEW CHANNON
> attempted to and did transmit and cause to be transmitted

BRANDI CHANNON'S
EXHIBIT

**65**

1:13-CR-966-JCH-KK   2255 MOTION

> by means of wire communications in interstate commerce
> the following writings, signals, and sounds [….]  In violation
> of 18 U.S.C. § 1343.

The bracketed text in the above sentence consists of a list of three descriptions of alleged

fraudulent conduct, "[o]nline request[s] to Google to create the email account

[specified] under the name [specified]" in counts 1, 3 and 5 of the indictment.  Counts 2,

4, and 6 of the indictment describe, "[o]nline request[s] to OfficeMax to create MaxPerks

account[s] in the name [specified] with an address [specified], and an email

[corresponding to the preceding count]." (Doc. 2).

     2.    Counts 7-10 of the Indictment (Doc. 2) in this matter state:

> For the purpose of executing such scheme and artifice,
> [described in paragraphs 3-6 on pp. 5-6], on or about the
> dates listed below, the defendants MATTHEW CHANNON
> and BRANDI CHANNON attempted to and did transmit
> and cause to be transmitted by means of wire
> communications in interstate commerce the following
> writings, signals, and sounds [….]  In violation of 18 U.S.C. §
> 1343.

The bracketed text in the above sentence consists of a list of three descriptions of alleged

fraudulent conduct, "[o]nline request[s] to Google to create the email address

[specified] under the name [specified]" in counts 7 and 9 of the Indictment.  Counts 8

and 10 of the indictment describe, "[o]nline request[s] to OfficeMax to create MaxPerks

account[s] in the name [specified] with an address [specified], and an email address

[corresponding to the preceding count]." (Doc. 2).

     3.    Count 11 of the indictment (Doc. 2) in this matter states:

Between on or about September 18, 2009, through on or about June 28, 2011, in the District of New Mexico and elsewhere, the defendants, MATTHEW CHANNON and BRANDI CHANNON, did knowingly and voluntarily conspire and agree and act interdependently with each other and with others known and unknown to the Grand Jury to commit an offense under 18 U.S.C. § 1343: wire fraud.

In violation of 18 U.S.C. § 1349.

4.      "Conviction for wire fraud under 18 U.S.C. § 1343 requires (1) a scheme or artifice to defraud or obtain property by means of false or fraudulent pretenses, representations, or promises, (2) an intent to defraud, and (3) use of interstate wire or radio communications to execute the scheme." *United States v. Gordon*, 710 F.3d 1124, 1147 (10th Cir. 2013) cert. denied, 134 S. Ct. 617 (U.S. 2013).

5.      "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1349. Conspiracy charges require two levels of intent: the specific intent to further the object of the conspiracy, and the intent of the underlying crime. *See, e.g.*, *United States v. Jackson*, 213 F.3d 1269, 1293 (10th Cir. 2000) *cert. granted, judgment vacated on other grounds*, 531 U.S. 1033, 121 S. Ct. 621, 148 L. Ed. 2d 531 (2000); *United States v. Bedford*, 536 F.3d 1148, 1155 (10th Cir. 2008).

## ARGUMENT

The Sixth Amendment of the United States Constitution ensures that all citizens enjoy the right to be informed of the "nature and cause" of any criminal accusation

3

against him.  U.S. Const., amend. VI; *Wong Tai v. United States*, 273 U.S. 77, 79 (1927).

Thus, an indictment must sufficiently apprise "the defendant of what he must be

prepared to meet."  *Russell v. United States*, 369 U.S. 749, 763 (1962); *United States v.*

*Washington*, 653 F.3d 1251, 1259 (10th Cir. 2011) cert. denied, ___ U.S. ____, 132 S. Ct.

1039, 181 L. Ed. 2d 765 (U.S. 2012).   Allegations in an indictment which are so vague,

indefinite, or uncertain that the accused cannot marshal an adequate defense violate the

Sixth Amendment.  *Wong Tai v. United States*, 273 U.S. at 80.

Mr. and Mrs. Channon have not been informed of "the nature of the charge[s]

against [them] with sufficient precision," *Wyatt v. United States*, 388 F.3d 395, 397 (10th

Cir. 1968), to enable them to prepare for trial, *see id.*, to avoid or minimize the danger of

surprise at time of trial, *see id.*, and enable them "to plead acquittal or conviction in bar

of another prosecution for the same offense."  *Id.; see also United States v. Higgins*, 2 F.3d

1094, 1096 (10th Cir. 1993); *United States v. Dunn*, 841 F.2d 1026, 1028 (10th Cir. 1988);

*United States v. Sturmoski*, 971 F.2d 452, 460 (10th Cir. 1992); *United States v. Gabriel*, 715

F.2d 1447, 1449 (10th Cir. 1983); *United States v. Lujan*, 530 F. Supp. 2d 1224, 1242

(D.N.M. 2008).

Rule 7(f) of the Federal Rules of Criminal Procedure authorizes the Court to

direct the government to provide a bill of particulars.  Fed. R. Crim. P. 7(f).  The

granting of a bill of particulars is within the court's discretion.  *United States v. Dunn*,

841 F.2d 1026, 1029 (10th Cir. 1988); *Lujan*, at 1242.

A motion for a bill of particulars may be made at any other time as the court may permit, and should be required any time the charges against the accused are so general that he cannot prepare an intelligent defense. *Will v. United States*, 389 U.S. 90, 98-00 (1967). The purpose of a bill of particulars is to apprise the defendant of the charges against him in sufficient detail to (1) minimize surprise at trial, (2) allow the defendant to prepare an adequate defense, and (3) permit the defendant to plead double jeopardy in the event of a subsequent prosecution for the same offense. *United States v. Higgins*, 2 F.3d 1094, 1096 (10th Cir. 1993); *see also United States v. Gabriel*, 715 F. 2d 1447, 1449 (10th Cir. 1983); *United States v. Barbieri*, 614 F. 2d 715, 719 (10th Cir. 1980); *Dunn*, 841 F.2d at 1029.

A bill of particulars "entitles defendants to notice of the government's theory of the case." *United States v. Doe*, 572 F.3d 1162, 1177 (10th Cir. 2009). A bill of particulars is also "the proper method to challenge and prevent the prosecution from changing its theory of the case." *Id*. *See also Dunn*, 841 F.2d at 1029 (quoting 2 LaFave and Israel, *Criminal Procedure* § 19.2(f) (1984) for the proposition that in determining the need for a bill of particulars, the concern is not to avoid all surprise, but to avoid "surprise . . . as to the particular acts or events that the government will cite at trial as establishing the crime.").

The essential basis of the government's charges is the allegation that Mr. Channon and/or Mrs. Channon violated private, contractual terms and conditions

between himself/herself and OfficeMax, by signing up for more accounts than the contract permitted. Exhibit A, at 4 (copy of MaxPerks reward program terms provided in discovery). OfficeMax responded (as described in the contract) by terminating Mr. Channon and/or Mrs. Channon's access to the assorted points, rewards, etc., accrued under the contract. *Cf id.*. If OfficeMax believed that Mr. and Mrs. Channon had breached the contract in a manner that materially damaged OfficeMax, or had been unjustly enriched, or were promissorily estopped from some action they are alleged to have taken, it could have brought a civil suit to assert its rights under the contract. Upon information and belief, neither of the Channons has been served with a complaint or summons where OfficeMax alleges any damages.

Nonetheless, the government asserts that Mr. and Mrs. Channon "knowingly and intentionally devised a scheme and artifice to defraud and for obtaining money and property by means of materially false pretenses and representations" (Doc. 2). Mr. and Mrs. Channon are unable to determine what money or property they are alleged to have obtained by the purported wire transmission alleged in the Indictment (Doc. 2). Mr. and Mrs. Channon are also unable to determine what evidence demonstrates their intent to materially defraud OfficeMax (Doc. 2). "[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." *Neder v. United States*, 527 U.S. 1, 25, 119 S. Ct. 1827, 1841, 144 L. Ed. 2d 35 (1999).

6

Without knowing why the government believes that the alleged contract violations are criminal in nature, and what evidence may prove the elements of intent to defraud, intent to obtain money or property, and what alleged falsehoods the government believes to be material, Mr. and Mrs. Channon cannot investigate the charges against them and prepare their defense, nor are their counsel able to effectively assist them in their defense.

Based on the above, Mr. and Mrs. Channon respectfully request that this Court order the government to furnish them with a bill of particulars as to the evidence of the money or property they allegedly intended to obtain by each charged wire transmission, evidence of their alleged intent to defraud, and what alleged falsehoods the government believes are material such that the purported contract violations support criminal charges in this matter.

Respectfully submitted,

  /s
Amy Sirignano, Esq.
Kevin L. Nault, Esq.
Law Office of Amy Sirignano, P.C.
20 First Plaza NW, Suite 310
Albuquerque, NM 87102
(505) 242-2770
(505) 242-2774 facsimile
amy@abqnmlaw.com
kevin@abqnmlaw.com

Counsel for Matthew Channon

_____/s_____

Todd Hotchkiss, Esq.
Frechette & Associates PC
PO Box 26807
Albuquerque, NM 87125-6807
(505) 247-8558
(505) 842-8560 facsimile
tbhotchkiss@frechettelaw.com

Counsel for Brandi Channon

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the
foregoing was served via Court's
CM/ECF system on AUSA C. Paige
Messec, counsel for the government, on
this 27th day of January, 2014.

___/s_____
Amy Sirignano, Esq.

8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

v.                                 Case No. 13-CR-966 JCH

MATTHEW CHANNON and
BRANDI CHANNON,

     Defendants.

## DEFENDANTS' JOINT MOTION TO DISMISS

COME NOW Matthew Channon, by and through counsel of record, Amy Sirignano, Esq. and Kevin L. Nault, Esq., of the Law Office of Amy Sirignano, P.C., and Brandi Channon, by and through counsel of record, Todd B. Hotchkiss of Frechette & Associates, jointly and respectfully move the Court dismiss the above-captioned case because the government does not have admissible evidence to support a conviction on any counts alleged in the indictment.  The basis for this motion is as follows.

I.     **BACKGROUND**

Mr. Matthew Channon ("Channon") is charged in an eleven-count Indictment, with ten counts of wire fraud contrary to 18 U.S.C. §§ 1343 and 2, and conspiracy to commit wire fraud contrary to 18 U.S.C. § 1349 (Doc. 2).  His wife, Brandi Channon ("Brandi Channon") is charged only in counts 7-11.  As part of the schemes and artifices alleged in the Indictment (Doc. 2), the government alleges that the Channons knowingly

BRANDI CHANNON'S
EXHIBIT

**66**

1:13-CR-966-JCH-KK   2255 MOTION

and intentionally defrauded OfficeMax by creating more than 5,400 MaxPerks Rewards accounts using fictitious names, mailing address, and phone numbers (Doc. 2, at 3, ¶ 10).  The government also claims that Mr. Channon would obtain an Office Max receipt containing a store number, date, register number, and transaction number and use this information to extrapolate store numbers, dates, register numbers and transaction numbers for other purchases not made (Doc. 2, at 3, ¶ 12).  The government also alleges these "extrapolated" receipts were then claimed as purchases online under various MaxPerks accounts Channon allegedly controlled (Doc. 2, at 4, ¶ 13).  Once the purchases were claimed, the government states that rewards were issued to the various MaxPerks accounts (Doc. 2, at 3-4).

Also alleged is that Mr. Channon purchased used ink or toner cartridges and presented more of these used ink or toner cartridges for recycling at OfficeMax than the MaxPerks contract allowed (Doc. 2, at 5-6, ¶¶ 5-6).  The government also claims that the recycled cartridges caused MaxPerks rewards to be issued to the various MaxPerk accounts Channon allegedly controlled (Doc. 2, at 6, ¶ 6).

The government produced discovery on the following dates: approximately May 21, 2013 (CD with discovery labeled 0001 – 2166 sent directly to the Channons who were *pro se* at that time); August 26, 2013 (CD labeled Gladden Search Warrant Photos, 366 photos); September 4, 2013 (release of various computers and storage devices to private investigator: 1B46, 1B43, 1B42, 1B41, 1B40, 1B39, 1B 38, 1B36, 1B35, 1B34, 1B32, 1B29,

1B23, 1B22, 1B20, 1B16, 1B15); October 18, 2013 (1B86 – Computer); October 24, 2013

(CD labeled Discovery 10.24.13).  The attached discovery spreadsheet prepared by Mr.

Channon's defense investigator details what was provided by the government to

defense counsel thus far.  *See* Exhibit A.

     No original copies or duplicates of receipts of the alleged fraudulent in-store

purchases or transactions or "each extrapolated receipt" and/or a original copy or

duplicate of receipt for each recycled cartridge transaction alleged as fraudulent by the

government in the indictment were included in the discovery.  *See* Exhibit A.[1]  There

were minimal documents produced as evidence of creation of Google email accounts

and no evidence (other than summaries) of the creation of MaxPerks accounts, as

alleged in Counts 1-6 and 7-10 of the indictment. None of these documents contain

evidence identifying Mr. and Mrs. Channon.  *See* Exhibit F.

     These documents should exist and should be in the possession of the

government, as these documents are needed by the government to prove the counts in

the Indictment (Doc. 2) and the alleged scheme and artifice to defraud.  Charts and

summary witness testimony are admissible only where the documents they summarize

are admissible and have been disclosed to the opposing party.  *United States v. Irvin*, 682

F.3d 1254, 1261-1262 (10th Cir. 2012) (trial court abused its discretion by not requiring

---

[1] It is probable that these documents exist, since the discovery produced does include a computer "screen shot" of at least one alleged fraudulent transaction.  *See* Exhibit A, Exhibits D (Bates No. 1144-1154); Exhibit E (Bates No. 1420-1490).

the proponent of summary evidence to show admissibility of underlying evidence and referencing disclosure requirement); Fed. R. Evid. 1006. When a third party (here, OfficeMax) creates a summary for the purpose of litigation or prosecution, that summary must be vetted by the process described in Rule 1006. *United States v. Keck*, 643 F.3d 789, 797 (2011).

Conviction for wire fraud under 18 U.S.C. § 1343 requires (1) devising or intending to devise a scheme to defraud and obtain money or property by means of false or fraudulent pretenses, representations or promises; (2) acting with specific intent to defraud and obtain money or property by means of false or fraudulent pretenses, representations or promises; (3) using interstate or foreign wire communications facilities or causing another person to use interstate or foreign wire communications facilities for the purpose of carrying out the scheme; and (4) that the scheme employed false or fraudulent pretenses, representations, or promises that were material. Tenth Circuit Criminal Pattern Jury Instruction 2.57 (2011); Indictment (Doc. 2); *see also United States v. Gordon*, 710 F.3d 1124, 1147 (10th Cir. 2013) *cert. denied*, ____ U.S. ____, ____, 134 S. Ct. 617 (2013). "Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1349. Conspiracy charges require two levels of intent: the specific intent to further the object of the conspiracy, and the intent of the underlying crime. See, e.g., *United States v.*

4

*Jackson,* 213 F.3d 1269, 1293 (10th Cir. 2000) *cert. granted, judgment vacated on other grounds,* 531 U.S. 1033 (2000); *United States v. Bedford,* 536 F.3d 1148, 1155 (10th Cir. 2008).

In order for the government to prove the alleged scheme and artifice to defraud alleged in the Indictment (Doc. 2), the government must produce transaction receipts or record of each receipt-redemption and ink cartridge transaction and meet its burden as proponent of that evidence that it is admissible. *Accord. Irvin,* at 1262; *see also* 18 U.S.C. §§ 1343, 1349; *Gordon,* at 1147. In order for the government to prove the wire transmissions alleged in the Indictment to be part of that alleged scheme and artifice to defraud, it must produce the documentation supporting that the alleged online requests to Google and online requests to OfficeMax to create the accounts alleged in the Indictment (Doc. 2), and meet its burden as proponent of that evidence that it is admissible. *Id.* Only then can the government seek to introduce a summary of that admissible evidence. *Irvin,* at 1262; *Keck,* at 797; Fed. R. Evid. 1006.

Therefore, the government cannot proceed, and the defense cannot conduct a defense investigation or prepare for trial, without discovery of copies of receipts, screen printout of receipts, electronic journal receipts, and related transactional documents that might provide admissible evidence of the allegations in the Indictment (Doc. 2). *Gordon,* 710 F.3d at 1147. Those records cannot be summaries prepared by OfficeMax for use in litigation but must be original receipts demonstrating the alleged transactions, i.e., a

record from each store, identification of the store (store number), associate number, register number, transaction number, time of transaction, transaction type, and transaction amount, for each alleged fraudulent  transaction and alleged fraudulent ink recycling.  *Cf id.*; *see also Irvin*, 682 F.3d 1261-1262; *Keck*, 643 F.3d at 797.  To prove the wire transmission element, the government must produce evidence supporting the alleged online requests to Google and online requests to OfficeMax to create the accounts by Mr. Channon, as alleged in the indictment are essential to both the prosecution and defense.  *Id.*

In a letter dated October 2, 2013, Channon, through his counsel requested the following from the government:

1. All receipts (including, but not limited to "electronic journal receipts" *see* Bates 1144), records, back up documents, screen captures of receipts, profiles(s), Max Perks Profile detail, accurate reprinted copies of each transaction, records(s) of transactions for each alleged purchase/sale/transaction/"qualified purchase" at each Office Max store that the government alleges is related to Mr. Channon, identified in the countless spreadsheets provided by the government in the discovery relevant to Mr. Channon (*See* Bates numbers (1420-1424, 1374).

2. Copies of all register receipts, electronic journal receipts, or internal Office Max or MaxPerk documents(s) for any and all recycled ink accounts that the government alleges is related to Mr. Channon.

3. Any and all documents to ascertain what the government refers to as a "qualified purchase." (*See* Bates 1367).

4. Any and all receipts, including, but not limited to, "electronic journal receipts," records, backup documents, screen captures of receipts, profiles(s), Max Perks profile detail, accurate reprinted copies of each transaction, record(s) of transactions for each alleged purchase/sale/transaction/"qualified purchase" at each Office Max store identifying the dollar amounts for both loss and restitution claimed in the discovery and the plea agreement dated September 24, 2013.

5. Any offset or reduction in the loss calculation as determined in the discovery or the plea agreement dated September 24, 2013.

Exhibit B, at 3-4. The government responded on October 24, 2013.

• ¶¶ 1, 2, [and] 4 …. These paragraphs request materials which, if they exist, are in the possession of private parties. *The government is not required to obtain discovery from private parties on behalf of the Mr. Channon. Discoverable materials within these categories in the possession of the government have been disclosed.*

• ¶3. You requested documents to ascertain the meaning of the term "qualified purchase." This is a term used by OfficeMax. See, e.g., Bates 1757-61.

• ¶5. I don't understand what you are requesting.

Exhibit C, at 2 (emphasis added).

In a letter dated January 27, 2013, the defense requested the following:

40. Defense expert access to all of the data on the two computers still in the custody of the FBI, the Mac Mini A 1103 (1B31) and Mac Mini A 1179 (1B37).

41. Copies of the missing pages Bates: 43-44; 153-202; 478-482; 1338; 1369-1370; 1630-1633; 1638-1683; and 2166-2532.

42.    Any and all records of Mr. Channon and Mrs. Channon's credit card and debit card transaction records relating to Office Depot and Staples.

Exhibit G.  The government responded on January 28, 2014, via e-mail:

Counsel,

¶40: You know the government's position on the hard drives.  If you provide a storage device you will be given exact image copies of the drives, along with logs that will permit your expert to satisfy himself that the copies are true.

¶41: I will reexamine the discovery sent out, and if the Bates pages you listed were indeed missing from the initial or supplemental discovery, I will have them sent out.  I cannot get to that today, but there is no reason to bring it up with the Court.

¶42: You have been provided all records in the government's possession.

Exhibit H.

To date, the United States has not provided the defense with any actual evidence, i.e., receipts and documents related to the alleged fraudulent transactions, alleged fraudulent ink recyclings, and admissible documents regarding the creation of Google email and OfficeMax MaxPerks accounts by Mr. Channon to support the allegations in the indictment of the alleged scheme and artifice to defraud and alleged wire transmissions.

II.   **MOTION TO DISMISS**

    A.   **Legal Standard**

Due process requires that in a criminal case each element is proven by the government beyond a reasonable doubt. *Patton v. Mullin*, 425 F.3d 788, 803-04 (10th Cir. 2005); *In re Winship*, 397 U.S. 358, 364 (1970); *see also Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) (applying the same standard in state and federal prosecutions). "[T]he reasonable doubt standard is a constitutional cornerstone of the criminal justice system. A defendant is entitled to . . . the presumption of innocence." *United States v. Pepe*, 501 F.2d 1142, 1143 (10th Cir. 1974).

The reasonable doubt standard "provides concrete substance for the presumption of innocence — that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law." *Winship*, at 363 (citing *Coffin v. United States*, 156 U.S. 432, 453 (1895)); *Patton*, at 803 (quoting the same language). The United State Supreme Court "explicitly [held] that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, at 364. Where insufficient evidence of an element is offered by the prosecution, a conviction must be reversed. *Black v. Workman*, 682 F.3d 880, 901-02 (10th Cir. 2012) (analyzing Supreme Court precedent in an AEDPA habeas corpus proceeding).

9

B.      **Argument and Authority**

In this case, the government has the burden of proving beyond a reasonable

doubt that the Channons committed wire fraud, aiding and abetting wire fraud, and

conspiracy to commit wire fraud.  *Patton*, 425 F.3d at 803-04; *Winship*, at 362 ("the duty

of the Government to establish guilt beyond a reasonable doubt").  Wire fraud requires

the government to prove beyond a reasonable doubt that the Channons: (1) devised or

intended to devise a scheme to defraud and obtain money or property by means of false

or fraudulent pretenses, representations or promises; (2) acted with specific intent to

defraud and obtain money or property by means of false or fraudulent pretenses,

representations or promises; (3) used interstate or foreign wire communications

facilities or caused another person to use in-terstate or foreign wire communications

facilities for the purpose of carrying out the scheme; and (4) employed false or

fraudulent pretenses, representations, or promises that were material.  Tenth Circuit

Criminal Pattern Jury Instruction 2.57 (2011); Indictment (Doc. 2); 18 U.S.C. § 1343; *see*

*also United States v. Gordon*, 710 F.3d 1124, 1147 (10th Cir. 2013) *cert. denied,* _____ U.S.

_____, _____, 134 S. Ct. 617 (2013).

Aiding and abetting requires the government to prove beyond a reasonable

doubt that (1) someone else committed the charged crime, and (2) that the Channons

individually and "intentionally associated himself [or herself] in some way with the

crime and intentionally participated in it as he [or she] would in something he [or she]

wished to bring about.  This means that the government must prove that the defendant consciously shared the other person's knowledge of the underlying criminal act and intended to help him."  Tenth Circuit Criminal Pattern Jury Instruction 2.06; Indictment (Doc. 2); 18 U.S.C. § 2.

Conspiracy to Commit Wire Fraud requires that the government to prove beyond a reasonable doubt that the Channons' attempted or conspired to commit the elements of wire fraud.  18 U.S.C. § 1349; *United States v. Thornburgh*, 645 F.3d 1197, 1204 (10th Cir. 2011).  The elements of a conspiracy charge are that Mr. and Mrs. Channon individually (1) agreed with at least one other person to violate the law; (2) one of the conspirators engaged in at least one overt act furthering the conspiracy's objective; (3) Mr. and Mrs. Channon individually knew the essential objective of the conspiracy; (4) each of them knowingly and voluntarily participated; and (5) there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.  Tenth Circuit Criminal Pattern Jury Instruction 2.19; 18 U.S.C. § 1349; Indictment (Doc. 2).  Conspiracy charges require two levels of intent: the specific intent to further the object of the conspiracy, and the intent of the underlying crime.  See, e.g., *United States v. Jackson*, 213 F.3d 1269, 1293 (10th Cir. 2000) *cert. granted, judgment vacated on other grounds*, 531 U.S. 1033 (2000); *United States v. Bedford*, 536 F.3d 1148, 1155 (10th Cir. 2008).

The government asserts that it has no evidence of the transactions and wire transmissions it alleges were part of the scheme and artifice to defraud charged in the Indictment, insisting that Mr. Channon bears the burden of collecting the evidence in this case.  Exhibit C, at 2-3.  Had the government conducted an investigation of the charges it brought against Mr. Channon, limited items produced in discovery indicate that OfficeMax could have provided some form of records of transactions.  *See* Exhibits D (screenshots of what appear to be transaction records) and E (reproductions of receipts for transactions).  Instead, the sum total of the evidence that the government can produce to support that the scheme and artifice it alleges to have existed is a handful of records and summary spreadsheets apparently created by OfficeMax.  *See id.*; *see also* Exhibit A.  The only records supporting the wire transactions alleged in the Indictment (Doc. 2) are also problematic; the records from Google relevant to Counts 1, 3, 5, 7, and 9 list Internet Protocol ("IP") addresses that defense investigation show are currently assigned to Dallas, Texas, and Guangzhou, Guangdong, China.  Exhibits F (Google records) and I (IP geolocation information).  The only records the defense can locate related to the account creations alleged in Counts 2, 4, 6, 8, and 10 are summary spreadsheets which appear to show that the accounts exist, but not the dates of their creation, IP address originating the request to create the accounts, or e-mail address(es) associated with the accounts.  Exhibit F.

"The proponent of evidence may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. *The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.*" Fed. R. Evid. 1006 (emphasis added).  Summaries are appropriate to simplify court examination of voluminous documents.  Fed. R. Evid. 1006; *United States v. Samaniego*, 187 F. 3d 1222 (10th Cir. 1999) "Admission of summaries, however, is conditioned on the requirement that the evidence upon which they are based, if not admitted, must be admissible." *Id.* at 1222.  *See, e.g., Harris Market Research v. Marshall Marketing and Communications*, 948 F.2d 1518, 1525 (10th Cir. 1991) (holding that Rule 1006 "clearly permits the use of a summary of business records provided all of the records from which it is drawn are otherwise admissible" (quoting *State Office Sys., Inc. v. Olivetti Corp. of Am.*, 762 F.2d 843, 845 (10th Cir. 1985))); *Martin v. Funtime, Inc.*, 963 F.2d 110, 116 (6th Cir. 1992); Weinstein's Federal Evidence, § 1006.06[3].  "A contrary result would inappropriately provide litigants with a means of avoiding rules governing the admission of evidence such as hearsay." *Samaniego*, at 1224, citing *United States v. Johnson*, 594 F.2d 1253, 1255 (9th Cir.1979) ("We do not believe that Congress intended that counsel could abrogate other restrictions on the admissibility — like the hearsay rule — by the use of summaries...."); *see also Irvin*, 682 F.3d 1261-1262; *Keck*, 643 F.3d at 797.

13

The purpose of the availability requirement is to give the opposing party an opportunity to verify the reliability and accuracy of the summary prior to trial. *See, e.g., Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1259 (9th Cir. 1984).  When summaries are admitted with the proponent being held to the burden of making the underlying documents available and proving their admissibility, the result is reversible error.  *Irvin*, at 1261-1262.

The government's theory is that the Mr. and Mrs. Channon devised a scheme and artifice in which he/they transmitted and cause to be transmitted, by means of wire communications, in interstate commerce, writings, signals, and sounds, as specified in Counts 1 – 10 in the indictment, (Doc. 2) and that Mr. Channon would make in person purchases at various OfficeMax locations across the country to obtain a printed paper receipt.  (Doc. 2, at 3).  After obtaining an original receipt from a valid purchase, the government claims Mr. Channon would use the store number, date, register number, and transaction number, to "extrapolate" receipts for purchases not made (Doc. 2, at 3).

This scheme, the government alleges, was meant to defraud OfficeMax for the purpose of obtaining Max Perks rewards (Doc. 2, at 1).  In order to prove each element of this alleged wire fraud scheme, the government must have admissible evidence to prove that the purchases and/or "extrapolation" actually occurred, and Mr. Channon or Mrs. Channon was the one who perpetrated this alleged scheme and artifice to defraud, or they acted together.  Each transaction, sale, email or OfficeMax account opening

needs to be reflected by a copy of a receipt, transaction record, electronic journal receipt, or email/OfficeMax account opening documentation specifying Mr. or Mrs. Channon opened these accounts; only then can summary spreadsheets be used if those records are too burdensome.  Fed. R. Evid. 1006; *Irvin*, 682 F.3d 1261-1262; *Keck*, 643 F.3d at 797. The government has not produced these underlying documents because it has not obtained them, and instead expects Mr. Channon to do so.  Exhibit C, at 2.

The Due Process Clause protects the Channons' from unfair conviction in this case because the government has openly admitted that they do not have and cannot provide sufficient evidence to prove "beyond a reasonable doubt every fact necessary to constitute the crime with which he is charged."  *In Re Winship*, 397 U.S. 358, 364 (1963); *Patton*, 425 F.3d at 803-04.  The government has not obtained the evidence necessary to prove its case, and so this case should be dismissed.  *Id.*; Exhibit C, at 2; *Irvin*, at 1261-1262; *Keck*, at 797.

### C.   <u>Other Due Process Requirements</u>

The Due Process Clause of the Constitution requires the United States to disclose information favorable to the accused that is material to either guilt or to punishment." *United States v. Harry*, 927 F. Supp. 2d 1185, 1207 (D.N.M. 2013); *Brady v. Maryland*, 373 U.S. 83, 87 (2013) ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment"); *Giglio v. United States*, 405 U.S. 150, 153 (1972) (the prosecution must

15

disclose evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory). The materials disclosed thus far indicate that the wire transmissions the government alleges Mr. and Mrs. Channon made or caused to be made came from other cities and countries. Exhibit I. Further disclosures could contain additional information that exculpates Mr. and Mrs. Channon.

The offense conduct alleged in this indictment span from "on or about September 18, 2009 through on or about June 28, 2011" (Doc. 2, p. 5-6, Counts 7-11). This case was indicted on March 27, 2013, after significant delay by the FBI in investigating the case (Doc. 2, at 1). The basic ability to the defendant to defend his case is put in jeopardy by the government's failure to prosecute their case. *Cf Barker v. Wingo*, 407 U.S. 514, 532 (1972) ("[t]here is also prejudice if defense witnesses are unable to recall accurately events of the distant past." (discussing the Sixth Amendment right to a speedy trial)). Specific deadlines are in place so a due process violation does not occur, i.e., Discovery Order (Doc. 11) and amended scheduling order (45). The defendant has requested admissible, and possibly exculpatory evidence from the government, and the government is unable to produce them to the defense. Because the government has stated it cannot meet its burden in this case, and due to the delay in the case and in producing admissible evidence, the case should be dismissed.

Due to the nature of the motion, the government's position was not sought.  The defense presumes the government opposes.

## CONCLUSION

WHEREFORE, Mr. and Mrs. Channon respectfully request this Court grant their Joint Motion to Dismiss this action, as the government is unable to meet its burden of proof on each element of the crimes charged and the required scheme and artifice to defraud.

Respectfully submitted,
_____/s_____
Amy Sirignano, Esq.
Kevin L. Nault, Esq.
Law Office of Amy Sirignano, P.C.
20 First Plaza NW Suite, 310
Albuquerque, NM 87102
(505) 242-2770
(505)242-2774 facsimile
amy@abqnmlaw.com
kevin@abqnmlaw.com

Counsel for Matthew Channon

_____/s_____
Todd B. Hotchkiss
Frechette & Associates
P.O. Box 26807
Albuquerque, NM 87125
505-247-8558
505-842-8560 fascimile
tbhotchkiss@frechettelaw.com

Counsel for Brandi Channon

17

law holding that a court has no authority to dismiss an indictment before trial on the basis that

the government's evidence is insufficient.  An indictment "may not be properly challenged by a

pretrial motion on the ground that it is not supported by adequate evidence." *United States v.*

*King*, 581 F.2d 800, 802 (10th Cir. 1978).[2] "In considering a defense motion to dismiss an

indictment, the district court accepts as true the factual allegations set forth in the indictment."

*United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990).  "[E]vidence outside the

indictment . . . is irrelevant to a determination of whether the indictment itself is legally

sufficient." *King*, 581 F.2d at 802.

   An indictment is sufficient if it tracking the language of the statute and sets forth the

elements of the offense.  *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988).

Defendants devote three pages of their motion to listing out the elements of the charges, *see* Doc.

56 at 4, 10-11, but they make no claim that Indictment fails to allege the essential elements of the

offenses charged.  They do not attack the legal sufficiency of the Indictment, but rather opine

that the United States does not have sufficient evidence to prove its case at trial.

   The case law is replete with appellate pronunciations of the limited role of the court in

assessing the government's evidence before trial.  In the recent case of *United States v. Huet*,

665 F.3d 588 (3d Cir. 2012), the Third Circuit noted that "[i]t is well-established that an

indictment returned by a legally constituted and unbiased grand jury, if valid on its face, is

enough to call for trial of the charge on the merits." *Id.* at 594 (internal alterations and quotation

---

[2] The Tenth Circuit and a number of other courts have recognized a narrow exception to this rule,
not implicated here, "under the limited circumstances where the operative facts are undisputed
and the government fails to object to the district court's consideration of those undisputed facts
in making the determination regarding a submissible case." *United States v. Hall*, 20 F.3d 1084,
1088 (10th Cir. 1994).  The court recognized that the scenario present in *Hall* was "not likely to
recur" and that dismissal of an indictment on undisputed facts, without objection from the
government, would be "indeed the rare exception." *Id.*

BRANDI CHANNON'S
EXHIBIT

**67**

1:13-CR-966-JCH-KK   2255 MOTION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA

     Plaintiff,

v.                                  Case No. 13-CR-966 JCH

MATTHEW CHANNON, and
BRANDI CHANNON,

     Defendants.

## DEFENDANT'S JOINT REPLY TO UNITED STATES' RESPONSE TO DEFENDANTS' JOINT MOTION TO DISMISS

     COME NOW Matthew Channon, through Amy Sirignano, Esq., and Kevin L. Nault, Esq., of the Law Office of Amy Sirignano, PC, and Brandi Channon, through Todd Hotchkiss, Esq., of Frechette & Associates PC, and jointly reply that the government, in the United States' Response to Defendants' Joint Motion to Dismiss ("Response") (Doc. 62) does not demonstrate why it should be permitted to go forward without any admissible evidence of the transactions underlying the charges in this case. As a result, the Court should exercise its inherent power to manage its docket to save the public expense of further work by appointed counsel, jury and trial costs, and dismiss this case with prejudice.  The basis for this reply is as follows.

**BRANDI CHANNON'S EXHIBIT**

**68**

1:13-CR-966-JCH-KK   2255 MOTION

I.       **BASIS FOR DISMISSAL**

Citing a variety of out-of-circuit cases, the government states that a court

evaluating the sufficiency of a charging document cannot look beyond the face of that

document.  Response, at 2-5.[1]  However, Mr. and Mrs. Channon did not challenge the

sufficiency of the indictment in their underlying motion to dismiss; instead, Mr. and

Mrs. Channon argue that in order to conserve judicial resources and the public costs of

appointed counsel and a jury trial, the Court should dismiss this case because the

government has no admissible evidence of the transactions underlying the alleged

scheme or artifice to defraud (Doc. 56).

Federal Rule of Criminal Procedure 12(b)(2) states in pertinent part that "[a]

party may raise by pretrial motion any … request that the court can determine without

a trial of the general issue."  "The power of district courts to manage their dockets is

_____

[1] The cases relied on by the government to argue against dismissal stand for obvious
propositions that a court cannot dismiss charges pretrial on a finding of factual
innocence, where the indictment is not legally deficient, or for applying the wrong
standard by looking to extrinsic evidence to determine sufficiency of the charges.  None
of these cases address the issue of lack of admissible evidence raised by the Channons.
*See United States v. King*, 581 F.2d 800, 801-802 (no authority to dismiss on finding of
actual innocence); *United States v. Salman*, 378 F.3d 1266, 1267 (11th Cir. 2004) (same);
*United States v. Bergrin*, 650 F.3d 257, 268-269 (3rd Cir. 2011) (same); *United States v. Huet*,
665 F.3d 588, 597 (3rd. Cir. 2012) (same); *United States v. Besmajian*, 910 F.2d 1153, 1157-
1158 (3rd Cir. 1990) (indictment sufficient); *United States v. DeLaurentis*, 230 F.3d 659, 661
(3rd Cir. 2000) (same); *United States v. Gallagher*, 602 F.2d 1139, 1142 (3rd Cir. 1979)
(indictment sufficient; no review of evidence on facial challenge to indictment); *United
States v. Critzer*, 951 F.2d 306, 307 (8th Cir. 1992) (no review of evidence on facial
challenge to indictment).

deeply ingrained in our jurisprudence." *United States v. Schneider*, 594 F.3d 1219, 1226

(10th Cir. 2010) (citing to *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-631 (1962)).  Courts

are empowered to manage their docket and the parties.  *Id.*

   A trial court cannot dismiss a case pretrial on a finding of factual innocence

because innocence is not "capable of determination without the trial of the general

issue.  It [is] the general issue." *United States v. King*, 581 F.2d 800, 802 (10th Cir. 1978).

However, Mr. and Mrs. Channon do not assert factual innocence as a basis for their

motion to dismiss (Doc. 56).

## II.     DISMISSAL IS APPROPRIATE DUE TO THE GOVERNMENT'S LACK OF ADMISSIBLE EVIDENCE.

   "The United States maintains that it has provided or offered to provide all

discovery materials required at this stage of the litigation by the Court's discovery order

and Rule 16" (Doc. 60, at 4).  It was ordered to complete discovery, initially by April 20,

2013 (Doc. 11), then in a later order by August 26, 2013 (Doc. 41).  This case was charged

by Indictment on March 27, 2013, charging events that allegedly took place "[b]etween

… March 2010 [and] … September 2010" (Doc. 2).  The government has had ample time

in the nearly four years since criminal activity was alleged to have begun to investigate

its case and gather its evidence.  *Cf United States v. Seltzer*, 595 F.3d 1170, 1175-1176 (10th

Cir. 2010) ("it is the prosecution's burden … and not the defendant's responsibility to

assure that cases are brought to trial").

The only evidence the government has provided of the transactions that are the basis of the alleged scheme or artifice to defraud are summaries of the database of transactions kept by OfficeMax (Doc. 62, at 2 n. 1). These are, by the government's plain admission, summaries of the information in the database showing certain fields of information collected on each transaction (Doc. 62, at 2 n. 1). When Mr. Channon requested admissible – i.e., non-summary – evidence, the government responded that "[t]he government is not required to obtain discovery from private parties on behalf of the defendant" (Doc. 56-3, at 2).[2]

Mr. and Mrs. Channon briefed the Court on the inadmissibility of summaries prepared for litigation (Doc. 56), and the government did not respond with any authority for admitting its inadmissible summaries (Doc. 62). *See, e.g., United States v. Irvin*, 682 F.3d 1254, 1261-1262 (10th Cir. 2012) (proponent must show admissibility). Instead, the government asserts that "[t]he United States is *entitled* to present its evidence to a jury." Response (Doc. 62), at 5 (emphasis added). This assertion usurps the Court's role of resolving questions about the admissibility of evidence. Fed. R. Evid. 104(a). The government is entitled to present its *admissible* evidence, subject to the

―――――――――――――――

[2] The government states in its response that "Defendants are simply making … up" its statements that it did not have non-summary evidence and had refused to obtain it (Doc. 62, at 2). However, Mr. and Mrs. Channon attached the letters requesting non-summary evidence, and the government's response, to the underlying motion (Docs. 56-2 and 56-3). Demonstrably, the requests were made and the government's response is clear (Docs. 56-2 and 56-3).

4

Court's inherent power to manage its caseload, but must also have admissible evidence to prove every element beyond a reasonable doubt, or it cannot prevail at trial. *Schneider*, 594 F.3d at 1226; *Patton v. Mullin*, 425 F.3d 788, 803-04 (10th Cir. 2005).

Without trial of the general issue, i.e., factual guilt or innocence of Mr. and Mrs. Channon, the Court is capable of determining that the government's evidence of the transactions in the alleged scheme or artifice to defraud – the summary spreadsheets produced by OfficeMax – are inadmissible pursuant to Federal Rule of Evidence 1006. Fed. R. Evid. 104(a). If the government does not have any evidence to prove an element of the charges, the Court can exercise its inherent power to manage its docket and dismiss this case. *Cf, e.g., Schneider*, at 1226; *cf also United States v. Huet*, 665 F.3d 588 (3rd Cir. 2012) ("a district court may be able to address the sufficiency of the government's evidence in a pretrial motion to dismiss"). This determination is not on the merits of the case, neither is it on the sufficiency of the Indictment. Instead, the Court is managing its docket and resources to avoid the waste and undue burden on the jurors of proceeding to the close of the government's evidence at a trial before the inevitable occurs. *See Schneider*, at 1226.

III.    **CONCLUSION**

Because the government has only summary evidence of the transactions underlying the alleged scheme or artifice to defraud, and because it has offered no grounds for admission of this summary evidence without inspection of the underlying

5

records, as required by Federal Rule of Evidence 1006, Mr. and Mrs. Channon

respectfully request that the Court dismiss this case to save the unnecessary time and

expense of a trial at which the government cannot prevail.  *See Schneider*, 594 F.3d at

1226.

<div style="margin-left:40%">

Respectfully submitted,

_____/s_____

Amy Sirignano, Esq.
Kevin L. Nault, Esq.
Law Office of Amy Sirignano, P.C.
20 First Plaza NW, Suite 310
Albuquerque, NM 87102
(505) 242-2770
(505) 242-2774 facsimile
amy@abqnmlaw.com
kevin@abqnmlaw.com

Counsel for Matthew Channon


_____/s_____

Todd Hotchkiss, Esq.
Frechette & Associates PC
PO Box 26807
Albuquerque, NM 87125-6807
(505) 247-8558
(505) 842-8560 facsimile
tbhotchkiss@frechettelaw.com

Counsel for Brandi Channon

</div>

Page 36

1    understand that that puts a little time pressure on

2    the prosecution.

3              I would say this, though, with respect to

4    the trial setting.  I think to the extent that the

5    government needs time or needs witnesses to discuss

6    the property issue, if it's going to be the case that

7    they're going to bring folks to talk about facts

8    which contradict what seems to me to be patent, which

9    is that these rewards aren't property in the hands of

10   OfficeMax, that's not going to happen between now and

11   Monday.

12             And Mr. Channon, for his part, is not

13   violently opposed to the notion of postponing the

14   trial.

15             But I mean, I can't disagree with the

16   Court.  This is a big issue and it needs to be fully

17   addressed.

18             I will say this, and I think I mentioned

19   this by footnote in the original motion.

20             It wasn't clear to us at all whether this

21   was a motion that was required to be filed under Rule

22   12.  We thought that we would do what we did -- it's

23   kind of ironic to me, because the government accuses

24   me of bad faith and seeking a tactical advantage in

25   doing this.

Paul Baca, Official Court Reporter

BRANDI CHANNON'S
EXHIBIT

69

1:13-CR-966-JCH-KK   2255 MOTION

Page 37

1          What I've obviously done is exactly the
2    opposite of that.  I provided them with information
3    that caused them to take a step to remedy a problem
4    which they recognized was a problem.  And likewise --
5          THE COURT:  They don't agree with you on
6    that, by the way.
7          MR. ROBERT:  Yes.  Well, that may be.  But
8    the fact is, if we had said nothing and come to the
9    Court at the close of the government's case and made
10   a Rule 29 motion that said the evidence that they
11   produced does not comport with the case law dealing
12   with wire fraud, then where would we be?  That
13   would -- that would have been a big mess.  That would
14   have been a tactical advantage.
15          We didn't take that advantage.
16          Likewise, with respect to issues that I
17   think are essentially foundational issues, because
18   all of this stuff has to be admissible evidence no
19   matter where -- how many spreadsheets you put it
20   into.  And this seems to be a thing that -- you know,
21   we've alerted the government to that particular
22   problem as well.
23          We have again forfeited what would arguably
24   be a tactical advantage on our part by alerting the
25   Court and the prosecution to these issues.

10.    To that end, the Channons propose that the Court order that paragraphs 1 through 9 and paragraph 11 be stricken from the Second Superseding Indictment.  Those paragraphs are unnecessary to describe the elements of the charges against the Channons and are inflammatory and prejudicial to the Channons.  If those paragraphs are stricken, then paragraph 1 of the section of the Second Superseding Indictment captioned "Counts 2-7" becomes meaningless and should be stricken as well.

11.    The government opposes this motion.

**WHEREFORE**, for the foregoing reasons, MATTHEW CHANNON and BRANDI CHANNON, Defendants, by and through the undersigned appointed counsel, respectfully pray that the Court enter an order striking the identified portions of the Second Superseding Indictment; or in the alternative directing the preparation by the parties of a "statement of the case" to be presented to the jury venire during jury selection and to the seated and sworn jury during all phases of the trial, and limiting the content of the indictment presented to the jury to the essential elements of the offense; and providing for such other and further relief to which the Court may find Mr. and Ms. Channon to be justly entitled.

BRANDI CHANNON'S
EXHIBIT

**70**

1:13-CR-966-JCH-KK   2255 MOTION

241 F.3d 1306, 1312 (10th Cir. 2001); *see United States v. Bailey*, 327 F.3d 1131, 1140 (10th Cir.

2003) (observing that it is difficult to prove intent to defraud from direct evidence, but intent

may be proved by inference); *United States v. Prows*, 118 F.3d 686, 692 (10th Cir. 1997) (stating

that intent to defraud for wire fraud offense is usually proved by inference from circumstantial

evidence); *United States v. Sivigliano*, 550 Fed. Appx. 537, 539 (10th Cir. 2013) (unpublished)

(stating that intent to defraud may be inferred).  The Court concludes that Defendants' request is

for notice of evidence, and Defendants are not entitled to such notice.  The Court further

concludes that the Indictment gives sufficient notice of the theory of the Government's case.

The Government's response states that it has provided thousands of pages of discovery to

Defendants, and maintains that it has complied with its discovery obligations.  [Doc. 60, p. 4

(noting that there is an unresolved motion regarding further discovery, Doc. 57)]   When

discovery supplies the information necessary to allow the defendants to prepare their defense, a

bill of particulars is not warranted.  *Ivy*, 83 F.3d at 1282 (holding that discovery gave defendant

tools necessary to prepare defense, and rejecting conclusory allegations of prejudice).  To the

extent that Defendants contend discovery is incomplete, the Court presumes that Defendants

have also raised those arguments in their separate motion for discovery [Doc. 57], which will be

resolved in a separate opinion.

The Court concludes that Defendants' motion for a bill of particulars should be denied,

both because the motion was filed much later than allowed by the Rules and, more important,

because the Court concludes that the Indictment (together with voluminous discovery) gives

Defendants sufficient notice of the charges to allow them to prepare a defense.

**BRANDI CHANNON'S
EXHIBIT**

**71**

1:13-CR-966-JCH-KK   2255 MOTION

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Cause No. CR 13-966 JH |
| | § | |
| MATTHEW CHANNON and | § | |
| BRANDI CHANNON, | § | |
| | § | |
| Defendants. | § | |

## MOTION TO STRIKE SURPLUSAGE
## FROM THE SECOND SUPERSEDING INDICTMENT

MATTHEW CHANNON, Defendant, by and through his undersigned appointed counsel, Marc H. Robert and John F. Robbenhaar, Assistant Federal Public Defenders, joined by co-defendant BRANDI CHANNON, by and through her appointed counsel, Todd Hotchkiss, moves the Court for an order to strike surplusage from the Second Superseding Indictment, and in support of this motion would respectfully show the Court as follows:

1.    Mr. and Ms. Channon are charged in a Second Superseding Indictment with wire fraud and conspiracy in violation of 18 U.S.C. §§ 1349 and 1343. [Doc. 197]. Both are charged in count 1 with conspiracy in violation of § 1349. Mr. Channon is charged in Counts 3, 5, 6 and 7, and Ms. Channon is charged in Counts 2 and 4, with wire fraud in violation of 18 U.S.C. § 1343. Ms. Channon and Mr. Channon are at liberty pursuant to the Court's order setting conditions of release, with which, on information and belief, they are both compliant.

2.    Trial is set for January 11, 2016, with a call of the calendar scheduled for January 6, 2016.

**MOTION TO STRIKE SURPLUSAGE – PAGE 1**

BRANDI CHANNON'S
EXHIBIT

**72**

1:13-CR-966-JCH-KK   2255 MOTION

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

   *Plaintiff,*

  vs.            **CRIMINAL NO.: 13-966 JCH**

**MATTHEW CHANNON**, and
**BRANDI CHANNON**

   *Defendants.*

### MONEY JUDGMENT (ORDER OF FORFEITURE)

THIS MATTER, having come before the Court on the United States of America's Motion for Entry of Money Judgment (Order of Forfeiture) as to the defendants, MATTHEW CHANNON and BRANDI CHANNON, the Court having reviewed the motion and being fully advised in the premises, finds the motion is well-taken and will be granted.

WHEREAS, the defendants, MATTHEW CHANNON and BRANDI CHANNON, were convicted at trial of all charges in the Second Superseding Indictment, those being wire fraud and conspiracy to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349;

WHEREAS, the United States has established the requisite nexus between the money judgment and the offense to which the defendants were convicted, the money judgment is subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461;

WHEREAS, the imposition of the joint and severally liable money judgment shall be made a part of each defendant's sentencing and will be included in the Judgment;

WHEREAS, Rule 32.2(c)(1) of the Fed. Rules of Criminal Procedure provides that no

**BRANDI CHANNON'S
EXHIBIT**

**73**

1:13-CR-966-JCH-KK   2255 MOTION

Page 1532

1                There are few things in this world that we

2        know with absolute certainty, and in criminal cases

3        the law does not require proof that overcomes every

4        possible doubt.  It is only required that the

5        government's proof exclude any reasonable doubt

6        concerning the defendants' guilt.

7                A reasonable doubt is a doubt based on

8        reason and common sense after careful and impartial

9        consideration of all the evidence in the case.

10               If, based on your consideration of the

11       evidence, you are firmly convinced that the defendant

12       is guilty of the crime charged you must find him or

13       her guilty.

14               If, on the other hand, you think there is a

15       real possibility that the defendant is not guilty,

16       you must give him or her the benefit of the doubt and

17       find the defendant not guilty.

18               Now, Defendants Matthew Channon and Brandi

19       Channon are charged in Count 1 with a violation of 18

20       United States Code, Section 1349.

21               This law makes it a crime to conspire to

22       commit wire fraud.

23               To find any defendant guilty of this crime

24       you must be convinced that the government has proved

25       each of the following beyond a reasonable doubt:

**BRANDI CHANNON'S EXHIBIT**

**74**

1:13-CR-966-JCH-KK   2255 MOTION

Page 1533

1          First, the defendant agreed with at least

2     one other person to violate the law.

3          Second, the defendant knew the essential

4     objective of the conspiracy.

5          Third, the defendant knowingly and

6     voluntarily participated.

7          Fourth, the defendant acted with specific

8     intent to obtain money or property by means of false

9     or fraudulent pretenses, representations, or

10    promises.

11         And fifth, there was interdependence among

12    the members of the conspiracy; that is, the members

13    in some way or manner intended to act together for

14    their shared mutual benefit within the scope of the

15    conspiracy charged.

16         A conspiracy is an agreement between two or

17    more persons to accomplish an unlawful purpose.  It

18    is a kind of partnership in criminal purposes in

19    which each member becomes the agent or partner of

20    every other member.

21         The evidence need not show that the members

22    entered into an express or formal agreement, nor does

23    the law require proof that the members agreed on all

24    of the details.  But the evidence must show that the

25    members of the alleged conspiracy came to a mutual

PAUL BACA, OFFICIAL COURT REPORTER

Page 1534

1    understanding to try to accomplish a common and

2    unlawful plan.

3              If you are convinced that the charged

4    conspiracy existed, then you must next determine

5    whether the defendant was a member of that

6    conspiracy; that is, whether the defendant knew at

7    least the essential goals of the conspiracy and

8    voluntarily chose to be a part of it.

9              The law does not require proof that the

10   defendant knew all of the other members of the

11   conspiracy or knew all of the details about how

12   activities were to be carried out.

13             A person may belong to a conspiracy for a

14   brief period of time or play a minor role.

15             On the other hand, proof is not sufficient

16   if it merely shows that the defendant knew about the

17   existence of the conspiracy or was associated with

18   members of the conspiracy.

19             Rather, the evidence must show the

20   defendant knowingly joined the conspiracy with the

21   intent to advance its purposes.

22             You are also required to find that -- you

23   are also required to find that interdependence

24   existed among the members of the conspiracy.

25             This means that the members intended to act

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

    v.                                No.   CR 13-966 JH

MATTHEW CHANNON and
BRANDI CHANNON,

      Defendants.

## NOTE FROM JURY

Dear Judge,

In our "Courts Instructions to the Jury" document on page 3 in the "Count 1" section 1343 is referenced from 18 U.S.C. On page 6 the same is being referenced but the section is listed as 1349. Why is this difference present? Section 1343 is mentioned again on page 8 for counts 2-7.

_____
Foreperson

_1:14 pm_    _1/22/16_
Time  / Date

**BRANDI CHANNON'S EXHIBIT**

**75**

1:13-CR-966-JCH-KK   2255 MOTION

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

    v.                         No.   CR 13-966 JH

MATTHEW CHANNON and
BRANDI CHANNON,

      Defendants.

### NOTE FROM JURY

Dear Judge,

We are not comfortable moving forward until we
have a response to our previous question. We
believe it to be a typo only but would like
clarification to be sure.

<div style="text-align:center">▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅▅</div>

Foreperson

2:50 pm   1/22/16
Time   / Date

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                  No. CR 13-966 JH

MATTHEW CHANNON and
BRANDI CHANNON,

        Defendants.

**NOTE TO JURY**

Dear Jury,

On page 3, Count 1, the following sentence should be added as the last sentence of the paragraph:

In violation of 18 U.S.C. § 1349.

_____
JUDGE

2:57 P.M. / 1/22/16
_____
TIME   / DATE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

  v.                                                    No.   CR 13-966 JH

MATTHEW CHANNON and
BRANDI CHANNON,

      Defendants.

## NOTE FROM JURY

Dear Judge,

We have reached a verdict.

_____
Foreperson

3:12 pm   1/22/2016
Time   / Date

AO 245B (Rev 12/10) Criminal Judgment Sheet 1

# UNITED STATES DISTRICT COURT
## District of New Mexico

| UNITED STATES OF AMERICA | **Amended Judgment in a Criminal Case – Reason:** |
|---|---|
| V. | Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36) |

**MATTHEW CHANNON**

(For Offenses Committed On or After November 1, 1987)

Case Number: **1:13CR00966-001JCH**
USM Number: **72031-051**
Defense Attorney: **Marc H. Robert and John Robbenhaar**

### THE DEFENDANT:

☐ pleaded guilty to count(s)
☐ pleaded nolo contendere to count(s)  which was accepted by the court.
☒ after a plea of not guilty was found guilty on count(s) **1, 3, 5, 6, and 7 of Indictment**

The defendant is adjudicated guilty of these offenses:

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. Sec. 1343 | Wire Fraud | 03/09/2010 | 1 |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.  The Court has considered the United States Sentencing Guidelines and, in arriving at the sentence for this Defendant, has taken account of the Guidelines and their sentencing goals.  Specifically, the Court has considered the sentencing range determined by application of the Guidelines and believes that the sentence imposed fully reflects both the Guidelines and each of the factors embodied in 18 U.S.C. 3553(a).  The Court also believes the sentence is reasonable and provides just punishment for the offense.

☐ The defendant has been found not guilty on count .
☐ Count   dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**October 20, 2016**
Date of Imposition of Judgment

**/s/ Judith C. Herrera**
Signature of Judge

**Honorable Judith C. Herrera**
**United States District Judge**
Name and Title of Judge

**November 7, 2016**
Date Signed

**BRANDI CHANNON'S EXHIBIT**

**76**

1:13-CR-966-JCH-KK   2255 MOTION

Defendant: **MATTHEW CHANNON**
Case Number: **1:13CR00966-001JCH**

## ADDITIONAL COUNTS OF CONVICTION

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 10 U.S.C. Sec. 1343 | Wire Fraud | 05/29/2010 | 3 |
| 18 U.S.C. Sec 1343 | Wire Fraud | 06/04/2010 | 5 |
| 18 U.S.C. Sec. 1343 | Wire Fraud | 08/02/2010 | 6 |
| 18 U.S.C. Sec. 1343 | Wire Fraud | 11/04/2009 | 7 |

AO 245B (Rev 12/10) Criminal Judgment Sheet 1

# UNITED STATES DISTRICT COURT
**District of New Mexico**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>V.<br><br>**BRANDI CHANNON** | **Amended Judgment in a Criminal Case - Reason:**<br>Correction of Sentence for Clerical Mistake (Fed. R. Crim. P. 36)<br><br>(For Offenses Committed On or After November 1, 1987)<br>Case Number: **1:13CR00966-002JCH**<br>USM Number: **72032-051**<br>Defense Attorney: **Todd Hotchkiss** |

THE DEFENDANT:

☐ pleaded guilty to count(s)
☐ pleaded nolo contendere to count(s)  which was accepted by the court.
☒ after a plea of not guilty was found guilty on count(s) **Counts 1, 2 and 4 of Indictment**

The defendant is adjudicated guilty of these offenses:

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. Sec. 1343 | Wire Fraud | 03/09/2010 | 1 |

The defendant is sentenced as provided in pages 2 through 6 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.  The Court has considered the United States Sentencing Guidelines and, in arriving at the sentence for this Defendant, has taken account of the Guidelines and their sentencing goals.  Specifically, the Court has considered the sentencing range determined by application of the Guidelines and believes that the sentence imposed fully reflects both the Guidelines and each of the factors embodied in 18 U.S.C. 3553(a).  The Court also believes the sentence is reasonable and provides just punishment for the offense.

☐ The defendant has been found not guilty on count .
☐ Count  dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

**October 20, 2016**
Date of Imposition of Judgment

**/s/ Judith C. Herrera**
Signature of Judge

**Honorable Judith C. Herrera**
**United States District Judge**
Name and Title of Judge

**November 7, 2016**
Date Signed

**BRANDI CHANNON'S EXHIBIT**

**77**

1:13-CR-966-JCH-KK   2255 MOTION

AO 245B (Rev 12/10) Sheet 1 – Judgment in a Criminal Case                                      Judgment - Page 2 of 6

Defendant: **BRANDI CHANNON**
Case Number: **1:13CR00966-002JCH**

## ADDITIONAL COUNTS OF CONVICTION

| Title and Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. Sec. 1343 | Wire Fraud | 04/05/2010 | 2 |
| 18 U.S.C. Sec. 1343 | Wire Fraud | 05/29/2010 | 4 |

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,      )
                                )
            Plaintiff,           )
                                )
      vs.                        )          Criminal No. 13-966 JCH
                                )
MATTHEW CHANNON,                 )
                                )
            Defendant.           )

## **V E R D I C T**

**COUNT 1**

        WE, the jury, find the defendant, MATTHEW CHANNON, _____
                                               (guilty or not guilty)
as charged in Count 1 of the indictment.

**COUNT 3**

        WE, the jury, find the defendant, MATTHEW CHANNON, _____
                                               (guilty or not guilty)
as charged in Count 3 of the indictment.

**COUNT 5**

        WE, the jury, find the defendant, MATTHEW CHANNON, _____
                                             (guilty or not guilty)
as charged in Count 5 of the indictment.

**COUNT 6**

        WE, the jury, find the defendant, MATTHEW CHANNON, _____
                                             (guilty or not guilty)
as charged in Count 6 of the indictment.

**BRANDI CHANNON'S EXHIBIT**

**78**

1:13-CR-966-JCH-KK   2255 MOTION

1

**COUNT 7**

        WE, the jury, find the defendant, MATTHEW CHANNON, _____

                                                                   (guilty or not guilty)

as charged in Count 7 of the indictment.


        Dated this _____ day of _____, 2016.


                                               _____

                                             FOREPERSON

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,     )
                              )
            Plaintiff,        )
                              )
      vs.                     )          Criminal No. 13-966 JCH
                              )
BRANDI CHANNON,               )
                              )
            Defendant.        )
                              )

## V E R D I C T

### COUNT 1

    WE, the jury, find the defendant, BRANDI CHANNON, _____

                                   (guilty or not guilty)

as charged in Count 1 of the indictment.

### COUNT 2

    WE, the jury, find the defendant, BRANDI CHANNON, _____

                                   (guilty or not guilty)

as charged in Count 2 of the indictment.

### COUNT 4

    WE, the jury, find the defendant, BRANDI CHANNON, _____

                                   (guilty or not guilty)

as charged in Count 4 of the indictment.

    Dated this _____ day of _____, 2016.

                  _____

                  FOREPERSON

BRANDI CHANNON'S
EXHIBIT

**79**

1:13-CR-966-JCH-KK   2255 MOTION

1

b.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the presence or absence of counter-forensic

33

Chann[...]

**BRANDI CHANNON'S EXHIBIT**

**80**

1:13-CR-966-JCH-KK   2255 MOTION

programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

        f.     When an individual uses a computer to commit fraud, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

        99.     *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires agents to seize physical storage media and later review the media consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

        a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it

**Channon 2020**

will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

100.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), when officers executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit officers either to seize or to image-copy storage media that reasonably appear to contain some or all of the evidence described in the warrant, and then later examine the seized storage media or image copies consistent with the warrant.  The examination may require searching authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

35

**Channon 2021**

## **CONCLUSION**

101.   I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and seize the items described in Attachment B.

<div align="right">

Respectfully submitted,

Michael Boady
Special Agent
Federal Bureau of Investigation
</div>

Subscribed and sworn to before me
on June 24, 2011:

_____
UNITED STATES MAGISTRATE JUDGE

36

<div align="right">

**Channon 2022**
</div>

 Matt Channon <hydrazok@gmail.com>

# OfficeMax MaxPerks Account Repayment Agreement and Account Summary Information

**Gardner, Steven <STEVENGARDNER@officemax.com>**                    Fri, Jun 10, 2011 at 11:39 AM
To: "hydrazok@gmail.com" <hydrazok@gmail.com>

Matt,

As we discussed attached are some documents that support our investigation into your MaxPerks accounts.  The 1st is a 2 page Excel spreadsheet that shows by account the 4,251 MaxPerks Accounts that were set-up on email sequencing of Bargle, Coach, Teechur and blank (Elementary in the Business name).  These are the accounts that generated $179,000 by processing on-line adjustments via our MaxPerks website.  You have been linked to these accounts by your credit card usage, internet address ,and email accounts along with sequencing of data.  We were able to prevent the majority of the fraud from paying out but did incur a monetary loss of $34,856 in Rewards.  The 2nd sheet lists an additional 123 MaxPerks accounts that I have tied to you.  These accounts processed ink recycling and on-line adjustments that generated $46,375.75 in Rewards from January 2010 to present.   Please review these sheets, I am sure there are more than  I have discovered, but at this point I will stop looking for them if you will agree to cease your activity and resolve the issue.

The 2nd file is an agreement letter that states you will pay us back $81,231.75 which is the combined total from both frauds.

I have not been able to get a hold of you lately but expect that you will call me back so we can discuss how resolve this issue.   If I do not hear back by Monday June 13, 2011 I will be forced to present my findings to the FBI in Albuquerque.

Sincerely,

**Steven Gardner**
Manager Investigations & ORC, Loss Prevention

TEL: 847.836.0140 | CELL: 774.289.1752 | FAX: 630.647.3836 |SGardner@officemax.com
370 North 8th Street, West Dundee, IL 60118 | http://www.officemax.com

**BRANDI CHANNON'S EXHIBIT**

**81**

1:13-CR-966-JCH-KK   2255 MOTION



**STREUBEL KOCHERSBERGER MORTIMER LLC**

June 13, 2011

<u>**Via E-Mail & U.S. Mail**</u>
OfficeMax
Attn: Steven Gardner
Loss Prevention Department
263 Shuman Blvd.
Naperville, IL 60563
sgardner@officemax.com

**RE: Matt Channon**

Dear Mr. Gardner:

 Please be advised that this office represents Matt Channon in relation to the allegations you are making with respect to your employer's MaxPerks program. Accordingly, please refrain from any further direct contact with our client and, specifically, from attempting to extract payment by making any additional threats of prosecution.

 Mr. Channon categorically denies your allegations and will not be providing any payment. However, should you wish to provide us with whatever evidence you claim to have supporting your allegations, we would be happy to review it. Thank you for your attention to this matter.

    Sincerely,

    STREUBEL KOCHERSBERGER
    MORTIMER LLC

    Donald F. Kochersberger III

**BRANDI CHANNON'S EXHIBIT**

**82**

1:13-CR-966-JCH-KK   2255 MOTION

b.      Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic

33

BRANDI CHANNON'S
EXHIBIT

83

1:13-CR-966-JCH-KK   2255 MOTION

programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

       f.     When an individual uses a computer to commit fraud, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

       99.     *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires agents to seize physical storage media and later review the media consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

       a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it

will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

100.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), when officers executing the warrant conclude that it would be impractical to review the media on-site, the warrant I am applying for would permit officers either to seize or to image-copy storage media that reasonably appear to contain some or all of the evidence described in the warrant, and then later examine the seized storage media or image copies consistent with the warrant. The examination may require searching authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

35

hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## **CONCLUSION**

101.    I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

Respectfully submitted,

Michael Boady
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on June 27, 2011:

UNITED STATES MAGISTRATE JUDGE

38

(Hand the warrant to Boady)

Q: Agent Boady, can you identify the document I handed you?

Q: What is the document?

Q: For the Channons' home, 7100 Gladden?

Q: Now as part of that search warrant, is there an affidavit for a search warrant?

Q: Can you please describe to the court the purpose of an affidavit for a search warrant?

Q: So a federal judge has to sign off on it in order to authorize a search warrant?

Q: Who prepared the affidavit?

Q: And you got the judge to sign it?

Q: Can you turn to page 37 and read the last sentence?
A: There is no page 37.

Q: Is there a page 36?
A: No.

Q: Is there a page 38?

Q: Page 38 is the last page of the affidavit?

Q: Does the first sentence on page 38 match up with the last sentence on page 35 to form a complete sentence?
A: No.

Q: Does page 38 match the rest of the document?
A: (no but yes)

Q: Page 38 is the page the judge signed?

BRANDI CHANNON'S
EXHIBIT

**84**

1:13-CR-966-JCH-KK  2255 MOTION

Michael Boady - Cross by Mr. Hotchkiss

Page 1113

1          (End of bench conference.)

2          THE COURT:   You may proceed.

3   BY MR. HOTCHKISS:

4   Q.    Do you remember the question?

5   A.    Please repeat it.

6   Q.    Isn't it true that at the beginning of the

7   interview Ms. Channon told you that whatever it is

8   that the FBI was at her house for she wants to be

9   blamed for it and it was she who did it?

10  A.    She did say that.

11  Q.    Yesterday you testified about a lot of things

12  that Ms. Channon told you in your questioning,

13  correct?

14  A.    That's correct.

15  Q.    Isn't it fair to say that what she told you was

16  contrary to what you knew about the physical evidence

17  up to that point in time?

18  A.    I mean, it's contrary to what I -- I believed.

19  You know, I -- like I had said, I believed that

20  Mr. Channon, at the point that we had, you know,

21  written that affidavit and went to do the house, was

22  the primary subject.

23          But it's entirely possible that I would

24  have been wrong and that she could have been, so I

25  did not -- I would not have known that, who was

PAUL BACA, OFFICIAL COURT REPORTER

BRANDI CHANNON'S EXHIBIT

85

T:13-CR-966-JCH-KK   2255 MOTION

Michael Boady - Cross by Mr. Hotchkiss

Page 1114

1    behind a computer typing at the house, let's say,

2    until we did an interview.

3    Q.    So for instance, you believed up to that point

4    in time that Matt Channon opened the 4,500 MaxPerks

5    accounts?

6              MS. KASTRIN:  Your Honor, objection.

7              May we approach?

8              THE COURT:  Yes.

9              (Bench discussion:)

10             MS. KASTRIN:  Your Honor, this is playing

11   into the issue of -- it's because of the fact that

12   the agent has testified only as to what she said

13   about herself.  Now, when he's asking was what she

14   said contrary to your belief, that's not entirely

15   true, because she did speak about what Matt Channon

16   did as well.

17             And so this is, I think -- 403, I think it

18   is confusing.  And it's ask- -- it is going to -- for

19   the agent to answer truthfully, I think it's inviting

20   Bruton error.

21             THE COURT:  What's your position?

22             MR. HOTCHKISS:  My position is it's about

23   the accuracy of what he reported her to have said.

24   And I'm going to ask him if he followed up with

25   questions that she -- and he knew at that point in

PAUL BACA, OFFICIAL COURT REPORTER

Michael Boady - Cross by Mr. Hotchkiss

Page 1115

1    time.

2             THE COURT:  What was the last part?

3             MR. HOTCHKISS:  I'm going to follow up with

4    questions about how he -- his perspective on the

5    evidence up to that point in time, and then she tells

6    him something very entirely different.

7             And he should have followed up with

8    questions to see if she was not telling the truth

9    because she wanted to take the blame.

10             MS. KASTRIN:  I think he can -- I think

11   questions asking about whether what he was hearing

12   from her matched up with his investigation.  Based on

13   the way the statement could come in, he's having to

14   say yes, it was inaccurate when, in fact, she did

15   implicate what he believed to be true already.

16             And so I don't think that that's a fair

17   line of inquiry.  I do think he can say at the end --

18   ask him questions as to, Did you ask Ms. Channon?

19   Did you question whether or not, when she was

20   admitting to these things, whether or not she could

21   have been, you know, lying, because she said she

22   wanted to take the blame.

23             That, I think would be fine.  I don't think

24   he can go into, I want to compare what she said to

25   what you believed during the investigation, because I

PAUL BACA, OFFICIAL COURT REPORTER

Michael Boady - Cross by Mr. Hotchkiss

Page 1116

1    do think that that is inviting the agent to testify

2    in a way that creates Bruton error.

3            MR. HOTCHKISS:  Well, this is our defense,

4    Your Honor.  I mean, the redacted statement is a

5    first-person confession.  And if I can't challenge

6    it, I'm a potted plant here under the Court's ruling,

7    very honestly.  This is our defense.

8            MR. ROBERT:  May I, Your Honor?

9            THE COURT:  Yes, sure.

10           MR. ROBERT:  I think this whole problem

11   points up the flaws in the imperfect nature of the

12   attempted solution of the Bruton problem.  It creates

13   this fiction for the jury that we're now having to

14   try to dance around.

15           And I continue to object to the manner in

16   which this is being -- that it was presented at all,

17   and the nature of the redaction.

18           This whole thing is a product of what we've

19   done here with the imperfect redaction.

20           THE COURT:  All right.  Anything else?

21           MS. KASTRIN:  Just two points.

22           One, this is the same problem that exists

23   even without a Bruton·problem.  When the

24   United States brings in somebody's statement and

25   excludes a self-serving part that doesn't fall

PAUL BACA, OFFICIAL COURT REPORTER

Michael Boady - Cross by Mr. Hotchkiss

Page 1117

1   within, say, Rule 106 as to rule of completeness.  It

2   creates an issue for them where they decide if they

3   want to put their client on the stand or not to try

4   to address that issue.

5          They have that choice here, and I don't

6   think that the way that we've dealt with the Bruton

7   problem is impermissible.

8          I would also note that there is a way, like

9   I suggested earlier, for them to get into the fact

10  that under their theory of defense that she was lying

11  to the federal agents when she admitted to all of

12  this by asking that question.

13         They've already gotten out that, through

14  this witness, the fact that she said that she wanted

15  to take the blame for all of it.

16         I think very easily he could go into a line

17  of inquiry saying, Well, you knew from the beginning

18  that she said that she wanted to take the blame for

19  all of it.  Did you then follow up with her during

20  your interview to see if anything she was telling you

21  was a lie?

22         MR. HOTCHKISS:  And that's what I had

23  indicated a couple of minutes ago, and said that I'm

24  going to do it line-by-line with everything that he

25  said she said.

Michael Boady - Cross by Mr. Hotchkiss

Page 1118

1           THE COURT:  Well, I mean if we have to keep

2    coming up to the bench, then I guess that's what we

3    have to do.

4           But I tend to agree with the government,

5    that the way the question is posed makes all the

6    difference.

7           I do agree that you're free to follow up

8    with what he testified to previously, that he -- that

9    Mrs. Channon was shouldering the blame for what

10   occurred, and you can follow up in that regard.

11          But I'm afraid that if you venture too far

12   from that that we will end up -- I mean the way I see

13   it, you can -- you are more than a potted plant.

14          You can certainly protect your client's

15   interests by following that approach and not treading

16   close to the Bruton issues that we've already

17   addressed.

18          And I think that both defendants are

19   capably represented and are -- you know, have every

20   opportunity to avoid Bruton problems and have a fair

21   trial.

22          So I don't want to walk into a Bruton

23   problem.  I don't think it's necessary.

24          MR. ROBERT:  I would point out that the

25   government's rationale forces the defendants to

PAUL BACA, OFFICIAL COURT REPORTER

Michael Boady - Cross by Mr. Hotchkiss

Page 1119

1  choose between their constitutional rights to

2  confrontation and to silence.

3          MS. KASTRIN:  And that rationale exists

4  every time we bring in a defendant's statement and if

5  they want to explain it or not, and it's whether or

6  not there's a Bruton problem or not.

7          THE COURT:  Well, we're not at that point.

8  So hopefully you can craft your questions so we don't

9  have to keep having bench conferences.  But if we

10  have to, we will.

11          MR. HOTCHKISS:  Okay.

12          MS. KASTRIN:  And just along those lines, I

13  think so long as he's not asking for a comparison --

14          THE COURT:  Right.

15          MS. KASTRIN:  -- as to what the agent

16  believed walking in with her statement, we avoid it.

17  I mean I don't know what the rest of his questions

18  are, but that's what creates the problem.

19          But I think if it is the, She told you this

20  in the beginning and, you know, you did nothing to

21  challenge what she was asserting, knowing that she

22  said that in the beginning, it gets exactly to the

23  heart of what he's trying to do.

24          THE COURT:  Okay.  Thank you.

25          (End of bench conference.)

Michael Boady - Cross by Mr. Hotchkiss

Page 1120

1   BY MR. HOTCHKISS:

2   Q.    Now, Agent, when the bulk of what Ms. Channon

3   told you in answers to your questions, by admitting

4   certain things, those -- those admissions were new to

5   you.

6            Isn't that correct?

7   A.    I believed that she was involved from the

8   beginning, but I didn't -- it was new to me the

9   extent.

10  Q.    And with each of these admissions did it cause

11  you any concern, given her statement that she wanted

12  to take the blame for everything?

13  A.    No, sir.

14  Q.    It didn't cause you any concern?

15  A.    I understood why she was saying it.

16  Q.    Can you -- up to the point that you interviewed

17  Ms. Channon on the 28th, you had evidence that she

18  had gone into an OfficeMax store in November of 2010,

19  twice, with 20 inkjet cartridges to recycle, correct?

20            MS. KASTRIN:  Objection, Your Honor.  This

21  is beyond the scope of direct.

22            THE COURT:  Overruled.  Go ahead.

23  A.    We had more information than what I put in a

24  search warrant.  I -- a search warrant is a summary

25  of my investigation.  I had -- there were more

PAUL BACA, OFFICIAL COURT REPORTER

Michael Boady - Cross by Mr. Hotchkiss

Page 1121

1   videos, there were more pictures than just the ones

2   that were mentioned in the search warrant, sir.

3   BY MR. HOTCHKISS:

4   Q.    And you mentioned that in the search warrant

5   affidavit, too, that you had more, correct?

6   A.    That is correct.

7   Q.    So you had her going into stores with inkjet

8   recycling cartridges?

9   A.    That is correct.

10  Q.    Okay.  And yet she admitted to a whole bunch of

11  other things on June 28, correct?

12  A.    She did.

13  Q.    Now, when -- for instance, when she admit- --

14  when she said that she would create fictitious

15  rewards accounts, did she provide any details about

16  how she did that?

17  A.    She did.

18  Q.    You didn't put it in her statement.

19  A.    I was referring to the e-mail -- the e-mails,

20  how she used gmail accounts to -- with the dots.

21  That, I did put in my statement.

22  Q.    Okay.  Did she indicate, for instance, who she

23  contacted in Arizona regarding acquiring the

24  cartridges?

25  A.    She said a friend.

Michael Boady - Cross by Mr. Hotchkiss

Page 1122

1   Q.    Okay.  Did you ask who it was?

2   A.    I did not.

3           MR. HOTCHKISS:  May I approach the witness,

4   Your Honor?

5           THE COURT:  Yes, you may.

6   BY MR. HOTCHKISS:

7   Q.    I'm handing you a document, Agent.  Could you

8   look at that and tell me when you are done looking at

9   it?

10  A.    I'm familiar with this document, sir.

11  Q.    Okay.  Can you identify what that is?

12  A.    This is the search warrant affidavit that I did

13  for the residence, as well as the log of evidence

14  that was seized from the house.

15  Q.    Okay.  And that's for the Channon's residence

16  at 71 [sic] Gladden?

17  A.    That's correct, sir.

18  Q.    And part of what I handed you there is your

19  affidavit for search warrant?

20  A.    That's correct, sir.

21  Q.    And can you please tell the jury what the

22  purpose of an affidavit for search warrant is?

23  A.    The affidavit for a search warrant is a summary

24  of your investigation that describes what probable

25  cause we have to believe that there was a crime

Michael Boady - Cross by Mr. Hotchkiss

Page 1123

1    committed at the place where we want to do a search

2    at, or that a person -- yeah.  And that there would

3    be evidence of that crime that is in that house.

4    Q.     And because you were there on the 28th of June

5    to execute a search warrant, a federal judge did sign

6    a search warrant after you submitted the affidavit,

7    correct?

8    A.     That's correct, sir.

9    Q.     Now, who prepared the affidavit there?

10   A.     Myself and the US Attorney's Office that worked

11   with me.

12   Q.     But you are the signatory to the affidavit,

13   correct?

14   A.     That's correct, sir.

15   Q.     Now, can you turn to Page 37 and read the last

16   sentence?

17   A.     Are you talking about the one that's labeled 38

18   or 35?

19   Q.     Is there a page 37?

20   A.     There is not.

21   Q.     Is there a page 36?

22   A.     There is not.

23   Q.     Isn't it true it goes from page 35 to 38?

24   A.     That is correct.

25   Q.     And does the first sentence on page 38 match up

PAUL BACA, OFFICIAL COURT REPORTER

Michael Boady - Redirect by Ms. Kastrin

Page 1124

1   to the last sentence on page 35 to form a complete

2   sentence?

3   A.    That's correct.  Well, not to -- it's a

4   redundant sentence showing that, at the end of

5   page 35, the same thing was said in the beginning of

6   page 38.

7           MR. HOTCHKISS:  May I approach, Your Honor?

8           THE COURT:  You may.

9           MR. HOTCHKISS:  No further questions,

10  Your Honor.

11          THE COURT:  Ms. Kastrin, any redirect?

12          MS. KASTRIN:  Yes, Your Honor.

13                 REDIRECT EXAMINATION

14  BY MS. KASTRIN:

15  Q.    Agent Boady, on cross-examination you were

16  asked about the number of people who were armed and

17  the types of guns that they had when you arrived at

18  the residence.

19          And so to be clear, is it standard practice

20  for federal agents to be armed when they are

21  executing a search warrant?

22  A.    Yes.

23  Q.    And is it standard practice to have the weapons

24  drawn when you have the stack doing the knock and

25  announce?

PAUL BACA, OFFICIAL COURT REPORTER

Michael Boady - Redirect by Ms. Kastrin

Page 1131

1   A.    Yes.

2   Q.    Do you believe that your -- the 302 you wrote

3   in this case accurately documented the substance of

4   your conversation with Ms. Channon?

5   A.    I do.

6   Q.    And was it reviewed and checked by Agent Berry?

7   A.    It was.

8   Q.    Who was also present during the interview?

9   A.    And signed.

10         MS. KASTRIN:  If I could have one moment.

11  BY MS. KASTRIN:

12  Q.    At the end of cross Mr. Hotchkiss showed you

13  what I believe was the filed search warrant, and I

14  believe that there was a skip in pages.

15  A.    That's correct.

16  Q.    Do you know why that happened?

17  A.    Not particularly.  I assume it was a formatting

18  error.

19         MR. ROBERT:  Objection, speculation,

20  Your Honor.

21         THE COURT:  Yes.  If you know, you may

22  answer the question, but don't speculate.

23  A.    The same thing happened in the subsequent pages

24  as well.  They started to renumber one, two, three.

25

PAUL BACA, OFFICIAL COURT REPORTER

BRANDI CHANNON'S
EXHIBIT

86

1:13-CR-966-JCH-KK   2255 MOTION

Michael Boady - Redirect by Ms. Kastrin

Page 1132

1   BY MS. KASTRIN:

2   Q.     And so maybe more getting to the heart of this.

3          Did you compare the search warrant

4   affidavit that you wrote with the pages that were

5   right against the one that got filed?

6   A.     I did.

7   Q.     Was anything added?

8   A.     Nothing.

9   Q.     Other than the repeat of that one line?

10  A.     Nothing.

11  Q.     Was anything removed?

12  A.     Nothing.

13  Q.     Otherwise, were they exactly the same?

14  A.     They were.

15  Q.     And do you know how old Ms. Channon was on the

16  day that you interviewed her?

17  A.     She was in her early 30s, 31, 32.

18         MR. HOTCHKISS:  One moment.

19         Nothing further, Your Honor.

20         THE COURT:  All right.  May this witness be

21  permanently excused?

22         MS. KASTRIN:  Yes, Your Honor.

23         MR. ROBERT:  Yes, Your Honor.

24         MR. HOTCHKISS:  Yes, Your Honor.

25         THE COURT:  All right.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Cause No. 13-CR-966 JCH |
| | § | |
| MATTHEW CHANNON, | § | |
| | § | |
| Defendant. | § | |

### DEFENDANT'S EXHIBIT LIST

MATTHEW CHANNON, Defendant, by and through the undersigned appointed counsel,

Assistant Federal Public Defender Marc H. Robert, submits this list of exhibits it may present at

the trial in this matter.   The defense does not waive the right to supplement this list.

Exhibit A:    List of Office Max Program Changes;

Exhibit B:    MaxPerks® Rewards for Business, Terms and Conditions, December 1, 2008;

Exhibit C:    MaxPerks® Rewards for Business, Terms and Conditions, January 14, 2009;

Exhibit D:    MaxPerks® Rewards for Business, Terms and Conditions, February 17, 2009;

Exhibit E:    MaxPerks® Rewards for Business, Terms and Conditions, March 20, 2009;

Exhibit F:    MaxPerks® Rewards for Business, Terms and Conditions, April 20, 2009;

Exhibit G:    MaxPerks® Rewards for Business, Terms and Conditions, May 22, 2009;

Exhibit H:    MaxPerks® Rewards for Business, Terms and Conditions, June 22, 2009;

Exhibit I:    MaxPerks® Rewards for Business, Terms and Conditions, July 22, 2009;

BRANDI CHANNON'S
EXHIBIT

87

1:13-CR-966-JCH-KK   2255 MOTION

Exhibit J:      MaxPerks® Rewards for Business, Terms and Conditions, August 22, 2009;

Exhibit K:      MaxPerks® Rewards for Business, Terms and Conditions, September 24, 2009;

Exhibit L:      MaxPerks® Rewards for Business, Terms and Conditions, December 27, 2010;

Exhibit M:      MaxPerks® Rewards for Business, Terms and Conditions, July 21, 2011;

Exhibit N:      MaxPerks® Rewards for Business, Terms and Conditions, October 23, 2013;

Exhibit O:      MaxPerks® - Your Profile;

Exhibit P:      MaxPerks® - My Login, December 9, 2010;

Exhibit Q:      MaxPerks® - My Login, July 21, 2011;

Exhibit R:      MaxPerks® - My Profile, December 27, 2010;

Exhibit S:      MaxPerks® - My Profile, July 21, 2011.

Any exhibits identified by the Government in its exhibit list.

Respectfully Submitted,

FEDERAL PUBLIC DEFENDER
111 Lomas Blvd NW, Suite 501
Albuquerque, New Mexico 87102
(505) 346-2489
Fax (505) 346-2494

*filed electronically on January 4, 2016*
MARC H. ROBERT
Assistant Federal Public Defender
Albuquerque Office

*Counsel for Mr. Matthew Channon*

Steven Gardner - Direct by Ms. Vierbuchen

Page 340

1   not to show on the jury's monitors, but show on

2   everybody else's.

3           MS. VIERBUCHEN:  Just the jury's --

4   exactly, Judge.

5           THE COURT:  And I don't know how to do

6   that.

7           MS. VIERBUCHEN:  And I don't have the

8   controls.

9           THE COURT:  We need to get this work done,

10  though.

11          MS. VIERBUCHEN:  We can do it the old

12  fashioned way, Judge.

13          THE COURT:  I'm very comfortable with the

14  old fashioned way.

15          MS. VIERBUCHEN:  May I approach the

16  witness?

17          THE COURT:  You may.

18  BY MS. VIERBUCHEN:

19  Q.    I'll show you what's been marked as

20  Government's Exhibits 1 and 2.

21          Do you recognize these documents?

22  A.    Yes, I do.

23  Q.    What are these documents?

24  A.    These are the terms and conditions for our

25  MaxPerks rewards for business and consumer.

PAUL BACA, OFFICIAL COURT REPORTER

BRANDI CHANNON'S
EXHIBIT
88
1:13-CR-966-JCH-KK   2255 MOTION

Steven Gardner - Direct by Ms. Vierbuchen

Page 341

1   Q.     And are they for different time periods?

2   A.     Yes.   One looks like it's 2009, and I think

3   the -- this one may be 2010.

4   Q.     Are these the documents that are routinely kept

5   in OfficeMax's business?

6   A.     Yes, they are.

7                MS. VIERBUCHEN:   I would offer 1 and 2 into

8   evidence.

9                THE COURT:   Is there objection?

10               MR. ROBBENHAAR:   I have no objection to

11  Number 2.   Number 1 is an incomplete document.   It's

12  cut off on the right-hand side and it doesn't -- it's

13  excluding a bunch of text.

14               So for lack of completeness, I will object

15  to Number 1.

16               THE COURT:   Well, Exhibit 2 will be

17  admitted.

18               What's your position on Number 1?

19               MS. VIERBUCHEN:   Do you want me to address

20  it here or should I come up?   But I would just say it

21  is the best copy that we have.

22               OfficeMax no longer exists, so this is kind

23  of what we have.   It's not a substantial amount

24  that's cut off, and I think when you read the two

25  documents you can figure out what the missing

Steven Gardner - Direct by Ms. Vierbuchen

Page 342

1    language is.

2            THE COURT:  All right.  Thank you.

3            MR. ROBBENHAAR:  Another basis for the

4    objection is I don't believe this witness is the

5    proper witness to introduce these.  He's not a

6    records custodian, to my knowledge.

7            MS. VIERBUCHEN:  Your Honor -- Your Honor,

8    he just has to be a person with knowledge.  He

9    doesn't have to be a records custodian.

10           THE COURT:  You -- I guess I'm just

11   wondering about how much is cut off on the right.

12           Do you know specifically?

13           MS. VIERBUCHEN:  Your Honor, I don't -- I

14   don't think it's much, because if you read it in

15   comparison to 2, I mean, you can figure out what's

16   being said.

17           THE COURT:  All right.

18           MS. VIERBUCHEN:  They're largely the same

19   documents, just slightly modified from one year to

20   the next.

21           THE COURT:  And you don't have any better

22   version of this?

23           MS. VIERBUCHEN:  We do not, Your Honor.  We

24   actually looked prior to court.

25           They can certainly, if there's anything

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Direct by Ms. Vierbuchen

Page 343

1    that they think is material, they could bring out on

2    cross-examination, but there's really no material

3    omission here.

4              THE COURT:  Anything else?

5              MR. ROBBENHAAR:  Reading one line that cuts

6    off, there's a non sequitur to the next line.  We

7    don't know what the missing words are.

8              THE COURT:  Well, with respect to whether

9    the witness is a records custodian, I would note that

10   he is a qualified witness.  So the only concern I

11   have is the completeness of the exhibit.

12             MS. VIERBUCHEN:  Well, Your Honor, just to

13   save time, if I could just go on to Exhibit 2, and --

14             THE COURT:  Go ahead.

15             MS. VIERBUCHEN:  -- we'll see where we end

16   up.

17             THE COURT:  All right.

18             MS. VIERBUCHEN:  And if I could just have

19   it displayed to the jury, Your Honor.

20             THE COURT:  So we will turn the display

21   back on.

22             MR. ROBBENHAAR:  Your Honor, in the

23   interest of not interrupting, if there are other

24   documents that are going to be introduced through

25   this witness, I would just raise that same objection

Steven Gardner - Direct by Ms. Vierbuchen

Page 344

1   of not being the appropriate business custodian,

2   records custodian.

3              THE COURT:  All right.  Thank you.

4              MS. VIERBUCHEN:  May I continue?

5              THE COURT:  You may.

6   BY MS. VIERBUCHEN:

7   Q.    All right.  Let's look at Government's

8   Exhibit 2, and tell the jury what we're looking at.

9   A.    Sure.  This is the MaxPerks rewards terms and

10  conditions for business and consumer in 2010.  The

11  update on it says October 8, 2010.

12  Q.    Okay.  And what I'm going to do is have

13  Agent Moon highlight for us, so we can actually see

14  it a little bit bigger, and we're going to just do

15  the first two paragraphs there.

16             Can you actually just show us those two

17  paragraphs?

18             Perfect.

19             So the terms and conditions.  This says

20  last updated on October 8, 2010?

21  A.    Correct.

22  Q.    And Government's Exhibit 1 was dated

23  September 2010.

24             Is that right?

25  A.    Exhibit 1 was dated -- where would I see that,

Steven Gardner - Direct by Ms. Vierbuchen

Page 345

 1   because it's...

 2                MR. ROBBENHAAR:  Objection, Judge.

 3                MS. VIERBUCHEN:  At the bottom on the

 4   right.

 5                THE COURT:  I'll allow him to answer the

 6   date of the objection -- excuse me -- the date of the

 7   exhibit, but not display it to the jury.

 8   A.    Are you referring to -- sorry.

 9                THE COURT:  The question was:  What was the

10   date of Exhibit 1?

11                THE WITNESS:  On the bottom it says

12   9-18-2009.

13   BY MS. VIERBUCHEN:

14   Q.    Okay.  What is the difference between

15   Government's Exhibit 2 and 1?

16   A.    Government 1 -- or Government 2 and 1, it was

17   just an update from -- the difference was the ink

18   recycle, as I recall, the amount of ink that you

19   recycle between 2009 and 2010.

20                This is a period where I -- from my

21   recollection, it went from 10 a week to 20 a month.

22   Q.    And so over time, when the terms and conditions

23   changed, would OfficeMax issue a change to their

24   terms and conditions?

25   A.    Yes.

PAUL BACA, OFFICIAL COURT REPORTER





GOVERNMENT
EXHIBIT
1

JOIN NOW   LEARN MORE   MAXPERKS RECYCLING

## TERMS AND CONDITIONS

**MaxPerks® Rewards for Business Terms and Conditions | MaxPerks® Rewards for Teachers Te**

## MaxPerks Rewards for Business Terms and Conditions

**Overview**

MaxPerks Rewards for Business ("MaxPerks") is an OfficeMax® customer reward program that allows
earn $25 in rewards to spend at OfficeMax for every $500 in qualified purchases that you make during
year. Additionally, from time to time, OfficeMax may offer MaxPerks Bonus Rewards for purchases of
specified products. You will also receive exclusive savings offers through the mail and email. If you do
want the exclusive savings offers, just log into your account and change your profile or call 1-866-
MAXPERKS.

**How To Enroll**

To open a new MaxPerks Rewards for Business account, you can fill out an application at any OfficeM
location, online at www.officemax.com/maxperks, or by phone at 1-866-MAXPERKS. You will be given
MaxPerks member ID after you complete the enrollment process. If you enroll in an OfficeMax store, y
be given a membership kit that contains your MaxPerks member ID at the time of enrollment. If you en
online or by phone, we will mail a MaxPerks membership ID to you. You may begin using your MaxPe
membership immediately for all qualifying purchases including MaxPerks Bonus Rewards. Only one
MaxPerks account and member ID per person is permitted at any given time. After you enroll, you will
to go to www.officemax.com/maxperks to set up your user name and password so that you can view y
balance and keep track of your rewards.

**Eligibility**

MaxPerks is open to legal residents of the 50 United States (and D.C., Puerto Rico, and the Virgin Isla
age eighteen (18) years and older who have internet access to manage their MaxPerks account. Emp
of OfficeMax are eligible to participate, but purchases made with their MaxPerks ID may only be for th
personal use. By enrolling in MaxPerks, you agree to jurisdiction in Cook County, Illinois. Jurisdiction i
that if you sue OfficeMax for a violation of your rights under this program, you will have to bring the su
Cook County, Illinois. MaxPerks is void where prohibited by law.

**How To Earn Rewards**

If you are shopping in a retail store, you earn rewards by presenting your MaxPerks member ID card a
checkout. If you do not have your MaxPerks member ID card with you, a store associate can look up y
member ID number at the time of purchase. If you are shopping online or by phone or fax be sure to p
your MaxPerks member ID number at checkout. If you do not know your MaxPerks member ID numbe
time of purchase, you can later earn credit for your purchase towards a reward by logging in to your
MaxPerks account and entering the information from your purchase receipt that is requested in order t
obtain credit for your purchase. Customer service is also available at 1-866-MAXPERKS to assist you
obtaining credit for your purchase with receipt information. For MaxPerks Bonus Reward offers, such o
are only available at the time of purchase with your member ID number. You will receive credit for eve
qualified purchase that you make; however, each qualified purchase will initially be reflected in your ac
as "pending" until it clears a 7 day time period. Once cleared, the transaction will be eligible for reward
issuance. If a SKU is returned, the amount of the return will be deducted from the account balance eve
moved from pending status

If you have not reached the $500 minimum in any calendar month, your qualified p
carried over month to month until you reach the $500 minimum or January 1st of t
whichever comes first. For example, if you spend $300 in Month 1, $0 in Month 2,

**BRANDI CHANNON'S
EXHIBIT**

**89**

1:13-CR-966-JCH-KK   2255 MOTION

total account balance at the end of Month 3 will be $500 and a $25 reward will be issued to you by the Month 4. Your $25 reward expires ninety (90) days after it is issued, unless you are a Florida resident, which case it expires one (1) year from the date of issue, so be sure to log into your account and print as soon as it becomes available.

From time to time, OfficeMax may also offer its members Bonus Reward opportunities in which memb earn extra rewards (which may vary in amount) for purchasing specified products or completing a requ action. To take advantage of the MaxPerks Bonus Rewards special purchase offers, you must have yr MaxPerks member ID number at the time of purchase and it must be applied to that purchase. No Bor Reward adjustments will be made after purchase.

**Qualifying Purchase**

Qualifying purchases are any products or services in our stores, catalogs or web site except for comp OfficeMax gift cards, sales tax, purchases with a Retail Connect card, purchases made prior to the da enrollment, and purchases made with your MaxPerks rewards. You will start earning credit for purcha: your MaxPerks member ID number the day you sign up.

**How To Obtain and Use Rewards**

You can easily keep track of your account balance and any rewards you have earned by logging in to MaxPerks account online at www.officemax.com/maxperks. OfficeMax will send you electronic statem email at the end of each month, so that you can see the total amount of qualified purchases that you h made. The e-statement will be sent by the end of the following month. You may opt-out of receiving th notification by logging in to your account and updating your communication preferences. Once you ha reached the $500 minimum, you can log into your account and print a $25 reward card. Your reward c be available to you the month after you have reached the $500 minimum. For example, if you reach th minimum on March 11, your $25 reward card will be available by the end of April. You may use your r card at any OfficeMax retail location, online at www.officemax.com, or by phone at 1-877-OFFICEMA: may use up to three (3) reward cards from the same MaxPerks account in a single transaction. Rewar are not redeemable for OfficeMax brand gift cards and are not redeemable for cash unless otherwise required by law. No amount of your reward card may be applied as payment to any credit account.

**Expiration of Balances and Rewards**

You earn credit during each calendar year, from January 1 through December 31. If you do not reach minimum $500 spending requirement by December 31, your account balance will be reset to $0 on Ja of the following year. Accounts with a balance of over $500 are eligible for a $25 reward card for each spent by the end of each month. Remaining account balances less than $500 after issuance of a rewa during the year will also reset to $0 at the end of the year. For new customers who sign up for the prog after October 1 of any given year, for your first year of participation only, your balance will not be reset on December 31; the balance will be carried over to the next calendar year.

**The $25 reward card expires ninety (90) days after it is issued.** The expiration date will appear on front of the card and in your online account. If you are a resident of Florida, your reward card will expir (1) year from the date it is issued.

**Lost, Stolen or Damaged Reward Cards**

To report a lost, stolen, or damaged reward card, or for balance information, call 1-866-MAXPERKS ( 629-7375). OfficeMax will not replace the value on a lost or damaged reward card, or on a reward card without your permission or that has expired.

**MaxPerks Recycling Program**

In-Store Ink and Toner Recycling Program (Low volume recycler):

MaxPerks members may bring in up to 10 visibly undamaged HP, Dell, or Lexmark ink/toner cartridge week (Sun. thru Sat.) to an OfficeMax retail store and earn a $3 reward per qualified cartridge. There i maximum reward per week per member. All recycling rewards will be calculated monthly and available through your MaxPerks account by the end of the next month. Customers can sign up for MaxPerks a of recycling drop off to participate. Recycling rewards will come in the form of a reward card and will be issued to members electronically along with any other rewards they may have earned that month. Rec rewards can be used online, in-store or over the phone. While there is no limit to the number or brand ink/toner cartridges you may recycle, you will only receive credit for the qualifying cartridges identified and in the limits identified above.

Bulk Mail-In Ink and Toner Recycling Program (High volume recyclers):

For customers, teachers, schools, fundraisers and businesses who are high volume recyclers, we offe Bulk Mail-in Recycling program. Members can go to the MaxPerks website at www.officemax.com/ma

log into your account and order collection materials. Members will earn $1 in rewards for every qualifie
submitted up to $300 per month in the form of a reward card. Qualified items are visibly undamaged H
or Lexmark ink/toner cartridges, and undamaged cell phones, MP3 players, and PDAs. Rewards will b
issued to customers electronically monthly through your MaxPerks account along with any other rewa:
may have earned that month. Simply go to our website, www.officemax.com/maxperks, and follow the
steps to get started. Order the free collection materials from the website and use them to start collecti
qualifying ink and toner cartridges, cell phones, MP3 players and PDAs. Customers may mail in ink ar
cartridges of various brands to recycle, but will only receive credit for visibly undamaged HP, Dell, and
Lexmark brands and quantities noted above. The Bulk Mail-In Recycling Program is not available in A
Hawaii, Puerto Rico or the Virgin Islands.

MaxPerks Recycling Programs are not open to customers that broker or re-sell ink and/or toner cartric
and any rewards earned through those activities may be forfeited and the MaxPerks account closed.

**Modifications and Termination of MaxPerks**

OfficeMax reserves the right to modify any of these Terms and Conditions including the qualified purcl
the amount of the rewards, and any of the options available to you on your MaxPerks account at any t
with or without notice, even though these changes may affect your ability to accrue or use rewards. Y(
continued participation in MaxPerks constitutes your acceptance of any changes to these Terms and
Conditions. You are responsible for remaining knowledgeable as to any changes that OfficeMax may (
these Terms and Conditions. The most current version of these Terms and Conditions will be available
www.officemax.com/maxperks and will supersede all previous versions of these Terms and Condition:

OfficeMax reserves the right to terminate MaxPerks at any time, for any reason, with or without notice
though termination may affect your ability to accrue or use your rewards.

**General Terms and Conditions**

OfficeMax reserves the right to close your MaxPerks account if you engage in any fraudulent activity c
MaxPerks in a manner inconsistent with these Terms and Conditions or any federal, state or local, law
statutes or ordinances. Discontinued membership may result in the loss of all accumulated rewards in
but not limited to rewards earned from Bonus Reward offers and rewards from the ink and toner recyc
programs. In the event that OfficeMax should discontinue a membership, any ink or toner cartridge su
but not rewarded will not be returned nor will the monetary value of those cartridges be refunded. In a(
to discontinued membership, OfficeMax shall have the right to take appropriate administrative and/or l
action, including criminal prosecution, as it deems necessary in its sole discretion, and you will not be
permitted to participate in the MaxPerks program in the future.

Rewards are not your property and may be revoked by OfficeMax at any time as set forth herein. Rew
may not be sold, transferred or assigned, and are not transferable upon death, as part of a domestic r
matter or otherwise by operation of law.

OfficeMax is not responsible for any incorrect or inaccurate information supplied by you while participa
MaxPerks.

All questions or disputes regarding eligibility for MaxPerks, earning or redemption of rewards, or your
compliance with these Terms and Conditions will be resolved by OfficeMax in its sole discretion.

All issues and questions concerning the construction, validity, interpretation and enforceability of the T
and Conditions, or your rights and obligations shall be governed by, and construed in accordance with
laws of the State of Illinois, without giving effect to any choice of law or conflict of law rules.

These Terms and Conditions constitute the entire agreement between OfficeMax and you. They super
all prior or other arrangements, understandings, negotiations and discussions, whether oral or written
waiver of any of the provisions of these Terms and Conditions shall be deemed or shall constitute a w
any other provisions hereof, nor shall waiver constitute a continuing waiver unless otherwise expressl\
provided.

If any provision of these Terms and Conditions is found to be invalid or unenforceable by a court of
competent jurisdiction, such provision shall be severed from the remainder of these Terms and Condit
which will otherwise remain in full force and effect.

This reward card is issued by OfficeMax North America, Inc.

**Limitations of Liability**

OfficeMax and its partners, affiliates, subsidiaries, parent corporations and their respective agents and
agencies ("Releasees") are not responsible for incorrect or inaccurate transcription of information, for
problems related to any of the equipment or programming associated with MaxPerks, for any human e
for any interruption, deletion, omission, defect, or line failure of any telephone network or electronic
transmission, for problems relating to computer equipment, software, inability to access the rules or or

service, or for any other technical or non-technical error or malfunction. In the event of a printing error
problem with any items purchased with rewards, Releasees shall not have any liability. UNDER NO
CIRCUMSTANCES, INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE, SHALL ANY OF THE
RELEASEES BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR
CONSEQUENTIAL DAMAGES ARISING FROM MAXPERKS OR MERCHANDISE PURCHASED WI
MAXPERKS REWARDS EVEN IF ANY OR ALL OF THE FOREGOING OR ANY OF THEIR AUTHOF
REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IF OFFI(
IMPROPERLY DENIES YOU ANY REWARDS, LIABILITY WILL BE LIMITED TO THE EQUIVALENT
AMOUNT OF REWARDS OR $100, WHICHEVER IS LESS. BY PARTICIPATING IN MAXPERKS, YC
WAIVING ANY AND ALL RIGHTS TO BRING ANY CLAIM OR ACTION RELATED TO SUCH MATTE
ANY FORUM BEYOND NINETY (90) DAYS AFTER THE FIRST OCCURRENCE OF THE KIND OF A
EVENT, CONDITION OR OMISSION UPON WHICH THE CLAIM OR ACTION IS BASED. You agree
solely on the manufacturer's warranties, if any, for any products purchased with MaxPerks rewards.

Back to top

# MaxPerks Rewards for Teachers Terms and Conditions

### Overview

MaxPerks Rewards for Teachers ("MaxPerks") is an OfficeMax® customer reward program for teache
which gives you $10 in rewards to spend at OfficeMax for every $75 in qualified purchases that you m
during the year, up to a maximum reward of $100 per year. Additionally, from time to time, OfficeMax (
offer MaxPerks Bonus Rewards for purchases of specified products. You will also receive exclusive sa
offers through the mail and email. If you do not want the exclusive savings offers, just log into your acc
and change your profile or call 1-866-MAXPERKS.

### How To Enroll

To open a new MaxPerks Rewards for Teachers account, you can fill out an application at any OfficeM
location, online at www.officemax.com/maxperks, or by phone at 1-866-MAXPERKS. You will be given
MaxPerks member ID after you complete the enrollment process. If you enroll in an OfficeMax store, y
be given a membership kit that contains your MaxPerks member ID at the time of enrollment. If you er
online or by phone, we will mail a MaxPerks membership ID to you. You may begin using your MaxPe
membership immediately for all qualifying purchases, including MaxPerks Bonus Rewards. Only one
MaxPerks account and member ID per person is permitted at any given time. After you enroll, you will
to go to www.officemax.com/maxperks to set up your user name and password so that you can view y
balance and keep track of your rewards.

### Eligibility

The MaxPerks Rewards for Teachers Program is open to teachers who are legal residents of the 50 U
States (and D.C., Puerto Rico, and the Virgin Islands), age eighteen (18) years and older, and who ha
internet access to manage their MaxPerks account. By enrolling in MaxPerks, you agree to jurisdictior
Cook County, Illinois. Jurisdiction means that if you sue OfficeMax for a violation of your rights under t
program, you will have to bring the suit in Cook County, Illinois. MaxPerks is void where prohibited by

### How To Earn Rewards

If you are shopping in a retail store, you must present your MaxPerks member ID card at checkout. If y
not have your MaxPerks member ID card with you, a store associate can look up your member ID nur
the time of purchase. If you are shopping online, by phone or by fax, you must provide your MaxPerks
member ID number at checkout. If you do not know your MaxPerks member ID number at the time of
purchase, you can later earn credit for your purchase towards an award by logging into your MaxPerks
account and entering the information from your purchase receipt. You can also call customer service a
866-MAXPERKS to assist you with obtaining credit for your purchase towards an award by providing t
customer representative with the information from your receipt. For MaxPerks Bonus Rewards offers,
offers are only available at the time of purchase with your member ID number. You will receive credit f
a reward for every qualified purchase that you make; however, each qualified purchase will initially be
reflected in your account as "pending" until it clears a 7 day processing period. Once cleared, the tran:
will be eligible toward reward issuance. If a purchased item is returned, the amount of the return will be
deducted from the account balance even after moved from pending status.

If you have not reached the $75 minimum in any calendar quarter, your qualified purchase balance wi
carried over quarter to quarter until you reach the $75 minimum, or January 1 of the following year, wh
comes first. For example, if you spend $50 in Quarter 1, $0 in Quarter 2, and $30 in Quarter 3, your to
account balance at the end of Quarter 3 will be $80 and your $10 reward will be issued to you by the e
October. Your $5 balance will be carried over into Quarter 4. If you then spend $70 in Quarter 4, your
account balance at the end of Quarter 4 will be $75 and your $10 reward will be issued to you by the e
January of the following year. However, if you spend $10 in Quarter 1, $5 in Quarter 2, $30 in Quarter

$20 in Quarter 4, your total account balance will reset to $0 on January 1. Your $10 reward expires nir (90) days after it is issued, unless you are a Florida resident, in which case it expires one (1) year from date of issue, so be sure to log into your account and print it out as soon as it becomes available.

From time to time, OfficeMax may also offer MaxPerks Bonus Rewards permitting you to earn extra re (which may vary in amount) for purchasing specified products or completing a required action. To take advantage of the MaxPerks Bonus Rewards special purchase offers, you must have your MaxPerks n ID number at the time of purchase and it must be applied to that purchase. No Bonus Reward adjustm will be made after purchase.

**Qualifying Purchases**

Qualifying purchases are any products or services in our stores, catalogs or web site except for comp OfficeMax gift cards, sales tax, purchases with a Retail Connect card, purchases made prior to the da enrollment, and purchases made with your MaxPerks rewards. You will start earning credit for purcha: your MaxPerks member ID number the day you sign up.

**How To Obtain and Use Rewards**

You can easily keep track of your account balance and any rewards you have earned by logging into MaxPerks account online at www.officemax.com/maxperks. OfficeMax will send you quarterly electror statements via email by the end of the month the quarter end so that you can see the total a of qualified purchases that you have made. You may opt out of receiving this notification by logging in account and updating your communication preferences. Once you reach the $75 minimum, OfficeMax begin processing your reward card and it will be electronically issued to you by the end of the month f the end of the quarter when you reached the $75 minimum. For example, if you reach the $75 minimu January 13, your $10 reward card will be available no later than April 30. Simply log into your account print your $10 reward card. Use your reward card at any OfficeMax retail location, online at www.officemax.com, or by phone at 1-877-OFFICEMAX. You may use up to three (3) reward cards fr same MaxPerks account in a single transaction. Your reward card is not redeemable for OfficeMax br. cards, and is not redeemable for cash unless otherwise required by law. No amount of your reward ca be applied as payment to any credit account.

**Expiration of Balances and Rewards**

You earn credit during each calendar year, from January 1 through December 31. If you do not reach minimum by December 31, your account balance will be reset to $0 on January 1 of the following year Accounts with a balance of over $75 are eligible for a $10 reward card for each $75 spent by the end quarter. Remaining account balances less than $75 after issuance of a reward card during the year wi reset to $0 at the end of the year. If you are a new member and signed up for the program after Octob any given year, for your first year of participation only, your balance will not be reset but will be carrie the next calendar year.

**The $10 reward card expires ninety (90) days after it is issued.** If you are a resident of Florida, yo reward card will expire one (1) year from the date it is issued. The expiration date will appear on the fr the card and in your online account.

**Lost, Stolen or Damaged Reward Cards**

To report a lost, stolen, or damaged reward card, or for balance information, call 1-866-MAXPERKS ( 629-7375). OfficeMax will not replace the value on a lost or damaged reward card, or on a reward car without your permission or that has expired.

**MaxPerks Recycling Program**

In-Store Ink and Toner Recycling Program (Low volume recycler):

As a member of MaxPerks Rewards for Teachers, simply bring in visibly undamaged HP, Dell, or Lex ink/toner cartridges to an OfficeMax retail store and earn a $3 reward per qualified cartridge, with a m reward of $30 per week (or 10 cartridges) (Sun. thru Sat.). Recycling program rewards are calculated quarterly and are issued in the form of a reward card that will be issued to you electronically through y MaxPerks account, by the end of the month following the quarter end, along with any other rewards y have earned that quarter. You can use your recycling rewards online, in-store or over the phone. Whik is no limit to the number or brand of ink/toner cartridges you may recycle, you will only receive reward: the qualifying cartridges identified above, and in the limits identified above. Teachers who are not Max members can sign up for MaxPerks at time of recycling drop off to participate. Customers can always as many ink/toner cartridges of various brands to recycle, but will only receive credit for visibly undam HP, Dell, and Lexmark brands and quantities noted above.

Bulk Mail-In Ink and Toner Recycling Program (High volume recyclers):

As a member of MaxPerks Rewards for Teachers, if you and/or your school are high volume recyclers are eligible for OfficeMax's Bulk Mail-In Recycling Program. Simply go to the MaxPerks website at www.officemax.com/maxperks, log into your account, and follow the simple steps to get started. Order free collection materials and use them to start sending in visibly undamaged HP, Dell, or Lexmark ink cartridges, and undamaged cell phones, MP3 players, and PDAs, and earn a $1 reward per qualified with a maximum reward of $300 per month (or 300 items). All prepaid collection mailing materials are shipped to the Teachers free of charge. Recycling program rewards are calculated quarterly and come form of a reward card that will be issued to you electronically through your MaxPerks account, by the the month following the quarter end, along with any other rewards you may have earned that quarter. can use your recycling rewards online, in-store or over the phone. While there is no limit to the number brand of items described above that you may recycle, you will only receive rewards for the qualifying identified above, and in the limits identified above. The Bulk Mail-In Recycling Program is not available Alaska, Hawaii, Puerto Rico or the Virgin Islands.

MaxPerks Recycling Programs are not open to customers that broker or re-sell ink and/or toner cartridge and any rewards earned through those activities may be forfeited and the MaxPerks account closed.

### Modifications and Termination of MaxPerks

OfficeMax reserves the right to modify any of these Terms and Conditions including the qualified purch the amount of the rewards, and any of the options available to you on your MaxPerks account, at any with or without notice, even though these changes may affect your ability to accrue or use rewards. Yo continued participation in MaxPerks constitutes your acceptance of any changes to these Terms and Conditions. You are responsible for remaining knowledgeable as to any changes that OfficeMax may these Terms and Conditions. The most current version of these Terms and Conditions will be available www.officemax.com/maxperks and will supersede all previous versions of these Terms and Conditions

OfficeMax reserves the right to terminate MaxPerks at any time, for any reason, with or without notice though termination may affect your ability to accrue or use your rewards.

### General Terms and Conditions

OfficeMax reserves the right to close your MaxPerks account if you engage in any fraudulent activity o MaxPerks in a manner inconsistent with these Terms and Conditions or any federal, state or local, law statutes or ordinances. Discontinued membership may result in the loss of all accumulated rewards in but not limited to rewards earned from Bonus Reward offers and rewards from the ink and toner recyc programs. In the event that OfficeMax should discontinue a membership, any ink or toner cartridge su but not rewarded will not be returned nor will the monetary value of those cartridges be refunded. In a to discontinued membership, OfficeMax shall have the right to take appropriate administrative and/or action, including criminal prosecution, as it deems necessary in its sole discretion, and you will not be permitted to participate in the MaxPerks program in the future.

Rewards are not your property and may be revoked by OfficeMax at any time as set forth herein. Rew may not be sold, transferred or assigned, and are not transferable upon death, as part of a domestic matter or otherwise by operation of law.

OfficeMax is not responsible for any incorrect or inaccurate information supplied by you while participa MaxPerks.

All questions or disputes regarding eligibility for MaxPerks, earning or redemption of rewards, or your compliance with these Terms and Conditions will be resolved by OfficeMax in its sole discretion.

All issues and questions concerning the construction, validity, interpretation and enforceability of the T and Conditions, or your rights and obligations shall be governed by, and construed in accordance with laws of the State of Illinois, without giving effect to any choice of law or conflict of law rules.

These Terms and Conditions constitute the entire agreement between you and OfficeMax. They supe all prior or other arrangements, understandings, negotiations and discussions, whether oral or written. waiver of any of the provisions of these Terms and Conditions shall be deemed or shall constitute a w any other provisions hereof, nor shall waiver constitute a continuing waiver unless otherwise expressly provided.

If any provision of these Terms and Conditions is found to be invalid or unenforceable by a court of competent jurisdiction, such provision will be severed from the remainder of these Terms and Conditio which will otherwise remain in full force and effect.

This reward card is issued by OfficeMax North America, Inc.

### Limitations of Liability

OfficeMax and its partners, affiliates, subsidiaries, parent corporations and their respective agents and agencies ("Releasees") are not responsible for incorrect or inaccurate transcription of information, for

problems related to any of the equipment or programming associated with MaxPerks, for any human ε
for any interruption, deletion, omission, defect, or line failure of any telephone network or electronic
transmission, for problems relating to computer equipment, software, inability to access the rules or οι
service, or for any other technical or non-technical error or malfunction. In the event of a printing error
problem with any items purchased with rewards, Releasees shall not have any liability. UNDER NO
CIRCUMSTANCES, INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE, SHALL ANY OF THE
RELEASEES BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR
CONSEQUENTIAL DAMAGES ARISING FROM MAXPERKS OR MERCHANDISE PURCHASED WIT
MAXPERKS REWARDS, EVEN IF ANY OR ALL OF THE FOREGOING OR ANY OF THEIR AUTHOI
REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IF OFFIC
IMPROPERLY DENIES YOU ANY REWARDS, LIABILITY WILL BE LIMITED TO THE EQUIVALENT
AMOUNT OF REWARDS OR $100, WHICHEVER IS LESS. BY PARTICIPATING IN MAXPERKS, YΟ
WAIVING ANY AND ALL RIGHTS TO BRING ANY CLAIM OR ACTION RELATED TO SUCH MATTE
ANY FORUM BEYOND NINETY (90) DAYS AFTER THE FIRST OCCURRENCE OF THE KIND OF Α
EVENT, CONDITION OR OMISSION UPON WHICH THE CLAIM OR ACTION IS BASED. You agree
solely on the manufacturer's warranties, if any, for any products purchased with MaxPerks rewards.

Back to top

CUSTOMER SERVICE      866.MAXPERKS

INTERNET ARCHIVE
WayBackMachine

http://www.officemaxperks.com/TermsConditions.aspx    Go    AUG  SEP  OCT

18 captures    24
1 Dec 2008 - 11 Aug 2014    ▼ About this capture



**MaxPerks®**

JOIN NOW   LEARN MORE   MAXPERKS RECYCLING

## TERMS AND CONDITIONS

MaxPerks® Rewards for Business Terms and Conditions | MaxPerks® Rewards for Teachers Terms and Conditions

## MaxPerks Rewards for Business Terms and Conditions

### Overview

MaxPerks Rewards for Business ("MaxPerks") is an OfficeMax® customer reward program that allows you to earn $25 in rewards to spend at OfficeMax for every $500 in qualified purchases that you make during the year. Additionally, from time to time, OfficeMax may offer MaxPerks Bonus Rewards for purchases of specified products. You will also receive exclusive savings offers through the mail and email. If you do not want the exclusive savings offers, just log into your account and change your profile or call 1-866-MAXPERKS.

### How To Enroll

To open a new MaxPerks Rewards for Business account, you can fill out an application at any OfficeMax location, online at www.officemax.com/maxperks, or by phone at 1-866-MAXPERKS. You will be given a MaxPerks member ID after you complete the enrollment process. If you enroll in an OfficeMax store, you will be given a membership kit that contains your MaxPerks member ID at the time of enrollment. If you enroll online or by phone, we will mail a MaxPerks membership ID to you. You may begin using your MaxPerks membership immediately for all qualifying purchases including MaxPerks Bonus Rewards. Only one MaxPerks account and member ID per person is permitted at any given time. After you enroll, you will need to go to www.officemax.com/maxperks to set up your user name and password so that you can view your balance and keep track of your rewards.

### Eligibility

MaxPerks is open to legal residents of the 50 United States (and D.C., Puerto Rico, and the Virgin Islands) age eighteen (18) years and older who have internet access to manage their MaxPerks account. Employees of OfficeMax are eligible to participate, but purchases made with their MaxPerks ID may only be for their own personal use. By enrolling in MaxPerks, you agree to jurisdiction in Cook County, Illinois. Jurisdiction means that if you use OfficeMax for a violation of your rights under this program, you will have to bring the suit in Cook County, Illinois. MaxPerks is void where prohibited by law.

### How To Earn Rewards

If you are shopping in a retail store, you earn rewards by presenting your MaxPerks member ID card at checkout. If you do not have your MaxPerks member ID card with you, a store associate can look up your member ID number at the time of purchase. If you earn rewards online or by phone or fax be sure to provide your MaxPerks member ID number at checkout. If you do not know your MaxPerks member ID number at the time of purchase, you can later earn credit for your purchase towards a reward by logging in to your MaxPerks account and entering the information from your purchase receipt that is requested in order to obtain credit for your purchase. Customer service is also available at 1-866-MAXPERKS to assist you with obtaining credit for your purchase with receipt information. For MaxPerks Bonus Reward offers, such offers are only available at the time of purchase with your member ID number. You will receive credit for every qualified purchase that you make; however, each qualified purchase will initially be reflected in your account as "pending" until it clears a 7 day time period. Once cleared, the transaction will be eligible for reward issuance. If a SKU is returned, the amount of the return will be deducted from the account balance even after moved from pending status.

If you have not reached the $500 minimum in any calendar month, your qualified purchase balance will be carried over month to month until you reach the $500 minimum or January 1st of the following year, whichever comes first. For example, if you spend $300 in Month 1, $0 in Month 2, and $200 in Month 3, your total account balance at the end of Month 3 will be $500 and a $25 reward will be issued to you by the end of Month 4. Your $25 reward expires ninety (90) days after it is issued, unless you are a Florida resident, in which case it expires one (1) year from the date of issue, so be sure to log into your account and print it out as soon as it becomes available.

From time to time, OfficeMax may also offer its members Bonus Reward opportunities in which members can earn extra rewards (which may vary in amount) for purchasing specified products or completing a required action. To take advantage of the MaxPerks Bonus Rewards special purchase offers, you must have your MaxPerks member ID number at the time of purchase and it must be applied to that purchase. No Bonus Reward adjustments will be made after purchase.

### Qualifying Purchase

Qualifying purchases are any products or services in our stores, catalogs or web site except for computers, OfficeMax gift cards, sales tax, purchases with a Retail Connect card, purchases made prior to the date of enrollment, and purchases made with your MaxPerks rewards. You will start earning credit for purchases with your MaxPerks member ID number the day you sign up.

### How To Obtain and Use Rewards

You can easily keep track of your account balance and any rewards you have earned by logging in to your MaxPerks account online at www.officemax.com/maxperks. OfficeMax will send you electronic statements via email at the end of each month, so that you can see the total amount of qualified purchases that you have made. The e-statement will be sent by the end of the following month. You may opt-out of receiving this notification by logging in to your account and updating your communication preferences. Once you have reached the $500 minimum, you can log into your account and print a $25 reward card. Your reward card will be available to you the month after you have reached the $500 minimum. For example, if you reach the $500

BRANDI CHANNON'S
EXHIBIT

90

1:13-CR-966-JCH-KK   2255 MOTION

minimum on March 11, your $25 reward card will be available by the end of April. You may use your reward card at any OfficeMax retail location, online at www.officemax.com, or by phone at 1-877-OFFICEMAX. You may use up to three (3) reward cards from the same MaxPerks account in a single transaction. Reward cards are not redeemable for gift cards and are not redeemable for cash unless otherwise required by law. No amount of your reward card may be applied as payment to any credit account.

**Expiration of Balances and Rewards**

You earn credit during each calendar year, from January 1 through December 31. If you do not reach the minimum $500 spending requirement by December 31, your account balance will be reset to $0 on January 1 of the following year. Accounts with a balance of over $500 are eligible for a $25 reward card for each $500 spent by the end of each month. Remaining account balances less than $500 after issuance of a reward card during the year will also reset to $0 at the end of the year. For new customers who sign up for the program after October 1 of any given year, for your first year of participation only, your balance will not be reset to $0 on December 31; the balance will be carried over to the next calendar year.

**The $25 reward card expires ninety (90) days after it is issued.** The expiration date will appear on the front of the card and in your online account. If you are a resident of Florida, your reward card will expire one (1) year from the date it is issued.

**Lost, Stolen or Damaged Reward Cards**

To report a lost, stolen, or damaged reward card, or for balance information, call 1-866-MAXPERKS (1-866-629-7375). OfficeMax will not replace the value on a lost or damaged reward card, or on a reward card used without your permission or that has expired.

**MaxPerks Recycling Program**

In-Store Ink and Toner Recycling Program (Low volume recycler):

MaxPerks members may bring in up to 10 visibly undamaged HP, Dell, or Lexmark ink/toner cartridges per week (Sun. thru Sat.) to an OfficeMax retail store and earn a $3 reward per qualified cartridge. There is a $30 maximum reward per week per member. All recycling rewards will be calculated monthly and available to you through your MaxPerks account by the end of the next month. Customers can sign up for MaxPerks at time of recycling drop-off to participate. Recycling rewards will come in the form of a reward card and will be issued to members electronically along with any other rewards they may have earned that month. Recycling rewards can be used online, in-store or over the phone. While there is no limit to the number or brand of ink/toner cartridges you may recycle, you will only receive credit for the qualifying cartridges identified above, and in the limits identified above.

Bulk Mail-In Ink and Toner Recycling Program (High volume recyclers):

For customers, teachers, schools, fundraisers and businesses who are high volume recyclers, we offer the Bulk Mail-In Recycling program. Members can go to the MaxPerks website at www.officemax.com/maxperks, log into your account and order collection materials. Members will earn $1 in rewards for every qualified item submitted up to $300 per month in the form of a reward card. Qualified items are visibly undamaged HP, Dell, or Lexmark ink/toner cartridges, and undamaged cell phones, MP3 players, and PDAs. Rewards will be issued to customers electronically monthly through your MaxPerks account along with any other rewards you may have earned that month. Simply go to our website, www.officemax.com/maxperks, and follow the simple steps to get started. Order the free collection materials from the website and use them to start collecting all qualifying ink and toner cartridges, cell phones, MP3 players and PDAs. Customers may mail in ink and toner cartridges of various brands to recycle, but will only receive credit for visibly undamaged HP, Dell, and Lexmark brands and quantities noted above. The Bulk Mail-In Recycling Program is not available in Alaska, Hawaii, Puerto Rico or the Virgin Islands.

MaxPerks Recycling Programs are not open to customers that broker or re-sell ink and/or toner cartridges and any rewards earned through those activities may be forfeited and the MaxPerks account closed.

**Modifications and Termination of MaxPerks**

OfficeMax reserves the right to modify any of these Terms and Conditions including the qualified purchases, the amount of the rewards, and any of the options available to you on your MaxPerks account at any time, with or without notice, even though these changes may affect your ability to accrue or use rewards. Your continued participation in MaxPerks constitutes your acceptance of any changes to these Terms and Conditions. You are responsible for remaining knowledgeable as to any changes that OfficeMax may make to these Terms and Conditions. The most current version of these Terms and Conditions will be available at www.officemax.com/maxperks and will supersede all previous versions of these Terms and Conditions.

OfficeMax reserves the right to terminate MaxPerks at any time, for any reason, with or without notice, even though termination may affect your ability to accrue or use your rewards.

**General Terms and Conditions**

OfficeMax reserves the right to close your MaxPerks account if you engage in any fraudulent activity or use MaxPerks in a manner inconsistent with these Terms and Conditions or any federal, state or local, laws, statutes or ordinances. Discontinued membership may result in the loss of all accumulated rewards including but not limited to rewards earned from Bonus Reward offers and rewards from the ink and toner recycling programs. In the event that OfficeMax should discontinue a membership, any ink or toner cartridge submitted but not rewarded will not be returned nor will the monetary value of those cartridges be refunded. In addition to discontinued membership, OfficeMax shall have the right to take appropriate administrative and/or legal action, including criminal prosecution, as it deems necessary in its sole discretion, and you will not be permitted to participate in the MaxPerks program in the future.

Rewards are not your property and may be revoked by OfficeMax at any time as set forth herein. Rewards may not be sold, transferred or assigned, and are not transferable upon death, as part of a domestic relations matter or otherwise by operation of law.

OfficeMax is not responsible for any incorrect or inaccurate information supplied by you while participating in MaxPerks.

All questions or disputes regarding eligibility for MaxPerks, earning or redemption of rewards, or your compliance with these Terms and Conditions will be resolved by OfficeMax in its sole discretion.

All issues and questions concerning the construction, validity, interpretation and enforceability of the Terms and Conditions, or your rights and obligations shall be governed by, and construed in accordance with, the laws of the State of Illinois, without giving effect to any choice of law or conflict of law rules.

These Terms and Conditions constitute the entire agreement between OfficeMax and you. They supersede all prior or other arrangements, understandings, negotiations and discussions, whether oral or written. No waiver of any of the provisions of these Terms and Conditions shall be deemed or shall constitute a waiver of any other provisions hereof, nor shall waiver constitute a continuing waiver unless otherwise expressly provided.

If any provision of these Terms and Conditions is found to be invalid or unenforceable by a court of competent

jurisdiction, such provision shall be severed from the remainder of these Terms and Conditions, which will otherwise remain in full force and effect.

This reward card is issued by OfficeMax North America, Inc.

**Limitations of Liability**

OfficeMax and its partners, affiliates, subsidiaries, parent corporations and their respective agents and agencies ("Releasees") are not responsible for incorrect or inaccurate transcription of information, for problems related to any of the equipment or programming associated with MaxPerks, for any human error, for any interruption, deletion, omission, defect, or line failure of any telephone network or electronic transmission, for problems relating to computer equipment, software, inability to access the rules or online service, or for any other technical or non-technical error or malfunction. In the event of a printing error or problem with any items purchased with rewards, Releasees shall not have any liability. UNDER NO CIRCUMSTANCES, INCLUDING, BUT NOT LIMITED TO NEGLIGENCE, SHALL ANY OF THE RELEASEES BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING FROM MAXPERKS OR MERCHANDISE PURCHASED WITH MAXPERKS REWARDS. EVEN IF ANY OR ALL OF THE FOREGOING OR ANY OF THEIR AUTHORIZED REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IF OFFICEMAX IMPROPERLY DENIES YOU ANY REWARDS, LIABILITY WILL BE LIMITED TO THE EQUIVALENT AMOUNT OF REWARDS OR $100, WHICHEVER IS LESS. BY PARTICIPATING IN MAXPERKS, YOU ARE WAIVING ANY AND ALL RIGHTS TO BRING ANY CLAIM OR ACTION RELATED TO SUCH MATTERS IN ANY FORUM BEYOND NINETY (90) DAYS AFTER THE FIRST OCCURRENCE OF THE KIND OF ACT, EVENT, CONDITION OR OMISSION UPON WHICH THE CLAIM OR ACTION IS BASED. You agree to rely solely on the manufacturer's warranties, if any, for any products purchased with MaxPerks rewards.

Back to top

# MaxPerks Rewards for Teachers Terms and Conditions

**Overview**

MaxPerks Rewards for Teachers ("MaxPerks") is an OfficeMax® customer reward program for teachers, which gives you $10 in rewards to spend at OfficeMax for every $75 in qualified purchases that you make during the year, up to a maximum reward of $100 per year. Additionally, from time to time, OfficeMax may offer MaxPerks Bonus Rewards for purchases of specified products. You will also receive exclusive savings offers through the mail and email. If you do not want the exclusive savings offers, just log into your account and change your profile or call 1-866-MAXPERKS.

**How To Enroll**

To open a new MaxPerks Rewards for Teachers account, you can fill out an application at any OfficeMax location, online at www.officemax.com/maxperks, or by phone at 1-866-MAXPERKS. You will be given a MaxPerks member ID after you complete the enrollment process. If you enroll in an OfficeMax store, you will be given a membership kit that contains your MaxPerks member ID at the time of enrollment. If you enroll online or by phone, we will mail a MaxPerks membership ID to you. You may begin using your MaxPerks membership immediately for all qualifying purchases, including MaxPerks Bonus Rewards. Only one MaxPerks account and member ID per person is permitted at any given time. After you enroll, you will need to go to www.officemax.com/maxperks to set up your user name and password so that you can view your balance and keep track of your rewards.

**Eligibility**

The MaxPerks Rewards for Teachers Program is open to teachers who are legal residents of the 50 United States (and D.C., Puerto Rico, and the Virgin Islands), age eighteen (18) years and older, and who have internet access to manage their MaxPerks account. By enrolling in MaxPerks, you agree to jurisdiction in Cook County, Illinois. Jurisdiction means that if you sue OfficeMax for a violation of your rights under this program, you will have to bring the suit in Cook County, Illinois. MaxPerks is void where prohibited by law.

**How To Earn Rewards**

If you are shopping in a retail store, you must present your MaxPerks member ID card at checkout. If you do not have your MaxPerks member ID card with you, a store associate can look up your member ID number at the time of purchase. If you are shopping online, by phone or by fax, you must provide your MaxPerks member ID number at checkout. If you do not know your MaxPerks member ID number at the time of purchase, you can later earn credit for your purchase towards an award by logging into your MaxPerks account and entering the information from your purchase receipt. You can also call customer service at 1-866-MAXPERKS to assist you with obtaining credit for your purchase towards an award by providing the customer representative with the information from your receipt. For MaxPerks Bonus Rewards offers, such offers are only available at the time of purchase with your member ID number. You will receive credit towards a reward for every qualified purchase that you make; however, each qualified purchase will initially be reflected in your account as "pending" until it clears a 7 day processing period. Once cleared, the transaction will be eligible toward reward issuance. If a purchased item is returned, the amount of the return will be deducted from your account balance even after moved from pending status.

If you have not reached the $75 minimum in any calendar quarter, your qualified purchase balance will be carried over quarter to quarter until you reach the $75 minimum, or January 1 of the following year, whichever comes first. For example, if you spend $50 in Quarter 1, $0 in Quarter 2, and $30 in Quarter 3, your total account balance at the end of Quarter 3 will be $80 and your $10 reward will be issued to you by the end of October. Your $5 balance will be carried over into Quarter 4. If you then spend $70 in Quarter 4, your account balance at the end of Quarter 4 will be $75 and your $10 reward will be issued to you by the end of January of the following year. However, if you spend $10 in Quarter 1, $5 in Quarter 2, $0 in Quarter 3, and $20 in Quarter 4, your total account balance will reset to $0 on January 1. Your $10 reward expires ninety (90) days after it is issued, unless you are a Florida resident, in which case it expires one(1) year from the date of issue, so be sure to log into your account and print it out as soon as it becomes available.

From time to time, OfficeMax may also offer MaxPerks Bonus Rewards permitting you to earn extra rewards (which may vary in amount) for purchasing specified products or completing a required action. To take advantage of the MaxPerks Bonus Rewards special purchase offers, you must have your MaxPerks member ID number at the time of purchase and it must be applied to that purchase. No Bonus Reward adjustments will be made after purchase.

**Qualifying Purchases**

Qualifying purchases are any products or services in our stores, catalogs or web site except for computers. OfficeMax gift cards, sales tax, purchases with a Retail Connect card, purchases made prior to the date of enrollment, and purchases made with your MaxPerks rewards. You will start earning credit for purchases with your MaxPerks member ID number the day you sign up.

**How To Obtain and Use Rewards**

You can easily keep track of your account balance and any rewards you have earned by logging into your MaxPerks account online at www.officemax.com/maxperks. OfficeMax will send you quarterly electronic statements via email by the end of the month following the quarter end so that you can see the total amount of qualified purchases that you have made. You may opt out of receiving this notification by logging into your account and updating your communication preferences. Once you reach the $75 minimum, OfficeMax will begin processing your reward card and it will be electronically issued to you by file end of the month following the end of the quarter when you reached the $75 minimum. For example, if you reach the $75 minimum on January 13, your $10 reward card will be available no later than April 30. Simply log into your account and print your $10 reward card. Use your reward card at any OfficeMax retail location, online at www.officemax.com, or by phone at 1-877-OFFICEMAX. You may use up to three (3) reward cards from the same MaxPerks account in a single transaction. Your reward card is not redeemable for OfficeMax brand gift cards, and is not redeemable for cash unless otherwise required by law. No amount of your reward card may be applied as payment to any credit account.

**Expiration of Balances and Rewards**

You earn credit during each calendar year, from January 1 through December 31. If you do not reach the $75 minimum by December 31, your account balance will be reset to $0 on January 1 of the following year. Accounts with a balance of over $75 are eligible for a $10 reward card for each $75 spent by the end of each quarter. Remaining account balances less than $75 after issuance of a reward card during the year will also reset to $0 at the end of the year. If you are a new member and signed up for the program after October 1 of any given year, for your first year of participation only, your balance will not be reset but will be carried over to the next calendar year.

**The $10 reward card expires ninety (90) days after it is issued.** If you are a resident of Florida, your reward card will expire one (1) year from the date it is issued. The expiration date will appear on the front of the card and in your online account.

**Lost, Stolen or Damaged Reward Cards**

To report a lost, stolen, or damaged reward card, or for balance information, call 1-866-MAXPERKS (1-866-629-7375). OfficeMax will not replace the value on a lost or damaged reward card, or on a reward card used without your permission or that has expired.

**MaxPerks Recycling Program**

In-Store Ink and Toner Recycling Program (Low volume recycler).

As a member of MaxPerks Rewards for Teachers, simply bring in visibly undamaged HP, Dell, or Lexmark ink/toner cartridges to an OfficeMax retail store and earn a $3 reward per qualified cartridge, with a maximum reward of $30 per week (or 10 cartridges) (Sun. thru Sat.). Recycling program rewards are calculated quarterly and are issued in the form of a reward card that will be issued to you electronically through your MaxPerks account, by the end of the month following the quarter end, along with any other rewards you may have earned that quarter. You can use your recycling rewards online, in-store or over the phone. While there is no limit to the number or brand of ink/toner cartridges you may recycle, you will only receive rewards for the qualifying cartridges identified above, and in the limits identified above. Teachers who are not MaxPerks members can sign up for MaxPerks at time of recycling drop off to participate. Customers can always bring as many ink/toner cartridges of various brands to recycle, but will only receive credit for visibly undamaged HP, Dell, and Lexmark brands and quantities noted above.

Bulk Mail-In Ink and Toner Recycling Program (High volume recyclers).

As a member of MaxPerks Rewards for Teachers, if you and/or your school are high volume recyclers, you are eligible for OfficeMax's Bulk Mail-In Recycling Program. Simply go to the MaxPerks website at www.officemax.com/maxperks, log into your account, and follow the simple steps to get started. Order the free collection materials and use them to start sending in visibly undamaged HP, Dell, or Lexmark ink/toner cartridges, and undamaged cell phones, MP3 players, and PDAs, and earn a $1 reward per qualified item, with a maximum reward of $300 per month (or 300 items). All prepaid collection mailing materials are shipped to the Teachers free of charge. Recycling program rewards are calculated quarterly and come in the form of a reward card that will be issued to you electronically through your MaxPerks account, by the end of the month following the quarter end, along with any other rewards you may have earned that quarter. You can use your recycling rewards online, in-store or over the phone. While there is no limit to the number or brand of items described above that you may recycle, you will only receive rewards for the qualifying items identified above, and in the limits identified above. The Bulk Mail-In Recycling Program is not available in Alaska, Hawaii, Puerto Rico or the Virgin Islands.

MaxPerks Recycling Programs are not open to customers that broker or re-sell ink and/or toner cartridges, and any rewards earned through those activities may be forfeited and the MaxPerks account closed.

**Modifications and Termination of MaxPerks**

OfficeMax reserves the right to modify any of these Terms and Conditions including the qualified purchases, the amount of the rewards, and any of the options available to you on your MaxPerks account, at any time, with or without notice, even though these changes may affect your ability to accrue or use rewards. Your continued participation in MaxPerks constitutes your acceptance of any changes to these Terms and Conditions. You are responsible for remaining knowledgeable as to any changes that OfficeMax may make to these Terms and Conditions. The most current version of these Terms and Conditions will be available at www.officemax.com/maxperks and will supersede all previous versions of these Terms and Conditions.

OfficeMax reserves the right to terminate MaxPerks at any time, for any reason, with or without notice, even though termination may affect your ability to accrue or use your rewards.

**General Terms and Conditions**

OfficeMax reserves the right to close your MaxPerks account if you engage in any fraudulent activity or use MaxPerks in a manner inconsistent with these Terms and Conditions or any federal, state or local, laws, statutes or ordinances. Discontinued membership may result in the loss of all accumulated rewards including but not limited to rewards earned from Bonus Reward offers and rewards from the ink and toner recycling programs. In the event that OfficeMax should discontinue a membership, any ink or toner cartridge submitted but not rewarded will not be returned nor will the monetary value of those cartridges be refunded. In addition to discontinued membership, OfficeMax shall have the right to take appropriate administrative and/or legal action, including criminal prosecution, as it deems necessary in its sole discretion, and you will not be permitted to participate in the MaxPerks program in the future.

Rewards are not your property and may be revoked by OfficeMax at any time as set forth herein. Rewards may not be sold, transferred or assigned, and are not transferable upon death, as part of a domestic relations matter or otherwise by operation of law.

OfficeMax is not responsible for any incorrect or inaccurate information supplied by you while participating in MaxPerks.

All questions or disputes regarding eligibility for MaxPerks, earning or redemption of rewards, or your compliance with these Terms and Conditions will be resolved by OfficeMax in its sole discretion.

All issues and questions concerning the construction, validity, interpretation and enforceability of the Terms and Conditions, or your rights and obligations shall be governed by, and construed in accordance with, the laws of the State of Illinois, without giving effect to any choice of law or conflict of law rules.

These Terms and Conditions constitute the entire agreement between you and OfficeMax. They supersede all prior or other arrangements, understandings, negotiations and discussions, whether oral or written. No waiver of any of the provisions of these Terms and Conditions shall be deemed or shall constitute a waiver of any other provisions hereof, nor shall waiver constitute a continuing waiver unless otherwise expressly provided.

If any provision of these Terms and Conditions is found to be invalid or unenforceable by a court of competent jurisdiction, such provision will be severed from the remainder of these Terms and Conditions, which will otherwise remain in full force and effect.

This reward card is issued by OfficeMax North America, Inc.

**Limitations of Liability**

OfficeMax and its partners, affiliates, subsidiaries, parent corporations and their respective agents and agencies ("Releasees") are not responsible for incorrect or inaccurate transcription of information, for problems related to any of the equipment or programming associated with MaxPerks, for any human error, for any interruption, deletion, omission, defect, or line failure of any telephone network or electronic transmission, for problems relating to computer equipment, software, inability to access the rules or online service, or for any other technical or non-technical error or malfunction. In the event of a printing error or problem with any items purchased with rewards, Releasees shall not have any liability. UNDER NO CIRCUMSTANCES, INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE, SHALL ANY OF THE RELEASEES BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING FROM MAXPERKS OR MERCHANDISE PURCHASED WITH MAXPERKS REWARDS, EVEN IF ANY OR ALL OF THE FOREGOING OR ANY OF THEIR AUTHORIZED REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IF OFFICEMAX IMPROPERLY DENIES YOU ANY REWARDS, LIABILITY WILL BE LIMITED TO THE EQUIVALENT AMOUNT OF REWARDS OR $100, WHICHEVER IS LESS. BY PARTICIPATING IN MAXPERKS, YOU ARE WAIVING ANY AND ALL RIGHTS TO BRING ANY CLAIM OR ACTION RELATED TO SUCH MATTERS IN ANY FORUM BEYOND NINETY (90) DAYS AFTER THE FIRST OCCURRENCE OF THE KIND OF ACT, EVENT, CONDITION OR OMISSION UPON WHICH THE CLAIM OR ACTION IS BASED. You agree to rely solely on the manufacturer's warranties, if any, for any products purchased with MaxPerks rewards.

Back to top

Terms and Conditions | Privacy Policy | © 2009 - OMX, inc.

Steven Gardner - Direct by Ms. Vierbuchen

Page 352

1          MS. VIERBUCHEN:  Your Honor, at this time I

2   would like to move in Government's Exhibit 1.  I

3   believe it goes to weight, not admissibility -- the

4   objection, that is.

5          MR. ROBBENHAAR:  We continue to object to

6   Number 1, Your Honor.

7          THE COURT:  Well, based on the testimony,

8   the Court will allow admission of Exhibit Number 1.

9   And, of course, you're free to cross-examine the

10  witness.

11         MS. VIERBUCHEN:  If we could display

12  Exhibit 1 to the jury.

13         Can you just do the full screen?

14  BY MS. VIERBUCHEN:

15  Q.    Now, I would like to turn to explaining to the

16  jury how it is that the customer actually can

17  practically get rewards added to their MaxPerks

18  account.

19         So how did that happen, that when I buy,

20  that I get -- start to accumulate points that I can

21  use for later purchases -- or excuse me -- rewards,

22  not points.

23  A.    Sure.  When you walk into one of our buildings

24  you select your merchandise, right, and you walk up

25  front to pay for it.

BRANDI CHANNON'S
EXHIBIT

**91**

1:13-CR-966-JCH-KK  2255 MOTION

Steven Gardner - Direct by Ms. Vierbuchen

Page 509

1   Exhibit 24, and tell me if you recognize anything

2   about the transaction date and time on Government's

3   Exhibit 24.

4   A.    Yes.  On Government's Exhibit 24, the one we're

5   looking at now, was about five or six -- or a couple

6   of minutes before the other transaction.

7   Q.    I would like to turn now to Government's

8   Exhibit 63.

9         MS. VIERBUCHEN:  I'd offer that into

10  evidence -- or strike that.

11        Well, no.  In fact, Government's

12  Exhibit 63, let me just lay the foundation and do it

13  for identification only.

14  BY MS. VIERBUCHEN:

15  Q.    Okay.  Do you recognize it?

16  A.    Yes, I do.

17  Q.    And tell the Court about this video -- or tell

18  the jury, excuse me, about this video.

19        Is it one of the 80 or plus videos that you

20  obtained?

21  A.    Correct.

22  Q.    And did you -- is it one of the videos that you

23  reviewed to determine -- to match up the underlying

24  transactional data with the video?

25  A.    Yes.

BRANDI CHANNON'S
EXHIBIT

**92**

1:13-CR-966-JCH-KK   2255 MOTION

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Voir Dire by Mr. Robbenhaar

Page 510

1           MR. ROBBENHAAR:  Your Honor, again,

2   leading.  It's all leading.

3           THE COURT:  Well, in this particular

4   instance the Court will allow the questions because

5   they are foundational.

6           Go ahead.

7           MS. VIERBUCHEN:  Thank you.

8           At this point I'd offer it into evidence

9   pursuant to 803(6).

10          THE COURT:  Is there objection?

11          MR. ROBBENHAAR:  May I voir dire the

12  witness, please?

13          THE COURT:  You may.

14                  VOIR DIRE EXAMINATION

15  BY MR. ROBBENHAAR:

16  Q.    Mr. Gardner, what you've just identified as

17  Government's Exhibit 63, this is from one of the

18  stores in -- which store is this coming from?

19  A.    1156, Albuquerque.

20  Q.    And how are you familiar with the manner and

21  the means of the creation of this video and how it's

22  stored?

23  A.    From when I worked in the field and I was a

24  district loss prevention manager, part of my

25  responsibility was to make sure that the stores

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Voir Dire by Mr. Robbenhaar

Page 511

1   understood how to use this equipment and maintain it

2   and pull video.

3           And when I was in the role during this

4   investigation, I would, at times, call the stores and

5   walk them through how to pull the video and review

6   it.

7   Q.    Did you call this store?

8   A.    I would have -- from what I recall, I called

9   every store that I needed it from.  I'm just not

10  going to send them an e-mail and say, I need you to

11  do something.  I would have either called the store,

12  or if I was in the market, pulled it myself.

13  Q.    You don't recall about this video in this case?

14  A.    In this case I would have called the store,

15  because it's from 1-16-2011.  I wasn't out here at

16  that period.

17  Q.    So you would have called the store, is your

18  testimony?

19  A.    Yeah.  To the best of my recollection, I would

20  have called them and spoke with them.

21  Q.    Do you recall doing that?

22  A.    I don't recall, but that's normally how I

23  operate on -- you know, unless it's somebody I've

24  worked with a lot, but I would still have called

25  them.

PAUL BACA, OFFICIAL COURT REPORTER

Steven Gardner - Direct by Ms. Vierbuchen

Page 512

1            So yeah, I think I would have called them.

2     It's four or five years ago.  But, yeah.

3            MR. ROBBENHAAR:  No further questions.

4            THE COURT:  Is there objection?

5            MR. ROBBENHAAR:  Your Honor, I would object

6     on foundation.

7            THE COURT:  The foundation has been

8     adequately laid.

9            The Court will admit 63.

10            MS. VIERBUCHEN:  Okay.  If we could display

11     that to the jury.

12            DIRECT EXAMINATION (CONTINUED)

13     BY MS. VIERBUCHEN:

14     Q.     And if we -- when we hit play, Mr. Gardner, if

15     you would describe -- describe what we're seeing as

16     the video is playing, since there's no sound.

17     A.     Sure.

18            (Whereupon the video recording was played.)

19     A.     Here you can see somebody -- two individuals

20     that are in the building carrying plastic bags with

21     what I determined later to be ink.

22            The first individual appeared to be this

23     Matt Channon, the individual I normally had seen on

24     the videos.

25            And here you see a transaction where the

PAUL BACA, OFFICIAL COURT REPORTER

**MaxPerks**   **OfficeMax**
WORK WITH US

Customer Service

HOME     RECYCLING PROGRAM     OFFICEMAX.COM

**QUESTIONS? CONTACT US**

Call Us 24/7 at 866-MAXPERKS

Or Send Us an Email.

## MY PROFILE ( STEP 1 OF 3 )

Let us know who you are and create a password, then select your preferences and you're done!

Program Type: MaxPerks Rewards

* = Required Information

### LOGIN INFORMATION

* Enter Valid Email:

* Re-enter Email:

* Password:                    Minimum of seven characters and must
                               contain at least one number (0-9). No special
                               characters allowed.

* Re-enter Password:

### MEMBER NAME

Title:

* First Name:

Middle Initial:

* Last Name:

Birth Month & Day:

### CONTACT INFORMATION

Business Name:

* Address 1:

Address 2:

* City:

* State:               * Zip:

* Phone Number:

Extension:

Fax Number:

My mailing address is
different than the address
listed above.

### TERMS & CONDITIONS

Last Update: March 21, 2011

**PLEASE READ CAREFULLY. By reviewing these Terms and Conditions and signing up for the MaxPerks Rewards Program, you agree to the following terms.**

**OVERVIEW**
MaxPerks Rewards ("MaxPerks") is an OfficeMax® customer reward program that allows you to earn $25 in rewards to spend at OfficeMax for every $500 in qualified purchases that you make during the year. Additionally, from time to time, OfficeMax may offer MaxPerks Bonus Rewards for purchases of specified products. You will also receive exclusive savings offers through the mail and email. If you do not want the exclusive savings offers, just log into your account and change your profile or call 1-866-MAXPERKS (1-866-629-7375).

* I have read the MaxPerks Rewards Terms & Conditions and I Agree.

Type the text                    Privacy & Terms

CANCEL     NEXT

BRANDI CHANNON'S
EXHIBIT

93

1:13-CR-966-JCH-KK   2255 MOTION

INTERNET ARCHIVE
WayBackMachine

https://www.officemaxperks.com/EnrollmentForm.aspx?type=T    Go

9 captures
22 Dec 2010 – 12 Mar 2016

DEC    JUL
◀ 27 ▶
2010   2012

▼ About this capture

## MY PROFILE ( STEP 1 OF 3 )

= Required Information

Let us know who you are and create a password, then select your preferences and you're done!

Member Type: **Teacher**

### LOGIN INFORMATION

**Enter Valid Email:**

**Re-enter Email:**

**Password:**    Minimum of seven characters and must contain at least one number (0-9). No special characters allowed.

**Re-enter Password:**

**Security Question:**

**Enter Your Answer:**

### MEMBER NAME

**Title:**

**First Name:**

**Middle Initial:**

**Last Name:**

**Birth Month & Day:**

### SCHOOL INFORMATION

**School Name:**

**Address 1:**

**Address 2:**

**City:**

**State:**    **Zip:**

**Phone Number:**

**Extension:**

**Fax Number:**

**My mailing address is different than my school address.**

### TERMS & CONDITIONS

BRANDI CHANNON'S
EXHIBIT

**94**

1:13-CR-966-JCH-KK   2255 MOTION

Last Update: October 8, 2010

**PLEASE READ CAREFULLY. By reviewing these Terms and Conditions and clicking "I have read the MaxPerks Rewards for Teachers Terms and Conditions and I Agree" you agree to the following terms.**

**OVERVIEW**

MaxPerks Rewards for Teachers ("MaxPerks") is an OfficeMax® customer reward program for teachers, which gives you $10 in rewards to spend at OfficeMax for every $75 in qualified purchases that you make during the year, up to a maximum reward of $100 per year. Additionally, from time to time, OfficeMax may offer MaxPerks Bonus Rewards for purchases of specified products. You will also receive exclusive savings offers through the mail and email. If you do not want the exclusive savings offers, just log into your account and change your profile or call 1-866-MAXPERKS (1-

I have read the MaxPerks Rewards for Teachers Terms & Conditions and I Agree.

2.0.28.12

Steven Gardner - Redirect by Ms. Vierbuchen

Page 1015

1   Q.    Do you believe that that is captured in the
2   terms and conditions or on this receipt?
3   A.    That's captured on -- in my opinion, it's on
4   both.  It's captured verbally -- in writing, in the
5   terms and conditions.
6             And here, it's -- I think it's captured in
7   the spirit of it.  Anybody reading this is going to
8   assume -- because they're in their account.  They're
9   editing their own transaction, so it's kind of --
10  you have to go into your account to add the
11  transaction, so why would we need to restate?
12  Q.    Can you just remind the jury how you sign on to
13  actually do an online adjustment.
14  A.    You would have to sign in with your -- I
15  believe it was your e-mail and your password, so it's
16  your account that you're signing into.  So you're
17  adding a transaction to your account, so the whole
18  thought is it's your transaction.
19  Q.    Okay.  Now, I'd like to direct your attention
20  to Government's Exhibit 2.
21            And I'd like to direct your attention to
22  the section on how to earn rewards.
23            And let me clear the screen.
24            Okay.  Do you see what I've highlighted?
25  A.    Yes, I do.

PAUL BACA, OFFICIAL COURT REPORTER

BRANDI CHANNON'S
EXHIBIT

95

1:13-CR-966-JCH-KK   2255 MOTION

Steven Gardner - Redirect by Ms. Vierbuchen

Page 1016

1   Q.     Was it the expectation of OfficeMax that the --

2   only the person who made the underlying purchase

3   would be doing an online adjustment?

4   A.     Yes.

5   Q.     Does it say specifically your purchase?

6   A.     Yes.  Right here it says your purchase.

7   Q.     Okay.  What about -- let me clear it off.

8          Your purchase?

9   A.     Your purchase, yeah, three times.

10  Q.     And then defense counsel asked you a question

11  that I would like to draw your attention to, general

12  terms and conditions, on page 2.

13         And along the same lines of the person who

14  made the purchase is expected to be the one making

15  the online adjustment, do we have general terms and

16  conditions on page 2 of this exhibit?

17         Do you see what I've highlighted there?

18  A.     Yes.

19  Q.     And what does that mean?

20  A.     Well --

21  Q.     Cannot be sold, transferred, or assigned?

22  A.     That means they are yours, and if you don't use

23  them, you're going to wind up losing them.  You can't

24  give them away, you can't assign them, they are yours

25  to use or not use.

PAUL BACA, OFFICIAL COURT REPORTER

**MaxPerks®**

JOIN NOW   LEARN MORE   MAXPERKS RECYCLING

## TERMS AND CONDITIONS

**MaxPerks® Rewards for Business Terms and Conditions | MaxPerks® Rewards for Teachers Terms and Conditions**

## MaxPerks Rewards for Business Terms and Conditions

### Overview

MaxPerks Rewards for Business ("MaxPerks") is an OfficeMax© customer reward program that allows you to earn $25 in rewards to spend at OfficeMax for every $500 in qualified purchases that you make during the year. Additionally, from time to time, OfficeMax may offer MaxPerks Bonus Rewards for purchases of specified products. You will also receive exclusive savings offers through the mail and email. If you do not want the exclusive savings offers, just log into your account and change your profile or call 1-866-MAXPERKS.

### How To Enroll

To open a new MaxPerks Rewards for Business account, you can fill out an application at any OfficeMax location, online at www.officemax.com/maxperks, or by phone at 1-866-MAXPERKS. You will be given a MaxPerks member ID after you complete the enrollment process. If you enroll in an OfficeMax store, you will be given a membership kit that contains your MaxPerks member ID at the time of enrollment. If you enroll online or by phone, we will mail a MaxPerks membership ID to you. You may begin using your MaxPerks membership immediately for all qualifying purchases including MaxPerks Bonus Rewards. Only one MaxPerks account and member ID per person is permitted at any given time. After you enroll, you will need to go to www.officemax.com/maxperks to set up your user name and password so that you can view your balance and keep track of your rewards.

### Eligibility

MaxPerks is open to legal residents of the 50 United States (and D.C., Puerto Rico, and the Virgin Islands) age eighteen (18) years and older who have internet access to manage their MaxPerks account. Employees of OfficeMax are eligible to participate, but purchases made with their MaxPerks ID may only be for their own personal use. By enrolling in MaxPerks, you agree to jurisdiction in Cook County, Illinois. Jurisdiction means that if you sue OfficeMax for a violation of your rights under this program, you will have to bring the suit in Cook County, Illinois. MaxPerks is void where prohibited by law.

### How To Earn Rewards

If you are shopping in a retail store, you earn rewards by presenting your MaxPerks member ID card at checkout. If you do not have your MaxPerks member ID card with you, a store associate can look up your member ID number at the time of purchase. If you are shopping online or by phone or fax be sure to provide your MaxPerks member ID number at checkout. If you do not know your MaxPerks member ID number at the time of purchase, you can later earn credit for your purchase towards a reward by logging in to your MaxPerks account and entering the information from your purchase receipt that is requested in order to obtain credit for your purchase. Customer service is also available at 1-866-MAXPERKS to assist you with obtaining credit for your purchase with receipt information. For MaxPerks Bonus Reward offers, such offers are only available at the time of purchase with your member ID number. You will receive credit for every qualified purchase that you make; however, each qualified purchase will initially be reflected in your account as "pending" until it clears a 7 day time period. Once cleared, the transaction will be eligible for reward issuance. If a SKU is returned, the amount of the return will be deducted from the account balance even after moved from pending status.

If you have not reached the $500 minimum in any calendar month, your qualified purchase balance will be carried over month to month until you reach the $500 minimum or January 1st of the following year, whichever comes first. For example, if you spend $300 in Month 1, $0 in Month 2, and $200 in Month 3, your total account balance at the end of Month 3 will be $500 and a $25 reward will be issued to you by the end of Month 4. Your $25 reward expires ninety (90) days after it is issued, unless you are a Florida resident, in which case it expires one (1) year from the date of issue, so be sure to log into your account and print it out as soon as it becomes available.

From time to time, OfficeMax may also offer its members Bonus Reward opportunities in which members can earn extra rewards (which may vary in amount) for purchasing specified products or completing a required action. To take advantage of the MaxPerks Bonus Rewards special purchase offers, you must have your MaxPerks member ID number at the time of purchase and it must be applied to that purchase. No Bonus Reward adjustments will be made after purchase.

### Qualifying Purchase

Qualifying purchases are any products or services in our stores, catalogs or web site except for computers. OfficeMax gift cards, sales tax, purchases with a Retail Connect card, purchases made prior to the date of enrollment, and purchases made with your MaxPerks rewards. You will start earning credit for purchases with your MaxPerks member ID number the day you sign up.

### How To Obtain and Use Rewards

You can easily keep track of your account balance and any rewards you have earned by logging in to your MaxPerks account online at www.officemax.com/maxperks. OfficeMax will send you electronic statements via email at the end of each month, so that you can see the total amount of qualified purchases that you have made. The e-statement will be sent by the end of the following month. You may opt-out of receiving this notification by logging in to your account and updating your communication preferences. Once you have reached the $500 minimum, you can log into your account and print a $25 reward card. Your reward card will be available to you the month after you have reached the $500 minimum. For example, if you reach the $500

**BRANDI CHANNON'S EXHIBIT**

**96**

1:13-CR-966-JCH-KK   2255 MOTION

minimum on March 11, your $25 reward card will be available by the end of April. You may use your reward card at any OfficeMax retail location, online at www.officemax.com, or by phone at 1-877-OFFICEMAX. You may use up to three (3) reward cards from the same MaxPerks account in a single transaction. Reward cards are not redeemable for OfficeMax brand gift cards and are not redeemable for cash unless otherwise required by law. No amount of your reward card may be applied as payment to any credit account.

**Expiration of Balances and Rewards**

You earn credit during each calendar year, from January 1 through December 31. If you do not reach the minimum $500 spending requirement by December 31, your account balance will be reset to $0 on January 1 of the following year. Accounts with a balance of over $500 are eligible for a $25 reward card for each $500 spent by the end of each month. Remaining account balances less than $500 after issuance of a reward card during the year will also reset to $0 at the end of the year. For new customers who sign up for the program after October 1 of any given year, for your first year of participation only, your balance will not be reset to $0 on December 31; the balance will be carried over to the next calendar year.

**The $25 reward card expires ninety (90) days after it is issued.** The expiration date will appear on the front of the card and in your online account. If you are a resident of Florida, your reward card will expire one (1) year from the date it is issued.

**Lost, Stolen or Damaged Reward Cards**

To report a lost, stolen, or damaged reward card, or for balance information, call 1-866-MAXPERKS (1-866-629-7375). OfficeMax will not replace the value on a lost or damaged reward card, or on a reward card used without your permission or that has expired.

**MaxPerks Recycling Program**

In-Store Ink and Toner Recycling Program (Low volume recycler):

MaxPerks members may bring in up to 10 visibly undamaged HP, Dell, or Lexmark ink/toner cartridges per week (Sun. thru Sat.) to an OfficeMax retail store and earn a $3 reward per qualified cartridge. There is a $30 maximum reward per week per member. All recycling rewards will be calculated monthly and available to you through your MaxPerks account by the end of the next month. Customers can sign up for MaxPerks at time of recycling drop off to participate. Recycling rewards will come in the form of a reward card and will be issued to members electronically along with any other rewards they may have earned that month. Recycling rewards can be used online, in-store or over the phone. While there is no limit to the number or brand of ink/toner cartridges you may recycle, you will only receive credit for the qualifying cartridges identified above, and in the limits identified above.

Bulk Mail-In Ink and Toner Recycling Program (High volume recyclers):

For customers, teachers, schools, fundraisers and businesses who are high volume recyclers, we offer the Bulk Mail-In Recycling program. Members can go to the MaxPerks website at www.officemax.com/maxperks, log into your account and order collection materials. Members will earn $1 in rewards for every qualified item submitted up to $300 per month in the form of a reward card. Qualified items are visibly undamaged HP, Dell, or Lexmark ink/toner cartridges, and undamaged cell phones, MP3 players, and PDAs. Rewards will be issued to customers electronically monthly through your MaxPerks account along with any other rewards you may have earned that month. Simply go to our website, www.officemax.com/maxperks, and follow the simple steps to get started. Order the free collection materials from the website and use them to start collecting all qualifying ink and toner cartridges, cell phones, MP3 players and PDAs. Customers may mail in ink and toner cartridges of various brands to recycle, but will only receive credit for visibly undamaged HP, Dell, and Lexmark brands and quantities noted above. The Bulk Mail-In Recycling Program is not available in Alaska, Hawaii, Puerto Rico or the Virgin Islands.

MaxPerks Recycling Programs are not open to customers that broker or re-sell ink and/or toner cartridges and any rewards earned through those activities may be forfeited and the MaxPerks account closed.

**Modifications and Termination of MaxPerks**

OfficeMax reserves the right to modify any of these Terms and Conditions including the qualified purchases, the amount of the rewards, and any of the options available to you on your MaxPerks account at any time, with or without notice, even though these changes may affect your ability to accrue or use rewards. Your continued participation in MaxPerks constitutes your acceptance of any changes to these Terms and Conditions. You are responsible for remaining knowledgeable as to any changes that OfficeMax may make to these Terms and Conditions. The most current version of these Terms and Conditions will be available at www.officemax.com/maxperks and will supersede all previous versions of these Terms and Conditions.

OfficeMax reserves the right to terminate MaxPerks at any time, for any reason, with or without notice, even though termination may affect your ability to accrue or use your rewards.

**General Terms and Conditions**

OfficeMax reserves the right to close your MaxPerks account if you engage in any fraudulent activity or use MaxPerks in a manner inconsistent with these Terms and Conditions or any federal, state or local, laws, statutes or ordinances. Discontinued membership may result in the loss of all accumulated rewards including but not limited to rewards earned from Bonus Reward offers and rewards from the ink and toner recycling programs. In the event that OfficeMax should discontinue a membership, any ink or toner cartridge submitted but not rewarded will not be returned nor will the monetary value of those cartridges be refunded. In addition to discontinued membership, OfficeMax shall have the right to take appropriate administrative and/or legal action, including criminal prosecution, as it deems necessary in its sole discretion, and you will not be permitted to participate in the MaxPerks program in the future.

Rewards are not your property and may be revoked by OfficeMax at any time as set forth herein. Rewards may not be sold, transferred or assigned, and are not transferable upon death, as part of a domestic relations matter or otherwise by operation of law.

OfficeMax is not responsible for any incorrect or inaccurate information supplied by you while participating in MaxPerks.

All questions or disputes regarding eligibility for MaxPerks, earning or redemption of rewards, or your compliance with these Terms and Conditions will be resolved by OfficeMax in its sole discretion.

All issues and questions concerning the construction, validity, interpretation and enforceability of the Terms and Conditions, or your rights and obligations shall be governed by, and construed in accordance with, the laws of the State of Illinois, without giving effect to any choice of law or conflict of law rules.

These Terms and Conditions constitute the entire agreement between OfficeMax and you. They supersede all prior or other arrangements, understandings, negotiations and discussions, whether oral or written. No waiver of any of the provisions of these Terms and Conditions shall be deemed or shall constitute a waiver of any other provisions hereof, nor shall waiver constitute a continuing waiver unless otherwise expressly provided.

If any provision of these Terms and Conditions is found to be invalid or unenforceable by a court of competent

jurisdiction  such provision shall be severed from the remainder of these Terms and Conditions, which will otherwise remain in full force and effect.

This reward card is issued by OfficeMax North America, Inc.

**Limitations of Liability**

OfficeMax and its partners, affiliates, subsidiaries, parent corporations and their respective agents and agencies ( Releasees ) are not responsible for incorrect or inaccurate transcription of information, for problems related to any of the equipment or programming associated with MaxPerks, for any human error, for any interruption, deletion, omission, defect, or line failure of any telephone network or electronic transmission, for problems relating to computer equipment, software, inability to access the rules or online service, or for any other technical or non-technical error or malfunction. In the event of a printing error or problem with any items purchased with rewards, Releasees shall not have any liability. UNDER NO CIRCUMSTANCES, INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE, SHALL ANY OF THE RELEASEES BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING FROM MAXPERKS OR MERCHANDISE PURCHASED WITH MAXPERKS REWARDS, EVEN IF ANY OR ALL OF THE FOREGOING OR ANY OF THEIR AUTHORIZED REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IF OFFICEMAX IMPROPERLY DENIES YOU ANY REWARDS, LIABILITY WILL BE LIMITED TO THE EQUIVALENT AMOUNT OF REWARDS OR $100, WHICHEVER IS LESS. BY PARTICIPATING IN MAXPERKS, YOU ARE WAIVING ANY AND ALL RIGHTS TO BRING ANY CLAIM OR ACTION RELATED TO SUCH MATTERS IN ANY FORUM BEYOND NINETY (90) DAYS AFTER THE FIRST OCCURRENCE OF THE KIND OF ACT, EVENT, CONDITION OR OMISSION UPON WHICH THE CLAIM OR ACTION IS BASED. You agree to rely solely on the manufacturer's warranties, if any, for any products purchased with MaxPerks rewards.

Back to top

## MaxPerks Rewards for Teachers Terms and Conditions

**Overview**

MaxPerks Rewards for Teachers ("MaxPerks") is an OfficeMax© customer reward program for teachers, which gives you $10 in rewards to spend at OfficeMax for every $75 in qualified purchases that you make during the year, up to a maximum reward of $100 per year. Additionally, from time to time, OfficeMax may offer MaxPerks Bonus Rewards for purchases of specified products. You will also receive exclusive savings offers through the mail and email. If you do not want the exclusive savings offers, just log into your account and change your profile or call 1-866-MAXPERKS.

**How To Enroll**

To open a new MaxPerks Rewards for Teachers account, you can fill out an application at any OfficeMax location, online at www.officemax.com/maxperks, or by phone at 1-866-MAXPERKS. You will be given a MaxPerks member ID after you complete the enrollment process. If you enroll in an OfficeMax store, you will be given a membership kit that contains your MaxPerks member ID at the time of enrollment. If you enroll online or by phone, we will mail a MaxPerks membership ID to you. You may begin using your MaxPerks membership immediately for all qualifying purchases, including MaxPerks Bonus Rewards. Only one MaxPerks account and member ID per person is permitted at any given time. After you enroll, you will need to go to www.officemax.com/maxperks to set up your user name and password so that you can view your balance and keep track of your rewards.

**Eligibility**

The MaxPerks Rewards for Teachers Program is open to teachers who are legal residents of the 50 United States (and D.C., Puerto Rico, and the Virgin Islands), age eighteen (18) years and older, and who have internet access to manage their MaxPerks account. By enrolling in MaxPerks, you agree to jurisdiction in Cook County, Illinois. Jurisdiction means that if you sue OfficeMax for a violation of your rights under this program, you will have to bring the suit in Cook County, Illinois. MaxPerks is void where prohibited by law.

**How To Earn Rewards**

If you are shopping in a retail store, you must present your MaxPerks member ID card at checkout. If you do not have your MaxPerks member ID card with you, a store associate can look up your member ID number at the time of purchase. If you are shopping online, by phone or by fax, you must provide your MaxPerks member ID number at checkout. If you do not know your MaxPerks member ID number at the time of purchase, you can later earn credit for your purchase towards an award by logging into your MaxPerks account and entering the information from your purchase receipt. You can also call customer service at 1-866-MAXPERKS to assist you with obtaining credit for your purchase towards an award by providing the customer representative with the information from your receipt. For MaxPerks Bonus Rewards offers, such offers are only available at the time of purchase with your member ID number. You will receive credit towards a reward for every qualified purchase that you make; however, each qualified purchase will initially be reflected in your account as "pending" until it clears a 7 day processing period. Once cleared, the transaction will be eligible toward reward issuance. If a purchased item is returned, the amount of the return will be deducted from the account balance even after moved from pending status.

If you have not reached the $75 minimum in any calendar quarter, your qualified purchase balance will be carried over quarter to quarter until you reach the $75 minimum, or January 1 of the following year, whichever comes first. For example, if you spend $50 in Quarter 1, $0 in Quarter 2, and $30 in Quarter 3, your total account balance at the end of Quarter 3 will be $80 and your $10 reward will be issued to you by the end of October. Your $5 balance will be carried over into Quarter 4. If you then spend $70 in Quarter 4, your account balance at the end of Quarter 4 will be $75 and your $10 reward will be issued to you by the end of January of the following year. However, if you spend $10 in Quarter 1, $5 in Quarter 2, $30 in Quarter 3, and $20 in Quarter 4, your total account balance will reset to $0 on January 1. Your $10 reward expires ninety (90) days after it is issued, unless you are a Florida resident, in which case it expires one(1) year from the date of issue, so be sure to log into your account and print it out as soon as it becomes available.

From time to time, OfficeMax may also offer MaxPerks Bonus Rewards permitting you to earn extra rewards (which may vary in amount) for purchasing specified products or completing a required action. To take advantage of the MaxPerks Bonus Rewards special purchase offers, you must have your MaxPerks member ID number at the time of purchase and it must be applied to that purchase. No Bonus Reward adjustments will be made after purchase.

**Qualifying Purchases**

Qualifying purchases are any products or services in our stores, catalogs or web site except for computers, OfficeMax gift cards, sales tax, purchases with a Retail Connect card, purchases made prior to the date of enrollment, and purchases made with your MaxPerks rewards. You will start earning credit for purchases with your MaxPerks member ID number the day you sign up

**How To Obtain and Use Rewards**

You can easily keep track of your account balance and any rewards you have earned by logging into your MaxPerks account online at www.officemax.com/maxperks. OfficeMax will send you quarterly electronic statements via email by the end of the month following the quarter end so that you can see the total amount of qualified purchases that you have made. You may opt out of receiving this notification by logging into your account and updating your communication preferences. Once you reach the $75 minimum, OfficeMax will begin processing your reward card and it will be electronically issued to you by the end of the month following the end of the quarter when you reached the $75 minimum. For example, if you reach the $75 minimum on January 13, your $10 reward card will be available no later than April 30. Simply log into your account and print your $10 reward card. Use your reward card at any OfficeMax retail location, online at www.officemax.com, or by phone at 1-877-OFFICEMAX. You may use up to three (3) reward cards from the same MaxPerks account in a single transaction. Your reward card is not redeemable for OfficeMax brand gift cards, and is not redeemable for cash unless otherwise required by law. No amount of your reward card may be applied as payment to any credit account.

**Expiration of Balances and Rewards**

You earn credit during each calendar year, from January 1 through December 31. If you do not reach the $75 minimum by December 31, your account balance will be reset to $0 on January 1 of the following year. Accounts with a balance of over $75 are eligible for a $10 reward card for each $75 spent by the end of each quarter. Remaining account balances less than $75 after issuance of a reward card during the year will also reset to $0 at the end of the year. If you are a new member and signed up for the program after October 1 of any given year, for your first year of participation only, your balance will not be reset but will be carried over to the next calendar year.

**The $10 reward card expires ninety (90) days after it is issued.** If you are a resident of Florida, your reward card will expire one (1) year from the date it is issued. The expiration date will appear on the front of the card and in your online account

**Lost, Stolen or Damaged Reward Cards**

To report a lost, stolen, or damaged reward card, or for balance information, call 1-866-MAXPERKS (1-866-629-7375). OfficeMax will not replace the value on a lost or damaged reward card, or on a reward card used without your permission or that has expired.

**MaxPerks Recycling Program**

In-Store Ink and Toner Recycling Program (Low volume recycler):

As a member of MaxPerks Rewards for Teachers, simply bring in visibly undamaged HP, Dell, or Lexmark ink/toner cartridges to an OfficeMax retail store and earn a $3 reward per qualified cartridge, with a maximum reward of $30 per week (or 10 cartridges) (Sun. thru Sat.). Recycling program rewards are calculated quarterly and are issued in the form of a reward card that will be issued to you electronically through your MaxPerks account, by the end of the month following the quarter end, along with any other rewards you may have earned that quarter. You can use your recycling rewards online, in-store or over the phone. While there is no limit to the number or brand of ink/toner cartridges you may recycle, you will only receive rewards for the qualifying cartridges identified above, and in the limits identified above. Teachers who are not MaxPerks members can sign up for MaxPerks at time of recycling drop off to participate. Customers can always bring as many ink/toner cartridges of various brands to recycle, but will only receive credit for visibly undamaged HP, Dell, and Lexmark brands and quantities noted above.

Bulk Mail-In Ink and Toner Recycling Program (High volume recyclers):

As a member of MaxPerks Rewards for Teachers, if you and/or your school are high volume recyclers, you are eligible for OfficeMax's Bulk Mail-In Recycling Program. Simply go to the MaxPerks website at www.officemax.com/maxperks, log into your account, and follow the simple steps to get started. Order the free collection materials and use them to start sending in visibly undamaged HP, Dell, or Lexmark ink/toner cartridges, and undamaged cell phones, MP3 players, and PDAs, and earn a $1 reward per qualified item, with a maximum reward of $300 per month (or 300 items). All prepaid collection mailing materials are shipped to the Teachers free of charge. Recycling program rewards are calculated quarterly and come in the form of a reward card that will be issued to you electronically through your MaxPerks account, by the end of the month following the quarter end, along with any other rewards you may have earned that quarter. You can use your recycling rewards online, in-store or over the phone. While there is no limit to the number or brand of items described above that you may recycle, you will only receive rewards for the qualifying items identified above, and in the limits identified above. The Bulk Mail-In Recycling Program is not available in Alaska, Hawaii, Puerto Rico or the Virgin Islands.

MaxPerks Recycling Programs are not open to customers that broker or re-sell ink and/or toner cartridges, and any rewards earned through those activities may be forfeited and the MaxPerks account closed.

**Modifications and Termination of MaxPerks**

OfficeMax reserves the right to modify any of these Terms and Conditions including the qualified purchases, the amount of the rewards, and any of the options available to you on your MaxPerks account, at any time, with or without notice, even though these changes may affect your ability to accrue or use rewards. Your continued participation in MaxPerks constitutes your acceptance of any changes to these Terms and Conditions. You are responsible for remaining knowledgeable as to any changes that OfficeMax may make to these Terms and Conditions. The most current version of these Terms and Conditions will be available at www.officemax.com/maxperks and will supersede all previous versions of these Terms and Conditions.

OfficeMax reserves the right to terminate MaxPerks at any time, for any reason, with or without notice, even though termination may affect your ability to accrue or use your rewards.

**General Terms and Conditions**

OfficeMax reserves the right to close your MaxPerks account if you engage in any fraudulent activity or use MaxPerks in a manner inconsistent with these Terms and Conditions or any federal, state or local, laws, statutes or ordinances. Discontinued membership may result in the loss of all accumulated rewards including but not limited to rewards earned from Bonus Rewards and rewards from the ink and toner recycling programs. In the event that OfficeMax should discontinue a membership, any ink or toner cartridge submitted but not rewarded will not be returned nor will the monetary value of those cartridges be refunded. In addition to discontinued membership, OfficeMax shall have the right to take appropriate administrative and/or legal action, including criminal prosecution, as it deems necessary in its sole discretion, and you will not be permitted to participate in the MaxPerks program in the future.

Rewards are not your property and may be revoked by OfficeMax at any time as set forth herein. Rewards may not be sold, transferred or assigned, and are not transferable upon death, as part of a domestic relations matter or otherwise by operation of law.

OfficeMax is not responsible for any incorrect or inaccurate information supplied by you while participating in MaxPerks

All questions or disputes regarding eligibility for MaxPerks, earning or redemption of rewards, or your compliance with these Terms and Conditions will be resolved by OfficeMax in its sole discretion

All issues and questions concerning the construction, validity, interpretation and enforceability of the Terms and Conditions, or your rights and obligations shall be governed by, and construed in accordance with, the laws of the State of Illinois, without giving effect to any choice of law or conflict of law rules.

These Terms and Conditions constitute the entire agreement between you and OfficeMax. They supersede all prior or other arrangements, understandings, negotiations and discussions, whether oral or written. No waiver of any of the provisions of these Terms and Conditions shall be deemed or shall constitute a waiver of any other provisions hereof, nor shall waiver constitute a continuing waiver unless otherwise expressly provided.

If any provision of these Terms and Conditions is found to be invalid or unenforceable by a court of competent jurisdiction, such provision will be severed from the remainder of these Terms and Conditions, which will otherwise remain in full force and effect.

This reward card is issued by OfficeMax North America, Inc.

**Limitations of Liability**

OfficeMax and its partners, affiliates, subsidiaries, parent corporations and their respective agents and agencies ("Releasees") are not responsible for incorrect or inaccurate transcription of information, for problems related to any of the equipment or programming associated with MaxPerks, for any human error, for any interruption, deletion, omission, defect, or line failure of any telephone network or electronic transmission, for problems relating to computer equipment, software, inability to access the rules or online service, or for any other technical or non-technical error or malfunction. In the event of a printing error or problem with any items purchased with rewards, Releasees shall not have any liability. UNDER NO CIRCUMSTANCES, INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE, SHALL ANY OF THE RELEASEES BE LIABLE FOR ANY DIRECT, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING FROM MAXPERKS OR MERCHANDISE PURCHASED WITH MAXPERKS REWARDS, EVEN IF ANY OR ALL OF THE FOREGOING OR ANY OF THEIR AUTHORIZED REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IF OFFICEMAX IMPROPERLY DENIES YOU ANY REWARDS, LIABILITY WILL BE LIMITED TO THE EQUIVALENT AMOUNT OF REWARDS OR $100, WHICHEVER IS LESS. BY PARTICIPATING IN MAXPERKS, YOU ARE WAIVING ANY AND ALL RIGHTS TO BRING ANY CLAIM OR ACTION RELATED TO SUCH MATTERS IN ANY FORUM BEYOND NINETY (90) DAYS AFTER THE FIRST OCCURRENCE OF THE KIND OF ACT, EVENT, CONDITION OR OMISSION UPON WHICH THE CLAIM OR ACTION IS BASED. You agree to rely solely on the manufacturer's warranties, if any, for any products purchased with MaxPerks rewards.

Back to top

Page 1634

1          She admitted to creating a hundred,

2    possibly a thousand accounts.

3          Now we know there's more accounts than that

4    at issue, but that doesn't mean that her only

5    creating some of the accounts makes her -- because

6    she's less -- somehow less culpable than Mr. Channon,

7    that she's not involved in the conspiracy.

8          She knew the average cost for ink

9    recycling.  Remember she told Agent Boady that she

10   also would purchase ink from a gentleman in Arizona

11   for resale?

12         She admitted to doing online adjustments.

13   Remember that?

14         And she told the agent that what she would

15   have to do is like hang out in parking lots and find

16   receipts so she could get the information off the

17   receipts.

18         You know why that is, right?  Because in

19   September of 2010 OfficeMax changed their online

20   program and no longer could you just sign up and

21   using a register number, date, and store number, you

22   had to add the amount, and so that's why she was in

23   the parking lot picking up receipts.

24         Remember what else she told you -- told

25   Agent Boady?  She told Agent Boady that she had --

PAUL BACA, OFFICIAL COURT REPORTER

**BRANDI CHANNON'S EXHIBIT**

**97**

1:13-CR-966-JCH-KK   2255 MOTION

Page 1635

1    sometimes she would go in and make a purchase and she

2    would then get the transaction information by the

3    person -- from the person in front of her so she

4    could do an online adjustment.

5              And remember she also told Agent Boady that

6    that would make her nervous, waiting around.

7              It made her nervous because she knew what

8    she was doing was wrong.

9              She also -- you also have information that

10   in addition to the evidence we saw in her video, as

11   well as her admission to Agent Boady, that she

12   traveled with Mr. Channon on the Texas trip.  She

13   traveled with him on the East Coast trip, and she

14   traveled with him when he went to California.

15             And all of those trips were -- were trips

16   that were designed to defraud OfficeMax by using

17   those Group 1 and Group 2 accounts to recycle ink and

18   to spend rewards that had been purchased.

19             And the evidence in this case actually

20   confirms exactly what Ms. Channon told Agent Boady

21   was, in fact, true.

22             Now just a minor point, I would say.  There

23   is evidence, of course, that the -- that Ms. Channon

24   did actually create a specific account, and that's

25   the smoked B account, in addition to her statement

Page 1636

1    that she created a hundred, at least a thousand.

2              There's also the evidence of the smoked B

3    gmail.  Do you remember that?

4              It's a Group 1 account.  It's in Row 4 of

5    Exhibit 19.

6              We saw the Google subscriber information

7    for that, as well as Exhibit 139A and B.

8              And so she did say, in fact, that was her

9    e-mail address, so that's another account that we

10   know that she used.

11             And she clearly knows that she can't have

12   more than one account because that's what she told

13   Agent Boady.

14             Now, I would like to talk about the

15   defendant's claim -- Mr. Hotchkiss' claim about

16   Ms. Channon's statement somehow not being voluntary.

17             The judge has instructed you on the law in

18   that regard, and if I could have --

19             Agent Moon, could you please hit the next

20   page, please?

21             Now, I'm going to call this the beloved cat

22   argument here.  So I'm a little unclear what the cat

23   has to do with anything.

24             We have a woman here who is -- who has been

25   told she's free to leave, she's in her early 30s.

Page 1637

1            She has a criminal justice background.  You

2    recall that she worked for the bailiffs and the DA's

3    office, and she's told she's free to leave.

4            The judge has given you the instruction on

5    voluntariness and the factors you should consider,

6    and I would suggest to you that all of the statements

7    made by Ms. Channon were, in fact, voluntary under

8    those standards.

9            Defense counsel seems to argue that somehow

10   she was, I don't know, distracted because her cat had

11   got away.  It really doesn't make a lot of sense to

12   me.

13           But I want to show you this photograph,

14   which is from Government's Exhibit 149.  And recall

15   the testimony of Diana Parker?

16           They would clear -- they would pull

17   everybody out of the house first, and then they would

18   take photographs, and then they would do their

19   search.  And so this photograph is while they're

20   clearing the house.

21           And you see Ms. Channon on the far right.

22   And what --

23           Go ahead and hit the next one.

24           And so this is after she's been told she's

25   free to leave and that she wanted to stay because of

Page 1638

1    her cat.  But it's also before the interview by

2    Mr. Boady.

3           Does she look remotely distraught?

4           And although Agent Boady, you know,

5    couldn't recall the color of the robe she was

6    wearing -- I mean we see it right there.  It's

7    purple.

8           I'm not sure what the relevance of that is

9    to voluntariness, but she seems like she's sort of

10   hamming it up with the agents, which suggests to you,

11   as well, that the statement was voluntary, that her

12   will was not overborne, and that she answered the

13   questions that were asked by Agent Boady because she

14   chose to.

15          Now, defendant counsel --

16          If you could go to the next page, please.

17          Mr. Hotchkiss suggested to you that

18   Mrs. Channon didn't know that there was no proof that

19   she knew that interstate wires were being used.

20          I just wanted to draw you to the Court's

21   instruction which has been read to you and will be

22   provided to you back in deliberations.

23          But here's the definition of what that

24   means.

25          "To cause interstate wire communications

1

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF NEW MEXICO

3    UNITED STATES OF AMERICA,

4             Plaintiff,

5       vs.          NO:  13-cv-966

6    MATTHEW CHANNON and BRANDI CHANNON,

7             Defendants.

8

9             TRANSCRIPT OF PROCEEDINGS
                    MATTER 20
10               March 26, 2013
            TESTIMONY OF MICHAEL BOADY

11

12
     BEFORE:
13            Albuquerque, New Mexico

14              A P P E A R A N C E S

15   For the Government:

16       MS. PAIGE MESSEC
         Assistant United States Attorney
17       Post Office Box 607
         Albuquerque, New Mexico 87103

18

19
     REPORTED BY: Mary Abernathy Seal, RDR, CRR, NM CCR 69
20               Bean & Associates, Inc.
                 Professional Court Reporting Service
21               201 Third Street, Northwest, Suite 1630
                 Albuquerque, New Mexico 87102

22

23   (9756K) MAS

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 T
Alb

e-mail





BRANDI CHANNON'S
EXHIBIT
98
1:13-CR-966-JCH-KK  2255 MOTION

2

<table>
<tr><td>9</td><td>EXAMINATION</td></tr>
<tr><td>10</td><td>BY MS. MESSEC:</td></tr>
<tr><td>11</td><td>A.    Hi, everyone.</td></tr>
<tr><td>12</td><td>Q.    Please state your name for the record.</td></tr>
<tr><td>13</td><td>A.    Michael Boady.</td></tr>
<tr><td>14</td><td>Q.    And Mr. Boady, where are you employed?</td></tr>
<tr><td>15</td><td>A.    I work for the FBI.</td></tr>
<tr><td>16</td><td>Q.    And how are you employed at the FBI?</td></tr>
<tr><td>17</td><td>A.    I'm a cyber agent.</td></tr>
<tr><td>18</td><td>Q.    Is that a type of special agent?</td></tr>
<tr><td>19</td><td>A.    Yes.</td></tr>
<tr><td>20</td><td>Q.    And what are your general duties as a</td></tr>
<tr><td>21</td><td>cyber agent?</td></tr>
<tr><td>22</td><td>A.    I generally work computer crimes, most of</td></tr>
<tr><td>23</td><td>the, like, violations of the law that fall under</td></tr>
<tr><td>24</td><td>like a criminal nexus with cyber and computers.  I</td></tr>
<tr><td>25</td><td>generally work with those types of cases.</td></tr>
</table>

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3863

3

1      Q.   Are you the case agent assigned to this

2  matter involving Matthew and Brandi Channon?

3      A.   I am.

4      Q.   Then let's get started with the case.

5  This case involves OfficeMax.  Can you just tell me

6  briefly who OfficeMax is?

7      A.   OfficeMax is like a national retailer that

8  sells a lot of like computer and printer-related

9  stuff.  They're kind of like a computer store, but

10 they also specialize in selling a lot of accessories

11 for computers and printers and, you know, things

12 like that.

13     Q.   Are they a nationwide retailer?

14     A.   Yes.

15     Q.   Do they have local retail stores in the

16 Albuquerque area?

17     A.   Yes.

18     Q.   Tell me about the MaxPerks Loyalty

19 Program.

20     A.   So OfficeMax has a loyalty program for any

21 of their customers that kind of shop there

22 frequently, basically.  They have two different

23 kinds of tracks.  One is for teachers and one is for

24 businesses.  The teacher one is specifically for

25 people who are teachers and some -- you know, under

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

Channon_3864

4

1   some parameters based on their terms and conditions.

2          And then the other one is just like the

3   general everybody-else businesses.  And the one for

4   teachers is a little bit more lucrative, basically.

5   They just kind of wanted to do a favor for teachers,

6   you know, being they don't generally make as much

7   money and stuff like that.  So the benefits are

8   better if you're a teacher than if you're just the

9   general public or someone like myself.

10      Q.   And does it work with a customer earning

11  credits for qualifying purchases?

12      A.   Yes.  So let's say you're a teacher and

13  you have an OfficeMax account.  Every $75 that you

14  spend, you get a $10 gift card to spend at OfficeMax

15  for your MaxPerks account.  If you're a business or

16  just the general public, like every $500 you spend,

17  you get a $25 gift card.  For the teacher one, it

18  maxes out at $100 a year.  So basically every $750

19  you spend, you get $100 worth of gift cards at

20  OfficeMax to spend within their store.

21      Q.   And are those credits to spend within the

22  store called MaxPerks Rewards?

23      A.   Yes.

24      Q.   Now, how does a person sign up for a

25  MaxPerks Rewards account?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3865

5

1  A. Most people sign up in the store, but you

2 can also sign up over the phone or actually in the

3 store itself or online to request a MaxPerks

4 account.

5  Q. When you're signing up in any of these

6 locations, does the customer need to provide their

7 name, mailing address, phone number, and e-mail?

8  A. Yes.

9  Q. Does OfficeMax limit the number of

10 accounts that a person can have?

11  A. Yes, I believe their terms and conditions

12 say it's one account per person, and it might even

13 say per household or something like that.

14  Q. Does a customer have to agree to the terms

15 and conditions when signing up for a MaxPerks

16 account?

17  A. Yes.  In order to receive the benefits of

18 it, you agree to the terms.

19  Q. Once you have a MaxPerks Rewards account,

20 how do you use that account to claim purchases?

21  A. Typically it's like when you go to a

22 grocery store or something and you want to use your

23 discount card or whatever, and they scan it.  The

24 same thing at OfficeMax.  When you make a purchase,

25 you show them your little discount card, and they'll

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3866

6

1  scan it in, and then they'll associate your

2  purchases with that same account.  And once you

3  reach that $75 mark, they send you a MaxPerks

4  Rewards account, a gift card for ten bucks.  If you

5  forget to have your little card with you or

6  whatever, you can do it after the fact, as well.

7  You can go back, go online, and say, like, "This is

8  where I went, this is how much I spent, and this is,

9  you know, the account, the MaxPerks account I have,

10  so add this to my ongoing balance."

11      Q.   Would you take a look at Grand Jury

12  Exhibit 1?  What's this exhibit right here?

13      A.   What you're seeing here is an example of

14  one of their store receipts.  And basically in the

15  case like I just described, when you forget to bring

16  your card in or you forget to associate your

17  purchase that you made in the store and you want to

18  do it online, these are the four items that you need

19  to be able to input into the computer in order to

20  associate your MaxPerks account with a purchase that

21  you made.  So the store number, the register number,

22  the receipt number, and the date.  You put those

23  four things in, and then you tell them what your

24  MaxPerks Rewards number is, and then they say,

25  "Okay, that transaction occurred on this date, this

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3867

7

1   is how much you spent," and they add it to your

2   balance.

3       Q.   Okay.  So this is what a person sees when

4   they go online to add their MaxPerks purchases to

5   their account?

6       A.   Yes.  This is actually a copy of their

7   website, I believe, the web page where someone would

8   add a receipt online.  This is exactly what you

9   would see when you go to their website, or at least

10   used to.

11       Q.   Oh, used to?  Has the process changed?

12       A.   Yes.  They changed the process basically

13   because of the case that we're here presenting to

14   you today.  There was a lot of fraud that was

15   happening, and so they had to increase their

16   security protocols to make it a little bit harder

17   for somebody to do, I guess what we're going to

18   describe here in a little bit.

19       Q.   But at the time alleged in the indictment,

20   this is what a person had to fill out; is that

21   right?

22       A.   Yes.

23       Q.   Okay.  Tell me about OfficeMax's ink

24   recycling program.

25       A.   So the same thing.  When you have your

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3868

8

1   account -- and this one, I believe, is across the

2   board for both businesses and teachers -- basically

3   every purchase of -- anytime you want to recycle ink

4   in their store, you can recycle up to 20

5   cartridges -- I believe it's a month -- yes, 20

6   cartridges a month.  And for each cartridge they

7   give you $3.  And it's basically one of their ways

8   that they're trying to be more environmentally

9   friendly and stuff like that.  Basically ink

10   cartridges can be pretty bad for the environment, so

11   they basically will allow someone to recycle them

12   for $3 back which they receive in MaxPerks Rewards

13   to spend at the store, as well.

14       Q.   Does the ink recycling program require

15   something called a qualifying purchase balance?

16       A.   Yes.  So basically, let's say I brought in

17   an ink cartridge and they gave me $3.  If I went

18   into the store and I spent $3, then I get the $3

19   reward.  It's kind of like you have to spend that

20   equal amount to receive that amount in reward.

21       Q.   So once a customer has recycled a certain

22   amount of ink and has a qualifying purchase balance

23   equal to that amount or more, at that point would

24   the rewards be issued?

25       A.   That's right.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3869

9

1    Q.   Okay.   Now, did OfficeMax at some point

2  notice or suspect that fraud was being committed on

3  this program?

4    A.   Yes.   OfficeMax kind of tracks, you know,

5  how much they're giving out in their rewards, you

6  know, just part of their bottom line, I think, and

7  how much their cost base is and stuff.   And all of a

8  sudden they had observed a significant spike in the

9  amount of rewards that they were having to issue for

10  purchases.   I think that's generally just because

11  most people don't have a MaxPerks Rewards account so

12  most people weren't associating every purchase they

13  made, and so it didn't -- it's only some people who

14  are frequent customers, that really use the benefits

15  of it.

16    Q.   Did OfficeMax then conduct an internal

17  investigation?

18    A.   Yes, that's correct.

19    Q.   And in that investigation, did they

20  identify a number of suspicious accounts?

21    A.   Yes.   Basically OfficeMax identified over

22  5,400 accounts that were -- had really major

23  similarities in the e-mail accounts.   Like if your

24  e-mail is, you know, Jane@hotmail.com, they were

25  putting dots in between each -- J dot A dot N dot E,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3870

10

1   and then they were moving the dots to different

2   places and stuff.  And so it was the same e-mail

3   account, but the way OfficeMax received it, it

4   looked like a unique e-mail account.

5       Q.   When you say it's the same e-mail account,

6   first, were all of these suspicious accounts Gmail

7   addresses?

8       A.   Yes, they were.

9       Q.   Does Gmail recognize special characters

10  like a period within an e-mail address?

11      A.   So Gmail -- I don't know all the special

12  characters, but I know specifically like a dot or a

13  period -- like if you put your first name dot last

14  name at Gmail.com, if you forgot to put the dot in

15  there, it would still go to the same account,

16  because the way Gmail recognizes it, they don't see

17  the dot.  There's a couple little -- I know there's

18  some special characters that they do see, but a dot

19  is one that they don't see.

20      Q.   But in OfficeMax' e-mail system, OfficeMax

21  did recognize a dot as creating a different e-mail

22  address; is that correct?

23      A.   That's correct.

24      Q.   Okay.  Now, you mentioned that OfficeMax

25  had identified over 5,400 suspicious accounts and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


**BEAN & ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3871

11

1    that those came from common e-mail chains.  What

2    were the most common four chains?

3        A.   Okay.  So basically they all -- one of

4    them was like teechur, one of them was bargle, once

5    was garble, and one of them was coach, I believe.

6    And then they had the numbers 1 through 8 following,

7    so it was like teechur12345678, coach12345678, and

8    then -- for all four of those strands.  And there

9    were dots just randomly between letters or between

10   numbers, or a little bit of both, or sometimes it

11   would be like, you know, C dot O-A-C-H 123 dot

12   45678, so dots just in different places in each

13   e-mail account.

14       Q.   Were there, as alleged in the indictment,

15   approximately 5,247 total teechur, coach, bargle, or

16   garble e-mail addresses?

17       A.   Yes.  That's correct.

18       Q.   We talked earlier about a customer having

19   to provide additional information other than an

20   e-mail address like their name, phone number,

21   mailing address.  Did these accounts have that

22   information provided?

23       A.   Yes.  So when we did a search warrant on

24   the subject's house, Matthew Channon and Brandi

25   Channon's house, we found on one of their computers

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3872

12

1   that they had had some e-mails and stuff like that
2   related to something called fake name generator, I
3   believe.  And basically it looked like it was a
4   service where you could pay -- you know, "I want
5   10,000 names," or whatever the number was that they
6   purchased, and it would give you a name -- a fake
7   name, a fake address, and so it looks like they just
8   copied and pasted those names and addresses into
9   each account as they create another one.
10      Q.   So it looks like the vast majority, you
11  would say, of these suspicious accounts had fake
12  names and addresses and phone numbers?
13      A.   Yes.  However, there were a couple that
14  were like in our subject's real name, and stuff like
15  that.  But generally the reason for that is
16  OfficeMax would -- you know, they were looking for
17  common names and stuff like that to prevent people
18  from having more than one account.  And so if you
19  had a fake name and all your e-mails were
20  somewhat -- slightly different, it seemed like
21  different accounts.
22      Q.   Were a lot of these suspicious accounts
23  made to appear to be associated with a school of
24  some sort?
25      A.   They used a lot of like elementary school

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com
Channon_3873

13

1    names, like a city, I believe, like Denver

2    Elementary School, or something like that.  I don't

3    think there was a specific elementary school that

4    they used.  They'd use like a state name or a city

5    name, or -- you know, like on Exhibit 2 you have

6    like Houston Academy, but you have like Mountain

7    View Elementary, Washington Elementary, Tifton

8    Elementary, Eagleville, like -- and if you notice,

9    like a lot of times the city where the person lives

10   or the fake name that was provided is the name of

11   the elementary school.  So like if the person was

12   living in Houston, they went to Houston Academy.  Or

13   if they lived in Mountain View, they went to

14   Mountain View Elementary School.

15        Q.    Exhibit 2.  Is that just a selection of

16   the suspicious accounts?

17        A.    Yes.  That's a very small selection of

18   them.

19        Q.    Okay.  And were there also approximately

20   96 other of these elementary type accounts that

21   weren't teechur, coach, bargle or garble e-mail

22   addresses?

23        A.    Yes.  There were some other e-mail

24   addresses that appeared that the same people were

25   using, too, or that had the commonality of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


**DEAN & ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3874

14

1  elementary thing, but they used a different e-mail

2  address.  I don't know why.

3      Q.   And were there also some accounts

4  identified by OfficeMax as suspicious that were

5  linked in some way to these accounts we've talked

6  about but that did not follow the elementary or the

7  teechur/coach/garble?

8      A.   Yes.

9      Q.   Okay.  And do you have a theory as to how

10  someone could set up this many fake accounts?

11     A.   Yes.  Basically, we are looking at the

12  numbers.  I mean, in one day I think they created

13  over 1,100 accounts, for instance, in a one-day

14  period, which to input a name, an address, an e-mail

15  address, and constantly move the dot and all that

16  stuff, in my experience, it typically signifies that

17  there was some kind of computer script that was used

18  that was doing all the legwork for them.  I think we

19  looked at -- I mean, it would take over nine hours

20  of continuous typing, getting one account every like

21  30 seconds or something like that, to do it by hand.

22          However, we didn't find the script.  It's

23  kind of like finding a needle in a haystack, really,

24  when you're looking at a bunch of computers that one

25  person has.  But it just makes sense that it's

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3875

15

1  probably a script unless they really spent the time

2  typing it in one by one, and that would be a lot of

3  time.  That's just one day, for instance.

4      Q.   So let's talk about how this scheme made

5  money.  You had described before how a person could

6  claim a purchase that had been made at a store by

7  going on to do an online adjustment.  Can you

8  explain how online adjustments were central to the

9  scheme here?

10     A.   Yes.  So basically, let's say you have all

11 these accounts.  Now you want to get money from

12 them, right?  Well, the way to do that is, you claim

13 other people's purchases.  So if you went to

14 OfficeMax, and you went to OfficeMax, and you each

15 got your own receipt, if you'll notice on that

16 Exhibit 1, the things that they ask for was a store

17 number, a register number, a receipt number, and a

18 date.

19          So if you went to an OfficeMax one day and

20 you got a receipt, you know the store number, you

21 know how many registers they have -- I mean, you

22 know register number 1, 2, 3, maybe 4, you know.

23 You know what receipt number you have, and you know

24 what date it was that you made a purchase.

25          If you wrote a script that incremented the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3876

16

1  date or the time -- like you just constantly say, "I

2  think it's the same store, same register, one

3  receipt number higher, or one receipt number lower

4  on the same date," you can write a script that all

5  of a sudden just blasts to OfficeMax' website and

6  says, "Claim every purchase made that day on that

7  register."

8         And then you change the register number

9  and you do the same thing again.  And so in a short

10 amount of time, this person claimed $180,000 worth

11 of rewards, which means, you know, it's really $75

12 spent every time and they get $10 back, so you

13 multiply $180,000 times $75.  It's a lot of money,

14 of purchases, that they claimed.

15      Q.   And did OfficeMax note between March and

16 September of 2010 approximately 47,688 purchases

17 being claimed through online adjustments by these

18 accounts?

19      A.   Yeah.   In that period of time there was

20 almost 48,000 purchases that other people had made

21 that they claimed.

22      Q.   And were there also thousands of attempts

23 to claim a transaction as an online purchase that

24 actually wasn't -- or as an instore purchase that

25 actually wasn't a purchase?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3877

17

1    A.    Yes.

2    Q.    Does that make sense?

3    A.    Yes.  So I mean, when you have a script

4  that's running every possible number, there's a

5  bunch of instances where someone would get a receipt

6  where they're not actually making a purchase, or if

7  like you had already claimed the purchase with your

8  MaxPerks account, they tried to claim it, and

9  OfficeMax would get a, like, "Hey, this person is

10  trying to claim the same purchase."

11        So you know, I'm sure there's other

12  scenarios where that would fall through, as well.

13  But those are some of the possibilities.  Or a

14  return or something like that, where it's not a

15  purchase, you know, but you get a receipt number

16  anyway.

17    Q.    Was OfficeMax able to block the issuance

18  of a lot of these rewards once the scheme was

19  discovered?

20    A.    Yes.  I believe there was about -- a

21  little over $34,000 that they had already given to

22  the subject before they realized what was going on.

23  And so they, you know, shut off the accounts as soon

24  as they realized what was going on.  So a lot of

25  those were rewards that the subject had already, you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3878

18

1   know, been like granted, but they were able to

2   basically put the value to the gift cards at zero,

3   essentially, the MaxPerks Rewards were.  So if you

4   went in there to spend them, they would just say,

5   "There's no money on this left."  So...

6        Q.   Again, is it your theory that a person

7   would probably have to use a computer script in

8   order to claim this many transactions?

9        A.   Yeah.  It would be pretty difficult to

10  input them as quickly as they did in as short an

11  amount of time.  I mean, it would be easier to write

12  a script.  Makes sense.

13       Q.   In the course of the investigation, did

14  you issue subpoenas to Google or Gmail for account

15  info on these four most common e-mail address

16  chains?

17       A.   Yes.

18       Q.   And let's turn to some of the counts of

19  the indictment.  First, let's see, counts 1, 3, and

20  5.  Count 1 was the teechur12345678@gmail.com,

21  opened by an online request to Google under the name

22  of Tee Chur --

23       A.   Yes.

24       Q.   -- on March 9, 2010?

25       A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3879

19

1    Q.   And was a coach account opened by an

2  online request at Google under the name of Coach

3  Alphabet on May 5, 2010?

4    A.   Yeah.

5    Q.   And was the bargle account opened by an

6  online request to Google under the name of Bargle

7  Bargleton on June 4, 2010?

8    A.   Yes.

9    Q.   And when a user sends a request to Gmail

10  to open an account, does that request travel by

11  interstate wire?

12    A.   Yes.

13    Q.   Okay.  Did this scheme start -- or did the

14  online adjustment start in large quantity on around

15  March 10 of 2010?

16    A.   I believe so.

17    Q.   And was basically the end of the large

18  amounts of online adjustment around September 1 of

19  2010?

20    A.   Yes.  I believe that's when OfficeMax made

21  a change to the way that they accepted adjustments

22  online.

23    Q.   So before, you did not have to know the

24  amount spent at a store.

25    A.   That's correct.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3880

20

1    Q.   And then after the change, did you have to

2  know that piece?

3    A.   Yes, so to make it a little bit more

4  difficult to run a script like this, OfficeMax added

5  a couple of elements.  One is, you had to say the

6  amount of money spent, which to write a script

7  claiming the same purchase over and over again,

8  incrementing by a penny, would be -- it would take

9  forever to claim a lot of people's purchases, and so

10  it looks like the subjects stopped claiming other

11  people's purchases when they made that change.  And

12  they made other changes, as well, but that one was

13  probably the biggest one that made it less

14  lucrative.

15    Q.   So we've been talking about the online

16  adjustment portion of this scheme.  We also talked a

17  little bit before about an ink-recycling program

18  that OfficeMax was running.  Did they also note

19  suspicious activity in this ink-recycling program?

20    A.   Yes.  For the ink-recycling program they

21  had noticed that they had recycled about 74 -- a

22  little over $74,000 worth of MaxPerks Rewards that

23  had been given to accounts that they had identified

24  that are associated with our subject, as well.

25    Q.   And did these accounts take the elementary

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3881

21

1  form that we were talking about earlier, or were

2  they other assorted names?

3      A.   They were other random fake business names

4  and stuff like that.  They were different than the

5  elementary ones.

6      Q.   Okay.  I think you mentioned it was over

7  $74,000 in MaxPerks Rewards.  Was that, as alleged

8  in the indictment, on account of 24,934

9  approximately ink cartridges recycled?

10     A.   I believe so.

11     Q.   Okay.  Did this ink recycling scheme take

12 place in many different states?

13     A.   Yes.  So we have like some -- like from

14 the stores, they were able to get some images of

15 them walking into the stores in different stores all

16 over the country.  And when we did a search warrant

17 on their residence, we found some evidence of like

18 receipts and other stuff.

19         Like there was one Excel file that showed

20 like the trip that they had planned to take where it

21 like goes from one OfficeMax to another around the

22 country, and they like had it all mapped out, "We'll

23 go from here to here to here to here."

24         And we saw, like, based on like subpoena

25 stuff we got back from like the airline and stuff,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

**BEAN & ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

**Channon_3882**

22

1  we saw that they flew to these places, and then they

2  hit OfficeMax stores in that state or wherever they

3  flew in that area.

4      Q.   And OfficeMax' own corporate records would

5  show that these particular suspicious accounts were

6  recycling ink all over the place; is that right?

7      A.   Yes, I believe so.

8      Q.   According to OfficeMax' information that

9  they provided you, did the ink recycling start

10 approximately September 18, 2009?

11     A.   Yes.  That's what they believe.

12     Q.   And do you know when approximately it

13 ended?

14     A.   It was in June of 2011 sometime.

15     Q.   Is that approximately when you served a

16 search warrant on the suspects' residents?

17     A.   Yeah, we basically did a search warrant on

18 the subjects' residence around that time.

19     Q.   And we'll get to the details of that in

20 just a minute.  So now that we've talked about the

21 general scheme, how was the particular suspect, the

22 main suspect, identified?

23     A.   There was a couple ways that OfficeMax was

24 able to identify him, as well as our investigation.

25 I mean, one was, some of the MaxPerks accounts, he'd

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3883

23

1  go in and he'd make a purchase with the MaxPerks

2  Rewards, and he wouldn't have enough rewards to pay

3  in full for an item, so he'd use a debit card that's

4  his personal debit card, for instance, to pay the

5  remaining balance, or different things like that.

6        We have some video from the stores, like I

7  said, where we see him walking in and stuff like

8  that.  So there's things like that.  And some of the

9  MaxPerks accounts, like I said, actually had his

10  real information.  There was a couple that had like

11  his phone number, I believe, and his real name, and

12  maybe a real e-mail address, or a P.O. box or

13  something that we could directly link to

14  Mr. Channon.

15        Q.   In the course of the investigation, did

16  you get a search warrant on about 13 of these

17  suspicious e-mail addresses?

18        A.   Yeah.

19        Q.   Including coach, bargle, garble, and

20  teechur?

21        A.   Yes.

22        Q.   Okay.  And were you able to confirm

23  through your review of those e-mail accounts that

24  they belonged to the same person?

25        A.   Yeah.  For the most part, basically, we'd

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3884

24

1  look at IP logs, for instance, and we'd see that he

2  was logging in from his house or from a common IP

3  that he would use to log into his Facebook account

4  or something else like that.  Some of the e-mails

5  within the e-mail accounts that we did searches had

6  things in his real name, where it was like kind of

7  unrelated, but it was still, you know, stuff that

8  was associated with him.

9      Q.   So you were able to take IP address that

10 you knew to be associated with accounts controlled

11 by him, and then you saw the same IP addresses on

12 these suspicious accounts?  Is that basically a

13 correct summary?

14     A.   Yeah.

15     Q.   Okay.  I think you mentioned before that

16 you had found the fake name generator e-mails in

17 some of these accounts.  Were those in the teechur

18 and bargle accounts; do you recall?

19     A.   I don't recall which one.  We just saw it

20 in the account that we did a search warrant on that

21 he had had the fake name generator account that he

22 purchased a bunch of names.

23     Q.   And you mentioned also that surveillance

24 video had captured Matthew Channon on video.

25     A.   Yes, as well as Brandi Lucero, his wife, I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3885

25

1   believe.

2       Q.   Okay.  And is her name now Brandi Channon,

3   to your knowledge?

4       A.   That's correct.

5       Q.   So at the beginning of this, they weren't

6   married, but now at some point they have been?

7       A.   Yeah.

8       Q.   Okay.  And the video that you saw him

9   on -- was that linked in some way to the suspicious

10  transactions or online adjustments?

11      A.   Yes.  So OfficeMax -- a lot of times

12  they'd see the video with him walking into a store,

13  and then he'd use one of his MaxPerks cards that was

14  associated with -- you know, whether it was the ink

15  recycling accounts or the elementary accounts that

16  they had identified for the online adjustments.

17      Q.   Did Matthew Channon have a background in

18  computers?

19      A.   Yes.  He has a master's degree, I believe,

20  in computer and electrical engineering from Georgia

21  Tech.  And he also went to New Mexico Tech, got a

22  bachelor's degree there, as well, in material

23  engineering.  He's a smart guy.

24          MS. MESSEC:  I see a reaction from one of

25  the grand jurors.  I just want to make sure that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3886

26

 1   that is not an indication that you know --

 2           GRAND JUROR:  No, I don't, but I just

 3   guessed it.

 4           MS. MESSEC:  Okay.

 5           GRAND JUROR:  Sorry.

 6           MS. MESSEC:  That's fine.  I just wanted

 7   to make sure it wasn't like a light bulb went off

 8   and you said, "Oh, I went there, too."

 9           GRAND JUROR:  No, I didn't recognize the

10   name.  I was trying real hard to think if I

11   recognized the name.

12           MS. MESSEC:  So seeing nobody still knows

13   the target, I think we can keep going.

14           GRAND JUROR:  Okay.

15       Q.   (By Ms. Messec) Now, does Matthew Channon

16   have an eBay account under the user name of Dr.

17   Zoidberg?

18       A.   He does.

19       Q.   And what part does that eBay account play

20   in this scheme?

21       A.   Well, it was registered in his name.  I

22   believe that we made an undercover purchase, we made

23   an undercover purchase from one of his e-mail

24   accounts -- I mean eBay accounts.  I think it was

25   that one.  But he was selling -- he was selling a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3887

27

1   lot of things that he was purchasing from OfficeMax

2   with the MaxPerks Rewards on eBay, because in some

3   cases, you had to get these rewards and then you had

4   to buy something with it.  In order to turn it into

5   cash, you sell something on eBay.  So I believe he

6   may have purchased some like ink recycling from --

7   some, like, empty ink cartridges, as well, from one

8   of his PayPal or eBay accounts, as well.

9        Q.   Because you would have to have a huge

10  quantity of ink cartridges to recycle -- to be able

11  to recycle 25,000 or something of them.

12       A.   Yeah.  I mean, I think he was paying like

13  30 cents or 30-something cents.  I don't remember

14  the exact number.  It was like 36 cents for an ink

15  cartridge, when he'd buy like 14,000 or something,

16  and then you could use them at OfficeMax and get $3

17  for them.

18       Q.   Now, OfficeMax, you said, had been

19  conducting its own internal investigation of this

20  fraud.  As part of that investigation, did an

21  OfficeMax investigator speak with Matthew Channon?

22       A.   Yes, they interviewed him in June of 2011.

23       Q.   Were you present for this?

24       A.   No.

25       Q.   Did you know it was going to happen?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3888

28

1    A.   No.

2    Q.   But were you informed as to the contents

3  of that conversation?

4    A.   Yes.  After the fact, they had told us

5  that they interviewed him and that basically he had

6  admitted to having, you know, like 100 MaxPerks

7  Rewards cards and that he had done some ink

8  recycling.  And he said that he had -- in order to

9  do online adjustments, he would just memorize the

10  person's stuff in front of him, like the amount they

11  spent, or whatever.  He said it was like memory, is

12  how he was able to do online adjustments.

13    Q.   So did he deny doing his online

14  adjustments through a computer script of some sort?

15    A.   Yeah.  He denied that he did it through

16  scripting like we believe he probably did.

17    Q.   Did he claim that he had purchased these

18  MaxPerks accounts, at least the teechur accounts,

19  from some other entities?

20    A.   Yeah.  I believe he said that he purchased

21  them from eBay, or something like that.  But he

22  couldn't provide the e-mail account -- the eBay

23  account that he purchased it from, and you know, we

24  looked at a lot of his PayPal and eBay accounts and

25  we didn't see any kind of purchases made for

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3889

29

1   somebody else's MaxPerks accounts or anything like

2   that.

3       Q.   Right.

4       A.   He also had talked about paying --

5   repaying OfficeMax and said he might, you know, pay

6   them back for some of it, but never followed through

7   on that.

8       Q.   Okay.  In June of 2011, did you obtain a

9   search warrant for Matthew Channon's residence?

10      A.   Yes, that's correct.  We did a search

11  warrant on his residence, and there were four people

12  at the house, Brandi Channon now, his wife, and

13  Roberta Duran Gonzales, I believe, and a Jason

14  Moran, which are another couple that are friends of

15  theirs that happened to be at the house.

16        And the irony of it is that they were

17  basically disciples of Matthew and Brandi, and they

18  were doing the exact same scheme.  And so basically

19  Matthew and Brandi had took them -- I think they

20  went to Arizona or California or something, and they

21  showed them how to do this whole thing, and they had

22  just started the whole thing themselves.  And

23  fortunately, they had like their whole bag of

24  MaxPerks accounts and the order of stores they were

25  going to go to, and all that stuff.  And when we



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

30

1  showed up and did a search warrant on their house,

2  we seized all that, as well.  So it looked like they

3  were having some other people who were going to

4  follow suit, doing the exact same thing.

5      Q.   Matthew Channon himself was not present at

6  the house at the time?

7      A.   Yeah, I believe he had a work thing going

8  on somewhere in Roswell, or somewhere south,

9  southern New Mexico.

10      Q.   Did Brandi Channon agree to speak with

11  you?

12      A.   She did.

13      Q.   And did she make statements admitting to

14  doing the ink recycling?

15      A.   Yeah, she had said that she -- that they

16  recycled some ink.  I think she said they had made

17  about like $30,000 worth, is what she had said, that

18  she believed they had made.  And she said she

19  purchased the ink cartridges from somebody in

20  Arizona, I believe, online.  Or maybe a friend or

21  something.  I don't remember if they knew the guy.

22      Q.   Did she admit to traveling to a number of

23  different states to recycle ink?

24      A.   Yes, she did say they went to lots of

25  different states and they -- you know, she said they

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


DEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3891

31

1  had at least 100 MaxPerks Rewards accounts, I

2  believe, maybe even as much as a thousand, is what I

3  believe she said.

4      Q.   Did she make any statements about claiming

5  the purchases of other people?

6      A.   She kind of did the same thing that

7  Matthew Channon had said.  They memorized somebody's

8  information in front of them, or behind them, or

9  whatever, and that's how they did their online

10 adjustments.

11     Q.   Or would they pick up receipts?

12     A.   Or they'd pick up receipts on the floor,

13 around the stores, or something like that.  She also

14 said that -- she did admit to doing the e-mail thing

15 with the periods between like the Gmail accounts and

16 stuff like that.

17     Q.   Did she deny using a computer script to

18 perform any part of the scheme?

19     A.   Yes.

20     Q.   Now, at the residence did you seize a

21 number of computers or storage devices?

22     A.   Yes.

23     Q.   And you have already mentioned that you

24 could not find any computer script on them.

25     A.   Yeah.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3892

32

1     Q.    Would it be fairly difficult to find that

2 kind of thing, you think?

3     A.    It's really like a needle in a haystack on

4 a huge computer hard drive.  And we had several

5 computers.  We didn't know which one it was we were

6 even looking for.  And to be honest, I mean, the

7 fact that OfficeMax had interviewed them a couple

8 weeks before we showed up, it's possible they

9 deleted it, as well.  We just -- we were hopeful to

10 find the script, but I wasn't able to.

11     Q.    Did you find some item of evidentiary

12 significance, though, on those storage items,

13 computers or storage devices?

14     A.    Yes.  We saw a lot of like OfficeMax

15 related coupons and MaxPerks card stuff.  We saw

16 like an Excel file that I believe it like showed

17 like where they were going from one store to another

18 and as they were traveling and stuff like that.  It

19 was -- stuff like that was really agreeable with

20 what the evidence was that OfficeMax had provided

21 us.

22     Q.    Okay.  Let's turn to the other counts in

23 the indictment that we haven't covered yet.  We did

24 1, 3, and 5, talking about the online adjustment

25 scheme earlier.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3893

33

1          Now, for count 2, on April 5, 2010, was a

2   request sent online to OfficeMax to create a

3   MaxPerks account in the name of Florence D. Wheeler

4   at Milwaukee Elementary School, with an address of

5   3747 Joseph Street, Milwaukee, Wisconsin, and an

6   e-mail address of t.eech.u.r.1.2345.6.78@gmail.com?

7          A.   Yes.

8          Q.   I'm not sure I read that all right.  It's

9   hard to pronounce all those dots.  All right, and on

10  May 29, 2010, did OfficeMax receive an online

11  request to create a MaxCards account in the name of

12  Thelma B. Johnson at Toledo Elementary School with

13  an address of 201 Hill Street, Toledo, Ohio, and an

14  e-mail address of co.a.ch.1.2.3.4.56.78@gmail.com?

15         A.   Yes.

16         Q.   And on August 2, 2010, did OfficeMax

17  receive an online request to create a MaxPerks

18  account in the name of Bernice W. Henry at Decatur

19  Elementary School with an address of 2494 Isaacs

20  Creek Road, Decatur, Illinois, and an e-mail address

21  of b.a.rgl.e.12.34.56.78@gmail.com, with periods

22  inserted?

23         A.   Yes.

24         Q.   Okay.  And when OfficeMax received an

25  online request to open a MaxPerks account, does that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3894

34

1    request travel by interstate wire?

2        A.   Yes.

3        Q.   Okay.  Now, the wires associated with the

4    ink recycling scheme are 7 through 10.  Now, in

5    count 7, I believe this is an e-mail address we

6    haven't talked about yet before,

7    sandeepshwawar@gmail.com.  Is that an e-mail address

8    that was associated with an account used in the ink

9    recycling scheme?

10       A.   Yes.  The hydrazok or something --

11            THE REPORTER:  I'm sorry, the what?

12       A.   It was associated with an e-mail account

13   that was spelled H-Y-D-R-A-Z-O-K.

14       Q.   And when you say "associated with," do you

15   mean that that was also a Channon e-mail account?

16       A.   Yes.

17       Q.   And was that Channon e-mail account

18   accessed from the same IP address that was used to

19   set up this Sandeepshwawar Gmail account?

20       A.   Yes.

21       Q.   So on November 4, 2009, did Google receive

22   an online request to create this e-mail address,

23   sandeepshwawar@gmail.com under the name of Sandeep

24   Shwawar?

25       A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3895

35

1      Q.    And on December 10, 2009, did OfficeMax

2   receive an online request to create a MaxPerks

3   account using that Gmail account in the name of

4   Sandeepshwawar Decor, with an address of 2701 E.

5   Helen Street, Tucson, Arizona?

6      A.    Yes.

7      Q.    And the next two accounts -- or the next

8   two counts, excuse me, involved an e-mail address,

9   ameriodespatch@gmail.com.  Is that Gmail address

10  used to register accounts that participated in an

11  ink-recycling scheme?

12     A.    Yes.

13     Q.    And did you find a connection between that

14  ameriodespatch@gmail.com account and other accounts

15  that were known to be created by Matthew Channon?

16     A.    Yes.

17     Q.    Did Google receive an online request on

18  January 28, 2010, to create the e-mail address

19  ameriodespatch@gmail.com under the name of Amerio

20  Despatch?

21     A.    Yes.

22     Q.    And on February 20, 2010, did OfficeMax

23  receive a request to create a MaxPerks account in

24  the name of Waterspout Cinema, with an address of

25  1150 East 800 South, Salt Lake City, Utah, with an

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3896

36

1    address of a.m.eriodespatch@gmail.com?

2        A.   Yes.

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                          1-800-669-9492
                                                    e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

Channon_3897

37

1

2

3      GRAND JUROR:  I can understand having a

4  large number of e-mail addresses that are finally

5  routed to an individual.  But how did they get the

6  cards from all of these different accounts?  Did

7  they have several mailing addresses, as well?

8      A.   So if you register it online, you can just

9  print the card out online.  So you get it

10 electronically, electronic number, and electronic

11 card.  And I think they ask you -- I'm not certain

12 on this, but I think they ask you, do you want it

13 mailed, or do you want to just print it?  And I

14 think they want you to just print it, so they don't

15 have to mail anything.

16      GRAND JUROR:  I think you alluded to this,

17 because all this -- they have to spend the money in

18 the store.  So basically they bought stuff and

19 fenced it to make money.

20      A.   So when we interviewed Brandi Channon, I

21 believe she said that they bought a lot of prepaid

22 gift cards, like OfficeMax sold like Southwest

23 Airlines gift cards, and they sell other, you

24 know -- I don't know if you notice that a lot of

25 stores have started to sell prepaid gift cards these

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3898

38

1   days, and a lot of -- they may even sell like cash

2   ones.  I believe we did find one instance where he

3   used one of these gift cards to pay for a dentist

4   bill with like a Visa gift card or something like

5   that, something similar, American Express, or

6   something.

7            GRAND JUROR:  A question about the

8   recycling of cartridges.  The rules established by

9   OfficeMax were that if you had the cartridge, you

10  could return it for $3.  Right?  They didn't really

11  specify the source.  The targets were purchasing

12  these cartridges elsewhere and turning them in.  But

13  was there something that was not in play with the

14  rules here?

15       A.   So if you remember what I said at the

16  beginning about the ink recycling, you could only do

17  $60 worth per month.  So that meant 20 cartridges at

18  $3 each.

19  ████████████████████████████

20       A.   Per account.  So in order for them to

21  recycle the 24,000, you know, which turned out to be

22  $70,000-some worth of ink recycling, you have to

23  have a ton of accounts.

24            GRAND JUROR:  Right.  And that's where

25  things were not playing with the rules.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


**DEAN
&ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3899

39

1       A.    Yes.





SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3900

40

REPORTER'S CERTIFICATE

     I, Mary Abernathy Seal, New Mexico Certified Shorthand Reporter, DO HEREBY CERTIFY that the proceedings of the above-entitled cause were reported by me stenographically on March 26, 2013, and that the within transcript is a true and accurate transcription of my shorthand notes.

     I FURTHER CERTIFY that I am neither employed by nor related to any of the parties or attorneys in this case, and that I have no interest whatsoever in the final disposition of this case in any court.

*Mary A. Seal*

_____
Mary Abernathy Seal
BEAN & ASSOCIATES, INC.
NM Certified Court Reporter #69
License expires:  12/31/14

(9756K) MAS
Date taken:  March 26, 2013



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3901

**From:**      Boady, Michael
**To:**        Messec, Paige (USANM)
**Subject:**   Re: email validation
**Date:**      Friday, January 25, 2013 10:01:44 AM

It was a misunderstanding. After seeing the email accounts we searched, it appears that the email validation is more of an internal thing where OfficeMax ensures no two accounts are setup with the same email address and that it is a valid email when they send an email to the customer saying Welcome to MaxPerks.

**From:** Messec, Paige (USANM) <█████████████████████>
**To:** Boady, Michael
**Sent:** Fri Jan 25 11:40:36 2013
**Subject:** email validation

Not to harp on the email validation thing, but I just noticed this in Paragraph 18 of the Gladden SW affidavit: "Before a MaxPerk account can be set up online, the email address associated with the account must be validated - that is, the customer will receive an email at the email account provided and will have to click on a link to confirm that they are the email account holder." Was that a misunderstanding, or maybe it used to be that way?

**Channon_3902**

Paige
Messec
pt

1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW MEXICO

3

4   UNITED STATES OF AMERICA,

5

6              Plaintiff,

7         vs.                    NO:   13-CR-966

8   MATTHEW CHANNON AND BRANDI
    CHANNON,

9

10             Defendants.

11

12

13           TRANSCRIPT OF PROCEEDINGS
                    Matter 12
14              January 21, 2015
             Testimony of Jeffrey Moon

15  BEFORE:
             Albuquerque, New Mexico.

16

17           A P P E A R A N C E S

18

19  For the Government:

20      MS. PAIGE MESSEC
        ASSISTANT UNITED STATES ATTORNEY
        U.S. ATTORNEY'S OFFICE
21      DISTRICT OF NEW MEXICO
        201 Third Street, Northwest, Suite 900
22      Albuquerque, New Mexico  87102

23

24  (2118L) BEV

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

Channon_3903

Accounts Linked to Channon

BRANDI CHANNON'S
EXHIBIT
99
1:13-CR-966-JCH-KK  2255 MOTION

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 658092537 | AMERICAN CLAY PRODUCTS | AMERICAN CLAY PRODUCTS | 311 W BASELINE RD, #311 | TEMPE | AZ | 85282 | (480) 852-8285 | amclay2@gmail.com | 445 | | | | 1 | | recylces at 1156 right |
| 712516003 | CHEMIX CHEMIX | CHEMIX CHEMIX | 910 10TH ST | GOLDEN | CO | 80401 | (720) 804-0180 | chemixchemix@gmail.com | 680 | | | | 1 | | |
| 794701857 | ARIZONA GREEN | ARIZONA GREEN | 2660A W BASELINE RD | PHOENIX | AZ | 85041 | (480) 850-4185 | azgreen7@hotmail.com | 421 | NCOA | 9/20/09 | found on 1/24/2010 by RC used | 0 | | 11/17/10 R 1 T9701, no |
| 795433732 | SANDEEPSHWAWAR DECOR | SANDEEPSHWAWAR DECOR | 2701 E HELEN ST | TUCSON | AZ | 857163808 | (520) 857-1685 | sandeepshwawar@gmail.com | 520.12 | | | | 0 | | |
| 795885153 | BOX FACTORY | BOX FACTORY | 13337 SOUTH ST PMB 1482 | CERRITOS | CA | 907037308 | (714) 907-0390 | s.andeepshwawar@gmail.com | 505 | | | | 1 | | |
| 795971912 | ARIZONA GREEN #7 | ARIZONA GREEN | 3668 W ARROWWOOD PLACE | TUCSON | AZ | 85741 | (520) 857-4185 | azgreen7@gmail.com | 493 | | | | 1 | | |
| 795971939 | TEXAS TRAFFIC | TEXAS TRAFFIC | 8210 BENT BRANCH DR | IRVING | TX | 75063 | (972) 314-1891 | texas_traffic@yahoo.com | 556 | | | | 1 | | |
| 796085916 | CREATIVE FIBERGLASS | CREATIVE FIBERGLASS | 19940 HANSEN AVE | NUEVO | CA | 925679649 | (951) 925-6792 | job38.38.19@gmail.com | 240 | | | purchases against with prepaid cc's but not credited with his sale (just | 0 | | |
| 796100796 | MICRONE CONTACTS | MICRONE CONTACTS | 1236 MAGNOLIA AVE | CORONA | CA | 92879 | (951) 928-8192 | job383.8.19@gmail.com | 297 | | | Connected through prepaid Amex ending #1953 | 0 | | |
| 796100834 | CRESTLINE TREATS | CRESTLINE TREATS | 23835 LAKE DR | CRESTLINE | CA | 92325 | (909) 923-2592 | jo.b3.83819@gmail.com | 240 | | | purchases against with prepaid cc's but not credited with his sale (just | 0 | | |
| 796101172 | SOUTHERN & ASSOCIATES | SOUTHERN & ASSOCIATES | 7184 ARCHIBALD AVE | RANCHO CUCAMONGA | CA | 917015016 | (909) 917-0191 | job.3.838.19@gmail.com | 0 | | | purchases against with prepaid cc's | 0 | | |
| 796134518 | LATHE TURNERS OF HENDERSON | LATHE TURNERS HENDERSON | 243 N STEPHANIE ST | HENDERSON | NV | 89074 | (702) 890-7489 | johann.arathassim@gmail.com | 430 | NCOA | 2/13/10 | found on 1/24/2010 by RC used | 0 | | 12/16/10 R 1 T9698, can |
| 796134674 | LOW DESERT FLORAL | LOW DESERT FLORAL | 886 S RAMPART BLVD | LAS VEGAS | NV | 89145 | (702) 891-4589 | johannar.a.thassim@gmail.com | 240 | NCOA | 2/13/10 | Found on 12/22/10 while going through Aspect | 0 | | Channon 5 |
| 796147997 | MOTRON VENTURES INC. | MOTRON VENTURES | 1706 SAINT ANDREWS CT | BOULDER CITY | NV | 890053663 | (702) 890-0589 | johanna.rathas.sim@gmail.com | 297 | | | | 0 | | |
| 796155019 | TELSPAR TELECOM | TELSPAR TELECOM | 277 WATER SPOUT ST | SEARCHLIGHT | NV | 89046 | (702) 890-4689 | j.ohanna.rathassim@gmail.com | 288 | | | purchases against with prepaid cc's but not credited with his sale (just | 0 | | |
| 796163798 | DEAD DUCK DEVELOPMENT | DEAD DUCK DEVELOPMENT | 160 LINCOLN ST | CALIENTE | NV | 89008 | (702) 890-0889 | jo.hannar.athassim@gmail.com | 265 | | | purchases against with prepaid cc's but not credited with his sale (just | 0 | | |
| 796164093 | DELTA 3 INTERNET DESIGN | DELTA 3 INTERNET DESIGN | 9389 BOROUGH PARK ST | LAS VEGAS | NV | 891788293 | (702) 891-7889 | johan.narathas.sim@gmail.com | 300 | | 2/17/10 | Found on 12/13/10 while going through accounts | 0 | | Channon 5 |
| 796190477 | FIGHTING FISHTAILS | FIGHTING FISHTAILS | 5016 N PIONEER WAY | LAS VEGAS | NV | 89149 | (702) 891-4989 | johanna.rathassim@gmail.com | 297 | | | purchases against with prepaid cc's | 0 | | |
| 796190639 | WINCHESTER HEADLIGHT | WINCHESTER HEADLIGHT | 5008 ARVILLE ST | LAS VEGAS | NV | 89118 | (702) 891-1889 | johannarath.assim@gmail.com | 300 | NCOA | 2/19/10 | found 1/3/10 | 0 | 1 | Channon 6 |
| 796198559 | SLC METRO DESK | SLC METRO DESK | 1000 E 3900 S | SALT LAKE CITY | UT | 84124 | (801) 841-2484 | a.menodespatch@gmail.com | 240 | | 2/20/10 | Found on 12/13/10 while going through accounts | 0 | | Channon 5 |
| 796198575 | WATERSPOUT CINEMA | WATERSPOUT CINEMA | 1150 E 800 S | SALT LAKE CITY | UT | 841023703 | (801) 841-0284 | a.m.eriodespatch@gmail.com | 120 | Active | 2/20/10 | Found on 12/27/10 while going through Aspect | 0 | | Channon 5 |
| 796199474 | DOS CAVRONES RESTAURANTS | DOS CAVRONES RESTAURANTS | 2945 E 3300 S | SLC | UT | 841092138 | (801) 841-0984 | ame.riodespatch@gmail.com | 120 | Active | 2/21/10 | Found on 12/27/10 while going through Aspect | 0 | | Channon 5 |
| 796200715 | SUPREME INDUSTRIALS | SUPREME INDUSTRIALS | 2832 S 1000 W | SYRACUSE | UT | 84075 | (801) 840-7584 | amer.iodes.patch@gmail.com | 145 | NCOA | 2/21/10 | Found on 12/27/10 while going through Aspect | 0 | | Channon 5 |
| 796201258 | BACKLOT DISCOUNTERS #4 | BACKLOT DISCOUNTERS #4 | 4703 ODIN LN | WEST JORDAN | UT | 84088 | (801) 840-8884 | a.meriod.espatch@gmail.com | 120 | NCOA | 2/21/10 | found on 1/24/2010 by RC used | 0 | | |
| 796204419 | ANGRY HANK'S ROTISSERIE | ANGRY HANK'S ROTISSERIE | 10000 TIMP VIEW DR | EAGLE MOUNTAIN | UT | 84005 | (801) 840-0584 | ameripd.espatch@gmail.com | 60 | NCOA | 2/21/10 | found on 1/19/2010 by RC used | 0 | | Channon 6 |
| 796205679 | ST. LOUIS METRODYNE | ST. LOUIS METRODYNE | 4435 FOREST PARK AVENUE #C200 | ST LOUIS | MO | 63108 | (314) 631-0863 | maha.shamaranka@gmail.com | 325 | | | Connected through Channon's debit card 10/14/2010 | 1 | | |
| 796207612 | MMW CORP | MMW CORP | 31 HOLLENBERG CT | BRIDGETON | MO | 63044 | (314) 630-4463 | ma.h.ashamaranka@gmail.com | 240 | | | purchases against with prepaid cc's but not credited with his sale (just | 0 | | |
| 796210478 | GRAVITAS ENTERTAINMENT | GRAVITAS ENTERTAINMENT | 207 N RHODES ST | UNION POINT | GA | 306691045 | (575) 592-6669 | maha.s.hamara.nka@gmail.com | 205 | Active | 2/22/10 | Found on 12/27/10 while going through Aspect | 0 | | Channon 5 |
| 796212055 | DISSENTERS OF MISSOURI | DISSENTERS MISSOURI | 220 OLD HIGHWAY O | VILLA RIDGE | MO | 63089 | (314) 630-8963 | ma.hash.amaranka@gmail.com | 222 | | | purchases against with prepaid cc's but not credited with his sale (just used Reward Card) | 0 | | |
| 796213337 | SHOW ME OIL #118 | SHOW ME OIL #118 | 8501 INDUSTRIAL DR | CEDAR HILL | MO | 63016 | (314) 630-1663 | m.ahashama.rank.a@gmail.com | 120 | | | purchases against with prepaid cc's | 0 | | |
| 796215259 | YARROW MONEY SERVICES | YARROW MONEY SERVICES | 113 W JEFFERSON ST | KIRKSVILLE | MO | 63501 | (314) 635-0163 | maha.shamar.anka@gmail.com | 180 | | | | 1 | | |
| 796216433 | MARIO BROTHERS RENTALS | MARIO BROTHERS RENTALS | 2711 TELEGRAPH RD | SAINT LOUIS | MO | 631254027 | (314) 631-2563 | mahashamarank.a@gmail.com | 168 | | | Connected through Channon's debit card | 1 | | |
| 796217057 | IVY LEAGUE PREP SUPPLY | IVY LEAGUE PREP SUPPLY | 527 S LINDBERGH BLVD | CREVE COEUR | MO | 63141 | (314) 631-4163 | mah.ashamara.nka@gmail.com | 240 | | 2/23/10 | Found on 12/13/10 while going through accounts | 0 | | Channon 5 |
| 806254517 | New Account no info on 2/14/11 | | | | | | | | 0 | Pending | 12/7/10 | found on 2/13/2011 by CC or RC used | 0 | | Channon 6 |
| 815830717 | New Account no info on 2/14/11 | | | | | | | | 3 | Pending | 1/24/11 | found on 2/13/2011 by CC or RC used | 0 | | Channon 6 |
| 861203832 | AUSTIN ELEMENTARY SCHOOL | DEBORAH KING | 2283 STATION STREET | ROUND ROCK | TX | 78664 | (512) 218-0337 | ga.rble12345678@gmail.com | 0 | NCOA | 8/17/10 | found on 2/13/2011 by CC or RC used | 0 | | Channon 6 |
| 861203972 | LAS VEGAS ELEMENTARY SCHOOL | TYLER TORREZ | 2027 HALL STREET | LAS VEGAS | NV | 89119 | (702) 581-3646 | g.a.rble12345678@gmail.com | 0 | NCOA | 8/17/10 | found on 2/15/2011 by Channon's Debit Card use (4445) | 1 | | Channon 6 |
| 861203719 | SAN FRANCISCO ELEMENTARY SCHOOL | FRED ROSENTHAL | 1520 BORING LANE | SAN FRANCISCO | CA | 94108 | (415) 622-3622 | g.arble12345678@gmail.com | 0 | NCOA | 8/17/10 | it from trans 9168 s217 2/12/11 (trans after one he is on video | | | |
| 644922006 | TACO TOTEM | TACO TOTEM | 401 N PEARL ST, A1 | DALLAS | TX | 75201 | (214) 441-6262 | tacototemdfw@yahoo.com | 355 | | | 10/20/09 | | | RC from it Linked to Garble Account. Started tracking |
| | | | | | | | | | | | | | | | |
| Adjusted | | | | | | | | | | | | | | | |
| Too Old | Too Old | | | | | | | | | | | | | | |
| None | None | | | | | | | | | | | | | | |

Channon 1617

## MaxPerks Loyalty Transactions -- All captured loyalty transactions & Online adjustment details since 10/1/20

| Trans Key | Member ID | ans | Trans Date | Trans Time | Store ID | Store C | Onlin | Receipt Nbr | Register ID | Net Sales | Gross Sales | Units | F Submitte |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S_192292149 | 643910403 | 1 | 03/21/2010 | 2:23:03 PM | 1156 | Retail | 0 | 00000000009168 | 0000000001 | $0.00 | $0.20 | 20 | |
| S_197616996 | 796217057 | 1 | 03/22/2010 | 3:02:15 PM | 1479 | Retail | 0 | 00000000004260 | 0000000003 | $0.00 | $0.20 | 20 | |
| S_197617084 | 796215259 | 1 | 03/22/2010 | 3:03:29 PM | 1479 | Retail | 0 | 00000000004261 | 0000000003 | $0.00 | $0.20 | 20 | |
| S_197498532 | 796212055 | 1 | 03/22/2010 | 3:30:01 PM | 1209 | Retail | 0 | 00000000006824 | 0000000001 | $0.00 | $0.20 | 20 | |
| S_197498620 | 796216433 | 1 | 03/22/2010 | 3:30:36 PM | 1209 | Retail | 0 | 00000000006825 | 0000000001 | $0.00 | $0.20 | 20 | |
| S_197535188 | 630504937 | 1 | 03/22/2010 | 7:54:31 PM | 0422 | Retail | 0 | 00000000001546 | 0000000001 | $206.95 | $207.15 | 22 | |
| S_197539801 | 636673773 | 1 | 03/22/2010 | 8:41:06 PM | 0638 | Retail | 0 | 00000000009664 | 0000000001 | $0.00 | $0.20 | 20 | |

| Site | Address | City | ST | Zip | Phone | Fax |
|---|---|---|---|---|---|---|
| 0422 | 3301 Menaul Blvd. NE, Suite A | Albuquerque | NM | 87107 | 505.889.9696 | 505.889.9466 |
| 0638 | 3731-A Ellison Rd NW (Cottonwd Cmrs) | Albuquerque | NM | 87114 | 505.897.9275 | 505.897.9348 |
| 1156 | 8100 Wyoming N.E. | Albuquerque | NM | 87113 | 505.821.1144 | 505.821.7184 |
| 1209 | 153 Gravois Bluff Plaza Dr. | Fenton | MO | 63026 | 636.326.1714 | 636.326.1715 |
| 1479 | 2184 Michigan Ave. | Arnold | MO | 63010 | 636.287.3179 | 636-287-1142 |

BRANDI CHANNON'S EXHIBIT

100

1:13-CR-966-JCH-KK   2255 MOTION