IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff/Respondent, | ) | CV 19-201 JCH/SMV |
| | ) | CR 13-966 JCH |
| vs. | ) | |
| | ) | |
| **BRANDI CHANNON**, | ) | |
| | ) | |
| Defendant/Movant. | ) | |
| | ) | |

## RESPONSE TO BRANDI CHANNON'S MOTION UNDER 28 U.S.C. § 2255

Matthew and Brandi Channon were convicted after a six-day jury trial on charges of wire fraud and conspiracy stemming from a sophisticated scheme to defraud the office-supply retailer OfficeMax. The Tenth Circuit affirmed the Channons' convictions. *United States v. Channon*, 881 F.3d 806 (10th Cir. 2018). Now proceeding pro se, they each bring collateral attacks on their convictions under 28 U.S.C. § 2255.[1] The Channons' motions should be denied without a hearing because their conclusory allegations of error, while numerous, fail to establish that their attorneys' vigorous representation was constitutionally deficient or that they suffered any prejudice in light of the overwhelming evidence of their guilt.

---

[1] This pleading refers jointly to the Channons where the government's response to their shared complaints is the same.

## I.       Standards for Motions Under 28 U.S.C. § 2255

Section 2255 of Title 28 provides that "a prisoner in custody" under a federal sentence "claiming the right to be released" upon enumerated grounds "may move the court which imposed the sentence to vacate, set aside or correct the sentence."

### A.       Burden of Proof and Presumption of Regularity

To obtain post-conviction relief under § 2255, a defendant generally must establish that his or her sentence was "imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a).  After direct review, "a presumption of finality and legality attaches to the conviction and sentence," *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993) (citation omitted), and courts are "entitled to presume" that a defendant "stands fairly and finally convicted," *United States v. Frady*, 456 U.S. 152, 164 (1982).  That "presumption of regularity . . . makes it appropriate to assign a proof burden to the defendant" on collateral review.  *Parke v. Raley*, 506 U.S. 20, 31 (1992).  Section 2255's standards are demanding, and "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal."  *Frady*, 456 U.S. at 166.

### B.       Custody and Timeliness

The first requirement for a § 2255 claim is that the movant be "a prisoner in custody." As to each count of conviction, Brandi was sentenced to probation, from which she was recently discharged.  Doc. 535.[2]  Because section 2255's custody requirement extends to probation, *United States v. Condit*, 621 F.2d 1096, 1098 (10th Cir. 1980), and because custodial status is

---

[2] All references to docket entries in this filing are designated in the format "Doc. __" and refer to this Court's earlier docket entries in the Channons' underlying criminal case, 13-CR-966 JCH.

measured as of the motion's filing date, *Carafas v. LaVallee*, 391 U.S. 234, 236-39 (1968), Brandi's status as a probationer on the filing date of her original motion suffices to bring her within the statute's coverage. And since she attacks her conviction, rather than the sentence she already served, her motion is not moot. *Id.* at 237; *see also Spencer v. Kemna*, 523 U.S. 1, 7 (1998).

The Channons' motions are timely. The Supreme Court denied certiorari on October 1, 2018, Docs. 499-500, rendering final their judgments of conviction. *United States v. Willis*, 202 F.3d 1279, 1280 (10th Cir. 2000). Their original motions were filed March 11, 2019, within the first window provided by § 2255(f)(1), that being one year of "the date on which the judgment of conviction bec[ame] final."

C.      **Procedural Default**

Under a doctrine known as procedural default, a defendant who raises a claim under § 2255 that was not brought on direct appeal generally cannot obtain relief. *See Sanchez-Llamas v. Oregon*, 548 U.S. 331, 350-51 (2006) ("The general rule in federal habeas cases is that a defendant who fails to raise a claim on direct appeal is barred from raising the claim on collateral review."). This is so because "[h]abeas review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621 (1998) (internal citations and quotations omitted). Normally a new claim may be raised under § 2255 only if the defendant can demonstrate (1) good cause for failing to raise the issue earlier and actual prejudice, or (2) actual innocence. *Id.* at 622. "Actual prejudice" means "not merely that the errors . . . created a possibility of prejudice, but that they worked to [defendant's] actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."

*Frady*, 456 U.S. at 170. And "'actual innocence' means factual innocence, not mere legal insufficiency." *Bousley*, 523 U.S. at 623-24.

Allegations that counsel rendered ineffective assistance complicate this framework in two ways. First, allegations of ineffective assistance in the trial court are exempt from procedural default because of the obstacles to raising such claims on direct appeal. *Massaro v. United States*, 538 U.S. 500, 509 (2003). Second, when a defendant claims that counsel should have pursued on appeal an issue previously raised, counsel's failure may satisfy the "cause" standard *if* that failure rises to the level of constitutionally ineffective assistance. *Murray v. Carrier*, 477 U.S. 478, 492 (1986).

Applying these principles to the Channons' case, essentially all of the Channons' allegations not involving ineffective assistance are procedurally defaulted. The Channons raised two issues on appeal, one involving the government's computer-derived exhibits and one involving forfeiture. *Channon*, 881 F.3d at 808. With one narrow exception under Ground Twelve, *infra* at 36, these issues are not the root of their current complaints. The United States therefore confines its response to whether the Channons have established ineffective assistance of counsel in any respect.

### D. Claims of Ineffective Assistance of Counsel

To establish an ineffective-assistance claim, a defendant must show both that counsel's performance "fell below an objective standard of reasonableness" and that "the deficient performance prejudiced the defense," *Strickland v. Washington*, 466 U.S. 668, 687-88 (1980), meaning that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id*. at 694.

To show deficient performance, a defendant must establish "that counsel made errors so serious that [he] was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Review is "highly deferential," with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," that is, a strong presumption "that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (quotation marks omitted). "There are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Id*. Constitutionally deficient performance means performance that is "completely unreasonable, not merely wrong." *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) (internal citations and quotations omitted). Further, counsel is not required to pursue every claim of potential merit; the Sixth Amendment does not "require counsel to raise, or even be cognizant of, all potential defenses." *United States v. Harms*, 371 F.3d 1208, 1212 (10th Cir. 2004). Rather, counsel is "entitled . . . to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 107 (2011).

In the trial context, *Strickland*'s second prong asks "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. "An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like." *Id*. Prejudice must necessarily be evaluated "in view of the strength of the government's case." *United States v. Miller*, 907 F.2d 994, 997 (10th Cir. 1990).

A court may address the performance and prejudice components in any order and need not address both if it concludes that the defendant has failed to satisfy one. *See Strickland*, 466 U.S. at 697.

### E.     Disposition Without Hearing

A district court need not hold a hearing on a § 2255 motion where "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). A hearing is unnecessary where the allegations, even if proven, would not demand relief. *United States v. Barboa*, 777 F.2d 1420, 1422 (10th Cir. 1985). Further, "[d]istrict courts are not required to hold evidentiary hearings in collateral attacks without a firm idea of what the testimony will encompass and how it will support a movant's claim." *United States v. Moya*, 676 F.3d 1211, 1214 (10th Cir. 2012). Conclusory allegations do not warrant a hearing. *Id*.; *see also United States v. Kilpatrick,* 1997 WL 537866, at *3 (10th Cir. 1997) (unpublished).

## II.     The Evidence at Trial

### A.     The Channons' Scheme and Discovery of Their Fraud

The Channons' scheme targeted OfficeMax's customer-loyalty program, MaxPerks Rewards. The MaxPerks program offered customers two ways to earn rewards, which were essentially store credits. First, customers could earn rewards by purchasing qualifying items at OfficeMax. For MaxPerks members employed as teachers, $75 spent at OfficeMax yielded a $10 reward, up to an annual maximum of $100. Trial Tr. 327-29, 348, 355. Second, customers could earn rewards by bringing used inkjet cartridges to OfficeMax for recycling. OfficeMax issued the customer $3 in rewards for each cartridge, up to a monthly maximum of 20 cartridges,

as long as the customer had spent an amount equal to the reward issued. *Id*. at 330, 1013-14. OfficeMax imposed the 20 cartridge limit because the recycling program (indeed, the entire MaxPerks program) was a loss leader. *Id*. at 334; Tr. 9/28/16 at 27, 31. OfficeMax limited each customer to one MaxPerks account. Trial Tr. 327, 982-84; Tr. Ex. 1 at 1, 4; Tr. Ex. 2 at 1, 4.[3]

The Channons' scheme involved both parts of MaxPerks. In the primary component of the scheme, the Channons employed a computer program to claim purchases made by other customers as their own, thereby generating rewards they hadn't earned. To do so, they exploited a process called an "online adjustment," by which a customer who had forgotten to present a MaxPerks number at the store could go online and add the purchase by entering information from the store receipt. Trial Tr. 363-67. The Channons took real receipts from OfficeMax stores around the country and used the information on those receipts to extrapolate the information needed to perform online adjustments with *other* receipts. *Id*. at 515-19, 532. Specifically, the Channons took the information that an online adjustment required (shown in this excerpt from trial Exhibit 3) from legitimate store receipts and then repeatedly increased the receipt number by

---

[3] "Tr. Ex." refers to the admitted trial exhibits, the complete set of which will be transmitted on a DVD to the Court for its convenience. "Resp. Ex." refers to exhibits to this response.



one (and eventually advanced the date) to claim MaxPerks credit for other people's purchases. A single real receipt would allow the Channons to claim hundreds of purchases made later at the same store. *Id*. at 668-69. Over the course of the scheme the Channons made more than 60,000 online adjustments, claiming credit for almost $2 million in purchases they hadn't made and generating $179,000 in rewards credit. *Id*. at 522, 524, 530; Tr. Ex. 27.

In the other part of the scheme, the Channons used their group of fraudulent accounts to turn in more than 27,000 used ink cartridges, *id*. at 639, receiving $3 in rewards for each after having paid about 32 cents for each empty cartridge on eBay, *id*. at 1194. To avoid having to spend $81,000 of their own money at OfficeMax, the Channons generated most of the required purchase balance through fraudulent online adjustments. *Id*. at 1014-15; Tr. Ex. 33.

To collect receipts and avoid detection, the Channons personally visited over 300 OfficeMax stores in 20 states. *Id*. at 531, 641-42, 647; Tr. Ex. 28, 32, 34. Airline records documented several trips dedicated to "OfficeMaxing," as Matthew called it. Trial Tr. 547-48,

876, 1324-27, 1403; Tr. Ex. 36. Approximately 80 store-surveillance videos across the country showed the Channons (primarily Matthew, accompanied sometimes by Brandi) using the accounts at OfficeMax stores. Trial Tr. 492. Portions of eight videos were played for the jury. Tr. Ex. 48, 54, 57, 60, 63, 66, 72.

The Channons redeemed their ill-gotten rewards at OfficeMax for office supplies, which they often sold on eBay, or for prepaid gift or debit cards sold by OfficeMax (thus essentially converting rewards into cash). *Id*. at 1064, 1209. Matthew also sold a portion of the reward certificates to third parties on eBay. *Id*. at 1205.

The Channons' scheme was detected when an OfficeMax fraud investigator, Steven Gardner, noticed suspiciously high online-adjustment activity across a large number of accounts. Trial Tr. 381-84. Gardner saw that nearly all of those accounts were registered to one of three email addresses: teechur12345678@gmail.com, coach12345678@gmail.com, and bargle12345678@gmail.com, but with periods sprinkled between the characters of each address — for instance, c.oa.ch.1.23.4.5.6.7.8@gmail.com and coac.h.1234.5678@gmail.com. *Id*. at 384. A fourth address, garble12345678@gmail.com, was discovered later. *Id*. at 392. The effect of the interspersed periods was to cause OfficeMax's system to recognize the variations as unique email addresses, whereas Google disregards periods. *Id*. at 383-84. Gardner also observed that the name used to register the accounts was almost always the member's city plus "Elementary School." *Id*. at 389-90. For example, an account registered to an address in Washington, DC, would use "Washington Elementary School." *Id*. Occasionally a glitch would appear, such as an email address in the name field, which — along with the sheer number of accounts — led Gardner to conclude that a computer program had been used to enroll the

accounts. *Id*. at 401-03. The list of these accounts was Trial Exhibit 4. OfficeMax closed these accounts in September 2010 after discovering the fraud. *Id*. at 525; Tr. Ex. 29.

Consulting OfficeMax's transactional records, Gardner examined the transactions in which reward cards issued to suspicious accounts were redeemed at OfficeMax. He saw that on occasion, when a reward card was not enough to cover the purchase, a debit card was used for the balance. Trial Tr. 411-15. That debit card belonged to Matthew Channon. *Id*. By identifying other reward cards used in the same transaction as a reward from one of the suspicious accounts, Gardner linked more than a hundred other accounts to Matthew. *Id*. at 464, 481-82. These other accounts also had high numbers of online adjustments, *id*. at 523; Tr. Ex. 26, and some of them used the Gmail dot trick. Because they were opened before the Teechur/Coach/Bargle/Garble accounts, they were referred to collectively as "Group 1" and the Teechur/Coach/Bargle/Garble accounts as "Group 2." The list of Group 1 accounts was Trial Exhibit 19.

Comparison of the Channons' known travels to OfficeMax's records showed that their trips corresponded precisely to in-store transactions and later online adjustments involving the Group 1 and Group 2 accounts. *Id*. at 647-72, 673-77; Tr. Ex. 36-46. For instance, Southwest Airlines records showed the Channons flying from Albuquerque to Lubbock on July 7, 2010 on tickets purchased from the Channons' home IP address and sent to an email address associated with a Group 1 account. Tr. Ex. 36. Over the next week, Group 1 and Group 2 accounts were then used at 47 OfficeMax stores in Texas, including seven times with Matthew's debit card. Tr. Ex. 43. These accounts also turned in more than 1,600 ink cartridges on the trip. *Id*. The Channons flew home from San Antonio on July 14, 2010. Tr. Ex. 36. A week later, their

accounts began to perform online adjustments of other people's purchases at these Texas stores, ultimately claiming more than 14,000 purchases over the next month from these stores alone. Tr. Ex. 43. The Channons also took a recycling and online-adjustment trip to California, Tr. Ex. 36, 45, and they traveled to the East Coast to redeem more than $5,000 in MaxPerks rewards that belonged almost exclusively to Group 2 accounts, Tr. Ex. 36, 46.

In early June 2011, having completed his internal investigation, Gardner called Matthew Channon on the phone and confronted him. Trial Tr. 914-923. During the call, Matthew made several admissions. *Id*. at 916-22. After Gardner's call, OfficeMax shut down the remainder of the Channons' accounts. *Id*. at 923.

After OfficeMax reported the crime to the FBI, the FBI executed a search warrant at the Channons' house. Brandi Channon, home at the time of the search, gave a statement. As told by Agent Boady (who, under *Bruton v. United States*, 391 U.S. 123 (1968), omitted the parts of her statement that implicated Matthew), Brandi assumed the FBI was at her house for "the OfficeMax thing." Trial Tr. 1061. She admitted to using fake names to create up to a thousand reward accounts to get around the cartridge-recycling limitations, *id*. at 1062, 1065, describing it as a "full time job," *id*. at 1065. She recounted the details of the cartridge scheme, explaining that she would purchase the used cartridges from a guy in Arizona for 10 to 60 cents each, *id*. at 1062, and would have them shipped to a place near the OfficeMax stores where she intended to turn them in for credit, *id*. at 1063. To visit the stores, she would fly around the country, using Southwest Airlines gift cards she had purchased with MaxPerks rewards. *Id*. at 1063-64. Describing the basic concept of an online adjustment, she claimed she would pick up receipts off the ground from the parking lot so that she could later claim the purchases as her own. *Id*. at

1063. Sometimes, while inside the store, she would take note of the amount of money being spent by other customers so that she could claim those purchases, but she didn't like to wait around too long because it made her nervous. *Id.* She used Gmail addresses to create some of the reward accounts because she noticed that if she moved the dot around within the address, OfficeMax would recognize it as a distinct address. *Id.* at 1064. She estimated she had made $30,000 from the OfficeMax accounts. *Id.* at 1065.

On a computer at the house the FBI found deleted spreadsheets listing the Teechur, Coach, and Bargle accounts, along with their fictitious profile details. *Id.* at 1423-31. Those spreadsheets used a sophisticated formula to intersperse the periods at intervals within the email addresses. *Id.* at 1438-39. In email accounts controlled by Matthew, the FBI discovered emails from a service called Fake Name Generator, containing links to download sets of false names and identifiers. *Id.* at 1268-69. The FBI was also able to establish extensive connections between the Channons and the email addresses used to enroll the Group 1 and Group 2 accounts. *Id.* at 1218-33; Tr. Ex. 10, 46, 86-88, 90-92. For instance, the coach12345678 Gmail account was created from the Channons' home IP address, Trial Tr. 1226-27, and it was linked to the teechur, bargle, and garble addresses through other shared IP log-ons and subscriber information, *id.* at 1229-30, 1232-33.

All told, over the course of their 21-month scheme the Channons redeemed more than $100,000 in MaxPerks rewards. *Id.* at 1477. OfficeMax warded off further losses by closing the accounts and voiding reward credit before the Channons could use it. Tr. 9/28/16 at 29; MC PSR at 9. If the company had not discovered the online-adjustment scheme when it did, its

losses could have grown to a half million dollars in 2010 alone.  Trial Tr. 530-31; Tr. 9/28/16 at 15.

### B.    The Channons' Defenses

Matthew Channon's defense team — Marc Robert and John Robbenhaar, both then at the Office of the Federal Public Defender — decided that the evidence against Matthew was so substantial that his best chance was admitting his actions while their illegality.  Resp. Ex. 1 (Robert affidavit).  "Look," Robert told the jury, "We're not here to tell you that these things didn't happen.  We're not even here to tell you that it wasn't Matt that was involved in doing those things."  *Id*. at 1585.  Instead, Matthew's defense was that he had "an intent to outsmart," not an intent to deceive.  *See, e.g., id.* at 1584-86, 1592-93, 1602, 1604, 1608.  Defense counsel portrayed him as an enterprising computer whiz running a small business by exploiting "loopholes" in a program run by a corporation that cared only for its bottom line.  *Id*.

Todd Hotchkiss, on behalf of Brandi Channon, sought to downplay her role in the scheme.  Resp. Ex. 2 (Hotchkiss affidavit).  He felt that the right strategy, given the government's focus on Matthew, was to avoid calling attention to Brandi's presence in the case at all.  *Id*.  To address her confession, he intimated that, under immense stress and hoping to protect her husband, Brandi had implicated herself in crimes that were his alone.  Trial Tr. 1112.  Hotchkiss emphasized the relative quantity of evidence against her versus Matthew, *see, e.g.*, *id.* at 1614-15, 1624-25, and argued that her confession was unreliable, *id*. at 303, 305-06, 1618-22.

### III.    Response to the Channons' Allegations

With that background, the United States now addresses the Channons' hundred-plus complaints, which they have grouped into twenty-two "grounds."  None of their complaints, as

13

set forth below, meet *Strickland*'s first prong, deficient performance. In some places, the United States supports its argument with affidavits of counsel, but given the baselessness of the allegations and out of respect for counsel's time, counsel were not asked to address every complaint. Generally, a showing that the Channons' legal contentions lack merit should suffice to establish that counsel was not ineffective for failing to raise an issue. *United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006) ("If the omitted issue is without merit, then counsel's failure to raise it is not prejudicial, and thus is not ineffective assistance.").

None of the Channons' complaints satisfy *Strickland*'s prejudice prong either. Lack of prejudice may, in fact, be the simplest way for the Court to dispose of the varied complaints. Given the number of discrete and unsupported complaints, the United States has not attempted to expound upon the lack of prejudice for each. The analysis, however, is the same from complaint to complaint: with the heavy weight of the evidence against them, none of the alleged errors call into question their trial's result.

### Ground One (Motion at 2-10)

The Channons, misunderstanding the requirements for an indictment, first allege that their attorneys should have challenged various aspects of the indictment they perceive as inadequate. An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . . ." Fed. R. Crim. P. 7(c)(1). It is sufficient if it (1) contains the elements of the charged offense and fairly informs a defendant of the charge against which he must defend, and (2) enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. *Hamling v. United States*, 418 U.S. 87, 117 (1974); *United States v. Chisum*, 502 F.3d 1237, 1244 (10th Cir. 2007). Tracking the language of the

statute is generally enough. *See Hamling*, 418 U.S. at 117-18; *United States v. Dunn*, 841 F.2d 1026, 1029 (10th Cir. 1988). An indictment "need not go further and allege in detail the factual proof that will be relied upon to support the charges." *Dunn*, 841 F.2d at 1029 (internal quotation marks omitted).

The indictment in this case was sufficient, alleging every element of the charged offenses. Doc. 197.[4] Contrary to the Channons' contentions, the indictment alleged that the Channons "caused" the wire transmissions and that OfficeMax transmitted data by interstate wires (not carrier pigeons), *see* Doc. 197 at 3 ¶10, 6 ¶2; that they acted interdependently, *id*. at 3 ¶ 10; and that conspired to commit wire fraud, *id*. It was unnecessary to allege that either defendant personally "performed any wire transmissions," Motion at 3. *See* 18 U.S.C. § 1343 (applying to one who "causes [a wire] to be transmitted"). Reflecting the wire-fraud statutes, the indictment alleged that the Channons devised, and conspired to devise, a scheme to defraud, *id*. at 3 ¶ 10; it was not required, as they suggest, to allege "actual losses as its object," Motion at 3. *United States v. Welch*, 327 F.3d 1081, 1104 (10th Cir. 2003) ("An intent to inflict economic harm on or injure the property rights of another is not an element of federal mail or wire fraud."). The indictment properly alleged that the scheme employed material false pretenses, Doc. 197 at 3, 6; it need not have alleged that OfficeMax consulted the fictitious account information at the point of issuing a reward, Motion at 3. Further, the charged wire transmissions need not be the vehicle for the misrepresentations or for obtaining the property. *See United States v. Redcorn*,

---

[4] The United States refers to the second superseding indictment as filed, not as it remained after the Court struck portions of it as surplusage in advance of trial on the Channons' motion. Doc. 286. It is not deficient for counsel to refrain from alleging that language struck from an indictment at defendants' own request was legally necessary.

528 F.3d 727, 738 (10th Cir. 2008) ("[The wire] need not be at the heart of a scheme, nor necessary or even helpful for its success; it need not itself be false or deceptive."). Finally, the Channons' denial of the materiality of their false statements does not establish any flaw in the indictment. But even if the Channons had pointed to any problem, they could not show that those problems could not have been remedied, so they would still fail at *Strickland*'s second prong.

In the midst of their complaints about the indictment itself, the Channons allege a "fatal variance" between the indictment and proof at trial. Motion at 3. The Channons say they were "deceptively alleged to have made pretenses (teacher name, school, etc.) during the transmissions as charged," but that it was never proven that the point-of-sale transmissions or email transmissions contained the pretenses. *Id*. This allegation rests on a misreading of the indictment. The indictment does not allege, nor was it required to, *see Redcorn*, 528 F.3d at 738, that the wires themselves "made pretenses." The account details listed in each count serve merely to identify the wires in question. The proof at trial comported with those descriptions.

The Channons next complain that their attorneys did not raise defenses of good faith, express consent, novation, or entrapment. (Though included under the section challenging the indictment's legal sufficiency, these factual defenses would not have been proper pretrial attacks). As to good faith, they say counsel should have argued they had no intent to defraud because they thought OfficeMax profited from the recycled cartridges. Motion at 4-5. But both defense teams did in fact raise a good-faith defense. *See* Trial Tr. 1588, 1590, 1602-03, 1608-11, 1602-03 (Matthew); *id*. at 1626-28 (Brandi). The suggestion that counsel should have raised the issue on appeal is meritless because, among other reasons, it is no defense to wire fraud that a

defendant did not believe the party misled into parting with its property would suffer harm. *Welch*, 327 F.3d at 1104.

The Channons' express-consent and novation theories are equally without merit. They claim that OfficeMax expressly consented to them claiming credit for other customers' purchases because its online-adjustment interface told the customer to "Enter a receipt to receive credit for a purchase made in a store without *your* MaxPerks ID Card." Motion at 4 (emphasis added). Since every purchase the Channons claimed was made in a store without *their* MaxPerks ID cards, they read this as a literal instruction by OfficeMax to claim other people's purchases. The idea that this language signaled OfficeMax's knowing and voluntary consent to the scheme is, frankly, so outrageous that it would risk offending the jury. Robert did, however, make a less brazen point: suggesting that Channon saw a "loophole" to be exploited, which was part-and-parcel of his defense of "outsmarting" the company. Trial Tr. 1601-02. Furthermore, had defense counsel advanced the precise argument that the Channons now propound, the easy rebuttal would be that the Channons could not have thought that the instruction covered their actions because they were not "enter[ing] a receipt." They did not have the receipts. The people who made those purchases had the receipts. The Channons were merely making educated guesses about receipts other people had. In short, the attorneys did not abdicate their constitutional duties by not advancing consent or novation in precisely the manner the Channons would have liked.

Nor was counsel ineffective for not arguing entrapment. OfficeMax was a corporate victim with an internal fraud-investigation department, and the United States denies that OfficeMax and Gardner were ever government agents. It specifically denies that Agent Boady

17

delayed the search to accommodate OfficeMax or that he gave Gardner access to the FBI's evidence room. Those factual disputes, however, are immaterial because even if OfficeMax or Gardner became government agents after reporting the fraud, none of their actions constituted entrapment. "There are two elements to the entrapment defense: The defendant must have been induced to commit the offense by government agents, and the defendant must not have been otherwise predisposed to do so when presented with the opportunity." *United States v. Duran*, 133 F.3d 1324, 1330 (10th Cir. 1998) (quotation omitted). The Channons could not have met either element. They initiated the fraudulent scheme before OfficeMax had discussions with the government, before any corporate actions could (even allegedly) have taken on a governmental character. Further, the Channons identify no "inducement" by OfficeMax other than the administration of its MaxPerks program. The Channons specifically complain that OfficeMax left open the Group 1 accounts even after suspecting that Matthew Channon was behind the fraud, Motion at 6, but allowing them the means to execute a scheme they'd already devised does not constitute entrapment. *Duran*, 133 F.3d at 1330.

The Channons next argue that the indictment treated the MaxPerks rules as "binding law" and their violation as a criminal offense. Motion at 6-7. To the contrary, the illegal conduct alleged in the indictment was using interstate wires to execute a fraudulent scheme. Doc. 197 at 3, 6. The MaxPerks rules merely demonstrated the materiality to OfficeMax of the false representations involved. In other words, the indictment alleged that OfficeMax placed conditions on its bestowal of benefits and that the Channons had to deceive OfficeMax to obtain those benefits. The indictment was not based on "extracongressional legislation," and the Channons' counsel made sound choices not to raise such a challenge. Matthew's attorneys, did

however, make the point in both opening and closing that OfficeMax's rules are not law. Trial Tr. 302-03, 1584-85.

The Channons criticize their attorneys for accepting the "narrative" that MaxPerks limited each customer to one account, Motion at 7, but they fail to explain what counsel should have done differently, given that the rules explicitly provided that "[o]nly one MaxPerks account and member ID per person is permitted at any given time," *see* Tr. Ex. 1 at 1, 4; Tr. Ex. 2 at 1, 4. The Channons further suggest that representations of teacher status were immaterial to OfficeMax because it did not define "teacher" and did not "vet" teacher claims before enrolling customers in the Teachers program, Motion at 7, but their own conduct in registering thousands of accounts as elementary schools shows they knew it was material.

The Channons contend that their attorneys fell short by failing to allege that the government was presenting its trial case in accordance with the first superseding indictment, rather than the second. Motion at 7-8. After the Channons moved to dismiss the first superseding indictment on the grounds that MaxPerks Rewards were not "property" that could form the object of a fraud scheme, Doc. 177, the United States superseded to allege that the object of the conspiracy was obtaining OfficeMax merchandise with MaxPerks Rewards certificates to which they were not entitled. The United States maintains that the first superseding indictment was valid, *see* Docs. 202, 230, but regardless, the Channons are incorrect about the proof at trial. The United States proved that the Channons executed a scheme to obtain OfficeMax merchandise, which included prepaid gift cards and prepaid debit cards,[5] *through* the

---

[5] Those gift cards and prepaid cards are different from MaxPerks rewards, which were essentially OfficeMax store credits.

use of fraudulently obtained rewards, exactly as the second superseding indictment alleged.  *See, e.g.*, Trial Tr. 900 (in response to a question about "what OfficeMax had issued in reward cards that had been subsequently redeemed for OfficeMax merchandise," Gardner answered, "That was a little north of $100,000, as I recall.").  The trial started and ended with a description of the scheme's object as merchandise, *see* Trial Tr. 282-83, 1551, 1555, 1556; along the way, the evidence necessarily showed how the Channons obtained the MaxPerks rewards, the *means* by which the Channons obtained the merchandise.  The jury instructions correctly reflected the language of the second superseding indictment.  Doc. 298 at 8.

The Channons' next paragraph contains a hodgepodge of allegations, most of which appear to be a rehashing of their complaints that counsel failed in various ways to challenge the indictment.  Motion at 8-9.  They also fault counsel for asserting in a motion to strike surplusage that the indictment went beyond stating the essential elements of the offense — an allegation that is, of course, essential to such motion.  The motion abandoned no meritorious challenges to the indictment (and certainly none that would be timely a week before trial), and it succeeded in preventing the jury from hearing the full indictment, which counsel characterized as prejudicial and "unconscionably argumentative."  Doc. 274 at 3.

In the final allegation under Ground 1, the Channons claim that Count 1 failed to state which statute it charged because it cited both 18 U.S.C. § 1343 and 18 U.S.C. § 1349.  Motion at 9.  The indictment's citation of those two sections, *see* Doc. 197 at 3, 5, however, was proper.  Section 1349 prohibits a conspiracy "to commit any offense under this chapter," and "the offense" under that chapter that the Channons conspired to commit was wire fraud under § 1343.  Further, the caption of the indictment makes clear that Count 1 charges § 1349.  *Id*. at 1.  The

Channons are correct that "in violation of § 1349" was initially left out of the jury instructions'

summary of Count 1, Doc. 298 at 3, although it appeared in the instruction specific to Count 1,

*id*. at 6. Over defense counsel's objection, Trial Tr. 1651, the Court remedied the omission, Doc.

300 at 4. The Channons suffered no conceivable prejudice from the initial omission or counsel's

failure to raise it on appeal. The same goes for the Court's mistake in labeling Count 1 as a

conviction under § 1343 rather than § 1349 in the written judgment. Motion at 9.[6]

### Ground 2 (Motion at 10)

The United States has difficulty following the chronology of the misconduct alleged in

Ground 2, but what is clear is that the Channons place great weight on an irregularity in the

printed pagination of a warrant affidavit signed by Judge Schneider. As the Court can verify

from the copies on CM/ECF, Judge Schneider signed the warrant on June 27, 2011. *See* 11-MR-

401 Doc. 2. He also signed the affidavit's cover page and last page. *See* 11-MR-401 Doc. 1.

The affidavit's page numbers skip from 35 to 38, with a portion of page 35's last sentence

reprinted at the top of the next page. *Id*. Long before trial, Robert, copying Hotchkiss, emailed a

question about the numbering to the prosecutor, who responded with a reasonable explanation.

Resp. Ex. 3. Hotchkiss at trial then raised the issue with Agent Boady, Trial Tr. 1123-24, who

---

[6] The Channons also complain about the inclusion of 18 U.S.C. § 2, aiding and abetting, in the
indictment and jury instructions. The United States cannot discern why they believe that to be
error. Motion at 9. "It is well established that aiding and abetting is not an independent crime
under 18 U.S.C. § 2; it simply abolishes the common-law distinction between principal and
accessory." *United States v. Scroger*, 98 F.3d 1256, 1262 (10th Cir. 1996). A jury need not
agree unanimously whether a defendant acted as a principal or as an aider and abettor. *United
States v. Garcia*, 400 F.3d 816, 820 (9th Cir. 2005); *United States v. Horton*, 921 F.2d 540, 541
(4th Cir. 1990).

said he assumed it was a formatting error. *Id*. at 1131. Boady had compared the affidavit he submitted to the filed copy and confirmed that nothing had been removed. *Id*. at 1132.

Defense counsel's handling of this issue was appropriate. Counsel conducted a reasonable pretrial investigation of the issue and used it at trial to imply sloppiness on the part of the government. Counsel properly refrained from making baseless accusations of forgery. Resp. Ex. 1 at 2; Resp. Ex. 2 at 1.

### Ground 3 (Motion at 10-12)

The Channons begin here by complaining that, due to attorney "blunder[s]," the jury was left without a legible copy of the MaxPerks Terms from late 2009. Motion at 10-11. This mattered, in their view, because the recycling program did not then require a "qualified purchase" balance equal to the rewards sought. They allege that because they opened the Group 1 accounts prior to the change in terms, opening the accounts could not have been fraudulent. *Id*. at 13. They believe their attorneys should have argued that this made them "actually innocent." *Id*. at 12.

This argument fails for several reasons. First, Gov. Ex. 1 was adequate to show that the cartridge recycling program in September 2009 contained no qualified-purchase requirement. Though the end of each line is cut off, it is nevertheless clear, especially when compared to Ex. 2's 2010 version, that minimal text is missing. There is no room to hide the lengthy qualified-purchase explanation that appears in Ex. 2 at 2.

More importantly, however, the government's theory of the case did not depend on a qualified-purchase requirement at the start of the scheme. (Indeed, the second superseding indictment alleged that the requirement began in 2010. Doc. 197 at 3 ¶ 9.) Even the 2009 Terms

restricted each customer to one account and placed limits on cartridge recycling, both of which the Channons evaded through fictitious enrollment information. Had the Channons stuck to cartridge recycling, OfficeMax might not have noticed them, but even in those early stages, what they were doing was fraud. When OfficeMax started to require qualified purchases, however, the Channons' scheme truly took off. To keep up their recycling numbers, they had to find a way to falsify qualified purchases. And once they learned to manipulate online adjustments, they realized they could generate rewards independent of the cartridge program. In short, the Channons' adaptation to the changing program terms evinces their knowledge and intent, not their innocence. And even if counsel could have shown through a better copy of the 2009 terms that the Channons' early conduct was not criminal, the Channons lacked any defense to the heart of the scheme, the online-adjustment fraud.

The Channons also assert that there was evidence that that some Group 1 accounts were used out-of-state when the Channons were in New Mexico, raising doubt that they created the Group 1 accounts. Motion at 12. To the extent that the Channons fault their attorneys for not bringing this alleged evidence to the jury's attention, they are mistaken about the wisdom of that strategy. First, the United States never alleged that every transaction involving one of the suspect accounts was personally performed by Matthew or Brandi; to the contrary, there was evidence that they had trained friends to engage in the same sort of fraud. *See* Trial Tr. 1064. Attempting to distance themselves from the Group 1 accounts would have invited unwanted focus on this evidence. Resp. Ex. 1 at 5; Resp. Ex. 2. at 3. Furthermore, there was strong evidence linking the Channons to all 118 of the Group 1 accounts, including videos, IP addresses, and their own admissions. An attempt to isolate a handful of transactions that the

Channons did not personally perform would only have led to a more detailed explanation as to how those particular accounts were linked to the Channons.

## Ground Four (Motion at 12-16)

As recounted above, Brandi Channon made incriminating statements during the execution of the search warrant at her house. Hotchkiss filed a motion to suppress those statements as involuntary and as products of unwarned custodial interrogation. Docs. 52, 53. The Court denied that motion, concluding that Brandi was not in custody during the interview and that even if aspects of the initial encounter exerted a coercive effect, the effect had dissipated by the time Brandi gave her statement. Doc. 123. Brandi now raises various complaints about the use of those statements at trial. In many instances she criticizes the Court's findings of fact, but she has not alleged (nor could she establish) that Hotchkiss was ineffective for not challenging that fact-finding on appeal, where it would have been afforded substantial deference. *United States v. Cash*, 733 F.3d 1264, 1273 (10th Cir. 2013). Resp. Ex. 2 at 2. None of Brandi's complaints establish that Hotchkiss's performance in handling the motion to suppress was deficient or that a different approach would have succeeded.

First, the issues that she implies that Hotchkiss should have raised simply have no bearing on the voluntariness of her statement. This is true of the alleged "cross talk" between agents conducting the two backyard interviews, Motion at 13 — an issue that Hotchkiss did in fact attempt to broach at trial. Trial Tr. 1108. It is also true of the encounter's effect on Brandi's health (which she does not allege the agents were aware of), *id*. at 14-15, and of her statement that she did not wish to leave because of her cat, *id*. at 15. As to the cat, she complains that Hotchkiss "never explained the cat's significance." *Id*. To the contrary, he made clear to the

jury that she had not wanted to leave the premises because of her cat. Trial Tr. 306, 1105, 1619.
He could not have suggested that not *wanting* to leave meant she was not *free* to leave, nor could
he have said that concern for the cat forced her to grant an interview.

Brandi next alleges that Hotchkiss ineffectively failed to allege a violation of her right to
representation. Motion at 16. She claims that at the time of the search, she was represented by
Donald Kochersberger. Even if true,[7] however, a person has no right to counsel during a
noncustodial preindictment interview. *United States v. Gouveia*, 467 U.S. 180, 187 (1980)
(Sixth Amendment right "attaches only at or after the time that adversary judicial proceedings
have been initiated"); *Eidson v. Owens*, 515 F.3d 1139, 1149 (10th Cir. 2008) (Fifth Amendment
right contingent upon custodial interrogation). Counsel was not ineffective for not seeking to
vindicate a nonexistent right.

Lastly under this Ground, Brandi shifts focus to counsel's trial conduct and alleges that
Hotchkiss "inexcusably brought forth incriminating testimony" by eliciting that she told FBI
agents "that whatever it is that the FBI was at her house for she wants to be blamed for it and it
was she who did it." Trial Tr. 1113. But this was sound strategy because the statement
suggested that Brandi had falsely confessed to shield her husband, one of the main themes of her
defense. Resp. Ex. 2 at 1. Her confession was already in evidence, and there was no drawback
to attempting to cast doubt on its veracity.

---

[7] A letter sent by Kochersberger to OfficeMax before the search stated that he represented
*Matthew* Channon. The United States therefore disputes Brandi's assertion of representation but
believes it immaterial for the reasons given.

**Ground Five (Motion at 16-17)**

The Channons next allege that the redaction of the grand jury foreperson's signature on the indictments (denoted by "/s" on the filed copies) means that "it is likely some or all of the indictments skipped a proper Grand Jury altogether." Motion at 16. As defense counsel knew, Resp. Ex. 1 at 2; Resp. Ex. 2 at 2, "this Court redacts signatures from public copies of indictments." *United States v. Brakeman*, 04-CR-2524 RB, Doc. 83 at 2 (Sept. 29, 2008) (unpublished order). Returns of signed indictments are made to the magistrate judge in open court, and the court itself retains the signed copy and publicly files the redacted version. And as the Channons later acknowledge, Motion at 20, they received two grand-jury transcripts as discovery. Further, the Channons have not established any prejudice from counsel's reasonable decision not to raise the alleged "irregularity." *Hobby v. United States*, 468 U.S. 339, 345 (1984) ("Even the foreman's duty to sign the indictment is a formality, for the absence of the foreman's signature is a mere technical irregularity that is not necessarily fatal to the indictment.").

**Ground Six (Motion at 17-18)**

The Channons allege here that the Court, through remarks on the record and through the court reporter's inquiries about settlement, betrayed its bias against them. None of the incidents cited, however, display any bias. First, the series of remarks cited from the July 2015 pretrial hearing related to the Channons' motion to dismiss the indictment, where the Court was required to accept as true the indictment's well-plead allegations. *United States v. Wood*, 6 F.3d 692, 694 (10th Cir. 1993) (abrogated on unrelated grounds); *United States v. Besmajian*, 910 F.2d 1153, 1154 (3d Cir. 1990). The Court was simply focusing the parties' attention on the legal issues, not any dispute of fact. Next, the Court was indisputably correct when it made the neutral

statement at a pretrial hearing that "This case is about the Channons."  Tr. 1/16/16 at 152.

Lastly, inquiries by the Court or the court reporter about the probability of resolving the case

indicated the Court's need to settle its calendar, rather than prejudgment of the case.  It is

unsurprising that defense counsel perceived no judicial bias.  Resp. Ex. 1 at 2; Resp. Ex. 2 at 2.

And for obvious reasons, it is poor strategy to accuse the presiding judge of bias without a sound

basis.  Defense counsel did not err by failing to raise the issue with the Court or on appeal.

### Ground Seven (Motion at 18-20)

The Channons begin their next collection of complaints with a claim that counsel

mishandled the subject of IP addresses at trial.  But contrary to the Channons' allegations, Agent

Moon made clear the points that the Channons would like counsel to have introduced: that

several devices accessing the internet from a single location (*e.g.*, a home or a Starbucks) can

share the same "external" IP address, Trial Tr. 1214-15, and that residential IP addresses may be

reassigned, *id*. at 1213.  Beyond that, they have not explained how counsel should have

"debunked" Agent Moon's testimony.

The Channons claim that counsel should have objected when Moon testified that

Comcast records showed that the 98.230.199.128 address was assigned to the Channons' home.

While no such Comcast document was in evidence, the government had tendered that document

to the Court and defense counsel as its proposed Exhibit 85, *see* Resp. Ex. 4, and had counsel

objected that Moon was testifying to "facts not in evidence," the inevitable result would have

been its admission.  That document forecloses any suggestion that 98.230.199.128 was assigned

at the time to multiple residences.  Nor did counsel fall short by failing to bring up foreign log-

ons to email addresses associated with the MaxPerks accounts, which would have invited prejudicial testimony about IP-hiding techniques. Resp. Ex. 1 at 6.

The Channons allege that counsel made incomplete objections to the government's summary exhibits. Counsel did object to these exhibits as hearsay and improper summaries under Rule 1006, objections that were overruled by the Court and ultimately the Tenth Circuit. Among the alleged deficiencies is that counsel did not object to the exhibits "for assuming facts not in evidence," but Rule 1006 makes the summary *itself* evidence so long as the records summarized are made available to the opposing party. *United States v. Samaniego*, 187 F.3d 1222, 1224 (10th Cir. 1999). The Channons also claim counsel should have objected to the summaries as "being incomplete," but they do not point to anything missing. In addition, the Channons allege that counsel should have objected to the government adding details to the receipt exhibits that "went beyond mere summary." Counsel did, in fact, raise that objection, Doc. 208 at 3-4, and were overruled. Though the Channons believe it improper to draw together in one document information from multiple sources (sources that cannot together be "conveniently examined in court," *see* Rule 1006), nothing in the Rule prohibits that approach. As the United States explained in response to the Channons' pretrial objection, Doc. 227 at 5-6, the alternative would have been a piece-by-piece explanation of every detail annotated on the receipts, an approach that offered no advantage to the Channons beyond, perhaps, boring the jury.

The Channons also accuse government counsel of "manufacturing" evidence in various ways. Contrary to their insinuations, there is nothing improper about counsel working with OfficeMax to ensure that the summary exhibits accurately reflected the vast transactional data

that OfficeMax had provided.[8]  Summary exhibits are, by necessity, created by a party.  The underlying evidence, however, is admissible and available to the opposing party.  Fed. R. Evid. 1006.  If any error was made in the creation of the summary, the Channons could have attacked the summary's validity — but they have never identified a single such error.  Similarly, the Channons accuse government counsel of manufacturing three exhibits (10D, 88, and 89) because the document "properties" show AUSA Messec to be the document's author.  Defense counsel raised similar objections below, Doc. 208 at 2, to which the United States responded, Doc. 227 at 3, and which remain meritless.  A records custodian from eBay authenticated Ex. 10D at trial as a portion of a transactional log produced to the government by eBay.  Trial Tr. 617-19.  Exhibits 88 and 89 are *summary* exhibits pairing together records obtained from OfficeMax and Google.  Trial Tr. 1219-1221, 1254-55.  That precise presentation could not possibly have come directly from either company, and the government never suggested otherwise.

Lastly under this Ground, the Channons allege various forms of grand-jury misconduct, which the United States will address even though the Channons have not specifically complained about defense counsel's handling of the purported misdeeds.  First, the Channons claim that Agent Boady "fabricated evidence" when he testified to the first grand jury that the FBI found emails from Fake Name Generator in one of the suspect email accounts.  The FBI had indeed found such emails.  Trial Tr. 1269-71; Tr. Ex. 92, Tr. Ex. 93.  The Channons, however, say that

---

[8] The Channons also accuse government counsel of redacting her email inquiries to Gardner to hide "what she asked Gardner to manufacture."  Motion at 16.  To the contrary, the emails were redacted because the Channons were entitled under the Jencks Act to prior statements of a witness, not prior statements of counsel.  Nevertheless, counsel has located the specific email that the Channons cite ("Let me know if they are correct") and would be glad to provide an unredacted copy for *in camera* review should the Court desire.

Agent Boady's grand-jury testimony had "no evidentiary basis" because an FBI computer

forensic examiner had inadvertently deleted the *bookmarks* that Agent Boady had created during

his review of the accounts (not his "entire case file," as the Channons claim, *see* Trial Tr. 1155-

57, 1177, 1184).  Testifying about documents that Agent Boady had personally seen before and

could pull up again, even without the help of "bookmarks," is not fabrication.

Nor did Agent Boady mislead the grand jury about a Facebook account.  What Boady

said was that the FBI was able to determine that the suspicious email accounts belonged to the

same person (and that said person was Matthew Channon) because "he was logging in from his

house or from a common IP that he would use to log in to his Facebook account or something

else like that."  Resp. Ex. 5.  While not a model of precision, "his Facebook account or

something else like that" accurately conveyed that IP addresses known to be associated with

accounts controlled by Matthew also logged into these suspicious email accounts — which

Boady confirmed in response to the prosecutor's follow-up question.  *Id.*

Finally, because they were not presented with complete grand-jury transcripts, each of the

Channons "believes and therefore states" that government counsel fabricated evidence at the

grand juries.  But the Channons were not entitled to full transcripts; what they received was the

testimony whose disclosure was required under the Jencks Act, 18 U.S.C. § 3500.[9]  Grand jury

presentations often involve non-Jencks material, such as the prosecutor's legal instructions to the

grand jury and the agent's report ("return") of material obtained pursuant to grand-jury

---

[9] While the Channons have not made any allegation of misconduct credible enough to warrant
further inquiry (and none that would be redressable through these § 2255 motions), should the
Court desire to review the full grand-jury transcripts *in camera*, the United States would readily
produce them.

subpoenas. Defense counsel knew that and reasonably concluded that the redaction presented no basis for suspecting fabrication of evidence. Resp. Ex. 1 at 2; Resp. Ex. 2 at 2.

## Ground Eight (Motion at 20)

The Channons assert that their attorneys expected to win a motion to exclude most of the government's case-in-chief, were thus "unprepared to proceed to a trial" when that motion was denied, and should have requested a continuance. Defense counsel deny that they were unprepared to proceed to trial. Resp. Ex. 1 at 2-3; Resp. Ex. 2 at 2. The United States further notes that by the start of trial on January 13, 2016, the Channons had been in possession of the government's full set of exhibits for six months. Doc. 185 at 7.

## Ground Nine (Motion at 21)

The Channons claim that the jury pool for their January 2016 trial contained too many women. They speculate that some of the prospective-juror surveys were blank due to a "systemic computer error." (They do not, however, explain how this alleged error relates to the gender balance of the venire.) They complain that counsel raised no objection to the composition of the jury pool.

"A criminal defendant has a Sixth Amendment right to a jury pool comprised of a fair cross section of the community." *United States v. Robertson*, 45 F.3d 1423, 1439 (10th Cir. 1995). To show a prima facie violation of this right, a defendant must show, among other things, "that the group's under-representation is due to the systematic exclusion of the group in the jury selection process." *United States v. Hardwell*, 80 F.3d 1471, 1486 (10th Cir. 1996). A bare allegation, such as the Channons', that "systematic exclusion can be inferred from the under-representation in a single venire" does not carry this burden. *Id*.

As defense counsel explain in their affidavits, they were not concerned with the gender balance of the venire.  Hotchkiss in fact preferred women as a matter of strategy, Resp. Ex. 2 at 2-3, and Robert would not have thought it worthwhile to raise an attack on the composition of the venire given the obstacles that such an attack must overcome, Resp. Ex. 1 at 3.

Nor have the Channons shown that any prejudice resulted from counsel's lack of objection to the number of women in the jury pool.  To do so, they would have to show a reasonable probability that a different jury would have acquitted them.  Notably, the question is not whether a jury composed of more *men* would have acquitted them.[10]  As the Sixth Circuit explained in a case involving the racial composition of a jury:

> Since defendants are not entitled to a jury of any particular composition, it follows that they are not entitled to a jury predisposed to better "understand" their defense strategy.  There is no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. . . . The question is not whether the petitioner missed his chance to stand trial before a more merciful jury panel or a panel with a particular racial balance, but rather whether there is a reasonable probability that a different jury would have reached a different result.

*Garcia-Dorantes v. Warren*, 801 F.3d 584, 599 (6th Cir. 2015).  Here, evidence of the Channons' guilt was overwhelming.  No reasonable jury of any gender composition would have acquitted them.  *Thomas v. Borg*, 159 F.3d 1147, 1152 (9th Cir. 1998) (rejecting a claim of prejudice "because the evidence . . . was so overwhelming that it is hard to believe that any

---

[10] Even if that were the inquiry, the Channons' self-reported results from their self-designed jury research does not establish that men were more likely to acquit.  The United States questions their methodology, particular given that their results showed a spike in willingness to convict among divorcees, a status with no logical bearing on one's assessment of the case.

reasonable juror, black or white, would have voted to acquit").  Further, the jury that the Channons ultimately selected was equally split between men and women.  Motion at 21.

**Ground Ten (Motion at 21-22)**

The Channons continue under Ground Ten to speculate about redacted portions of the first two grand-jury transcripts and the nondisclosure of a third transcript.  The Channons are mistaken that the third presentation — made to the same grand jury as the second and involving limited changes to the indictment — would "necessarily have heard from witnesses who later testified at trial."  For one, hearsay is admissible in grand jury presentations.  *Costello v. United States*, 350 U.S. 359 (1956).  Counsel appropriately declined to raise the Channons' baseless speculation with the Court.

The United States cannot decipher the allegation in the last three sentences under this Ground, or what, if any, relation it bears to the preceding material.  To the extent it alleges late disclosure of Jencks information, it is incorrect.  The Jencks Act requires disclosure of a witness's related prior statements only after the witness has testified on direct examination.  18 U.S.C. § 3500; *see also* Fed. R. Crim. P. 26.2(a).  The United States disclosed Jencks material for Steven Gardner on January 8, 2016, who first testified at trial on January 14.  Resp. Ex. 6.  It disclosed Jencks material for Agent Boady on January 15, 2016, Resp. Ex. 7, who first testified at trial on January 19, 2016.  None of the material, contrary to the suggestion in this Ground's heading, was exculpatory.  Whatever the precise nature of their complaint, the Channons have not shown that their attorneys' performance was deficient.

**Ground Eleven (Motion at 22-23)**

The Channons next complain about the conduct of OfficeMax investigator Gardner. Gardner, unbeknownst to the FBI, called Matthew in June 2011 and confronted him. Resp. Ex. 8; Trial Tr. 995. After Matthew failed to respond to subsequent attempts to arrange for repayment of the defrauded amount, Gardner sent Matthew an email in which he stated, "If I do not hear back by Monday June 13, 2011 I will be forced to present my findings to the FBI in Albuquerque." Resp. Ex. 9.

According to the Channons, Gardner's email constituted blackmail, a misdemeanor under 18 U.S.C. § 873, and their attorneys should have cross-examined him about it. That, however, would have been improper under the Rules of Evidence. Rule 608(b) permits inquiry on cross-examination into "specific instances of a witness's conduct" only if they "are probative of the character for truthfulness or untruthfulness" of the witness. And even had it been proper impeachment, the Court would have acted well within its discretion to exclude the evidence anyway. *See* Fed. R. Evid. 608, advisory committee notes ("[T]he overriding protection of Rule 403 requires that probative value not be outweighed by danger of unfair prejudice, confusion of issues, or misleading the jury."). The jury was to determine whether the Channons committed the crimes in the indictment, not whether Gardner committed a separate uncharged misdemeanor. *See* Doc. 298 at 17 (jury instruction stating that "[t]he fact that another person also may be guilty is no defense to a criminal charge").

The Channons next allege that counsel failed to react appropriately to what they view as problems regarding the origin of the spreadsheets containing OfficeMax's transactional data, the source of many of the government's summary exhibits. The Channons here misrepresent

34

Gardner's testimony, and they also attach undue importance to him being listed as the "author" of one of the source spreadsheets. As witnesses explained, the source of the underlying data was OfficeMax's transactional records. Tr. 1/11/16 at 17-18. That data was obtained from a company (SHC) that housed it in a database. *Id*. at 35-36, 40-41, 45-46. The database format was "not pretty for the client to view," *id*. at 25, so SHC would export the data into Excel for easier viewing, *id*. at 22. Gardner would provide SHC a "template" —essentially, a spreadsheet with headings but no content — with field names to indicate the information he wanted. *Id*. at 37, 179, 201-02. SHC would extract the requested data, populate the spreadsheet, and return it to him. *Id*. at 37. In other words, neither Gardner nor SHC "created" the data, but they both had a hand in causing that data to be displayed in that particular format. This process explains why the "author" of the Excel spreadsheet was "sgardner." *Id*. at 77-78. None of this indicates that Gardner was "lying" or that the spreadsheet documents were "fraudulent." Further, counsel made extensive challenges to the admissibility of the spreadsheets over the course of several pretrial hearings. *See* Tr. 10/28/15; Tr. 1/6/16; Tr. 1/11/16. Their zealous representation did not deprive the Channons of their constitutional right to the assistance of counsel.

### Ground Twelve (Motion at 21-22)

Under Ground Twelve the Channons continue to complain about counsel's handling of the spreadsheets. According to the Channons, counsel "waived objection" to the idea that the data was machine-generated and thus not hearsay under Rule 801. In fact, Robert did make this objection during the pretrial hearings. *See* Tr. 1/6/16 at 106, 109, 113. And when the government again on appeal defended the spreadsheets as machine-generated nonhearsay, defense counsel again disputed it. The Tenth Circuit then affirmed that the data was machine-

generated. *Channon*, 881 F.3d at 811. The Channons may not relitigate a claim rejected on direct appeal under § 2255. *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994).

The Channons next allege that counsel should have pursued on direct appeal the argument that the spreadsheets were inadmissible hearsay under Rule 803(6)(E) because their method of preparation indicated untrustworthiness. The United States denies the merit of such argument, but at any rate, the Tenth Circuit's holding that the records were machine-generated *nonhearsay* puts to rest any claim of prejudice from counsel not approaching this hearsay-exception argument in the exact manner the Channons would have preferred.

The Channons also contend that counsel should have raised an authenticity objection to the spreadsheets, pointing to the SHC custodian's lack of deep technical knowledge. But authentication of a computer output does not require a witness with "personal knowledge of computer system's operation or who could confirm the accuracy of the input to and output from the computer." *United States v. Whitaker*, 127 F.3d 595, 601 (7th Cir. 1997). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901. Authentication does not require that the proponent demonstrate the accuracy of a document or printout at issue, *United States v. Meienberg*, 263 F.3d 1177, 1181 (10th Cir. 2001), although one way of authenticating records is to introduce "[e]vidence describing a process or system and showing that it produces an accurate result," Fed. R. Evid. 901(b)(9). This foundation may be laid by the testimony of "a witness who frequently works with and relies on the program," *United States v. Lizarraga-Tirado*, 789 F.3d 1107, 1110 (9th Cir. 2015) — as did

the SHC custodian, *e.g.* Tr. 1/6/16 at 19-21.  The testimony of the SHC custodian and Gardner

established that the spreadsheets were what they government claimed them to be.

<h3 style="text-align:center">Ground Thirteen (Motion at 25)</h3>

The Channons complain here about their "package deal" plea offers.  Although this

Ground's heading alleges ineffective assistance of counsel, the Channons do not explain what

counsel should have done differently.  Neither defense counsel nor the Court could force the

government to make a plea offer more attractive to the Channons.  *United States v. Gonzales*, 65

F.3d 814, 823 (10th Cir. 1995) (vacated on unrelated grounds) ("It is the prosecutor's prerogative

to offer a 'package deal,' or no deal at all.").  To the extent that the Channons allege that the

superseding indictment (which *reduced* the number of charges) was retribution for their rejection

of the offers, the United States denies this as a matter of fact and further notes as a matter of law

that the Supreme Court has rejected the idea that such a practice gives rise to any presumption of

vindictiveness.  *Bordenkircher v. Hayes*, 434 U.S. 357, 358 (1978); *United States v. Goodwin*,

457 U.S. 371 (1982).

<h3 style="text-align:center">Ground Fourteen (Motion at 25-26)</h3>

The Channons read part of the conspiracy instruction given by the Court as a command to

find that interdependence had been proven ("You are also required to find that interdependence

existed[,] Doc. 298 at 7"), and they allege that counsel was ineffective for failing to object.  But

the Channons take the phrase out of context.  The instruction clearly conveyed that to convict,

the jury must find that the government had proven interdependence *and* the other four elements

of conspiracy, beyond a reasonable doubt.  Doc. 298 at 6 ("To find any defendant guilty of this

crime you must be convinced that the government has proved each of the following beyond a

reasonable doubt: … *Fifth*, there was interdependence among the members of the conspiracy…").  Two sentences after the offending language, the instruction provides that "To satisfy this element, you must conclude that the defendant participated in a shared criminal purpose…."  *Id*. at 7.  There is no chance that the jury read the instruction as a judicial decree that interdependence was established.  Furthermore, counsel's performance does not fall beneath prevailing professional standards when counsel offers or fails to object to language that appears in the Tenth Circuit's Criminal Pattern Jury Instructions, *see* Instruction 2.87, and which has never been found lacking.

## Ground Fifteen (Motion at 26-28)

The Channons next allege that counsel should have moved to dismiss the indictment for a violation of the Speedy Trial Act, 18 U.S.C. § 3161.  Counsel, however, appropriately refrained from filing such a motion because there was, in fact, no Speedy Trial Act violation, nor did counsel perceive one.  Resp. Ex. 1 at 3-4; Resp. Ex. 2 at 3.

The Channons were arraigned on the first indictment on April 12, 2013.  Docs. 9, 10.  Twenty-six days passed before the first ends-of-justice continuance under § 3161(h).  Doc. 20.  Every day thereafter until the start of trial was covered by a well-justified continuance; the clock was also tolled under § 3161(h)(1)(D) for long periods due to pretrial motions.  *United States v. Tinklenberg*, 563 U.S. 647, 650 (2011) ("[T]he filing of a pretrial motion falls within this provision irrespective of whether it actually causes, or is expected to cause, delay in starting a trial.").  On June 27, 2013, the Court declared the case complex and ordered the parties to submit a proposed scheduling order.  Doc. 28.  A status conference was held approximately two weeks later, the minutes of which indicate that the Court mentioned that it had declared the case

complex and was awaiting the parties' proposed scheduling order. Doc. 33. Adopting the parties' joint proposal on August 28, 2013, the Court then set trial for January 21, 2014. Doc. 41. On the Channons' motion two months later, *see* Doc. 42, which cited ongoing discovery disputes, the need to review discovery, and the need to identify and file pretrial motions, the Court continued the trial to May 19, 2014, *see* Doc. 45.

The first pretrial motions were filed on January 27 and 28, 2014. *See* Docs. 49-57. The Court decided the first of these on July 22, 2014 (Brandi's motion to suppress), *see* Doc. 52; several others on September 22, 2014, *see* Doc. 130; and the Channons withdrew the last of them on November 20, 2014, *see* Doc. 140. Meanwhile, the United States filed a notice of its intention to offer expert testimony, *see* Doc. 58, to which the Channons responded in opposition, *see* Doc. 70. The Court construed the notice as a motion, which it granted on January 8, 2015. Doc. 152. In short, pretrial motions were pending for the entire period between January 28, 2014, and January 8, 2015. During that time, the Court moved back the trial date twice more, *see* Doc. 99 (to August 11, 2014), Doc. 139 (to January 26, 2015), both times following motions by the Channons asserting a need for additional time, *see* Docs. 89, 137.

At the end of December 2014, the United States filed an unopposed motion for a brief continuance of the scheduled trial date of January 26, 2015, citing the unavailability of a key witness, followed by the unavailability of government counsel. Doc. 146. The United States requested a trial date no sooner than February 10, 2015, to accommodate those conflicts, and the Court set trial to begin on February 23, 2015. Doc. 153.[11] On January 21, 2015, the grand jury

---

[11] The United States does not believe that the clock ran for the thirteen days between February 10 and February 23 because the Channons moved for another continuance even before February 10. Doc. 157. But even counting those 13 days would not cause a speedy trial violation.

issued a superseding indictment.  Doc. 155.  The Channons moved for a continuance to allow time to adapt to the changes, *see* Doc. 157, which the Court granted, *see* Doc. 165, setting trial for May 11, 2015.

On April 2, 2015, motions tolling resumed when the United States filed a motion in limine on several issues, *see* Doc. 169, to which the Channons responded in June 2015, *see* Docs. 200, 212, and again on January 4, 2016, *see* Doc. 280.[12]  On January 4, 2016, the Channons moved to strike surplusage from the indictment, which the Court granted on January 12, 2016, the day before trial began.  That day, the United States sought a pretrial ruling on the admissibility essential evidence, *see* Doc. 288, which the Court made the next morning, the start of trial.  During this period when the clock was tolled, the Court moved the trial date back three times, *see* Doc. 171 (to July 13, 2015) (on account of a defense scheduling conflict, *see* Doc. 168); Doc. 246 (to January 11, 2016) (following continuance of the *Daubert* hearing, *see* Doc. 244); Doc. 282 (to January 13, 2016) (to accommodate the evidentiary hearing set for January 11, 2016, *see* Doc. 282).

In conclusion, the speedy trial clock ran for the first 26 days after indictment and then stopped as the case heated up.  There was no violation of the Speedy Trial act and no reason for counsel to have moved to dismiss.  But even if there had been a plausible argument for dismissal, it was nevertheless reasonable for counsel not to pursue it.  Rejecting a claim that defense counsel was ineffective for foregoing a meritorious speedy-trial motion, the Tenth Circuit

---

[12] Between April 2, 2015, and January 4, 2016, the parties filed a number of other motions, *see* Docs. 177, 182, 183, 185, 189, 204, 208, 209, 210, 235, 259, 260, many of which were not resolved before trial.  To simply matters, the United States recounts above the motions whose disposition dates are clear and which collectively cover the full span until trial.

explained that "a reasonable attorney in the sound exercise of his or her professional judgment arguably might have decided to forgo the filing of a motion to dismiss the indictment as largely ineffective, an imprudent use of limited resources, or even unwarranted gamesmanship." *United States v. Rushin*, 642 F.3d 1299, 1308 (10th Cir. 2011). Here, counsel appropriately decided that a speedy-trial motion was not a good use of resources because its merits were uncertain and because it was unlikely that any dismissal would have been with prejudice. Resp. Ex. 1 at 3-4; Resp. Ex. 2 at 3. *See also United States v. Abdush-Shakur*, 465 F.3d 458, 462 (10th Cir. 2006) ("A violation of the speedy trial requirement, by itself, is not a sufficient basis for dismissal with prejudice."). Counsel's assessment was reasonable given the lack of egregious government conduct, the government's assertions that it was ready for trial, *see* Doc. 168 & Tr. 7/7/13 at 38, and the Channons' own repeated requests for continuances.[13] Further, reindictment within six months would have prevent any statute-of-limitations problem. *See Rushin*, 642 F.3d at 1304 (citing 18 U.S.C. § 3288).

## Ground Sixteen (Motion at 28-29)

The Channons complain under Ground Sixteen that counsel failed to pursue a discovery dispute. On January 28, 2014, the Channons, in a motion filed by Amy Sirignano, jointly moved to compel various categories of discovery. Doc. 57. The United States responded in detail, explaining its compliance with its obligations. Doc. 82. Relevant to the Channons' current claim, the United States stated that it did not possess the several categories of requested OfficeMax materials. *Id*. at 8. It pointed out that Rule 16 does not extend to materials in the

---

[13] The Court will recall that as part of Ground Eight, the Channons contend that counsel should in fact have sought *another* continuance.

hands of private third parties such as OfficeMax. *Id.* at 8-9. Several months later, the Court referred the discovery dispute to United States Magistrate Judge Khalsa; after a court-ordered meeting, *see* Doc. 133, the parties told Judge Khalsa that the remaining issues had been resolved, *see* Doc. 135, and the Channons thereafter withdrew the motion, *see* Doc. 140.

The Channons now fault counsel for withdrawing the discovery demands, claiming that Robert offered "no upside" to the move and merely stated "we weren't going to get it" and that they needed to "move on to a different issue." Motion at 28. Although the Channons may find it unsatisfying, this explanation makes perfect sense. The motion was futile (*i.e.* they "weren't going to get it"), and pursuing it would waste time that could be better spent elsewhere (*i.e.* on "a different issue"). Withdrawing it was sound strategy. Resp. Ex. 1 at 4; Resp. Ex. 2 at 3.

The Channons also believe that counsel should have subpoenaed OfficeMax directly for the company's "financial records" before trial, a course later pursued before sentencing. Doc. 354. Counsel made reasonable strategic decisions not to do that. Resp. Ex. 1 at 4; Resp. Ex. 2 at 3. The Channons, further, have neither alleged nor established how such financial data would have helped their trial defense. The records they received didn't even help them at sentencing because the records showed, as OfficeMax had consistently maintained, that the cartridge recycling program was a loss leader. *See* Doc. 368 at 1-5, 16-17; Sent'g Tr. 9/8/16 at 27; 10/20/16 at 49, 54.

### Ground Seventeen (Motion at 29-31)

Here again the Channons raise the theory that their evasion of the recycling-program limits was a financial boon to OfficeMax. The proposition is both factually unsupportable and legally irrelevant. *Welch*, 327 F.3d at 1104 (10th Cir. 2003) (intent to inflict economic harm is

not an element of wire fraud). And even if OfficeMax, contrary to fact and reason, made money by paying the Channons $3 in rewards for cartridges worth far less, Trial Tr. 1194, the Channons have never explained how OfficeMax could have profited from the core of their scheme, the online adjustments.

The Channons also criticize counsel's choice not to call witnesses at trial. It isn't clear whether this alleged failure pertains to the Channons' theory of recycling profitability or something else, but the Channons have failed to point to any relevant, admissible testimony these witnesses would have offered. That deficiency is fatal. *See United States v. Ndiaye*, 318 F. App'x 621, 624 (10th Cir. 2008) (affirming denial of ineffective-assistance claim where defendant failed to present an affidavit demonstrating what helpful testimony the witness would have given); *United States v. Cudjoe*, 536 F. App'x 801, 804 (10th Cir. 2013) (affirming denial of insufficient-investigation claim where defendant "failed to describe what new exculpatory evidence or helpful law would have been discovered through additional factual and legal research"). Further, the attorneys made defensible tactical decisions not to call the witnesses that the Channons suggested. Resp. Ex. 1 at 4-5; Resp. Ex. 2 at 1.

The Channons additionally complain that counsel failed to challenge the government's claim that Rule 615 allowed Sam Baca, its retained witness in forensic accounting, to remain in the courtroom during their expert's *Daubert* hearing testimony. Rule 615(b) in fact exempts from exclusion an "employee of a party that is not a natural person," which is intended to cover both investigative case agents and "expert[s] needed to advise counsel in the management of the litigation." Fed. R. Evid. 615 adv. committee notes. Further, "it is within the sound discretion of the court to permit an expert witness to remain in the court room while other witnesses are

testifying." *Lewis v. Owen*, 395 F.2d 537, 541 (10th Cir. 1968). Counsel did not err by not

accusing the government of "perfidy," nor could any error have conceivably prejudiced the

Channons (especially given that Baca never testified).

### Ground Eighteen (Motion at 31-35)

The first identifiable allegation of error in the mishmash of complaints under Ground

Eighteen is that counsel failed to draw the jury's attention to various alleged "inconsistencies" in

OfficeMax's data. They claim that it purportedly showed them in the impossible feat of

conducting transactions near in time in disparate far-flung locations. But as discussed earlier, the

government never alleged that the Channons acted entirely alone or even that they always

traveled together. Attempting to suggest that they could not have been responsible for every

single transaction would merely have invited the evidence that the Channons had taught others to

do the same thing. Resp. Ex. 1 at 5. More fundamentally, Robert made a strategically sound

decision not to nitpick the facts, and Hotchkiss made a strategically sound decision not to draw

attention to Brandi. The Channons also contend that counsel should have used the "hidden"

spreadsheet data to argue that some of the Group 2 accounts had been created when they were on

an airplane or were conducting in-store transactions, evidence that they believed was

exculpatory. Counsel reasonably thought such evidence would instead provide damning support

for the government's suggestion that the Channons had used a computer program to automate the

account enrollments. Resp. Ex. 1 at 5-6; Resp. Ex. 2 at 3.

The Channons next fault counsel for not making a snappy "retort" at a pretrial hearing to

the prosecutor's accurate statement that the defense had never pointed to any error in the

summary exhibits (as in, any error in reducing the spreadsheet data to the summary). The Channons now claim that such errors were "legion," but they again fail to point to any.

It is unclear what relevance the Channons ascribe to the manual in-store enrollment of the Group 1 accounts, given that none of these account enrollments were charged as substantive wire-fraud counts.

The Channons also question counsel's decision not to challenge the attribution to them of the deleted spreadsheet files found on a computer at their house. As Robert's affidavit explains, he expected that the government could easily rebut any such challenge. Resp. Ex. 1 at 6. Refraining from mounting a weak argument is good strategy. Likewise, had defense counsel suggested, as the Channons wish, that the government's failure to locate their computer program means that none could have existed, the government would have had an easy rebuttal because the Group 2 spreadsheets had been fortuitously discovered in *deleted* space on one of the Channons' computers. In any event, use of a computer program may have explained *how* the Channons executed their scheme, but it was not a legal requirement for such scheme. That challenge would therefore have been both doomed and pointless.

Last under Ground Eighteen, the Channons express disappointment that counsel did not make various points to show that they were not "sneaking around." But defense counsel did in fact argue that the Channons were not being deceptive. In closing, Robert argued that Matthew lacked the intent to defraud because he simply was trying to outsmart OfficeMax. He pointed out that the OfficeMax clerks in the videos seemed untroubled by the Channons and made no attempt to verify their compliance with program rules. *Id*. at 1589-90. "[T]hat tells him something about how the company perceives what he's doing" Robert said. "And it informs his

intent. He's not intending to defraud or cheat or deceive anybody if the program is administered in a way that makes it look to him like they don't really care." *Id.* at 1590. Robert also argued that "Matt didn't hide. . . . His face was all over the cameras. . . . [H]e used his own cards — a credit card, a debit card — easily traceable back to Matt Channon." *Id.* at 1603. Counsel decided that this argument would be more effective than calling OfficeMax clerks to testify at trial. Resp. Ex. 1 at 5. And finally, contrary to the Channons' suggestion, it was indisputably against their interests to emphasize Matthew's partial admission to the scheme in an attempt to suggest that he wasn't being deceptive, when the obvious rejoinder would be that his *denial* of the more egregious parts of the scheme highlighted his awareness of its fraudulent nature.

### Ground Nineteen (Motion at 35-36)

The Channons next complain that counsel should have raised on appeal the Court's handling of their trial objections to leading questions. This claim fails for several reasons. First, contrary to the Channons' contention, the Court effectively sustained most of the objections they cite. Trial Tr. 355, 504, 654, 1384. Second, quibbling about the Court's handling of leading questions is bad appellate strategy. For one, a district court has ample authority to allow leading questions. *United States v. Olivo*, 69 F.3d 1057, 1065 (10th Cir. 1995) ("Rule 611(c) governs leading questions; it vests broad discretion in the trial judge."). This is particularly true when the questions pertain to foundational matters, as the prosecutor stated and the Court agreed. Trial Tr. 514-15; *see* 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 611.06[2][b] (2d ed. 2006) ("Leading questions on direct examination will more quickly get the witness over preliminary matters. Often, leading questions are asked on preliminary and collateral matters to expedite the trial.") (quoted in *Saurini v. Adams Cty. Sch. Dist. No. 12*, 191

F. App'x 628, 639 (10th Cir. 2006)). And in the exceedingly unlikely event that the Tenth

Circuit found an abuse of discretion, the error would have been subject to a harmlessness review,

which the Channons could not have surpassed. Finally, "[e]xperienced advocates since time

beyond memory have emphasized the importance of winnowing out weaker arguments on appeal

and focusing on one central issue if possible, or at most on a few key issues." *Jones v. Barnes*,

463 U.S. 745, 751–52 (1983). An appellate attorney is therefore not required to "raise every

nonfrivolous issue requested by the client." *Id*. at 750.

For the same reason, the Channons' next allegation also fails. They complain that

counsel did not argue on appeal that the Court improperly limited their cross-examination about

the hidden spreadsheets, suggesting that the Court should have allowed this to go "to weight, not

admissibility." Counsel acted well within the bounds of professional norms (and indeed, in

accordance with best practices) in focusing the appeal on the threshold question of admissibility,

not weight, of the government's core evidence. Further, the Channons could not have

established on appeal that the Court's ruling harmed them because they were later allowed to

elicit the information about the hidden tabs, *see* Trial Tr. 1471, which they used in closing

argument, *id*. at 1606.

### Ground Twenty (Motion at 36)

The Channons allege that some jurors fell asleep for portions of the trial and that counsel

should have brought the matter to the Court's attention. They relay that counsel declined to do

so, explaining that "a sleeping juror is a friendly juror." In other words, counsel made a tactical

choice. *See also* Resp. Ex. 1 at 6 (Robert did not notice jurors sleeping and it would not have

been his strategy to object); Resp. Ex. 2 at 4 (same as to Hotchkiss). That choice does not

constitute ineffective assistance. *Ciaprazi v. Senkowski*, 151 F. App'x 62, 63 (2d Cir. 2005) (desire to retain sleeping juror was "paradigmatically strategic"); *Lamar v. Graves*, 326 F.3d 983, 986 (8th Cir. 2003). And given the strength of the evidence against them, the Channons cannot demonstrate prejudice from the jurors' alleged inattentiveness or counsel's handling of it.

### Ground Twenty-One (Motion at 36-39)

Under this Ground, the Channons contend that counsel ineffectively failed to object to various aspects of the government's Rule 29 argument and closing argument. At bottom, this claim lacks merit because none of the remarks were improper. The prosecutor did not "testify," and the jury was properly instructed that the closing statements were not evidence. Trial Tr. 1538. It is permissible for a prosecutor to draw inferences from the record, *Hooper v. Mullin*, 314 F.3d 1162, 1172 (10th Cir. 2002), as the prosecutor did from the videos; the jury had received the evidence necessary to evaluate the inferences' validity. It is not inflammatory for a prosecutor to refer to defendants in a conspiracy case as "partners in crime," *id*. at 1551, 1572, nor to suggest that defendants on trial for fraud have lied, *id*. at 1552. Those remarks went to the elements of the crime. Nor is it "vouching" to say that evidence corroborates a witness's statement. *Id*. at 1635. There is nothing wrong with rhetorical questions (none of which, contrary to Matthew's suggestion, were posed *to him*). *Id*. at 1645-46. The word "imagination" is not verboten in closing; saying "it doesn't take much imagination" to know what the Channons were doing during their travel is simply presenting the inference as intuitive. Referring to concessions made by the defense at the outset of the case does not constitute burden shifting. *Id*. at 1554. Pointing out that OfficeMax, the victim, had been deceived by the Channons' fraud is not "festooning [it] with the jury's sympathy," and further, any "festooning" was in response to

defense counsel's characterization of the case as "corporate America" "losing at its own game," "cry[ing] foul," and "enlist[ing] the federal government for help." *Id*. at 295. The prosecutor accurately referred to Gardner's testimony about OfficeMax's potential losses from the scheme. *Id*. at 530, 898. Finally, it is unclear what the Channons find inflammatory about using a photograph of them as background to the concluding remark that "the picture is complete." *Id*. at 1647; Tr. Ex. 149 at 4.

Even if any portion of the argument was improper, however, counsel reasonably chose not to object. Resp. Ex. 1 at 6; Resp. Ex. 2 at 4. Indeed, it is reasonable strategy not to draw further attention to a purportedly objectionable statement. *Priest v. Marr*, 182 F.3d 932 (10th Cir. 1999) (unpublished); *Schauer v. McKee*, 401 F. App'x 97, 101 (6th Cir. 2010) ("[N]ot drawing attention to [a] statement may be perfectly sound from a tactical standpoint."). Finally, the Channons cannot establish that objecting to any or all of the disputed remarks would have changed the outcome of their trial.

## IV.    Conclusion

In sum, the Channons were charged in a legally sufficient indictment. The evidence at trial overwhelmingly established that they committed the acts charged. Their attorneys subjected the case to thorough adversarial testing, and none of the Channons' claims establish that counsel's performance fell short or call the result of the proceeding into question. Their motions and the record conclusively establish that they are not entitled to relief under 28 U.S.C. § 2255. For these reasons, the Court should deny their motions without a hearing.

Respectfully submitted,

JOHN C. ANDERSON
United States Attorney

/s
C. PAIGE MESSEC
Assistant U.S. Attorney
201 Third St. NW, Suite 900
Albuquerque, NM 87102
(505) 224-1501
(505) 246-7296 fax

## CERTIFICATE OF SERVICE

I certify that a copy of this pleading was sent on June 20, 2019, by first-class mail to movant Brandi Channon at her address of record.

/s
C. Paige Messec